Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

Attorneys for Defendants Lamb and Gibson

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| ALLISON OBREGON, an individual; ALLISON OBREGON on behalf of and as legal guardian and parent of her minor child, MC; ALLISON OBREGON as pending personal representative of THE ESTATE OF MICHEAL OBREGON; MEAGAN BRADY, individually; MEAGAN BRADY on behalf of and as legal guardian and parent of her minor child, MB;<br><br>Plaintiffs,<br><br>v.<br><br>MARK LAMB and JANE DOE LAMB, husband and wife; BRADY GIBSON and JANE DOE GIBSON, husband and wife; JOHN AND JANE DOES 1-X,<br><br>Defendants. | NO. 2:24-cv-01510-DJH<br><br>**DEFENDANTS LAMB AND GIBSON'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT[1]** |

In this officer-involved shooting, Plaintiff Allison Obregon brings claims against Deputy Brady Gibson and Sheriff Mark Lamb related to the death of her husband. Nearly every claim she brings fails as a matter of law. Her survival actions fail for lack of recoverable damages, and her claims for negligent use of intentional force fail under Arizona law. Her Fourth Amendment claim against Sheriff Lamb fails because he did not use force and 42 U.S.C. § 1983 does not allow claims of vicarious liability.

---

[1] Defendants attempted to confer with Plaintiffs' counsel through multiple emails outlining the arguments to be raised in this Motion, but did not receive a substantive response.

The other two plaintiffs in this case—Meagan Brady and her daughter, MB, who lived at the property where the shooting occurred, *but did not witness it and are not related to the decedent*—bring claims for negligent infliction of emotional distress and intentional infliction of emotional distress, respectively. MB's claim for intentional infliction of emotional distress falls far short of the high bar necessary to plead such a claim, particularly when viewed in connection with the body-worn camera that reflects MB's actions after the shooting. Meagan Brady's claim is essentially a bystander-of-a-bystander claim; she alleges that she experienced distress after witnessing her daughter's distress. This claim fails because Meagan Brady did not witness a physical injury to another and because she was not in a zone of danger.

Pursuant to Rule 12(b)(6), and for the reasons stated below, the Court should dismiss Counts I, III, IV, V, and VI in their entirety, and should dismiss Count II (Fourth Amendment excessive force) against Sheriff Lamb.

**I.    FACTS**

**A.    The Shooting of Michael Obregon**

Plaintiff Allison Obregon, on behalf of herself, her minor daughter, and the decedent's estate, brings claims against Deputy Brady Gibson and Sheriff Mark Lamb related to the death of her husband, Michael Obregon ("Obregon"). She alleges that on March 16, 2023, Deputy Gibson conducted a stop of Obregon, who then decided to run from Gibson. (Doc. 1-2 ¶¶ 14-15, 22.) Plaintiff alleges that Gibson fired at Obregon while his back was turned, and then fired additional shots while Obregon was on the ground. *Id.* ¶¶ 23-24 26-29. Gibson later told detectives that he only fired after Obregon pointed a weapon at him. *Id.* ¶ 77. PCSO personnel found a pistol on the ground several feet from Obregon's body. *Id.* ¶ 71.

**B.    The Involvement of Meagan Brady and MB**

The other plaintiffs in this case are Meagan Brady and her minor daughter, MB, who both lived on the property where the shooting occurred. According to the Complaint, "MB knew Michael, who was a family friend, very well." *Id.* ¶ 35. She heard gunshots and ran

outside, where she observed Gibson "standing over Michael in an apparent frozen state." *Id.* ¶¶ 37-38. Gibson went to his patrol vehicle, "leaving MB with the responsibility of rolling Michael over onto his back and trying to revive him." *Id.* ¶ 44. She alleges that Gibson ordered her to stand next to Michael, forcing her to watch "her friend" die in front of her. *Id.* ¶¶ 46-47. She alleges that Gibson and other PCSO personnel "forced MB to stand near the feet of Michael's dead body for hours while an investigation took place." *Id.* ¶ 49. She claims that she "tried desperately to leave the scene and pleaded with the Defendants to move her to another location to be with her mother." *Id.* ¶ 51. MB's mother, Meagan Brady, alleges that she was "forced to stand on the sidelines with no ability to comfort, console, or otherwise provide support to MB as Defendants refused any plea or request to rejoin the family members." *Id.* ¶ 60.

The body-worn camera footage of the Casa Grande Police Department ("CGPD) paints a drastically different picture.[2] Officer Fox was the first officer on scene; when he arrived, only Deputy Gibson (in a tan uniform) and a male civilian were standing over the body. (Ex. 1, Fox BWC at 0:31.) MB is not visible, and was certainly not "near the feet of Michael's dead body." *Id.*; Doc. 1-2 ¶ 49. Deputy Gibson said, "I got chest seals and stuff. I'm rendering aid. I just need an ambulance for him." (Ex. 1 at 0:42.) A male civilian and female were also standing nearby. *Id.* at 0:33. They identified themselves as Obregon's brother and his wife. *Id.* at 0:50-55. Officer Fox spoke with them, told them to stay back, and led them away from the crime scene. *Id.* at 0:55-1:45. Then, a young woman in a black tank top and white pants approached. *Id.* at 1:46. The young woman later identified herself as MB. (Ex. 3, Rush BWC at 5:49.)

MB led the older man and woman down the road and away from the house to talk to them. (Ex. 1, Fox BWC at 2:13.) No one tried to stop her or follow her. *Id.* Officer Fox returned to Obregon's body and assisted in rendering aid. *Id.* at 3:00. His camera then

---

[2] While Defendants cite to specific portions of the BWC, the exhibits contain the complete footage to give the Court (and the Plaintiffs) the complete picture of what occurred with MB after the shooting.

1 captured MB walking back toward the scene—again, without being escorted or compelled. *Id.* at 3:22-3:32. Officer Fox told her, "Just stay back there," but MB argues, "I live here." *Id.* at 3:30-35. For the next ten minutes, Officer Fox, along with other members of law enforcement and EMS, worked to save Obregon's life. *Id.* at 4:00-13:56. MB is not visible on camera, much less standing at Obregon's feet. *Id.* Rather, she was standing a distance away from the body, behind caution tape. *Id.* at 14:05.

Officer Reed—the second responding officer—had a lengthy interaction with MB while she was standing behind the caution tape. (Ex. 2, Reed BWC at 20:00-32:31.) She never asked to move away from the scene or expressed any distress at being near Obregon's body. *Id.* She stood calmly, close to the caution tape, watching the life-saving efforts on Obregon. *Id.* at 20:25. Rather than asking to move away, she was adamant that she should be allowed to cross through the crime scene to enter her yard and her house. *Id.* She said, "Can I be let in my fucking yard now? It's been a long ass time." *Id.* at 23:52. Officer Reed calmly and patiently explained that she could not go in the yard, and if she crossed the caution tape, she would go to jail. *Id.* at 24:00. She responded, "It's my property. I have nothing to do with this. I should have the right to go in my damn yard." *Id.* at 24:22. Another officer explained, "this is a crime scene. So no, you're not going to go in the yard. And if I have to—let me finish—I will remove you even from being in this area." *Id.* at 24:40. MB expressed no desire to be removed from the area. Her demands to enter the yard continued unabated. *See id.* at 30:00.

Perhaps the most informative body worn camera is that of Sgt. Rush. (Ex. 3.) When he arrived at the scene, EMS was providing aid to Obregon, and MB was standing behind the caution tape, with no officer nearby. *Id.* at 1:55. The footage shows that there was nothing preventing her from turning around and walking down the road, toward the ambulance. *Id.* at 2:05. Rather than doing that, MB (who is on the phone) said, "I need to get in my yard. He said I am not allowed to cross because it is a crime scene and I don't understand why I can't go that way and into my other gate." *Id.* at 2:05-11.

During this interaction, MB also provided Sgt. Rush with information about the incident. She clearly stated that she does **not** know who the decedent was. *Id.* at 7:00-30. She clarified that she did not witness anything, but rather was inside and heard shots, and then ran outside. *Id.* at 8:45. Recounting her interaction with Deputy Gibson, she said, "And he was like, 'he pulled out a gun so I had to react,' and I was like, "Obviously.' And then I was just like, 'well just make sure he is ok, I can't have this man die in my freaking yard.'" *Id.* at 8:50-9:20. At another point, MB can be heard on her cell phone recounting that she told Gibson to cut Obregon's clothes off and "make sure he's alright," and Gibson, "was doing that." *Id.* at 4:30. She complained on the phone that she was not being allowed in the yard. *Id.* at 5:00.

Around 40 minutes after Officer Fox—the first responding officer—arrived, he said, "sounds like homeowner mom just got on scene. She's on her way up." (Ex. 1, Fox BWC at 41:30.) A PCSO deputy notes, "Mom is down here," and points down the road to his right. *Id.* at 46:11. A little over an hour after Officer Fox arrived, a deputy walked MB down the road towards the area where her mother was. *Id.* at 1:07:30. MB was not, as she now claims, forced to "stare at Michael's dead body for hours." Doc. 1-2 ¶ 50.

## II.     LEGAL STANDARDS

### A.     Motions to Dismiss

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility is more than a "sheer possibility that a defendant has acted unlawfully." *Id.* If the allegations in a complaint "are so general that they encompass a wide swath of conduct, much of it innocent," then they are not plausible. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). In reviewing a Rule 12(b)(6) motion, a court need not accept as true "conclusory statements" or "legal conclusions," *Iqbal*, 556 U.S. at 678, nor must it draw "unreasonable inferences" or "unwarranted deductions of fact," *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

**B.     The Court May Consider Defendants' Exhibits**

In ruling on this Motion to Dismiss, the Court should consider the body-worn camera footage of Officer Fox, Sgt. Rush, and Officer Reed, three CGPD employees who arrived at the scene and directly captured the events that underlie MB's and Meagan's claims. *See* Exhibits 1-3. The Ninth Circuit has upheld the district court's consideration of body camera footage when ruling on a motion to dismiss, specifically noting that the lower court acts within its discretion when it rejected plaintiff's conclusory allegations that contradicted the video evidence. *J. K. J. v. City of San Diego*, No. 20-55622, 2021 U.S. App. LEXIS 33778, at *13 (9th Cir. Nov. 15, 2021). Such is the case here. Likewise, courts in this district will also consider body camera footage without converting a Rule 12 Motion to a Rule 56 Motion. *See also Mayfield v. City of Mesa*, No. CV-22-02205-PHX-JAT, 2023 U.S. Dist. LEXIS 191351, at *14 (D. Ariz. Oct. 25, 2023) (considering body camera footage at the Rule 12 stage because it was quoted in the plaintiff's complaint and thus incorporated by reference); *Muhaymin v. City of Phx.,* No. CV-17-04565-PHX-SMB, 2019 U.S. Dist. LEXIS 26819, at *9 (D. Ariz. Feb. 20, 2019) (same).

**III.    PLAINTIFF OBREGON'S SURVIVAL ACTIONS FAIL**

Plaintiff Alison Obregon brings survival actions under A.R.S. § 14-3110 in Count I ("Wrongful Death and Survival Action") and Count IV ("Battery and Survival Action"). Count III, while simply titled "Gross Negligence," also appears to be a survival action. *See* Doc. 1-2 ¶ 116 (setting forth the alleged damages of Obregon, only). The survival actions allege that "Michael suffered an untimely and preventable death and lost the ability to provide for his wife and child." *See* Doc. 1-2 ¶ 85. *See also* Doc. 1-2 ¶ 116 ("Michael sustained severe and permanent injuries, suffered extreme pain and suffering, lost the ability to have and maintain meaningful familial relationships, lost the ability to provide for his wife and child, and lost his life.") Any survival action fails here because the damages alleged are not recoverable under law.

Arizona's survival statute (A.R.S. § 14-3110) excludes damages for pain and suffering of the decedent, stating "Every cause of action . . . shall survive the death of the

person entitled thereto or liable therefor, and may be asserted by or against the personal representatives of such person, ***provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed***." Case law has extended the statute to exclude damages for loss of enjoyment of life (hedonic damages). *See Quintero v. Rodgers*, 221 Ariz. 536, 539, 212 P.3d 874 (App. 2009) ("Therefore, we find A.R.S. § 14-3110 does not allow Quintero to recover damages for Soto's loss of enjoyment of life resulting from Rodgers' negligence.") The single category of damages left—economic loss damages—are only available if they were sustained from the time of the incident until the decedent's death. *Rodriguez v. Lytle*, No. 1 CA-CV 20-0048, 2021 Ariz. App. Unpub. LEXIS 174, at *6 (App. Feb. 16, 2021). Here, where Mr. Obregon died on the scene, there cannot be any economic loss damages. Because Plaintiff Obregon has not pled any recoverable damages under A.R.S. § 14-3110, the survival action claims fail.

### IV. ARIZONA LAW BARS NEGLIGENCE CLAIMS ARISING OUT OF INTENTIONAL USES OF FORCE

Count I ("Wrongful Death and Survival") and Count III ("Gross Negligence") further fail under well-established Arizona Supreme Court precedent barring claims for negligent use of intentional force. *See Ryan v. Napier*, 425 P.3d 230 (Ariz. 2018). In *Ryan*, the Court decisively rejected the concept of a negligent use of intentional force, noting that "negligence and intent are mutually exclusive grounds for liability," and holding that "negligent use of intentionally inflicted force" is not a cognizable claim. *Id.* at 236. The Court preserved negligence claims only where the facts suggest that the defendant did not act intentionally; for example, an officer who accidentally dropped a police dog's leash, which led to a bite, rather than an officer who intentionally deployed a police dog. *Id.* at 238. The Court further held that there can be no negligence claim related to "a law enforcement officer's 'evaluation' of whether to intentionally use force against another person." *Id.* at 236. Courts in this district have repeatedly relied on *Ryan* to dismiss negligence claims arising out of police use of force. *See Davis v. City of Glendale*, 2023

U.S. Dist. LEXIS 145672 (D. Ariz. August 18, 2023) (granting motion to dismiss claims of negligent use of force and negligent evaluation of the use of force where officers shot the decedent); *Nees v. City of Phoenix*, 2022 U.S. Dist. LEXIS 232650 (D. Ariz. Dec. 28, 2022) (noting that "Arizona law does not allow recovery for negligence if liability is based upon an intentional act" and dismissing bystander claim relating to an officer involved shooting); *Harris v. City of Phoenix,* 2021 U.S. Dist. LEXIS 204452 (D. Ariz. October 22, 2021) (holding that the City could not be vicariously liable for an Officer's shooting of a decedent).

Here, Count I and Count III are based on Deputy Gibson's intentional use of deadly force. Therefore, both fail to state a claim.

## V. SHERIFF LAMB CANNOT BE LIABLE ON PLAINTIFF OBREGON'S BATTERY CLAIM

Count IV is a "Battery and Survival Action" against both Deputy Gibson and Sheriff Lamb. As discussed above, any survival action fails. But even if Plaintiff were to restyle this claim, Sheriff Lamb cannot be vicariously liable for battery under state law.

A.R.S. § 12-820.05(B) immunizes a public entity from liability for losses "that arise out of and are directly attributable to an act or omission determined by a court to be a criminal felony by a public employee unless the public entity knew of the public employee's propensity for that action." It immunizes the public entity from vicarious and direct liability claims arising out of a particular "loss." *Gallagher v. Tucson Unified Sch. Dist.*, 349 P.3d 228, 231, ¶ 11 (Ariz. App. 2015).

The law does not require a prior determination that the defendant committed a criminal felony. *Fernandez v. City of Phoenix*, No. CV 11-02001-PHX-FJM, 2012 WL 2343621, 2012 U.S. Dist. LEXIS 85268 at *10 (D. Ariz. June 20, 2012). For Section 12-820.05(B) purposes, the inquiry focuses on what the plaintiff alleged the defendant did, and whether, as pled, those actions constitute a criminal felony. Thus, this Court may assess whether the allegations in the Complaint constitute a "criminal felony" under Arizona law; a prior judicial determination is not required. *McGrath v. Scott*, 250 F. Supp. 2d 1218, 1234

1  (D. Ariz. 2003) ("[T]he Court finds that the Arizona Supreme Court would follow the
2  reasoning of Judge Fidel, and allow A.R.S. § 12-820.05(B) to apply despite the lack of a
3  prior criminal court finding that Scott's action constituted a felony."), citing *State v. Heinze*,
4  993 P.2d 1090, 1094-95 (Ariz. App. 1999) (determining an identically worded
5  indemnification statute, A.R.S. § 41-621(K)(1), does not require a prior criminal court
6  determination that the employee committed a felony).

7  The Complaint alleges that Deputy Gibson shot Obregon without justification or
8  cause. Viewing the allegations of the Complaint in the light most favorable to the
9  nonmoving party, Plaintiff Obregon alleges that he committed, at minimum, felony
10 aggravated assault under A.R.S. § 13-1203 and A.R.S. § 13-1204(A)(2). Given this, under
11 A.R.S. § 12-820.05(B), Sheriff Lamb can only be liable for Deputy Gibson's actions if he
12 "knew of [Deputy Gibson's] propensity for that action." *See also Ryan*, 425 P.3d at 237, ¶
13 24; *Harris*, 2021 U.S. Dist. LEXIS at *3-4 ("[A] municipality cannot be held liable for its
14 employee's intentional use of force unless it actually knows of the employee's propensity
15 to commit that particular act.") (citing *Tucson Unified Sch. Dist. v. Borek*, 322 P.3d 181,
16 184, ¶ 8 (Ariz. App. 2014)). Here, the Complaint does not plead any facts that would show
17 Deputy Gibson had a propensity for felony aggravated assault. It certainly pleads no facts
18 that Sheriff Lamb knew of any such propensity. By failing to plead these facts, Plaintiff
19 Obregon has doomed any vicarious liability claim against the Sheriff arising out of battery.

20 **VI.   THE FOURTH AMENDMENT CLAIM (COUNT II) FAILS AS TO SHERIFF
21        LAMB**

22 The Complaint brings this claim against "All Defendants," which would include
23 Sheriff Lamb. The Sheriff, however, did not use any force, and Section 1983 does not allow
24 vicarious liability. *See Hansen v. Black*, 885 F.2d 642, 645-46 (9th Cir. 1989) ("Under
25 Section 1983, supervisory officials are not liable for actions of subordinates on any theory
26 of vicarious liability.") Sheriff Lamb should be dismissed from this claim.

27 "Liability under section 1983 arises only upon a showing of personal participation
28 by the defendant." *See Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Not only must

9

plaintiff alleges that they suffered a specific injury as a result of the conduct of a particular defendant, they must also allege an affirmative link between the injury and the conduct of that Defendant. *Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976). Moreover, under *Torres v. Madrid*, 141 S. Ct. 989 (2021), a seizure for Fourth Amendment purposes requires "the application of physical force to the body of a person with intent to restrain." *Id.* at 1003. Actual contact is necessary for a seizure to occur. *Id.* at 999-1000. If there is no contact, then there is no seizure.[3] Because Plaintiff Obregon does not and cannot allege that Sheriff Lamb used any force against Obregon, this claim fails as to him.

## VII. MB'S INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM (COUNT V) FAILS

MB's IIED claim is based on the premise that MB suffered mental anguish "as a result of seeing Michael get shot multiple times and then being forced [to] remain with Michael's body while he bled to death and for hours thereafter." Doc. 1-2 ¶ 58. The BWC proves that this is false. And according to the U.S. Supreme Court, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007). The same is true for this Motion to Dismiss.

Here, MB told officers that she did not know Obregon. (Ex. 2, Rush BWC at 7:00-30.) She did not see the shooting. *Id.* at 8:45. She was not forced to stand by Obregon's body, much less "for hours." Rather, she left the scene, willingly came back, and stood at the edge of the caution tape, demanding to be allowed to enter her yard and house.

Recovery for IIED is only permitted where: (1) the conduct by the defendant is "extreme" and "outrageous," (2) the defendants either intend to cause emotional distress or

---

[3] The only exception to the contact rule is where the suspect voluntarily submits to a show of authority. *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority") (emphasis in original)). Plaintiff does not allege that here.

10

recklessly disregard the near certainty that such distress will result from the conduct; and (3) severe emotional distress results from the defendant's conduct. *See Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580 (1987). According to the Restatement (Second) of Torts S 46 cmt. D:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, **"Outrageous!"**

(emphasis added)

The facts pled in this case do not rise to the level needed to meet any of the three prongs set forth in *Ford*—particularly when viewed in light of the body-worn camera footage.

## VIII. MEAGAN BRADY'S NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS CLAIM (COUNT VI) FAILS

The NIED claim is based on the premise that "Meagan was forced to helplessly stand by and was not allowed to comfort, console, or provide any other means of support to her daughter." Doc. 1-2 ¶ 144. It is, essentially, a "bystander-of-a-bystander" claim, and it fails as a matter of law.

"The tort of negligent infliction of emotional distress requires a showing that the plaintiff witnessed an injury to a closely related person, suffered mental anguish manifested as physical injury, and was within the zone of danger so as to be subjected to an unreasonable risk of bodily harm created by the defendant." *Rodriguez v. Fox News Network, L.L.C.*, 238 Ariz. 36, 39, 356 P.3d 322, 325 (Ct. App. 2015)

Ms. Brady's claim fails at every turn. She is not closely related to Obregon and did not witness his death. She did not witness *an injury* to MB. She was never in any "zone of danger" such that she was "subjected to an unreasonable risk of bodily created by [Defendant Gibson]." Her NIED claim fails.

11

## IX. PLAINTIFFS CANNOT RECOVER PUNITIVE DAMAGES ON THEIR STATE LAW CLAIMS

Plaintiffs seek punitive damages as part of their state law claims. *See* Doc. 1-2 ¶¶ 88, 133, 146. Pursuant to A.R.S. §12-820.04, however, punitive damages are not recoverable against a public entity or employee acting in the course and scope of employment. These claims for punitive damages should be dismissed as a matter of law.

## X. PLAINTIFFS IMPROPERLY NAME "DOE" DEFENDANTS

Plaintiffs name John and Jane Doe Defendants. Naming of "John Doe" defendants is inconsistent with Fed. R. Civ. P. 10(a) (requiring that a complaint name all parties) and could also violate Fed. R. Civ. P. 4(m) (mandating service of a complaint within 120 days of filing). *See also De Lamos v. Mastro*, 2010 U.S. Dist. LEXIS 108058, at *2 (D. Ariz. Sep. 17, 2010) ("The naming of 'John Doe' and 'X and Y Corporations' defendants is inconsistent with [the Federal Rules]"). The Court should dismiss all "Doe" Defendants.

## XI. CONCLUSION

For the reasons stated above, the Court should dismiss Counts I, III, IV, V, and VI in their entirety, and should dismiss Count II (Fourth Amendment excessive force) against Sheriff Lamb.

DATED this 30th day of July, 2024.

                                        WIENEKE LAW GROUP, PLC

By: */s/ Laura Van Buren*
      Kathleen L. Wieneke
      Laura Van Buren
      1225 West Washington Street, Suite 313
      Tempe, Arizona 85288
      *Attorneys for Defendants Lamb and Gibson*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 30, 2024, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

>Robert T. Mills
>Sean A. Woods
>MILLS + WOODS LAW, PLLC
>5055 North 12th Street, Suite 101
>Phoenix, Arizona 85014
>*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

>N/A

By:   */s/ Lauren Rasmussen*