Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
rmills@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon, on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon, as personal representative of The Estate of Micheal Obregon; Meagan Brady, on behalf of and as legal guardian and parent of her minor child, MB,<br><br>Plaintiffs,<br><br>vs.<br><br>Mark Lamb; and, Brady Gibson,<br><br>Defendants. | No.: CV-24-1510-PHX-KML<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>(Assigned to the Honorable Krissa M. Lanham) |

Plaintiffs ALLISON OBREGON ("Allison"), individually, as the widow and personal representative of the Estate of Micheal Obregon (the "Estate"), and as mother of the minor child ("MC") of Micheal Obregon; and, MEAGAN BRADY ("Meagan"), on behalf of and as legal guardian and parent of her minor child, MB; by and through their attorneys, Mills + Woods Law, PLLC, for her Complaint against Pinal County Sheriff MARK LAMB ("Lamb") and BRADY GIBSON ("Gibson"), hereby allege as follows:

///

## INTRODUCTION

Allison brings this action for the wrongful death and murder, and the violation of Constitutional rights of her husband Micheal Obregon ("Micheal"), at the hands of Pinal County Sheriff's Deputy Brady Gibson. Micheal was also the father of Allison's minor child MC. Allison brings this action on her own behalf, on behalf of MC and on behalf of the Estate of Micheal.

Meagan brings this action for the intentional infliction of emotional distress caused by Defendants to her daughter MB, as well as the negligent infliction of emotional distress sustained by having to listen to and watch her daughter be subjected to the emotional distress caused by Defendants.

## JURISDICTION AND VENUE

1. Pursuant to Article 6, Section 14 of the Arizona Constitution, this court has original subject matter jurisdiction in this Complaint because the claims relate to causes of action, the underlying acts and/or omissions for which, at all times relevant, have caused the events alleged herein to occur with primary effect in Maricopa County, Arizona.

**2.** Pursuant to 42 U.S.C. §1983 et seq., Plaintiffs bring certain claims in this action for violations of the United States Constitution, including without limitation the Eighth and Fourteenth Amendments and Arizona common and statutory laws, including A.R.S. §12-611, et seq.

3. The amount in controversy exceeds the minimal jurisdictional limits of this Court.

4. To the extent applicable, and without conceding that said statute applies, Plaintiffs have served their Notice of Claim upon Defendants in compliance with A.R.S. §12-821, *et seq*. More than sixty (60) days have expired since Plaintiffs served their Notice of Claim and Defendants have not responded in any manner to said Notice of Claim.

5. Venue is proper in that the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

## PARTIES

6. Plaintiff Allison Obregon ("Allison") is an adult resident of Pinal County, Arizona.

7. Allison is the widow of Micheal Obregon ("Micheal"), deceased.

8. Allison is the mother and guardian of a minor child ("MC") of Micheal.

9. On March 13, 2024, at the Superior Court of Pinal County, Arizona, Allison filed case number S1100PB202400145 to be Personal Representative of the Estate of Micheal (the "Estate").

10. Defendant MARK LAMB is, and at all relevant times was, the Sheriff of Pinal County and is sued in his official and individual capacity. He is tasked with oversight of the Pinal County Sheriff's Department and is responsible for all policies and procedures promulgated by the Pinal County Sheriff's Department, operating in his official and individual capacity in Pinal County.

11. Defendant BRADY GIBSON is, and at all relevant ties was, a Deputy Sheriff of the Pinal County Sheriff's Department.

## FACTUAL ALLEGATIONS

12. In the early evening of March 16, 2023, Micheal rode his red motorcycle to the home of a friend in Casa Grande, Arizona.

13. As Micheal rode onto the property where his friend's residence was located, Gibson pulled up to the property in his patrol vehicle and activated the vehicle's red and blue lights.

14. Gibson told Micheal to stop, and Micheal responded that he was not running.

15. Micheal and Gibson had encountered each other on several occasions in the past, and Gibson strongly disliked Micheal.

16. Micheal got off his motorcycle and said: "Oh hey Gibson."

3

17. Micheal and Gibson then conversed for several minutes while standing next to Gibson's patrol vehicle.

18. Micheal was not threatening Gibson in any way.

19. When Gibson asked to see Micheal's driver's license, Micheal complied. While doing so he dropped certain items from his wallet and bent down to pick them up before handing his driver's license to Gibson.

20. Again, Micheal made no threatening movements with respect to Gibson while recovering the dropped items.

21. After some further discussion, Micheal decided to run away from Gibson.

22. Micheal ran through the gate at the driveway of the property.

23. Gibson, who was determined not to let Micheal get away from him, pulled his lethal service weapon – a Glock 17 .9mm handgun – and began firing at Micheal, whose back was turned to Gibson.

24. Micheal fell to the ground face first and lay there in a prone position.

25. Gibson later stated that at that point, he actually approached Micheal and stood "atop of Micheal" as Micheal lay face down on the ground.

26. Gibson then fired even more shots at Micheal.

27. As Gibson shot Micheal numerous times, Micheal was not threatening Gibson in any way. In fact, Micheal was lying face down on the ground in such position that he could have been easily apprehended by Gibson.

28. Instead, Gibson shot Micheal several more times.

29. Multiple witnesses either saw the interaction or the immediate aftermath of the interaction, between Micheal and Gibson.

30. None of the witnesses saw Micheal with a weapon.

31. One witness MB, a minor, witnessed the interaction between Micheal and Gibson.

32. Micheal was shot in the front yard of the house then occupied by MB and at least one of her siblings.

4

33. MB heard the gunshots coming from the yard.

34. MB knew Micheal, who was a family friend, very well.

35. After Micheal had been shot multiple times by Gibson, MB ran outside to the place where Micheal was laying on the ground, bleeding to death.

36. She reported that Gibson was standing over Micheal in an apparent frozen state.

37. Gibson at that time was not performing life-saving measures to help Micheal.

38. Gibson told MB that he shot Micheal because Micheal pulled a gun on him.

39. MB looked around, but did not see a gun anywhere in the surrounding area.

40. MB confronted Gibson, asking where Micheal's alleged gun was.

41. Gibson did not respond.

42. MB insisted that Micheal needed medical help.

43. At that point Gibson walked away to his patrol vehicle, leaving MB with the responsibility of rolling Micheal over onto his back and trying to revive him.

44. When Gibson returned from his patrol vehicle with an emergency medical kit, he ordered MB to stand next to Micheal and not leave the scene for any reason.

45. Gibson thus forced MB to watch her friend die in front of her.

46. MB reported that as she stood there unable to leave Micheal was bleeding and gurgling blood.

47. MB watched Micheal breath his last breaths.

48. Gibson and other PCSO personnel then forced MB to stand near the feet of Micheal's dead body for hours while an investigation took place.

49. MB had to stare at Micheal's dead body for hours.

50. MB was terrified of the officers and deputies on scene after having watched her family friend die at the hands of Deputy Gibson.

51. This resulted in MB providing conflicting answers to law enforcement because she did not want to get in trouble and was fearful that if she told them of her family's relationship to Micheal, that something bad would happen to her.

5

52. MB tried desperately to leave the scene and pleaded with the Defendants to move her to another location so she could be with her mother.

53. Defendants refused and even engaged in verbal battles with MB.

54. MB in complete terror and shock became extremely angry and traded verbal attacks with Defendants.

55. MB was visibly shaken and upset by the callous and wanton nature of Defendants actions.

56. MB was not allowed to see or speak with her family members, including her parents.

57. MB called Meagan and Meagan listened to the horror that MB was subjected to.

58. PCSO likewise prohibited Meagan, who had come to the scene, to see, speak to or otherwise comfort MB.

59. MB suffered severe mental and emotional anguish, trauma and distress as a result of seeing Micheal get shot multiple times and then being forced remain with Micheal's body while he bled to death and for hours thereafter.

60. Defendants' conduct was especially outrageous and egregious because MB was a minor at the time.

61. Meagan suffered by being forced to stand on the sidelines with no ability to comfort, console, or otherwise provide support to MB as Defendants refused any plea or request to rejoin the family members.

62. As this case continues, more information may come to light as to additional defendants that prevented MB from leaving the scene, but at a bare minimum, the current Defendants controlled MB's and Meagan's movements.

63. Another witness upon information and belief observed the entire interaction between Gibson and Micheal and reported to Micheal's family that Micheal at no point brandished or otherwise held a weapon during the interaction. Gibson simply started firing at Micheal as Micheal was running away.

64. Other witnesses have reported that they saw Gibson stand directly over Micheal and state "I'll bet you're scared now." Gibson then shot Micheal two or three times in the torso.

65. Ring camera video ("Video") was recovered from a neighboring house that captured the encounter between Micheal and Gibson.

66. The Video is from a distance and not all events are visible. However, the Video clearly shows Micheal peacefully interacting with Gibson.

67. In fact, the Video shows Micheal providing his documents to Gibson upon request.

68. The Video begins at 6:33 p.m.

69. From 6:33:52, Micheal and Gibson are seen together having a discussion. Both Gibson and Micheal move around slightly. Gibson is shown going back to the driver's side door of his vehicle once or twice.

70. The Video shows that at 6:36:06 p.m., Micheal began to run away through the gate on the property. Gibson is shown following Micheal and moving the gate out of the way.

71. The Video then shows Gibson firing his lethal weapon at Micheal multiple times. Only seven of the ten shots fired by Gibson are shown on the video.

72. PCSO personnel reportedly "found" a Smith and Wesson pistol on the ground near the open gate several feet from Micheal's body but near the spot where Micheal began to run from Gibson. Investigators determined that no bullets were fired from that weapon.

73. Gibson fired ten bullets at Micheal.

74. According to the Medical Examiner's Report, Micheal suffered seven gunshot wounds of which the following five fragments were recovered:

-2673-10, Projectile fragment removed from the left thigh.

-2673-11, Projectile fragment removed from the right axilla.

-2673-12, Projectile fragment removed from the right scapula.

7

-2673-13, Projectile fragment removed from the left upper chest.

-2673-14, Projectile fragment removed from the right shoulder.

75. In Gibson's interview with Detectives, he stated that Micheal tripped while running from him and landed face down on the ground. Gibson further told Detectives that Micheal did **NOT** try to get up or to fight with him.

76. Gibson also told Detectives that he actually stood "atop of Micheal," then got off Micheal and began to back away with his gun drawn.

77. Gibson told Detectives that Micheal rolled to his side and pointed a weapon at Gibson. Gibson claimed that it was at that point that he began firing at Micheal.

78. Gibson told Detectives that he saw Micheal's weapon fall to the ground, although none of the other witnesses saw Micheal with a weapon.

## COUNT I

## WRONGFUL DEATH PURSUANT TO A.R.S. § 12-611, *et seq.*

(All Defendants)

79. Plaintiffs Allison, individually, and on behalf of the Estate and MC, incorporate by reference all previous allegations in the foregoing paragraphs as fully set forth herein.

80. A.R.S. § 12-611, *et seq.* provides that "When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter."

81. Allison is the widow of Micheal and has the right under Arizona law to bring a wrongful death action on behalf of all statutory beneficiaries including MC.

82. Gibson caused the wrongful death of Micheal by his unlawful act of shooting Micheal as alleged herein in violation of Gibson's duties.

83. Lamb is vicariously liable for the acts and omissions of his employees, including Gibson.

84. As a direct and proximate result of the unlawful, reckless, and grossly negligent actions of the Gibson, Micheal suffered an untimely and preventable death and lost the ability to provide for his wife and child.

85. As a direct and proximate result, Micheal's widow and child have been deprived of the continued companionship and society of their husband and father, and have suffered and continue to suffer the loss of a loved one, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

86. Additionally, the acts of Gibson, as set forth above, demonstrate gross and wanton negligence in that he knew or had reason to know that his acts individually and collectively created an unreasonable risk of bodily harm to Micheal and a high probability that substantial harm would result.

## COUNT II

## EXCESSIVE FORCE IN VIOLATION OF THE FOURTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983

**(Gibson)**

87. Plaintiff Allison, on behalf of the Estate, incorporates by reference all previous allegations in the foregoing paragraphs as fully set forth herein.

88. 42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights.

89. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 4th Amendment protects individuals from the use of excessive force by law enforcement officers. Gibson,

9

while acting in his official capacity and individual capacities and under the color of law, violated Micheal's rights to freedom from unreasonable seizures.

90. Gibson acted willfully, knowingly, and with specific intent to deprive Micheal of his rights under the Fourth Amendment of the United States Constitution, including his right to be secure in his person and free from the use of unreasonable force and seizure.

91. Gibson acted unreasonably by using unnecessary deadly forced as described herein.

92. Micheal was not resisting arrest.

93. Micheal was not fighting with or threatening Gibson.

94. Micheal was unarmed.

95. Micheal was lying prone on the ground and had his back turned toward Gibson.

96. Despite the clear evidence that Micheal posed no apparent threat to Gibson, Gibson used lethal force which was objectively unreasonable under the totality of the circumstances.

97. Micheal's death was the direct result of Gibson's actions and inactions.

98. Additionally, the acts of Gibson, as set forth above, demonstrate gross and wanton negligence in that he knew or had reason to know that his acts created an unreasonable risk of bodily harm to Micheal and a high probability that substantial harm would result.

99. In causing the painful, barbaric and premature death of Micheal, Gibson acted with an evil mind and a malignant heart warranting an award of punitive damages.

## COUNT III
## GROSS NEGLIGENCE
## (ALL DEFENDANTS)

100. Plaintiff Allison, on behalf of the Estate, incorporates by reference all previous allegations in the foregoing paragraphs as fully set forth herein.

101. Under Arizona Revised Statute § 12-820.02(A) a public employee acting within the scope of the public employee's employment can be liable for damages and injuries if the employee was grossly negligent.

102. Gibson's actions were willful and wanton with reckless indifference to Micheal's life and safety.

103. Gibson's actions were willful and wanton with reckless indifference to Micheal's life and safety.

104. Micheal's actions created an unreasonable risk of harm to Micheal and that risk was so great that it was highly probable that harm would have resulted.

105. Gibson systematically and repeatedly acted with reckless indifference towards Micheal's life and safety, including their acts and omissions set forth above, resulting in the wrongful death of Micheal.

106. Lamb is vicariously liable under *respondeat superior* for the actions of any of his employees, agents, or servants, including Gibson.

107. Gibson was grossly negligent and acted with reckless indifference to Micheal's life and safety by using excessive force objectively unreasonable under the totality of the circumstances.

108. Gibson, while acting as an agent and employee of Lamb, owed a duty to Micheal to perform his responsibilities as an officer of the law without reckless indifference to Micheal's life and safety.

109. Gibson, while acting as an agent and employee of Lamb, owed a duty to Micheal to act objectively reasonably and without reckless indifference to Micheal's life and safety.

110. Gibson's use of deadly and excessive force upon Micheal constitutes reckless indifference to Micheal's life and safety and gross negligence for which the Defendants are individually liable.

111. Gibson's conduct, in not using non-lethal force that was readily available, constitutes gross negligence for which he and Lamb are individually liable.

112. Gibson had a duty to provide immediate medical care to Micheal.

113. Gibson, in failing to provide needed medical care to Micheal, and instead freezing and watching MB provide uneducated medical care to Micheal, with deliberate indifference to the life of Micheal, breached this duty.

114. In taking the actions as described above, the Gibson breached his duty to refrain from such unreasonable and recklessly indifferent conduct.

115. As a direct and proximate result of Gibson's breach, Micheal sustained severe and permanent injuries, suffered extreme pain and suffering, lost the ability to have and maintain meaningful familial relationships, lost the ability to provide for his wife and child, and lost his life.

116. Gibson's acts and omissions set forth above also demonstrate gross and wanton negligence in that Gibson knew or had reason to know that his acts individually and collectively created an unreasonable risk of bodily harm to Micheal and a high probability that substantial harm would result.

## COUNT IV
## BATTERY
### (All Defendants)

117. Plaintiff Allison, on behalf of the Estate, incorporates by reference all previous allegations in the foregoing paragraphs as fully set forth herein.

118. Gibson intentionally shot Micheal causing harmful or offensive contact with Micheal.

119. As a direct and proximate result of Gibson's harmful or offensive contact, Micheal died.

120. Defendant's acts constitute a battery upon Micheal in that the above-described bodily contact was intentional, unauthorized, or grossly offensive in nature.

121. The acts and omissions of Defendants were intentional, negligent, reckless, and unwarranted, and without any just cause or provocation.

As a direct and proximate result of Gibson's conduct, Micheal was deprived of his liberty, and was ultimately killed. The conduct described herein was undertaken by Gibson within the scope of his employment and under color of law such that his employer Lamb is vicariously liable for Gibson's actions.

### COUNT V
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OF MB
(Gibson)

122. Meagan, on behalf of MB, realleges and incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint.

123. Gibson, acting within the scope of his employment, knowingly caused Plaintiff MB emotional distress with the intent to:

124. Cause MB to feel harassed, humiliated, or embarrassed;

125. Cause MB to feel unsafe;

126. Cause MB to be terrified and forever traumatized;

127. Gibson's acts were in reckless and wanton disregard to MB's safety and rights.

128. The acts were outrageous on their face.

129. As a result of the above-described conduct, MB suffered, continues to suffer, and may permanently suffer from embarrassment, terror, fear, humiliation, anger, and indignity causing damages in an amount to be proven at trial. MB suffered severe emotional distress which has physically manifested in weight loss, nightmares, migraines, and behavioral changes, all of which were nonexistent before the events of this Complaint.

130. The conduct of Defendants Gibson described herein was in wanton, reckless, and intentional disregard of societal obligations, and constituted a reckless and outrageous indifference to the health, safety, and welfare of others.

### JURY TRIAL DEMAND

131. Plaintiffs hereby demand a jury trial in this matter as to all claims and against all Defendants.

///

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against the Defendants and in favor of the Plaintiffs, as follows:

a) For compensatory, general and special damages against each and every Defendant, jointly and severally, in an amount to be proven at trial;

b) For all other non-pecuniary damages as to be proven at trial;

c) For punitive and exemplary damages against Defendants in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

d) For pre-and post judgment interest to the extent provided by law;

e) For Plaintiffs' incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. §1988 and as otherwise authorized by any other statute or law; and

f) For such other relief as this Court may deem proper.

**RESPECTFULLY SUBMITTED** this 20th day of September 2024.

**MILLS + WOODS LAW, PLLC**

By  */s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 20, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
Laura Van Buren
lvanburen@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
lrasmussen@wienekelawgroup.com
mmahler@wienekelawgroup.com
1225 W Washington St., Ste. 313
Tempe, Arizona 85288
*Attorneys for Defendants*


        /s/ Ben Dangerfield