Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

*Attorneys for Defendants Lamb and Gibson*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB;<br><br>Plaintiffs,<br><br>v.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does 1-X,<br><br>Defendants. | NO. 2:24-cv-01510-PHX-KML<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT** |

During a lawful traffic stop for running a red light, Micheal Obregon attempted to flee on foot after informing Deputy Brady Gibson that he was wanted on outstanding warrants. Obregon tripped and fell as he fled, and when Deputy Gibson got on his back to take him into custody, Obregon drew a loaded handgun from beneath his body and leveled it at the Deputy, who retreated and fired in self-defense. Three neighbors heard Gibson's commands not to reach for the gun; investigators photographed the loaded weapon at Obregon's side; and even Plaintiffs' own police-practices expert assumes that Obregon pointed it at Gibson and as such concedes the first shot was justified. Deputy Gibson's use of force when a loaded firearm was pointed at him was objectively reasonable and independently protected by qualified immunity. Further, Deputy Gibson's use of force was

justified under Arizona statute, and Plaintiffs cannot establish gross negligence related to Deputy's Gibson provision of medical care or intentional infliction of emotional distress to bystander M.B. Defendants are entitled to summary judgment on every claim.

## I.    FACTUAL BACKGROUND

### A.    Deputy Gibson Conducts a Lawful Traffic Stop.

On the night of March 16, 2023, Deputy Gibson was on patrol in the Indian Hills area, an unincorporated county island near Casa Grande where complaints about reckless, unlit, and speeding dirt bikes, quads, and ATVs were a recurring problem. (DSOF ¶ 1) Deputy Gibson observed a red dirt bike with no visible license plate and no working tail or brake light speed through a stop sign and cross the main road at roughly 40 to 60 miles per hour. (DSOF ¶ 2.) He activated his emergency lights to initiate a traffic stop. (DSOF ¶ 3)

Rather than stop, the rider—later identified as Michael Obregon—accelerated his bike into a closed, chain-link gate of a fenced residence in an apparent attempt to get through it and flee, damaging the gate and stalling the bike. (DSOF ¶ 4) A neighbor, Brandon Chapman, reported that he observed the dirt bike trying to ram the gate to get in the yard, and that it seemed like he was trying to open the fence with the front of his bike until he realized it was locked. (DSOF ¶ 5) Deputy Gibson exited his vehicle and told the driver (Obergon) to stop and not to run. (DSOF ¶ 6) Obregon apparently recognized Deputy Gibson, stating "Oh, hey, Gibson," and the two began to talk. (DSOF ¶ 7) Obregon volunteered that he had outstanding warrants, which Deputy Gibson was unable to verify in the field. (DSOF ¶ 8)

### B.    Obregon Flees.

As they spoke, Deputy Gibson, a certified peace officer trained in use of force, response to critical incidents, and the recognition of human behavior in law enforcement encounters, observed a series of what he believed to be escalating pre-flight and pre-assault indicators. (DSOF ¶ 4) Obregon repeatedly tugged at his backpack straps, shifted his glances to the left and right rather than engaging, dropped his identification and papers from his wallet more than once, and kept distancing himself and placing the dirt bike between himself

and the Deputy each time Deputy Gibson tried to retreat toward his patrol vehicle to determine his location and run Obregon's information. (DSOF ¶ 10) Deputy Gibson also observed a "heavy, bulky object in the front of [Obregon's] jacket or sweater." (DSOF ¶ 11) Chapman confirmed that he saw Obregon drop something and bend down to pick it up as he interacted with the Deputy. (DSOF ¶ 12)

Recognizing these indicators from his training and experience as a signal that Obregon intended to fight or flee, Deputy Gibson began to broadcast a partial description over the radio and advised dispatch to stand by. (DSOF ¶ 13) When Deputy Gibson made another attempt to determine the location and told Obregon he was going to detain him, Obregon turned, ran toward the residence, and tripped over his motorcycle, landing on his stomach. (DSOF ¶ 14)

### C.    Obregon Points a Loaded Handgun at Deputy Gibson, Who Fires in Self-Defense.

Deputy Gibson got onto Obregon's back to handcuff him. (DSOF ¶ 15) Significantly, Obregon did not try to crawl away to keep running, and he did not try to roll over to fight. (DSOF ¶ 16) Instead, he was "manipulating something under his body," which Deputy Gibson found odd—until Obregon produced a silver-and-black handgun with his right hand, bringing his arm across his body with his finger in the trigger well. (DSOF ¶ 17) Deputy Gibson told Obregon to drop the gun, broadcast the emergency code for backup, pushed off, and began backpedaling; his "gun was already out of the holster and firing" as his training and muscle memory took over. (DSOF ¶ 18) As Deputy Gibson retreated, Obregon rolled toward the Deputy's new position, looked for him, and again pointed the handgun in his direction. (DSOF ¶ 19) Deputy Gibson fired what he recalled as seven or eight shots in what "felt very fast and very rapid," with what seemed like "milliseconds" between the shots, and stopped firing the instant he saw Obregon drop the gun and the threat end. (DSOF ¶ 20)

The physical evidence and the independent witnesses confirm Deputy Gibson's account. Investigators photographed a loaded Smith & Wesson handgun on the ground in Obregon's reach, which was marked at the scene as evidence alongside Obregon's wallet.

3

(DSOF ¶ 21) Neighbor Brandon Chapman saw "a silver top gun, and … the bottom half was black" lying three to four feet from Obregon and identified it as the same handgun depicted in the scene photograph. (DSOF ¶ 22)

Three neighbors independently corroborate that Obregon was armed. Chapman heard Deputy Gibson command "Don't reach for the gun," which "almost sounded like he was pleading for him not to reach for it." (DSOF ¶ 23) Another neighbor, Wade Putt, heard Deputy Gibson say something to the effect of "Put the gun down," "more than once," and vaguely recalled the command not to reach for the gun. (DSOF ¶ 24) A third neighbor, Samantha Plummer, heard Deputy Gibson command "Don't reach for the gun" "at least twice." (DSOF ¶ 25) While only Chapman observed Obregon's firearm, the neighbors who did not see a weapon simply could not see Obregon at all, because Deputy Gibson's patrol vehicle blocked their view. (DSOF ¶ 26)

Even Plaintiffs' retained police-practices expert, Mark Hafkey, assumes Obregon pointed the gun and concedes that Deputy Gibson's first shot was justified. (DSOF ¶ 27) Mr. Hafkey further admitted that the handgun came to rest three to four feet from Obregon, that it was loaded, that a loaded handgun is a deadly weapon, and that a loaded handgun within three to four feet of a suspect can present a danger to an officer. (DSOF ¶ 128)

Defendants' police-practices expert, James Borden, also independently corroborated this sequence after reviewing the video, forensic, and documentary evidence. The handgun recovered within arm's reach of Obregon was a loaded, operable .40-caliber Smith & Wesson. (DSOF ¶ 29) The autopsy's predominantly back-to-front wounds are consistent with Obregon rolling and turning during the struggle, and the Ring video shows Deputy Gibson backpedaling as he fired, "aligning with a dynamic threat rather than a static execution." (DSOF ¶ 30) Post-incident toxicology detected methamphetamine, amphetamine, and THC in Obregon's system, consistent with the erratic behavior Deputy Gibson observed during the encounter. (DSOF ¶ 31)

**D.      Deputy Gibson Promptly Renders Medical Aid.**

Deputy Gibson is CPR-certified and trained as a combat lifesaver through the Arizona Army National Guard in the "MARCH" protocol for traumatic injuries. (DSOF ¶ 39) After the shooting stopped, Deputy Gibson broadcast the officer-involved-shooting codes, advised that one subject was down, and formed a plan to approach, secure, and render aid, which required caution because the firearm was still within arm's reach of Obregon. (DSOF ¶ 40) He retrieved his trauma kit, moved the handgun out of reach, performed blood sweeps, cut away Obregon's layered clothing and backpack, assessed the airway, and applied three chest seals to prevent a collapsed lung, following the MARCH protocol in order of severity. (DSOF ¶ 41) Deputy Gibson rendered aid continuously until a Casa Grande Police Department officer relieved him. (DSOF ¶ 42) Neighbor Chapman, who held a flashlight so Deputy Gibson could see while he rendered aid, testified that the Deputy appeared to be "doing the right steps," and that he would have intervened with his own Amry first aid training if he had thought otherwise. (DSOF ¶ 43) Defendants' expert, drawing on the radio-traffic timeline, opines that Deputy Gibson initiated medical care without unreasonable delay—approximately one minute and forty seconds after the shooting—after first securing the weapon and the scene as a lone deputy, consistent with generally accepted police practice and PCSO policy. (DSOF ¶ 44)

**E.      M.B. Chooses to Come Outside and Remain at the Scene After the Shooting.**

Plaintiff M.B., then fifteen, was inside the residence and did not come outside until after the shooting. (DSOF ¶ 45) When she came out, she was "yelling at the deputy to get off the property" and was "adamant about yelling at the officer" while Deputy Gibson was rendering aid. (DSOF ¶ 46) Deputy Gibson asked her to back up so he could work in the area he was trying to secure. (DSOF ¶ 47) He did not order her to remain, did not force her to stand by Obregon's body, and erected scene tape only after other officers relieved him from rendering aid. (DSOF ¶ 48)

M.B.'s own testimony confirms that Deputy Gibson did not force her to stay. Although her interrogatory answer had asserted that Deputy Gibson told her she would be arrested if she moved, M.B. expressly recanted that answer at her deposition, testifying that "it wasn't like him directly" and that he "did not tell her that if she moved she would be arrested." (DSOF ¶ 49) She attributed the impression that she could not leave to unidentified "sheriffs" standing near the secured, taped-off scene, not to Deputy Gibson. (DSOF ¶ 50) Chapman, who was present from shortly after the shooting and observed M.B.'s arrival, stated that he never heard any deputy tell M.B. she could not leave, never saw Deputy Gibson walk away and leave M.B. to roll Obregon over, and never saw M.B. interact with Obregon at all. (DSOF ¶ 51)

Body-worn camera footage from Casa Grande Police Department officers confirms that no one (much less Deputy Gibson) forced M.B. to remain on scene. Officer Fox was the first officer to arrive at the scene after Gibson's radio call. M.B. was not visible on his body-worn camera and was not standing near Obregon's body. (DSOF ¶ 53) Officer Fox's camera captures M.B. leading a man and woman—identified as Obregon's brother and his wife—down the road and away from the house, and no officer tried to stop or follow her. (DSOF ¶ 54) M.B. then walked back toward the scene on her own, without being escorted or compelled, and when Officer Fox told her to "stay back," she responded, "I live here." (DSOF ¶ 55) While Officer Fox and other law enforcement and EMS personnel worked to save Obregon's life, M.B. was not standing at Obregon's body but a distance away, behind caution tape. (DSOF ¶ 56) Approximately one hour after Officer Fox arrived, a deputy walked M.B. down the road toward the area where her mother was located. (DSOF ¶ 57)

During a lengthy interaction with Case Grande Police Department Officer Reed, M.B. stood behind the caution tape, never asked to move away from the scene, and expressed no distress at being near Obregon's body. (DSOF ¶ 58) Rather than asking to be moved away, M.B. repeatedly demanded to be allowed to cross the crime scene to enter her own yard and house, insisting, "It's my property. I have nothing to do with this. I should have the right to go in my damn yard." (DSOF ¶ 59)

Likewise, on Sgt. Rush's body-worn camera, M.B. is seen standing behind the caution tape with no officer nearby and nothing preventing her from turning around and walking down the road away from the scene. (DSOF ¶ 60) Rather than leaving, M.B. stated that she wanted to get into her yard and complained that she was not being allowed to cross because it was a crime scene. (DSOF ¶ 61) M.B. told Sgt. Rush that she did not know the decedent and that she did not witness the shooting, but was inside when she heard shots and then ran outside. (DSOF ¶ 62) M.B. was recorded recounting on her cell phone that she had told Deputy Gibson to cut off Obregon's clothes and "make sure he's alright," and that Gibson "was doing that." (DSOF ¶ 63)

## II.    PROCEDURAL HISTORY.

Plaintiff Allison Obregon, individually and as Personal Representative of the Estate of Michael Obregon and as parent of a minor child, asserts a Fourth Amendment excessive-force claim under 42 U.S.C. § 1983 against Deputy Gibson, a state-law wrongful-death claim against Deputy Gibson for the shooting itself, and a state-law wrongful death/gross-negligence claim for failure to render medical aid against Deputy Gibson and Sheriff Lamb. Plaintiff Meagan Brady asserts a claim for intentional infliction of emotional distress on behalf of her minor child, M.B. By Order dated March 31, 2025, the Court resolved Defendants' motion to dismiss. Plaintiffs conceded—and the Court dismissed—Allison's battery claim and any survival actions. The Court permitted the Fourth Amendment excessive force, wrongful death, gross-negligence, and IIED claims to proceed, expressly noting that it was "confined to the facts alleged in the complaint" on a Rule 12 record and that "critical aspects of plaintiffs' claims rely on what happened before other officers arrived on the scene." Discovery is now complete, and the undisputed evidence—including the deposition testimony of Deputy Gibson, three independent neighbors, M.B., and Plaintiffs' own expert—establishes that Defendants are entitled to judgment as a matter of law.

///

///

///

7

III.    **SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFF OBREGON'S EXCESSIVE FORCE CLAIM.**

A.    **Plaintiff's Excessive Force Claim Fails.**

To determine if a Fourth Amendment violation has occurred, a court must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances.

*Id.* (citations and quotations omitted).

Here, all three of the *Graham* factors weigh in favor of Deputy Gibson's use of force.

### 1.    *The Severity of the Crime.*

While a traffic stop is typically not considered a severe crime, the Ninth Circuit has recognized that the first *Graham* factor should not focus too narrowly on the severity of the initial crime, but rather on the nature of the ongoing emergency exacerbated by a suspect's resistance. *Ames v. King Cnty., Washington*, 846 F.3d 340, 348 (9th Cir. 2017)*; see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (finding excessive force where the trespassing suspect was already handcuffed when the force occurred).

Here, when Deputy Gibson moved in to facilitate the arrest, Oregon began to flee to evade arrest, physically resisted arrest, and then pointed a gun at Deputy Gibson, providing probable cause to arrest him for several more severe crimes. *See* A.R.S. §§ 13-2508

(resisting arrest); 13-2409 (obstructing criminal investigations); 13-2402 (obstructing governmental operations); 13-2904 (disorderly conduct); 13-1204 (aggravated assault).

### 2.    Obregon Represented an Immediate Threat to Deputy Gibson.

The second, and most important, *Graham* factor—whether the suspect poses an immediate threat to the safety of the officers or others—also weighs heavily in the Deputy Gibson's favor. *See Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (stating that of the *Graham* factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others.")

Here, Plaintiff it is undisputed that Obregon pointed a loaded handgun at Deputy Gibson, presenting an immediate deadly threat. Courts have found that this factor weighs in favor of the shooting officer under even less dangerous circumstances. *See Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 618, 623 (9th Cir. 2023), cert. denied, 144 S. Ct. 559, 217 L. Ed. 2d 297 (2024) (use of deadly force reasonable where a mentally ill suspect, armed with a plastic replica gun mistaken by officers as a real gun, "lowered the barrel toward" the officers); *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 912 (9th Cir. 2014) (where suspect disregards officer commands and advances toward officers while holding an object perceived to be a weapon, officers are objectively reasonable to view the suspect as an immediate threat); *see also Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1116 (9th Cir. 2005) (holding that it was objectively reasonable for officers to view a suspect holding a sword as an immediate threat when he attempted to enter a house or yard and failed to comply with warnings or commands to put down the weapon).

### 3.    Obregon Actively Resisted Arrest and Attempted to Flee.

The third *Graham* factor—whether the suspect was actively resisting arrest or attempting to evade arrest—also weighs in Deputy Gibson's favor. Obregon ran from Deputy Gibson and, even when on the ground, continued to actively resist by manipulating the firearm. The third *Graham* factor supports a finding that the use of force by Deputy Gibson was reasonable.

**B.    Deputy Gibson Is Entitled to Qualified Immunity on Plaintiff's Excessive Force Claim.**

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan,* 555 U.S. 223, 231 (2009) (citation omitted). The qualified immunity inquiry is two-fold: (1) whether the facts as alleged show that the official's conduct violated a constitutional right; and (2) if so, whether the right violated was "clearly established." *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009). Courts have "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson,* 555 U.S. at 236. To deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021). As the *Shooter* Court noted, "the Supreme Court has 'repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.'" *Shooter*, 4 F.4th at 962, quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018).

The qualified immunity analysis asks whether the constitutional right was clearly established at time of the event. "A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Zorn v. Linton*, No. 25-297, 2026 U.S. LEXIS 1471, 2026 WL 795469, at *2 (U.S. Mar. 23, 2026). As to the second prong for qualified immunity, "[o]ur case law is clear that when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." *Sabbe v. Washington Cnty. Bd. of Commissioners,* 84 F.4th 807, 828 (9th Cir. 2023). Nor must officers have to wait until a gun is pointed at them "before they are entitled to take action." *Est. of Strickland*, 69 F.4th at 620 (citation modified). Here, because the law was clearly established that shooting at armed suspect was not unconstitutional, the court need not address the other prong concerning the underlying merits of the constitutional claim. *See Shooter*, 4 F.4th 955 at 961 ("We have

10

discretion to address the "'clearly established' prong" of the qualified immunity test first; if we conclude that the relevant law was not clearly established, we need not address the other prong concerning the underlying merits of the constitutional claim.")

In *Kisela v. Hughes*, 138 S. Ct. 1148 (2018), the Supreme Court afforded qualified immunity to the shooting of a mentally impaired woman holding a knife in her front yard as she approached another woman (her roommate) as responding officers stood outside of a chain-link fence. The Supreme Court recognized the non-obvious circumstances under which the officer used deadly force:

> Kisela was separated from Hughes and Chadwick by a chain-link fence; Hughes had moved to within a few feet of Chadwick; and she failed to acknowledge at least two commands to drop the knife. Those commands were loud enough that Chadwick, who was standing next to Hughes, heard them. *This is far from an obvious case in which any competent officer would have known that shooting Hughes to protect Chadwick would violate the Fourth Amendment.*

*Id.* at 1153 (emphasis added). *Kisela*'s analysis vividly demonstrates that qualified immunity is to be accorded an officer unless it involves the rare case in which all competent officers would universally condemn the use of force. *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1777 (2015) ("so long as 'a reasonable officer could have believed that his conduct was justified,' a plaintiff cannot 'avoi[d] summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless.'").).

Following *Kisela*, the Ninth Circuit held that the use of deadly force 2-4 seconds after a gun is thrown away by a fleeing suspect is protected by qualified immunity. In *Easley v. City of Riverside*, 890 F.3d 851 (9th Cir. 2018), the Ninth Circuit affirmed the grant of qualified immunity in a case involving a suspect running away from a traffic stop who was shot three times in the back several seconds after he tossed an object believed to be a gun from his waistband:

> It is undisputed that as he ran, Easley pulled an object from his right pants' pocket with his left hand and threw it away from his body. Macias shot Easley within two to four seconds of the

object leaving Easley's hand. Easley stated that he threw the gun in a motion similar to throwing a Frisbee across his body; this would necessarily involve some upper body or shoulder movement. Based on these undisputed facts, a reasonable officer may have reasonably feared that Easley had a gun and was turning to shoot him.

*Id.* at 857. If the gun-tossing motion made by the fleeing suspect in *Easly* could warrant qualified immunity for an officer shooting him in the back up to four (4) seconds later, surely Deputy Gibson's use of deadly force is similarly protected when Obregon pointed a gun at him.

## IV.   SUMMARY JUDGEMENT IS WARRANTED ON PLAINTIFFS' WRONGFUL DEATH CLAIM

Plaintiff Obregon's wrongful death claim fails for the same reasons that her excessive force claim fail—Deputy Gibson's use of force was justified under the circumstances. *See Marquez v. City of Phoenix*, 693 F.3d 1167, 1176 (9th Cir. 2013) (holding that because officers acted reasonably in using force, their claim cannot succeed under Arizona law); *Miller v. Clark Cnty.*, 340 F.3d 959, 968 n.14 (9th Cir. 2003) (affirming the district court's judgment for the defendants on plaintiffs' state tort claims because they fell "along with [plaintiff]'s rejected federal Fourth Amendment claim.").

### A.   Arizona's Justification Statutes

Arizona's justification statutes also provide a basis for summary judgment. Under A.R.S. § 13-413, "[n]o person in this state shall be subject to civil liability for engaging in conduct otherwise justified" pursuant to the provisions of Arizona's justification statutes. A.R.S. § 13-409 governs the use of physical force by a law enforcement officer, while A.R.S. § 13-410 governs the use of deadly physical force by a law enforcement officer. Section 13-410(C) states that the use of deadly force against another is justified under Section 13-409 if the officer "reasonably believes that it is necessary:"

1    To defend himself or a third person from what the peace officer reasonably believes to be the use or imminent use of deadly physical force.

2    To effect an arrest or prevent the escape from custody of a person whom the peace officer reasonably believes:

12

(a)    Has committed, attempted to commit, is committing or is attempting to commit a felony involving the use or a threatened use of a deadly weapon.

(b)    Is attempting to escape by use of a deadly weapon.

(c)    Through past or present conduct of the person which is known by the peace officer that the person is likely to endanger human life or inflict serious bodily injury to another unless apprehended without delay.

A.R.S. § 13-410(C). If the officer's use of force is justified under Section 13-409, the officer is immune from civil liability under Arizona law. *Ryan v. Napier*, 425 P.3d 230, 239 (Ariz. 2018).

### B.    Deputy Gibson's Actions are *Presumptively* Reasonable

Also relevant is A.R.S. § 12-716, which states that a police officer is presumed to be acting reasonably if the officer uses deadly physical force to "[p]rotect himself or another person against another person's use or attempted use of physical force or deadly physical force," *or* to "effect an arrest or prevent […] a plaintiff's escape." A court need only make such a finding by a preponderance of the evidence. A.R.S. § 12-716(A);s*See also Valdez v. City of Phoenix*, No. CV-18-0921-PHX-DGC, 2019 U.S. Dist. LEXIS 182312 at *5-7 (D. Ariz. Oct. 21, 2019). There is no genuine dispute that the presumption applies here. The FAC concedes that the decedent was attempting to escape from police. (Doc. 30 at ¶¶ 21-22) (admitting that "Michael decided to run away from Gibson"). Additionally, no reasonable juror could dispute that Deputy Gibson was attempting to "effect an arrest" at the time the shooting took place; Gibson had pulled up behind the decedent and turned on his lights to pull Micheal over. *Id.* at ¶ 13. And, or course, Deputy Gibson was "protect[ing] himself . . . against another person's use or attempted use of . . . deadly physical force." *See* A.R.S. § 12-716. The presumption of reasonableness under Section 12-716(A) applies. *See Ryan*, 425 P.3d at 237 ("statutory presumptions are triggered when a law enforcement officer injured.)

13

**C.      Deputy Gibson's Use of Deadly Force Was Justified**

Even if the Court does not presume that Deputy Gibson's force was justified under A.R.S. § 12-716, the undisputed evidence still shows that it is reasonable—and thus cannot be the basis for a civil claim—under A.R.S. § 13-410. Deputy Gibson used force "to defend himself . . . from what [he] reasonably believes to the use or imminent use of deadly physical force." *See* A.R.S. § 13-410(C)(1). He further used deadly force "to effect an arrest . . . of a person whom the peace officer reasonably believes . . . is attempting to escape by use of a deadly weapon. *See* A.R.S. § 13-410(C)(2)(b).

## V.      DEPUTY GIBSON AND SHERIFF LAMB ARE ENTITLED TO SUMMARY JUDGMENT ON THE FAILURE TO RENDER AID CLAIM.

Plaintiff claims that Deputy Gibson was grossly negligent by failing to render aid to decedent Obregon at the scene after the shooting.   Gross negligence requires a showing of "[g]ross, willful, or wanton conduct." *Armenta v. City of Casa Grande*, 205 Ariz. 367, ¶ 20, 71 P.3d 359, 364 (App. 2003), quoting *Williams v. Thude*, 180 Ariz. 531, 539, 885 P.2d 1096, 1104 (App. 1994).  Gross negligence is "highly potent, and when it is present it fairly proclaims itself in no uncertain terms. It is 'in the air,' so to speak. It is flagrant and evinces a lawless and destructive spirit." *Scott v. Scott*, 75 Ariz. 116, 122, 252 P.2d 571, 575 (1953).

The undisputed evidence of Deputy Gibson's' post shooting conduct in rendering aid demonstrated the opposite of gross negligence.  A trained combat lifesaver, Deputy Gibson immediately radioed for medical support, acquired his first aid kit from his vehicle, moved the deadly weapon a safe distance from Obregon, performed blood sweeps, cut away clothing, assessed his airway, applied three chest seals, and continued to provide aid continuously until another officer relieved him, all within the one minute and forty seconds after the shooting. (DSOF ¶ 39-44) A neighbor who assisted Deputy Gibson by holding a flashlight testified that he was "doing the right steps," (DSOF ¶ 43) In that one minute and forty seconds between the shooting and rendering aid, Deputy Gibson had to assess the safety of the scene and approach a subject who was lying within arm's reach of a gun that he had pointed mere seconds before. No witness reached Obregon and attempted to render

14

aid before Gibson, and when neighbor Chapman arrived, Gibson was already rendering aid. Defendant's police practices expert opines that the short delay was consistent with generally accepted police practice and PCSO policy. (DSOF ¶ 44.) No reasonable jury could find this prompt, sustained, trained response is "flagrant and evinces a lawless and destructive spirit" constituting gross negligence. *See Scott,* 75 Ariz. at 122.[1]

More importantly, Plaintiff provides no expert opinions establishing that the one minute, forty seconds "delay" while Deputy Gibson secured the scene caused Obregon's death.  Plaintiffs have no admissible expert testimony to prove medical causation. *See Schudel v. Gen. Elec. Co.*, 35 F. App'x. 481, 484 (9th Cir. May 10, 2002) (jury cannot resort to speculation or conjecture regarding medical cause of injury). Deputy Gibson was not grossly negligent.[2]

## VI.    THE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM FAILS.

To prevail on an IIED claim, a plaintiff must prove (1) "extreme" and "outrageous" conduct; (2) that the defendant intended to cause emotional distress or recklessly disregarded the near certainty that distress would result; and (3) that the conduct in fact caused severe emotional distress. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43, 734 P.2d 580, 585 (1987). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* "Only when reasonable minds could differ in determining whether conduct is sufficiently extreme or outrageous does the issue go to the jury." *Mintz v. Bell Atl. Sys. Leasing Int'l*, 183 Ariz. 550, 554, 905 P.2d 559, 563 (Ct. App. 1995)

---

[1] While Plaintiff's failure to render medical aid claim is brought under state law, it is worth noting that an officer satisfies his constitutional obligation to render aid by promptly summoning medical assistance (to include calling the fire department). *See Tatum v. City of San Francisco*, 441 F.3d 1090, 1099 (9th Cir. 2006) (police officer who promptly summons the necessary medical assistance has acted reasonably for purposes of the Fourth Amendment, even if the officer did not personally administer care).

[2] Since Defendant Lamb is allegedly only vicariously liable for Deputy Gibson's actions, he is entitled to dismissal as well if this claim fails.

15

The IIED claim rests on the allegation that Deputy Gibson ordered M.B. to stand next to Obregon and not leave the scene for any reason, forcing her to watch him die.  The undisputed evidence defeats that premise. Deputy Gibson states he never told her she could not leave and never forced her to stand by the body, putting up scene tape only after other officers relieved him. (DSOF ¶ 48) Gibson's statement was corroborated by witness Chapman, who stated that M.B. did not come outside until after the shooting, and she came out yelling at Deputy Gibson to get off the property—not because anyone compelled her to be there. (DSOF ¶ 51, 49) It is also soundly defeated by the Casa Grande officers' body worn camera. (DSOF ¶ 53-63 But perhaps most importantly, M.B. recanted the central factual allegation of her claim: she testified that "it wasn't Gibson directly" who forced her to stand near Obregon, and that Deputy Gibson "did not tell her that if she moved she would be arrested." (DSOF ¶ 49-50.) And the neighbor who was present never heard any deputy tell M.B. she could not leave. (DSOF ¶ 51)

Stripped of the recanted allegation, what remains is that Deputy Gibson asked an agitated bystander to step back from an active shooting scene while he rendered life-saving aid—conduct that is not "extreme and outrageous" as a matter of law. Asking a bystander to stay clear of a secured scene does not "go beyond all possible bounds of decency." *Ford*, 153 Ariz. at 43.

Plaintiff also cannot establish the intent required by the second element. There is no credible evidence that Deputy Gibson intended to cause M.B. distress or recklessly disregarded a near certainty of it; he was focused on rendering aid and was not even aware of M.B. until she willingly approached and subjected herself to the scene. (DSOF ¶ 52) Plaintiff also cannot prove that any conduct directed at her by Deputy Gibson caused emotional distress. M.B. testified to pre-existing anxiety and depression predating the incident, and significant unrelated stressors afterward, which can independently explain her claimed emotional distress. (DSOF ¶ 64)

M.B.'s IIED claim was based entirely upon inflammatory fabricated testimony that she has since recanted. "Where the record taken as a whole could not lead a rational trier of

16

fact to find for the nonmoving party, there is no genuine issue for trial." *Wilkinson*, 610 F.3d 546, 553 No rational jury could find that Deputy Gibson intentionally caused severe emotional distress to M.B. by telling her to step back from a crime scene, and the Court should not adopt her since recanted version of the facts for the purposes of Summary Judgement.

## VII.    PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES.

Under A.R.S. 12-820.04, a public employee acting within the scope of his employment cannot be liable for punitive or exemplary damages. Punitive damages under § 1983 are available only where the defendant's conduct is "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). For the reasons above, the undisputed evidence shows Deputy Gibson acted reasonably and in lawful self-defense in response to a suspect who pointed a loaded handgun at him, not with an evil motive or reckless indifference to Obregon's rights.

## VIII.    CONCLUSION

For the reasons stated above, and pursuant to Fed. R. Civ. P. 56, Defendants are entitled to summary judgment on all Plaintiffs' claims against them.

DATED this 22nd day of June, 2026.

WIENEKE LAW GROUP, PLC

By:    */s/ Laura Van Buren*
Kathleen L. Wieneke
Laura Van Buren
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants Lamb and Gibson*

17

**CERTIFICATE OF SERVICE**

I hereby certify that on June 22, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

N/A

By:    */s/ Lauren Rasmussen*

18