Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

*Attorneys for Defendants Lamb and Gibson*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB;<br><br>Plaintiffs,<br><br>v.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does 1-X,<br><br>Defendants. | NO. 2:24-cv-01510-PHX-KML<br><br>**DEFENDANTS' STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

Defendants Mark Lamb and Brady Gibson ("Defendants") submit the following Statement of Facts in Support of their Motion for Summary Judgment.

1.     On the night of March 16, 2023, Deputy Gibson was on patrol in the Indian Hills area—an unincorporated county island near Casa Grande where complaints about reckless, unlit, and speeding dirt bikes, quads, and ATVs were a recurring problem. (Ex. 1, Gibson Depo. at 28:19–31:4, 36:16–37:4.)

2.     Deputy Gibson observed a red dirt bike with no visible license plate and no working tail or brake light speed through a stop sign and cross the main road at roughly 40 to 60 miles per hour. (Ex. 1, Gibson Depo. at 47:23–49:12, 53:2–8, 68:14–24.)

3. He activated his emergency lights to initiate a traffic stop. (Ex. 1, Gibson Depo. at 49:13–51:16.)

4. Rather than stop, the rider—later identified as Michael Obregon—accelerated his bike into a closed, chain-link gate of a fenced residence in an apparent attempt to get through it and flee, damaging the gate and stalling the bike. (Ex. 1, Gibson Depo. at 51:17–57:19.)

5. A neighbor, Brandon Chapman, reported that he observed the dirt bike trying to ram the gate to get in the yard, and that it seemed like he was trying to open the fence with the front of his bike until he realized it was locked. (Ex. 2, Chapman Depo. at 15:25–17:2, 46:3–10.)

6. Deputy Gibson exited his vehicle and told Obregon to stop and not to run. (Ex. 1, Gibson Depo. at 51:17–52:10.)

7. Obregon recognized the Deputy, stating "Oh, hey, Gibson," and the two began to talk. (Ex. 1, Gibson Depo. at 52:1–10.)

8. Obregon volunteered that he had outstanding warrants, which Deputy Gibson was unable to verify in the field. (Ex. 1, Gibson Depo. at 103:13–16, 115:11–25.)

9. As they spoke, Deputy Gibson, a certified peace officer trained in use of force, response to critical incidents, and the recognition of human behavior in law enforcement encounters, observed a series of what he believed to be escalating pre-flight and pre-assault indicators. (Ex. 1, Gibson Depo. at 11:7–12:2, 81:5–14.)

10. Obregon repeatedly tugged at his backpack straps, shifted his glances to the left and right rather than engaging, repeatedly dropped his identification and papers from his wallet, and kept distancing himself and placing the dirt bike between himself and the Deputy each time Deputy Gibson tried to retreat toward his patrol vehicle to determine his location and run Obregon's information. (Ex. 1, Gibson Depo. at 52:11–53:1, 67:2–69:19, 112:11–113:18.)

11. Deputy Gibson also observed a "heavy, bulky object in the front of [Obregon's] jacket or sweater." (Ex. 1, Gibson Depo. at 69:1–19, 177:18–178:7.)

2

12.    Chapman confirmed that he saw Obregon drop something and bend down to pick it up as he interacted with the Deputy. (Ex. 2, Chapman Depo. at 17:3–12, 44:16–45:6.)

13.    Recognizing these indicators from his training and experience as a signal that Obregon intended to fight or flee, Deputy Gibson began to broadcast a partial description over the radio and advised dispatch to stand by. (Ex. 1, Gibson Depo. at 68:1–69:19, 112:11–113:18.)

14.    When Deputy Gibson made another attempt to determine the location and told Obregon he was going to detain him, Obregon turned, ran toward the residence, and tripped over his motorcycle, landing on his stomach. (Ex. 1, Gibson Depo. at 76:6–23, 81:23–82:13, 106:3–109:10.)

15.    Deputy Gibson got onto Obregon's back to handcuff him. (Ex. 1, Gibson Depo. at 81:23–82:13, 98:5–22.)

16.    Obregon did not try to crawl away to keep running, and he did not try to roll over to fight. (Ex. 1, Gibson Depo. at 82:14–83:4, 98:5–22, 164:24–165:10.)

17.    Instead, he was "manipulating something under his body," which Deputy Gibson found odd—until Obregon produced a silver-and-black handgun with his right hand, bringing his arm across his body with his finger in the trigger well. (Ex. 1, Gibson Depo. at 82:14–83:4, 164:24–165:10, 176:17–179:14.)

18.    Deputy Gibson told Obregon to drop the gun, broadcast the emergency code for backup, pushed off, and began backpedaling; his "gun was already out of the holster and firing" as his training and muscle memory took over. (Ex. 1, Gibson Depo. at 82:14–83:23, 141:3–142:1, 172:15–25.)

19.    As Deputy Gibson retreated, Obregon rolled toward the Deputy's new position, looked for him, and again pointed the handgun in his direction. (Ex. 1, Gibson Depo. at 87:15–88:2, 90:23–91:11, 176:17–24.)

20.    Deputy Gibson fired what he recalled as seven or eight shots in what "felt very fast and very rapid," like "milliseconds" between the shots, and stopped firing the

3

instant he saw Obregon drop the gun and the threat end. (Ex. 1, Gibson Depo. at 83:24–84:20, 133:9–134:3.)

21.    Investigators photographed a loaded Smith & Wesson handgun on the ground in Obregon's reach, which was marked at the scene as evidence alongside Obregon's wallet. (Ex. 1, Gibson Depo. at 63:16–64:2, 120:15–22, 137:6–139:1; Ex. 8, PCSO Photo at DEFS_Obregon 000146, 000382.)

22.    Neighbor Brandon Chapman saw "a silver top gun, and … the bottom half was black" lying three to four feet from Obregon and identified it as the same handgun depicted in the scene photograph. (Ex. 2, Chapman Depo. at 25:19–26:15.)

23.    Chapman heard Deputy Gibson command "Don't reach for the gun," which "almost sounded like he was pleading for him not to reach for it." (Ex. 2, Chapman Depo. at 20:13–19, 44:3–15.)

24.    Wade Putt heard Deputy Gibson say something to the effect of "Put the gun down," "more than once," in reference to a gun, and vaguely recalled the command not to reach for the gun. (Ex. 4, Putt Depo. at 13:4–12, 19:4–17.)

25.    Samantha Plummer heard Deputy Gibson command "Don't reach for the gun" "at least twice." (Ex. 3, Plummer Depo. at 13:19–14:24, 20:24–21:3.)

26.    While only Chapman observed Obregon's firearm, the neighbors who did not see a weapon simply could not see Obregon at all, because Deputy Gibson's patrol vehicle blocked their view. (Ex. 4, Putt Depo. at 12:21–14:15; Ex. 3, Plummer Depo. at 12:25–16:4.)

27.    Plaintiffs' retained police-practices expert, Mark Hafkey, assumes Obregon pointed the gun and concedes that Deputy Gibson's first shot was justified. (Ex. 5, Hafkey Depo. at 65:2–8, 69:1–9, 70:8–17.)

28.    Mr. Hafkey further admitted that the handgun came to rest three to four feet from Obregon, that it was loaded, that a loaded handgun is a deadly weapon, and that a loaded handgun within three to four feet of a suspect can present a danger to an officer. (Ex. 5, Hafkey Depo. at 97:7–18.)

4

29. The handgun recovered within arm's reach of Obregon was a loaded, operable .40-caliber Smith & Wesson. (Ex. 9, Borden Report at 8.)

30. The autopsy's predominantly back-to-front wounds are consistent with Obregon rolling and turning during the struggle, and the Ring video shows Deputy Gibson backpedaling as he fired, "aligning with a dynamic threat rather than a static execution." (Ex. 9, Borden Report at 8, 10–13, 24–25; Ex. 10, Ring camera footage.)

31. Post-incident toxicology detected methamphetamine, amphetamine, and THC in Obregon's system, consistent with the erratic behavior Deputy Gibson observed during the encounter. (Ex. 9, Borden Report at 25; Ex. 7, PCSO Report at 84-85.)

32. When M.B. came outside after the shooting, she looked around for the gun and did not see one. (Ex. 6, M.B. Depo. at 57:3–19.)

33. M.B. was in shock during the incident and described the experience as very stressful. (Ex. 6, M.B. Depo. at 50:9–22, 57:20–22.)

34. Mr. Hafkey opines that Deputy Gibson's first shot was justified, but that the subsequent lethal rounds were not. (Ex. 11, Hafkey Report at 6; Ex. 5, Hafkey Depo. at 65:2–8.)

35. Mr. Hafkey developed his trajectory and sequencing opinions using a "Stretch Armstrong" doll, a pool-cue stick, and sewing pins. (Ex. 5, Hafkey Depo. at 49:4-24.)

36. Mr. Hafkey's opinion that the later shots were unjustified rests on his assumption that Obregon dropped the firearm after the first shot—an assumption based on the firearm being found on the left side of Obregon's body and on Mr. Hafkey's review of the Medical Examiner's report. (Ex. 11, Hafkey Report at 8.)

37. Mr. Hafkey concedes that the Medical Examiner did not determine the order of the shots, that the autopsy wounds are "arbitrarily numbered" and do not reflect the firing sequence, and that he has no opinion as to which gunshot wound or wounds was fatal. (Ex. 5, Hafkey Depo. at 71:5–19, 72:9–11.)

38. Defendants' police-practices expert, Jamie Borden, opines that Deputy Gibson's use of force was a proportional response to an actual deadly threat, pointing to the

video evidence of Deputy Gibson backpedaling while firing, the rolling-motion wound pattern, and the recovery of the loaded handgun within reach. (Ex. 9, Borden Report at 7–8, 10–13, 24–25; Ex. 10, Ring camera footage)

39. Deputy Gibson is CPR-certified and trained as a combat lifesaver through the Arizona Army National Guard in the "MARCH" protocol for traumatic injuries. (Ex. 1, Gibson Depo. at 12:3–20, 146:15–147:25.)

40. After the shooting stopped, Deputy Gibson broadcast the officer-involved-shooting codes, advised that one subject was down, and formed a plan to approach, secure, and render aid, which required caution because the firearm was still within arm's reach of Obregon. (Ex. 1, Gibson Depo. at 85:14–86:12, 152:22–153:17.)

41. He retrieved his trauma kit, moved the handgun out of reach, performed blood sweeps, cut away Obregon's layered clothing and backpack, assessed the airway, and applied three chest seals to prevent a collapsed lung, following the MARCH protocol in order of severity. (Ex. 1, Gibson Depo. at 86:6–87:3, 121:10–149:16.)

42. Deputy Gibson rendered aid continuously until a Casa Grande Police Department officer relieved him. (Ex. 1, Gibson Depo. at 111:11–112:10, 155:8–156:11.)

43. Neighbor Chapman, who held a flashlight so Deputy Gibson could see while he rendered aid, testified that the Deputy appeared to be "doing the right steps," and that he would have intervened with his own Army first aid training if he had thought otherwise. (Ex. 2, Chapman Depo. at 23:1–22, 25:9–18.)

44. Mr. Borden, drawing on the radio-traffic timeline, opines that Deputy Gibson initiated medical care without unreasonable delay—approximately one minute and forty seconds after the shooting—after first securing the weapon and the scene as a lone deputy, consistent with generally accepted police practice and PCSO policy. (Ex. 9, Borden Report at 8–9.)

45. M.B., then fifteen, was inside the residence and did not come outside until after the shooting. (Ex. 6, M.B. Depo. at 52:20–53:18, 56:19–57:2.)

6

46.    When she came out, she was "yelling at the deputy to get off the property" and was "adamant about yelling at the officer" while Deputy Gibson was rendering aid. (Ex. 2, Chapman Depo. at 22:2–18, 23:9–22.)

47.    Deputy Gibson asked her to back up so he could work in the area he was trying to secure. (Ex. 1, Gibson Depo. at 110:9–111:10, 123:18–124:18.)

48.    He did not order her to remain, did not force her to stand by Obregon's body, and erected scene tape only after other officers relieved him from rendering aid. (Ex. 1, Gibson Depo. at 123:18–124:18, 162:7–163:19.)

49.    Although her interrogatory answer had asserted that Deputy Gibson told her she would be arrested if she moved, M.B. expressly recanted that answer at her deposition, testifying that "it wasn't Gibson directly" and that he "did not tell her that if she moved she would be arrested." (Ex. 6, M.B. Depo. at 75:2–76:5.)

50.    She attributed the impression that she could not leave to unidentified "sheriffs" standing near the secured, taped-off scene, not to Deputy Gibson. (Ex. 6, M.B. Depo. at 66:8–67:11, 75:2–76:15.)

51.    Chapman, who was present from shortly after the shooting and observed M.B.'s arrival, stated that he never heard any deputy tell M.B. she could not leave, never saw Deputy Gibson walk away and leave M.B. to roll Obregon over, and never saw M.B. interact with Obregon at all. (Ex. 2, Chapman Depo. at 35:6–18.)

52.    Deputy Gibson was focused on rendering aid and was not aware of M.B. until she approached the scene and began yelling at him. (Ex. 1, Gibson Depo. at 110:9–111:10, 145:18–146:2.)

53.    Casa Grande Police Department's Officer Fox, was the first officer to arrive at the scene after Gibson's radio call. M.B. was not visible on his body-worn camera and was not standing near Obregon's body. (Ex. 12, Fox BWC at 0:31.)

54.    Officer Fox's camera captured M.B. leading an older man and woman—identified as Obregon's brother and his wife—down the road and away from the house, and no officer tried to stop or follow her. (Ex. 12, Fox BWC at 2:13.)

7

55.    M.B. then walked back toward the scene on her own, without being escorted or compelled, and when Officer Fox told her to "stay back," she responded, "I live here." (Ex. 12, Fox BWC at 3:22–3:35.)

56.    While Officer Fox and other law enforcement and EMS personnel worked to save Obregon's life, M.B. was not standing at Obregon's body but a distance away, behind caution tape. (Ex. 12, Fox BWC at 4:00–14:05.)

57.    Approximately one hour after Officer Fox arrived, a deputy walked M.B. down the road toward the area where her mother was located. (Ex. 12, Fox BWC at 1:07:30.)

58.    During a lengthy interaction with Case Grande Police Department Officer Reed, M.B. stood calmly behind the caution tape, never asked to move away from the scene, and expressed no distress at being near Obregon's body. (Ex. 13, Reed BWC at 20:00–32:31, 20:25.)

59.    Rather than asking to be moved away, M.B. repeatedly demanded to be allowed to cross the crime scene to enter her own yard and house, insisting, "It's my property. I have nothing to do with this. I should have the right to go in my damn yard." (Ex. 13, Reed BWC at 24:22; *see also id*. at 30:00.)

60.    On Sgt. Rush's body-worn camera, M.B. is seen standing behind the caution tape with no officer nearby and nothing preventing her from turning around and walking down the road away from the scene. (Ex. 14, Rush BWC at 1:55–2:05.)

61.    Rather than leaving, M.B. stated that she wanted to get into her yard and complained that she was not being allowed to cross because it was a crime scene. (Ex. 14, Rush BWC at 2:05–2:11; *see also id.* at 5:00.)

62.    M.B. told Sgt. Rush that she did not know the decedent and that she did not witness the shooting, but was inside when she heard shots and then ran outside. (Ex. 14, Rush BWC at 7:00–7:30, 8:45.)

63.    M.B. was recorded recounting on her cell phone that she had told Deputy Gibson to cut off Obregon's clothes and "make sure he's alright," and that Gibson "was doing that." (Ex. 14, Rush BWC at 4:30.)

8

64.    Before the March 2023 incident, M.B. had experienced both depression and anxiety. She reported increased depression in February 2022 after being expelled from school, she "was put on medication" and had been referred to counseling for anxiety prior to the shooting. (Ex. 6, M.B. Depo. at 21:2–22:9; 26:1–15.)

DATED this 22nd day of June, 2026.

WIENEKE LAW GROUP, PLC

By:    */s/ Laura Van Buren*
Kathleen L. Wieneke
Laura Van Buren
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants Lamb and Gibson*

9

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 22, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

N/A

By:   */s/ Lauren Rasmussen*

10