Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

*Attorneys for Defendants Lamb and Gibson*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB;<br><br>Plaintiffs,<br><br>v.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does 1-X,<br><br>Defendants. | NO. 2:24-cv-01510-PHX-KML<br><br>**DEFENDANTS' *DAUBERT* MOTION REGARDING PLAINTIFFS' POLICE PROCEDURES EXPERT, MARK HAFKEY** |

Defendants Lamb and Gibson move to preclude Plaintiffs' expert, Mark Hafkey, from offering opinions and testimony in opposition to Defendants' summary judgment motion or at trial. Mr. Hafkey lacks the necessary qualifications in ballistics shooting reconstruction or forensic pathology to assist the jury. His opinions regarding Deputy Gibson's use of force lack factual support and foundation or otherwise contain improper legal conclusions. Moreover, Hafkey's report fails to satisfy the standards governing the admissibility of expert testimony under Rule 702, includes substantial methodological deficiencies, relies on speculation and unsupported assertions, and exceeds the limits of his expertise. The Court should exercise its gatekeeping function and exclude Hafkey's testimony in its entirety.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    LEGAL STANDARD

For expert testimony to be admitted under Rule 702, it must be both relevant and reliable. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999). Rule 702 embodies an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. *Id*. at 591. The plaintiff bears the burden to establish the admissibility of the expert testimony, and it is the trial court's obligation to act as a "gatekeeper." *Daubert,* 509 U.S. at 597. To determine whether the expert's proposed testimony is relevant and reliable, the trial judge must perform a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts." *Daubert,* 509 U.S. at 592-93; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999).

Rule 702, in its current version, states:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

>(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
>(b) the testimony is based on sufficient facts or data;
>
>(c) the testimony is the product of reliable principles and methods; and
>
>(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 was amended to correct some courts' prior inaccurate application of the Rule. As the Committee Notes to the 2023 Amendment state, "many courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. Committee Not. (1) (effective Dec. 1, 2023).

Expert testimony is "relevant" if it fits the facts of the case and logically advances "a material aspect of the proposing party's case." *Daubert v. Merrell Dow Pharms, Inc.* (*Daubert II*), 43 F.3d 1311, 1315 (9th Cir. 1995). Expert testimony, however, is not properly admitted if the expert is offered as an advocate rather than to provide a scientifically supported opinion. *See Arrendondo v. Uniroyal Goodrich Tire Co.*, 1995 U.S. Dist. LEXIS 19943, *7 (D. Ariz. 1995), citing *United States v. Rincon*, 28 F.3d 921, 923 (9th Cir. 1994). It is mandatory that an expert must back up his opinion with specific facts. *Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 831 (9th Cir. 2001) (affirming exclusion of three experts whose opinions were not grounded in fact), quoting *U.S. v. Various Slot Machines*, 658 F.2d 697, 700 (9th Cir. 1981). If an expert's testimony is not based on sufficient facts, it should be excluded. *Guidroz-Brault*, 254 F.3d at 831.

Several factors can assist the Court in determining the reliability of the expert's opinions, including: "1) whether a theory or technique can be tested; 2) whether it has been subjected to peer review and publication; 3) the known or potential error rate of the theory or technique; and 4) whether the theory or technique enjoys general acceptance within the relevant scientific community." *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000) (citing *Daubert,* 509 U.S. at 592-94).

An expert's opinion may be excluded where, as is the case here, it is based on subjective beliefs or unsupported speculation. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (holding that a trial court may properly exclude *ipse dixit* opinions where there is simply too great an analytical gap between the data and the opinion). "Experts must explain precisely how they went about reaching their conclusions and point to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Daubert II*, 43 F.3d at 1319. An expert is not permitted to give an opinion simply based on his "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590; see *also Joiner*, 522 U.S. at 146.

Further, expert testimony generally does not help the jury "when it offers nothing more than what lawyers for the parties can argue in closing arguments." *United States v. Frazier*, 387 F.3d 1244, 1262-63 (11th Cir. 2004). Nor does expert testimony help a jury if it does not "fit" the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004). And an expert may not intrude on the province of the jury by rendering opinions that require no specialized knowledge and that the jury can evaluate on its own, and "cannot give an opinion as to her legal conclusion, i.e. an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ*, 299 F.3d 1053, 1066 (9th Cir. 2002) (amended by 319 F.3d 1073).

## II.    FACTUAL BACKGROUND

### A.    The Officer Involved Shooting

On March 16, 2023, Pinal County Sheriff's Deputy Brady Gibson stopped Michael Obregon, who had been riding a dirt bike in a residential area, for a traffic violation. (DSOF ¶ 1–4.)[1] Obregon told Deputy Gibson that he had outstanding warrants, then fled on foot and fell to the ground. (DSOF ¶ 8, 14.) As Deputy Gibson tried to handcuff him, Obregon took out a handgun and pointed it at Deputy Gibson. (DSOF ¶ 15, 17.) In response to the threat of deadly force, Deputy Gibson pushed off Obregon, backed away, and fired 7-8 shots rapid shots in one uninterrupted volley lasting approximately 3.5 seconds. (*See* Ex. 1, Hafkey Report at OBREGON_000904; Ex. 1 to DSOF, Hafkey Depo., at 172:15-25.)

Obregon was pronounced dead at the scene. According to the Medical Examiner's Report, he sustained multiple gunshot wounds, one to the front of his body and six to his back. (Ex. 4, DEFS_Obregon000092-95.) Investigators also recovered a loaded handgun within feet of Obregon's body. (DSOF ¶ 21–22.)

Deputy Gibson was not equipped with body worn camera at the time. A nearby Ring camera, however, recorded some of the interaction. The Ring camera confirms that Deputy

---

[1] To minimize redundancy of exhibits on the docket, Defendants cite to either their Statement of Facts ("DSOF"), or exhibits to the same, wherever possible. Defendants attach exhibits to this Motion only when they are not otherwise provided.

Gibson was in contact with Obregon for approximately three minutes during the traffic stop and that Obregon attempted to flee on foot. *See* Ex. 10 to DSOF.  During the following encounter, the two go out of the sight of the Ring camera for approximately 3.5 seconds before Deputy Gibson can be seen backing away while shooting multiple rounds downward toward the area in which Obregon had fled. *Id.*

Plaintiffs admit that the first shot fired by Deputy Gibson was justified, but contend the later shots were excessive. (Ex. 1, Hafkey Report at OBREGON_000902.)

### B.    Hafkey's Report.

Plaintiffs retained Hafkey as a "police policy, practices, and procedures" expert, and he prepared a report dated January 31, 2026. (*See* Ex. 1, Hafkey Report.) His report sets out three numbered opinions:

> 1    Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, [Gibson's] initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.
>
> 2    There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.
>
> 3    Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.

*Id.* at OBREGON_000899.

The first opinion—that all shots fired after the first were unnecessary and an excessive use of force—rests on Hafkey's reconstruction of the order in which the shots struck Obregon and of his body position at the time. Hafkey "deduce[s]" from the medical examiner's wound descriptions and the resting position of the recovered handgun that "one of Deputy Gibson's initial rounds struck Mr. Obregon in the front, whereas the remaining lethal rounds stitched him down his back in a semi-linear pattern," and that the gun "likely fell to the ground following the first frontal shot." *Id.* at OBREGON_000904. In reaching

this conclusion, Hafkey comments on the credibility of Deputy Gibson's account of the events, calling them "unreliable" because Hafkey believes that Gibson could not have completed the actions he described during a 3.5 second, the time the shots were fired. *Id.* at OBREGON_000911–000913.

**C.     Hafkey's Reenactments and Use of a Non-Anatomical Doll.**

***1.     The Reenactment***

Hafkey identified the following actions that he believed Deputy Gibson completed while out of the Ring camera view for 3.5 seconds as follows:

1.     He ran after Mr. Obregon
2.     Got on top of him
3.     Radioed for backup
4.     Felt Mr. Obregon manipulating something with his hands underneath his waistline
5.     Saw Mr. Obregon work his arm out brandishing a silver and black gun
6.     Pushed off of Mr. Obregon
7.     Started back peddling away from Mr. Obregon
8.     Drew his service weapon
9.     Saw Mr. Obregon roll to his side trying to relocate him
10.     Saw Mr. Obregon point the gun at him
11.     Warned Mr. Obregon to drop the gun
12.     Started firing at Mr. Obregon

*Id.* at OBREGON_000912

To prove his theory that Deputy Gibson could not have completed the actions he describes in the time frame that he was out of sight of a nearby Ring camera, Hafkey conducted a nonscientific and non-replicable "experiment" using his teenage daughter as a stand in for Deputy Gibson. The experiment was conducted in his living room and required his teenage daughter, with no instructions on how fast or slow to move to accurately reflect Gibson's movements, to walk thru the 12 identified motions of Deputy Gibson and time them to determine whether the actions could have been accomplished in the time frame. (Ex. 3, Hafkey Depo at 45:25–46:19, 55:21–56:07.) Hafkey did not record the reenactment by video or take photographs, and he made no notes of it. *Id.* at 74:8–20. The reenactment appears nowhere in his report and was not disclosed until his deposition. *See* Ex. 1.

6

### 2.    *The Non-Anatomical Doll*

In support of his opinions regarding the trajectory of the bullets, Hafkey used a Stretch Armstrong doll "probably nine or 10 inches" long, which he did not confirm was the appropriate scale and proportions for Obregon's body and only used because it was "handy." (Ex. 3, Hafkey Depo. at 49:20, 57:13–15.)



(Ex. 5).

Using the Medical Examiner's Report as a guide, Hafkey stuck sewing "stickpins" into the doll where he believed the shots were on Obregon's body and pointed a "pool cue stick" at it, because "it just helped me put it all together and confirm my -- you know, what my brain told me happened." *Id.* at 49:9–51:22.

No photographs or video of the doll were included in Hafkey's report, nor was the doll even mentioned. *See* Ex. 1. As with the reenactment, Hafkey disclosed his use of the Stretch Armstrong doll only at his deposition.

## III.    HAFKEY'S OPINIONS FAIL TO MEET THE REQUIREMENTS OF RULE 702

### A.    Hafkey Lacks Qualifications in Ballistics and Bullet Trajectories to Render Opinions

First, consistent with its gatekeeping role, this Court must assess whether Plaintiffs' expert possesses the required expertise—"knowledge, skill, experience, or education"—under Rule 702(a). Here, Plaintiffs bear the burden of demonstrating that their expert is

7

qualified to render the opinions he offers. *Cooper v. Brown*, 510 F.3d 870, 942 (9th Cir. 2007). Failing this test renders the expert's opinions inadmissible. *Id.* at 942.

From 2004 until he retired from the Phoenix Police Department in 2012, Hafkey held no patrol assignment and instead served as president of the Sergeants and Lieutenants Association, the police union. (Ex. 2, Hafkey CV, OBREGON_000916–000917.) He never investigated or reconstructed a shooting, including reconstructing the sequence of shots fired, and never reviewed a medical examiner's report to provide analysis regarding the sequence of gunshots or their trajectories. (Ex. 3, Hafkey Depo. at 25:2–26:21.). From 2012 to 2023 Hafkey worked as airline cabin crew. (Ex. 2, Hafkey CV) Nothing in his education, training, or assignment history involves ballistics, bullet-trajectory analysis, forensic pathology, biomechanics, or crime-scene/shooting reconstruction. *Id.* at OBREGON_000916–000920.

Ballistics opinions require specialized knowledge and expertise. *See Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1266 (D. Ariz. 2020) (collecting cases). In *Krause*, the court rejected the ballistics opinions of a police procedures expert, finding that his general police and firearms background "cannot replace qualifications in ballistic forensics and do not qualify [the expert] to opine on the highly technical area of bullet path reconstruction or ballistics." *Id*. at 1266. Critically, the court rejected the specific methodology that Hafkey employed here, finding that "[r]eading a coroner's report does not transform a police practices expert into an expert on bullet trajectory analysis." *Id.* (*quoting Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *9 (C.D. Cal. Oct. 9, 2018)).

Hafkey is even less qualified than the expert in *Krause*. His degrees are in Educational Leadership and political science (Ex. 2, Hafkey CV); he has no training in determining bullet trajectories (Ex. 3, Hafkey Depo. at 29:16–18); his forensic-pathology exposure was "very general, nothing very advanced" (*id.* at 27:22–24); and his firearms-instructor training was "not … from a forensic level" but "more of an identification level" and completed over twenty years ago (*id.* at 29:5–15). He was never a detective and never

8

before reconstructed a shooting from an ME report. *Id.* at 25:2–8, 25:20–21, 26:19–21. Hafkey admitted his trajectory opinion was "100 percent based on the written opinion from the medical examiner" because he is "not trained well enough" to read the autopsy photographs himself. *Id.* at 60:25–61:04. Reading and extrapolating from the Medical Examiner's Report is the precise disqualifying, unreliable, unscientific shortcut *Krause* and *Dominguez* condemn. Hafkey's "decades of experience as law enforcement officer… cannot replace qualifications in ballistic forensics." *Krause*, 459 F. Supp. 3d at 1265. Hafkey's trajectory and ballistics opinions must be excluded.

**B.    Hafkey's Opinions Include Impermissible Legal Conclusions Regarding the Use of Force**

*1.    Improper Legal Conclusions*

"An expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." *Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1066 n. 10 (9th Cir. 2002). Likewise, an expert witness may not offer opinions which usurp the function of the jury by telling the jury what result to reach. *See United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not aid the jury in making a decision but rather attempts to substitute the expert's judgment for the jury's.")

In excessive force cases, the issue of whether an officer's use of force was "objectively reasonable" is a jury question. *See Barber v. City of Santa Rosa*, No. 08-cv-5649 MMC, 2010 U.S. Dist. LEXIS 129093, 2010 WL 5069868, at *6 n.9 (N.D. Cal. Dec. 7, 2010). Experts cannot tell the jury that an officer's use of force was excessive or unreasonable. *See May v. San Mateo Cnty.*, No. 16-cv-00252-LB, 2017 U.S. Dist. LEXIS 83425, 2017 WL 2305160, at *9 (N.D. Cal. May 26, 2017) (excluding expert's opinion that officer "used excessive or unreasonable force"); *Villanueva-Galvez v. City of San Jose*, Case No. 24-cv-09055-VKD, 2026 U.S. Dist. LEXIS 124259 * | 2026 LX 244032, at *13, (N. D. Cal. June 4, 2026) (excluding police procedure expert opinions describing force as unreasonable and excessive).

9

### *2.      Improper Legal Standard Applied to the Legal Conclusion*

Courts judge excessive-force reasonableness "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Hafkey acknowledged this standard, then testified that "the courts and the juries want to have somebody come in and provide a 20/20 opinion after the fact. And that's what I was hired to do and that's what I have tried to do" (Ex. 3, Hafkey Depo. at 100:24–101:08.) An opinion built on a legal standard the Supreme Court has expressly rejected does not assist the jury; it invites the jury to apply the wrong test, and the Court should exclude it. Fed. R. Evid. 702(a); 403.

**C.      Hafkey's Opinions Are Not the Product of Reliable Principles and Methods.**

Hafkey's opinions are an unscientific product of an unreliable methodology. Rule 702(c)–(d) requires "reliable principles and methods" that are "reliably applied" to the facts. Hafkey's "principles and methods" were a nine-inch toy doll that he never confirmed was to scale, sewing pins, and a pool cue (Ex. 3, Hafkey Depo. at 49:9–50:18, 57:13–15); an untimed, uninstructed reenactment by his teenage daughter in his living room (*id.* at 45:25–46:19, 55:21–56:07); and "running it through my head over and over and over" (*id.* at 97:23–98:03). He admits that he did not conduct those demonstrations to develop his opinions, but only did so after he had already written his report, because they "helped me confirm my opinion that I had already written at that point." *Id.* at 74:8–20; 46:01-48:16. He did not take notes about how he came to his conclusions, made no video documenting his reenactment, and recorded no measurements of the scene or reaction times. *Id.* at 74:8–20, 98:4–12. He described his methodology as "running scenarios through my brain … putting myself in the officer's shoes, and running it through my head over and over and over." *Id.* at 97:23–98:03.

None of this can be tested or replicated; "running it through in my head" has no known error rate, never underwent peer review, conforms to no professional standard, and enjoys no general acceptance in the field of ballistics and forensic pathology. *Daubert*, 509

U.S. at 593–94. It is the same defect that compelled exclusion in *Krause*: the expert there "made no measurements or calculations to support his conclusions," and his "investigation [wa]s entirely devoid of scientific analysis." 459 F. Supp. 3d at 1265. Hafkey's own words confirm the opinion is *ipse dixit*, a conclusion his "brain told [him] happened" that he then "wanted to confirm." (Ex. 3, Hafkey Depo. 51:18–20.) Rule 702 does not permit "simply 'taking the expert's word for it.'" *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Hafkey's opinions regarding reaction time and the 'recreation' of the incident using his daughter is especially telling, because his own report undermines his demonstration and its conclusions. He concedes that reaction time "varies from person to person" and that "in order to measure accurately a specific person's RT, that individual would have to be tested individually." (Ex. 1, Hafkey Report, OBREGON_000913.) Deputy Gibson's reaction times were not tested and were not available to Hafkey, but that did not stop him from rendering an authoritative opinion. Instead, he timed his teenage daughter, who had no training or experience in law enforcement or the specific actions described by Gibson, with no attempt to control for their differing ages, body shape, reaction times, or settings. Hafkey identified that a scientific methodology required measuring Gibson's reaction times, and then substituted it with a wholly unscientific stand-in.

D.    **Hafkey Fails to Reliably Apply the Principles and Methods to the Facts of the Case.**

Hafkey's ultimate opinion—that the first shot was justified but the later shots were excessive—requires the jury to know which shot came first and which wound caused death. Hafkey admits he cannot say which wound or wounds were fatal. (Ex. 3, Hafkey Depo. at 72:10–11.) He therefore cannot exclude the possibility that the "justified" first shot was itself the fatal one, which would sever his entire excessive-force theory. Whether a particular gunshot wound "significantly contributed to a person's death is a complex question about which a lay juror cannot draw a reasonable inference without expert medical

11

evidence" that Hafkey is not qualified to give. *See Estate of Jaquez v. Flores*, 2016 U.S. Dist. LEXIS 42579, at *9–10 (S.D.N.Y. 2016).

Hafkey also assumes that Obregon dropped the gun after the first shot because the firearm was found to the left of Obregon's body, and that the subsequent shots were unreasonable because without the firearm Obregon was no longer a threat. This assumption does not account for the Gibson's testimony that he moved the firearm ***away from Obregon*** so it was out of reach before he rendered first aid. *See* DSOF ¶ 41. Therefore, Hafkey's speculation regarding when Obregon dropped the gun in the shooting sequence based on its post shooting location on the ground after Deputy Gibson moved it is meaningless. This assumption renders his testimony inadmissible by creating an "analytical gap" between his ultimate conclusions and the actual facts too great to permit. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997) (explaining a court may conclude there is simply too great an analytical gap between the data and the opinion proffered).

### E.    Hafkey's Opinions Are Not Relevant or Helpful to the Jury and Invade the Province of the Jury

#### 1.    *Subjective Beliefs*

Opinions which are nothing more than subjective beliefs or speculation are not based on conclusions using scientific methods and procedures. See *Claar v. Burlington Northern Railroad Co.,* 29 F.3d 499, 502 (9th Cir. 1994). Knowledge under Rule 702 means more than subjective belief or unsupported speculation. *Daubert*, 509 U.S. at 590.

Here, Hafkey's opinions based on his experiment in his living are not the result of scientific testing but rather reflect Hafkey's subjective belief that the events Deputy Gibson recounted could not have happened in the time allotted. The jury could do their own experiment/reenactment in the jury room, and do not need Hafkey's opinions.

#### 2.    *Comments Regarding Deputy Gibson's Credibility*

Hafkey offers opinions which cast doubt on the accuracy and credibility of Deputy Gibson' s account of the shooting event:

> There are a number of procedural and investigative irregularities, as well contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

(Ex. 1, Hafkey Report at at OBREGON_000899).

Expert opinions should be excluded if they concern a subject "improper for expert testimony" such as "one that invades the province of the jury." *United States v. Lukashov*, 694 F.3d 1107, 1116 (9th Cir. 2012) (internal quotation marks omitted). It is solely within the province of the jury to make credibility determinations. *See United States v. Sanchez-Lima,* 161 F.3d 545, 548 (9th Cir. 1998). Likewise, resolving evidentiary conflicts, and drawing reasonable inferences from facts, are functions within the exclusive province of the jury. *See Bruce v. Terhune*, 376 F.3d 950, 957 (9th Cir. 2004).

Hafkey's opinions which cast doubt on Deputy Gibson's credibility must be precluded. Nor may Hafkey offer opinions or suggest that other witness statements are not credible. These credibility assessments are not the proper topic of expert opinion.

### 3. *Investigative Irregularities*

Hafkey opines that the Pinal County investigators engaged in "confirmation bias" in their investigation, explaining that that this bias is the tendency to search for and interpret investigative findings that conform to an investigator's pre-existing beliefs or hypotheses and to disregard statements or evidence that do not. (Ex. 1, Hafkey Report at at OBREGON_000909-10).[2] This opinion has nothing to do with Fourth Amendment claim against Deputy Gibson. Further, like the comments regarding Deputy Gibson and his "accuracy" in his recall of events, this opinion represents a comment on the credibility of witnesses. Thes opinions should be excused both under Rule 702 and 403, F.R.E.

### F. Hafkey Asserts that Non-Party Officers Violated M.B.'s Fourth Amendment Rights—a Claim Not Raised in This Action.

Hafkey's third opinion is independently inadmissible because it analyzes the wrong claim under the wrong law. M.B.'s only surviving claim is for intentional infliction of

---

[2] Hafkey lacks any qualifications in psychology.

13

emotional distress. There are three elements that govern an IIED claim: extreme and outrageous conduct, intent or reckless disregard of the near certainty of distress, and resulting severe emotional distress. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). Plaintiffs assert no Fourth Amendment claim on M.B.'s behalf.

Instead of attempting to render an opinion about Deputy Gibson's conduct in the context of IIED, Hafkey instead analyzes her treatment as a Fourth Amendment seizure under *Terry v. Ohio* and opines that "the seizure was beyond the scope of the 4th Amendment" and that "the length of her seizure w[as] unreasonable." (Ex. 1, Hafkey Report at OBREGON_000899, 000913–000915.) An opinion keyed to a legal standard that does not govern the claim cannot "help the trier of fact … determine a fact in issue." Fed. R. Evid. 702(a). Further, it is unduly prejudicial and a needless waste of time and resources under Fed.R.Evid., 403.

Worse, Hafkey was not even addressing the actions of Deputy Gibson. M.B. has recanted her initial claim that Deputy Gibson was the one who told her she had to remain at the scene with her testimony at deposition (DSOF ¶ 49), and instead points to an hour-long detention by backup officers, which is what Hafkey chose to address. Hafkey's third opinion assesses whether backup officers not named in the lawsuit violated M.B.'s fourth amendment rights, a claim that is not present in the lawsuit. As such, it should be excluded.

**G.    Hafkey Is Not Qualified to Opine on Medical Care or Causation.**

To the extent Hafkey's opinions stray into whether or when medical aid would have affected the outcome, the Court should exclude them for the same reason *Krause* excluded such testimony: he "is not a trained medical professional and has no medical training in gunshot wound treatment," and thus "obviously cannot testify as to the severity of [the decedent's] injuries or opine on whether any medical care would have assisted [him], much less when administering such care would assist." 459 F. Supp. 3d at 1266. (Emphasis original)

## IV.    CONCLUSION

Plaintiffs cannot demonstrate that Mr. Hafkey possess the qualifications and experience to render ballistics and trajectory opinions. His report improperly contains legal conclusions and invades the province of the jury by making credibility determinations. His experiments and use of the Stretch Armstrong doll to allegedly support his opinions are not supported by accepted scientific methodology to make them reliable or even capable of replication.

Defendants therefore respectfully request that the Court exclude the opinions and testimony of Mr. Hafkey in their entirety. In the alternative, the Court should exclude his opinions regarding bullet trajectory, body positioning, and shot sequencing; his "investigative irregularities" opinions; his opinions regarding Mariah Brady; and his opinions regarding medical care and causation, on the independent grounds stated above.

DATED this 22nd day of June, 2026.

WIENEKE LAW GROUP, PLC

By:    */s/ Laura Van Buren*
Kathleen L. Wieneke
Laura Van Buren
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants Lamb and Gibson*

15

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

N/A

By:    */s/ Lauren Rasmussen*

16