# EXHIBIT 1

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-24-1510-PHX-KML – Michael Obregon Homicide

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police practices, policies and procedures, as well as use of force and investigative irregularities in the investigation of this matter.

The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath. My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience.

My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).

**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended

OBREGON_000897

by former counsel for a specific case.  It is not something I do fulltime.  I occasionally provide my opinion on cases I feel strongly about and work by referral.  To date, I have provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants, relating to vehicular homicide, use of force, search & seizure, traffic matters, and common police policies, practices and procedures.  Finally, I understand that discovery is an ongoing process and could reveal yet other information relevant to the formulation of my opinions in this matter.   I have also been informed that there is still outstanding discovery and that disputes have arisen regarding production of certain documents and, therefore, I reserve the right to modify or supplement my opinions upon receipt of further documentation produced in this matter.

**Case Material Reviewed:**

- Pinal County Sheriff's Department Incident Report
- Casa Grande Police Department Incident Reports
- Ring Camera Surveillance Video
- Radio / Dispatch Audio Recording
- Police Canvass / Witness Audio Recordings
- Witness and Officer Deposition Transcripts
- Miscellaneous Police Body Cam Videos
- Witness Declarations and Interview Statements
- Crime Scene Photos and FARO Diagrams
- Miscellaneous Case File Information as Necessary


**Research Material:**

- Cases:
    - Terry v Ohio, 392 US 1 (1968)
    - Brosseau v Haugen, 543 US 194 (2004)
    - Graham v Connor, 490 US 386 (1989)
    - Plumhoff v. Rickard, 572 U.S. 765 (2014)
    - Tennessee v Garner, 471 US 1 (1985)

OBREGON_000898

**Opinion(s):**

1. Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

2. There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

3. Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment. The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Case Synopsis:**

On March 16, 2023, at approximately 1900 hours, Deputy Gibson was working uniformed patrol in Casa Grande when he reportedly observed a red dirt bike driving at high rate of speed on Hualapai Drive, from Hopi Drive. He then "sped up to catch up to the dirt bike in an attempt to conduct a traffic stop." Deputy Gibson saw the bike stopped in the driveway of 19005 Mescalero Drive and activated his emergency lights, at which time the driver "accelerated the bike crashing into the closed fence." Deputy Gibson then exited his vehicle and commanded him to "stop." He also put the dirt bike's kickstand down. (PCSD Report, Pg. 75)

**Note**, ring camera video confirms that Deputy Gibson rolled up to a subject in a patrol vehicle with rear emergency lights activated while subject Obregon was sitting on a motor cycle in the driveway and the cycle lurch forward striking a chain link gate. By activating his emergency lights, commanding the suspect to stop, and putting the bike's kickstand down, Deputy Gibson effectively seized the subject under the 4th amendment.

Deputy Gibson indicated that during a brief discussion with the subject, he obtained Mr. Obregon's identification and observed some indications of nervous flight. He also said that Mr. Obregon admitted to having warrants. Deputy Gibson said he advised Mr. Obregon that he was going to detain him, at which time Mr. Obregon attempted to flee on foot but tripped and fell prone to the ground. (PCSO Report Pg. 76 and Gibson Deposition)

**Note**, ring camera video confirms Deputy Gibson in contact with Mr. Obregon for approximately three minutes and Mr. Obregon appearing to drop items and pick them up. The video also confirms that Mr. Obregon attempted to flee on foot and Deputy Gibson giving chase.

Deputy Gibson indicated that he got on top of Mr. Obregon's back and felt him manipulating something with his hands, which were underneath him at his waistline. At that time, Deputy Gibson indicated that Mr. Obregon brandished a handgun, so he pushed off of him, backed away and drew his sidearm. He said that Mr. Obregon then rolled onto his side away from him and pointed a handgun at him, so Deputy Gibson fired 7-8 rounds at him and saw the gun fall to the ground. Deputy Gibson then "took cover near the dirt bike." (PCSO Report, Pg. 76).

**Note**, after Deputy Gibson is seen chasing after Mr. Obregon, he goes out of sight of the ring-camera for approximately 3.5 seconds before being seen again backing away while

shooting multiple rounds downward toward the area in which Mr. Obregon had fled. Deputy Gibson then appears to operate his radio and take cover behind his patrol vehicle.

Deputy Gibson indicated that he then assessed the incident, relayed information to dispatch, obtained his medical trauma kit from the passenger side of his vehicle and then returned to Mr. Obregon to render aid. He indicated that while he was rendering aid, a female approached him yelling and cursing. He also indicated that a male approached offering to help, so he had him hold his flash light. (PCSO Report, Pg. 76)

**Note**, ring camera video confirms that Deputy Gibson retrieved something from the passenger side of his vehicle before returning to Mr. Obregon's location. Footage also revealed Deputy Gibson possibly accessing the driver's side of his vehicle and subjects approaching and lingering in the area before backup units arrived.

Mr. Obregon died at the scene. It was determined that the weapon located near his body was loaded but had not been fired. At this time, there is no physical evidence placing the handgun into Mr. Obregon's hands. The autopsy report revealed the cause of death to be multiple gunshot wounds, i.e., 1 anterior and 6 posteriors.

Approximately 25 direct or indirect witnesses were contacted and interviewed in this case. Most were circumstantial witnesses. There were variations to the number of shots heard (from 2-9), and seven witnesses ultimately reported some manner of pause between shots. Some witness statements conflicted with and in one case, contradicted with pertinent elements of Deputy Gibson's account of the incident, e.g., succession of shots and whether Mr. Obregon had brandished a weapon. Furthermore, there is some physical evidence which raises doubt as to the plausibility of Deputy Gibson's specific account.

**My Opinions Regarding Officer Gibpson's Use of Force:**

Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

**Discussion:**

Officers are justified in using lethal force when they have probable cause to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others. When given time, officers must provide a warning before implementing lethal force and utilize it only as a last resort. In the case of a police shooting, officers are responsible for every round they fire, as well as the backdrop behind their line of fire. When an officer perceives that the imminent threat has ceased, so must the continued use of lethal force. Officers cannot use excessive force to stop a fleeing suspect unless they have probable cause (PC) to believe that the suspect is an immediate threat of deadly force or serious injury to the officer or others. (*Brosseau v Haugen, Graham v Conner, Plumhoff v Rickard,* and *Tennessee v Garner*)

According to Deputy Gibson's statements to investigators, while on top of Mr. Obregon's back, he felt Mr. Obregon manipulating something underneath his waistline area before he brandished a black and silver handgun. Deputy Gibson then pushed off of Mr. Obregon, began backing away from him and drew his service weapon. He said he began firing his weapon when he saw Mr. Obregon roll away from him onto his side and point the gun at him. Deputy Gibson said that he believed he would be shot and recalled firing 7-8

times and seeing the handgun fall to Mr. Obregon's side.  (PCSO Report, Pg. 76)

Subjectively, the officers account would justify his initial use of lethal force.

In deposition, Deputy Gibson stated that he didn't stop firing "…until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped."  Deputy Gibson confirmed multiple times that he had stopped firing when the weapon dropped.  When asked if he believed that the threat was neutralized when the gun dropped, Deputy Gibson responded "yes."  (Gibson Deposition, Pg. 138-139)

The medical examiner (Dr. John Hu, MD) concluded that Mr. Obregon was struck with 6 fatal rounds, i.e., 1 anterior and 5 posteriors, as well as one non-lethal posterior grazing round.  He also provided trajectory descriptions for the lethal rounds. Extrapolating his anterior trajectory, Mr. Obregon's gunshot wound is consistent with having been struck while on the ground either on his back or on his side facing Deputy Gibson, who would have been shooting from an elevated position.  Extrapolating his posterior trajectories, Mr. Obregon's gunshot wounds are consistent with his having been struck while on the ground rolling away from Deputy Gibson, who would have been shooting from an elevated position.

Deputy Gibson described in deposition that while on Mr. Obregon's back, he saw him pull a black and silver gun out from underneath him with his right hand.  Deputy Gibson then transmitted "913" (immediate backup request), yelled "drop the gun," pushed off of Mr. Obregon's back and began backpedaling.  He said Mr. Obregon rolled away from him onto his right side and pointed a handgun at him, so Deputy Gibson fired 7-8 fast and

OBREGON_000903

rapid shots.  He could not recall if there was a pause between his shots.  (Gibson Deposition Pgs. 83-93)

Based upon the medical examiner's trajectories of the anterior and posterior rounds, as well as Mr. Obregon's body positioning, it is reasonable to deduce that one of Deputy Gibson's initial rounds struck Mr. Obregon in the front, whereas the remaining lethal rounds stitched him down his back in a semi-linear pattern, from his upper right shoulder to his left thigh (at approximately a 60-degree angle), as he rolled away from the officer.

Deputy Gibson indicated in deposition (Pg. 93) that he stopped firing when he saw the handgun fall to the ground beside Mr. Obregon.  He also indicated that he moved the gun a short distance farther away from Mr. Obregon's body after the shooting.  (Pg. 90) The officer's relative position to Mr. Obregon's position and Deputy Gibson's testimony that he saw the gun fall to the ground are both consistent with the gun landing on the left side of Mr. Obregon's prone body.  Crime scene investigation photos and FARO data also place the handgun to the left (and rear) of Mr. Obregon's body.

The positioning of the handgun to the left of the body indicates to me that it likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position.  In other words, if Mr. Obregon had retained possession of the gun during the roll away from the officer, it is not likely that the weapon could have landed on the left side of the body.  As Deputy Gibson stated in deposition, Mr. Obregon would no longer have been an imminent threat to him after the gun had fallen to the ground.  Therefore, continuing to fire at Mr. Obregon from behind as he rolled to his right away from Deputy Gibson was unnecessary.

OBREGON_000904

Deputy Gibson also indicated in deposition that he wasn't sure if there was any sort of pause between his shots.  However, seven witnesses described hearing some form of pause between essentially two volleys.  A pause would be consistent between the anterior and posterior strikes depending on the time it would have taken for Mr. Obregon to roll away from the officer exposing his backside, i.e., the greater the pause the slower the roll.

**Note**, officers are trained and tested to shoot and assess, i.e., firing in controlled bursts while simultaneously monitoring the suspect for a change in behavior, such as falling, fleeing or dropping a weapon.

### Observations

**Observation 1**:

When questioned in deposition regarding whether the sheriff's department had any policy relating to shooting fleeing suspects from behind, Deputy Gibson responded "There is a policy for use of deadly force in the circumstance of a person that is fleeing."  (Gibson Deposition, Pg. 83)  I am not aware of any such PCSO policy.  Pursuant to the landmark case of Tennessee v Garner, officers must have PC to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others before they can shoot them from behind.

**Observation 2**:

In the radio recording of the incident, Deputy Gibson put out an emergency transmission code (998/999) of an officer involved in a shooting followed by a "drop the gun!" exclamation.  (Radio Transmission at 00:53)  However, there is

OBREGON_000905

evidence that the transmission occurred after Deputy Gibson had finished firing and, therefore, after Deputy Gibson stated that he saw the gun fall.

**Observation 3**:

During the radio traffic communication, before returning to the body, Deputy Gibson can be heard calmly describing the handgun's colors and stating by name that Michael Obregon had tried to shoot him.  (Radio Transmission beginning 01:07)

**Observation 4**:

When apprehending a fleeing suspect, it is common police practice and training to take subjects prone to the ground, get their hands behind their back and secure them in handcuffs.  Being on top of a suspect's back, particularly with the weight of an officer's gear, generally gives officers a tactical advantage to control suspects and their hands.  Conversely, getting off a suspect would tend to shift the tactical advantage by relinquishing control.

**My Opinions Regarding Procedural and Investigative Irregularities:**

Having reviewed the investigation in this matter, there are a number of procedural and investigative irregularities, as well as conflicting witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

**First**:

Deputy Gibson did not follow police protocol preceding his contact with Mr. Obregon.  It is common police policy, practices and procedures for officers to notify dispatch when conducting legitimate traffic enforcement activities, engaging in a pursuit or

OBREGON_000906

other on-view (OV) activity.  There are many safety, ethical and constitutional reasons for this.  Not doing so is generally not only a violation, but also begs the question of why the breach in protocol.

When conducting a traffic stop, officers must have reasonable suspicion (RS) of an enforceable traffic-code violation or other legal exception in order to stop individuals, and they are required to advise dispatch of the location of the seizure.  When conducting a pursuit, i.e., when an officer is actively trying to stop a vehicle and the driver is actively alluding, officers are required to not only advise dispatch of the pursuit, but also follow additional regulations, such as: advising a supervisor of their speed, location, traffic conditions, and purpose of the pursuit.  If an officer goes out with a subject on OV activity, he is also required to notify dispatch of his location and contact.

In this case, Deputy Gibson indicated to investigators that while in the area of Hopi and Battleford, he initially observed a red dirt bike driving south on Hualapai at a high rate of speed.  Hualapai is located 2-3 blocks west of Battleford, a distance of approximately .1 miles, and it was dark out at that time.  At night at that location and perpendicular to the subject vehicle, it would have been extremely difficult, if not impossible, to accurately gage the speed or color of a dirt bike from that distance.

That being said, at least one witness (Mariah Brady) indicated that Mr. Obregon had driven onto her property (passing right by her window) into the back yard for approximately one minute and was in the process of leaving when Deputy Gibson arrived.  Ring video confirms that Mr. Obregon was off the street and in the driveway when the officer arrived on scene.  He activated his rear emergency lights and seized Mr. Obregon by ordering him to stop without informing dispatch that he was following a vehicle at high

speed, conducting a traffic stop or going out with a subject.  This breach in protocol is indicative of not having a legitimate reason to make a traffic stop.  Without RS of an enforceable violation, the seizure was unconstitutional.

## Observations

**Observation 5**:

Despite Mariah Brady's statements that Mr. Obregon had already arrived and was in the process of leaving when the deputy arrived, investigators did not question the breach in protocol or seizure of Mr. Obregon.

**Observation 6**:

Deputy Gibson indicated to investigators that he was unsure of the name of the street in which he contacted Mr. Obregon; there is evidence that he had been to that specific address on a call relatively recent to this incident.

**Observation 7:**

There is some evidence that Deputy Gibson had adverse history with Mr. Obregon, as well as with off-road vehicles driving in the area.  (Nicholas Wallace Declaration, Daniel Wallace Declaration, Nicole Bernier Declaration, Meagon Brady Interview)

**Observation 8:**

The first witness on the scene, Mariah Brady, indicated in her interview with Detective Gonzalez that Deputy Gibson did not render aid or retrieve his first aid kit until after she walked up and told him to "help him."  She was adamant that she did not see a gun.  (Mariah Interview 01:50)

OBREGON_000908

**Observation 9:**

Two residents, Samantha Dean and Whitney Hector, indicated that they heard Deputy Gibson yell "I bet your scared of me now huh" and "I bet you're scared of me now," respectively, just before hearing shots.  (Samantha Dean Face Book Communication / Whitney Hector Declaration)

**Observation 10:**

There is evidence that Tiffany Chapman was on her phone with Nicole Bernier while observing the interaction of Deputy Gibson and Mr. Obregon.  During the call, Tiffany Chapman reportedly told Nicole that Mr. Obregon was running from the deputy and "oh my god, he shot him!"

**Observation 11:**

Of the three witnesses who reported having seen Mr. Obregon fall, i.e., Mariah Brady, Kenyan Bower, and Tiffinay Chapman, none of them reported seeing Mr. Obregon with a gun.

**Observation 12:**

Mr. Obregon's nephew, Nicholas Wallace, reported in his declaration that his uncle "always kept his gun in his belt in the back of his pants because he rode a motorcycle or dirt bike."

**Second**:

There appears to have been some investigative confirmation bias as it relates to Deputy Gibson's account.  Confirmation bias is the tendency to search for and interpret investigative findings that conform to an investigators pre-existing beliefs or hypotheses

OBREGON_000909

and to disregard statements or evidence that do not.  Consider the following factual hypothesis which outlines the facts of this case:

An officer seizes a subject in a private driveway contrary to protocol and with questionable legal justification.  While on the ground, the suspect is fired at ten times and struck posteriorly by six of the rounds.  The weapon recovered is found not to have been fired, linked to the subject, or forensically placed in the subject's hand.  Gunshot wound trajectories do not conform with the officer's account.  Moreover, witnesses arrive within moments of the shooting but report that they did not see a gun.  Anomalies such as these are clearly significant and would need to be thoroughly investigated and challenged.

Mariah Brady was a direct witness to the incident, as she was able to provide both audible and visual observations preceding, during and after the shooting.  She was also the first person to walk up to Deputy Gibson following the shooting.  In her interview with Detective Gonzalez, she indicated that she heard the m/c come into her yard and pass by her window.  After a minute or so, she heard the m/c drive back past her window and to her driveway gate.  She also heard gate opening and closing noises, the m/c turn off and Deputy Gibson yelling for him (Mr. Obregon) to get on the ground.  While looking out of her window into her front yard, she started hearing shots and ran outside.  She saw Deputy Gibson standing over him (Mr. Obregon) with a gun pointed at him.  She then heard more shots and ran outside.  Note, her observation point would have made her one of the closest witnesses to the shooting scene.

Mariah admitted that she was very upset (and "freaking" out) because she initially thought that he (Mr. Obregon) was her mother's friend that lives with them, so she asked the deputy what happened.  She said that Deputy Gibson told her that he (Mr. Obregon) had

pulled a gun on him.  Because she never saw a gun, she asked Deputy Gibson where it was but he did not respond.  She then pleaded with him to help him (Mr. Obregon), at which time Deputy Gibson retrieved a first aid kit, cut Mr. Obregon's clothes off and render aid.

Despite conflicting witness statements and the number of posterior wounds, investigators presented Deputy Gibson with very few questions into the anomalies. Investigators were unable to link the handgun recovered as belonging to Mr. Obregon. DNA swabs were taken from the gun but never submitted for DNA analysis in order to forensically place the weapon in Mr. Obregon's hands.  Finally, Mr. Obregon was wearing a backpack during the shooting, but there is no indication that it was examined to corroborate trajectories.

There were contradictory statements as to the number and succession of gunshots. Seven witnesses ultimately described some manner of a pause between the number of shots fired.  Despite this anomaly to Deputy Gibson's account, investigators did not seem to consider potential implications as there was apparently no investigative analysis conducted or investigative conclusions made relating to the projectile impact trajectories identified in the medical examiner's report.

**Fourth:**

Deputy Gibson's shooting account is questionable.  The ring-camera footage depicts Deputy Gibson going after Mr. Obregon.  He is out of sight for approximately 3.5 seconds before reemerging walking backward while shooting downward into the area in which Mr. Obregon had reportedly fallen.  According to Deputy Gibson's deposition, during that 3.5 second timeframe, he did the following:

1. He ran after Mr. Obregon

2. Got on top of him

3. Radioed for backup

4. Felt Mr. Obregon manipulating something with his hands underneath his waistline

5. Saw Mr. Obregon work his arm out brandishing a silver and black gun

6. Pushed off of Mr. Obregon

7. Started back peddling away from Mr. Obregon

8. Drew his service weapon

9. Saw Mr. Obregon roll to his side trying to relocate him

10. Saw Mr. Obregon point the gun at him

11. Warned Mr. Obregon to drop the gun

12. Started firing at Mr. Obregon

Based upon testimony, crime scene data, and having visited the scene, I estimated the distance from the moment Deputy Gibson left sight of the camera to Mr. Obregon's location, to be between 5-9 feet. Physically navigating that distance both directions and completing all the above steps within a 3.5 second timeframe seems unlikely, especially when also factoring in cognitive reaction time (RT) for one or more of the stated steps.

Cognitive reaction time is essentially the total duration of time between the perception of a stimulus (visual or auditory) and the initiation of a physical response. In other words, the time it takes a person to perceive and then to physically react to a given threat or other stimulus. There are many variables in which can influence RT, e.g., age,

OBREGON_000912

weariness, lighting conditions, etc.   There has been research done to calculate average RT, but it varies from person to person.  Therefore, in order to measure accurately a specific person's RT, that individual would have to be tested individually.

**My Opinions Regarding the Seizure of Mariah Brady:**

Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.  The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Discussion:**

In the landmark case of in landmark case of Terry v Ohio, the Supreme Court described the difference between a non-seizure (a contact) and a seizure (stop or arrest). The Court defined a seizure as "Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred."  Officers must have reasonable suspicion (RS) of a crime to seize a person, including a witness, and they can only detain that person for a reasonable amount of time. A reasonable amount of time has been defined as brief and lasting only as long as necessary to confirm or dispel the officer's suspicion.

All officers are taught Terry v Ohio.  They are also taught that 20-minutes is a good rule of thumb for traffic stops and other citizen contacts.  Officers are taught that even more deference should be given to holding witnesses and that witnesses should not be detained against their will, especially when they have been identified.

OBREGON_000913

That being said, Mariah Brady was a witness to the police shooting in front of her residence. At the time of the incident, she was fifteen years old. Pursuant to her police interview and/or subsequent deposition, Mariah's parent(s) were not home and she had been caring for younger siblings. After the shooting, she immediately went outside and contacted the deputy involved as detailed above. As backup officers arrived, she was ordered to stay there. (Fox Body Cam 03:30 / 1908hrs.)

In Mariah's interview with Detective Gonzalez, she described being held very close to Mr. Obregon and held against her will for a very long time throughout the incident. She emotionally described being "trapped" by several officers and made to "watch him die." She asked to leave multiple times to go back into her home but was rebuffed, told to "shut her mouth" and warned that she would be arrested if she passed the "line," i.e., crime scene tape preventing her from getting back into her house. (Mariah Audio Interview 01:50 – 10:30)

Body cam video confirms that Mariah was detained at 1908 hours on the SEC of her property, between the utility pole and driveway, approximately 20ft of the decedent. Video confirms that Mariah was kept there (officers standing by) for over an hour (1908-2012hrs) despite multiple requests to leave and arguments that she needed to go back inside her home and care for her siblings. Mariah was emotional, angry and even insulting to the officers when they rebuffed her requests. At 2012 hours, you can hear the officer tell detectives "We wouldn't let her go in – she's just mad."

Mariah lived there, had already been identified as a witness and was not a suspect in any crime. The officers would have known that Mariah was a juvenile and visibly upset

young girl, and they should have known that placing a child in close proximity to a fatally wounded person could be traumatic.  Mr. Obregon was reported to be a family friend.

Holding a witness, particularly one that could be considered as a hostile witness, inside the inner perimeter of a crime scene is highly unusual.  It is common police practice to relocate witnesses not only outside of a crime scene, but also to shield them from public scrutiny.  Instead, Mariah was detained on the shoulder of the road.  Officers routinely ask witnesses if they would mind waiting in a vehicle, restaurant or other safe location outside of the crime scene and out of public view.  There is no evidence that they made such an offer.

If a witness objects to being detained, officers should obtain their contact information and arrange to interview them later, especially when there is no urgency.  In this case, Mariah's home was not part of the crime scene, and she could have waited inside her home for investigators.  The officers' treatment of this minor witness and the length of her seizure were unreasonable.

Respectfully given January 31, 2026

_____
Ret. Lt. Mark R. Hafkey, M. Ed.

# EXHIBIT 2

**CURRICULUM VITAE**
**RETIRED LIEUTENANT MARK RICHARD HAFKEY, M. Ed.**
**5801 Illilouette Fall**
**Mariposa, California 95338**
**602-703-5211**
**Mark.hafkey@gmail.com**

| | |
|---|---|
| **EDUCATION** | <ul><li>**Northern Arizona University**, Masters - Educational Leadership, GPA 4.0, Summer, 2000</li><li>**Arizona State University**, BS in Political Science / history minor, Cum Laude, Fall, 1993</li><li>**Central Arizona College**, AA degree: Honors – GPA 3.68; Spring, 1989</li><li>**Other College**: completed 31 credit hours in Spanish (advanced speaker)</li><li>**Spanish Immersion** Program in Hermosillo, Sonora, México (4 weeks)</li></ul> |
| **EMPLOYMENT HISTORY** | **Police Expert Witness Consulting 2016-present** <br> **Police Expert Witness** – conduct private consultation and offer expert opinions and testimony relating to police policies, practices and procedures for both Plaintiffs and Defendants, e.g., <ul><li>Obregon v. Lamb and Gibson (provided written opinion for Plaintiffs)</li><li>Adams v. Lake Havasu City, et al, (provided written opinion for Plaintiffs)</li><li>Shere v. City of Phoenix, et al (provided written opinion for Plaintiffs)</li><li>Loentae Kirk v. City of Phoenix, et al (provided written opinions for <u>Plaintiffs</u>)</li><li>James W. Denby v. Lujan, et al (provided written opinions and deposition for <u>Plaintiffs</u>)</li><li>Sorensen v. Babeu and Steele, et al (testified in Pima County Superior Court for <u>Plaintiffs</u>, who were also <u>Defendants</u> in this matter)</li><li>McRae v. Arizona, et al (provided written opinions for <u>Defendants</u> / Attorney General)</li><li>State of Arizona v. Hampton, Sr. (provided opinions for <u>Plaintiff</u> / Pima County Legal Defender)</li><li>Numerous consultations and file reviews which did not extend beyond initial discussions and file reviews of pending civil actions, including two wrongful deaths filed by <u>Plaintiffs</u></li></ul> **American Airlines / U.S. Airways / Frontier Airlines 2012-2023** <br> **Cabin Crew** – trained on Airbus, Boeing, and Embraer aircraft <br><br> **Phoenix Police Department (PPD) 1989-2012** <br> **President** - Phoenix Police Sergeants & Lieutenants Association (PPSLA) <br> Duties: managed and operated employee association corporation, led elected board, negotiated employee contracts, represented employees in misconduct and other matters, conducted and coordinated law enforcement training seminars, responded to membership issues, lobbied and networked on the local, state, and national level regarding laws and law enforcement concerns & interests, represented police management interests on approximately 30 boards and committees; reviewed, developed, investigated, and interpreted police policy, practices, and procedures <br><br> **Lieutenant** - Public Affairs Bureau, Community Relations Bureau, & Squaw Peak Precinct <br> Duties: worked cooperatively and jointly to provide quality seamless customer service, participated in various community activities and made verbal presentations to groups, led sworn and non-sworn police staff, reviewed and analyzed work and crime statistics and plans to ensure efficient allocation of police manpower, supervised major crime scenes and barricades, maximized utilization of resources and achieved the highest possible productivity, testified as a witness in court in connection with arrests and investigations; demonstrated continuous effort to improve operations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations <br><br> **Sergeant** - Traffic Bureau, Organized Crime Bureau, Desert Horizon Precinct & Central City Precinct <br> Duties:  participated in community activities, made verbal presentations to groups, and worked cooperatively and jointly to provide quality seamless customer service; supervised sworn and non-sworn police staff, conducted training and presentations, served as a witness in court, investigated complaints or allegations of misconduct against employees of the Police Department, kept informed and aware of persons and places suspected of illegal activity and/or potential for |

OBREGON_000916

Curriculum Vitae – **MARK R. HAFKEY**
2 | P a g e

problems within an assigned area; supervised and secured major crime scenes, pursuits and barricades, administered first aid, arbitrated disputes, and conducted preliminary and follow-up investigations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations

**Patrol Officer / Field Training Officer**, South Mountain Precinct
Duties: Served and protected the community, enforced laws, mediated disputes, provided information, investigated crimes, secured crime scenes, conducted barricades, assisted with tactical entries, testified in court, made arrests, trained officers, etc.

**PPD ASSIGNMENT HISTORY**

**Phoenix Police Department**
- President – Phoenix Police Sergeants & Lieutenants Association, 7/2004-2/2012
- Patrol Lieutenant / Area Manager,  1/2002-7/2004
- Motor Supervisor, Traffic Bureau, 9/2000-1/2002
- Administrative / Training / Investigation Supervisor, Organized Crime Bureau, 9/1997-9/2000
- Patrol Sergeant, 11/1995-9/1997
- Patrol Officer / Field Training Officer, South Mountain Precinct, 1989-1995

**PPD DECORATIONS**

**Medals**
- Merit (2X)
- Lifesaving
- Physical Fitness
- Safe Driving
- No Sick Leave Usage

**Commendations**
- Over 30 written commendations while serving the Phoenix Police Department

**PUBLICATIONS**

- *Law Enforcement Matters, Understanding and Attaining a Career as a Police Officer*, 2020
- *Proud to Be Phoenix PD*, Commemorative Edition Magazine, 2011
- *Phoenix Police Sergeants and Lieutenants Association Bars & Stripes* - Quarterly Newsletter

**PROFESSIONAL DEVELOPMENT**

**Instructor Certifications**
- Defensive Driving Instructor, 2000
- MCCC Teacher Certification, 1998 (Adjunct Faculty – Phoenix College)
- Drug Recognition Expert (Instructor), 1997
- Firearms Instructor, 1994
- Defense Tactics Instructor, 1994
- General Instructor, 1993

**Courseware Development and Instruction**
- Distinguishing Between Drug Intoxication and Mental Illness
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Management
- Team Building
- Time Management
- Professional Traffic Stops & Customer Service
- Defensive Driving (personal and for commercial vehicle operators)
- Microsoft Office Software Applications
- Advanced Internet Investigations

OBREGON_000917

Curriculum Vitae – **MARK R. HAFKEY**

3 | P a g e

## Law Enforcement Certifications and Training

- Numerous union and police officer rights seminars, 7/2004 -11/2011
- Globalization, Development & It's Unintended Consequences for U.S. Public Safety, 9/2010
- Brand Piracy, the Links to Organized Crime and Terrorism Investigation, 9/2009
- Legal Issues – Interviews and Interrogations, 2/2009
- Advanced Police-Media Relations 12/2007
- Dealing with the Psychological Aftermath of Critical Incidents / Risk Management, 10/2007
- Stress Management in Law Enforcement, 6/2007
- Public Safety and Homeland Security Law and Practices Training Conference, 6/2007
- Psychological Terrorism a Law Enforcement Perspective, 12/2006
- New Patterns of Leadership, 9/2005
- Critical Incident Risk Management for Managers & Supervisors, 8/2005
- Legal Survival for Police Personnel, 8/2005 and Hot Topics in Law (Enforcement), 8/2005
- Future Trends in Crime – Profiling Interpersonal Violence, 1/ 2005
- Leadership for Managers, 9/2004
- Contemporary Issues in Internal Affairs and Use of Force, 4/ 2004 and 3/2007
- Civil Liability Management Workshop, 4/2003
- Legal Issues for Law Enforcement Personnel – Investigations, 3/2003
- Responding to Alien Crimes, 2/2003
- Police-Media Relations, 1/2003
- Advanced Spanish for Law Enforcement, 12/2002
- Enlightened Leadership Principles, 12/2002
- Disaster Response for Aircraft Mishaps & Weapons of Mass Destruction, 11/2002
- Legal Issues for Law Enforcement Personnel Advanced Seminar, 7/2002
- Radar Speed Measurement, 7/2001
- City of Phoenix Police Department Leadership Forum, 3/2001
- Drug Enforcement Bureau Supervisor Seminar, 5/2000
- Phoenix Police Department Spanish Language Certification, 12/1999
- Investigation of Computer Crime, 10/1999
- Panel Interviewing Skills, 2/1997
- Personnel Law for Managers and Supervisors, 11/1996
- Supervisor Development School, 9/1995 and IACP Advanced Supervision Skills, 9/1996
- Detective School/Certification, 8/1994 and AzPOST Interview and Interrogation, 5/1995
- Horizontal Gaze Nystagmus (HGN) and DRE Certification, 5/1991 &  7/1993

## Aviation Certifications and Training

- Private Pilot, U.S. DOT / FAA Certificate Number 3678344
- Flight Attendant, U.S. DOT / FAA Certificate Number 3625697

## Computer Training

- Microsoft Office applications, ArcView, PACE, and Advanced Internet Investigations

## Writing Courses

- Essential Business Writing Skills, 1/1997
- Effective Written Communication, 9/1994
- Writing for Professions, 5/1993
- Grammar Gremlins, 12/1993
- ALEOAC Report Writing, 3/1993
- Sharpening Basic Writing Skills, 11/1992
- Proofamatics, 5/1992

## DUI/Drug Traffic Safety Training:

- Fourth IACP-DRE Training Conference, June, 1998
- Third IACP-DRE Training Conference, June 14-17, 1997
- DRE Instructor School, June 2-6, 1997

OBREGON_000918

Curriculum Vitae – **MARK R. HAFKEY**
4 | P a g e

- Second IACP-DRE Training Conference, May 12-14, 1996
- First IACP-DRE Training Conference, June 10-13, 1995
- Drug Identification Class (by DEA), August 7, 1995
- Mark IV GCI/IR 3000 Operator School, December 2, 1993
- Drug Evaluation and Classification (DRE School), July 20-31, 1993
- Preliminary Training; Drug Evaluation & Classification, June 22-23, 1993
- Drug Screening (Phoenix Police Department), August 12, 1991
- Horizontal Gaze Nystagmus (HGN School), January 29-31, 1991
- DUI Training (Phoenix Police Department), February 23, 1991
- Narcotics Identification (Phoenix Police Department), June 6, 1990
- DUI & Drug Investigation (Academy), September 18; October 23-27, 1989

**PROFESSIONAL MEMBERSHIPS**

**Past or Present Affiliations**
- Association of Professional Flight Attendants - Member
- Police Sergeants and Lieutenants Association (PPSLA)  - President
- Arizona Police Association (APA) - Secretary
- National Association of Police Organizations (NAPO) – Area Vice President
- Spanish Toast Masters - Member

**CONSULTING**

**Courseware Development and Instruction**
- Distinguishing between Mental Illness and Drug Intoxication
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Resolution
- Team Building
- Defensive Driving (personal and commercial vehicle operators)
- Microsoft Office Software Applications

**SPECIALIZED READINGS**
- "Arizona Officers Legal Source Book" by Dale Anderson, Esq. (The Peace Officers Bible)
- "Drug Evaluation and Classification Training," Student Manual, U.S. DOT, et al., 1993 ed.
- "Little Flowers of the Gods," Hightimes, by Richard Evans Schultes and Albert Hofmann, 1987. Study of Psilocybin (Mushrooms).
- "Highanxiety," Consumer Reports, 1993.  Study of tranquilizer abuse.
- "Who Takes Xanax, and Why?" Consumer Reports. 1993.
- "Halcion and Prozac," Consumer Reports.  1993.  Comparing tranquilizers.
- "Relief without Drugs," Consumer Reports, 1993.  Discussing psychotherapy as an alternative.
- Psychedelic Drugs," The Harvard Medical School Mental Health Letter, February, 1990. Overview on effects and reactions.
- "We Should Reject the Disease Concept of Alcoholism," The Harvard Medical School Mental Health Letter, February, 1990.
- "MDA (Methylenedioxyamphetamine) AKA the Love Drug, Psychedelic Speed," by David E. Smith, M.D. and Rick Seymour.
- "LSD Still on Some Minds," L.A. Times, by Harry Nelson, March, 1991.
- "User's Defense of Marijuana Goes up in Smoke," by Sue Rusche.
- "More and More, Marijuana Becoming a Homegrown Crop," Daily News, by Tom Ashbrook, September, 1988.
- "Marinol-Dosing Begins Before Chemotherapy," by Roxane Laboratories, Inc., 1986.
- "The Escalating Problem of Inhalant Abuse," International Inst. for Inhalant Abuse.
- "Brain's Marijuana 'Receptor' is Identified," L.A. Times, by Thomas H. Maugh II, August, 1990.
- "Neurotransmitters," by Sergeant Thomas E. Page, LAPD, 1990.

OBREGON_000919

**Curriculum Vitae – MARK R. HAFKEY**

5 | **P a g e**

- "Phoenix Police Department Narcotics Price Survey," Drug Enforcement Bureau.
- "Guide to Dangerous Drugs," Institute for a Drug-Free Workplace, 1994.
- "What Works, Schools without Drugs," U.S. Department of Education, 1987.
- "Drug Identification, CNS-Psychoactive Drugs," U.S. Department of Justice DEA, 1995.
- "The Psychological and Physical Effects of Drug Abuse," U.S. Dept. of Justice DEA, 1995.
- "Tweakers & Bingers, Abuse Patterns among Meth Users," Excerpt from Effects of D-Methamphetamine, National Drug Information Center, by Margaret J. Potter, 1997.

**INTERESTS**
- Aviation
- Foreign language studies
- Boating, fishing, camping, and hunting
- Jogging, hiking, and martial arts
- Mind teaser puzzles and chess

**VOLUNTEER WORK**
- Ramond Museum and Community Center
- Raymond 4H
- Raymond-Knowles Elementary School
- Blue Santa (PPD)
- Franklin Elementary School
- PPSLA Charities
- Toys for Tots

**REFERENCES**
1. Dale Anderson, Esq., LEOTraining.com, 779-255-1298, daa2000@aol.com
2. John Commerford, Esq., Commerford Law, 602-614-7270, commerlaw@gmail.com
3. Jeff Miller, Esq., Miller Weber Kory, 602-648-4045, jeff@mwkfirm.com
4. Michael G. Gaughan, Esq., AZ Attorney General, 602-620-8122, mggaughan@cox.net
5. Sean Woods, Esq., Mills and Woods, 602-480-999-4556, swoods@millsandwoods.com

OBREGON_000920

# EXHIBIT 3

# In the Matter of:

*Obregon*

*vs*

**_Lamb_**

*Mark Richard Hafkey*

*April 24, 2026*



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB, | ) ) ) ) ) NO. ) 2:24-cv-01510-PHX- ) KML ) ) ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X, | ) ) ) ) ) |
| Defendants. | ) ) |

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF
MARK RICHARD HAFKEY

April 24, 2026
Witness Location:  Mariposa, California
9:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

5

The court reporter may swear in the witness at this time, please.


MARK RICHARD HAFKEY,

a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:


EXAMINATION

BY MS. VAN BUREN:

Q.   If you will please state your full name for the record, sir.

A.   **Mark Richard Hafkey.**

Q.   You broke up there a little bit for me, which means you may have for the others.  Can you say it one more time.

A.   **Mark Richard Hafkey.**

Q.   Mr. Hafkey, where are you right now?

A.   **I'm in Mariposa, California, County of Mariposa.**

Q.   Are you in your home?

A.   **Yes.**

Q.   Is anyone else in the room with you right now?

A.   **No.**

Q.   Do you have any written materials with you right now?

12

and there was some discussion.  And I did not think it warranted a written rebuttal to his rebuttal in my report.

Q.    Okay.  And you raised a fair point.  Mr. Borden did provide two reports, an initial report and a rebuttal.

A.    Correct.

Q.    So let me focus on the initial report.

Did you review his initial report?

A.    No, not in its entirety.  Generally speaking, I try to rely on my own thoughts, my own opinions.  I did not go through his report in detail.  And -- but I did look at his rebuttal in detail.

Q.    So let's talk about the initial report before we get to the rebuttal.

As you sit here today, do you recall any opinions in his initial report that you disagreed with?

A.    No.

Q.    Did you disagree with the video analysis he performed?

A.    I don't recall a video analysis that I reviewed.

Q.    Now we will talk about the rebuttal report.  It sounds like you did review that.  Correct?

A.    Yes.

Q.    And did you disagree with anything he says in the rebuttal report?

A.    Well, his rebuttal report essentially disagreed



**Obregon vs Lamb**                                        **Mark Richard Hafkey**

13

with my opinions, so I would -- I stand by my opinions in my report.

Q.    And can you recall anything specific that Mr. Borden said in that rebuttal report that you think, hey, I disagree with that?

A.    I don't recall anything offhand, except his disagreement with my opinion.  And I stand by my opinions.

Q.    Are there any additional facts or witness statements that you feel you need to finalize your opinions in this case?

A.    No.  My opinions are stated in my written opinion, which I stand by.  I don't have anything to add to that at this time.

Q.    Do you believe that you had all the information you needed to complete your report?

A.    There was more information that I would have liked to have had given to me or looked at, but the information that was provided to me was sufficient for me to come to my conclusions in my written opinion.

Q.    What kind of information would you have liked to have?

A.    I would have liked to have had the doorbell video that starts at the time that Deputy Gibson arrived on scene.  I would have liked to have seen the video a couple of minutes prior to that, and that was not provided to me.



**Obregon vs Lamb**                                              **Mark Richard Hafkey**

25

actually supervised detectives in their roles as well.

Q.    Did you ever have the position of a detective?

A.    No.

Q.    Did you ever reconstruct a shooting as part of your duties with Phoenix PD?

A.    No.  Except in my preliminary scene response and passing on observations to the -- whatever detectives were eventually assigned the case.

Q.    Did you ever determine the sequence of gunshots in any homicide investigation with Phoenix PD?

A.    In every homicide you respond to, you, you take a look at the evidence that's at the scene.  And I would have done that on virtually every case that I was -- that I responded to in terms of my observations.

In terms of comparing -- I think what you are asking me is in terms of taking a medical examiner's report and then reconstructing the sequence.  Is that what you are asking me?

Q.    Correct, sir.

A.    No, I have never specifically been asked to do that.

Q.    And relatedly, did you ever analyze bullet trajectories when you were with Phoenix PD?

A.    Yes.  But those trajectories were always preliminary, because they would have been pre-forensic



Obregon vs Lamb                                          Mark Richard Hafkey

26

examination.  So oftentimes we had to take a look at a scene and determine trajectories to try to gather evidence at the scene, determine where the shots were fired from, and make observations that were associated with where the rounds were actually fired from, both from the recipient of those rounds and also from a police officer making those shots.

And so we had to always take a look at those types of evidentiary observations to pass on in -- as part of our general investigation, which oftentimes led to a homicide investigation, and where we would brief our homicide detectives as to our observations.  So there's a lot of preliminary work that goes into a response at a serious crime scene that are made by patrol officers.

Q.   Would you agree with me that in this case you took the ME report and offered opinions regarding sequence of gunshots and body positioning?

A.   Yes.

Q.   Did you ever do that in your roles with Phoenix PD?

A.   Not as part of my assignment, no.

Q.   As any other part of your role, did you --

A.   Yes.

Q.   -- do with that Phoenix PD?

When else did you do that with Phoenix PD?



**Griffin Group International**
**888.529.9990 | 602.264.2230**

27

A.   It's part of reviewing a case.  What I mentioned earlier, in terms of representing police employees when they are involved in shootings, especially shootings that lead to a homicide, the entire report gets reviewed.  And I reviewed many reports to evaluate their accuracy and to make observations as to the investigation, and make sure that all I's were dotted and all T's were crossed in representing my employees.

So I was -- I have a lot of experience looking at reports and making sure that those reports are as accurate as possible in my role as a representative for the employees involved.

Q.   But you did not actually take the ME report and determine bullet sequencing yourself in those matters, correct?

A.   No.  Again, it's a matter of reviewing what's already been done, for the most part, and making my, my observations of investigations which were completed and then evaluating their accuracy, their validity.  Making sure that if there are holes in the investigation, that those holes get addressed after the fact.

Q.   Have you ever received any training or education in forensic pathology?

A.   Very general, nothing very advanced.

Q.   Tell me about the general training that you



**Obregon vs Lamb**                                          **Mark Richard Hafkey**

29

make sure that all angles in an investigation are completed and conducted properly.

Q.   Have you had any other training or education in ballistics besides what we just talked about?

A.   Yes.  In my role as a firearms instructor, you go through quite a bit of ballistic-type training to understand calibers of rounds, various firearms, what types of -- from rifles to pistols, different types of pistols.  But not, not from a forensic level, if that's what you are asking me.  It's more of an identification level.  Different rounds make different types of wounds. And there's a lot of general training that firearms instructors go through to understand the types of wounds and the types of damage that particular rounds will cause on a body.

Q.   Have you had any training or education in determining bullet trajectories?

A.   No.

Q.   Did you ever serve with the PSB, the Professional Standards Bureau, with Phoenix PD?

A.   I was never assigned to the Professional Standards Bureau, no.

Q.   On your CV, Exhibit 2, under Lieutenant, for example, and I'm looking on page one, you say that you "conducted police misconduct investigations, including use



45

and seeing how they align to the rounds fired, the rounds that struck Mr. Obregon.

The timing part of that has really to do with the few seconds that the deputy was off camera and Obregon was off camera. And I had to look at the timing to the Ring video and the audio and then see how it lined up with the rounds fired, if that makes sense.

And the statement analysis was statements involving what the witnesses said and what the deputy said occurred, and then making an analysis of, as much as I could, what could be confirmed with video, what could be confirmed with audio. And then also a part of that timing had to do with reenacting what the officer said occurred and comparing it with the timeline of the various evidentiary pieces we had, like the Ring camera, and trying to determine if all of the things that were said occurred, could it have occurred during the time frame in which I calculated was available at the time.

Q.   You said reenacting what the officer said occurred.

Did you do a reenactment yourself?

A.   Yes.

Q.   Was anybody else involved in that reenactment?

A.   Yes.

Q.   Who else?



Obregon vs Lamb

Mark Richard Hafkey

46

A.    My daughter.

Q.    Tell me how you did that reenactment.

A.    Essentially I had a window of time that I was able to determine and I put -- I had my daughter do the things that the deputy testified that he did from the distances I calculated and I timed it.

And so I instructed my daughter, who is not quite 18 yet -- but I needed another person to go the distance that I calculated the officer had to go to get on Mr. Obregon's back and then retreat and get back into the video range.  And doing that calculation helped me understand how much time it would take somebody to actually do all the things the deputy said, and it helped me develop my opinion.  Well, it helped me confirm my opinion that I had already written at that point.  I just wanted to do a little bit more work on that.

Q.    Where did you do this reenactment with your daughter?

A.    In my home.

Q.    When we were talking about the trajectory analysis, you used the language that you compared the ME report, comparing the ME report of injuries.

What were you comparing the ME report with?

A.    I used a human figurine and I used stickpins to document based on what the medical examiner's opinion was



Obregon vs
Lamb

Mark Richard Hafkey

49

A.    And I took those just recently, Laura.  It was -- it's not something that I had prior to that subpoena.

Q.    So we are going to need you to supplement that subpoena to include those photos.  Okay?

A.    Yes.  I will send them to Sean, if you like.

Q.    That's fine.  Thank you.

A.    It's not the -- a -- it's the best human figurine I had to me, so don't laugh when you see the photo.  But I used a Stretch Armstrong doll.

Q.    Okay.  That was going to be my next question for you.  A Stretch Armstrong doll, did you order it on Amazon?

A.    No, I actually had it.  It's what I had handy.  And I used stickpins, and I just took photos of that.  And each stickpin was -- I tried to place exactly as the medical examiner said the rounds entered the body and at which direction.  And that helped me understand how Mr. Obregon, how he was moving when the shots were fired.

Q.    About how long is the Stretch Armstrong doll?

A.    Well, it's probably nine or 10 inches is all.

Q.    You mentioned that you used a cue stick.

        Are you talking about like a pool cue stick or something else?

A.    A pool cue stick.  It helps me -- we did this in law enforcement.  It's one of the techniques that a patrol



50

officer can do out on a scene.  You use a, you know, a baton or some kind of straight stick and you can show -- when you are doing briefings, for example, you can show the general direction of a round entering the body.  And that helps us go and look for evidence from the direction that we believe the rounds came from.

And we used it, not only for bodies, but for vehicles and buildings.  So you really just need a straight stick of some sort.  And it often helps you point to where the suspect, or the officer in some cases, was firing.  And it's nothing more than an investigative tool to help understand where the rounds came from or where the rounds went to.

Q.   You also mentioned "stickpins."

Can you describe for me more, what do you mean by "stickpins"?

A.   Just like you would find in a standard sewing kit, a ball on one end and a pin.  And so I was able to pin based on what the medical examiner indicated was the -- how the round entered the body.  And once you have all the pins in place, then it helps -- it helped me understand what position Mr. Obregon's body was in when the rounds were fired.

Q.   So then walk me through, how did you use the stickpins versus the cue stick?



51

A.    In the same manner.  I start with a cue stick, just to help me understand it.  Then the stickpins was just a way -- because in Mr. Obregon's case, it was a little complicated in that there was anterior as well as posterior shots.

And so, you know, I had to use a cue stick on a body, but then -- which was my daughter, to show how the rounds must have gone in and what position that body was in at the time the rounds -- each round struck.  And then the stickpins came in after that.  And then once all the stickpins are in, I could maneuver the figurine to help determine how both posterior and anterior rounds could have occurred and what the body's position must have been in at the time they occurred.

So everything I did, Laura, was just to help me understand, and so I could clarify that -- without simply looking at a report and trying to figure out each round all at one time, it just helped me put it all together and confirm my -- you know, what my brain told me happened, I just wanted to confirm it.  So I did that not too long ago, just to help me confirm what my brain said had occurred based on just reading the material.

Q.    Did you do that after you prepared your January 31, 2026 report?

A.    Yes, I believe I did.



54

at least Axon videos to understand how long exactly she was held and some of the issues that arose during that containment to supplement my opinion on that specific issue.

Q.   Do you recall the name of that witness?

A.   Mariah, I believe.  Yeah, Mariah.  I just looked down at my Witness Statement Table.

Q.   And you understand that she's bringing a claim in this case, correct?

A.   I didn't know all of that in the beginning, but I have learned that subsequent, yes.

Q.   Do you know what kind of claim she's bringing?

A.   No.  I haven't read it.  Sean may have mentioned something about it, but I think it -- I don't think it had to do with the constitutional issue that I opined on.  I think it had to do with other issues related to how she was treated, I believe.  But my opinion had more to do with the legality of being seized.

Q.   Have you ever reviewed the Complaint in this case?

A.   I don't think I ever reviewed the Complaint, Laura.

MS. VAN BUREN:  We have been going a little over an hour and a half, so I need to give our court reporter a break.  Why don't we come back in about 10



Obregon vs Lamb                                    Mark Richard Hafkey

55

minutes.  All right?

THE WITNESS:  Sure.

MR. WOODS:  Sounds good.

THE VIDEOGRAPHER:  We are going off the record.  The time is 10:34 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER:  We are back on the record.  The time is 10:44 a.m.

BY MS. VAN BUREN:

Q.  Mr. Hafkey, I want to ask you a couple more questions about the reenactment you did with your daughter.

Did you say that she was 17?

A.  Yes.  She will be 18 very soon.

Q.  And you did the reenactment at your home?

A.  Yes.

Q.  Outside or inside?

A.  Inside.

Q.  Where exactly did you do it?

A.  Living room.

Q.  Did you give her any instructions on how fast she should be progressing through these different steps?

A.  No.  In fact, I was real careful just to tell her the things I would like her to do.  She doesn't really know the case or all the issues or anything.  I just



56

needed a body to do the things that Deputy Gibson

indicated he did in a certain time period at a certain

distance, and I needed to clock it.  So I gave her very

limited information.

Q.    Did you have her go through the steps once or
more than once?

A.    We did it twice.

Q.    Do you remember what the time clock was for each
of those times?

A.    It was more than the time I had calculated that
Deputy Gibson was off Ring video, which I calculated to be
about 3.5 seconds.  So it was, it was beyond 3.5 seconds.
And that's what I was calculating, could the things that
occurred within that known period -- or I'm sorry, that
unknown period off Ring camera -- and so it was -- I think
the first one was probably close to 3.5 and the next one,
it ranged from up to like 3.5 -- I guess the first one, it
was over 3.5.  It was probably 4 seconds up to 7 or 8
seconds, in that time period.  So it was -- since it was
more than the 3.5 I was looking at, I didn't go further
than that.

Q.    The Stretch Armstrong doll that we were talking
about -- and I know I'm going to get your photos so I will
learn more then.  But I'm going to show you just this
picture I just pulled off line.  This will be Exhibit 7.



57

(Deposition Exhibit No. 7 was marked for identification.)

BY MS. VAN BUREN:

Q.    Is this the kind of doll that you used?

A.    Yes.

Q.    And I saw from my online perusing that you can stretch it out, as the name suggests, right?

A.    Yes.

Q.    When you were performing your analysis, did you stretch the doll out or did you leave it at its original size?

A.    At its original size.

Q.    And did you confirm that this doll is in scale to a human body?

A.    No.

Q.    All right.  Let's go back to your report, please, Exhibit 1.  And I will pull it up on the screen as well for you.

First, did you write this report yourself?

A.    Yes.

Q.    Did anyone assist you in writing any portion of this report?

A.    No.

Q.    Let's go to the second page of the report.  Just for the record, the Bates is OBREGON_000898.  You list the

60

never printed out.

And so, again, it goes back to me getting into a large, large case file and trying to pull out items that I think will help me in my opinion.  And so a lot of that, if it's not in my -- listed specifically, and I looked at it, it's because I don't have it.  In other words, if I didn't list it in my response to that subpoena, it's because I didn't actually physically have it.

Q.   And if you didn't physically have it, if you didn't save it to your computer, does that mean that you didn't rely on it in preparing your report?

A.   Well, that's hard to say.  I don't think I did.  Everything I relied on I think I documented in my written opinion, either in the Case Material Reviewed section or in the verbiage of the various pages of the opinion.

But I guess what I'm saying is I'm not 100 percent sure that there wasn't something I saw that I had in digital available to me at the time.  I just didn't keep it.

Q.   Did you review any of the ME photos from the autopsy?

A.   Yes.

Q.   How many photos did you review?

A.   I don't think I reviewed many at all.  I think I just glanced at that particular section.  Because I'm not



Obregon vs
Lamb

Mark Richard Hafkey

61

trained well enough to look at a photo and determine trajectory, so I -- my opinion regarding the trajectories was 100 percent based on the written opinion from the medical examiner and not on any specific photos.

Q.    So you may have glanced at the photos, but you didn't rely on those in preparing your opinion, correct?

A.    Right.

Q.    What about the ME radiographs, did you look at those?

A.    I'm going to grab the medical report, what I have.

Q.    Okay.

A.    And which specific portion are you referring to? Because the one I have starts at page 90 and goes to 103. There was also a diagram that's numbered 2042.

Q.    There are radiographs, so diagnostic imaging, separate from the photos in the report.

Did you review those at all?

A.    I don't think I did then, Laura.  I don't see them in here.  Well, maybe they -- let's see here.  No, that's lab work.  Yeah, what you are referring to I don't think I have and I don't think I looked at them or relied upon them.

Q.    Going back to your report, Bates page -898, the "Miscellaneous Case File Information as Necessary," what



72

sometimes difficult to determine what would have killed the person because of how long it would take medical care to get there to provide life-saving measures.

So my understanding in reading this medical examiner's report is he's saying at least six of those shots could have been life-threatening. But to know for certain, if you don't know the sequencing of the rounds, would be extremely difficult to ascertain.

Q. And do you have an opinion on which gunshot wound or wounds was fatal here?

A. No.

MS. VAN BUREN: It's about 11:15. This is a good stopping point for me.

Sean, we can let you go ahead and get ready for your hearing.

MR. WOODS: Okay. Thank you.

THE WITNESS: Will we be continuing the deposition, then?

MS. VAN BUREN: Yeah. Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 11:14 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:46 a.m.

Obregon vs Lamb                                          Mark Richard Hafkey

74

they were taken the 15th, which would have been after my visit to the scene, which I think I mentioned it was around that time frame.

Q.    Okay.  Let me ask you a couple questions before the rest of your clarification.

Over the break, as you were, you know, looking through your phone and maybe remembering things, did you prepare any notes or video of your testing with the Stretch Armstrong?

A.    No.

Q.    Okay.  What about any measurements?

A.    No.

Q.    Okay.  What about -- and, again, I'm I just want to confirm, what about the reenactment you did with your daughter, do you have any videos or photos of that?

A.    No.  I didn't take any of that.  It was more clarification in my brain.

Q.    So no notes or no measurements involving that reenactment, correct?

A.    That's correct.

Q.    Okay.  Did you have any other clarifications?

A.    Yeah.  You had asked me about -- we were talking about a homicide scene and different details I work for related to homicide.  And I was explaining that as patrol, you virtually go to a lot of homicides before the Homicide



**Griffin Group International**
**888.529.9990 | 602.264.2230**

97

statements indicate that he was prone when the witnesses
and the officer approached the body.  However, the video
from the officers giving first aid show him face up.  So
the body had been moved face up sometime after the
shooting.

Q.   Based on the video and the photos that you saw,
how far away was the gun from Mr. Obregon's body?

A.   A few feet, maybe three to four feet.

Q.   And you are aware that that gun was loaded,
correct?

A.   Yes, that's what I read.

Q.   And you would agree that a loaded handgun is a
deadly weapon?

A.   Yes.

Q.   And you would agree that a loaded handgun within
three to four feet of a suspect can present a danger to an
officer?

A.   Potentially it could, yes.

Q.   We talked about some of the testing and the
reenactment that you did.

Did you perform any other kind of testing in
preparing your opinions for this case?

A.   No.  Mainly just running scenarios through my
brain, reading the material, putting myself in the
officer's shoes, and running it through my head over and



98

over and over.  And my experience with so many shootings, I could not possibly count, and drawing on my experience, I felt very comfortable and stand by my opinion.

Q.    Did you create any sort of diagram?

A.    No.

Q.    Did you use any kind of software to test your opinions?

A.    No.  I would like to.

Q.    Do you -- what kind of software would you use to test your opinions?

A.    Reenactment software, where they can actually lay out my opinion and -- I'm not skilled to do it myself, but there are, there are people in the industry that can extrapolate all the testimony and the scene photos, and so forth and so on, and probably put together a computer enactment that would be consistent with my opinion.

Q.    Do you acknowledge that other qualified experts in your field might interpret this data differently?

A.    Yes.  Especially if you, if you don't account for the deputy's statements.  Because in this case that's the void.  You have statements from your primary witness in the case.  But if those statements are not valid, are not correct, you could -- I could probably draw some other possibilities in which he was actually struck in his back first and the last shot was the frontal shot.



different in the body positioning.  I think the opinion would likely -- could likely be different in terms of the sequence of the shots and whether he was hit in the back first or hit in the front first.

So to answer your question, Laura, I think it's limited.  I'm very confident in my trajectories drawing everything together, but I don't doubt you can get another expert to counter just about everything else.

Q.    Do you know what the elements of gross negligence are here in Arizona?

A.    Not really.  I'm not an attorney.  I have read gross negligence in cases, and I think it's -- it lends itself to interpretation of what "gross" means and what the level of the gross negligence means.

Q.    What are the Graham factors?

A.    Oh, Graham verse Connor factors?

Q.    What are the Graham v. Connor factors, yes.

A.    Well, certainly the primary one is the, the severity of the crime.  And then Graham looks at, you know, looking at an objective reasonableness and the force applied based on that severity of the crime.

Q.    Do you agree that an officer's use of force should not be viewed with the benefit of 20/20 hindsight?

A.    Boy, that's a loaded question.  The courts have -- in one case the judge actually stated that.  So,



Obregon vs Lamb                                    Mark Richard Hafkey

101

and -- but in reality the courts and the juries want to have somebody come in and provide a 20/20 opinion after the fact. And that's what I was hired to do and that's what I have tried to do.

It's certainly not comfortable to apply a 20/20 after-the-fact opinion because there's a lot of variables leading up to the force. But that's what I was hired to do and I tried to base, base it on -- the best I could based on the totality of the evidence in this case, and I stand by my opinion.

Q.    Do you agree that under the law a use of force is judged on a reasonableness standard?

A.    Yes.

Q.    And do you agree that under the law an officer's force can be legally justified, even if they were wrong, if their mistake was objectively reasonable, given the context?

MR. WOODS:  Form, foundation.

THE WITNESS:  Yes, I do believe that the courts could go that direction, and they have in some cases.

MS. VAN BUREN:  All right.  Mr. Hafkey, those are the only questions I have for you.  Mr. Woods might have a few things.

MR. WOODS:  I have no follow-ups.



# EXHIBIT 4

23-0281                                               Michael Brandon Obregon



# FORENSIC EXAMINATION REPORT
# MICHAEL BRANDON OBREGON
# PINAL COUNTY ME CASE #23-0281
# PINAL COUNTY SHERIFF'S OFFICE
# CASE #23-0316206

Pinal County

APR 18 2023

Medical Examiner

Page 1 of 10

DEFS_Obregon 000090

23-0281                                          Michael Brandon Obregon

## <u>Report of Examination</u>

Decedent:                Michael Brandon Obregon
Date of death:           March 16, 2023
Date of examination:     March 17, 2023
Time of examination:     1045 hours
Investigator:            Samantha Dungan
Forensic Technician:     Breanna McGinnis, Samantha Kuba
Present at examination:  Crime Scene Technician L. Rabb #2673 PCSO
                         Detective. B. Gay #2329 PCSO
                         Detective. M. Fender #1604 PCSO
                         Detective. J. Bonucci #877 PCSO

---

Cause of Death:          Multiple gunshot wounds
Manner of Death:         Homicide

<u>April 6, 2023</u>
Date Signed

John Hu, MD
**Chief Medical Examiner**

Page 2 of 10

DEFS_Obregon 000091

23-0281                                              Michael Brandon Obregon

**REPORTED CIRCUMSTANCES OF DEATH**

The decedent was a 36-year-old male who resided in Casa Grande, Arizona. On March 16, 2023, a deputy observed the decedent seated on a motorcycle that was parked on the side of the roadway in a residential area of Casa Grande. The deputy informed dispatch he was going to conduct an interview of the person on the motorcycle. The deputy parked his marked vehicle, and as the deputy approached the motorcycle, the occupant brandished a .40mm handgun and pointed it at the deputy. The deputy immediately removed his service weapon from his holster and fired approximately ten shots toward the occupant. No commands or conversation reportedly took place. The deputy called in the incident and medics arrived on scene. They attempted resuscitation efforts, but the death was ultimately pronounced at the scene.

Past Medical/Surgical History

The decedent had no reported medical conditions. He suffered a neck fracture in a dirt-bike accident in 2018, but had no reported ongoing complications. He had a history of methamphetamine abuse.

**INITIAL EXTERNAL EXAMINATION**

The body is received in a zippered body pouch secured by evidence seal number 0006031.

**CLOTHING AND PERSONAL EFFECTS**

All property is documented on the property sheet that is separate in the file. The decedent was also wearing blue latex gloves.

**EVIDENCE OF MEDICAL INTERVENTION**

There is a laryngeal mask airway present in the mouth. There is an intraosseous line present on the front of the right leg. There are multiple electrocardiogram leads present on the front of the torso. There are adhesive plastic films present around the wounds on the abdomen and on the back.

**EVIDENCE OF TRAUMA**

**Multiple gunshot wounds**

There are seven gunshot wounds. The wounds are arbitrarily numbered for the ease of description. The number does not indicate the sequence of firing. The terms projectile and bullet are used interchangeably and do not represent different objects. Both metric and American customary units of measurement are used. One inch is approximately 2.5 cm.

Page 3 of 10

DEFS_Obregon 000092

23-0281                                                    Michael Brandon Obregon

**Gunshot wound #1**

There is a gunshot wound of entrance present on the posterior aspect of the right shoulder, labeled defect #2. It is located 13 inches below the top of the head and 7 inches to the right of a posterior midline.  The wound consists of a 0.9 cm circular defect with a thin regular abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the scapula and the musculatures around the scapula. The bullet is lodged in the right scapular region muscle, along with three small lead colored fragments. A medium caliber severely deformed jacketed bullet and three small metal fragments are recovered from the right scapular region. The trajectory for this gunshot wound is from back to front, right to left, and slightly downward when the body is viewed in its anatomic position.

**Gunshot wound #2**

There is a gunshot wound of entrance on the right upper back, labeled defect #3. It is located 15 ½ inches below the top of the head and 5 inches to the right of a posterior midline. The wound consists of a 0.9 cm circular defect with a regular abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound.  The wound proceeds from this injury through the right posterior chest wall perforating right lower lobe of the lung, the descending aorta, the esophagus, left pulmonary vein, and the left upper lobe of the lung. There are bilateral hemothoraces measuring 1400 cc in the left pleural cavity and 200 cc in the right pleural cavity. There is 100 cc in the pericardial sac. The bullet is lodged in the left upper chest wall.  A medium caliber severely deformed jacketed bullet is recovered from the left upper chest. The trajectory for this gunshot wound is from right to left, back to front, and slightly upward when the body is viewed in its anatomic position.

**Gunshot wound #3**

There is a gunshot wound of entrance located on the left mid back, labeled defect #4. It is located 20 inches below the top of the head and 2 inches to the left of a posterior midline. The wound consists of an irregular defect measuring 1 x 1.5 cm with an exaggerated abrasion margin on its 5 to 7 o'clock edge.  The wound proceeds from this injury through the back muscles and the ribcage. The bullet is lodged in the right shoulder area. The trajectory for this gunshot wound is from back to front, left to right, and sharply upward when the body is viewed in its anatomic position.  A medium caliber severely deformed jacketed bullet is recovered from the right shoulder area and packaged as evidence.

DEFS_Obregon 000093

23-0281                                          Michael Brandon Obregon

**Gunshot wound #4**

There is a gunshot wound labeled defect #5.   It is located on the left mid back, 21 ½ inches below the top of the head and 4 inches to the left of a posterior midline.  The wound consists of an irregular 2 x 1.2 cm irregular perforation with no obvious abrasion margins identified. This wound connects with defect #6. Defect #6 is located on the left mid back on the left posterior axillary line 21 inches below the top of the head.  The wound consists of a 1 cm circular defect with a thin abrasion margin.  There is a contusion around the defect at its 6 to 10 o'clock edge, measuring up to 1 cm in thickness. There is no evidence of soot deposit or gunpowder stippling noted on the skin around these two wounds. These two wounds are a pair of tangential through-and-through gunshot wound involving subcutaneous tissue and muscles only. The trajectory for this wound cannot be determined.

**Gunshot wound #5**

There is a gunshot wound of entrance on the midline upper abdomen, labeled defect #9. It is located 22 ½ inches below the top of the head.  The wound consists of a 1 cm circular defect with an abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound.   The wound proceeds from this injury through the abdominal wall, causing a large deep graze wound in the liver tissue. The bullet partially exits the right axillary wall causing a large defect labeled #8. The partial exit wound is located on the right axilla on the right mid clavicle line, 14 ½ inches below the top of the head.  The wound consists of an irregular defect, measuring 2 x 1 cm with no abrasion margin. There is a small amount of blood in the abdominal cavity. There is a medium caliber severely deformed jacketed projectile lodged near the partial exit wound at the right axilla. It is recovered and packaged as evidence. The trajectory for this gunshot wound is from front to back, left to right, and moderately upward when the body is viewed in its anatomic position.

**Gunshot wound #6**

There is a gunshot wound of entrance located on the posterior lateral aspect of the left thigh, labeled defect #7. It is located 15 inches below the left anterior superior iliac spine.  The wound consists of a 0.9 cm circular defect with a focal abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the thigh musculature and fractures the left femur.  Multiple fragments of a medium caliber jacketed projectile are recovered from the left thigh muscle and packaged as evidence. The trajectory for this gunshot wound is from back to front.

Page 5 of 10

23-0281                                             Michael Brandon Obregon

**Gunshot wound #7**

There is a graze wound on the back of the neck, labeled defect #1. This wound consists of 1.2 x 0.2 cm superficial laceration consistent with a graze wound. It is located 10 inches below the top of the head and ½ inch to the left of the posterior midline. The directionality cannot be determined.

Both hands were previously bagged at the scene. Both hands were wearing blue latex gloves. No trauma or other significant findings are noted on the hands.

**Other trauma**

There is a small abrasion on the anterior aspect of the right shoulder. There is a small abrasion on the forehead, just on the hairline.

These injuries, having been once described, will not be repeated.

**SCARS, TATTOOS, AND OTHER IDENTIFYING BODY FEATURES**

There are numerous tattoos present on the neck, upper back, torso, and left leg. There are multiple irregular scars present on the right knee.

**GENERAL EXTERNAL EXAMINATION**

The preservation is good in the absence of embalming. The body is cold to touch, subsequent to refrigeration. Rigor mortis is full. Posterior red-purple lividity is unfixed.

The body is that of a normally developed Hispanic male measuring 68 inches in length and weighing 168 pounds. The general appearance is compatible with the reported age of 36 years. Scalp hair is black. The irises are brown, and there is no jaundice or lesions of sclerae or conjunctivae. The ears are unremarkable. There is facial hair of a mustache. The nose is unremarkable. The mouth is unremarkable. Teeth are natural. The neck is unremarkable. There are no palpable axillary, cervical, abdominal, or inguinal masses. The chest and back are symmetrical and unremarkable. Body hair is normal in amount and distribution of an average male adult. The abdomen is flat. The external genitalia, anus, and perineum are unremarkable. The extremities are symmetrical, without significant clubbing, edema, or deformity. Fingernails are intact.

**INTERNAL EXAMINATION**

The body is opened by a standard Y-shaped thoracoabdominal incision. All viscera occupy their appropriate anatomic relationships. Subcutaneous adipose tissue ranges up to 1.5 cm in thickness over the abdominal wall. Serous surfaces are smooth and glistening throughout. There are extensive right pleural

Page 6 of 10

23-0281                                                          Michael Brandon Obregon

adhesions. There are bilateral hemothoraces as described above. Weights of the internal organs are as follows, and, unless specified below, show no evidence of congenital or acquired disease.

| | | | |
|---|---|---|---|
| Heart: | 360 grams | Spleen: | 160 grams |
| Right lung: | 740 grams | Right kidney: | 100 grams |
| Left lung: | 300 grams | Left kidney: | 120 grams |
| Liver: | 1820 grams | Brain: | 1510 grams |

**CARDIOVASCULAR SYSTEM:** The pericardium is unremarkable, with blood in the pericardial sac as described above. The heart occupies its usual mediastinal site and has a smooth epicardial surface. The external configuration is not remarkable. All major vessels arise in their appropriate anatomic relationships. The coronary ostia are normally placed and are patent. The coronary arteries arise normally, are distributed in a right dominant pattern, and show no significant stenosis by atherosclerosis. The atria and ventricles are of normal caliber and are free of gross anomalies and thrombi. The myocardium is red-brown and firm, without focal abnormalities. The ventricular thicknesses are within normal limits. The endocardium is unremarkable. The cardiac valve circumferences are appropriate for the caliber of the cardiac chambers. The cardiac valves have thin, pliable leaflets that are free of fusion, vegetations, or significant fenestrations. The aorta has injuries detailed above otherwise, the aorta is of normal caliber with all major arterial branches arising in their appropriate anatomic relationship. The intimal surfaces are smooth, without aneurysm formation or dissection. No systemic venous abnormalities or thrombi are present.

**RESPIRATORY SYSTEM:** The esophagus has injuries detailed above otherwise, the upper airway, larynx, and trachea are patent with no evidence of edema, ulceration, or obstruction. The pleural surfaces are smooth and glistening. The lung parenchyma is well expanded, with injuries detailed above. Sectioning reveals pink to red-purple tissue with no areas of induration, consolidation, hemorrhage, or gross scarring. The bronchi and pulmonary vessels are patent and of normal caliber.

**DIGESTIVE SYSTEM:** The tongue is unremarkable. The oropharynx is grossly normal and unobstructed. The esophagus is of normal caliber with a smooth, gray-white mucosal lining. The gastroesophageal junction is well defined. The stomach has intact mucosal surfaces. The lumen contains 200 mL of red brown fluid. There are no areas of mucosal ulceration, erosion, hemorrhage, or scarring. The small and large intestines are not remarkable. The appendix is present in the right lower quadrant and is unremarkable. The tan-gray, lobular pancreas has no focal abnormalities. The pancreatic ducts are patent and of normal caliber.

**HEPATOBILIARY SYSTEM:** The liver has injuries detailed above otherwise, the liver has a smooth capsule covering red-brown parenchyma. The cut surfaces

Page 7 of 10

DEFS_Obregon 000096

23-0281                                                    Michael Brandon Obregon

show no diffuse or focal abnormalities. The intrahepatic and extrahepatic biliary ducts are unremarkable. The gallbladder contains viscid olive green bile and is free of calculi. The gallbladder mucosa is grossly normal.

**GENITOURINARY SYSTEM:** The kidneys are similar in shape with intact capsules covering smooth, red-brown parenchyma. The capsules strip with ease. The cut surfaces show distinct corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The renal vessels are patent and of normal caliber. The urinary bladder contains approximately 50 mL of urine. The mucosal surfaces are flat and pink-tan.  The prostate gland is unremarkable.

**RETICULOENDOTHELIAL SYSTEM:** The spleen has an intact, smooth, and glistening capsule covering dark purple, moderately soft parenchyma. Regional lymph nodes have their usual distribution and appearance.

**ENDOCRINE SYSTEM:** The thyroid and adrenal glands are grossly unremarkable.

**NECK:** The cervical spine, hyoid bone, and thyroid cartilage are intact and unremarkable. There are no hemorrhages in the strap muscles or soft tissues of the neck.

**MUSCULOSKELETAL SYSTEM:** The bony framework, supporting musculature, and soft tissues are grossly normal except injuries detailed above.

**NERVOUS SYSTEM:** The scalp is reflected in the usual fashion. There are no contusions, lacerations, or abrasions of the scalp or subscalpular structures. There are no skull fractures. The pituitary gland is unremarkable. The cerebral vessels are intact with no malformation, aneurysm, thrombosis, or significant atherosclerotic narrowing.  The cranial nerves are grossly normal. The dura and dural sinuses are unremarkable. There are no epidural, subdural, or subarachnoid hemorrhages.  The leptomeninges are thin and clear. The cerebral hemispheres are symmetrical with normal external landmarks and an unremarkable convolution pattern. There are no uncal, subfalcial, transtentorial, or tonsillar herniations. Multiple sections of cerebrum, cerebellum, and brain stem are unremarkable. The ventricular system is symmetrical and filled with clear fluid.

**TOXICOLOGY SPECIMENS**

Samples of the following are collected and some are submitted for toxicological testing. The toxicology report is attached.

- Vitreous fluid.
- Blood.
- Urine.

Page 8 of 10

DEFS_Obregon 000097

23-0281                                                    Michael Brandon Obregon

**FINAL SUMMARY**

Based on the forensic examination findings and investigative history as available to me, it is my opinion that the cause of death is multiple gunshot wounds.  The manner of death is homicide.

*As with all death investigations, opinions expressed herein are amenable to change should new, reliable, and pertinent information come to light. The Pinal County Medical Examiner's Office is required by statute (A.R.S. § 11-594(A) (2) and (4)) to certify the cause and manner of death following completion of the death investigation of each case over which it assumes jurisdiction, and to promptly execute a death certificate, on a form provided by the state registrar of vital statistics, indicating the cause and manner of death.  The form provided by the state registrar of vital statistics includes five manners of death: homicide, suicide, accident, natural, and undetermined.  The determination of manner of death is a forensic determination by the pathologist predicated upon the totality of all then-known forensic evidence and other circumstances surrounding the cause of death; it is not a legal determination of criminal or civil responsibility of any person(s) for the death. The significant findings below may not be a complete list of the decedent's medical history. This report was partially generated using dragon automated dictation software and may contain minor transcription errors.*

Significant findings

I.   Multiple gunshot wounds
  a.  Gunshot wound #1
       i.  Entrance: posterior aspect of the right shoulder, Defect #2
       ii.  Injuries: Scapula and musculature around the scapula
       iii.  The bullet and fragments of a bullet are lodged in the right scapular region
       iv.  Trajectory: Back to front, right to left, and slightly downward
       v.  The bullet and fragments are lodged in the right scapular region

  b.  Gunshot wound #2
       i.  Entrance: Right upper back, Defect #3
       ii.  Injuries: Right posterior chest wall, right lower lobe of the lung, descending aorta, the esophagus, left pulmonary vein, and left upper lobe of the lung
       iii.  The bullet is lodged in the left upper chest wall
       iv.  Trajectory: Right to left, back to front, and slightly upward
       v.  A medium caliber severely deformed jacketed bullet is recovered from the left upper chest

  c.  Gunshot wound #3
       i.  Entrance: Left mid back, labeled defect #4
       ii.  Injuries: Back muscles and ribcage
       iii.  The bullet is lodged in the right shoulder/neck
       iv.  Trajectory: Back to front, left to right, and sharply upward

Page 9 of 10

23-0281                                                    Michael Brandon Obregon

        v. A medium caliber severely deformed jacketed bullet is recovered and packaged as evidence

   d. Gunshot wound #4
      i. Entrance wounds: Defects #5 and #6
      ii. Defects #5 and #6 are connected in the subcutaneous tissue and muscles, representing a single tangential through and through gunshot wound
      iii. Trajectory: Cannot be determined
      iv. No bullet or part of bullet is recovered

   e. Gunshot wound #5
      i. Entrance: midline upper abdomen, labeled defect #9
      ii. Injuries: liver tissue, right axillary wall
      iii. Partial exit: right axilla on the right mid clavicle line. . A medium caliber severely deformed jacketed projectile is recovered near the exit wound.
      iv. Trajectory: front to back, left to right, and moderately upward
      v. A medium caliber severely deformed jacketed projectile is recovered and packaged as evidence

   f. Gunshot wound #6
      i. Entrance: Posterior lateral aspect of the left thigh, labeled defect #7
      ii. Injuries: thigh musculature and femur fracture
      iii. Trajectory: Back to front
      iv. Multiple fragments of a medium caliber jacketed projectile are recovered from the thigh muscle and packaged as evidence

   g. Gunshot wound #7
      i. Graze wound on the back of the neck, labeled defect #1

II. Mild external trauma

III. Reported history neck fracture

IV. Acute methamphetamine intoxication
   a. Amphetamine 130 ng/mL Femoral Blood
   b. Methamphetamine 830 ng/mL Femoral Blood

V. Consumption of marijuana
   a. 11-Hydroxy Delta-9 THC 1.2 ng/mL Femoral Blood
   b. Delta-9 Carboxy THC 15 ng/mL Femoral Blood
   c. Delta-9 THC 7.7 ng/mL Femoral Blood

Page 10 of 10



**NMS Labs**

200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**    04/06/2023 17:08

To:    **146677**
Pinal County Medical Examiner's Office
570 West Adamsville Road
PO Box 2728
Florence, AZ   85132

| | |
|---|---|
| **Patient Name** | Obregon, Micheal B |
| **Patient ID** | 230317-134 |
| **Chain** | 230317-134 |
| **DOB** | ▮▮▮▮ |
| **Sex** | Male |
| **Workorder** | 23110462 |

Page 1 of 4

### Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Amphetamine | 130 | ng/mL | 001 - Femoral Blood |
| Methamphetamine | 830 | ng/mL | 001 - Femoral Blood |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 001 - Femoral Blood |
| Delta-9 Carboxy THC | 15 | ng/mL | 001 - Femoral Blood |
| Delta-9 THC | 7.7 | ng/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

Agency Case Number: 23-0281

### Testing Requested:

| Test | Test Name |
|---|---|
| 8041B | Postmortem, Basic w/Vitreous Alcohol Confirmation, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/ Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Clear Top PT with Preservative | 5 mL | 03/17/2023 11:30 | Femoral Blood | 23-0281 |
| 002 | Red Stopper Plastic Tube | 5 mL | 03/17/2023 11:30 | Vitreous Fluid | 23-0281 |
| 003 | Yellow Stopper Plastic Tube | 6 mL | 03/17/2023 11:30 | Urine | 23-0281 |

All sample volumes/weights are approximations.

Specimens received on 03/23/2023.

NMS v.26.0

DEFS_Obregon 000100



CONFIDENTIAL

**Workorder** 23110462
**Chain** 230317-134
**Patient ID** 230317-134

**Page 2 of 4**

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Amphetamine | 130 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| Methamphetamine | 830 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 1.0 | 001 - Femoral Blood | LC-MS/MS |
| Delta-9 Carboxy THC | 15 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| Delta-9 THC | 7.7 | ng/mL | 0.50 | 001 - Femoral Blood | LC-MS/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

## Reference Comments:

1. 11-Hydroxy Delta-9 THC (Active Metabolite) - Femoral Blood:

   11-hydroxy-THC is a psychoactive THC metabolite. 11-OH-THC was detectable in blood, with a 0.5 ng/mL cutoff, for 1.5 hours (range: 0.25-3.5) when cannabis was smoked by occasional users. 11-OH-THC may be present over 72 hours in chronic, frequent cannabis users.

   In occasional cannabis users, median (range) peak blood concentrations after smoking of 6.9% (50 mg) THC were 1.9 (0.5-8.7) ng/mL with median times of maximum concentrations at approximately 11 minutes. In chronic, frequent cannabis users, median (range) peak blood concentrations after smoking 6.9% THC were 7.2 (1.9-30.9) ng/mL, with median times of maximum concentrations at approximately 12 minutes. Usual peak levels are less than 10% of THC levels after smoking.

2. Amphetamine - Femoral Blood:

   Amphetamine (Adderall, Dexedrine) is a central nervous system stimulant. Amphetamine is also a metabolite of methamphetamine, benzphetamine and selegiline. It is used therapeutically in the treatment of narcolepsy and obesity and also in the treatment of attention-deficit hyperactivity disorder (ADHD). Amphetamine has a high potential for abuse. At low doses, amphetamine causes mild stimulation, offset of fatigue, and increase in alertness. It also causes changes in attitude, judgment and impulsivity. At higher doses, amphetamine causes euphoria, excitation, agitation, hypervigilance, rapid speech, dilated pupils which react slowly to light and increased motor restlessness. Pulse and blood pressure may be elevated. Withdrawal from amphetamine following abuse can result in extreme fatigue and uncontrollable sleepiness, agitation, and depression. In the treatment of narcolepsy, amphetamine is administered in daily divided doses of 5 to 60 mg. In abuse doses of several grams may be used on a daily basis in 'runs' lasting a week or more.

   Following a single oral dose of 10 mg amphetamine sulfate, a reported peak blood concentration of 40 ng/mL was reached at 2 hr. Following a single 30 mg dose to adults, an average peak plasma level of 100 ng/mL was reported at 2.5 hr. A steady-state blood level of 2000-3000 ng/mL was reported in an addict who consumed approximately 1000 mg daily.

   Overdose with amphetamine can produce restlessness, hyperthermia, convulsions, hallucinations, respiratory and/or cardiac failure. Reported blood concentrations in amphetamine-related fatalities ranged from 500-41000 ng/mL (mean 9000 ng/mL).

3. Delta-9 Carboxy THC (Inactive Metabolite) - Femoral Blood:

   Delta-9 THC is the principle psychoactive ingredient of marijuana/hashish. Delta-9 carboxy THC (THCC) is the inactive metabolite of THC. The usual peak concentrations in serum for 1.75% or 3.55% THC marijuana cigarettes are 10-101 ng/mL attained 32 to 240 minutes after beginning smoking, with a slow decline thereafter. The ratio of whole blood concentration to plasma concentration is unknown for this analyte. THCC may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users. THCC is usually not detectable after passive inhalation.

NMS v.26.0

DEFS_Obregon 000101



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 23110462 |
| **Chain** | 230317-134 |
| **Patient ID** | 230317-134 |

**Page 3 of 4**

## Reference Comments:

4.  Delta-9 THC (Active Ingredient of Marijuana) - Femoral Blood:

    Delta-9 THC is the principle psychoactive ingredient of marijuana (cannabis, hashish). It is also the active component of the prescription medication Marinol®. Marijuana use causes relaxation, distorted perception, euphoria and feelings of well being, along with confusion, dizziness, somnolence, ataxia, speech difficulties, lethargy and muscular weakness.

    After smoking a user-preferred 300 mcg/kg dose average plasma THC concentrations at 35 minutes were reported at 16.1 (range 4.7-30.9) ng/mL, and had declined to 1.5 (range 0.4-3.2) ng/mL after 190 minutes. Usual peak levels in serum for 1.75% or 3.55% THC marijuana cigarettes: 50-270 ng/mL at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/mL by 2 hrs. Whole blood THC concentrations are typically half those in a corresponding plasma sample.

5.  Methamphetamine - Femoral Blood:

    d-Methamphetamine is a DEA schedule II stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions. Chemically, there are two forms (isomers) of methamphetamine: l- and d-methamphetamine. The l-isomer is used in non-prescription inhalers as a decongestant and has weak CNS-stimulatory activity. The d-isomer has been used therapeutically as an anorexigenic agent in the treatment of obesity and has potent CNS-, cardiac- and circulatory-stimulatory activity. Amphetamine and norephedrine (phenylpropanolamine) are metabolites of methamphetamine. d-Methamphetamine is an abused substance because of its stimulatory effects and is also addictive.

    A peak blood concentration of methamphetamine of 20 ng/mL was reported at 2.5 hr after an oral dosage of 12.5 mg. Blood levels of 200-600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse and convulsions.

    *In this case, the level of methamphetamine determined has not been differentiated according to its isomeric forms. Differentiation of the isomers of methamphetamine is available upon request.

## Sample Comments:

001    Physician/Pathologist Name: John Hu,MD,Ph.D.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 23110462 was electronically
signed on 04/06/2023 16:36 by:

Kristopher W. Graf, M.S., D-ABFT-FT
Forensic Toxicologist

## Analysis Summary and Reporting Limits:

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Test 50010B - Amphetamines Confirmation, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | MDEA | 5.0 ng/mL |
| MDA | 5.0 ng/mL | MDMA | 5.0 ng/mL |

NMS v.26.0

DEFS_Obregon 000102



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 23110462 |
| **Chain** | 230317-134 |
| **Patient ID** | 230317-134 |

**Page 4 of 4**

## Analysis Summary and Reporting Limits:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Methamphetamine | 5.0 ng/mL | | |

**Test 52198B - Cannabinoids Confirmation, Blood - Femoral Blood**

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| 11-Hydroxy Delta-9 THC | 1.0 ng/mL | Delta-9 THC | 0.50 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

**Test 8041B - Postmortem, Basic w/Vitreous Alcohol Confirmation, Blood (Forensic) - Femoral Blood**

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Amphetamines | 20 ng/mL | Fentanyl / Acetyl Fentanyl | 1.0 ng/mL |
| Barbiturates | 0.040 mcg/mL | Methadone / Metabolite | 25 ng/mL |
| Benzodiazepines | 100 ng/mL | Methamphetamine / MDMA | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Opiates | 20 ng/mL |
| Cannabinoids | 10 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | Phencyclidine | 10 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

NMS v.26.0

DEFS_Obregon 000103

# EXHIBIT 5

