# EXHIBIT 1

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as personal representative of The Estate of Michael Obregon; Meagan Brady, on behalf of and as legal guardian and parent of her minor child, MB, <br><br> Plaintiffs, <br><br> vs. <br><br> Mark Lamb and Brady Gibson, <br><br> Defendants. | Case No. <br><br> CV-24-1510-PHX-KML |

VIDEOTAPED DEPOSITION OF BRADY GIBSON

Phoenix, Arizona

Monday, January 5, 2026

Prepared by
Debra K. Price
Freelance Court Reporter

**CERTIFIED TRANSCRIPT**

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
2..5

**Page 2**

VIDEOTAPED DEPOSITION OF BRADY GIBSON was taken on Monday, January 5, 2026, commencing at 10:00 a.m. at the offices of Coash Court Reporting & Video, 1802 N. 7th Street, Phoenix, before Debra Price, a Freelance Court Reporter and Notary Public in the State of Arizona.

\* \* \*

APPEARANCES:

For the Plaintiffs:
MILLS & WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12th Street, Suite 101
Phoenix, Arizona  85014
Phone:  480-999-4556
Swoods@millsandwoods.com

For the Defendants:
WIENEKE LAW GROUP, PLC
By: Laura Van Buren, Esq.
Kathleen L. Wieneke, Esq.
1225 W. Washington Street
Suite 313
Tempe, Arizona 85288
Phone:  602-715-1868
Lvanburen@wienekelawgroup.com
Kwieneke@wienekelawgroup.com

Also appearing telephonically:
Allison Obregon, plaintiff
Meagan Brady, plaintiff
Also appearing:
Dennis Woods, videographer
Danielle Morris, Arizona County
Insurance Pool

**Page 3**

I N D E X

WITNESS                                PAGE

BRADY GIBSON
Examination by Mr. Woods            5
Examination by Ms. Van Buren     129
Re-Examination by Mr. Woods      164


EXHIBITS MARKED

EXHIBITS          DESCRIPTION          PAGE

1      Policy 300                          15
2      Photograph of Mr. Gibson            20
3      Officer Report for Incident         34
4      Photograph of Incident Scene        57
5      Photograph of Police Vehicle at Scene  60
6      Photograph of Decedent              62
7      Forensic Examination Report         91
8      Medical Examiner's Chart            92
9      Dep. Gibson Interview, Part 2       98
10     Performance Improvement Recommendation  126
11     Photograph of Gun                  137
12     Radio Traffic Audio File (retained)  139
13     Ring Video (retained)              149
14     Ofc. Fox Body-Worn Camera (retained)  155
15     Plaintiffs' Fourth Supp. Disclosure  157
16     First Amended Complaint            161

**Page 4**

THE VIDEOGRAPHER:  We are on the record.  Time on the video monitor is 9:56 a.m.  We're beginning on Volume 1, media number 1 in the deposition of Brady Gibson in the matter of Al (sic) Obregon versus Mark Lamb and Brady Gibson in the United States District Court of Arizona, Case Number CV-24-1510-PHX-KML.  Today's date is January 5th of 2026.

Our court reporter is Debra Price.  I'm Dennis Woods, certified legal videographer, and we both represent Coash Court Reporting.  This deposition is taking place at Coash Court Reporting & Video located at 1802 North 7th Street, Phoenix, Arizona.

Counsel, please identify yourselves and state whom you represent starting with the plaintiff.

MR. WOODS:  This is Sean Woods from Mills and Woods Law.  I represent the plaintiffs, Allison Obregon and Meaghan Brady on behalf of Mariah Brady.  On the phone today, we have Allison Obregon and Meaghan Brady.

MS. VAN BUREN:  Laura Van Buren for Wieneke Law Group on behalf of defendants.  Also present is Kathleen Wieneke as well as Danielle

**Page 5**

Morris from the Arizona County Insurance Pool.

THE VIDEOGRAPHER:  Would our court reporter please swear in the witness.  Thereupon,

BRADY GIBSON:
a witness of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified upon his oath as follows:


EXAMINATION

BY MR. WOODS:

Q.  Good morning, Mr. Gibson.  Could you give me your full name for the record?

A.  It's Brady John Gibson.

Q.  Okay.  Have you ever had your deposition taken before?

A.  No.

Q.  Okay.  I'll be brief.  It's kind of rote but during the deposition give verbal answers, not like uh-huhs, or hmm, or anything like that.  You want to give actual words so the court reporter can write it down.  Okay?

A.  Sounds good.

Q.  I'll do my best not to talk over you if

**Page 22**

A. On my left, you have the radio that's in a radio pouch, a soft radio pouch. Next to it going right, kind of on the left center of my chest is a taser. I believe it's the X26.

In the center is an AR-15 magazine. A little above that is a black object and that is a little flashlight.

Next to that, the kind of coyote brown, tan-looking object, that's a -- like trauma clothes cutter, clothes remover.

Below that in the cloth pouch are -- is a handcuff pouch that contains two pairs of handcuffs.

To the right of that is a pouch that would contain a cell phone, and a notebook, and pens.

Above that is the microphone or -- it hooks up to the radio so that I can transmit from there instead of having to pull out the radio from the pouch. And then going kind of back the other direction is --

MS. VAN BUREN: Hold on a second. Can I just clarify for the record that when you said going left to right, you're talking about across your body left to right, but right to left across

**Page 23**

the photograph?

THE WITNESS: Yes.

MS. VAN BUREN: Okay. Thank you.

A. Moving back, I have a nameplate that says the first initial of my first name, B, and then my last name, Gibson. Under that in bold all capital letters, it says sheriff. And then above that on my left shoulder is a badge and it says, Deputy Sheriff, Pinal County Sheriff's Office.

And then on both shoulders, I have two visible shoulder patches that say Pinal County Sheriff's Office with our insignia and seal.

Moving down to the belt on the -- my far left side, so where my left hand is at, I have a watch on. On my belt is a flashlight.

Next to that is a spare magazine pouch for my handgun, so I have two spare magazines, and then a belt buckle that goes across.

I have a key fob holder that holds my truck keys, car keys, handcuff key, which I don't have my truck keys on because I left them at the scene at that time.

Further right of that is the connection point to my drop-down holster. And then behind that is a baton, collapsible baton holder with a

**Page 24**

baton.

BY MR. WOODS:

Q. Okay. Thank you. You mentioned that there was a flashlight in between your AR-15 magazine and the trauma cutoff tool; is that correct?

A. Yes. Just kind of below the sheriff patch, there's a black, little flashlight.

Q. Is that attached to you? Is that something you can remove?

A. It's a -- it's a clip on -- clipped on a pocket, so I can remove it if I want to.

Q. At -- at the time of the shooting on March 16th, 2023, did Pinal County have body cams?

A. No, sir. At least not assigned to me.

Q. Do you know if other deputies or employees had body cams?

MS. VAN BUREN: Foundation. Form.

BY MR. WOODS:

Q. If you know.

A. I don't know at that time if any other employee had a body cam or not.

Q. After the shooting, at any point, were you ever assigned a body cam?

A. No, sir.

**Page 25**

Q. When you left Pinal County, do you know -- and again, this is just if you know -- if anybody else was assigned body cams?

A. By the time that I left, some specialty units were trying and had body cams, but I was not trained or familiar with them for my use.

Q. At the time or on the day of the shooting when you pulled -- let me just take that back.

On the day of the shooting, you made a traffic stop of Michael Obregon, correct?

A. Yes.

Q. And when you stopped him, you thought he was somebody else; is that right?

A. When I spoke to him and he said my name and he recognized me, I thought he was somebody else and called him by a different name.

Q. And who was that somebody else?

A. It was Anthony de Santiago.

Q. And how did you know Anthony de Santiago?

A. Anthony was involved in a different incident, I don't recall how many months prior, involving a dirt bike in the Casa Grande area.

Q. Do you recall what -- what that incident

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
46..49

Page 46

trying to locate Robert?

MS. VAN BUREN:  Form.

A.  Michael told me that they were heading to his house.  He was being towed to his house.  At some point, we later ended up at his house where I released him.

BY MR. WOODS:

Q.  Okay.  The last paragraph on this page says that Michael pushed his three-wheeler around the corner to his residence.  Do I have that right?

A.  That's -- yes.  That's what this document says.

Q.  Okay.  So at that point, was he still in handcuffs?

A.  If he pushed his three-wheeler, he would not have been in handcuffs.

Q.  Okay.  And then it says that Michael gave me permission to search the backyard for, quote, Robert, end quote; is that correct?

A.  That's what this document says.

Q.  Okay.  So Michael was out of handcuffs pushing his three-wheeler to his house, and then he gave you permission to search his backyard for Robert?

Page 47

A.  At this point, I had informed Michael that I was going to issue him a criminal citation and that if he refused to sign, that I would have to take him before the nearest magistrate or take him to jail, and go through that process.

He agreed that he was going to sign the criminal citation.  And I told him that I was not going to charge him with a felony or do an in-custody arrest because he was honest with me.  So I issued -- later issued the criminal citation as he was waiting out front of his residence for me to finish the criminal citation.

Q.  Were you able to find Robert?

A.  I did find Robert.

Q.  Where was Robert?

A.  He was kind of near a carport or a side driveway that goes up the side of the house, and right around the corner behind the house.  He was standing there with the dirt bike.

Q.  Was it -- you said "the house."  Was that Michael Obregon's house?

A.  It appeared to be his residence.

Q.  Okay.  Let's talk a little bit about the day -- the incident itself.  Walk me through how it began with your traffic stop to the shooting.

Page 48

MS. VAN BUREN:  Object to the form.

A.  So after I had closed two calls for service, I was in this area with another deputy, Terry Pickett.  The rest of my squad had been busy way down south near Ridge Rock.  There was a pursuit, bail out.  They were looking for a felony subject that we were looking for the previous day.

I observed a dirt bike or motorcycle, after I had closed these two calls, blow through a stop sign then cross the main road, which is Hopi.  And so the vehicle was traveling south on Hualapai across Hopi through the stop sign at approximately 40, 50, 60 miles per hour.

MS. VAN BUREN:  Sean, going forward, can you ask questions.  I don't want narrative testimony.

MR. WOODS:  It's my deposition.  I can ask an open-ended question in search of an answer.

MS. VAN BUREN:  But just saying, tell me what happened the entire day.

MR. WOODS:  I didn't ask for the entire day.  I just asked from the traffic stop to the shooting.

MS. VAN BUREN:  Going forward --

MR. WOODS:  As a matter of five minutes.

Page 49

MS. VAN BUREN:  Ask your next question.

BY MR. WOODS:

Q.  So you saw him speed.  Did you clock his speed with a radar gun?

A.  I also saw him blow through the stop sign.

Q.  Okay.  Did you clock his speed was my question.

A.  It was an approximate estimate.

Q.  Okay.  You just estimated that just based on what?

A.  Training and experience.

Q.  Okay.  And then you what?  What did you do from that point?  Did you chase him?

MS. VAN BUREN:  Form.

A.  I attempted to conduct a traffic stop.

BY MR. WOODS:

Q.  Okay.  And did that traffic stop happen?

A.  I caught up to -- I made a left-hand turn onto Hualapai to head south.  I observed the dust getting kicked up on the road.  I observed how great of a distance the motorcycle had created from where I was previously to that, that went into my estimate of how fast he was going.

And my in-computer AVL information that

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
62..65

**Page 62**

Q. What do you mean by that?

A. As the photograph is depicting right now with how the gates were, the gates were not like that after Michael had crashed into the fence.

Q. What were the gates like?

A. After Michael crashed into the left gate or left fence, the left gate or left fence was left ajar or at an angle. It was damaged and not in its designed position to be in.

Q. Looking at -- let's do it this way.

EXHIBITS:

(Deposition Exhibit No. 6 marked for identification.)

BY MR. WOODS:

Q. This is Obregon 382. I'm handing you what's been marked as Exhibit 6. It's been disclosed as Obregon underscore 382. There's a body on the ground in the middle of the picture.

Do you see that?

A. Yes.

Q. Is that Michael Obregon?

A. It appears to be, yes.

Q. Okay. Is that where his body ended up after the shooting or was it moved?

MS. VAN BUREN: Form and foundation.

**Page 63**

A. I can only state what medical care that I provided. I don't know after what happened to him or his position after I was relieved.

BY MR. WOODS:

Q. When you were providing, as you stated, medical care, was his body in this position?

MS. VAN BUREN: Form.

A. I don't recall exactly what position he was in. I was focused on providing the treatment.

BY MR. WOODS:

Q. Did you move his body?

A. I cut off several articles of clothing and a backpack. So I had to adjust him to be able to look for injuries, to do blood sweeps, to see where the bleeding and issues were.

Q. There's a couple of pyramidal cones there. Do you see them marked 11 and 12?

A. Yes.

Q. To the best of your knowledge, what are those?

A. It appears that 11 is a handgun and that 12 is a wallet.

Q. Okay. And -- and for what purposes, to the best of your knowledge, do those cones get placed?

**Page 64**

A. To my knowledge, they are scene markers that mark pieces of evidence.

Q. Do you know if any of the gates had damage prior to Michael being stopped by you?

A. I do not know.

Q. Okay. Okay. So going back to this Exhibit 6. You said number 11 is a handgun?

A. It appears to be, yes.

Q. And number 12 is what?

A. It appears to be a wallet.

Q. Over to the left side of that photograph, do you see a backpack or a satchel or whatever that is?

A. Yes.

Q. Do you recall what that was?

A. Yes.

Q. What was it?

A. That's my trauma kit, my trauma medical kit.

Q. Okay. Let's go back to Exhibit 5. I'm looking at the dirt bike. Looking at the back wheel of the dirt bike, I see a backpack there as well. Is that your trauma kit?

A. It appears to be, yes.

Q. After you put the kickstand down, what

**Page 65**

happened next?

A. Michael had recognized me. I had told him to stop running. He said, I'm not running. He recognized me. I put the kickstand down.

I believe I -- I called him Anthony de Santiago. He said he wasn't Anthony de Santiago. And then I was trying to identify him, so I asked him for his ID.

Q. Okay. Where were you standing at that time?

A. We both had moved or gotten closer to my vehicle. So behind the dirt bike, a little bit closer to my vehicle.

Q. Looking at Exhibit 4, can you identify where your vehicle was?

A. Yes.

Q. Okay. And where is it on that picture?

A. It appears to be approximately 10 to 15 feet from the motor -- the back wheel of the motorcycle.

Q. Okay. And do you recall that being the spot where you had stopped your vehicle for the traffic stop?

A. I did not move my vehicle after making the traffic stop.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
74..77

**Page 74**

A. Like physical exertion or grunting noise when someone turns and goes into a sprint, a noise.

Q. Would you classify that as yelling at you?

MS. VAN BUREN: Form.

A. I would classify it as a noise.

BY MR. WOODS:

Q. Okay. But again, I asked you if he was yelling at you. And you said, not at that point.

When did he start yelling at you?

A. I don't recall if he yelled. I do recall at some point, I told him to drop the gun.

Q. He told you that he wasn't scared of you, right?

A. I don't recall.

Q. Say that again.

A. I don't recall.

Q. But he told you something, didn't he?

MS. VAN BUREN: Form.

A. We had been talking back and forth during the duration of at least several moments that we had together initially up to this point.

BY MR. WOODS:

Q. When he was fumbling around with his

**Page 75**

wallet and you said he was dropping stuff in front of the vehicle, did he pick them up?

MS. VAN BUREN: Form.

A. I don't recall if he picked them up or if I had helped pick them up. I just know that he was dropping several pieces of paper and different things, other than his ID.

BY MR. WOODS:

Q. When the items were being picked up, you said you don't recall if you helped him with that, correct?

A. I don't recall if I helped pick them up or not, or if he picked them up.

Q. Were you right next to him when the items were being picked up?

MS. VAN BUREN: Form.

A. I was observing his actions and trying to get his ID card from him.

BY MR. WOODS:

Q. How close to him were you?

A. I don't recall exactly how close.

Q. You don't recall his position compared to yours?

MS. VAN BUREN: Form.

A. I don't recall exactly where we were

**Page 76**

standing or our position.

BY MR. WOODS:

Q. And you don't recall if you helped pick any items up off the ground?

A. I don't recall if I did or not.

Q. At what point did Michael start running away from you?

A. I had told him after another attempt to put out my location by backing up and looking at my GPS, and I had previously told him that he needed to stand right there and stay right there. As I backed up or attempted to back up again, I observed a similar behavior of him trying to distance himself, and to look left and right.

I told him that I'm going to detain him so that he doesn't make a poor choice. As I told him that, he turned, and ran, and tripped over the motorcycle as I was on my radio trying to communicate.

Q. Prior to him running away from you, did he display or brandish a weapon?

MS. VAN BUREN: Form.

A. No, not that I observed.

BY MR. WOODS:

Q. Did he ever lunge at you?

**Page 77**

A. No, not that I observed.

Q. When he started to run, he ran away from you, correct?

A. He ran towards the dirt bike and towards the residence, it appeared.

Q. Okay. But you were behind that?

MS. VAN BUREN: Form.

A. I was closer to my vehicle. He was closer to his bike and to the residence than I was.

BY MR. WOODS:

Q. He wasn't running towards your vehicle when he started running?

A. No.

Q. He was running away from your vehicle when he started running?

A. Yes.

Q. And you were, again, at your vehicle --

MS. VAN BUREN: Form.

Q. -- correct?

A. I was in the area of my vehicle.

BY MR. WOODS:

Q. Okay. So he was running away from you, correct?

A. He was running towards the motorcycle or

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
78..81

Page 78

towards the residence, it appeared.

Q. When you saw him running, his back was to you, correct?

MS. VAN BUREN: Form.

A. It appeared he was running towards the residence or towards the motorcycle.

BY MR. WOODS:

Q. Was he running backwards?

A. No.

Q. So his face wasn't looking at you while he was running?

MS. VAN BUREN: Form.

A. Not that I could see.

BY MR. WOODS:

Q. His back, you saw his back, correct?

MS. VAN BUREN: Form.

A. I saw him running towards the motorcycle and towards the trailer or residence.

BY MR. WOODS:

Q. Okay. But it's a pretty simple question. When you saw him running, was his back turned to you?

MS. VAN BUREN: Form.

A. There were several steps that he would take to run away and now I am running to catch up

Page 79

to him. I couldn't say exactly his body position every single moment of that short amount of time.

BY MR. WOODS:

Q. If -- if someone was running away -- let me take it back.

I asked earlier if he was running backwards. Do you know what I mean by that?

A. Yes.

Q. What do I mean by that?

A. Like a football player that's guarding a receiver, he backpedals.

Q. Backpedals. He wasn't backpedaling when he was running, was he?

A. He was not backpedaling.

Q. Okay. And since he wasn't running towards you and he was running away from you and not backpedaling, that means you saw his back, correct?

MS. VAN BUREN: Form.

A. From what I recall, I don't recall if he looked back at me or not. I don't recall if he changed body positions or faced his shoulders in a different direction. So I can't say with exactness that the entire time his back was faced towards me.

Page 80

BY MR. WOODS:

Q. You weren't injured at that moment, were you?

A. I was not injured at that moment.

Q. You didn't see a weapon when he was running, did you?

A. I did not observe a weapon, no.

Q. Is there some sort of policy that the department had or -- I'm sorry, the sheriff's office had regarding fleeing suspects?

MS. VAN BUREN: Form.

A. Not that I can recall right now.

BY MR. WOODS:

Q. What about shooting someone with their back to you?

MS. VAN BUREN: Form.

A. There is a policy for use of deadly force in the circumstance of a person that is fleeing.

BY MR. WOODS:

Q. When he was running away from you, did you think that he was going to harm somebody?

MS. VAN BUREN: Form.

A. From what I knew at that time, I didn't have a belief that he was going to harm someone at

Page 81

that moment.

BY MR. WOODS:

Q. You did not?

A. I did not.

Q. Okay. Did -- did -- at the time that he was running away from you, did you feel like he was going to harm you?

A. I --

MS. VAN BUREN: Form.

A. -- observed those pre-assault or pre-flight indictors that were concerning throughout the entirety of my contact with him. So as I was following him to apprehend him or to stop him, I was concerned for my safety.

Q. As you -- as he was running away, were you concerned that there was an imminent threat of serious bodily injury or death to any other person?

MS. VAN BUREN: Form.

A. As he was running away, at that precise moment, not as much as when I was on his back and then he produced the firearm.

BY MR. WOODS:

Q. When you were on his back, describe that. How did you get on his back?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
82..85

Page 82

A. Michael had appeared to trip over something, either his motorcycle or an object in the road, and he landed on his stomach or on the front. I had gotten onto his back to attempt to detain him with handcuffs and get his hands behind his back.

And I observed that he wasn't trying to continue to crawl and claw to run away, and he wasn't trying to roll towards me to fistfight. He was focused on something else and was doing this other movement under his body. And I didn't know what that was until he produced a silver and black handgun and it came out from under his body.

Q. You were still on his back when that happened?

A. Yes.

Q. And his arm came out with a handgun you're saying?

A. Not -- not as you're showing me. His other arm came out and he produced a handgun.

Q. You're showing that his other arm came cross body. And by his "other arm," you're saying his right arm with your movement that you just showed me?

MS. VAN BUREN: Form.

Page 83

A. It appeared an arm came cross body and that their finger was in the trigger well. I could see the gun come out and I said, drop the gun.

Q. Okay. And then what happened?

A. Since I was holding my radio, I had said 913, which is our emergency code for backup. The gun came out. I yelled, drop the gun. And I responded muscle memory into my training and found myself backpedaling.

And my gun was already out of the holster and my gun was already firing. And next thing I knew, I was behind my engine block, and I was yelling for him to drop the gun, don't reach for the gun, and that I wanted to help him.

Q. When did you start shooting him?

MS. VAN BUREN: Form.

A. My muscle memory, my training kicked in. So as soon as the gun came out, my -- I pushed off him and was backpedaling. And my gun was already out of the holster, and shooting, and backing up before I could catch up and realize that that's what was happening.

BY MR. WOODS:

Q. Did you fire all your shots in the

Page 84

same -- let me take a step back.

Did you pause in between any of your shots?

MS. VAN BUREN: Form.

A. My muscle memory and training kicked in. It felt very tense and rapidly evolving, and fast, like milliseconds, just extremely fast and rapid.

BY MR. WOODS:

Q. I mentioned earlier that there were 10 gunshots or 10 bullet casings found from your weapon. Is that -- do you recall that?

A. I recall --

MS. VAN BUREN: Form.

A. -- you mentioning that.

BY MR. WOODS:

Q. Do you recall there being 10?

MS. VAN BUREN: Form. Foundation.

A. I recall possibly shooting approximately seven to eight shots. But later in the investigation, it appears that I fired 10 shots.

BY MR. WOODS:

Q. Okay. And did you fire the 10 shots, one, two, three, four, five, six, seven, eight, nine, ten? Or was it some other combination, pause, combination?

Page 85

MS. VAN BUREN: Form.

A. I don't recall exactly, but it seemed very fast and very rapid.

BY MR. WOODS:

Q. Were you yelling anything while you were shooting?

A. The only thing I recall saying was drop the gun, 913, drop the gun. I was backing up, firing. And then when I realized what had happened, I again was saying, drop the gun, don't reach for the gun. I want to help you, as well as putting out radio communication of what had happened.

Q. After the shooting stopped, what did you do?

A. So after I was behind or backed up kind of near the hood of my vehicle, I had called out, don't reach for the gun, drop the gun. Michael, I want to help you.

And I had advised our communication center, 998, 999, which are the codes for officer-involved shooting and I need urgent help. I then stated that there was one person down that was shot multiple times, and that my down range was to the south.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
86..89

**Page 86**

Later, I said I'm going to approach and secure him, and start rendering aid. I had heard some of the communications on the radio that medical was being staged for me and for Michael.

Q. And then what happened?

A. I went over to my passenger side door and opened it, and I pulled out that -- that coyote tan, trauma medical kit that's on my passenger front seat headrest. And then I approached Michael, and then got down and started assessing where I needed to render aid at, what was going on.

Q. Do you recall how much time elapsed between the shooting and medical aid provided by you?

A. I don't recall an exact amount. It felt very fast. And once I had gotten down, I had moved the gun slightly away from his body out of reach, and then started seeing what I needed to render aid to.

So I was looking for massive amounts of bleeding, bright, red bleeding first. And so I started doing blood sweeps and cutting away the clothes, which there was a lot of -- the backpack was on. There was a lot of layers. I was trying

**Page 87**

to get the clothes open and off so I could see where he was injured at, and start addressing those injuries.

Q. How close were you when you started shooting? How close were you to Michael?

A. After the fact the night of, I was asked that question and asked to place a cone on the scene approximately where I was. I felt like -- I felt pretty close from what I saw and how I saw his gun pointed at me, and how big it was, and just pointing at me.

It felt like I was very, very close after I got up and pushed off, and was backing up. But I couldn't say a number.

Q. When you got off of Michael, was he still on his -- was he still face down or was he face up?

A. It appeared that when he cross body drew or had the handgun presented and out with his finger in the trigger that I was on his back. So he was trying to come my way.

So when I pushed off and was backpedaling, I saw that he then rolled the opposite way to where I was backpedaling to look where I was, and then presented the handgun in

**Page 88**

that direction to try to find me, and to point it at me.

Q. Was your flashlight on?

A. From what I recall, no. My little black flashlight that I have right here?

Q. Yeah.

A. From what I recall, no.

Q. Did you have another flashlight out at that time?

A. I had another flashlight on my person. I don't believe I had it out at that time.

Q. You wear contact lenses, right?

A. Yes.

Q. When was the last time you had your prescription checked?

A. July or September of this last year.

Q. Okay. Did they update your prescription or did it stay no change?

A. I believe it updated a little bit. Every year it's a slight adjustment, it seems.

Q. Do you have astigmatism?

A. Yes.

Q. Do you know what the doctors told you that astigmatism is for?

A. From what I was explained, I have more

**Page 89**

of a flat eye. So there's like the astigmatism that's super curved and they could go and do surgery, and shave it down.

Then there's the one that's more flat where they have to go in and do surgery, and place something in to make it more curved. So I have more of the flat eye. So if I wanted to get surgery, which I asked my doctor about, I would have to get that clearer glass or whatever it's made out of in my eye to correct the shape.

Q. Did they tell you -- did your optometrist or ophthalmologist tell you any -- any -- walk that back.

Does your astigmatism affect your vision at night?

A. From what I understand, no.

Q. And you didn't have your flashlight on, correct?

A. I did not have, from what I recall, either flashlight on.

Q. Okay. Do you recall where the bullets hit Michael?

MS. VAN BUREN: Form and foundation.

A. All I observed and saw was when he rolled over and was presenting the handgun, and

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
98..101

**Page 98**

Q. At the time of the shooting, you had -- we saw your photo earlier. You had your taser with you, right?

A. Yes.

Q. Michael wasn't struggling with you when you were on his back, was he?

MS. VAN BUREN: Form.

A. He was resisting arrest.

BY MR. WOODS:

Q. I thought I read in your interview and in the report that he wasn't struggling with you. He was just fumbling around with the front pocket or something. Do I have that right?

MS. VAN BUREN: Form.

A. From -- I was explaining earlier, I observed that he wasn't trying to crawl or claw his way up to continue running away or to jerk away. He also was not trying to roll over to fistfight.

He was doing something else, like manipulating something under his body. And then that's when I observed the handgun come out.

EXHIBITS:

(Deposition Exhibit No. 9 marked for identification.)

**Page 99**

BY MR. WOODS:

Q. All right. I've handed you what's marked as Exhibit 9. This is another one where the Bates stamps are cut off. It's DEFS underscore Obregon 1027 to 1063. And it says, "In the Matter of: Obregon v. Lamb, Deputy Gibson, Interview Part 2, September 30, 2024."

Do I have that right?

A. Yes. That's what the document says.

Q. Did you review this?

A. I listened to my audio interview and I believe I did read over this or a version of this narrative.

Q. Okay. Let's turn to page 3 of the document.

MS. VAN BUREN: I'm sorry, Sean. What was the Bates number again?

MR. WOODS: It's 1027 to 1063.

MS. VAN BUREN: Thank you.

MR. WOODS: No problem.

BY MR. WOODS:

Q. So page 3 would be -- the top right has a number 2 just because the cover sheet didn't get counted. Do you see where it says "beginning of recording" at the very top?

**Page 100**

A. Yes.

Q. Okay. And then there's a "Detective Bonucci: All right." He says, "all right. This is Detective Bonucci. This is the on-scene walkthrough portion of the officer-involved shooting with Deputy Gibson."

Do I have that right?

A. Yes.

Q. Okay. Let's turn to what's marked as page 5 in the top right. Are you there?

A. Yes.

Q. We had -- we talked earlier. It says here on line 17 that he recognized me and said, "oh, hey, Gibson." Do I have that right?

A. That's what the document says.

Q. Is that accurate?

A. From my recollection, yes, he did recognize me and say my last name.

Q. In that photograph starting at line 12, it starts with Officer Gibson colon; do you see that?

A. Yes.

Q. Is it your understanding that whenever it says "Officer Gibson" that is the transcription of your voice from your interview recording?

**Page 101**

A. As reflected in this document, it appears to be, yes.

Q. And you reviewed this document before the deposition, correct?

A. Yes.

Q. And you listened to your audio recording before this deposition, correct?

A. Yes.

Q. Do you have any reason to dispute that this transcript is not an accurate reflection of what was said on that interview recording?

MS. VAN BUREN: Form.

A. There's some minor typos that I've already seen.

BY MR. WOODS:

Q. Okay. Down below you continue on line 23, "I thought he was Anthony de Santiago. So I was like, Anthony? And he said no."

Do I have that right?

A. That's what the document says.

Q. Okay. If you go to the next page, which is page 6. Starting on line 1 towards the end, full sentence says, "I observed that he was wearing this backpack and his -- I was already observing his behaviors by him walking back and

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
102..105

**Page 102**

forth and him looking around.  I saw his sweatshirt was sagging and hanging with a middle pocket in the middle."

Q.    Do I have that right?

A.    That's what the document says.

Q.    Okay.  And at that time, you saw that his sweatshirt had -- was sagging and hanging with the middle pocket in the middle?

A.    I observed that there was a bulky object or something in his sweatshirt or jacket pocket.

Q.    Okay.  And that was right after he told you that he wasn't Anthony de Santiago, correct?

A.    Yes.

Q.    "There was a bulge" -- starting on line 7.  "There was a bulge, bulky object in the front. He was making a lot of movements, and he was showing that he was real nervous."  Is that right?

A.    That's what the document says.

Q.    Okay.  So right off the bat, you saw that there was a bulky object in his sweatshirt, correct?

MS. VAN BUREN:  Form.

A.    I observed that object or bulky object. And then as -- as well as his mannerisms and behaviors of tugging on the backpack straps, and

**Page 103**

looking left and right.

BY MR. WOODS:

Q.    Did you ask him what he had in his sweatshirt?

A.    I later asked him why he was looking left and right.  I was concerned with getting out the rest of my transmission on my radio.  I had given out my location, gave his description, getting his ID.

And every time I attempted to do that, he would distance himself from me, which I perceived as a risk.

Q.    He -- he told you that he had warrants, didn't he?

A.    Michael did tell me that he had warrants, yes.

Q.    Okay.  And you knew from the beginning that you saw some sort of bulky object in his sweatshirt, correct?

MS. VAN BUREN:  Form.

A.    From -- I knew that I had observed -- well, he was wearing a big, bulky backpack.  He was wearing layers of clothing and there appeared to be a bulky object in his jacket or sweatshirt.

BY MR. WOODS:

**Page 104**

Q.    Let's turn to page 7.  At the very top you say, "he was on the other side of the bike and then he came out over here."

And then Detective Bonucci says, "standing more into the street?"

And then Officer Gibson, which should be Deputy Gibson, which is you, says, "yeah," correct?

A.    That's what the document states.

Q.    And that's what you recall?

A.    So I believe at this point -- I don't recall where we were at as we were doing the scene walk-through.  From what I recall about this interview, I was doing a lot of hand gestures and pointing.

So with this narrative, I can't say with exactness where we're at.

Q.    Would you have any reason to dispute that the audio recording of your interview with Detective Bonucci has been altered in any way?

MS. VAN BUREN:  Form.

A.    No.

BY MR. WOODS:

Q.    Would you have any reason to dispute its accuracy?

**Page 105**

A.    Of the audio recording, no.

Q.    Okay.  Going down towards the bottom of this page starting at line 20 it says, "as that was going on, he is still tugging on his backpack and getting a distance from me.  He placed himself on the other side of the bike, and he's starting to work himself through both of the, the gates into the yard."

Do I have that right?

A.    That's what the document says.

Q.    Do you recall him starting to work himself through both of the gates into the yard?

A.    I recall that he had gained distance. I'm trying to look at what -- where this is at because there was a couple different times that he had gained distance.

But yes, he was attempting to gain distance, looking left and right, messing with his backpack straps, which I kept having to address, and tell him to stay where I told him to stand, and to not make this worse than it had to be, and not make a mistake by running or fighting.

Q.    Okay.  But you say that he was working himself through both of the gates into the yard, correct, at that point?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
106..109

**Page 106**

A. That's what's reflected in this document.

Q. Okay. And then on the next page -- let's go to page 8. He comes back to you at some point you say. If you look at line 11 -- sorry, line 8, "and he kind of slowly started coming my way. And I was like, as I was coaxing him I was like come, come here, stand right here. And I was like, what's the matter?"

And you say, "like, do you have warrants or something? And he's like, yeah, I have some warrants."

Do I have that right?

A. That's what the document says, yes.

Q. Do you recall that conversation with Michael Obregon?

A. Yes.

Q. Do you recall telling the detective that you had that conversation with Michael Obregon?

A. Yes.

Q. So going down further to line 19 you say, "and I asked him for his ID so he pulls out his wallet and he's fumbling with his wallet and he keeps dropping stuff."

Do I have that right?

**Page 107**

A. Yes. That's what the document says.

Q. Do you recall telling that to Detective Bonucci?

A. Yes.

Q. Do you recall that happening?

A. Yes.

Q. "And he kept" -- line 24, "and he kept dropping like some piece of paper and a card and pick it up. And his ID wasn't" -- going to page 9, line 1 -- "coming out of his wallet and he just kept tugging at it. So then I, I get his ID card from him and place it right here and I'm coming back again to advise dispatch of, of my location."

Do I have that right?

A. That's what the document says.

Q. Do you recall telling Detective Bonucci that?

A. Yes.

Q. Let's turn to page 10. Starting at line 11 you say, "I don't know what he wants to do with his backpack. I go back over to my car and go to get on my radio, and he darts and runs inside the fence."

Do I have that right?

A. That's what the document says.

**Page 108**

Q. Do you recall telling Detective Bonucci that?

A. Yes.

Q. And you say, "so as he's doing that, he trips because the fence is still closed." Do I have that right?

A. Yes.

Q. Do you recall telling Detective Bonucci that?

A. Yes.

Q. You say, "his bike was pushed up against the fence. He trips over his bike or the rocks or something. He trips and lands onto his stomach."

Do I have that right?

A. That's what the document says.

Q. Do you recall telling Detective Bonucci that?

A. Something, yeah. That sounds right.

Q. Further down, line 19 you say, "so I'm already -- I clicked on my radio and said 913 -- 44 Charlie 913, which means emergency backup," correct?

A. That's what the document says.

Q. Do you recall telling Detective Bonucci that?

**Page 109**

A. It was just some minor typos in the document, but something similar, yes.

Q. And you say, "and I got on top of his back. And as I'm looking, what's going on he's not, he's not fighting me and he's not trying to get up." Do I have that right?

A. That's what the document says.

Q. Do you recall telling Detective Bonucci that?

A. At that portion, yes.

Q. Okay. Did Michael Obregon ever fire his weapon at you?

A. From what I observed of him producing the handgun from under his body and then me backing up to him rolling over and presenting the firearm at me, I perceived an imminent threat against serious bodily harm or death against me.

Q. I appreciate that response except that was not the question that I asked.

The question I asked was, did he ever fire his weapon at you?

A. From what I understand --

Q. It's yes or no.

A. -- after the fact --

MS. VAN BUREN: He can give an answer to

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
114..117

**Page 114**

A. Yes.

Q. Okay. If you knew that it was going to be a foot pursuit or a fight or an issue, why didn't you tell -- tell Michael, hey, you know what, stay still. I'm detaining you until we can figure something out?

A. So when he told me that he had warrants and I was talking to him, trying to calm him down and deescalate the situation saying, don't make this into something bigger than it has to be. Don't make a mistake. Don't fight.

Even from the initial point of the stop when I said, stop, don't run; and he said, I'm not running. Oh, hey, Gibson. There were several moments that I was trying to deescalate and calm him down.

Each time that my attention was directed towards the administrative tasks of trying to finish my radio communication and get out my location, he would continue with those behaviors. So I addressed it multiple times.

I was trying to avoid going hands-on and grabbing, and touching him, because I did not want a run or a fight to happen.

Q. Why didn't you just let him run?

**Page 115**

MS. VAN BUREN: Form.

A. I had him legally and lawfully detained. I did not know whose residence that was, whose property he damaged. So now there's potential crime. I ran after him to detain him and stop him.

The moment that he pulled out the firearm, now the severity of that contact and the crime went to aggravated assault and attempted murder.

BY MR. WOODS:

Q. So he committed a crime right out of the get-go is what you're saying?

MS. VAN BUREN: Form.

A. Other than the civil traffic violations and potential reckless driving, I did not know whose residence that was. The fully fenced residence, I did not know whose property had been damaged. I did not know who that bike belongs to because there was no visible license plate.

There was a bunch of other things that I was still investigating because I was actively investigating. And I did not know or get a chance to verify what warrants he had and what they were for.

**Page 116**

BY MR. WOODS:

Q. There's no recording of your interaction with Michael, is there?

A. I did not have a body cam. I did not have a dash cam or in-car recording, and I did not have a recorder on. But my understanding, there was a neighbor's house that had a security cam footage that partially captured the incident.

Q. But there's no audio that you heard of your interaction with Michael Obregon?

A. Other than brief radio transmissions of me communicating to my communication center.

Q. You mentioned earlier that you've had constitutional law training as part of your role with the Pinal County Sheriff's Office, correct?

A. Yes.

Q. And that, I think, you mentioned that you had training on the amendments?

A. Yes.

Q. What's the First Amendment?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. What's the First Amendment to the United States Constitution?

A. Freedom of speech, freedom of religion,

**Page 117**

the right to peacefully assemble.

Q. Okay. What's the Fourth Amendment to the United States Constitution?

A. It bars the government from unlawful search and seizure, that people shall be secure in their papers and effects unless there is a search warrant or probable cause.

Q. Does it also -- to your knowledge, does the Fourth Amendment also protect from excessive force?

A. Yes.

Q. Okay. What's excessive force?

MS. VAN BUREN: Form. Foundation.

A. Excessive force is force that is greater than what you necessarily need to resolve the situation.

BY MR. WOODS:

Q. Every U.S. citizen has the right to be free from excessive force, correct?

MS. VAN BUREN: Form. Foundation.

A. I acted and every citizen has a right to be treated as -- by a government agent as the standard of any other reasonable government agent would act in that similar circumstance and given those facts.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
118..121

**Page 118**

BY MR. WOODS:

Q. The question I guess I asked was -- you defined what excessive force was, to your knowledge, correct?

A. Yes.

Q. And you've had constitutional law training, correct?

A. Yes.

Q. And you knew -- you know what the Fourth Amendment is, correct?

A. Yes.

Q. And that guarantees people that are U.S. citizens under the United States Constitution the right to be free from excessive force, correct?

MS. VAN BUREN: Form.

A. Yes.

BY MR. WOODS:

Q. This is a -- the excessive force analysis is something that -- let me take a step back.

When you are detaining somebody, do you determine the type of force that you're going to use?

MS. VAN BUREN: Form.

A. So there's two parties in that type of

**Page 119**

incident. I am responding to their actions and behaviors. So I attempted to deescalate in this situation and I'm acting as any other reasonable peace officer would in this situation, and that's why my training and muscle memory kicked in, and I reacted the way it did.

BY MR. WOODS:

Q. Tell me about when it's okay to shoot someone in the back.

MS. VAN BUREN: Form. Foundation.

A. In this circumstance, I observed that a gun was produced and I pushed off and was backing away. Michael then rolled and pointed that firearm in my new direction.

I perceived that as an imminent threat of bodily harm or death, and was fearful for my safety and my life, and acted to defend myself until that weapon was dropped.

BY MR. WOODS:

Q. How long were you on top of Michael?

A. All of these rapidly evolving, tense circumstances occurred in what felt like fractions of a second. I couldn't say exactly how long, but it was very fast and happening all at once.

Q. Did you tell Michael at any point that

**Page 120**

you were going to put him in handcuffs?

A. Before Michael had turned and run, I had told him to remove the option of him making a mistake or making things worse. I'm going to detain you, and that's when he turned and ran.

Q. Just so I'm clear one more time on this. After the shooting stopped, was Michael face down or face up?

MS. VAN BUREN: Form.

A. I don't recall his position at that time. I was fixated on that the gun was dropped and away from his body, and then did my radio communications, retrieved my medical bag, and approached to render aid.

BY MR. WOODS:

Q. Where was the gun before you moved it?

A. It was laying in his immediate possession or area.

Q. What side of his body?

A. It was this -- it was the same area approximately as the photo. I just had picked it up and moved it out of the immediate control.

Q. At some point, you had to go to your car -- we talked about this earlier. The trauma kit bag, at some point you had to go retrieve

**Page 121**

that, correct?

A. Yes.

Q. When did you retrieve that? I just want to be clear on that.

A. I retrieved that bag after I had put out my radio communication of what had happened. And then what my plan was that I was going to approach, secure, and render aid. I retrieved my medical bag.

Q. You approached his body. Did you assess anything when you approached his body?

MS. VAN BUREN: Form.

A. The first thing I was looking for was massive hemorrhaging, so bright, red bleeding, pools of blood, blood oozing, or gushing out. In order to do that, I was doing blood sweeps to look at his arms, his legs to see if there were any spots that I needed to immediately address first before I did anything first. I didn't see any.

Then it turns into me removing all the clothing where all of his vital organs are so that I could look at the front and back of his chest and back to see where I need to address the nature of the bleeding.

BY MR. WOODS:

**Page 134**

Q. Is that why you stopped firing at that point?

A. Yes.

Q. Going back to Exhibit 1, the PCSO policy. Take a look at the second page, top paragraph, last sentence of that top paragraph.

"Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident."

Did I read that correctly?

A. Yes.

Q. And did you use your well-reasoned discretion in determining the appropriate use of force to use in this incident?

A. Yes.

Q. Turn the page again to page 3, 300.4, deadly force applications. And again, this is Exhibit 1.

"Use of deadly force is justified in the following circumstances:  (a) A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily

**Page 135**

injury."

And I believe you testified that that was your reasoning for using deadly force against Mr. Obregon, correct?

A. Yes.

Q. Looking at subsection (b), did you use force because you considered him to be a fleeing subject?

A. No.

Q. So when you look at section 300.4, it's your belief that subsection (a) applies to your use of force in this incident, correct?

A. Yes.

Q. As part of your current employment, did you have to obtain a security clearance?

A. Yes.

Q. Did you undergo a background check as part of that?

A. Yes.

Q. Did you pass that background check?

A. From my -- well, it's kind of continuous. But from my understanding, yes.

Q. What do you mean "it's kind of continuous"?

A. The security clearance is constantly

**Page 136**

renewed and they -- I'm not a hundred percent familiar of how they do stuff.  But it's a continuous process to make sure you're constantly vetted, and read in, and have the appropriate clearance for what you're doing.

Q. Okay.  I understand that it's a continuous process.  But did you initially receive your security clearance?

A. Yes.

Q. Do you know if as part of that security clearance those investigators looked into your PCSO employment at all?

A. Yes, I was told that people had called asking about me, that they were asking around about me.

Q. And do you know who specifically they were talking to?  "They" being the security clearance investigators.

A. I can recall some names.  I believe they talked to Captain Villegas.  I believe they talked to Raffaele Defina.  I believe they talked to Chris Todd, Captain Laos (phonetic), and I believe they talked to Lieutenant Kingspotter (phonetic).

Q. And as far as you know, were there any obstacles arising from your PCSO employment that

**Page 137**

prevented you from obtaining a security clearance?

A. Not as far as I know, no.

MS. VAN BUREN:  What number are we on now?  11?

EXHIBITS:

(Deposition Exhibit No. 11 marked for identification.)

BY MS. VAN BUREN:

Q. I'm showing you what's been marked as Exhibit 11, Mr. Gibson.  The Bates number is DEFS Obregon 000146.

Do you recognize that as the handgun that Michael Obregon pointed at you?

A. Yes.

Q. You mentioned that you moved the handgun slightly after the shooting, correct?

A. Yes.

Q. Are you able to give us an estimate of how far you moved it in feet or inches or anything else?

A. I'd say approximately 2 to 3 feet.

Q. Go ahead and look again at Exhibit 6, please.  And before we get to that, I'm sorry, Exhibit 11.  To be clear, this was the handgun that you saw Mr. Obregon have his finger on the

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
138..141

Page 138

trigger on, correct?
     A.  Yes.
     Q.  Back to Exhibit Number 6.  Are you able
to mark with an X where the handgun was before you
moved it?
          MR. WOODS:  Foundation.
     A.  I could approximate, yes, where it could
be at.
BY MS. VAN BUREN:
     Q.  Can you do that on your copy of Exhibit
6, please?
     A.  (Witness complied.)
     Q.  Make it, you know, a decent-sized X so
we can all see it.
          MS. VAN BUREN:  Sean.
          MR. WOODS:  Okay.  Thanks.
BY MS. VAN BUREN:
     Q.  Are you able to recall as you're sitting
here how far away from Mr. Obregon's hand that gun
was before you moved it?
          MR. WOODS:  Foundation.
     A.  Approximately a foot.
BY MS. VAN BUREN:
     Q.  So if he had been able to, would he have
been able to reach over and grab that handgun?

Page 139

     A.  Yes.
     Q.  I want to play for you now some of the
radio traffic which I know you've testified about.
EXHIBITS:
          (Deposition Exhibit No. 12 marked for
identification.)
          MS. VAN BUREN:  And I'll make sure to
provide this to the court reporter.  Give me just
one moment to get this set up.
          Are we okay if she does not transcribe
it while it's being played and we can just say --
          MR. WOODS:  Yeah, I'm fine with that.
          MS. VAN BUREN:  -- parentheses
Exhibit --
          MR. WOODS:  12.
          MS. VAN BUREN:  -- 12 is played?
          MR. WOODS:  Which one?  Which file are
you on?
          MS. VAN BUREN:  This will be Defendant's
Obregon 810.
          MR. WOODS:  Okay.  With silences, I just
wanted to make sure.
          MS. VAN BUREN:  Yes, yes.  All right.
Let me make sure my volume is turned up.
          (Video played, not transcribed.)

Page 140

          MS. VAN BUREN:  I just paused it at 5
seconds in.
BY MS. VAN BUREN:
     Q.  Did you hear a voice say 4, Charlie 33?
     A.  Yes.
     Q.  Was that you?
     A.  Yes.
     Q.  And 4, Charlie 33, was your -- I don't
want to use the wrong terminology -- call sign?
     A.  My call sign or designator, yes.
     Q.  All right.  I'm going to keep playing it
starting again at 5 seconds.
          (Video played, not transcribed.)
BY MS. VAN BUREN:
     Q.  When you called in "male subject, purple
over blue," did you realize it was Michael Obregon
at that point?
     A.  No.
     Q.  Did you realize that it was Michael
Obregon when you first initiated the traffic stop?
     A.  No.
     Q.  When did you first realize that it was
Michael Obregon?
     A.  After he handed me his ID.  And even
then, I still didn't recall our previous

Page 141

interaction.  I just vaguely knew that I had dealt
with him before and that he recognized me.
     Q.  All right.  I'm going to start Exhibit
12 again at 28 seconds.
          (Video continued, not transcribed.)
BY MS. VAN BUREN:
     Q.  Was that your voice saying 913?
     A.  Yes.
     Q.  What does that mean?
     A.  It's the radio code for I need urgent
backup.
     Q.  And do you recall what you were
perceiving when you said 913 over the radio?
     A.  This was after one of the attempts to
look back and get my location, and I had told
Michael to stand right there.  I then told him,
you know what, I don't -- I don't want you to make
this worse.  You know, don't run, don't fight.
I'm going to detain you to keep you from making
this worse.
          And then he had turned and started
running, and that's when that radio transmission
happened.
     Q.  You made that radio transmission when he
started running?

Page 142

A. Yes.
Q. I'm going to start again at 49 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Pause it at 52 seconds. What was that loud beeping sound we just heard?
A. That's one of their buttons to hold the channel to give me that channel to communicate because now I'm in an emergency.
Q. Based on your circumstance -- based on your training and experience, what are the circumstances when a dispatcher would hold the channel?
A. When something is not safe or an extreme risk, or something like this. I need the air traffic to start coordinating and directing, because I'm involved in something potentially dangerous for me.
Q. I'm starting again at 52 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Did you hear yourself saying 998, 999?
A. Yes.
Q. What does 998 mean?
A. 998 means officer-involved shooting and

Page 143

then 999 means it's just a higher urgency of I need backup, like send people now from other jurisdictions. Whoever is closest get here.
Q. And you also said "drop the gun"?
A. Yes.
Q. Do you recall when in the timeline you said, "998, 999, drop the gun"?
A. That radio transmission was immediately after I had fired and stopped firing.
Q. You said that while you were still under the stress of having had a handgun pointed at you and shooting back, correct?
A. Yes.
Q. I'm going to scoot ahead a little bit. I'm going to start Exhibit 12 again at we'll say 1:42.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. And I stopped it at 1:50. Was that your voice who said, "he pulled a gun and tried to shoot me"?
A. Yes.
Q. Did you say this immediately after Obregon had pulled the gun on you?
A. Yes.

Page 144

Q. While you said that, were you still experiencing the stress of that moment?
A. Yes.
Q. I'm going to keep playing again at 1 minute 50 seconds of Exhibit 12.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Can you tell us what was said after you gave Mr. Obregon's birthday? And I can play it again if you'd like.
A. My sergeant, Sergeant Ransome, Michael Ransome, said, "have med staged for two." So that means medical is being called and they're staging somewhere safe until it's safe for them to approach.
And he said for two, because I was not certain yet if I had been injured at all or if I had been shot.
Q. Okay. I'm going to pick up again at 1 minute 59 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. I paused it at 2:17. What did you mean, "I'm securing him now"?
A. I meant I was going to approach and

Page 145

assess -- assess him if I needed to secure him with handcuffs, then I would have. I approached and observed that he needed medical attention and aid.
So I moved the handgun away from his immediate reach, and immediately started assessing for injuries, and providing aid.
Q. I'm going to skip again, oops. This will be Exhibit 12. I'll start at 4 minutes and 22 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. I paused it at 4 minutes 40 seconds. To be clear when you said, "I'm rendering aid," were you describing an activity that you were actually doing in the moment?
A. Yes.
Q. You said, "I have multiple residents out with me." Did you hear that?
A. Yes.
Q. Was one of those residents a young woman who ran out of the house?
A. Yes.
Q. When you first became aware of that young woman who ran out of the house, were you

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
150..153

**Page 150**

started right at the beginning. All right. Do you recognize the scene in Exhibit 13 as where the shooting took place?

A. Yes.

Q. Do you see a Pinal County Sheriff's Office truck?

A. Yes.

Q. And do you see if that truck has its lights turned on?

A. Yes.

Q. Did you turn off those lights at any point during this interaction?

A. No.

Q. I'm going to start playing right at the beginning of Exhibit 13.

(Video played.)

BY MS. VAN BUREN:

Q. Pause at 5 seconds in. Did you see an individual on a red -- is it a quad?

A. It is a dirt bike.

Q. A red dirt bike?

A. Yes.

Q. That would have been Michael Obregon, right?

A. Yes.

**Page 151**

Q. Okay. Playing it again starting at 5 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. At about 22 seconds, did you see an individual with a backpack to the side of your car?

A. Yes.

Q. And that would have been Michael Obregon, too, correct?

A. Yes.

Q. I'm going to jump forward to about a minute in. I'll say 55 seconds, and keep a close eye up near the front of your vehicle.

(Video continued.)

BY MS. VAN BUREN:

Q. It looked to me like behind the vehicle you could see, at about 1 minute 15 seconds, two individuals bending over. Were you able to see that?

A. Yes.

Q. Do you want me to play it again? So would that have been you and Mr. Obregon reaching down to pick something up, you think?

A. Yes.

**Page 152**

Q. So by that point, at about 1 minute 15 seconds in, you would have asked him for his driver's license?

A. Yes.

Q. Let's pick up again at 3 minutes into Exhibit 13. And again, keep a close eye on that area near the front of your vehicle. I'm playing -- starting at 2 minutes 56 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. Pause the video at 3 minutes 16 seconds. Were you able to see yourself firing in that section of the video we just watched?

A. Yes.

Q. So by 3 minutes 16 seconds, you had discharged your weapon, correct?

A. Yes.

Q. I'm just going to play the next couple minutes starting at 3 minutes 17 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. I'm going to stop it at 3 minutes 45 seconds and ask you, why didn't you immediately start rendering aid to Mr. Obregon after that 3 minute 17 second mark we looked at?

**Page 153**

A. I called out several times to see if I could get any verbal compliance, to not reach for the gun, to drop the gun, that I wanted to help him.

I also was communicating to my communications center that I had been involved in a shooting, that I needed backup. And then formulating a plan of I'm going to approach, and secure, and render aid, and then communicate at that point.

Q. So were you concerned at this point that Mr. Obregon might still pose an immediate threat to you?

A. Yes.

Q. Because the gun was still within arm's reach, correct?

A. Yes.

Q. I'm going to start again at 3 minutes 45 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. What were you doing there at about 4 minutes 27 seconds?

A. I had to open my passenger door and retrieved my gunshot trauma kit, and then started

Page 154

approaching Michael.
Q. All right. I'm going to start playing again at 4 minutes 33 seconds.
(Video continued.)
BY MS. VAN BUREN:
Q. Keep a close eye on yourself. I stopped the video at 5 minutes. At this point when you're on the other side of the patrol vehicle, were you rendering aid to Mr. Obregon?
A. Yes, I began assessing the area, removing the gun from his immediate reach, and rendering aid.
Q. And then I want to pick up one last segment towards the end. We'll start at about 8 minutes into this exhibit. Okay. I'm going to play the last 25 seconds for you, so keep an eye on that.
(Video continued.)
BY MS. VAN BUREN:
Q. All right. I went and stopped it at 8:15. Did you see another vehicle with lights on pull up to the scene?
A. Yes.
Q. And that was at about 8 minutes 15 seconds, correct?

Page 155

A. Yes.
Q. And to the best of your knowledge, was that Casa Grande PD?
A. Yes.
Q. Do you happen to recall the officer who was the first one to arrive?
A. I believe it was Officer Fox.
Q. Okay. Exhibit 14 will be just a small segment of Officer Fox's body-worn camera. This is DEFS Obregon 135.
EXHIBITS:
(Deposition Exhibit No. 14 marked for identification.)
MS. VAN BUREN: Are you okay if we agree not to transcribe this for the record?
MR. WOODS: Yeah, I'm fine with that.
MS. VAN BUREN: Perfect. All right.
BY MS. VAN BUREN:
Q. Exhibit 14, I'm going to start it at the very beginning and I'm just going to play the first minute of it. You have to wait a little bit before anything happens, but I'm just going to start here.
(Video played, not transcribed.)
BY MS. VAN BUREN:

Page 156

Q. I paused it at 45 seconds. Was that you saying, "I'm rendering aid. I just need an ambulance for him"?
A. Yes.
Q. So am I correct that when the first Casa Grande Police Department officer arrived, you had already begun rendering aid to Mr. Obregon?
A. Yes.
Q. And at that point, you believed that PCSO was also staging medical, correct?
A. Yes.
Q. When you first pulled that red dirt bike over, at that moment in time, did you have any animosity towards Michael Obregon?
A. No.
Q. What about when you saw his driver's license and realized that that's who it was, did you have any animosity towards him?
A. No. I still didn't fully recall who -- who he was.
Q. Did you ever feel any ill will towards Michael Obregon?
A. No.
Q. Let me show you -- this will be Exhibit 15. This is Plaintiffs' Fourth Supplemental

Page 157

Disclosure Statement.
EXHIBITS:
(Deposition Exhibit No. 15 marked for identification.)
BY MS. VAN BUREN:
Q. All right. Take a look at page 3 of Exhibit 15, please, and look particularly about line 16 under the name Chad Garcia. It says, "Mr. Garcia is a friend and/or acquaintance of Michael Obregon. He has discoverable information regarding Defendant Gibson's dislike of, and potential obsession with Michael Obregon."
Mr. Gibson, did you ever have a dislike of Michael Obregon?
A. No.
Q. Did you ever have a potential obsession with Michael Obregon?
A. No.
Q. Do you have any idea why Mr. Garcia would think you felt that way?
A. No, I do not.
Q. Take a look at the remaining witnesses on pages 2 through 6. And I believe Mr. Woods read you some or all of these names earlier. I'm sorry, 3 through 6, so starting right there.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
162..165

**Page 162**

Q. What would you correct about that?

A. I don't think she even touched him or -- I think she was just yelling, and in my space and area that I was trying to secure and work in, and that I was telling her to get back so that I could work safely and effectively.

Q. Do you recall a time where she was standing near Mr. Obregon and then you went back to your vehicle?

A. No.

Q. Paragraph 44, "when Gibson returned from his patrol vehicle with an emergency medical kit, he ordered MB to stand next to Michael and not leave the scene for any reason."

Did you ever tell Mariah Brady to, quote, not leave the scene for any reason?

A. No.

Q. Paragraph 48, "Gibson and other PCSO personnel then forced MB to stand near the feet of Michael's dead body for hours while an investigation took place."

Did you ever force Mariah Brady to stand near Mr. Obregon's body?

A. No. I actually put up police line to keep her from approaching further after I was

**Page 163**

relieved of rendering aid.

Q. Did you witness any other PCSO personnel forcing her to stand near Mr. Obregon's body?

A. Not that I witnessed, no.

Q. Look on page 6 at paragraph 52, "MB tried desperately to leave the scene and pleaded with defendants to move her to another location so she could be with her mother."

Did she ever ask you to move her to another location so she could be with her mother?

A. No.

Q. Paragraph 53, "defendants refused and even engaged in verbal battles with MB."

Did you ever refuse to allow MB to move away from Mr. Obregon's body?

A. No. I was asking her to back up.

Q. Did you ever engage in any verbal battles with her?

A. No, other than me asking her to back up.

MS. VAN BUREN: Those are all the questions I have for you, Mr. Gibson. Mr. Woods may have some follow up.

MR. WOODS: Just a couple.

///

///

**Page 164**

RE-EXAMINATION

BY MR. WOODS:

Q. When Michael ran from you, you said he tripped and fell on his stomach, correct?

A. Yes.

Q. How far away from you was he when he fell on his stomach?

A. Approximately 5 feet to 7 feet.

Q. Did he move after he fell on his stomach?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. Did he crawl? Did he try to get up and move more feet away from you? Run? Anything?

MS. VAN BUREN: Form.

A. From what I observed, as soon as I was on his back, I noticed that he was manipulating an object under his body and then I saw the silver handgun. It all happened fast and it short -- short amount of time. It wasn't a long process or a step by step. It was really rapid and quick moving.

BY MR. WOODS:

Q. Describe -- describe what you mean by you were on his back.

**Page 165**

A. I believe I had gotten -- grabbed his backpack and was looking where his hands were or what he was doing. And I could feel and sense, and he wasn't trying to get up and like crawl and claw his way to continue running, and he wasn't rolling over to fistfight.

He was doing this weird movement under his body like he was manipulating something and I found it odd. And then I saw the handgun and I responded to that.

Q. Were you standing over him or were you actually on top of him?

A. I couldn't say exactly.

Q. Because I -- I mean, you say throughout your interviews and the different reports that you were on his back. So clearly, you had some sort of recollection and definition of what on his back meant at that time, correct?

A. I couldn't say if I was on one knee or both knees, or what side I was on. I just know that he had all that bulky clothing, the big bulky backpack. I had hands on and was observing what he was doing.

I was more concerned and my attention was focused on that than if I had a knee or not on

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
174..177

**Page 174**

He knew who I was."

Q.   What do you mean by that?

A.   So now that I was in physical possession of his license, and he had recognized me, and knew that I was in physical possession of his license, and that he had told me that he had warrants.  I was speaking to potentially his mental state or decision-making process.

So I felt that by him pulling the handgun and introducing that to the situation after I had multiple attempts to deescalate to then when I was backpedaling, he continued to point that in my direction with the intent to use it, that I was in reasonable apprehension of imminent deadly assault.

Q.   Okay.

A.   So I had to use force to avoid that situation.

Q.   I'm going to play from 3:04 to 3:11.  I want you to look as closely as you can.  Just watch and tell -- so what you're going to see here is you coming out like this, and then running in, then coming out again shooting, okay.

MS. VAN BUREN:  Form.

(Video played.)

**Page 175**

BY MR. WOODS:

Q.   So we're at 3:04.  Tell me when you see you.

A.   I see me backing up.

Q.   Okay.  I knew that was going to be a fruitless exercise.  So from 3:04 to the time you said "I see me" was 10 seconds.  We stopped at 3:14.  Do you know that?

A.   I -- I don't know what you're referring to.  Just now --

Q.   Just now -- and I'll show you.  I didn't even move it.  What timestamp is on there?

A.   3:14.

Q.   And we started at 3:04 --

A.   Yes.

Q.   -- right?  So in that time frame, let's just be generous and say there was 10 seconds.  Michael ran from you, you chased him, you got on his back, you backed up and started shooting all in that time frame?

MS. VAN BUREN:  Form.

A.   It was a rapidly evolving situation and I didn't have the time to think or to choose a different option.

BY MR. WOODS:

**Page 176**

Q.   But you had time to get on his back and say, oh, my gosh, he's got a gun in his hand.  He's rummaging through his front.  He's got a gun in his hand, right?

MS. VAN BUREN:  Form.

A.   Yeah, so I had noticed that he was running away.  I had -- I was calling for emergency backup.  I was dispatching that as I was getting on his back.

At some point, he manipulated and produced the handgun.  I backed up.  He rolled over and presented that handgun again towards me, and then I was firing all --

Q.   So --

A.   -- in that small amount of that time.

BY MR. WOODS:

Q.   So you saw the handgun twice, two separate scenarios.  He's pulling it out.  And then at some point, he rolls over and points it at you?

MS. VAN BUREN:  Form.

A.   From when it's manipulated from under his body and then from when he rolls over and is pointing towards me, yes.

BY MR. WOODS:

**Page 177**

Q.   Okay.  And you just said that you didn't have enough time to think during that time frame.

A.   My training and experience or muscle memory kicked in.

Q.   And you -- and just to be clear.  You were able to tell without a shadow of a doubt that it was a gun in his hand?

A.   Yes.

Q.   Enough so that you were able to get on his back -- you got on his back, right?

A.   That was before the handgun was produced.

Q.   And then the gun somehow was produced?

A.   The --

MS. VAN BUREN:  Form.

A.   He pulled out the gun from wherever he had it concealed.

BY MR. WOODS:

Q.   Okay.  And you had noticed earlier that he had had a bulky object somewhere in his front, right?

A.   I had noticed that there was -- he was wearing bulky clothing, a bulky backpack, and that there was a bulky object, yes.

Q.   And at the beginning when you stopped,

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
178..181

**Page 178**

did you ask him if he had any firearms?

A.  I don't recall asking him if he had any weapons.

Q.  But you noticed the bulky object at that time, correct?

A.  At some point before he fell down and produced the handgun, I did notice it, yes.

Q.  So then he runs away.  You chase after him.  You get on his back after he's tripped.  You're on his back, right?

MS. VAN BUREN:  Form.

A.  I'm on his back at that point, yes, when I see him produce the handgun from under his body.

BY MR. WOODS:

Q.  Okay.  And again, you're on his back.  There's a big, bulky backpack between you and him, correct?

MS. VAN BUREN:  Form.

A.  There is a big, bulky backpack involved.  I'm feeling and observing his movements, and figuring out as he's doing it what he's doing.  So that's why I mentioned to Detective Bonucci, I observed he wasn't trying to get back up and bear crawl, and keep running away.

I observed he wasn't trying to roll over

**Page 179**

and physically fight, like punch, fight it out or kick me away off his back.  He was manipulating an object and I found that odd.  I found his movements odd.

And then the handgun came out and then that's when I realized what he was doing, and then I pushed off, and backed up.

BY MR. WOODS:

Q.  And started shooting?

A.  So muscle -- yes, muscle memory and training kicked in.  He rolled over, continued to point the handgun at me.  I said, drop the gun.  I'm backing up.  My body was already shooting and backing up, and out of the holster before --

Q.  Did you tell him to drop the gun before you started shooting?

A.  I recall saying it a few times during the incident.  I --

Q.  Do you recall saying, what now, "a few times during the incident"?

A.  Yes.

Q.  Okay.  Do you recall before you started shooting telling him to drop the gun?

A.  I -- I can't tell.  I know that after the shooting, I told him to drop the gun.  I

**Page 180**

believe I said it earlier than that, but I'm not a hundred percent certain.

Q.  So just to be 100 percent clear because earlier when we were talking about -- when we were talking about the getting on his back, the backpack didn't really come up.

Do you know if bullet holes were found in his backpack?

A.  I don't know.

Q.  Do you know if any of your shell -- any cartridges -- or not cartridges, any of the spent bullets were found in the backpack?

A.  I don't know.

Q.  Was his backpack covering the majority of his back?  Do you recall where the backpack was sitting on him?

MS. VAN BUREN:  Form.

A.  I -- I don't recall.  I know that I was feeling his body movements and observing.  And when I saw the gun, that's where my attention was.

BY MR. WOODS:

Q.  Okay.  So in that 10 seconds that we watched, he ran.  You chased.  You got on his back after he had tripped.  You felt the movements underneath him.  You pushed yourself off and then

**Page 181**

your muscle memory kicked in shooting.

Do I have that right?

MS. VAN BUREN:  Compound.  Form.

A.  It -- there's a lot that happened in that.  So he ran.  I radioed 913 and that was going on while I was getting on his back.  I felt his movements and was observing his actions.  I observed the gun come out.  I pushed off and backpedalled.  He relooks where I'm at when he points the gun at me, and then I'm backing up while firing.

BY MR. WOODS:

Q.  Okay.  And all that happened in that time frame that we looked at on the video?

MS. VAN BUREN:  Form.

BY MR. WOODS:

Q.  Just want to make sure.

A.  It appears to have occurred in a very short amount of time, very rapidly, yes.

Q.  Okay.  You -- there was a question about the position of the gun when you found it next to his body that your counsel asked you.  I think that was on Exhibit 6 and you put an X there.

Do you recall doing that?

A.  Yes.

**Page 182**

Q. Okay. As soon as she asked you about it, you were able to look at that and mark an X as to where you found the gun, right?

MS. VAN BUREN: Form.

A. No. I looked at the photo and took the time to recall where approximately it was at.

BY MR. WOODS:

Q. Okay. But you were able to recall where the gun was at?

A. Approximately.

Q. But you weren't able earlier when I asked you to recall where his body was after -- after the shooting, correct?

MS. VAN BUREN: Form.

A. My focus and attention was on the firearm throughout this portion of this incident when he produced it from under his body to when he rolled over. When I'm approaching him, I'm looking at the firearm and not the position of his body, because I want to make sure that that is secure.

BY MR. WOODS:

Q. But how do you know where the firearm actually was when you moved it if you don't know where his body was?

**Page 183**

A. By the position with the fence and where on the ground, the approximate location of where it was, of how this movement that I did to move the firearm out of his immediate reach would look.

Q. Okay. So you're just guessing at this point?

MS. VAN BUREN: Form.

A. This is an estimate.

BY MR. WOODS:

Q. Yeah. But it's also a guess because you can't tell me where his body was?

MS. VAN BUREN: Form.

A. It's not a guess. I disagree.

BY MR. WOODS:

Q. But can you tell me where his body was?

MS. VAN BUREN: Form.

A. Not -- not with exact certitude exactly where each arm was, and limb was, and head was, and article of clothing was.

BY MR. WOODS:

Q. And you can't tell me if he was face down or face up either after the shooting, can you?

A. Not -- not that I can recall right now.

Q. Okay.

**Page 184**

MR. WOODS: I have nothing further.

MS. VAN BUREN: We'll read and sign, please.

THE VIDEOGRAPHER: Regarding the video orders, will you need a video?

MR. WOODS: Yeah.

MS. VAN BUREN: I'll take a video, too, please.

THE VIDEOGRAPHER: We are off the record. Time on the video monitor is 2:33. This ends media number 2 in the deposition of Brady Gibson.

(Thereupon, the deposition was concluded at 2:34 p.m. with reading and signing having not been waived.)

_____

BRADY GIBSON

**Page 185**

STATE OF ARIZONA    )
COUNTY OF MARICOPA  )

BE IT KNOWN the foregoing deposition was taken by me pursuant to stipulation of counsel; that I was then and there a Court Reporter and Notary Public of the State of Arizona, and by virtue thereof authorized to administer an oath; that the witness before testifying was duly sworn by me to testify to the whole truth; notice was provided that the transcript was available for signature by the deponent; that the questions propounded by counsel and the answers of the witness thereto were taken down by me in shorthand and thereafter transcribed into typewriting under my direction; that the foregoing pages are a full, true, and accurate transcript of all proceedings and testimony had and adduced upon the taking of said deposition, all to the best of my skill and ability.

I FURTHER CERTIFY that I am in no way related to nor employed by any parties hereto, nor am I in any way interested in the outcome hereof.

DATED at Mesa, Arizona, this 15th day of January 2026.

_____
Debra K. Price
Court Reporter
Notary State of Arizona

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

# EXHIBIT 2

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-24-1510-PHX-KML – Michael Obregon Homicide

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police practices, policies and procedures, as well as use of force and investigative irregularities in the investigation of this matter.

The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath. My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience.

My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).

**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended

OBREGON_000897

by former counsel for a specific case.  It is not something I do fulltime.  I occasionally provide my opinion on cases I feel strongly about and work by referral.  To date, I have provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants, relating to vehicular homicide, use of force, search & seizure, traffic matters, and common police policies, practices and procedures.  Finally, I understand that discovery is an ongoing process and could reveal yet other information relevant to the formulation of my opinions in this matter.   I have also been informed that there is still outstanding discovery and that disputes have arisen regarding production of certain documents and, therefore, I reserve the right to modify or supplement my opinions upon receipt of further documentation produced in this matter.

**Case Material Reviewed:**

- Pinal County Sheriff's Department Incident Report
- Casa Grande Police Department Incident Reports
- Ring Camera Surveillance Video
- Radio / Dispatch Audio Recording
- Police Canvass / Witness Audio Recordings
- Witness and Officer Deposition Transcripts
- Miscellaneous Police Body Cam Videos
- Witness Declarations and Interview Statements
- Crime Scene Photos and FARO Diagrams
- Miscellaneous Case File Information as Necessary

**Research Material:**

- Cases:
  - Terry v Ohio, 392 US 1 (1968)
  - Brosseau v Haugen, 543 US 194 (2004)
  - Graham v Connor, 490 US 386 (1989)
  - Plumhoff v. Rickard, 572 U.S. 765 (2014)
  - Tennessee v Garner, 471 US 1 (1985)

OBREGON_000898

**Opinion(s):**

1. Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

2. There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

3. Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.  The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Case Synopsis:**

On March 16, 2023, at approximately 1900 hours, Deputy Gibson was working uniformed patrol in Casa Grande when he reportedly observed a red dirt bike driving at high rate of speed on Hualapai Drive, from Hopi Drive.  He then "sped up to catch up to the dirt bike in an attempt to conduct a traffic stop."  Deputy Gibson saw the bike stopped in the driveway of 19005 Mescalero Drive and activated his emergency lights, at which time the driver "accelerated the bike crashing into the closed fence."  Deputy Gibson then exited his vehicle and commanded him to "stop."  He also put the dirt bike's kickstand down. (PCSD Report, Pg. 75)

OBREGON_000899

**Note**, ring camera video confirms that Deputy Gibson rolled up to a subject in a patrol vehicle with rear emergency lights activated while subject Obregon was sitting on a motor cycle in the driveway and the cycle lurch forward striking a chain link gate.  By activating his emergency lights, commanding the suspect to stop, and putting the bike's kickstand down, Deputy Gibson effectively seized the subject under the 4th amendment.

Deputy Gibson indicated that during a brief discussion with the subject, he obtained Mr. Obregon's identification and observed some indications of nervous flight.   He also said that Mr. Obregon admitted to having warrants.  Deputy Gibson said he advised Mr. Obregon that he was going to detain him, at which time Mr. Obregon attempted to flee on foot but tripped and fell prone to the ground.  (PCSO Report Pg. 76 and Gibson Deposition)

**Note**, ring camera video confirms Deputy Gibson in contact with Mr. Obregon for approximately three minutes and Mr. Obregon appearing to drop items and pick them up. The video also confirms that Mr. Obregon attempted to flee on foot and Deputy Gibson giving chase.

Deputy Gibson indicated that he got on top of Mr. Obregon's back and felt him manipulating something with his hands, which were underneath him at his waistline.  At that time, Deputy Gibson indicated that Mr. Obregon brandished a handgun, so he pushed off of him, backed away and drew his sidearm.  He said that Mr. Obregon then rolled onto his side away from him and pointed a handgun at him, so Deputy Gibson fired 7-8 rounds at him and saw the gun fall to the ground.  Deputy Gibson then "took cover near the dirt bike." (PCSO Report, Pg.  76).

**Note**, after Deputy Gibson is seen chasing after Mr. Obregon, he goes out of sight of the ring-camera for approximately 3.5 seconds before being seen again backing away while

shooting multiple rounds downward toward the area in which Mr. Obregon had fled. Deputy Gibson then appears to operate his radio and take cover behind his patrol vehicle.

Deputy Gibson indicated that he then assessed the incident, relayed information to dispatch, obtained his medical trauma kit from the passenger side of his vehicle and then returned to Mr. Obregon to render aid. He indicated that while he was rendering aid, a female approached him yelling and cursing. He also indicated that a male approached offering to help, so he had him hold his flash light. (PCSO Report, Pg. 76)

**Note**, ring camera video confirms that Deputy Gibson retrieved something from the passenger side of his vehicle before returning to Mr. Obregon's location. Footage also revealed Deputy Gibson possibly accessing the driver's side of his vehicle and subjects approaching and lingering in the area before backup units arrived.

Mr. Obregon died at the scene. It was determined that the weapon located near his body was loaded but had not been fired. At this time, there is no physical evidence placing the handgun into Mr. Obregon's hands. The autopsy report revealed the cause of death to be multiple gunshot wounds, i.e., 1 anterior and 6 posteriors.

Approximately 25 direct or indirect witnesses were contacted and interviewed in this case. Most were circumstantial witnesses. There were variations to the number of shots heard (from 2-9), and seven witnesses ultimately reported some manner of pause between shots. Some witness statements conflicted with and in one case, contradicted with pertinent elements of Deputy Gibson's account of the incident, e.g., succession of shots and whether Mr. Obregon had brandished a weapon. Furthermore, there is some physical evidence which raises doubt as to the plausibility of Deputy Gibson's specific account.

**My Opinions Regarding Officer Gibpson's Use of Force:**

Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment.  However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

**Discussion:**

Officers are justified in using lethal force when they have probable cause to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others.  When given time, officers must provide a warning before implementing lethal force and utilize it only as a last resort.  In the case of a police shooting, officers are responsible for every round they fire, as well as the backdrop behind their line of fire.  When an officer perceives that the imminent threat has ceased, so must the continued use of lethal force.  Officers cannot use excessive force to stop a fleeing suspect unless they have probable cause (PC) to believe that the suspect is an immediate threat of deadly force or serious injury to the officer or others.  (*Brosseau v Haugen, Graham v Conner, Plumhoff v Rickard,* and *Tennessee v Garner*)

According to Deputy Gibson's statements to investigators, while on top of Mr. Obregon's back, he felt Mr. Obregon manipulating something underneath his waistline area before he brandished a black and silver handgun.  Deputy Gibson then pushed off of Mr. Obregon, began backing away from him and drew his service weapon.  He said he began firing his weapon when he saw Mr. Obregon roll away from him onto his side and point the gun at him.  Deputy Gibson said that he believed he would be shot and recalled firing 7-8

times and seeing the handgun fall to Mr. Obregon's side.  (PCSO Report, Pg. 76)

Subjectively, the officers account would justify his initial use of lethal force.

In deposition, Deputy Gibson stated that he didn't stop firing "…until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped."  Deputy Gibson confirmed multiple times that he had stopped firing when the weapon dropped.  When asked if he believed that the threat was neutralized when the gun dropped, Deputy Gibson responded "yes."  (Gibson Deposition, Pg. 138-139)

The medical examiner (Dr. John Hu, MD) concluded that Mr. Obregon was struck with 6 fatal rounds, i.e., 1 anterior and 5 posteriors, as well as one non-lethal posterior grazing round.  He also provided trajectory descriptions for the lethal rounds. Extrapolating his anterior trajectory, Mr. Obregon's gunshot wound is consistent with having been struck while on the ground either on his back or on his side facing Deputy Gibson, who would have been shooting from an elevated position.  Extrapolating his posterior trajectories, Mr. Obregon's gunshot wounds are consistent with his having been struck while on the ground rolling away from Deputy Gibson, who would have been shooting from an elevated position.

Deputy Gibson described in deposition that while on Mr. Obregon's back, he saw him pull a black and silver gun out from underneath him with his right hand.  Deputy Gibson then transmitted "913" (immediate backup request), yelled "drop the gun," pushed off of Mr. Obregon's back and began backpedaling.  He said Mr. Obregon rolled away from him onto his right side and pointed a handgun at him, so Deputy Gibson fired 7-8 fast and

rapid shots.  He could not recall if there was a pause between his shots.  (Gibson Deposition Pgs. 83-93)

Based upon the medical examiner's trajectories of the anterior and posterior rounds, as well as Mr. Obregon's body positioning, it is reasonable to deduce that one of Deputy Gibson's initial rounds struck Mr. Obregon in the front, whereas the remaining lethal rounds stitched him down his back in a semi-linear pattern, from his upper right shoulder to his left thigh (at approximately a 60-degree angle), as he rolled away from the officer.

Deputy Gibson indicated in deposition (Pg. 93) that he stopped firing when he saw the handgun fall to the ground beside Mr. Obregon.  He also indicated that he moved the gun a short distance farther away from Mr. Obregon's body after the shooting.  (Pg. 90) The officer's relative position to Mr. Obregon's position and Deputy Gibson's testimony that he saw the gun fall to the ground are both consistent with the gun landing on the left side of Mr. Obregon's prone body.  Crime scene investigation photos and FARO data also place the handgun to the left (and rear) of Mr. Obregon's body.

The positioning of the handgun to the left of the body indicates to me that it likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position.  In other words, if Mr. Obregon had retained possession of the gun during the roll away from the officer, it is not likely that the weapon could have landed on the left side of the body.  As Deputy Gibson stated in deposition, Mr. Obregon would no longer have been an imminent threat to him after the gun had fallen to the ground.  Therefore, continuing to fire at Mr. Obregon from behind as he rolled to his right away from Deputy Gibson was unnecessary.

OBREGON_000904

Deputy Gibson also indicated in deposition that he wasn't sure if there was any sort of pause between his shots.  However, seven witnesses described hearing some form of pause between essentially two volleys.  A pause would be consistent between the anterior and posterior strikes depending on the time it would have taken for Mr. Obregon to roll away from the officer exposing his backside, i.e., the greater the pause the slower the roll.

**Note**, officers are trained and tested to shoot and assess, i.e., firing in controlled bursts while simultaneously monitoring the suspect for a change in behavior, such as falling, fleeing or dropping a weapon.

## Observations

**Observation 1**:

When questioned in deposition regarding whether the sheriff's department had any policy relating to shooting fleeing suspects from behind, Deputy Gibson responded "There is a policy for use of deadly force in the circumstance of a person that is fleeing."  (Gibson Deposition, Pg. 83)  I am not aware of any such PCSO policy.  Pursuant to the landmark case of Tennessee v Garner, officers must have PC to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others before they can shoot them from behind.

**Observation 2**:

In the radio recording of the incident, Deputy Gibson put out an emergency transmission code (998/999) of an officer involved in a shooting followed by a "drop the gun!" exclamation.  (Radio Transmission at 00:53)  However, there is

OBREGON_000905

evidence that the transmission occurred after Deputy Gibson had finished firing and, therefore, after Deputy Gibson stated that he saw the gun fall.

**Observation 3**:

During the radio traffic communication, before returning to the body, Deputy Gibson can be heard calmly describing the handgun's colors and stating by name that Michael Obregon had tried to shoot him.  (Radio Transmission beginning 01:07)

**Observation 4**:

When apprehending a fleeing suspect, it is common police practice and training to take subjects prone to the ground, get their hands behind their back and secure them in handcuffs.  Being on top of a suspect's back, particularly with the weight of an officer's gear, generally gives officers a tactical advantage to control suspects and their hands.  Conversely, getting off a suspect would tend to shift the tactical advantage by relinquishing control.

**My Opinions Regarding Procedural and Investigative Irregularities:**

Having reviewed the investigation in this matter, there are a number of procedural and investigative irregularities, as well as conflicting witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

**First**:

Deputy Gibson did not follow police protocol preceding his contact with Mr. Obregon.  It is common police policy, practices and procedures for officers to notify dispatch when conducting legitimate traffic enforcement activities, engaging in a pursuit or

OBREGON_000906

other on-view (OV) activity.  There are many safety, ethical and constitutional reasons for this.  Not doing so is generally not only a violation, but also begs the question of why the breach in protocol.

When conducting a traffic stop, officers must have reasonable suspicion (RS) of an enforceable traffic-code violation or other legal exception in order to stop individuals, and they are required to advise dispatch of the location of the seizure.  When conducting a pursuit, i.e., when an officer is actively trying to stop a vehicle and the driver is actively alluding, officers are required to not only advise dispatch of the pursuit, but also follow additional regulations, such as: advising a supervisor of their speed, location, traffic conditions, and purpose of the pursuit.  If an officer goes out with a subject on OV activity, he is also required to notify dispatch of his location and contact.

In this case, Deputy Gibson indicated to investigators that while in the area of Hopi and Battleford, he initially observed a red dirt bike driving south on Hualapai at a high rate of speed.  Hualapai is located 2-3 blocks west of Battleford, a distance of approximately .1 miles, and it was dark out at that time.  At night at that location and perpendicular to the subject vehicle, it would have been extremely difficult, if not impossible, to accurately gage the speed or color of a dirt bike from that distance.

That being said, at least one witness (Mariah Brady) indicated that Mr. Obregon had driven onto her property (passing right by her window) into the back yard for approximately one minute and was in the process of leaving when Deputy Gibson arrived.  Ring video confirms that Mr. Obregon was off the street and in the driveway when the officer arrived on scene.  He activated his rear emergency lights and seized Mr. Obregon by ordering him to stop without informing dispatch that he was following a vehicle at high

speed, conducting a traffic stop or going out with a subject.  This breach in protocol is indicative of not having a legitimate reason to make a traffic stop.  Without RS of an enforceable violation, the seizure was unconstitutional.

## Observations

**Observation 5**:

Despite Mariah Brady's statements that Mr. Obregon had already arrived and was in the process of leaving when the deputy arrived, investigators did not question the breach in protocol or seizure of Mr. Obregon.

**Observation 6**:

Deputy Gibson indicated to investigators that he was unsure of the name of the street in which he contacted Mr. Obregon; there is evidence that he had been to that specific address on a call relatively recent to this incident.

**Observation 7:**

There is some evidence that Deputy Gibson had adverse history with Mr. Obregon, as well as with off-road vehicles driving in the area.  (Nicholas Wallace Declaration, Daniel Wallace Declaration, Nicole Bernier Declaration, Meagon Brady Interview)

**Observation 8:**

The first witness on the scene, Mariah Brady, indicated in her interview with Detective Gonzalez that Deputy Gibson did not render aid or retrieve his first aid kit until after she walked up and told him to "help him."  She was adamant that she did not see a gun.  (Mariah Interview 01:50)

**Observation 9:**

Two residents, Samantha Dean and Whitney Hector, indicated that they heard Deputy Gibson yell "I bet your scared of me now huh" and "I bet you're scared of me now," respectively, just before hearing shots.  (Samantha Dean Face Book Communication / Whitney Hector Declaration)

**Observation 10:**

There is evidence that Tiffany Chapman was on her phone with Nicole Bernier while observing the interaction of Deputy Gibson and Mr. Obregon.  During the call, Tiffany Chapman reportedly told Nicole that Mr. Obregon was running from the deputy and "oh my god, he shot him!"

**Observation 11:**

Of the three witnesses who reported having seen Mr. Obregon fall, i.e., Mariah Brady, Kenyan Bower, and Tiffinay Chapman, none of them reported seeing Mr. Obregon with a gun.

**Observation 12:**

Mr. Obregon's nephew, Nicholas Wallace, reported in his declaration that his uncle "always kept his gun in his belt in the back of his pants because he rode a motorcycle or dirt bike."

**Second**:

There appears to have been some investigative confirmation bias as it relates to Deputy Gibson's account.  Confirmation bias is the tendency to search for and interpret investigative findings that conform to an investigators pre-existing beliefs or hypotheses

and to disregard statements or evidence that do not. Consider the following factual hypothesis which outlines the facts of this case:

An officer seizes a subject in a private driveway contrary to protocol and with questionable legal justification. While on the ground, the suspect is fired at ten times and struck posteriorly by six of the rounds. The weapon recovered is found not to have been fired, linked to the subject, or forensically placed in the subject's hand. Gunshot wound trajectories do not conform with the officer's account. Moreover, witnesses arrive within moments of the shooting but report that they did not see a gun. Anomalies such as these are clearly significant and would need to be thoroughly investigated and challenged.

Mariah Brady was a direct witness to the incident, as she was able to provide both audible and visual observations preceding, during and after the shooting. She was also the first person to walk up to Deputy Gibson following the shooting. In her interview with Detective Gonzalez, she indicated that she heard the m/c come into her yard and pass by her window. After a minute or so, she heard the m/c drive back past her window and to her driveway gate. She also heard gate opening and closing noises, the m/c turn off and Deputy Gibson yelling for him (Mr. Obregon) to get on the ground. While looking out of her window into her front yard, she started hearing shots and ran outside. She saw Deputy Gibson standing over him (Mr. Obregon) with a gun pointed at him. She then heard more shots and ran outside. Note, her observation point would have made her one of the closest witnesses to the shooting scene.

Mariah admitted that she was very upset (and "freaking" out) because she initially thought that he (Mr. Obregon) was her mother's friend that lives with them, so she asked the deputy what happened. She said that Deputy Gibson told her that he (Mr. Obregon) had

pulled a gun on him.  Because she never saw a gun, she asked Deputy Gibson where it was but he did not respond.  She then pleaded with him to help him (Mr. Obregon), at which time Deputy Gibson retrieved a first aid kit, cut Mr. Obregon's clothes off and render aid.

Despite conflicting witness statements and the number of posterior wounds, investigators presented Deputy Gibson with very few questions into the anomalies.  Investigators were unable to link the handgun recovered as belonging to Mr. Obregon.  DNA swabs were taken from the gun but never submitted for DNA analysis in order to forensically place the weapon in Mr. Obregon's hands.  Finally, Mr. Obregon was wearing a backpack during the shooting, but there is no indication that it was examined to corroborate trajectories.

There were contradictory statements as to the number and succession of gunshots.  Seven witnesses ultimately described some manner of a pause between the number of shots fired.  Despite this anomaly to Deputy Gibson's account, investigators did not seem to consider potential implications as there was apparently no investigative analysis conducted or investigative conclusions made relating to the projectile impact trajectories identified in the medical examiner's report.

**Fourth:**

Deputy Gibson's shooting account is questionable.  The ring-camera footage depicts Deputy Gibson going after Mr. Obregon.  He is out of sight for approximately 3.5 seconds before reemerging walking backward while shooting downward into the area in which Mr. Obregon had reportedly fallen.  According to Deputy Gibson's deposition, during that 3.5 second timeframe, he did the following:

OBREGON_000911

1.  He ran after Mr. Obregon

2.  Got on top of him

3.  Radioed for backup

4.  Felt Mr. Obregon manipulating something with his hands underneath his waistline

5.  Saw Mr. Obregon work his arm out brandishing a silver and black gun

6.  Pushed off of Mr. Obregon

7.  Started back peddling away from Mr. Obregon

8.  Drew his service weapon

9.  Saw Mr. Obregon roll to his side trying to relocate him

10. Saw Mr. Obregon point the gun at him

11. Warned Mr. Obregon to drop the gun

12. Started firing at Mr. Obregon

Based upon testimony, crime scene data, and having visited the scene, I estimated the distance from the moment Deputy Gibson left sight of the camera to Mr. Obregon's location, to be between 5-9 feet. Physically navigating that distance both directions and completing all the above steps within a 3.5 second timeframe seems unlikely, especially when also factoring in cognitive reaction time (RT) for one or more of the stated steps.

Cognitive reaction time is essentially the total duration of time between the perception of a stimulus (visual or auditory) and the initiation of a physical response. In other words, the time it takes a person to perceive and then to physically react to a given threat or other stimulus. There are many variables in which can influence RT, e.g., age,

OBREGON_000912

weariness, lighting conditions, etc.   There has been research done to calculate average RT, but it varies from person to person.  Therefore, in order to measure accurately a specific person's RT, that individual would have to be tested individually.

**My Opinions Regarding the Seizure of Mariah Brady:**

Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.  The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Discussion:**

In the landmark case of in landmark case of Terry v Ohio, the Supreme Court described the difference between a non-seizure (a contact) and a seizure (stop or arrest). The Court defined a seizure as "Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred."  Officers must have reasonable suspicion (RS) of a crime to seize a person, including a witness, and they can only detain that person for a reasonable amount of time. A reasonable amount of time has been defined as brief and lasting only as long as necessary to confirm or dispel the officer's suspicion.

All officers are taught Terry v Ohio.  They are also taught that 20-minutes is a good rule of thumb for traffic stops and other citizen contacts.  Officers are taught that even more deference should be given to holding witnesses and that witnesses should not be detained against their will, especially when they have been identified.

OBREGON_000913

That being said, Mariah Brady was a witness to the police shooting in front of her residence.  At the time of the incident, she was fifteen years old.  Pursuant to her police interview and/or subsequent deposition, Mariah's parent(s) were not home and she had been caring for younger siblings.  After the shooting, she immediately went outside and contacted the deputy involved as detailed above.  As backup officers arrived, she was ordered to stay there.  (Fox Body Cam 03:30 / 1908hrs.)

In Mariah's interview with Detective Gonzalez, she described being held very close to Mr. Obregon and held against her will for a very long time throughout the incident.  She emotionally described being "trapped" by several officers and made to "watch him die."  She asked to leave multiple times to go back into her home but was rebuffed, told to "shut her mouth" and warned that she would be arrested if she passed the "line," i.e., crime scene tape preventing her from getting back into her house.  (Mariah Audio Interview 01:50 – 10:30)

Body cam video confirms that Mariah was detained at 1908 hours on the SEC of her property, between the utility pole and driveway, approximately 20ft of the decedent.  Video confirms that Mariah was kept there (officers standing by) for over an hour (1908-2012hrs) despite multiple requests to leave and arguments that she needed to go back inside her home and care for her siblings.  Mariah was emotional, angry and even insulting to the officers when they rebuffed her requests.  At 2012 hours, you can hear the officer tell detectives "We wouldn't let her go in – she's just mad."

Mariah lived there, had already been identified as a witness and was not a suspect in any crime.  The officers would have known that Mariah was a juvenile and visibly upset

young girl, and they should have known that placing a child in close proximity to a fatally wounded person could be traumatic.  Mr. Obregon was reported to be a family friend.

Holding a witness, particularly one that could be considered as a hostile witness, inside the inner perimeter of a crime scene is highly unusual.  It is common police practice to relocate witnesses not only outside of a crime scene, but also to shield them from public scrutiny.  Instead, Mariah was detained on the shoulder of the road.  Officers routinely ask witnesses if they would mind waiting in a vehicle, restaurant or other safe location outside of the crime scene and out of public view.  There is no evidence that they made such an offer.

If a witness objects to being detained, officers should obtain their contact information and arrange to interview them later, especially when there is no urgency.  In this case, Mariah's home was not part of the crime scene, and she could have waited inside her home for investigators.  The officers' treatment of this minor witness and the length of her seizure were unreasonable.

Respectfully given January 31, 2026



_____
Ret. Lt. Mark R. Hafkey, M. Ed.

OBREGON_000915

# EXHIBIT 3

# In the Matter of:

*Obregon*

*vs*

**Lamb**

*Mark Richard Hafkey*

*April 24, 2026*



# GRIFFIN GROUP
## INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB, <br><br>       Plaintiffs, <br><br> v. <br><br> Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X, <br><br>       Defendants. | ) ) ) ) ) NO. ) 2:24-cv-01510-PHX- ) KML ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF
MARK RICHARD HAFKEY

April 24, 2026
Witness Location:  Mariposa, California
9:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Page 2

                    I N D E X
WITNESS                                          PAGE

MARK RICHARD HAFKEY

        Examination by Ms. Van Buren                 5


                  E X H I B I T S
EXHIBITS  DESCRIPTION                            MARKED
No. 1     Police Expert Opinion, dated 1-31-26       8
          (19 pages) (OBREGON_000897 through
          OBREGON_000915)
No. 2     Curriculum Vitae (5 pages)                 7
          (OBREGON_000916 through OBREGON_000920)

No. 3     Invoice, dated 2-2-26 (1 page)            41

No. 4     Forensic Examination Report, dated        70
          3-17-23 (14 pages) (DEFS_Obregon 000090
          through DEFS_Obregon 000103)

No. 5     Witness Statement Table on Obregon Case    9
          (3 pages)
No. 6     Radio/Video Timeline (1 page)             44
No. 7     Color copy of a photograph (1 page)       57

Page 3

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF MARK RICHARD HAFKEY, located in Mariposa, California, taken on April 24, 2026, commencing at 9:00 a.m. before ROBIN JASPER, a Certified Stenographer in the State of Arizona.

COUNSEL APPEARING BY VIDEOCONFERENCE:
        WIENEKE LAW GROUP
        BY:  Ms. Laura Van Buren
        1225 West Washington Street, Suite 313
        Tempe, Arizona  85288
        Attorneys for Defendants
        MILLS + WOODS LAW, PLLC
        BY:  Mr. Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, Arizona  85014
        Attorneys for Plaintiffs

ALSO PRESENT BY VIDEOCONFERENCE:

        Ms. Danielle Morris
        Mr. Alex Marinakis, Videographer

Page 4

THE VIDEOGRAPHER:  We are on the record. Today's date is Friday, April 24, 2026, and the time is 8:59 a.m. Arizona time.  This is the video-recorded deposition of Mark Richard Hafkey, noticed by counsel for the defendants, Lamb and Gibson, in the matter of Allison Obregon, et al., versus Mark Lamb, et al.  The case number is 2:24-cv-01510-PHX-KML.  This matter is being held in the United States District Court for the District of Arizona.

THE certified court reporter is Robin Jasper of Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona.  My name is Alex Marinakis.  I'm the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, would you identify yourselves and whom you represent, starting with the plaintiffs' counsel, please.

MR. WOODS:  Sean Woods from Mills + Woods Law.  I represent the plaintiffs in this matter.

MS. VAN BUREN:  Laura Van Buren from Wieneke Law Group on behalf of defendants.  Also present is Danielle Morris on behalf of the Arizona Counties Insurance Pool.

THE VIDEOGRAPHER:  Thank you, Counsel.

Page 5

The court reporter may swear in the witness at this time, please.

MARK RICHARD HAFKEY,
a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MS. VAN BUREN:

Q.  If you will please state your full name for the record, sir.

A.  Mark Richard Hafkey.

Q.  You broke up there a little bit for me, which means you may have for the others.  Can you say it one more time.

A.  Mark Richard Hafkey.

Q.  Mr. Hafkey, where are you right now?

A.  I'm in Mariposa, California, County of Mariposa.

Q.  Are you in your home?

A.  Yes.

Q.  Is anyone else in the room with you right now?

A.  No.

Q.  Do you have any written materials with you right now?



Page 22

no.

Q. What do you mean when you say you worked with the Homicide Bureau?

A. In my role as union president, in my role as a -- working for the Traffic Bureau, in my role with Patrol, we worked closely with the homicide scenes from the beginning, were often -- we are often first responders before Homicide ever gets involved. So managing a homicide scene, I have done that many times in my role as an -- in Patrol. As a supervisor, supervisors respond to -- Patrol supervisors respond to the homicide scenes. In my role with the Traffic Bureau, we often respond to the homicide scenes, either because it's a vehicular homicide or because they need scene support and scene security.

So I worked with the Homicide Bureau all through my career, just because of the logistics of getting it started. Homicide in most cases is not contacted or not called out for some time after an initial scene in which somebody is either killed or is seriously injured.

Q. Did you ever act as a detective in a homicide investigation with Phoenix PD?

A. Yes. Every time a patrol officer, just starting at the patrol level, responds, they conduct investigative duties at that scene, from securing the scene to gathering

Page 23

investigative evidence to support Homicide. So from the very beginnings of a homicide situation, it almost always began with Patrol or some other unit attached to Patrol, like the Traffic Bureau. And everything has to be handled up until the Homicide Bureau actually is called out or responses and takes over that scene. And, in fact, follow-up and other logistics associated with the homicide is often done by other units that support Homicide.

Q. And when would have been the last time you worked on a homicide investigation with Phoenix PD?

A. I think all the way up until 2012 I would have been responding to homicide scenes in my role as a union president, because we responded to virtually all homicides when they involved a police sergeant or lieutenant. And in some cases, because police sergeants and lieutenants oversee homicide scenes, the union is -- monitors and reviews all the cases that come through to make sure that our employees have not been exposed to potential police policy violations and other, other issues that could lead to an Internal Affairs investigation or involve a police sergeant or lieutenant in some other capacity in which their job may be at jeopardy or their -- or any allegations should surface regarding their, their response to that scene.

I don't know if I'm being entirely clear in

Page 24

answering your question. But when -- as role of the -- in my capacity as a union president, we have to take a look at all issues that could potentially affect our sergeants and lieutenants. And in the case of a police shooting or where -- and I assume you are speaking primarily about homicides involving a police officer. Is that correct? Or are we talking about just a homicide that doesn't involve a police response?

Q. Let me, let me ask a new question.

Phoenix PD has a position of detective, correct?

A. Yes.

Q. Were you ever a detective with Phoenix PD?

A. Yes.

Q. When did you become a detective?

A. The time I went through detective school I was in patrol, and so I obtained a police certification as a detective. So it's not exactly a detective position. It's a detective certification that allows you to take a detective position.

So officers often go to detective school well before they are assigned a detective position. So I was a detective while I was still working in patrol and used those detective skills all through patrol and through my supervisory career. And in the Organized Crime Bureau I

Page 25

actually supervised detectives in their roles as well.

Q. Did you ever have the position of a detective?

A. No.

Q. Did you ever reconstruct a shooting as part of your duties with Phoenix PD?

A. No. Except in my preliminary scene response and passing on observations to the -- whatever detectives were eventually assigned the case.

Q. Did you ever determine the sequence of gunshots in any homicide investigation with Phoenix PD?

A. In every homicide you respond to, you, you take a look at the evidence that's at the scene. And I would have done that on virtually every case that I was -- that I responded to in terms of my observations.

In terms of comparing -- I think what you are asking me is in terms of taking a medical examiner's report and then reconstructing the sequence. Is that what you are asking me?

Q. Correct, sir.

A. No, I have never specifically been asked to do that.

Q. And relatedly, did you ever analyze bullet trajectories when you were with Phoenix PD?

A. Yes. But those trajectories were always preliminary, because they would have been pre-forensic



Page 26

examination. So oftentimes we had to take a look at a scene and determine trajectories to try to gather evidence at the scene, determine where the shots were fired from, and make observations that were associated with where the rounds were actually fired from, both from the recipient of those rounds and also from a police officer making those shots.

And so we had to always take a look at those types of evidentiary observations to pass on in -- as part of our general investigation, which oftentimes led to a homicide investigation, and where we would brief our homicide detectives as to our observations. So there's a lot of preliminary work that goes into a response at a serious crime scene that are made by patrol officers.

Q. Would you agree with me that in this case you took the ME report and offered opinions regarding sequence of gunshots and body positioning?

A. Yes.

Q. Did you ever do that in your roles with Phoenix PD?

A. Not as part of my assignment, no.

Q. As any other part of your role, did you --

A. Yes.

Q. -- do with that Phoenix PD?

When else did you do that with Phoenix PD?

Page 27

A. It's part of reviewing a case. What I mentioned earlier, in terms of representing police employees when they are involved in shootings, especially shootings that lead to a homicide, the entire report gets reviewed. And I reviewed many reports to evaluate their accuracy and to make observations as to the investigation, and make sure that all I's were dotted and all T's were crossed in representing my employees.

So I was -- I have a lot of experience looking at reports and making sure that those reports are as accurate as possible in my role as a representative for the employees involved.

Q. But you did not actually take the ME report and determine bullet sequencing yourself in those matters, correct?

A. No. Again, it's a matter of reviewing what's already been done, for the most part, and making my, my observations of investigations which were completed and then evaluating their accuracy, their validity. Making sure that if there are holes in the investigation, that those holes get addressed after the fact.

Q. Have you ever received any training or education in forensic pathology?

A. Very general, nothing very advanced.

Q. Tell me about the general training that you

Page 28

received.

A. Well, from -- even in the academy, they, they go through a very general crime scene investigation training, which is linked to that specific area. And in detective school they do as well. To help a detective in training be the best that they could be, you go through all the different avenues and try to, for lack of a better term, punch holes in a case to make sure that nothing has been missed, that if there's information that's needed or further investigation, that that gets completed. It's all part of the detective training you go through.

And then as a supervisor, supervisors also go through training. And a lot of that training is to make sure that employees are managed properly so they conduct a thorough investigation. And in all those investigations, any case involving gunfire, you have to look at trajectories, distances, angles, the various elements to make sure that the case is investigated properly.

Q. You mentioned the training you received at the academy and then as part of your detective coursework. You also mentioned supervisors training.

Did you personally have supervisor training that involved forensic pathology?

A. I can't recall any specific forensic pathology in that training. It's more from the managerial side, to

Page 29

make sure that all angles in an investigation are completed and conducted properly.

Q. Have you had any other training or education in ballistics besides what we just talked about?

A. Yes. In my role as a firearms instructor, you go through quite a bit of ballistic-type training to understand calibers of rounds, various firearms, what types of -- from rifles to pistols, different types of pistols. But not, not from a forensic level, if that's what you are asking me. It's more of an identification level. Different rounds make different types of wounds. And there's a lot of general training that firearms instructors go through to understand the types of wounds and the types of damage that particular rounds will cause on a body.

Q. Have you had any training or education in determining bullet trajectories?

A. No.

Q. Did you ever serve with the PSB, the Professional Standards Bureau, with Phoenix PD?

A. I was never assigned to the Professional Standards Bureau, no.

Q. On your CV, Exhibit 2, under Lieutenant, for example, and I'm looking on page one, you say that you "conducted police misconduct investigations, including use



Page 42

the distances, the area, the obstructions.

And then I wanted to take a look at the distances from the cameras, in this case the doorbell Ring camera, to the scene. I wanted to take a look at the measurements. I took a look at the -- tried to get my bearings on that and match it up with the Axon data, the Ring camera video and the scene, FARO data that was presented, and also the distance from various witnesses who reported having some visual knowledge of what occurred that night.

So it was in general, Laura. I wasn't looking for very specific items. It was to get my bearings for the totality of everything and make sure that I didn't see any problems, you know. Or maybe something could have jumped up at me during my scene view that wasn't necessarily documented in the report and I wanted to take a look for myself.

Q. Did you make any notes while you were there at the scene?

A. No. I pretty much kept everything just in my brain. And I had already reviewed the material pretty well, so I just wanted to pull it all together and make sure I wasn't maybe incorrect on something. Because sometimes when you look at FARO data or crime scene data, you get a different perspective when you are actually on

Page 43

the scene. I wanted to look at levels of the ground, for example, to help me with some of my -- for some of the trajectory information in my written opinion.

And I really needed to be on the scene. It's what is sort of Detective 101, and I want to be out there. So I went out there and took a look around and spent a couple hours and developed a personal knowledge of that area.

Q. Did you take any photos or video while you were out there?

A. No.

Q. You mentioned distances. Did you measure distances yourself or was it more observing the distances?

A. I took a -- I think I only -- I walked off the area. As an accident investigator, I developed a very good ability to measure distance by walking off, walking off the distance. And so I walked off several items, several things, and just made a mental note of those distances.

Q. On January 14, you have an entry that mentions "audio confirmations."

What does that mean?

A. I took a look at the radio communication in this matter and compared it with the video and to line up the audio with the video. So, for example, if I saw Deputy

Page 44

Gibson raise the radio or the microphone to his mouth or activate the transmitter on his uniform, I wanted to make sure that I lined up the audio to understand what he was likely saying on the radio at that particular moment.

And I compared it -- so I looked at video and audio together, and then also the statements that were made by both witnesses and the deputy, and just tried to line everything up, if that makes sense. So I could -- that's why I did a Radio/Video Timeline document, just to help me understand the sequencing of the radio transmissions with the actions seen in the videos.

Q. And I'm going to show you what we will mark as Exhibit 6.

(Deposition Exhibit No. 6 was marked for identification.)

BY MS. VAN BUREN:

Q. Is this the Radio/Video Timeline that you were referring to?

A. Yes.

Q. Going back to Exhibit 3, your invoice, on January 15 you talk about "Trajectory analysis, timing, and statement analysis."

Tell me what that entailed.

A. Well, a trajectory analysis was comparing primarily the medical examiner's report of the injuries

Page 45

and seeing how they align to the rounds fired, the rounds that struck Mr. Obregon.

The timing part of that has really to do with the few seconds that the deputy was off camera and Obregon was off camera. And I had to look at the timing to the Ring video and the audio and then see how it lined up with the rounds fired, if that makes sense.

And the statement analysis was statements involving what the witnesses said and what the deputy said occurred, and then making an analysis of, as much as I could, what could be confirmed with video, what could be confirmed with audio. And then also a part of that timing had to do with reenacting what the officer said occurred and comparing it with the timeline of the various evidentiary pieces we had, like the Ring camera, and trying to determine if all of the things that were said occurred, could it have occurred during the time frame in which I calculated was available at the time.

Q. You said reenacting what the officer said occurred.

Did you do a reenactment yourself?

A. Yes.

Q. Was anybody else involved in that reenactment?

A. Yes.

Q. Who else?



Page 46

A. My daughter.

Q. Tell me how you did that reenactment.

A. Essentially I had a window of time that I was able to determine and I put -- I had my daughter do the things that the deputy testified that he did from the distances I calculated and I timed it.

And so I instructed my daughter, who is not quite 18 yet -- but I needed another person to go the distance that I calculated the officer had to go to get on Mr. Obregon's back and then retreat and get back into the video range. And doing that calculation helped me understand how much time it would take somebody to actually do all the things the deputy said, and it helped me develop my opinion. Well, it helped me confirm my opinion that I had already written at that point. I just wanted to do a little bit more work on that.

Q. Where did you do this reenactment with your daughter?

A. In my home.

Q. When we were talking about the trajectory analysis, you used the language that you compared the ME report, comparing the ME report of injuries.

What were you comparing the ME report with?

A. I used a human figurine and I used stickpins to document based on what the medical examiner's opinion was

Page 47

on how the rounds entered the body and from which direction. I used stickpins on a human figurine to help me understand how those rounds -- well, to see the overall body stuck with all the pins, it helped me understand the general trajectory of all those rounds coming into that body. And so I looked at that.

I also used a cue stick in the same fashion, to show how the rounds would have entered a human body, and tried to get a good feel for the confirmation of what the doctor said, the location of the officer, the location of Obregon. And I needed a better understanding of how those rounds could have entered the body in the way that the medical examiner said they did.

So by using stickpins and a figurine, a cue stick, showing the trajectory and assistance with my daughter on the timing, I got a better grasp of how Mr. Obregon must have been shot, how those wounds occurred, and to try to make sure that it all lined up with what the officer said occurred. So I was just making a comparison and building my knowledge of the situation.

Q. In this reenactment, was your daughter reenacting the role of Deputy Gibson or Mr. Obregon or both?

A. Deputy Gibson.

Q. Did you ever do a reenactment where someone reenacted Mr. Obregon's movements?

Page 48

A. Well, in a sense it was part of the analysis, because we, we -- I positioned where he would have been, calculated the distance from where the officer was at least at a given moment in time, and then had my daughter walk through those steps based on the Ring video coverage, the FARO scene information, and the layout of the body.

And so I knew I had -- I knew where the body was at and I was able to measure it off for my -- where Deputy Gibson would have left camera range. And I was able to place my daughter with instruction of doing exactly what was listed, in my opinion, as to the steps that I extrapolated from Deputy Gibson's statements and also video information, and had her go through those steps under a stopwatch to see if all those steps could have been completed during that time.

Q. Did you make any notes from this reenactment?

A. No. Everything was calculated more as a confirmation of my opinion. And I took mental notes and then did not record or otherwise document that confirmation. It was more for my personal knowledge.

Q. And what about your work you did with the human figurine, did you create any notes or recording or photos of that testing?

A. I took photos of the figurine, yes.

Q. Okay. So --

Page 49

A. And I took those just recently, Laura. It was -- it's not something that I had prior to that subpoena.

Q. So we are going to need you to supplement that subpoena to include those photos. Okay?

A. Yes. I will send them to Sean, if you like.

Q. That's fine. Thank you.

A. It's not the -- a -- it's the best human figurine I had to me, so don't laugh when you see the photo. But I used a Stretch Armstrong doll.

Q. Okay. That was going to be my next question for you. A Stretch Armstrong doll, did you order it on Amazon?

A. No, I actually had it. It's what I had handy. And I used stickpins, and I just took photos of that. And each stickpin was -- I tried to place exactly as the medical examiner said the rounds entered the body and at which direction. And that helped me understand how Mr. Obregon, how he was moving when the shots were fired.

Q. About how long is the Stretch Armstrong doll?

A. Well, it's probably nine or 10 inches is all.

Q. You mentioned that you used a cue stick.

Are you talking about like a pool cue stick or something else?

A. A pool cue stick. It helps me -- we did this in law enforcement. It's one of the techniques that a patrol



Page 50

officer can do out on a scene. You use a, you know, a baton or some kind of straight stick and you can show -- when you are doing briefings, for example, you can show the general direction of a round entering the body. And that helps us go and look for evidence from the direction that we believe the rounds came from.

And we used it, not only for bodies, but for vehicles and buildings. So you really just need a straight stick of some sort. And it often helps you point to where the suspect, or the officer in some cases, was firing. And it's nothing more than an investigative tool to help understand where the rounds came from or where the rounds went to.

Q. You also mentioned "stickpins."

Can you describe for me more, what do you mean by "stickpins"?

A. Just like you would find in a standard sewing kit, a ball on one end and a pin. And so I was able to pin based on what the medical examiner indicated was the -- how the round entered the body. And once you have all the pins in place, then it helps -- it helped me understand what position Mr. Obregon's body was in when the rounds were fired.

Q. So then walk me through, how did you use the stickpins versus the cue stick?

Page 51

A. In the same manner. I start with a cue stick, just to help me understand it. Then the stickpins was just a way -- because in Mr. Obregon's case, it was a little complicated in that there was anterior as well as posterior shots.

And so, you know, I had to use a cue stick on a body, but then -- which was my daughter, to show how the rounds must have gone in and what position that body was in at the time the rounds -- each round struck. And then the stickpins came in after that. And then once all the stickpins are in, I could maneuver the figurine to help determine how both posterior and anterior rounds could have occurred and what the body's position must have been in at the time they occurred.

So everything I did, Laura, was just to help me understand, and so I could clarify that -- without simply looking at a report and trying to figure out each round all at one time, it just helped me put it all together and confirm my -- you know, what my brain told me happened, I just wanted to confirm it. So I did that not too long ago, just to help me confirm what my brain said had occurred based on just reading the material.

Q. Did you do that after you prepared your January 31, 2026 report?

A. Yes, I believe I did.

Page 52

Q. Do you remember when you did that?

A. No, I don't, Laura. It's been a number of months now, but I don't remember the exact day.

Q. But it was after the report?

A. Well, my report was in January.

Q. Yes.

A. I would have to look back to know exactly, at the date of that report. Because the -- when I write a report it's ongoing. And when I actually turn it in is different than, you know, than -- it's not always the same as when I actually put pen to paper on the report. Does that make sense?

Q. Yes. I guess what I'm just trying to figure out is, did you do that testing with the figurine before you prepared your written opinions in this case or after?

A. And that's what I'm telling you, I can't remember exactly. It would have been near the completion of my opinion, or even after I had written it, I might have gone back and just confirmed by doing that. I think it was after I actually was at the scene. So I'm looking back at that invoice, and the travel to Arizona was January 10, and it was around that time period, after I had a look at the scene.

Q. Okay. And did I understand, was your daughter also involved in that trajectory analysis?

Page 53

A. Yes.

Q. What was her involvement?

A. No, she was involved as walking through the steps of Deputy Gibson. She -- no, she didn't have any idea what the trajectories were. She just had to demonstrate how long it would take somebody to move a certain distance, go through all the steps listed in my opinion, and then back off and away from our body area. And so I knew that the timing of everything that was said by Deputy Gibson and the time period that we reenacted would have been almost impossible.

And I have also suggested that we do a computerized version of what we are talking about now for court. But I don't know if that has happened or will happen in the future. I doubt that I will be part of that, but I might be.

Q. Back on Exhibit 3, on February 2 you talk about a "post-scene video review."

What was that?

A. Let's see. Post-scene video -- oh. That involved the issue of one of the witnesses that was detained for a long period of time, the first witness on scene. And I was looking at videos to add some opinion regarding the legality of her being detained for so long. So I had to review videos, Axon videos and other -- well,



Page 54

at least Axon videos to understand how long exactly she was held and some of the issues that arose during that containment to supplement my opinion on that specific issue.

Q. Do you recall the name of that witness?

A. Mariah, I believe. Yeah, Mariah. I just looked down at my Witness Statement Table.

Q. And you understand that she's bringing a claim in this case, correct?

A. I didn't know all of that in the beginning, but I have learned that subsequent, yes.

Q. Do you know what kind of claim she's bringing?

A. No. I haven't read it. Sean may have mentioned something about it, but I think it -- I don't think it had to do with the constitutional issue that I opined on. I think it had to do with other issues related to how she was treated, I believe. But my opinion had more to do with the legality of being seized.

Q. Have you ever reviewed the Complaint in this case?

A. I don't think I ever reviewed the Complaint, Laura.

MS. VAN BUREN: We have been going a little over an hour and a half, so I need to give our court reporter a break. Why don't we come back in about 10

Page 55

minutes. All right?

THE WITNESS: Sure.

MR. WOODS: Sounds good.

THE VIDEOGRAPHER: We are going off the record. The time is 10:34 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:44 a.m.

BY MS. VAN BUREN:

Q. Mr. Hafkey, I want to ask you a couple more questions about the reenactment you did with your daughter.

Did you say that she was 17?

A. Yes. She will be 18 very soon.

Q. And you did the reenactment at your home?

A. Yes.

Q. Outside or inside?

A. Inside.

Q. Where exactly did you do it?

A. Living room.

Q. Did you give her any instructions on how fast she should be progressing through these different steps?

A. No. In fact, I was real careful just to tell her the things I would like her to do. She doesn't really know the case or all the issues or anything. I just

Page 56

needed a body to do the things that Deputy Gibson indicated he did in a certain time period at a certain distance, and I needed to clock it. So I gave her very limited information.

Q. Did you have her go through the steps once or more than once?

A. We did it twice.

Q. Do you remember what the time clock was for each of those times?

A. It was more than the time I had calculated that Deputy Gibson was off Ring video, which I calculated to be about 3.5 seconds. So it was, it was beyond 3.5 seconds. And that's what I was calculating, could the things that occurred within that known period -- or I'm sorry, that unknown period off Ring camera -- and so it was -- I think the first one was probably close to 3.5 and the next one, it ranged from up to like 3.5 -- I guess the first one, it was over 3.5. It was probably 4 seconds up to 7 or 8 seconds, in that time period. So it was -- since it was more than the 3.5 I was looking at, I didn't go further than that.

Q. The Stretch Armstrong doll that we were talking about -- and I know I'm going to get your photos so I will learn more then. But I'm going to show you just this picture I just pulled off line. This will be Exhibit 7.

Page 57

(Deposition Exhibit No. 7 was marked for identification.)

BY MS. VAN BUREN:

Q. Is this the kind of doll that you used?

A. Yes.

Q. And I saw from my online perusing that you can stretch it out, as the name suggests, right?

A. Yes.

Q. When you were performing your analysis, did you stretch the doll out or did you leave it at its original size?

A. At its original size.

Q. And did you confirm that this doll is in scale to a human body?

A. No.

Q. All right. Let's go back to your report, please, Exhibit 1. And I will pull it up on the screen as well for you.

First, did you write this report yourself?

A. Yes.

Q. Did anyone assist you in writing any portion of this report?

A. No.

Q. Let's go to the second page of the report. Just for the record, the Bates is OBREGON_000898. You list the

Page 58

Case Material Reviewed.

Do you see that?

A. Yes.

Q. Is this a complete list of the materials that you reviewed in this case?

A. No.

Q. What else did you review that is not on this list?

A. It's a little hard to say, because I receive a link to digital files, and I go through a lot of digital files and I quickly rule out things I don't need. Things like the actual Complaint, for example. If I don't need something -- in fact, I don't want to read a lot of stuff that could sway my opinion. I try to keep with the facts and develop my opinions based on the facts.

So what I have listed are things that I actually rely upon in my opinion specifically. But it's in no way all of the data that I looked at trying to sort of vet down or ferret down to these particular items.

Q. The ME report is not listed on here.

Did you rely on that in developing your opinions?

A. Yes.

Q. Okay. So that should be on here, correct?

A. If it's not there, it's an oversight for not

Page 59

listing it there. I think I have it referred to in the actual written portion of the opinion. But, yeah, you're right, I don't see it listed there. That's just an oversight.

Q. Did you rely on anything else in developing your opinion that you don't see listed here on page two?

A. I referred to some witness pieces of information from various witnesses, Laura. I talk about it, I think, in the written portion also. And I don't have those listed, specifically. And I looked at a lot of video. And as you see in the listing there, "Miscellaneous Police Body Cam Videos," I list it like that because there's so many videos I look at, and rather than, you know, write two pages of every single little video, I try to be general, just for sake of saving time and energy listing all of the actual individual items.

Q. Did you produce everything that you relied on in response to our subpoena?

A. I believe.

Q. The last --

A. The problem with that, Laura, is -- and I did have a conversation with Sean about that, I believe, when the subpoena first came out. I gave you everything I had copies of on my computer for my digital information. But a lot of stuff I looked at but never saved to my computer,

Page 60

never printed out.

And so, again, it goes back to me getting into a large, large case file and trying to pull out items that I think will help me in my opinion. And so a lot of that, if it's not in my -- listed specifically, and I looked at it, it's because I don't have it. In other words, if I didn't list it in my response to that subpoena, it's because I didn't actually physically have it.

Q. And if you didn't physically have it, if you didn't save it to your computer, does that mean that you didn't rely on it in preparing your report?

A. Well, that's hard to say. I don't think I did. Everything I relied on I think I documented in my written opinion, either in the Case Material Reviewed section or in the verbiage of the various pages of the opinion.

But I guess what I'm saying is I'm not 100 percent sure that there wasn't something I saw that I had in digital available to me at the time. I just didn't keep it.

Q. Did you review any of the ME photos from the autopsy?

A. Yes.

Q. How many photos did you review?

A. I don't think I reviewed many at all. I think I just glanced at that particular section. Because I'm not

Page 61

trained well enough to look at a photo and determine trajectory, so I -- my opinion regarding the trajectories was 100 percent based on the written opinion from the medical examiner and not on any specific photos.

Q. So you may have glanced at the photos, but you didn't rely on those in preparing your opinion, correct?

A. Right.

Q. What about the ME radiographs, did you look at those?

A. I'm going to grab the medical report, what I have.

Q. Okay.

A. And which specific portion are you referring to? Because the one I have starts at page 90 and goes to 103. There was also a diagram that's numbered 2042.

Q. There are radiographs, so diagnostic imaging, separate from the photos in the report.

Did you review those at all?

A. I don't think I did then, Laura. I don't see them in here. Well, maybe they -- let's see here. No, that's lab work. Yeah, what you are referring to I don't think I have and I don't think I looked at them or relied upon them.

Q. Going back to your report, Bates page -898, the "Miscellaneous Case File Information as Necessary," what



Page 70

Mr. Obregon, this is based on Deputy Gibson's statements. That is what I consider the initial, the initial force, deadly force, was the deputy firing at Mr. Obregon who allegedly pointed a gun at him first.

Q. Are there a certain number of gunshots that you consider the initial lethal response?

A. One.

Q. So it's your opinion, sir, that the first shot appears to be justified under the Fourth Amendment?

A. If it occurred as the deputy stated. The problem, Laura, is there's some things that I don't believe occurred as he stated. And so I struggle with that part of the opinion.

But if in fact Mr. Obregon pointed his gun and the deputy was responding to that, then I believe that it appears justified under the court -- under the Fourth Amendment, that initial shot.

Q. Let me ask you a few questions about the ME report before we have to break again. This will be Exhibit 4. And Exhibit 4 starts at defendants under score Obregon 00090.

(Deposition Exhibit No. 4 was marked for identification.)

BY MS. VAN BUREN:

Q. And you recall, sir, that on pages -- well,

Page 71

starting on page three, there's a discussion of multiple gunshot wounds, and that goes on through page six, correct?

A. Yes.

Q. And the ME lists Gunshot wounds number 1 through 7, correct?

A. Yes.

Q. Now, the ME did not determine the order of shots, correct?

A. That's correct.

Q. Okay. And, in fact, on page -92 it says "The wounds are arbitrarily numbered for the ease of description. The number does not indicate the sequence of firing."

Did I read that correctly?

A. Yes. I recall that too.

Q. And you understood that when you were preparing your opinions, right?

A. Yes, I did.

Q. Does the ME say which of these wounds, whether singular or plural, would have been fatal?

A. No, I think they are listed as fatal in general, but they weren't specific in that regard. And I have an understanding of, you know, attending these autopsies and going through these types of situations, where it's

Page 72

sometimes difficult to determine what would have killed the person because of how long it would take medical care to get there to provide life-saving measures.

So my understanding in reading this medical examiner's report is he's saying at least six of those shots could have been life-threatening. But to know for certain, if you don't know the sequencing of the rounds, would be extremely difficult to ascertain.

Q. And do you have an opinion on which gunshot wound or wounds was fatal here?

A. No.

MS. VAN BUREN: It's about 11:15. This is a good stopping point for me.

Sean, we can let you go ahead and get ready for your hearing.

MR. WOODS: Okay. Thank you.

THE WITNESS: Will we be continuing the deposition, then?

MS. VAN BUREN: Yeah. Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 11:14 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:46 a.m.

Page 73

BY MS. VAN BUREN:

Q. All right. Mr. Hafkey --

A. Laura.

Q. Yes.

A. I have got a couple points of clarification. I don't know if this is a good time to --

Q. Sure. Go ahead.

A. Before I forget them, because I might.

Q. Sure.

A. I looked back at my phone and -- at those pictures of the Stretch Armstrong with the pins that I will be providing.

Q. Yes.

A. And in the details I can tell you exactly when they were taken, because you know you asked that.

Q. Okay. When was that?

A. January 15, which means I think they were even before that subpoena, so -- and I can't remember sending them. And since you said you -- or you are implying you haven't seen them, then I apologize for not getting those to you. Because I looked in my electronic files on my computer and I don't see them there. They were on my phone.

Q. Okay.

A. So I'm going to send them. But it looks like



Page 74

they were taken the 15th, which would have been after my visit to the scene, which I think I mentioned it was around that time frame.

Q. Okay. Let me ask you a couple questions before the rest of your clarification.

Over the break, as you were, you know, looking through your phone and maybe remembering things, did you prepare any notes or video of your testing with the Stretch Armstrong?

A. No.

Q. Okay. What about any measurements?

A. No.

Q. Okay. What about -- and, again, I'm I just want to confirm, what about the reenactment you did with your daughter, do you have any videos or photos of that?

A. No. I didn't take any of that. It was more clarification in my brain.

Q. So no notes or no measurements involving that reenactment, correct?

A. That's correct.

Q. Okay. Did you have any other clarifications?

A. Yeah. You had asked me about -- we were talking about a homicide scene and different details I work for related to homicide. And I was explaining that as patrol, you virtually go to a lot of homicides before the Homicide

Page 75

investigators actually take control of the scene. So I just wanted to clarify that, as a patrol officer and as a patrol sergeant and lieutenant, I have been to lots and lots of homicide scenes and managed those scenes, sometimes for hours, if not days, before Homicide takes over, because the person is still alive. And I wanted you to understand that.

I mean, one night in patrol I responded to four homicides in one shift, because I worked the roughest areas of Phoenix. And at the time we were having about, over 200, sometimes 250 homicides in a single year. And most of those homicides are in south central, south and west Phoenix, which is the areas I worked.

So I couldn't give you an exact number, but there's probably hundreds of homicide scenes that I went and worked, and sometimes worked for quite a while before we actually turned them over to Homicide investigators.

The other thing is, I have ridden with the Homicide detail. You had asked me a question about if I ever worked as a Homicide detective and the answer was no. But I rode with Homicide on more than one occasion for various reasons throughout my career, to get -- primarily for the experience of working with Homicide.

The third thing I wanted to clarify is that, as a sergeant and lieutenant, I supervise many homicide scenes

Page 76

while the investigators work it. In other words, when the investigators show up, we don't all go home and walk away from it. We keep working it. We work with the Homicide detectives. We look at, we look at the scenarios, which often involve trajectory type of issues that we had to evaluate at the scene before we even had a medical examiner's report, because we are trying to figure out where rounds are coming from, from a different building, a different house, a drive-by shooting scenario, things of this nature.

So I just wanted to sort of clarify that my Homicide experience is -- there's a lot more experience I have that's not necessarily because I was assigned as a Homicide investigator. That's all.

Q. Thank you. I appreciate that.

When you would evaluate trajectories at the scene, were you actually examining the body?

A. Yes. But in the case of a body at the scene, you are very limited with how the round entered the body. You can only see sort of major areas, like back, front, side. And so the trajectories cannot be done very scientifically at the scene. It was almost always very general. You can't get more specific until you get the medical examiner's report in most cases.

Q. And in homicide cases, whose role, when you were

Page 77

with Phoenix PD, would it be to get the ME report and determine trajectories? Was that the investigators' role?

A. Almost always the investigators. And then from a supervisory standpoint, then they look at the results and they look at the issues, just to make sure the investigators handled it correctly, that they didn't misinterpret the medical examiner's report.

And in my role as a supervisor, and particularly my work with the union, that -- sometimes that information became critical in determining did the officer act correctly or incorrectly. And so we had to look at trajectories pretty commonly when we had our -- my subjects of my union involved in those types of cases, to make sure that the data collected was accurate.

Because it's not just the officers -- the case itself. It's their reputation. It's their -- the investigation. Because homicides always go to -- when an officer is involved in a homicide or a shooting, they all go through Internal Affairs. And so we always had to make sure that the facts are all correct and that they jive with the medical examiner's report. We had to go through the entire investigation and make sure our employees were treated fairly.

And as president, I was involved in every single police shooting involving a sergeant or a lieutenant from



Page 94

Mr. Obregon was in fact on the ground and on his side, facing where the officer would have fired.

Q. Okay. So did you rely on the assumption that Mr. Obregon was on the ground on his side, facing Deputy Gibson at the time the first bullet struck him?

A. Yes. And the -- based on the -- what I extrapolated as the angle of fire and the distance the officer was from Mr. Obregon, which change because it was fluid and he was moving. So I took -- my analysis was based on the combination of all of those things together.

Q. Going back to your report, Exhibit 1, is it also your opinion that Mr. Obregon's handgun fell to the ground after he was hit by the first shot?

A. I didn't have a specific opinion that he was -- that the gun was even in his hands. But based upon the officer's statements it was. And if the first round struck, then my opinion is that gun would have fallen before he rolled away from the officer. Had he retained possession of the weapon, if in fact he had the weapon in his hand and he rolled away from the officer, then that weapon would mostly have been taken to the opposite side of Mr. Obregon.

Q. So looking at this first sentence, last paragraph of page eight of your report, "The positioning of the handgun to the left of the body indicates to me that it

Page 95

likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position."

Did I read that correctly?

A. That's correct.

Q. So what is your basis for making the statement that the handgun likely fell to the ground following the first frontal shot?

A. Multiple reasons. One being Mr. Obregon's -- I mean, sorry, the deputy's statements that he saw the gun pointed at him, he fired and he saw the gun fall. For him to see that gun from his positioning on the -- what would in essence be between him and Mr. Obregon, he had to have seen it. He would likely not have seen the gun if Mr. Obregon was completely facing away from him and having the gun.

The distance that the officer fired, the lighting conditions, just a number of things I observed at the scene, he likely could not have seen it unless it was on that left side of Mr. Obregon and that's where the gun fell, which is in fact where the gun was located pursuant to the FARO data, the crime scene photos, et cetera. So I made my -- that was part of my opinion.

The second part is, generally speaking, my experience is when somebody gets hit with a round, they

Page 96

are going to drop their gun. And in this case that was consistent with the deputy's statements that Mr. Obregon was pointing a gun at him, he fired and he dropped the gun.

So a lot of my opinion is based on what the deputy is saying. And if that is in fact what happened, then it was also consistent with where the gun was found, it was consistent with the medical examiner's report of the trajectory of that round, and it was consistent in just the physics of somebody having a gun while on their side and then doing almost a complete roll the opposite way and being able to see that gun fall at that time or retaining the gun that whole time. And none of that was consistent with the deputy's statements.

Q. Do you know where the gun fell in relation to Mr. Obregon's body?

A. Well, the crime scene photos, the FARO data and even the video from the first responders that gave medical aid and took over medical aid, all of that shows the gun to the -- what would essentially be the left of Mr. Obregon's body if he was prone face down on the ground. The left sort of -- closer to his feet on the left side of his body if he was prone to the ground. So because --

And the reason I say "if he was prone," the

Page 97

statements indicate that he was prone when the witnesses and the officer approached the body. However, the video from the officers giving first aid show him face up. So the body had been moved face up sometime after the shooting.

Q. Based on the video and the photos that you saw, how far away was the gun from Mr. Obregon's body?

A. A few feet, maybe three to four feet.

Q. And you are aware that that gun was loaded, correct?

A. Yes, that's what I read.

Q. And you would agree that a loaded handgun is a deadly weapon?

A. Yes.

Q. And you would agree that a loaded handgun within three to four feet of a suspect can present a danger to an officer?

A. Potentially it could, yes.

Q. We talked about some of the testing and the reenactment that you did.

Did you perform any other kind of testing in preparing your opinions for this case?

A. No. Mainly just running scenarios through my brain, reading the material, putting myself in the officer's shoes, and running it through my head over and



Page 98

over and over. And my experience with so many shootings, I could not possibly count, and drawing on my experience, I felt very comfortable and stand by my opinion.

Q. Did you create any sort of diagram?

A. No.

Q. Did you use any kind of software to test your opinions?

A. No. I would like to.

Q. Do you -- what kind of software would you use to test your opinions?

A. Reenactment software, where they can actually lay out my opinion and -- I'm not skilled to do it myself, but there are, there are people in the industry that can extrapolate all the testimony and the scene photos, and so forth and so on, and probably put together a computer enactment that would be consistent with my opinion.

Q. Do you acknowledge that other qualified experts in your field might interpret this data differently?

A. Yes. Especially if you, if you don't account for the deputy's statements. Because in this case that's the void. You have statements from your primary witness in the case. But if those statements are not valid, are not correct, you could -- I could probably draw some other possibilities in which he was actually struck in his back first and the last shot was the frontal shot.

Page 99

And that's what I'm saying, I drew my opinion on an assumption that what the officer remembers seeing was accurate. If that officer's statements were not accurate, you might be able to show it in reverse or the inverse of what my opinion was, that he was actually struck in his back first.

Q. Do you agree that an expert in your field could, like you, assume that the deputy's statements are correct and still come to a different conclusion than you?

A. I mean, it's possible, because experts -- some experts will say whatever you want them to say, especially if you are paying them. And I also think that, because there's unknowns, another expert could take the opinion that it cannot be known for sure, which would then contradict with my opinion. And that's why I worded my opinion on an assumption, that what the deputy says occurred occurred.

If you are telling me to give an opinion if that's not the case, then it would be very different to do so because you don't have good enough witness statements from the nonpolice witnesses. And so I, I concede that another witness -- another expert witness could easily go a different direction.

But based on the scientific facts of trajectories, I don't think that the opinion would be

Page 100

different in the body positioning. I think the opinion would likely -- could likely be different in terms of the sequence of the shots and whether he was hit in the back first or hit in the front first.

So to answer your question, Laura, I think it's limited. I'm very confident in my trajectories drawing everything together, but I don't doubt you can get another expert to counter just about everything else.

Q. Do you know what the elements of gross negligence are here in Arizona?

A. Not really. I'm not an attorney. I have read gross negligence in cases, and I think it's -- it lends itself to interpretation of what "gross" means and what the level of the gross negligence means.

Q. What are the Graham factors?

A. Oh, Graham verse Connor factors?

Q. What are the Graham v. Connor factors, yes.

A. Well, certainly the primary one is the, the severity of the crime. And then Graham looks at, you know, looking at an objective reasonableness and the force applied based on that severity of the crime.

Q. Do you agree that an officer's use of force should not be viewed with the benefit of 20/20 hindsight?

A. Boy, that's a loaded question. The courts have -- in one case the judge actually stated that. So,

Page 101

and -- but in reality the courts and the juries want to have somebody come in and provide a 20/20 opinion after the fact. And that's what I was hired to do and that's what I have tried to do.

It's certainly not comfortable to apply a 20/20 after-the-fact opinion because there's a lot of variables leading up to the force. But that's what I was hired to do and I tried to base, base it on -- the best I could based on the totality of the evidence in this case, and I stand by my opinion.

Q. Do you agree that under the law a use of force is judged on a reasonableness standard?

A. Yes.

Q. And do you agree that under the law an officer's force can be legally justified, even if they were wrong, if their mistake was objectively reasonable, given the context?

MR. WOODS: Form, foundation.

THE WITNESS: Yes, I do believe that the courts could go that direction, and they have in some cases.

MS. VAN BUREN: All right. Mr. Hafkey, those are the only questions I have for you. Mr. Woods might have a few things.

MR. WOODS: I have no follow-ups.



# EXHIBIT 4

23-0281

Michael Brandon Obregon



**PINAL COUNTY**

WIDE OPEN OPPORTUNITY

## FORENSIC EXAMINATION REPORT
## MICHAEL BRANDON OBREGON
## PINAL COUNTY ME CASE #23-0281
## PINAL COUNTY SHERIFF'S OFFICE
## CASE #23-0316206

Pinal County

APR 18 2023

Medical Examiner

Page 1 of 10

DEFS_Obregon 000090

23-0281                                               Michael Brandon Obregon

## Report of Examination

Decedent:                  Michael Brandon Obregon
Date of death:             March 16, 2023
Date of examination:       March 17, 2023
Time of examination:       1045 hours
Investigator:              Samantha Dungan
Forensic Technician:       Breanna McGinnis, Samantha Kuba
Present at examination:    Crime Scene Technician L. Rabb #2673 PCSO
                           Detective. B. Gay #2329 PCSO
                           Detective. M. Fender #1604 PCSO
                           Detective. J. Bonucci #877 PCSO

---

Cause of Death:            Multiple gunshot wounds
Manner of Death:           Homicide

April 6, 2023
Date Signed

John Hu, MD
**Chief Medical Examiner**

Page 2 of 10

DEFS_Obregon 000091

23-0281                                              Michael Brandon Obregon

**REPORTED CIRCUMSTANCES OF DEATH**

The decedent was a 36-year-old male who resided in Casa Grande, Arizona. On March 16, 2023, a deputy observed the decedent seated on a motorcycle that was parked on the side of the roadway in a residential area of Casa Grande. The deputy informed dispatch he was going to conduct an interview of the person on the motorcycle. The deputy parked his marked vehicle, and as the deputy approached the motorcycle, the occupant brandished a .40mm handgun and pointed it at the deputy. The deputy immediately removed his service weapon from his holster and fired approximately ten shots toward the occupant. No commands or conversation reportedly took place. The deputy called in the incident and medics arrived on scene. They attempted resuscitation efforts, but the death was ultimately pronounced at the scene.

Past Medical/Surgical History

The decedent had no reported medical conditions. He suffered a neck fracture in a dirt-bike accident in 2018, but had no reported ongoing complications. He had a history of methamphetamine abuse.

**INITIAL EXTERNAL EXAMINATION**

The body is received in a zippered body pouch secured by evidence seal number 0006031.

**CLOTHING AND PERSONAL EFFECTS**

All property is documented on the property sheet that is separate in the file. The decedent was also wearing blue latex gloves.

**EVIDENCE OF MEDICAL INTERVENTION**

There is a laryngeal mask airway present in the mouth. There is an intraosseous line present on the front of the right leg. There are multiple electrocardiogram leads present on the front of the torso. There are adhesive plastic films present around the wounds on the abdomen and on the back.

**EVIDENCE OF TRAUMA**

**Multiple gunshot wounds**

There are seven gunshot wounds. The wounds are arbitrarily numbered for the ease of description. The number does not indicate the sequence of firing. The terms projectile and bullet are used interchangeably and do not represent different objects. Both metric and American customary units of measurement are used. One inch is approximately 2.5 cm.

Page 3 of 10

23-0281                                                   Michael Brandon Obregon

**Gunshot wound #1**

There is a gunshot wound of entrance present on the posterior aspect of the right shoulder, labeled defect #2. It is located 13 inches below the top of the head and 7 inches to the right of a posterior midline.  The wound consists of a 0.9 cm circular defect with a thin regular abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the scapula and the musculatures around the scapula. The bullet is lodged in the right scapular region muscle, along with three small lead colored fragments. A medium caliber severely deformed jacketed bullet and three small metal fragments are recovered from the right scapular region. The trajectory for this gunshot wound is from back to front, right to left, and slightly downward when the body is viewed in its anatomic position.

**Gunshot wound #2**

There is a gunshot wound of entrance on the right upper back, labeled defect #3. It is located 15 ½ inches below the top of the head and 5 inches to the right of a posterior midline. The wound consists of a 0.9 cm circular defect with a regular abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound.  The wound proceeds from this injury through the right posterior chest wall perforating right lower lobe of the lung, the descending aorta, the esophagus, left pulmonary vein, and the left upper lobe of the lung. There are bilateral hemothoraces measuring 1400 cc in the left pleural cavity and 200 cc in the right pleural cavity. There is 100 cc in the pericardial sac. The bullet is lodged in the left upper chest wall.  A medium caliber severely deformed jacketed bullet is recovered from the left upper chest. The trajectory for this gunshot wound is from right to left, back to front, and slightly upward when the body is viewed in its anatomic position.

**Gunshot wound #3**

There is a gunshot wound of entrance located on the left mid back, labeled defect #4. It is located 20 inches below the top of the head and 2 inches to the left of a posterior midline. The wound consists of an irregular defect measuring 1 x 1.5 cm with an exaggerated abrasion margin on its 5 to 7 o'clock edge.  The wound proceeds from this injury through the back muscles and the ribcage. The bullet is lodged in the right shoulder area. The trajectory for this gunshot wound is from back to front, left to right, and sharply upward when the body is viewed in its anatomic position.  A medium caliber severely deformed jacketed bullet is recovered from the right shoulder area and packaged as evidence.

DEFS_Obregon 000093

23-0281                                                    Michael Brandon Obregon

**Gunshot wound #4**

There is a gunshot wound labeled defect #5.   It is located on the left mid back, 21 ½ inches below the top of the head and 4 inches to the left of a posterior midline.  The wound consists of an irregular 2 x 1.2 cm irregular perforation with no obvious abrasion margins identified. This wound connects with defect #6. Defect #6 is located on the left mid back on the left posterior axillary line 21 inches below the top of the head.  The wound consists of a 1 cm circular defect with a thin abrasion margin.  There is a contusion around the defect at its 6 to 10 o'clock edge, measuring up to 1 cm in thickness. There is no evidence of soot deposit or gunpowder stippling noted on the skin around these two wounds. These two wounds are a pair of tangential through-and-through gunshot wound involving subcutaneous tissue and muscles only. The trajectory for this wound cannot be determined.

**Gunshot wound #5**

There is a gunshot wound of entrance on the midline upper abdomen, labeled defect #9. It is located 22 ½ inches below the top of the head.  The wound consists of a 1 cm circular defect with an abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound.   The wound proceeds from this injury through the abdominal wall, causing a large deep graze wound in the liver tissue. The bullet partially exits the right axillary wall causing a large defect labeled #8. The partial exit wound is located on the right axilla on the right mid clavicle line, 14 ½ inches below the top of the head.  The wound consists of an irregular defect, measuring 2 x 1 cm with no abrasion margin. There is a small amount of blood in the abdominal cavity. There is a medium caliber severely deformed jacketed projectile lodged near the partial exit wound at the right axilla. It is recovered and packaged as evidence. The trajectory for this gunshot wound is from front to back, left to right, and moderately upward when the body is viewed in its anatomic position.

**Gunshot wound #6**

There is a gunshot wound of entrance located on the posterior lateral aspect of the left thigh, labeled defect #7. It is located 15 inches below the left anterior superior iliac spine.  The wound consists of a 0.9 cm circular defect with a focal abrasion margin.  There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the thigh musculature and fractures the left femur.   Multiple fragments of a medium caliber jacketed projectile are recovered from the left thigh muscle and packaged as evidence. The trajectory for this gunshot wound is from back to front.

Page 5 of 10

23-0281                                              Michael Brandon Obregon

**Gunshot wound #7**

There is a graze wound on the back of the neck, labeled defect #1.  This wound consists of 1.2 x 0.2 cm superficial laceration consistent with a graze wound.  It is located 10 inches below the top of the head and ½ inch to the left of the posterior midline. The directionality cannot be determined.

Both hands were previously bagged at the scene. Both hands were wearing blue latex gloves. No trauma or other significant findings are noted on the hands.

**Other trauma**

There is a small abrasion on the anterior aspect of the right shoulder. There is a small abrasion on the forehead, just on the hairline.

These injuries, having been once described, will not be repeated.

**SCARS, TATTOOS, AND OTHER IDENTIFYING BODY FEATURES**

There are numerous tattoos present on the neck, upper back, torso, and left leg. There are multiple irregular scars present on the right knee.

**GENERAL EXTERNAL EXAMINATION**

The preservation is good in the absence of embalming. The body is cold to touch, subsequent to refrigeration. Rigor mortis is full.  Posterior red-purple lividity is unfixed.

The body is that of a normally developed Hispanic male measuring 68 inches in length and weighing 168 pounds. The general appearance is compatible with the reported age of 36 years.  Scalp hair is black.  The irises are brown, and there is no jaundice or lesions of sclerae or conjunctivae. The ears are unremarkable. There is facial hair of a mustache. The nose is unremarkable.  The mouth is unremarkable. Teeth are natural. The neck is unremarkable. There are no palpable axillary, cervical, abdominal, or inguinal masses. The chest and back are symmetrical and unremarkable. Body hair is normal in amount and distribution of an average male adult. The abdomen is flat. The external genitalia, anus, and perineum are unremarkable. The extremities are symmetrical, without significant clubbing, edema, or deformity. Fingernails are intact.

**INTERNAL EXAMINATION**

The body is opened by a standard Y-shaped thoracoabdominal incision. All viscera occupy their appropriate anatomic relationships. Subcutaneous adipose tissue ranges up to 1.5 cm in thickness over the abdominal wall. Serous surfaces are smooth and glistening throughout. There are extensive right pleural

Page 6 of 10

23-0281                                        Michael Brandon Obregon

adhesions. There are bilateral hemothoraces as described above. Weights of the internal organs are as follows, and, unless specified below, show no evidence of congenital or acquired disease.

| | | | |
|---|---|---|---|
| Heart: | 360 grams | Spleen: | 160 grams |
| Right lung: | 740 grams | Right kidney: | 100 grams |
| Left lung: | 300 grams | Left kidney: | 120 grams |
| Liver: | 1820 grams | Brain: | 1510 grams |

**CARDIOVASCULAR SYSTEM:** The pericardium is unremarkable, with blood in the pericardial sac as described above. The heart occupies its usual mediastinal site and has a smooth epicardial surface. The external configuration is not remarkable. All major vessels arise in their appropriate anatomic relationships. The coronary ostia are normally placed and are patent. The coronary arteries arise normally, are distributed in a right dominant pattern, and show no significant stenosis by atherosclerosis. The atria and ventricles are of normal caliber and are free of gross anomalies and thrombi. The myocardium is red-brown and firm, without focal abnormalities. The ventricular thicknesses are within normal limits. The endocardium is unremarkable. The cardiac valve circumferences are appropriate for the caliber of the cardiac chambers. The cardiac valves have thin, pliable leaflets that are free of fusion, vegetations, or significant fenestrations. The aorta has injuries detailed above otherwise, the aorta is of normal caliber with all major arterial branches arising in their appropriate anatomic relationship. The intimal surfaces are smooth, without aneurysm formation or dissection. No systemic venous abnormalities or thrombi are present.

**RESPIRATORY SYSTEM:** The esophagus has injuries detailed above otherwise, the upper airway, larynx, and trachea are patent with no evidence of edema, ulceration, or obstruction. The pleural surfaces are smooth and glistening. The lung parenchyma is well expanded, with injuries detailed above. Sectioning reveals pink to red-purple tissue with no areas of induration, consolidation, hemorrhage, or gross scarring. The bronchi and pulmonary vessels are patent and of normal caliber.

**DIGESTIVE SYSTEM:** The tongue is unremarkable. The oropharynx is grossly normal and unobstructed. The esophagus is of normal caliber with a smooth, gray-white mucosal lining. The gastroesophageal junction is well defined. The stomach has intact mucosal surfaces. The lumen contains 200 mL of red brown fluid. There are no areas of mucosal ulceration, erosion, hemorrhage, or scarring. The small and large intestines are not remarkable. The appendix is present in the right lower quadrant and is unremarkable. The tan-gray, lobular pancreas has no focal abnormalities. The pancreatic ducts are patent and of normal caliber.

**HEPATOBILIARY SYSTEM:** The liver has injuries detailed above otherwise, the liver has a smooth capsule covering red-brown parenchyma. The cut surfaces

Page 7 of 10

23-0281                                              Michael Brandon Obregon

show no diffuse or focal abnormalities. The intrahepatic and extrahepatic biliary ducts are unremarkable. The gallbladder contains viscid olive green bile and is free of calculi. The gallbladder mucosa is grossly normal.

**GENITOURINARY SYSTEM:** The kidneys are similar in shape with intact capsules covering smooth, red-brown parenchyma. The capsules strip with ease. The cut surfaces show distinct corticomedullary junctions. The calyces, pelves, and ureters are unremarkable. The renal vessels are patent and of normal caliber. The urinary bladder contains approximately 50 mL of urine. The mucosal surfaces are flat and pink-tan. The prostate gland is unremarkable.

**RETICULOENDOTHELIAL SYSTEM:** The spleen has an intact, smooth, and glistening capsule covering dark purple, moderately soft parenchyma. Regional lymph nodes have their usual distribution and appearance.

**ENDOCRINE SYSTEM:** The thyroid and adrenal glands are grossly unremarkable.

**NECK:** The cervical spine, hyoid bone, and thyroid cartilage are intact and unremarkable. There are no hemorrhages in the strap muscles or soft tissues of the neck.

**MUSCULOSKELETAL SYSTEM:** The bony framework, supporting musculature, and soft tissues are grossly normal except injuries detailed above.

**NERVOUS SYSTEM:** The scalp is reflected in the usual fashion. There are no contusions, lacerations, or abrasions of the scalp or subscalpular structures. There are no skull fractures. The pituitary gland is unremarkable. The cerebral vessels are intact with no malformation, aneurysm, thrombosis, or significant atherosclerotic narrowing. The cranial nerves are grossly normal. The dura and dural sinuses are unremarkable. There are no epidural, subdural, or subarachnoid hemorrhages. The leptomeninges are thin and clear. The cerebral hemispheres are symmetrical with normal external landmarks and an unremarkable convolution pattern. There are no uncal, subfalcial, transtentorial, or tonsillar herniations. Multiple sections of cerebrum, cerebellum, and brain stem are unremarkable. The ventricular system is symmetrical and filled with clear fluid.

**TOXICOLOGY SPECIMENS**

Samples of the following are collected and some are submitted for toxicological testing. The toxicology report is attached.

- Vitreous fluid.
- Blood.
- Urine.

Page 8 of 10

23-0281                                      Michael Brandon Obregon

**FINAL SUMMARY**

Based on the forensic examination findings and investigative history as available to me, it is my opinion that the cause of death is multiple gunshot wounds. The manner of death is homicide.

*As with all death investigations, opinions expressed herein are amenable to change should new, reliable, and pertinent information come to light. The Pinal County Medical Examiner's Office is required by statute (A.R.S. § 11-594(A) (2) and (4)) to certify the cause and manner of death following completion of the death investigation of each case over which it assumes jurisdiction, and to promptly execute a death certificate, on a form provided by the state registrar of vital statistics, indicating the cause and manner of death. The form provided by the state registrar of vital statistics includes five manners of death: homicide, suicide, accident, natural, and undetermined. The determination of manner of death is a forensic determination by the pathologist predicated upon the totality of all then-known forensic evidence and other circumstances surrounding the cause of death; it is not a legal determination of criminal or civil responsibility of any person(s) for the death. The significant findings below may not be a complete list of the decedent's medical history. This report was partially generated using dragon automated dictation software and may contain minor transcription errors.*

Significant findings

    I.   Multiple gunshot wounds
        a.  Gunshot wound #1
            i.  Entrance: posterior aspect of the right shoulder, Defect #2
           ii.  Injuries: Scapula and musculature around the scapula
          iii.  The bullet and fragments of a bullet are lodged in the right scapular region
          iv.  Trajectory: Back to front, right to left, and slightly downward
           v.  The bullet and fragments are lodged in the right scapular region

        b.  Gunshot wound #2
            i.  Entrance: Right upper back, Defect #3
           ii.  Injuries: Right posterior chest wall, right lower lobe of the lung, descending aorta, the esophagus, left pulmonary vein, and left upper lobe of the lung
          iii.  The bullet is lodged in the left upper chest wall
          iv.  Trajectory: Right to left, back to front, and slightly upward
           v.  A medium caliber severely deformed jacketed bullet is recovered from the left upper chest

        c.  Gunshot wound #3
            i.  Entrance: Left mid back, labeled defect #4
           ii.  Injuries: Back muscles and ribcage
          iii.  The bullet is lodged in the right shoulder/neck
          iv.  Trajectory: Back to front, left to right, and sharply upward

Page 9 of 10

23-0281                                                    Michael Brandon Obregon

          v. A medium caliber severely deformed jacketed bullet is recovered and packaged as evidence

   d. Gunshot wound #4
      i. Entrance wounds: Defects #5 and #6
      ii. Defects #5 and #6 are connected in the subcutaneous tissue and muscles, representing a single tangential through and through gunshot wound
      iii. Trajectory: Cannot be determined
      iv. No bullet or part of bullet is recovered

   e. Gunshot wound #5
      i. Entrance: midline upper abdomen, labeled defect #9
      ii. Injuries: liver tissue, right axillary wall
      iii. Partial exit: right axilla on the right mid clavicle line. . A medium caliber severely deformed jacketed projectile is recovered near the exit wound.
      iv. Trajectory: front to back, left to right, and moderately upward
      v. A medium caliber severely deformed jacketed projectile is recovered and packaged as evidence

   f. Gunshot wound #6
      i. Entrance: Posterior lateral aspect of the left thigh, labeled defect #7
      ii. Injuries: thigh musculature and femur fracture
      iii. Trajectory: Back to front
      iv. Multiple fragments of a medium caliber jacketed projectile are recovered from the thigh muscle and packaged as evidence

   g. Gunshot wound #7
      i. Graze wound on the back of the neck, labeled defect #1

II.   Mild external trauma

III.   Reported history neck fracture

IV.   Acute methamphetamine intoxication
   a. Amphetamine 130 ng/mL Femoral Blood
   b. Methamphetamine 830 ng/mL Femoral Blood

V.   Consumption of marijuana
   a. 11-Hydroxy Delta-9 THC 1.2 ng/mL Femoral Blood
   b. Delta-9 Carboxy THC 15 ng/mL Femoral Blood
   c. Delta-9 THC 7.7 ng/mL Femoral Blood

Page 10 of 10

DEFS_Obregon 000099



**NMS Labs**

200 Welsh Road, Horsham, PA 19044-2208
Phone: (215) 657-4900 Fax: (215) 657-2972
e-mail: nms@nmslabs.com
Robert A. Middleberg, PhD, F-ABFT, DABCC-TC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued**    04/06/2023 17:08

To:    **146677**
Pinal County Medical Examiner's Office
570 West Adamsville Road
PO Box 2728
Florence, AZ  85132

| | |
|---|---|
| **Patient Name** | Obregon, Micheal B |
| **Patient ID** | 230317-134 |
| **Chain** | 230317-134 |
| **DOB** | ████████ |
| **Sex** | Male |
| **Workorder** | 23110462 |

**Page 1 of 4**

### Positive Findings:

| Analyte | Result | Units | Matrix Source |
|---|---|---|---|
| Amphetamine | 130 | ng/mL | 001 - Femoral Blood |
| Methamphetamine | 830 | ng/mL | 001 - Femoral Blood |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 001 - Femoral Blood |
| Delta-9 Carboxy THC | 15 | ng/mL | 001 - Femoral Blood |
| Delta-9 THC | 7.7 | ng/mL | 001 - Femoral Blood |

See Detailed Findings section for additional information

Agency Case Number: 23-0281

### Testing Requested:

| Test | Test Name |
|---|---|
| 8041B | Postmortem, Basic w/Vitreous Alcohol Confirmation, Blood (Forensic) |

### Specimens Received:

| ID | Tube/Container | Volume/Mass | Collection Date/Time | Matrix Source | Labeled As |
|---|---|---|---|---|---|
| 001 | Clear Top PT with Preservative | 5 mL | 03/17/2023 11:30 | Femoral Blood | 23-0281 |
| 002 | Red Stopper Plastic Tube | 5 mL | 03/17/2023 11:30 | Vitreous Fluid | 23-0281 |
| 003 | Yellow Stopper Plastic Tube | 6 mL | 03/17/2023 11:30 | Urine | 23-0281 |

All sample volumes/weights are approximations.

Specimens received on 03/23/2023.

NMS v.26.0

DEFS_Obregon 000100



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 23110462 |
| **Chain** | 230317-134 |
| **Patient ID** | 230317-134 |

**Page 2 of 4**

## Detailed Findings:

| Analysis and Comments | Result | Units | Rpt. Limit | Specimen Source | Analysis By |
|---|---|---|---|---|---|
| Amphetamine | 130 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| Methamphetamine | 830 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| 11-Hydroxy Delta-9 THC | 1.2 | ng/mL | 1.0 | 001 - Femoral Blood | LC-MS/MS |
| Delta-9 Carboxy THC | 15 | ng/mL | 5.0 | 001 - Femoral Blood | LC-MS/MS |
| Delta-9 THC | 7.7 | ng/mL | 0.50 | 001 - Femoral Blood | LC-MS/MS |

**Other than the above findings, examination of the specimen(s) submitted did not reveal any positive findings of toxicological significance by procedures outlined in the accompanying Analysis Summary.**

## Reference Comments:

1.  11-Hydroxy Delta-9 THC (Active Metabolite) - Femoral Blood:

    11-hydroxy-THC is a psychoactive THC metabolite. 11-OH-THC was detectable in blood, with a 0.5 ng/mL cutoff, for 1.5 hours (range: 0.25-3.5) when cannabis was smoked by occasional users. 11-OH-THC may be present over 72 hours in chronic, frequent cannabis users.

    In occasional cannabis users, median (range) peak blood concentrations after smoking of 6.9% (50 mg) THC were 1.9 (0.5-8.7) ng/mL with median times of maximum concentrations at approximately 11 minutes. In chronic, frequent cannabis users, median (range) peak blood concentrations after smoking 6.9% THC were 7.2 (1.9-30.9) ng/mL, with median times of maximum concentrations at approximately 12 minutes. Usual peak levels are less than 10% of THC levels after smoking.

2.  Amphetamine - Femoral Blood:

    Amphetamine (Adderall, Dexedrine) is a central nervous system stimulant. Amphetamine is also a metabolite of methamphetamine, benzphetamine and selegiline. It is used therapeutically in the treatment of narcolepsy and obesity and also in the treatment of attention-deficit hyperactivity disorder (ADHD). Amphetamine has a high potential for abuse. At low doses, amphetamine causes mild stimulation, offset of fatigue, and increase in alertness. It also causes changes in attitude, judgment and impulsivity. At higher doses, amphetamine causes euphoria, excitation, agitation, hypervigilance, rapid speech, dilated pupils which react slowly to light and increased motor restlessness. Pulse and blood pressure may be elevated. Withdrawal from amphetamine following abuse can result in extreme fatigue and uncontrollable sleepiness, agitation, and depression. In the treatment of narcolepsy, amphetamine is administered in daily divided doses of 5 to 60 mg. In abuse doses of several grams may be used on a daily basis in 'runs' lasting a week or more.

    Following a single oral dose of 10 mg amphetamine sulfate, a reported peak blood concentration of 40 ng/mL was reached at 2 hr. Following a single 30 mg dose to adults, an average peak plasma level of 100 ng/mL was reported at 2.5 hr. A steady-state blood level of 2000-3000 ng/mL was reported in an addict who consumed approximately 1000 mg daily.

    Overdose with amphetamine can produce restlessness, hyperthermia, convulsions, hallucinations, respiratory and/or cardiac failure. Reported blood concentrations in amphetamine-related fatalities ranged from 500-41000 ng/mL (mean 9000 ng/mL).

3.  Delta-9 Carboxy THC (Inactive Metabolite) - Femoral Blood:

    Delta-9 THC is the principle psychoactive ingredient of marijuana/hashish. Delta-9 carboxy THC (THCC) is the inactive metabolite of THC. The usual peak concentrations in serum for 1.75% or 3.55% THC marijuana cigarettes are 10-101 ng/mL attained 32 to 240 minutes after beginning smoking, with a slow decline thereafter. The ratio of whole blood concentration to plasma concentration is unknown for this analyte. THCC may be detected for up to one day or more in blood. Both delta-9-THC and THCC may be present substantially longer in chronic users. THCC is usually not detectable after passive inhalation.

NMS v.26.0

DEFS_Obregon 000101



**CONFIDENTIAL**

| | |
|---|---|
| **Workorder** | 23110462 |
| **Chain** | 230317-134 |
| **Patient ID** | 230317-134 |

**Page 3 of 4**

**Reference Comments:**

4.   Delta-9 THC (Active Ingredient of Marijuana) - Femoral Blood:

Delta-9 THC is the principle psychoactive ingredient of marijuana (cannabis, hashish). It is also the active component of the prescription medication Marinol®. Marijuana use causes relaxation, distorted perception, euphoria and feelings of well being, along with confusion, dizziness, somnolence, ataxia, speech difficulties, lethargy and muscular weakness.

After smoking a user-preferred 300 mcg/kg dose average plasma THC concentrations at 35 minutes were reported at 16.1 (range 4.7-30.9) ng/mL, and had declined to 1.5 (range 0.4-3.2) ng/mL after 190 minutes. Usual peak levels in serum for 1.75% or 3.55% THC marijuana cigarettes: 50-270 ng/mL at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/mL by 2 hrs. Whole blood THC concentrations are typically half those in a corresponding plasma sample.

5.   Methamphetamine - Femoral Blood:

d-Methamphetamine is a DEA schedule II stimulant drug capable of causing hallucinations, aggressive behavior and irrational reactions. Chemically, there are two forms (isomers) of methamphetamine: l- and d-methamphetamine. The l-isomer is used in non-prescription inhalers as a decongestant and has weak CNS-stimulatory activity. The d-isomer has been used therapeutically as an anorexigenic agent in the treatment of obesity and has potent CNS-, cardiac- and circulatory-stimulatory activity. Amphetamine and norephedrine (phenylpropanolamine) are metabolites of methamphetamine. d-Methamphetamine is an abused substance because of its stimulatory effects and is also addictive.

A peak blood concentration of methamphetamine of 20 ng/mL was reported at 2.5 hr after an oral dosage of 12.5 mg. Blood levels of 200-600 ng/mL have been reported in methamphetamine abusers who exhibited violent and irrational behavior. High doses of methamphetamine can also elicit restlessness, confusion, hallucinations, circulatory collapse and convulsions.

*In this case, the level of methamphetamine determined has not been differentiated according to its isomeric forms. Differentiation of the isomers of methamphetamine is available upon request.

**Sample Comments:**

001   Physician/Pathologist Name: John Hu,MD,Ph.D.

Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded one (1) year from the date of this report; and generated data will be discarded five (5) years from the date the analyses were performed.

Workorder 23110462 was electronically
signed on 04/06/2023 16:36 by:

Kristopher W. Graf, M.S., D-ABFT-FT
Forensic Toxicologist

**Analysis Summary and Reporting Limits:**

All of the following tests were performed for this case. For each test, the compounds listed were included in the scope. The Reporting Limit listed for each compound represents the lowest concentration of the compound that will be reported as being positive. If the compound is listed as None Detected, it is not present above the Reporting Limit. Please refer to the Positive Findings section of the report for those compounds that were identified as being present.

Test 50010B - Amphetamines Confirmation, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
|---|---|---|---|
| Amphetamine | 5.0 ng/mL | MDEA | 5.0 ng/mL |
| MDA | 5.0 ng/mL | MDMA | 5.0 ng/mL |

NMS v.26.0

DEFS_Obregon 000102



**CONFIDENTIAL**

| **Workorder** | 23110462 |
| **Chain** | 230317-134 |
| **Patient ID** | 230317-134 |

**Page 4 of 4**

## Analysis Summary and Reporting Limits:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
| --- | --- | --- | --- |
| Methamphetamine | 5.0 ng/mL | | |

Test 52198B - Cannabinoids Confirmation, Blood - Femoral Blood

-Analysis by High Performance Liquid Chromatography/ Tandem Mass Spectrometry (LC-MS/MS) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
| --- | --- | --- | --- |
| 11-Hydroxy Delta-9 THC | 1.0 ng/mL | Delta-9 THC | 0.50 ng/mL |
| Delta-9 Carboxy THC | 5.0 ng/mL | | |

Test 8041B - Postmortem, Basic w/Vitreous Alcohol Confirmation, Blood (Forensic) - Femoral Blood

-Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
| --- | --- | --- | --- |
| Amphetamines | 20 ng/mL | Fentanyl / Acetyl Fentanyl | 1.0 ng/mL |
| Barbiturates | 0.040 mcg/mL | Methadone / Metabolite | 25 ng/mL |
| Benzodiazepines | 100 ng/mL | Methamphetamine / MDMA | 20 ng/mL |
| Buprenorphine / Metabolite | 0.50 ng/mL | Opiates | 20 ng/mL |
| Cannabinoids | 10 ng/mL | Oxycodone / Oxymorphone | 10 ng/mL |
| Cocaine / Metabolites | 20 ng/mL | Phencyclidine | 10 ng/mL |

-Analysis by Headspace Gas Chromatography (GC) for:

| Analyte | Rpt. Limit | Analyte | Rpt. Limit |
| --- | --- | --- | --- |
| Acetone | 5.0 mg/dL | Isopropanol | 5.0 mg/dL |
| Ethanol | 10 mg/dL | Methanol | 10 mg/dL |

NMS v.26.0

DEFS_Obregon 000103

# EXHIBIT 5

# In the Matter of:

*Obregon*

*vs*

***Lamb***

---

*Brandon Chapman*

*September 25, 2025*

---



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Michael Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB,<br><br>　　　　Plaintiffs,<br><br>　　　　vs.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X,<br><br>　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 2:24-cv-01510-PHX-KML<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

BRANDON CHAPMAN

Casa Grande, Arizona
September 25, 2025
11:56 a.m.

REPORTED BY:
TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



Page 2

I N D E X

WITNESS:                  PAGE:

BRANDON CHAPMAN

     Examination by Ms. Van Buren       5

     Examination by Mr. Woods         35

E X H I B I T S

Deposition                    PAGE:

1      Photograph, Bates DEFS_Obregon 000146 (1 page)     26

2      Video, Bates DEFS_Obregon 000135     28

Page 3

THE VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF BRANDON CHAPMAN was taken at 11:56 a.m., on Thursday, September 25, 2025, at the Fitzgibbons Law Offices, P.L.C., 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona, before TERESA A. WATSON, Registered Merit Reporter, and a Certified Reporter in and for the State of Arizona, County of Maricopa, pursuant to the Rules of Civil Procedure.

COUNSEL APPEARING:

For the Plaintiffs:

     MILLS + WOODS LAW PLLC

     Sean A. Woods, Esquire (via Zoom)

     swoods@millsandwoods.com

     5055 North 12th Street, Suite 101

     Phoenix, Arizona   85014

For the Defendants Lamb and Gibson:

     WIENEKE LAW GROUP, PLC

     Laura Van Buren, Esquire

     lvanburen@wienekelawgroup.com

     1225 West Washington Street, Suite 313

     Tempe, Arizona   85288

Also Present:

     Robin Smart, Videographer

     Allison Obregon (via Zoom)

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. Today's date is September 25th, 2025. The time is 11:56 a.m. This is the video-recorded deposition of Brandon Chapman, noticed by counsel for the defendants in the matter of Allison Obregon, et al., versus Mark Lamb, et al. This matter is being held in the United States District Court for the District of Arizona. Case Number 2:24CV-01510-PHX-KML. Our location today is 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona 85122.

The certified court reporter is Teresa Watson with Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona 85018.

My name is Robin Smart. I'm the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, please identify yourselves and whom you represent, starting with plaintiffs' counsel, please.

MR. WOODS: This is Sean Woods with Mills & Woods Law. I represent the plaintiffs in this case, including Allison Obregon, who is present.

MS. VAN BUREN: This is Laura Van Buren, and I represent the defendants.

THE VIDEOGRAPHER: Thank you, Counsel. The witness may be sworn in, please.

Page 5

BRANDON CHAPMAN, called as a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

COURT REPORTER: Thank you. You may put your hand down.

E X A M I N A T I O N

BY MS. VAN BUREN:

Q. Good afternoon.

A. Hello.

Q. Can you please state your name for the record?

A. Brandon Chapman.

Q. Mr. Chapman, we're here for a deposition in a civil case. This is a type of proceeding we do in civil cases that allows us to speak to witnesses like you and get your official testimony.

A. Okay.

Q. Have you ever had your deposition taken before?

A. This is the first time.

Q. Okay. So I want to go over some ground rules and make sure you understand how things are going to go. I represent the defendants in the case.



Page 22

walking up, render -- trying to render aid.

Q. Did you see him try to render aid?

A. Yes.

Q. What exactly did you see him do?

A. I seen him moving his shirt to look for bullet holes where he got hit, and then there was a point where -- I don't know if it was Meagan's daughter or -- someone came out and was yelling at the deputy to get off the property.

Q. Let me stop you. Can you -- can you describe for me at all what -- anything else about that person, like what she looked like?

A. She was a -- a younger female. I don't believe she was 18 yet.

Q. Okay. What were you doing when she came out of the property and was yelling at the deputy?

A. I -- I spoke to her. I asked her to calm down. That -- trying to let her know, like, he's trying to -- to save his life and to calm down, because she was upset.

Q. Uh-huh. You said that you saw the deputy trying to render aid. I asked what you saw. You said you saw him removing the shirt to look for bullet holes, and then I sidetracked you. Did you see the deputy doing anything else in terms of rendering aid?

A. I remember him radioing, I believe, for backup. I don't know 100 percent.

Page 23

Q. Did you do anything to help?

A. At one point he asked me to come hold his flashlight for him.

Q. Okay.

A. So that way he could start rendering medical aid quicker.

Q. Okay. And did you do that?

A. Yes.

Q. Do you remember anything specific the deputy did to provide aid once you were holding that flashlight?

A. I don't remember --

Q. Okay.

A. -- for sure. I -- I do -- this is so hard. I'm sorry. I believe he was reaching into his pouch for something to put on the wounds.

Q. What do you mean by "his pouch"?

A. I don't know -- I don't -- I don't remember. It was kind of hectic.

Q. Sure.

A. And the -- the younger female was still adamant about yelling at the officer, and I was trying to calm her down so he could do his job.

Q. When you went outside and you told the deputy that you could help if he needs help, was that younger female already outside?

Page 24

A. I do not remember.

Q. Do you remember what you were doing when you first saw her?

A. I was standing at my fence. I let the deputy know if he needed anything, I could assist him, and then I was just waiting in case he needed my help. And then at that time, I believe the younger lady came out and started yelling at him to get off the property, so on and so forth.

Q. I'm going to ask you two questions that are going to sound similar, but they're a little different, so pay attention.

Can you give me an estimate of how much time passed between when you heard gunshots and when you first saw the deputy rendering aid?

A. Four or five minutes, maybe.

Q. What makes you say "maybe"?

A. I have... I don't remember times very well, the length of them, especially in a situation that needs attention.

Q. Okay.

A. So like I said before, sometimes it feels like a minute, but it's been ten seconds.

Q. Right. Right.

A. That's -- that's why I said "maybe."

Q. Okay. At any point during that night, did you -- besides holding the flashlight, did you personally assist with rendering any aid?

Page 25

A. Negative.

Q. Was there anything that you thought based on your training from when you were in the Army that you could -- you could have done to help with aid?

A. To help -- help with aid, no.

Q. Okay.

A. If the deputy asked me to help render aid and told me what to do, I would be able to.

Q. Was there any moment where you thought, hey, this deputy should be doing XYZ to help with this injury based on your training?

A. Negative. It seemed to me that he was doing the right steps.

Q. If you had thought that he should be doing different steps, would you have expressed that to him?

A. Absolutely.

Q. Would you have stepped in yourself to assist?

A. I believe so. Yes.

Q. At some -- at some point, when you were on that side of the car with the deputy and the man on the ground, did you see a gun on the ground?

A. I did.

Q. Can you describe that gun for me?

A. I --

Q. To the best of your memory.



Page 26

A. To the best of my memory, it looked like a silver top gun, and then the -- the bottom half was black.

Q. Okay.

A. I do not know what caliber it was.

Q. Okay. I'm going to show you a photo.

MS. VAN BUREN: Sean, this is Defendants_Obregon 000146. And can we mark this as Exhibit 1, please?

(Deposition Exhibit No. 1 marked.)

BY MS. VAN BUREN:

Q. Okay. I'm showing you what's been marked as Exhibit 1. Is this the gun that you saw on the ground?

A. Yes.

Q. Do you recall how far away it was from the man who had been shot?

A. Three to four feet.

Q. When did you first see that gun?

A. I first saw that gun when the officer asked me to come over and hold his flashlight.

Q. Okay. About how long after the shooting was that?

A. I'm sorry. The -- the times are -- are rough. Can you repeat yourself?

Q. Yes. And if you don't -- if you can't answer, that's fine. But how -- how much time passed between when you heard gunshots and you saw this gun on the ground?

A. Five to six minutes.

Page 27

Q. Okay. Had any other officers arrived when you -- by the -- strike that.

Had any other officers arrived when you took that flashlight to assist the deputy?

A. When I took the flashlight, it was -- it felt like two to three minutes before I seen another deputy show up.

Q. Okay. That was going to be my next question.

So when you took the flashlight, it was you, the deputy, the man on the ground.

A. Yes.

Q. And the young woman?

A. Yes.

Q. Was she there, too?

A. Yes.

Q. Okay. And so it was -- and that -- and to make sure I understand, that was the same time you saw the gun on the ground was when you took the flashlight?

A. Yes.

Q. I want to show you a little bit of a video. It has some audio, so I think the best thing is for us to go off the record, and I'll play the video for you.

A. Okay.

MS. VAN BUREN: Before we go off the record, though, Sean, this is Defendants Obregon -- excuse me -- 135, which is Officer Fox's bodycam. And since I'm playing the

Page 28

audio, it -- I don't know -- it may be one that your client may not want to listen to.

MR. WOODS: Yeah. I appreciate that.

MS. VAN BUREN: So I would just --

MR. WOODS: Allison, I'll just ask you to -- I'll send you a message when we're done with this video.

MS. VAN BUREN: So let's go ahead and go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 12:31 p.m.

(Off the record, 12:31 p.m. to 12:33 p.m.)

(Deposition Exhibit No. 2 marked.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:33 p.m.

BY MS. VAN BUREN:

Q. All right. Mr. Chapman, off the record I showed you a clip of what we're going to mark as Exhibit 2 --

THE VIDEOGRAPHER: Counselor, I'm sorry. Your microphone.

BY MS. VAN BUREN:

Q. I showed you a clip of what we're going to mark as Exhibit 2 to your deposition. This was a body-worn camera footage from Officer Fox, and I showed you in particular from 25 seconds up to 45 seconds, and then we also watched from the beginning up to 45 seconds. Do you recall in that time frame

Page 29

seeing a man with a white shirt?

A. Yes.

Q. Was that you?

A. Yes.

Q. And was that when you were holding the flashlight for the deputy?

A. Yes.

Q. The deputy said something about chest seals.

A. Yeah.

Q. Do you remember hearing that?

A. Yes.

Q. Is that something that you were trained about in basic training?

A. Yes.

Q. I don't know what a chest seal is. Tell me what a chest seal is.

A. It's a police -- piece of plastic that goes over an open wound, gunshot wound, for -- I -- just to cover it up. I don't know all the medical terms. I just -- that's what I do remember from the military.

Q. That's fair. And is -- are chest seals one of the things you were trained to do to treat bullet wounds to the chest?

A. Yes.

Q. Do you recall now that you've watched this if you saw



# EXHIBIT 6
# (Non-Electronic Exhibit)

# EXHIBIT 7



# EXHIBIT 8

**CURRICULUM VITAE**
**RETIRED LIEUTENANT MARK RICHARD HAFKEY, M. Ed.**
**5801 Illilouette Fall**
**Mariposa, California 95338**
**602-703-5211**
**Mark.hafkey@gmail.com**

---

**EDUCATION**

- **Northern Arizona University**, Masters - Educational Leadership, GPA 4.0, Summer, 2000
- **Arizona State University**, BS in Political Science / history minor, Cum Laude, Fall, 1993
- **Central Arizona College**, AA degree: Honors – GPA 3.68; Spring, 1989
- **Other College**: completed 31 credit hours in Spanish (advanced speaker)
- **Spanish Immersion** Program in Hermosillo, Sonora, México (4 weeks)

**EMPLOYMENT HISTORY**

**Police Expert Witness Consulting 2016-present**
**Police Expert Witness** – conduct private consultation and offer expert opinions and testimony relating to police policies, practices and procedures for both Plaintiffs and Defendants, e.g.,
- Obregon v. Lamb and Gibson (provided written opinion for Plaintiffs)
- Adams v. Lake Havasu City, et al, (provided written opinion for Plaintiffs)
- Shere v. City of Phoenix, et al (provided written opinion for Plaintiffs)
- Loentae Kirk v. City of Phoenix, et al (provided written opinions for Plaintiffs)
- James W. Denby v. Lujan, et al (provided written opinions and deposition for Plaintiffs)
- Sorensen v. Babeu and Steele, et al (testified in Pima County Superior Court for Plaintiffs, who were also Defendants in this matter)
- McRae v. Arizona, et al (provided written opinions for Defendants / Attorney General)
- State of Arizona v. Hampton, Sr. (provided opinions for Plaintiff / Pima County Legal Defender)
- Numerous consultations and file reviews which did not extend beyond initial discussions and file reviews of pending civil actions, including two wrongful deaths filed by Plaintiffs

**American Airlines / U.S. Airways / Frontier Airlines 2012-2023**
**Cabin Crew** – trained on Airbus, Boeing, and Embraer aircraft

**Phoenix Police Department (PPD) 1989-2012**
**President** - Phoenix Police Sergeants & Lieutenants Association (PPSLA)
Duties: managed and operated employee association corporation, led elected board, negotiated employee contracts, represented employees in misconduct and other matters, conducted and coordinated law enforcement training seminars, responded to membership issues, lobbied and networked on the local, state, and national level regarding laws and law enforcement concerns & interests, represented police management interests on approximately 30 boards and committees; reviewed, developed, investigated, and interpreted police policy, practices, and procedures

**Lieutenant** - Public Affairs Bureau, Community Relations Bureau, & Squaw Peak Precinct
Duties: worked cooperatively and jointly to provide quality seamless customer service, participated in various community activities and made verbal presentations to groups, led sworn and non-sworn police staff, reviewed and analyzed work and crime statistics and plans to ensure efficient allocation of police manpower, supervised major crime scenes and barricades, maximized utilization of resources and achieved the highest possible productivity, testified as a witness in court in connection with arrests and investigations; demonstrated continuous effort to improve operations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations

**Sergeant** - Traffic Bureau, Organized Crime Bureau, Desert Horizon Precinct & Central City Precinct
Duties:  participated in community activities, made verbal presentations to groups, and worked cooperatively and jointly to provide quality seamless customer service; supervised sworn and non-sworn police staff, conducted training and presentations, served as a witness in court, investigated complaints or allegations of misconduct against employees of the Police Department, kept informed and aware of persons and places suspected of illegal activity and/or potential for

OBREGON_000916

**Curriculum Vitae – MARK R. HAFKEY**
2 | P a g e

problems within an assigned area; supervised and secured major crime scenes, pursuits and barricades, administered first aid, arbitrated disputes, and conducted preliminary and follow-up investigations; reviewed, developed, interpreted, and enforced police policy, practices, and procedures; conducted police misconduct investigations including use of force and civil rights violations

**Patrol Officer / Field Training Officer**, South Mountain Precinct
Duties: Served and protected the community, enforced laws, mediated disputes, provided information, investigated crimes, secured crime scenes, conducted barricades, assisted with tactical entries, testified in court, made arrests, trained officers, etc.

**PPD ASSIGNMENT HISTORY**

**Phoenix Police Department**
- President – Phoenix Police Sergeants & Lieutenants Association, 7/2004-2/2012
- Patrol Lieutenant / Area Manager,  1/2002-7/2004
- Motor Supervisor, Traffic Bureau, 9/2000-1/2002
- Administrative / Training / Investigation Supervisor, Organized Crime Bureau, 9/1997-9/2000
- Patrol Sergeant, 11/1995-9/1997
- Patrol Officer / Field Training Officer, South Mountain Precinct, 1989-1995

**PPD DECORATIONS**

**Medals**
- Merit (2X)
- Lifesaving
- Physical Fitness
- Safe Driving
- No Sick Leave Usage

**Commendations**
- Over 30 written commendations while serving the Phoenix Police Department

**PUBLICATIONS**
- *Law Enforcement Matters, Understanding and Attaining a Career as a Police Officer*, 2020
- *Proud to Be Phoenix PD*, Commemorative Edition Magazine, 2011
- *Phoenix Police Sergeants and Lieutenants Association Bars & Stripes* - Quarterly Newsletter

**PROFESSIONAL DEVELOPMENT**

**Instructor Certifications**
- Defensive Driving Instructor, 2000
- MCCC Teacher Certification, 1998 (Adjunct Faculty – Phoenix College)
- Drug Recognition Expert (Instructor), 1997
- Firearms Instructor, 1994
- Defense Tactics Instructor, 1994
- General Instructor, 1993

**Courseware Development and Instruction**
- Distinguishing Between Drug Intoxication and Mental Illness
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Management
- Team Building
- Time Management
- Professional Traffic Stops & Customer Service
- Defensive Driving (personal and for commercial vehicle operators)
- Microsoft Office Software Applications
- Advanced Internet Investigations

OBREGON_000917

**Curriculum Vitae – MARK R. HAFKEY**
3 | P a g e

**Law Enforcement Certifications and Training**
- Numerous union and police officer rights seminars, 7/2004 -11/2011
- Globalization, Development & It's Unintended Consequences for U.S. Public Safety, 9/2010
- Brand Piracy, the Links to Organized Crime and Terrorism Investigation, 9/2009
- Legal Issues – Interviews and Interrogations, 2/2009
- Advanced Police-Media Relations 12/2007
- Dealing with the Psychological Aftermath of Critical Incidents / Risk Management, 10/2007
- Stress Management in Law Enforcement, 6/2007
- Public Safety and Homeland Security Law and Practices Training Conference, 6/2007
- Psychological Terrorism a Law Enforcement Perspective, 12/2006
- New Patterns of Leadership, 9/2005
- Critical Incident Risk Management for Managers & Supervisors, 8/2005
- Legal Survival for Police Personnel, 8/2005 and Hot Topics in Law (Enforcement), 8/2005
- Future Trends in Crime – Profiling Interpersonal Violence, 1/ 2005
- Leadership for Managers, 9/2004
- Contemporary Issues in Internal Affairs and Use of Force, 4/ 2004 and 3/2007
- Civil Liability Management Workshop, 4/2003
- Legal Issues for Law Enforcement Personnel – Investigations, 3/2003
- Responding to Alien Crimes, 2/2003
- Police-Media Relations, 1/2003
- Advanced Spanish for Law Enforcement, 12/2002
- Enlightened Leadership Principles, 12/2002
- Disaster Response for Aircraft Mishaps & Weapons of Mass Destruction, 11/2002
- Legal Issues for Law Enforcement Personnel Advanced Seminar, 7/2002
- Radar Speed Measurement, 7/2001
- City of Phoenix Police Department Leadership Forum, 3/2001
- Drug Enforcement Bureau Supervisor Seminar, 5/2000
- Phoenix Police Department Spanish Language Certification, 12/1999
- Investigation of Computer Crime, 10/1999
- Panel Interviewing Skills, 2/1997
- Personnel Law for Managers and Supervisors, 11/1996
- Supervisor Development School, 9/1995 and IACP Advanced Supervision Skills, 9/1996
- Detective School/Certification, 8/1994 and AzPOST Interview and Interrogation, 5/1995
- Horizontal Gaze Nystagmus (HGN) and DRE Certification, 5/1991 &  7/1993

**Aviation Certifications and Training**
- Private Pilot, U.S. DOT / FAA Certificate Number 3678344
- Flight Attendant, U.S. DOT / FAA Certificate Number 3625697

**Computer Training**
- Microsoft Office applications, ArcView, PACE, and Advanced Internet Investigations

**Writing Courses**
- Essential Business Writing Skills, 1/1997
- Effective Written Communication, 9/1994
- Writing for Professions, 5/1993
- Grammar Gremlins, 12/1993
- ALEOAC Report Writing, 3/1993
- Sharpening Basic Writing Skills, 11/1992
- Proofamatics, 5/1992

**DUI/Drug Traffic Safety Training:**
- Fourth IACP-DRE Training Conference, June, 1998
- Third IACP-DRE Training Conference, June 14-17, 1997
- DRE Instructor School, June 2-6, 1997

OBREGON_000918

Curriculum Vitae – **MARK R. HAFKEY**

**4 | P a g e**

- Second IACP-DRE Training Conference, May 12-14, 1996
- First IACP-DRE Training Conference, June 10-13, 1995
- Drug Identification Class (by DEA), August 7, 1995
- Mark IV GCI/IR 3000 Operator School, December 2, 1993
- Drug Evaluation and Classification (DRE School), July 20-31, 1993
- Preliminary Training; Drug Evaluation & Classification, June 22-23, 1993
- Drug Screening (Phoenix Police Department), August 12, 1991
- Horizontal Gaze Nystagmus (HGN School), January 29-31, 1991
- DUI Training (Phoenix Police Department), February 23, 1991
- Narcotics Identification (Phoenix Police Department), June 6, 1990
- DUI & Drug Investigation (Academy), September 18; October 23-27, 1989

**PROFESSIONAL MEMBERSHIPS**

**Past or Present Affiliations**
- Association of Professional Flight Attendants - Member
- Police Sergeants and Lieutenants Association (PPSLA)  - President
- Arizona Police Association (APA) - Secretary
- National Association of Police Organizations (NAPO) – Area Vice President
- Spanish Toast Masters - Member

**CONSULTING**

**Courseware Development and Instruction**
- Distinguishing between Mental Illness and Drug Intoxication
- Drug Awareness, Identification, and Recognition
- Safety Awareness (Internet, work place, personal, social, environmental, etc.)
- Problem Solving
- Conflict Resolution
- Team Building
- Defensive Driving (personal and commercial vehicle operators)
- Microsoft Office Software Applications

**SPECIALIZED READINGS**
- "Arizona Officers Legal Source Book" by Dale Anderson, Esq. (The Peace Officers Bible)
- "Drug Evaluation and Classification Training," Student Manual, U.S. DOT, et al., 1993 ed.
- "Little Flowers of the Gods," Hightimes, by Richard Evans Schultes and Albert Hofmann, 1987. Study of Psilocybin (Mushrooms).
- "Highanxiety," Consumer Reports, 1993.  Study of tranquilizer abuse.
- "Who Takes Xanax, and Why?" Consumer Reports. 1993.
- "Halcion and Prozac," Consumer Reports.  1993.  Comparing tranquilizers.
- "Relief without Drugs," Consumer Reports, 1993.  Discussing psychotherapy as an alternative.
- Psychedelic Drugs," The Harvard Medical School Mental Health Letter, February, 1990. Overview on effects and reactions.
- "We Should Reject the Disease Concept of Alcoholism," The Harvard Medical School Mental Health Letter, February, 1990.
- "MDA (Methylenedioxyamphetamine) AKA the Love Drug, Psychedelic Speed," by David E. Smith, M.D. and Rick Seymour.
- "LSD Still on Some Minds," L.A. Times, by Harry Nelson, March, 1991.
- "User's Defense of Marijuana Goes up in Smoke," by Sue Rusche.
- "More and More, Marijuana Becoming a Homegrown Crop," Daily News, by Tom Ashbrook, September, 1988.
- "Marinol-Dosing Begins Before Chemotherapy," by Roxane Laboratories, Inc., 1986.
- "The Escalating Problem of Inhalant Abuse," International Inst. for Inhalant Abuse.
- "Brain's Marijuana 'Receptor' is Identified," L.A. Times, by Thomas H. Maugh II, August, 1990.
- "Neurotransmitters," by Sergeant Thomas E. Page, LAPD, 1990.

OBREGON_000919

**Curriculum Vitae – MARK R. HAFKEY**

5 | P a g e

- "Phoenix Police Department Narcotics Price Survey," Drug Enforcement Bureau.
- "Guide to Dangerous Drugs," Institute for a Drug-Free Workplace, 1994.
- "What Works, Schools without Drugs," U.S. Department of Education, 1987.
- "Drug Identification, CNS-Psychoactive Drugs," U.S. Department of Justice DEA, 1995.
- "The Psychological and Physical Effects of Drug Abuse," U.S. Dept. of Justice DEA, 1995.
- "Tweakers & Bingers, Abuse Patterns among Meth Users," Excerpt from Effects of D-Methamphetamine, National Drug Information Center, by Margaret J. Potter, 1997.

**INTERESTS**
- Aviation
- Foreign language studies
- Boating, fishing, camping, and hunting
- Jogging, hiking, and martial arts
- Mind teaser puzzles and chess

**VOLUNTEER WORK**
- Ramond Museum and Community Center
- Raymond 4H
- Raymond-Knowles Elementary School
- Blue Santa (PPD)
- Franklin Elementary School
- PPSLA Charities
- Toys for Tots

**REFERENCES**
1. Dale Anderson, Esq., LEOTraining.com, 779-255-1298, daa2000@aol.com
2. John Commerford, Esq., Commerford Law, 602-614-7270, commerlaw@gmail.com
3. Jeff Miller, Esq., Miller Weber Kory, 602-648-4045, jeff@mwkfirm.com
4. Michael G. Gaughan, Esq., AZ Attorney General, 602-620-8122, mggaughan@cox.net
5. Sean Woods, Esq., Mills and Woods, 602-480-999-4556, swoods@millsandwoods.com

OBREGON_000920

# EXHIBIT 9

# In the Matter of:

*Obregon*

*vs*

***Lamb***

---

*Mariah Brady*

*August 19, 2025*

---



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Allison Obregon, an individual;          )
Allison Obregon on behalf of and         )
as legal guardian and parent of          )
her minor child, MC; Allison             )
Obregon as pending personal              ) NO.
representative of the Estate of          ) 2:24-cv-01510-PHX-
Micheal Obregon; Meagan Brady,           ) KML
individually; Meagan Brady on            )
behalf of and as legal guardian          )
and parent of her minor child,           )
MB,                                      )
                           Plaintiffs,   )
v.                                       )
                                         )
Mark Lamb and Jane Doe Lamb,             )
husband and wife; Brady Gibson           )
and Jane Doe Gibson, husband and         )
wife; John and Jane Does I-X,            )
                                         )
                           Defendants.   )
_____  )

VIDEO RECORDED VIDEOCONFERENCED DEPOSITION OF
MARIAH BRADY

August 19, 2025
Witness Location:  Phoenix, Arizona
10:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Page 2

                    I N D E X
WITNESS                                          PAGE

MARIAH BRADY

     Examination by Ms. Van Buren            5

     Examination by Mr. Woods               77

     Further Examination by Ms. Van Buren   80


              E X H I B I T S

EXHIBITS   DESCRIPTION                          MARKED

No. 1    Video recording of Officer Fox's       60
         body-worn cam
No. 2    Video recording of Officer Reid's      65
         body-worn cam

No. 3    Video recording of Sergeant Rush's     48
         body-worn cam
No. 4    Denova Collaborative Health records    34
         (45 pages) (MB_000087 through
         MB_000131)
No. 5    Sun Life Health records (59 pages)     20
         (MB_000132 through MB_000190)

No. 6    Plaintiff Brady's Response to Defendant 68
         Gibson's First Interrogatories
         (15 pages)

Page 3

VIDEO RECORDED VIDEOCONFERENCED DEPOSITION OF MARIAH BRADY, located in Phoenix, Arizona, taken on August 19, 2025, commencing at 10:03 a.m. before ROBIN JASPER, a Certified Stenographer in the State of Arizona.

COUNSEL APPEARING BY VIDEOCONFERENCE:

     WIENEKE LAW GROUP
     BY:  Ms. Laura Van Buren
     1225 West Washington Street, Suite 313
     Tempe, Arizona  85288
     Attorneys for Defendants
     MILLS + WOODS LAW, PLLC
     BY:  Mr. Sean A. Woods
     5055 North 12th Street, Suite 101
     Phoenix, Arizona  85014
     Attorneys for Plaintiffs

ALSO PRESENT BY VIDEOCONFERENCE:

     Ms. Meagan Brady
     Ms. Allison Obregon
     Ms. Danielle Morris
     Mr. William Marinakis, Videographer

Page 4

THE VIDEOGRAPHER:  We are on the record. Today's date is Tuesday, August 19, 2025.  The time is 10:03 a.m.  This is the Zoom video recorded deposition of Mariah G. Brady, noticed by counsel for the defendants in the matter of Allison Obregon, et al., versus Mark Lamb, et al., in the United States District Court, District of Arizona, Case No. 2:24-cv-01510-PHX-KML.

The witness is located at the law offices of Mills + Woods law firm in Phoenix, Arizona.  All participants are appearing via Zoom video conferencing. Let me make a correction that with the witness today is Meagan Brady and her attorney.

All -- excuse me.  The certified court reporter is Robin Jasper of Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona, 85018.  My name is William Marinakis.  I am the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, will you please identify yourselves and state whom you represent for the record at this time, please, starting with plaintiffs' counsel.

MR. WOODS:  Thank you.  This is Sean Woods for Mills + Woods Law.  I'm here on behalf of the plaintiffs, Mariah Brady and Allison Obregon.  Mariah Brady is located to my right and Allison is joining on

Page 5

Zoom.

MS. VAN BUREN:  This is Laura Van Buren on behalf of the defendants.  Also present is Danielle Morris from the Arizona County Insurance Pool.

THE VIDEOGRAPHER:  Thank you, Counsel.

The witness may be sworn in at this time, please.

MARIAH BRADY, a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MS. VAN BUREN:

Q.  Good morning, can you please state your full name for the record.

**A.  Mariah Brady.**

Q.  Mariah, it's nice to meet you.  My name is Laura Van Buren.  I'm the attorney for the defendants in this case.  I will be asking you some questions right now.  And I want to start with a couple of things that we have already covered, but I just want to make sure I have on the record.

You are in your attorney's office right now,

Page 74

A. Not that I can say off the top of my head, no.

Q. Okay. We already talked about some of this. Oops.

Do you know the name of your probation officer?

A. Christine.

Q. Do you know Christine's last name?

A. No.

MR. WOODS: Laura, I think I mentioned in there we are working on getting the probation records so that you can have all that.

MS. VAN BUREN: You did, yes.

BY MS. VAN BUREN:

Q. I think I am almost done with you, Mariah. What I would like to do is take one last break, just for about 10 minutes, so I can go through everything. We will come on and we will finish up. Okay?

A. Thank you.

MS. VAN BUREN: Uh-huh.

THE VIDEOGRAPHER: We are going off the record. The time is 12:17 p.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:23 p.m. Thank you.

BY MS. VAN BUREN:

Page 75

Q. All right. Mariah, we are almost done.

Returning back to Exhibit 6, those interrogatories, Interrogatory No. 6 asked you to identify each and every act or omission by Defendant Gibson in particular that you assert constitutes intentional infliction of emotional distress.

When I go to page seven, line 10, it says "When Gibson returned, Gibson told MB that if she moved, she would be arrested."

Is that correct or do you want to change that?

A. I wanted to change that. Because it wasn't like him directly who -- like I don't know, but I was just like -- Gibson was there the whole time at the scene. You know what I mean? And usual -- like, and I know what he has done to my friend and family and family of friends and how he has a vicious intent. So I, I'm -- Gibson -- me personally, my opinion is Gibson has, has a say and can tell his co-workers, his buddies, that, you know, everything that he has also gone through. Because there's two sides of every story and then there's the truth, you know. So I feel like he would tell his side of the story and it would just make it to like him and his sheriffs are all in it together, like they are all, all a threat to me, all of them are a threat. And if one of them has told me

Page 76

to do something, it's all of them, I would take it as. Because they all have a say-so in what is going on.

Q. But Deputy Gibson in particular did not tell you that if you moved, you would be arrested, correct?

A. Correct.

Q. Later, around line 17, it says "MB was told to shut her damn mouth."

A. Correct.

Q. MB is you. Do you recall being told that?

A. Yes, but it was more like -- he didn't say "your damn mouth." He said, he said shut your F'ing mouth.

Q. Do you remember who told you that?

A. No, I don't.

Q. Was that Deputy Gibson?

A. No.

Q. Because Deputy Gibson, according to this response, was there and saying nothing, correct?

A. Yes. Gibson was just on the scene and, yeah.

Q. Did you ever post on social media about this incident?

A. No.

Q. Have you ever posted anywhere online about this incident?

A. No.

Q. Have you ever posted anywhere online about Deputy

Page 77

Gibson?

A. No.

Q. Do you know what a Brady list is? And I will give you a hint that it has nothing to do with your last name.

A. No.

MS. VAN BUREN: All right. Those are all the questions I have for you, Mariah. Mr. Woods may have a few.

MR. WOODS: I do. And do you need me to be on camera here or can I just represent with my hands here that I'm here?

MS. VAN BUREN: I'm fine with just having the camera on Mariah.

MR. WOODS: Okay. Cool.

EXAMINATION

BY MR. WOODS:

Q. All right. So I'm going to try to get you out of here quickly. She may -- Laura may have some follow-ups to my follow-ups.

But do you have any medical training?

A. No.

Q. So you are not an EMT?

A. No.

