# EXHIBIT 1

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

Allison Obregon, an individual;                 )
Allison Obregon on behalf of and                )
as legal guardian and parent of                 )
her minor child, MC; Allison                    )   Case No.
Obregon as personal                             )
representative of The Estate of                  )   CV-24-1510-PHX-
Michael Obregon; Meagan Brady, on               )   KML
behalf of and as legal guardian                 )
and parent of her minor child,                  )
MB,                                             )
                                                )
    Plaintiffs,                                 )
                                                )
vs.                                             )
                                                )
Mark Lamb and Brady Gibson,                     )
                                                )
    Defendants.                                 )

VIDEOTAPED DEPOSITION OF BRADY GIBSON

Phoenix, Arizona

Monday, January 5, 2026

Prepared by
Debra K. Price
Freelance Court Reporter

**CERTIFIED TRANSCRIPT**

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
2..5

**Page 2**

VIDEOTAPED DEPOSITION OF BRADY GIBSON was taken on Monday, January 5, 2026, commencing at 10:00 a.m. at the offices of Coash Court Reporting & Video, 1802 N. 7th Street, Phoenix, before Debra Price, a Freelance Court Reporter and Notary Public in the State of Arizona.

\*   \*   \*

APPEARANCES:

For the Plaintiffs:
MILLS & WOODS LAW, PLLC
By: Sean A. Woods, Esq.
5055 North 12th Street, Suite 101
Phoenix, Arizona  85014
Phone:  480-999-4556
Swoods@millsandwoods.com

For the Defendants:
WIENEKE LAW GROUP, PLC
By: Laura Van Buren, Esq.
Kathleen L. Wieneke, Esq.
1225 W. Washington Street
Suite 313
Tempe, Arizona 85288
Phone:  602-715-1868
Lvanburen@wienekelawgroup.com
Kwieneke@wienekelawgroup.com

Also appearing telephonically:
Allison Obregon, plaintiff
Meagan Brady, plaintiff
Also appearing:
Dennis Woods, videographer
Danielle Morris, Arizona County
Insurance Pool

**Page 3**

I N D E X

WITNESS                                PAGE

BRADY GIBSON
Examination by Mr. Woods              5
Examination by Ms. Van Buren         129
Re-Examination by Mr. Woods          164


EXHIBITS MARKED

| EXHIBITS | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Policy 300 | 15 |
| 2 | Photograph of Mr. Gibson | 20 |
| 3 | Officer Report for Incident | 34 |
| 4 | Photograph of Incident Scene | 57 |
| 5 | Photograph of Police Vehicle at Scene | 60 |
| 6 | Photograph of Decedent | 62 |
| 7 | Forensic Examination Report | 91 |
| 8 | Medical Examiner's Chart | 92 |
| 9 | Dep. Gibson Interview, Part 2 | 98 |
| 10 | Performance Improvement Recommendation | 126 |
| 11 | Photograph of Gun | 137 |
| 12 | Radio Traffic Audio File (retained) | 139 |
| 13 | Ring Video (retained) | 149 |
| 14 | Ofc. Fox Body-Worn Camera (retained) | 155 |
| 15 | Plaintiffs' Fourth Supp. Disclosure | 157 |
| 16 | First Amended Complaint | 161 |

**Page 4**

THE VIDEOGRAPHER:  We are on the record. Time on the video monitor is 9:56 a.m.  We're beginning on Volume 1, media number 1 in the deposition of Brady Gibson in the matter of Al (sic) Obregon versus Mark Lamb and Brady Gibson in the United States District Court of Arizona, Case Number CV-24-1510-PHX-KML.  Today's date is January 5th of 2026.

Our court reporter is Debra Price.  I'm Dennis Woods, certified legal videographer, and we both represent Coash Court Reporting.  This deposition is taking place at Coash Court Reporting & Video located at 1802 North 7th Street, Phoenix, Arizona.

Counsel, please identify yourselves and state whom you represent starting with the plaintiff.

MR. WOODS:  This is Sean Woods from Mills and Woods Law.  I represent the plaintiffs, Allison Obregon and Meaghan Brady on behalf of Mariah Brady.  On the phone today, we have Allison Obregon and Meaghan Brady.

MS. VAN BUREN:  Laura Van Buren for Wieneke Law Group on behalf of defendants.  Also present is Kathleen Wieneke as well as Danielle

**Page 5**

Morris from the Arizona County Insurance Pool.

THE VIDEOGRAPHER:  Would our court reporter please swear in the witness.

Thereupon,

BRADY GIBSON:

a witness of lawful age, having been first duly sworn to tell the truth, the whole truth and nothing but the truth, testified upon his oath as follows:


EXAMINATION

BY MR. WOODS:

Q.  Good morning, Mr. Gibson.  Could you give me your full name for the record?

A.  It's Brady John Gibson.

Q.  Okay.  Have you ever had your deposition taken before?

A.  No.

Q.  Okay.  I'll be brief.  It's kind of rote but during the deposition give verbal answers, not like uh-huhs, or hmm, or anything like that.  You want to give actual words so the court reporter can write it down.  Okay?

A.  Sounds good.

Q.  I'll do my best not to talk over you if

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
10..13

Page 10

months after Sheriff Ross Teeple was elected and later they made a change in the Criminal Investigations Bureau.

Q. Sometime after that, you left your employment with PCSO, correct?

A. Yes, sir.

Q. And when was that?

A. I don't recall the exact date, but my start date for my new job was -- or my entry of duty, DOD, was September 7th, 2025.

Q. Okay. And that new job I believe is with the -- with -- colloquially known as ICE; is that correct?

A. It's the Department of Homeland Security, Homeland Security Investigations.

Q. Okay. And what do you do there?

A. I'm a criminal investigator for transnational and intrastate crime, violations of the Federal criminal statute.

Q. Okay. Do you do anything with immigration enforcement or anything like that?

A. My job does pertain to immigration related crimes and enforcement, yes.

Q. Is it issued -- are you on the streets as part of that job or is it like a desk job?

Page 11

MS. VAN BUREN: Form.

A. As a criminal investigator, it depends what group you're in, but it's -- you investigate violations of certain criminal statutes, which may involve you executing search warrants, or making arrests, or conducting surveillance.

BY MR. WOODS:

Q. As part of your job with Pinal County sheriffs, did you receive training on anything?

A. Yes. I received -- I graduated from the Arizona POST Police Academy, so I was POST certified. I went through the academy at NARTA, the Northern Arizona Regional Training Academy, was -- became a certified peace officer.

I have received several advanced trainings throughout my eight years as being a deputy sheriff and detective there. Some of which include advanced report writing, advanced search and seizure, some advanced tactical courses, general instructor, field training deputy, basic investigations, force science, human characteristics in law enforcement, response to critical incidents, street cop training, different types of interdiction training, first aid, CPR, other in-house training involving taser or use of

Page 12

force training, and a few others. I don't recall every single one at this time.

Q. Did you ever get like a CPR certification?

A. Yes, sir.

Q. Okay. Any kind of other medical aid certifications?

A. At -- so through -- I was in the Arizona Army National Guard at the same time for a period of employment with Pinal County. So I went through the combat life saver course, which follows the MARCH acronym. It's more for traumatic injury, like major bleeding.

So MARCH stands for massive hemorrhaging, airway, respiratory, circulation, hypothermia. With the sheriff's office, it was the ABC acronym, airway, breathing, circulation.

Yeah, but it was -- from what I recall, our yearly sheriff's office training was from the American Heart Association.

Q. Okay. Are you -- as part of your role now, are you stationed in Arizona?

A. Yes, sir.

Q. Okay. Pinal County still or --

A. Yes, sir.

Page 13

Q. Okay. As part of your training with PCSO, did you get constitutional law training?

A. Yes, sir.

Q. Did you regularly get that or was it a one-time thing?

MS. VAN BUREN: Form.

A. In the basic academy, you go over various amendments, and search and seizure, and various scenarios. And then as an agency through the use of force training, firearms training.

And like I've previously mentioned, the advanced search and seizure training that I went through you -- you refresh that type of training and exposure to the constitutional law or search and seizure. There's also updates to case law.

BY MR. WOODS:

Q. Okay. Do you recall Graham versus Connor?

A. Yes, sir.

Q. Okay. Was that part of your constitutional law training?

A. Yes, sir.

Q. What did you do to prepare for this deposition?

A. I reviewed several documents. I

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
26..29

Page 26

entailed?

A. Basically, I was on foot looking for somebody else in the Colonial del Sol neighborhood. Another deputy and a volunteer, a Posse member, had somebody pulled over in the Colonial del Sol neighborhood.

I walked up to the traffic stop. Three of us were standing in the road and my vehicle was parked at the very front of the neighborhood with its lights off. A dirt bike and a quad came into the neighborhood and appeared to have seen my vehicle, and they turned off their lights and rapidly accelerated. And it drew our attention, the loud noise, and the act of turning off their lights and speeding towards us.

We turned to look and then both the quad and the dirt bike attempted to run us three over in the road. And we moved out of the way and got out of the road, and the dirt bike and quad kept driving through the neighborhood, revving their engines.

And the deputy and the patrol or the Posse member left and attempted to locate the dirt bike and the quad. I ran back to my vehicle at the front of the neighborhood and then got in my

Page 27

vehicle, and attempted to do the same. And I don't recall the exact street, but the dirt bike with Anthony de Santiago on it came down my street and was driving towards me.

So I had my lights and sirens activated and he kept driving towards me. I blocked his path of egress with my vehicle. And Anthony de Santiago crashed into the front of my vehicle, and then I got him, and arrested him.

Q. Do you recall what time frame that was?

A. I don't. I don't recall the exact date or month.

Q. Do you recall how many times you had contact with Anthony de Santiago in your career at PCSO?

A. From what I recall, only one time.

Q. Do you recall when that one time was?

A. It was that incident.

Q. Do you remember what year that was? What month?

A. I -- I don't. I just know that it was before this incident.

Q. But at this incident, you had enough recall to think that that was Anthony de Santiago, correct?

Page 28

MS. VAN BUREN: Form.

A. I knew I recognized having dealt with that person, but I didn't know who it was. So I thought it could be Anthony de Santiago, and so I asked if it was.

BY MR. WOODS:

Q. But it's your testimony you only had -- you only recall one previous -- one interaction with Anthony de Santiago, correct?

A. From what I recall, I believe I only contacted Anthony de Santiago that one time.

Q. Where is the Colonial del Sol neighborhood?

A. It's in the area of Pinal and McCartney in Casa Grande. Those are the major crossroads. You head south from Pinal and McCartney. And off of Pinal if you're heading south on Pinal, it's to the right and the cross street is Palm.

Q. Do you recall what neighborhood -- well, let me say it this way. The house where the shooting occurred in this case that we're here for was on Mescalero Drive; is that correct?

A. That sounds familiar, yes.

Q. And you're familiar with Mescalero?

MS. VAN BUREN: Form.

Page 29

A. At the time, I didn't know that exact street or that exact street name. Now I do more.

BY MR. WOODS:

Q. What neighborhood -- I mean, you say Colonial del Sol for the Anthony de Santiago situation.

What neighborhood would you classify the house on Mescalero Drive to be in?

A. That area is called by locals as Indian Hills. That's what it's kind of known as. It's a county island or a county covered area that's not covered by the City of Casa Grande.

So those were the two areas, Colonial del Sol neighborhood and the Indian Hills area, where I'll get the majority of my calls for service in that beat that I was assigned.

Q. Were the two neighborhoods close together?

A. They were both off of Pinal as the major artery road that heads north to south through Casa Grande. But depending on time and day of traffic, it could take several minutes to get between the two.

Q. Other than Michael -- or Anthony de Santiago and Michael Obregon, did you have

**Page 30**

encounters with other people on dirt bikes during your career?

A. Yes.

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. In the Colonial del Sol neighborhood?

MS. VAN BUREN: Form.

A. As far as exact names or time frames, I don't recall each one. But it was a normal call for service in both those neighborhoods for people calling and complaining about the reckless driving, the speeding, the noise of ATVs, side by sides, quads, dirt bikes, three-wheelers.

BY MR. WOODS:

Q. And just to be clear, you said it's a normal call for service in the Colonial del Sol neighborhood?

A. And the Indian Hills area.

Q. Were there -- outside of Anthony and Michael, were there other people that you encountered on a regular basis because of dirt bikes or ATV issues?

MS. VAN BUREN: Form and foundation.

A. I don't recall any names or faces, but it was -- it was a common occurrence to receive a

**Page 31**

call for service of a complaint of the use of quads or ATVs, or to observe speeding vehicles, including motorcycles and quads, in both of those neighborhoods.

BY MR. WOODS:

Q. Do you know Meaghan Brady?

A. At the -- at the time of the incident, I would not be able to recall her or my involvements with her. After the fact, knowing that at least the one time I responded for a suicidal subject and had spoken with her, but I don't know. I couldn't say what she looks like if I saw her today.

Q. And same question, Mariah Brady, do you know her?

A. At the -- at the time, no, I did not recognize her, know her. But after the fact, I learned that I had that same call for service, spoken with her briefly for a suicidal subject call for service.

Q. At that time, did you know a Chad Garcia?

A. I don't -- I know of a Chad. I don't know if it's the same person. I don't know his last name or anything else.

**Page 32**

Q. What do you know about the Chad that you know?

A. The Chad that I dealt with on a couple different traffic stops lived in the Colonial del Sol neighborhood.

Q. Did you know a Taryn Garcia?

A. No, that name does not sound familiar.

Q. What about a Zackary or Zac Reyes?

A. I don't recall knowing that person either.

Q. Miguel Mejia?

A. I don't recall knowing that person either.

Q. Deana Mejia?

A. I don't recall that name.

Q. What about Amy Mejia?

A. I don't recall that name either.

Q. Nicole Bernier?

A. I don't recall that name.

Q. Daniel, DJ, Wallace?

A. I don't recall that name.

Q. You don't recall a DJ?

A. No, I don't. I can't recall. I can't picture a face or a circumstance.

Q. What about Nick Wallace?

**Page 33**

A. I can't picture a face or a circumstance. I don't recall.

Q. Okay. And lastly, what about Danielle Wallace?

A. I don't recall.

Q. Do you recall a Deputy Schmidlin, S-C-H-M-I-D-L-I-N?

A. Yes.

Q. Who was that?

A. Deputy Schmidlin at that time, I believe, was a motorcycle cop or on the traffic unit.

Q. Was he ever your superior?

A. Deputy Schmidlin was later promoted to sergeant. And at one time, he was my supervisor.

Q. Prior to the March 16th shooting that's part of this case, did you ever have any interactions with Michael Obregon?

A. Yes. From what I recall, I had -- I had a traffic stop involving him and another individual. Michael was on or had access to a three-wheeler. I cited him and released him for possession of drug paraphernalia, for having a drug pipe, and gave him a criminal citation which he signed. I released him to his wife at his

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
46..49

**Page 46**

trying to locate Robert?

MS. VAN BUREN:  Form.

A.  Michael told me that they were heading to his house.  He was being towed to his house. At some point, we later ended up at his house where I released him.

BY MR. WOODS:

Q.  Okay.  The last paragraph on this page says that Michael pushed his three-wheeler around the corner to his residence.  Do I have that right?

A.  That's -- yes.  That's what this document says.

Q.  Okay.  So at that point, was he still in handcuffs?

A.  If he pushed his three-wheeler, he would not have been in handcuffs.

Q.  Okay.  And then it says that Michael gave me permission to search the backyard for, quote, Robert, end quote; is that correct?

A.  That's what this document says.

Q.  Okay.  So Michael was out of handcuffs pushing his three-wheeler to his house, and then he gave you permission to search his backyard for Robert?

**Page 47**

A.  At this point, I had informed Michael that I was going to issue him a criminal citation and that if he refused to sign, that I would have to take him before the nearest magistrate or take him to jail, and go through that process.

He agreed that he was going to sign the criminal citation.  And I told him that I was not going to charge him with a felony or do an in-custody arrest because he was honest with me.  So I issued -- later issued the criminal citation as he was waiting out front of his residence for me to finish the criminal citation.

Q.  Were you able to find Robert?

A.  I did find Robert.

Q.  Where was Robert?

A.  He was kind of near a carport or a side driveway that goes up the side of the house, and right around the corner behind the house.  He was standing there with the dirt bike.

Q.  Was it -- you said "the house."  Was that Michael Obregon's house?

A.  It appeared to be his residence.

Q.  Okay.  Let's talk a little bit about the day -- the incident itself.  Walk me through how it began with your traffic stop to the shooting.

**Page 48**

MS. VAN BUREN:  Object to the form.

A.  So after I had closed two calls for service, I was in this area with another deputy, Terry Pickett.  The rest of my squad had been busy way down south near Ridge Rock.  There was a pursuit, bail out.  They were looking for a felony subject that we were looking for the previous day.

I observed a dirt bike or motorcycle, after I had closed these two calls, blow through a stop sign then cross the main road, which is Hopi. And so the vehicle was traveling south on Hualapai across Hopi through the stop sign at approximately 40, 50, 60 miles per hour.

MS. VAN BUREN:  Sean, going forward, can you ask questions.  I don't want narrative testimony.

MR. WOODS:  It's my deposition.  I can ask an open-ended question in search of an answer.

MS. VAN BUREN:  But just saying, tell me what happened the entire day.

MR. WOODS:  I didn't ask for the entire day.  I just asked from the traffic stop to the shooting.

MS. VAN BUREN:  Going forward --

MR. WOODS:  As a matter of five minutes.

**Page 49**

MS. VAN BUREN:  Ask your next question.

BY MR. WOODS:

Q.  So you saw him speed.  Did you clock his speed with a radar gun?

A.  I also saw him blow through the stop sign.

Q.  Okay.  Did you clock his speed was my question.

A.  It was an approximate estimate.

Q.  Okay.  You just estimated that just based on what?

A.  Training and experience.

Q.  Okay.  And then you what?  What did you do from that point?  Did you chase him?

MS. VAN BUREN:  Form.

A.  I attempted to conduct a traffic stop.

BY MR. WOODS:

Q.  Okay.  And did that traffic stop happen?

A.  I caught up to -- I made a left-hand turn onto Hualapai to head south.  I observed the dust getting kicked up on the road.  I observed how great of a distance the motorcycle had created from where I was previously to that, that went into my estimate of how fast he was going.

And my in-computer AVL information that

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
50..53

**Page 50**

tracks my speed and location, it's timestamped, and also reflected that. I saw that the vehicle made a right-hand turn, and I had my lights on the third setting to conduct a traffic stop.

Q. Were you both heading in the same direction when you conducted the traffic stop or were you heading in a different direction than Michael?

MS. VAN BUREN: Form.

A. Michael had turned right and was heading west on Mescalero, which at the time I did not know that road name. He had pulled up to a chain link fence, like an entry gate to a residence.

BY MR. WOODS:

Q. You had visited that residence prior to that -- to this day? Prior to March 16, 2023, you had actually visited that residence, correct?

MS. VAN BUREN: Form.

A. What I recall, I was dispatched there for that suicidal subject call pursuit.

BY MR. WOODS:

Q. So you knew that the road name was Mescalero prior to this incident, correct?

A. I did not recall at this time what that cross street name was.

**Page 51**

Q. Okay. So you stopped Michael Obregon. Tell me what happened when -- so you're -- let me just say this. He was heading west you said on Mescalero?

A. Yes.

Q. Okay. And what direction were you heading?

A. I was attempting to catch up to him. So I started heading west on Mescalero behind him.

Q. Okay. At some point, you stopped your vehicle; is that correct?

A. I observed that Michael had stopped and was facing a fully fenced residence, and was attempting or appeared to be attempting to gain access to that. So I pulled up with my lights on to initiate a traffic stop and came to a stop.

Q. What did you do next?

A. I believe I partially called out a traffic stop -- correction. I observed that Michael observed me. He turned over and looked at me, and then he accelerated his bike into the left side of that gate causing it to bend and break slightly, and it caused his motorcycle to stop and not be able to progress any further. Then I jumped out and I told him to stop and to not run.

**Page 52**

Q. What happened next?

A. I approached Michael. And he recognized me at some point and said, oh, hey, Gibson. That's when I asked if he was Anthony and he corrected me and said, no. I put his dirt bike kickstand -- he was on the other side, the west side of his dirt bike. I was on the east side.

I put his kickstand down so that he wouldn't be holding on to the dirt bike still. Then we started talking.

Q. At that point when you put the dirt bike kickstand down, was Michael threatening you?

A. What I observed that was concerning to me was initially the acceleration into the fence as he clearly saw that it was a fully marked sheriff's patrol vehicle, and looked over and saw me, and then accelerated in the fence in what I perceived as an attempt to allude or evade.

And then when I walked up then I recognized his face. I didn't know from where or what. He recognized me. And then I started observing the furtive movements of tugging on the backpack straps, looking to the left and looking to the right, and later dropping objects that I was asking for, like his ID, and a big, bulky

**Page 53**

object in the front of his sweater or jacket.

Q. Describe the dirt bike. What did it look like?

A. I believe there was a -- there was no visible license plate or lights from what I recall. I believe one of the colors was red, and I believe that it had the numbers 520 on one of the sides.

Q. You said that Michael was on the west side of the dirt bike and you were on the east side of the dirt bike. Do I have that right?

A. At that specific moment, yes.

Q. He wasn't actually on the dirt bike at that time, correct?

MS. VAN BUREN: Form.

A. At that specific moment, he wasn't on the dirt bike.

BY MR. WOODS:

Q. Was he -- he was just holding on to the handle I think is what you said?

A. He was in possession or in control of the dirt bike.

Q. What does that mean?

A. He's touching it.

Q. Where is he touching it?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
54..57

**Page 54**

A. I don't recall exactly.

Q. I think earlier you said he had his hand on the handle; is that correct?

A. I don't recall stating that.

Q. Okay. You put the -- you put the kickstand down, right?

A. Yes.

Q. How did you do that?

A. With my foot.

Q. Okay. When you did that, were you having a conversation with Michael?

A. Yes.

Q. And did you tell him, hey, I'm going to put the dirt bike kickstand down?

A. I don't recall saying that.

Q. Okay. Did he make any movements towards you when you put the dirt bike kickstand down?

A. I don't recall when or exactly how, but my intention was to get him away from the gap in the fence that was created by him crashing into it and to talk to him closer to my vehicle. So I wanted to look at what the cross street was.

Q. What do you mean by "the gap in the fence"?

A. When he had looked at me and saw me and

**Page 55**

accelerated his bike and crashed into the fence, it broke or altered the fence. So there was now a gap or a hole in the fence.

Q. I just want to be clear on that. Describe the fence.

A. It's a chain-link fence. From what I recall, it has two moving gates or two moving pieces that were closed, and he crashed into the left swinging side. And it caused it to fold over, or be altered, or damaged by him crashing into it.

Q. Were the two swinging gates that you describe, were they -- were they connected to each other somehow?

A. It appeared they were connected.

Q. With a lock or with like just a latch; do you recall?

A. I don't know.

Q. When you said that the fence -- a gap was created by -- on the left side, were the two fences still connected to each other?

MS. VAN BUREN: Form.

A. All I recall seeing was that the left side of the fence was left ajar and that there was a gap created. It was altered or damaged.

**Page 56**

BY MR. WOODS:

Q. Was it -- was that left gate -- did that left gate swing open? Did it stay in the same spot and just bend?

I'm trying to understand what you saw.

MS. VAN BUREN: Form.

A. It appeared to have been damaged and be ajar at an angle creating a potential gap.

BY MR. WOODS:

Q. You said "a potential gap," but you also said that that was a gap. So I -- I'm a little confused. Let's just walk it back a little bit.

There were two gates. You say that they swung inward or outward, you weren't quite sure. He slammed into the left gate you claim, correct?

A. He slammed into the left gate.

Q. Okay. Did that separate the two gates from each other or did that gate -- just the position get modified?

MS. VAN BUREN: Form.

A. The gate was damaged or altered and left ajar. So there was a gap or a change from them being tightly closed like they're designed or their original state. Now they're not in their original state. It's altered.

**Page 57**

BY MR. WOODS:

Q. Okay. So the right gate, was that still standing up and down -- straight up and down?

MS. VAN BUREN: Form.

A. I observed damage to the left gate. I don't recall noticing the right gate as much.

BY MR. WOODS:

Q. Okay. Was the left gate vertical after Michael ran into it?

MS. VAN BUREN: Form.

A. It was at a -- it was ajar. It was bent, so at a different degree than upright.

BY MR. WOODS:

Q. Okay. So it was still upright, but it was now not vertical. It was at a different degree is what you're saying?

MS. VAN BUREN: Form.

A. It was not as intended or its design. It was damaged and altered.

BY MR. WOODS:

Q. I'll hand you an exhibit. It's number 4.

EXHIBITS:

(Deposition Exhibit No. 4 marked for identification.)

Coash Court Reporting & Video, LLC
staff@coashcrv.com
602-258-1440
www.CoashCourtReportingandVideo.com

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
62..65

**Page 62**

Q. What do you mean by that?

A. As the photograph is depicting right now with how the gates were, the gates were not like that after Michael had crashed into the fence.

Q. What were the gates like?

A. After Michael crashed into the left gate or left fence, the left gate or left fence was left ajar or at an angle. It was damaged and not in its designed position to be in.

Q. Looking at -- let's do it this way.

EXHIBITS:

(Deposition Exhibit No. 6 marked for identification.)

BY MR. WOODS:

Q. This is Obregon 382. I'm handing you what's been marked as Exhibit 6. It's been disclosed as Obregon underscore 382. There's a body on the ground in the middle of the picture.

Do you see that?

A. Yes.

Q. Is that Michael Obregon?

A. It appears to be, yes.

Q. Okay. Is that where his body ended up after the shooting or was it moved?

MS. VAN BUREN: Form and foundation.

**Page 63**

A. I can only state what medical care that I provided. I don't know after what happened to him or his position after I was relieved.

BY MR. WOODS:

Q. When you were providing, as you stated, medical care, was his body in this position?

MS. VAN BUREN: Form.

A. I don't recall exactly what position he was in. I was focused on providing the treatment.

BY MR. WOODS:

Q. Did you move his body?

A. I cut off several articles of clothing and a backpack. So I had to adjust him to be able to look for injuries, to do blood sweeps, to see where the bleeding and issues were.

Q. There's a couple of pyramidal cones there. Do you see them marked 11 and 12?

A. Yes.

Q. To the best of your knowledge, what are those?

A. It appears that 11 is a handgun and that 12 is a wallet.

Q. Okay. And -- and for what purposes, to the best of your knowledge, do those cones get placed?

**Page 64**

A. To my knowledge, they are scene markers that mark pieces of evidence.

Q. Do you know if any of the gates had damage prior to Michael being stopped by you?

A. I do not know.

Q. Okay. Okay. So going back to this Exhibit 6. You said number 11 is a handgun?

A. It appears to be, yes.

Q. And number 12 is what?

A. It appears to be a wallet.

Q. Over to the left side of that photograph, do you see a backpack or a satchel or whatever that is?

A. Yes.

Q. Do you recall what that was?

A. Yes.

Q. What was it?

A. That's my trauma kit, my trauma medical kit.

Q. Okay. Let's go back to Exhibit 5. I'm looking at the dirt bike. Looking at the back wheel of the dirt bike, I see a backpack there as well. Is that your trauma kit?

A. It appears to be, yes.

Q. After you put the kickstand down, what

**Page 65**

happened next?

A. Michael had recognized me. I had told him to stop running. He said, I'm not running. He recognized me. I put the kickstand down.

I believe I -- I called him Anthony de Santiago. He said he wasn't Anthony de Santiago. And then I was trying to identify him, so I asked him for his ID.

Q. Okay. Where were you standing at that time?

A. We both had moved or gotten closer to my vehicle. So behind the dirt bike, a little bit closer to my vehicle.

Q. Looking at Exhibit 4, can you identify where your vehicle was?

A. Yes.

Q. Okay. And where is it on that picture?

A. It appears to be approximately 10 to 15 feet from the motor -- the back wheel of the motorcycle.

Q. Okay. And do you recall that being the spot where you had stopped your vehicle for the traffic stop?

A. I did not move my vehicle after making the traffic stop.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
66..69

Page 66

Q. Okay. So you believe that's where your vehicle was stopped when you made the traffic stop?

A. To my knowledge, no one else moved my vehicle. So that appears to be the right location.

Q. Okay. So back to what happened. You said that you and Michael had moved towards your vehicle, correct?

A. Michael and I had gotten a little closer to my vehicle, yes.

Q. Had you detained Michael at that point?

A. Michael was detained for a traffic stop.

Q. Okay. Was he --

A. He was not free to leave.

Q. Was he in handcuffs?

A. No.

Q. Was he in the back of -- did you move him to the back of your patrol vehicle?

A. I did not.

Q. Had you asked him to get into your patrol vehicle?

A. No.

Q. Did you ask him to let you put handcuffs on him?

Page 67

A. No.

Q. Okay. And you guys just walked together back to your patrol vehicle, correct?

A. We moved a little closer to my patrol vehicle, between the motorcycle and my patrol vehicle.

Q. Okay. Then what happened?

A. I observed Michael was -- I asked him for his ID. I was talking with him. I observed he kept dropping his ID and other -- well, other pieces of paper and things out of his wallet.

And then I observed that he was tugging on his backpack straps, and looking left and looking right, and not really engaging with me. Eventually, Michael was able to produce his ID and give it to me.

Q. And what did you do next?

A. I kept trying to back up to the door of my vehicle to look at my GPS to see what the name of this road was called.

Q. Okay. So did you get back enough to look at your GPS?

A. Every attempt I would make to back up and to look at my GPS, he would distance himself and get on the other side of the dirt bike.

Page 68

Q. So he got, at some point, on the other side of the dirt bike?

A. Yes. So he was tugging at his backpack straps, looking left or right. I gave out a few different partial communications over the radio that I had traffic, and I gave a brief description of the dirt bike, and what he was wearing.

And then said, standby, because that's when I observed that he was moving further away from me, looking left and looking right. And I recognized from my training and experience that that was an indicator that he wanted to fight or run from the situation.

Q. And this was for a traffic stop, correct?

A. At this point from the facts I knew at the time, this was just a traffic stop.

Q. Because he had blown through a stop sign, correct?

MS. VAN BUREN: Form.

A. Because of that civil traffic violation, the no visible taillight or brake light to the rear, no visible license plate, and then the speeding or reckless driving.

BY MR. WOODS:

Page 69

Q. So he kept backing up. You called in traffic. What happened next?

MS. VAN BUREN: Form.

A. After I called out the partial traffic stop and I said, standby, it's because I observed that furtive movement of him pulling on his backpack straps, looking left and looking right, the heavy, bulky object in the front of his jacket or sweater.

So I stopped the radio transmission and told him, you need to come stand right here, come here. And then I kept coaxing him or telling him, come here, come here, stand right here.

Little by little, he would get a little bit closer, and then I would attempt again to look back. I was distracted with my radio or to look over at my GPS, and I would get the same type of reaction, the distancing himself and the other movements that were concerning to me.

BY MR. WOODS:

Q. In the previous stop that we talked about which was Exhibit 3, Michael had his backpack on at that time, too, right?

A. Yes.

Q. Okay. And you were able to put

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
74..77

Page 74

A. Like physical exertion or grunting noise when someone turns and goes into a sprint, a noise.

Q. Would you classify that as yelling at you?

MS. VAN BUREN: Form.

A. I would classify it as a noise.

BY MR. WOODS:

Q. Okay. But again, I asked you if he was yelling at you. And you said, not at that point.

When did he start yelling at you?

A. I don't recall if he yelled. I do recall at some point, I told him to drop the gun.

Q. He told you that he wasn't scared of you, right?

A. I don't recall.

Q. Say that again.

A. I don't recall.

Q. But he told you something, didn't he?

MS. VAN BUREN: Form.

A. We had been talking back and forth during the duration of at least several moments that we had together initially up to this point.

BY MR. WOODS:

Q. When he was fumbling around with his

Page 75

wallet and you said he was dropping stuff in front of the vehicle, did he pick them up?

MS. VAN BUREN: Form.

A. I don't recall if he picked them up or if I had helped pick them up. I just know that he was dropping several pieces of paper and different things, other than his ID.

BY MR. WOODS:

Q. When the items were being picked up, you said you don't recall if you helped him with that, correct?

A. I don't recall if I helped pick them up or not, or if he picked them up.

Q. Were you right next to him when the items were being picked up?

MS. VAN BUREN: Form.

A. I was observing his actions and trying to get his ID card from him.

BY MR. WOODS:

Q. How close to him were you?

A. I don't recall exactly how close.

Q. You don't recall his position compared to yours?

MS. VAN BUREN: Form.

A. I don't recall exactly where we were

Page 76

standing or our position.

BY MR. WOODS:

Q. And you don't recall if you helped pick any items up off the ground?

A. I don't recall if I did or not.

Q. At what point did Michael start running away from you?

A. I had told him after another attempt to put out my location by backing up and looking at my GPS, and I had previously told him that he needed to stand right there and stay right there. As I backed up or attempted to back up again, I observed a similar behavior of him trying to distance himself, and to look left and right.

I told him that I'm going to detain him so that he doesn't make a poor choice. As I told him that, he turned, and ran, and tripped over the motorcycle as I was on my radio trying to communicate.

Q. Prior to him running away from you, did he display or brandish a weapon?

MS. VAN BUREN: Form.

A. No, not that I observed.

BY MR. WOODS:

Q. Did he ever lunge at you?

Page 77

A. No, not that I observed.

Q. When he started to run, he ran away from you, correct?

A. He ran towards the dirt bike and towards the residence, it appeared.

Q. Okay. But you were behind that?

MS. VAN BUREN: Form.

A. I was closer to my vehicle. He was closer to his bike and to the residence than I was.

BY MR. WOODS:

Q. He wasn't running towards your vehicle when he started running?

A. No.

Q. He was running away from your vehicle when he started running?

A. Yes.

Q. And you were, again, at your vehicle --

MS. VAN BUREN: Form.

Q. -- correct?

A. I was in the area of my vehicle.

BY MR. WOODS:

Q. Okay. So he was running away from you, correct?

A. He was running towards the motorcycle or

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
78..81

Page 78

towards the residence, it appeared.

Q. When you saw him running, his back was to you, correct?

MS. VAN BUREN: Form.

A. It appeared he was running towards the residence or towards the motorcycle.

BY MR. WOODS:

Q. Was he running backwards?

A. No.

Q. So his face wasn't looking at you while he was running?

MS. VAN BUREN: Form.

A. Not that I could see.

BY MR. WOODS:

Q. His back, you saw his back, correct?

MS. VAN BUREN: Form.

A. I saw him running towards the motorcycle and towards the trailer or residence.

BY MR. WOODS:

Q. Okay. But it's a pretty simple question. When you saw him running, was his back turned to you?

MS. VAN BUREN: Form.

A. There were several steps that he would take to run away and now I am running to catch up

Page 79

to him. I couldn't say exactly his body position every single moment of that short amount of time.

BY MR. WOODS:

Q. If -- if someone was running away -- let me take it back.

I asked earlier if he was running backwards. Do you know what I mean by that?

A. Yes.

Q. What do I mean by that?

A. Like a football player that's guarding a receiver, he backpedals.

Q. Backpedals. He wasn't backpedaling when he was running, was he?

A. He was not backpedaling.

Q. Okay. And since he wasn't running towards you and he was running away from you and not backpedaling, that means you saw his back, correct?

MS. VAN BUREN: Form.

A. From what I recall, I don't recall if he looked back at me or not. I don't recall if he changed body positions or faced his shoulders in a different direction. So I can't say with exactness that the entire time his back was faced towards me.

Page 80

BY MR. WOODS:

Q. You weren't injured at that moment, were you?

A. I was not injured at that moment.

Q. You didn't see a weapon when he was running, did you?

A. I did not observe a weapon, no.

Q. Is there some sort of policy that the department had or -- I'm sorry, the sheriff's office had regarding fleeing suspects?

MS. VAN BUREN: Form.

A. Not that I can recall right now.

BY MR. WOODS:

Q. What about shooting someone with their back to you?

MS. VAN BUREN: Form.

A. There is a policy for use of deadly force in the circumstance of a person that is fleeing.

BY MR. WOODS:

Q. When he was running away from you, did you think that he was going to harm somebody?

MS. VAN BUREN: Form.

A. From what I knew at that time, I didn't have a belief that he was going to harm someone at

Page 81

that moment.

BY MR. WOODS:

Q. You did not?

A. I did not.

Q. Okay. Did -- did -- at the time that he was running away from you, did you feel like he was going to harm you?

A. I --

MS. VAN BUREN: Form.

A. -- observed those pre-assault or pre-flight indictors that were concerning throughout the entirety of my contact with him. So as I was following him to apprehend him or to stop him, I was concerned for my safety.

Q. As you -- as he was running away, were you concerned that there was an imminent threat of serious bodily injury or death to any other person?

MS. VAN BUREN: Form.

A. As he was running away, at that precise moment, not as much as when I was on his back and then he produced the firearm.

BY MR. WOODS:

Q. When you were on his back, describe that. How did you get on his back?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
82..85

---

**Page 82**

A. Michael had appeared to trip over something, either his motorcycle or an object in the road, and he landed on his stomach or on the front. I had gotten onto his back to attempt to detain him with handcuffs and get his hands behind his back.

And I observed that he wasn't trying to continue to crawl and claw to run away, and he wasn't trying to roll towards me to fistfight. He was focused on something else and was doing this other movement under his body. And I didn't know what that was until he produced a silver and black handgun and it came out from under his body.

Q. You were still on his back when that happened?

A. Yes.

Q. And his arm came out with a handgun you're saying?

A. Not -- not as you're showing me. His other arm came out and he produced a handgun.

Q. You're showing that his other arm came cross body. And by his "other arm," you're saying his right arm with your movement that you just showed me?

MS. VAN BUREN: Form.

---

**Page 83**

A. It appeared an arm came cross body and that their finger was in the trigger well. I could see the gun come out and I said, drop the gun.

Q. Okay. And then what happened?

A. Since I was holding my radio, I had said 913, which is our emergency code for backup. The gun came out. I yelled, drop the gun. And I had responded muscle memory into my training and found myself backpedaling.

And my gun was already out of the holster and my gun was already firing. And next thing I knew, I was behind my engine block, and I was yelling for him to drop the gun, don't reach for the gun, and that I wanted to help him.

Q. When did you start shooting him?

MS. VAN BUREN: Form.

A. My muscle memory, my training kicked in. So as soon as the gun came out, my -- I pushed off him and was backpedaling. And my gun was already out of the holster, and shooting, and backing up before I could catch up and realize that that's what was happening.

BY MR. WOODS:

Q. Did you fire all your shots in the

---

**Page 84**

same -- let me take a step back.

Did you pause in between any of your shots?

MS. VAN BUREN: Form.

A. My muscle memory and training kicked in. It felt very tense and rapidly evolving, and fast, like milliseconds, just extremely fast and rapid.

BY MR. WOODS:

Q. I mentioned earlier that there were 10 gunshots or 10 bullet casings found from your weapon. Is that -- do you recall that?

A. I recall --

MS. VAN BUREN: Form.

A. -- you mentioning that.

BY MR. WOODS:

Q. Do you recall there being 10?

MS. VAN BUREN: Form. Foundation.

A. I recall possibly shooting approximately seven to eight shots. But later in the investigation, it appears that I fired 10 shots.

BY MR. WOODS:

Q. Okay. And did you fire the 10 shots, one, two, three, four, five, six, seven, eight, nine, ten? Or was it some other combination, pause, combination?

---

**Page 85**

MS. VAN BUREN: Form.

A. I don't recall exactly, but it seemed very fast and very rapid.

BY MR. WOODS:

Q. Were you yelling anything while you were shooting?

A. The only thing I recall saying was drop the gun, 913, drop the gun. I was backing up, firing. And then when I realized what had happened, I again was saying, drop the gun, don't reach for the gun. I want to help you, as well as putting out radio communication of what had happened.

Q. After the shooting stopped, what did you do?

A. So after I was behind or backed up kind of near the hood of my vehicle, I had called out, don't reach for the gun, drop the gun. Michael, I want to help you.

And I had advised our communication center, 998, 999, which are the codes for officer-involved shooting and I need urgent help. I then stated that there was one person down that was shot multiple times, and that my down range was to the south.

---

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
86..89

**Page 86**

Later, I said I'm going to approach and secure him, and start rendering aid. I had heard some of the communications on the radio that medical was being staged for me and for Michael.

Q. And then what happened?

A. I went over to my passenger side door and opened it, and I pulled out that -- that coyote tan, trauma medical kit that's on my passenger front seat headrest. And then I approached Michael, and then got down and started assessing where I needed to render aid at, what was going on.

Q. Do you recall how much time elapsed between the shooting and medical aid provided by you?

A. I don't recall an exact amount. It felt very fast. And once I had gotten down, I had moved the gun slightly away from his body out of reach, and then started seeing what I needed to render aid to.

So I was looking for massive amounts of bleeding, bright, red bleeding first. And so I started doing blood sweeps and cutting away the clothes, which there was a lot of -- the backpack was on. There was a lot of layers. I was trying

**Page 87**

to get the clothes open and off so I could see where he was injured at, and start addressing those injuries.

Q. How close were you when you started shooting? How close were you to Michael?

A. After the fact the night of, I was asked that question and asked to place a cone on the scene approximately where I was. I felt like -- I felt pretty close from what I saw and how I saw his gun pointed at me, and how big it was, and just pointing at me.

It felt like I was very, very close after I got up and pushed off, and was backing up. But I couldn't say a number.

Q. When you got off of Michael, was he still on his -- was he still face down or was he face up?

A. It appeared that when he cross body drew or had the handgun presented and out with his finger in the trigger that I was on his back. So he was trying to come my way.

So when I pushed off and was backpedaling, I saw that he then rolled the opposite way to where I was backpedaling to look where I was, and then presented the handgun in

**Page 88**

that direction to try to find me, and to point it at me.

Q. Was your flashlight on?

A. From what I recall, no. My little black flashlight that I have right here?

Q. Yeah.

A. From what I recall, no.

Q. Did you have another flashlight out at that time?

A. I had another flashlight on my person. I don't believe I had it out at that time.

Q. You wear contact lenses, right?

A. Yes.

Q. When was the last time you had your prescription checked?

A. July or September of this last year.

Q. Okay. Did they update your prescription or did it stay no change?

A. I believe it updated a little bit. Every year it's a slight adjustment, it seems.

Q. Do you have astigmatism?

A. Yes.

Q. Do you know what the doctors told you that astigmatism is for?

A. From what I was explained, I have more

**Page 89**

of a flat eye. So there's like the astigmatism that's super curved and they could go and do surgery, and shave it down.

Then there's the one that's more flat where they have to go in and do surgery, and place something in to make it more curved. So I have more of the flat eye. So if I wanted to get surgery, which I asked my doctor about, I would have to get that clearer glass or whatever it's made out of in my eye to correct the shape.

Q. Did they tell you -- did your optometrist or ophthalmologist tell you any -- any -- walk that back.

Does your astigmatism affect your vision at night?

A. From what I understand, no.

Q. And you didn't have your flashlight on, correct?

A. I did not have, from what I recall, either flashlight on.

Q. Okay. Do you recall where the bullets hit Michael?

MS. VAN BUREN: Form and foundation.

A. All I observed and saw was when he rolled over and was presenting the handgun, and

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
90..93

Page 90

the handgun was huge and my focus was on my handgun. As my muscle memory and body acted until it stopped and I saw that he had dropped the handgun. And that's when I started saying, Michael, don't reach for the gun, drop the gun. I want to help you.

BY MR. WOODS:

Q. So you saw him roll over, so his face was looking at you, correct?

MS. VAN BUREN: Form.

A. I saw the gun and I was looking at the gun.

BY MR. WOODS:

Q. Okay.

A. He pointed the gun at me.

Q. But you said he rolled over and you saw that he rolled over with the gun pointing at you, correct?

MS. VAN BUREN: Form.

A. I saw that he had changed position and pointed the gun back into my new direction of where I was heading, looking for me.

BY MR. WOODS:

Q. Handing you what's marked as Exhibit 7.

EXHIBITS:

Page 91

(Deposition Exhibit No. 7 marked for identification.)

BY MR. WOODS:

Q. This time it didn't cut off my Bates stamp, so that's good. Handing you what's marked Exhibit 7. It's Bates stamped in the bottom right DEFS underscore Obregon 002021 and it goes through 2033.

On the front of this document it says, Pinal County. It says, Forensic Examination Report, Michael Brandon Obregon.

Do you see that?

A. Yes.

Q. And it has the Pinal County case number 23-0281, Pinal County Sheriff's Office case number 23-0316206, correct?

A. Yes. That's what the document says.

Q. Okay. On the second page, the date signed says April 6, 2023, and it's signed by John Hu, M.D., chief medical examiner.

Do I have that right?

A. That's what appears to be on the document.

Q. Okay. The bottom of page 3 there's a section that says, "Evidence of Trauma, multiple

Page 92

gunshot wounds. There are seven gunshot wounds." Do you see that?

A. I see that on the document, yes.

Q. Okay. Turning to the next page marked 2024, there are paragraphs with gunshot wound number 1, gunshot wound number 2, gunshot wound number 3. Do you see that?

A. I see that reflected in the document, yes.

Q. Okay. And it will continue, but we'll get there in a second.

EXHIBITS:

(Deposition Exhibit No. 8 marked for identification.)

BY MR. WOODS:

Q. All right. I've handed you what's been marked as Exhibit 8, which is Bates stamp DEFS underscore Obregon 00242. At the top it says, Pinal County Medical Examiner's Office.

Do you see that?

A. Yes.

Q. Okay. And this is a diagram, a body diagram it looks like, correct?

A. It appears to be, yes.

Q. Okay. Do you see on this diagram there

Page 93

are places where there are labels GSW and then a number following that?

A. I see that reflected in the document, yes.

Q. Okay. Take a look at that diagram. On the right side, it looks like we're looking at the back of a human diagram, correct?

A. Yes.

Q. And we have -- starting from the top, there's a graze wound on the neck. Do you see that?

A. I see that reflected on the document.

Q. There's a GSW number 1 there as well, correct?

A. I see that reflected below, yes.

Q. There's a GSW number 3 on the back, correct?

A. Yes.

Q. There's a GSW number 4 on the back; is that correct?

A. Yes.

Q. And then there's a GSW number 6 on the back?

A. Yes, on the like --

Q. And if we go to the left side where it

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
98..101

**Page 98**

Q. At the time of the shooting, you had -- we saw your photo earlier. You had your taser with you, right?

A. Yes.

Q. Michael wasn't struggling with you when you were on his back, was he?

MS. VAN BUREN: Form.

A. He was resisting arrest.

BY MR. WOODS:

Q. I thought I read in your interview and in the report that he wasn't struggling with you. He was just fumbling around with the front pocket or something. Do I have that right?

MS. VAN BUREN: Form.

A. From -- I was explaining earlier, I observed that he wasn't trying to crawl or claw his way up to continue running away or to jerk away. He also was not trying to roll over to fistfight.

He was doing something else, like manipulating something under his body. And then that's when I observed the handgun come out.

EXHIBITS:

(Deposition Exhibit No. 9 marked for identification.)

**Page 99**

BY MR. WOODS:

Q. All right. I've handed you what's marked as Exhibit 9. This is another one where the Bates stamps are cut off. It's DEFS underscore Obregon 1027 to 1063. And it says, "In the Matter of: Obregon v. Lamb, Deputy Gibson, Interview Part 2, September 30, 2024."

Do I have that right?

A. Yes. That's what the document says.

Q. Did you review this?

A. I listened to my audio interview and I believe I did read over this or a version of this narrative.

Q. Okay. Let's turn to page 3 of the document.

MS. VAN BUREN: I'm sorry, Sean. What was the Bates number again?

MR. WOODS: It's 1027 to 1063.

MS. VAN BUREN: Thank you.

MR. WOODS: No problem.

BY MR. WOODS:

Q. So page 3 would be -- the top right has a number 2 just because the cover sheet didn't get counted. Do you see where it says "beginning of recording" at the very top?

**Page 100**

A. Yes.

Q. Okay. And then there's a "Detective Bonucci: All right." He says, "all right. This is Detective Bonucci. This is the on-scene walkthrough portion of the officer-involved shooting with Deputy Gibson."

Do I have that right?

A. Yes.

Q. Okay. Let's turn to what's marked as page 5 in the top right. Are you there?

A. Yes.

Q. We had -- we talked earlier. It says here on line 17 that he recognized me and said, "oh, hey, Gibson." Do I have that right?

A. That's what the document says.

Q. Is that accurate?

A. From my recollection, yes, he did recognize me and say my last name.

Q. In that photograph starting at line 12, it starts with Officer Gibson colon; do you see that?

A. Yes.

Q. Is it your understanding that whenever it says "Officer Gibson" that is the transcription of your voice from your interview recording?

**Page 101**

A. As reflected in this document, it appears to be, yes.

Q. And you reviewed this document before the deposition, correct?

A. Yes.

Q. And you listened to your audio recording before this deposition, correct?

A. Yes.

Q. Do you have any reason to dispute that this transcript is not an accurate reflection of what was said on that interview recording?

MS. VAN BUREN: Form.

A. There's some minor typos that I've already seen.

BY MR. WOODS:

Q. Okay. Down below you continue on line 23, "I thought he was Anthony de Santiago. So I was like, Anthony? And he said no."

Do I have that right?

A. That's what the document says.

Q. Okay. If you go to the next page, which is page 6. Starting on line 1 towards the end, full sentence says, "I observed that he was wearing this backpack and his -- I was already observing his behaviors by him walking back and

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
102..105

**Page 102**

forth and him looking around.  I saw his sweatshirt was sagging and hanging with a middle pocket in the middle."

Q.    Do I have that right?

A.    That's what the document says.

Q.    Okay.  And at that time, you saw that his sweatshirt had -- was sagging and hanging with the middle pocket in the middle?

A.    I observed that there was a bulky object or something in his sweatshirt or jacket pocket.

Q.    Okay.  And that was right after he told you that he wasn't Anthony de Santiago, correct?

A.    Yes.

Q.    "There was a bulge" -- starting on line 7.  "There was a bulge, bulky object in the front.  He was making a lot of movements, and he was showing that he was real nervous."  Is that right?

A.    That's what the document says.

Q.    Okay.  So right off the bat, you saw that there was a bulky object in his sweatshirt, correct?

MS. VAN BUREN:  Form.

A.    I observed that object or bulky object.  And then as -- as well as his mannerisms and behaviors of tugging on the backpack straps, and

**Page 103**

looking left and right.

BY MR. WOODS:

Q.    Did you ask him what he had in his sweatshirt?

A.    I later asked him why he was looking left and right.  I was concerned with getting out the rest of my transmission on my radio.  I had given out my location, gave his description, getting his ID.

And every time I attempted to do that, he would distance himself from me, which I perceived as a risk.

Q.    He -- he told you that he had warrants, didn't he?

A.    Michael did tell me that he had warrants, yes.

Q.    Okay.  And you knew from the beginning that you saw some sort of bulky object in his sweatshirt, correct?

MS. VAN BUREN:  Form.

A.    From -- I knew that I had observed -- well, he was wearing a big, bulky backpack.  He was wearing layers of clothing and there appeared to be a bulky object in his jacket or sweatshirt.

BY MR. WOODS:

**Page 104**

Q.    Let's turn to page 7.  At the very top you say, "he was on the other side of the bike and then he came out over here."

And then Detective Bonucci says, "standing more into the street?"

And then Officer Gibson, which should be Deputy Gibson, which is you, says, "yeah," correct?

A.    That's what the document states.

Q.    And that's what you recall?

A.    So I believe at this point -- I don't recall where we were at as we were doing the scene walk-through.  From what I recall about this interview, I was doing a lot of hand gestures and pointing.

So with this narrative, I can't say with exactness where we're at.

Q.    Would you have any reason to dispute that the audio recording of your interview with Detective Bonucci has been altered in any way?

MS. VAN BUREN:  Form.

A.    No.

BY MR. WOODS:

Q.    Would you have any reason to dispute its accuracy?

**Page 105**

A.    Of the audio recording, no.

Q.    Okay.  Going down towards the bottom of this page starting at line 20 it says, "as that was going on, he is still tugging on his backpack and getting a distance from me.  He placed himself on the other side of the bike, and he's starting to work himself through both of the, the gates into the yard."

Do I have that right?

A.    That's what the document says.

Q.    Do you recall him starting to work himself through both of the gates into the yard?

A.    I recall that he had gained distance.  I'm trying to look at what -- where this is at because there was a couple different times that he had gained distance.

But yes, he was attempting to gain distance, looking left and right, messing with his backpack straps, which I kept having to address, and tell him to stay where I told him to stand, and to not make this worse than it had to be, and not make a mistake by running or fighting.

Q.    Okay.  But you say that he was working himself through both of the gates into the yard, correct, at that point?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
106..109

Page 106

A.  That's what's reflected in this document.

Q.  Okay.  And then on the next page -- let's go to page 8.  He comes back to you at some point you say.  If you look at line 11 -- sorry, line 8, "and he kind of slowly started coming my way.  And I was like, as I was coaxing him I was like come, come here, stand right here.  And I was like, what's the matter?"

And you say, "like, do you have warrants or something?  And he's like, yeah, I have some warrants."

Do I have that right?

A.  That's what the document says, yes.

Q.  Do you recall that conversation with Michael Obregon?

A.  Yes.

Q.  Do you recall telling the detective that you had that conversation with Michael Obregon?

A.  Yes.

Q.  So going down further to line 19 you say, "and I asked him for his ID so he pulls out his wallet and he's fumbling with his wallet and he keeps dropping stuff."

Do I have that right?

Page 107

A.  Yes.  That's what the document says.

Q.  Do you recall telling that to Detective Bonucci?

A.  Yes.

Q.  Do you recall that happening?

A.  Yes.

Q.  "And he kept" -- line 24, "and he kept dropping like some piece of paper and a card and pick it up.  And his ID wasn't" -- going to page 9, line 1 -- "coming out of his wallet and he just kept tugging at it.  So then I, I get his ID card from him and place it right here and I'm coming back again to advise dispatch of, of my location."

Do I have that right?

A.  That's what the document says.

Q.  Do you recall telling Detective Bonucci that?

A.  Yes.

Q.  Let's turn to page 10.  Starting at line 11 you say, "I don't know what he wants to do with his backpack.  I go back over to my car and go to get on my radio, and he darts and runs inside the fence."

Do I have that right?

A.  That's what the document says.

Page 108

Q.  Do you recall telling Detective Bonucci that?

A.  Yes.

Q.  And you say, "so as he's doing that, he trips because the fence is still closed."  Do I have that right?

A.  Yes.

Q.  Do you recall telling Detective Bonucci that?

A.  Yes.

Q.  You say, "his bike was pushed up against the fence.  He trips over his bike or the rocks or something.  He trips and lands onto his stomach."

Do I have that right?

A.  That's what the document says.

Q.  Do you recall telling Detective Bonucci that?

A.  Something, yeah.  That sounds right.

Q.  Further down, line 19 you say, "so I'm already -- I clicked on my radio and said 913 -- 44 Charlie 913, which means emergency backup," correct?

A.  That's what the document says.

Q.  Do you recall telling Detective Bonucci that?

Page 109

A.  It was just some minor typos in the document, but something similar, yes.

Q.  And you say, "and I got on top of his back.  And as I'm looking, what's going on he's not, he's not fighting me and he's not trying to get up."  Do I have that right?

A.  That's what the document says.

Q.  Do you recall telling Detective Bonucci that?

A.  At that portion, yes.

Q.  Okay.  Did Michael Obregon ever fire his weapon at you?

A.  From what I observed of him producing the handgun from under his body and then me backing up to him rolling over and presenting the firearm at me, I perceived an imminent threat against serious bodily harm or death against me.

Q.  I appreciate that response except that was not the question that I asked.

The question I asked was, did he ever fire his weapon at you?

A.  From what I understand --

Q.  It's yes or no.

A.  -- after the fact --

MS. VAN BUREN:  He can give an answer to

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
110..113

**Page 110**

the question.

A. From what I understand after the fact, he did not.

BY MR. WOODS:

Q. Okay. So he did not fire his weapon at you?

A. I did not know at the time that he had not fired until after the fact.

Q. Okay. After the shooting stopped, Mariah Brady came out of her house, correct?

A. At some --

MS. VAN BUREN: Foundation.

A. At some point, yes, she did come out.

BY MR. WOODS:

Q. Okay. You were there and you saw her come out, correct?

A. Yes. I observed -- I didn't recognize her, but I observed someone came out, and was yelling and screaming at me.

Q. Okay. And was she -- was she there while you were trying to provide medical aid?

MS. VAN BUREN: Form. Foundation.

A. I had approached and was rendering aid. And while she was yelling and screaming at me, I was telling her to get back because she was up in

**Page 111**

the scene and in the area, and she wasn't listening, and yelling and screaming.

And a little bit later, other individuals approached kind of and stood near my car door and were yelling and screaming at me. So with that and the radio communications and with what I was observing and the aid that I was rendering, there was a lot going on in a small amount of time that I was trying to deal with and address.

BY MR. WOODS:

Q. At some point, you left Michael Obregon's body to go to your truck, correct?

MS. VAN BUREN: Form.

A. After the shooting and I radioed and said what had happened, said that I was going to render aid and approach with my bag, got up and was rendering aid, cutting off clothing, assessing injuries. I heard that medical was staged.

And then Mariah and two other individuals were yelling and screaming at me. Some other neighbors came out. I asked one of them to hold my flashlight so I could see what I was doing. That's -- that's what I recall happening.

**Page 112**

I didn't leave until I was relieved and told to leave. One of the Casa Grande officers, I believe it was Officer Fox -- no, Officer Fox was the first one. It was -- he was dealing with the family. He asked what else I needed medical-wise and I said an ambulance.

And then Officer Reed, the second Casa Grande officer, was the one that ended up replacing me where I was at in the rendering aid process.

BY MR. WOODS:

Q. Let's turn to page 17. Let me know when you're there.

A. Okay.

Q. Starting at line 5 it says, "I didn't know at the time that he had active warrants until he told me, but just by his body language and stuff, there was something going on, and it was raising up red flags by -- I knew that this was going to be a foot pursuit or a fight or an issue, because of he was looking around, he was tugging on his backpack, he's doing things, amping himself up or convince himself that he needed to act."

Did I read that correctly?

A. That's what the document says.

**Page 113**

Q. Do you recall telling Detective Bonucci that?

A. Yes.

Q. So you saw something bulky in his shirt or his sweatshirt. And you tell Detective Bonucci that you knew that this was going to be a foot pursuit or fight or an issue, correct?

MS. VAN BUREN: Form.

A. I told him at that point in the interview, but all those facts and circumstances that led up to that point were leading to that reasonable belief that a reasonable peace officer would have based on their training and experience, based on his response to my verbal commands, and my actions of trying to communicate over the radio, and then his furtive movements of pulling on the backpack straps, looking left and right, and all those things I previously described.

BY MR. WOODS:

Q. When did the walk-through interview occur?

A. It was already night. It was approximately 10:30 or 11. I couldn't say an exact time.

Q. On the same day as the shooting?

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
114..117

**Page 114**

A. Yes.

Q. Okay. If you knew that it was going to be a foot pursuit or a fight or an issue, why didn't you tell -- tell Michael, hey, you know what, stay still. I'm detaining you until we can figure something out?

A. So when he told me that he had warrants and I was talking to him, trying to calm him down and deescalate the situation saying, don't make this into something bigger than it has to be. Don't make a mistake. Don't fight.

Even from the initial point of the stop when I said, stop, don't run; and he said, I'm not running. Oh, hey, Gibson. There were several moments that I was trying to deescalate and calm him down.

Each time that my attention was directed towards the administrative tasks of trying to finish my radio communication and get out my location, he would continue with those behaviors. So I addressed it multiple times.

I was trying to avoid going hands-on and grabbing, and touching him, because I did not want a run or a fight to happen.

Q. Why didn't you just let him run?

**Page 115**

MS. VAN BUREN: Form.

A. I had him legally and lawfully detained. I did not know whose residence that was, whose property he damaged. So now there's potential crime. I ran after him to detain him and stop him.

The moment that he pulled out the firearm, now the severity of that contact and the crime went to aggravated assault and attempted murder.

BY MR. WOODS:

Q. So he committed a crime right out of the get-go is what you're saying?

MS. VAN BUREN: Form.

A. Other than the civil traffic violations and potential reckless driving, I did not know whose residence that was. The fully fenced residence, I did not know whose property had been damaged. I did not know who that bike belongs to because there was no visible license plate.

There was a bunch of other things that I was still investigating because I was actively investigating. And I did not know or get a chance to verify what warrants he had and what they were for.

**Page 116**

BY MR. WOODS:

Q. There's no recording of your interaction with Michael, is there?

A. I did not have a body cam. I did not have a dash cam or in-car recording, and I did not have a recorder on. But my understanding, there was a neighbor's house that had a security cam footage that partially captured the incident.

Q. But there's no audio that you heard of your interaction with Michael Obregon?

A. Other than brief radio transmissions of me communicating to my communication center.

Q. You mentioned earlier that you've had constitutional law training as part of your role with the Pinal County Sheriff's Office, correct?

A. Yes.

Q. And that, I think, you mentioned that you had training on the amendments?

A. Yes.

Q. What's the First Amendment?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. What's the First Amendment to the United States Constitution?

A. Freedom of speech, freedom of religion,

**Page 117**

the right to peacefully assemble.

Q. Okay. What's the Fourth Amendment to the United States Constitution?

A. It bars the government from unlawful search and seizure, that people shall be secure in their papers and effects unless there is a search warrant or probable cause.

Q. Does it also -- to your knowledge, does the Fourth Amendment also protect from excessive force?

A. Yes.

Q. Okay. What's excessive force?

MS. VAN BUREN: Form. Foundation.

A. Excessive force is force that is greater than what you necessarily need to resolve the situation.

BY MR. WOODS:

Q. Every U.S. citizen has the right to be free from excessive force, correct?

MS. VAN BUREN: Form. Foundation.

A. I acted and every citizen has a right to be treated as -- by a government agent as the standard of any other reasonable government agent would act in that similar circumstance and given those facts.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
118..121

**Page 118**

BY MR. WOODS:

Q. The question I guess I asked was -- you defined what excessive force was, to your knowledge, correct?

A. Yes.

Q. And you've had constitutional law training, correct?

A. Yes.

Q. And you knew -- you know what the Fourth Amendment is, correct?

A. Yes.

Q. And that guarantees people that are U.S. citizens under the United States Constitution the right to be free from excessive force, correct?

MS. VAN BUREN: Form.

A. Yes.

BY MR. WOODS:

Q. This is a -- the excessive force analysis is something that -- let me take a step back.

When you are detaining somebody, do you determine the type of force that you're going to use?

MS. VAN BUREN: Form.

A. So there's two parties in that type of

**Page 119**

incident. I am responding to their actions and behaviors. So I attempted to deescalate in this situation and I'm acting as any other reasonable peace officer would in this situation, and that's why my training and muscle memory kicked in, and I reacted the way it did.

BY MR. WOODS:

Q. Tell me about when it's okay to shoot someone in the back.

MS. VAN BUREN: Form. Foundation.

A. In this circumstance, I observed that a gun was produced and I pushed off and was backing away. Michael then rolled and pointed that firearm in my new direction.

I perceived that as an imminent threat of bodily harm or death, and was fearful for my safety and my life, and acted to defend myself until that weapon was dropped.

BY MR. WOODS:

Q. How long were you on top of Michael?

A. All of these rapidly evolving, tense circumstances occurred in what felt like fractions of a second. I couldn't say exactly how long, but it was very fast and happening all at once.

Q. Did you tell Michael at any point that

**Page 120**

you were going to put him in handcuffs?

A. Before Michael had turned and run, I had told him to remove the option of him making a mistake or making things worse. I'm going to detain you, and that's when he turned and ran.

Q. Just so I'm clear one more time on this. After the shooting stopped, was Michael face down or face up?

MS. VAN BUREN: Form.

A. I don't recall his position at that time. I was fixated on that the gun was dropped and away from his body, and then did my radio communications, retrieved my medical bag, and approached to render aid.

BY MR. WOODS:

Q. Where was the gun before you moved it?

A. It was laying in his immediate possession or area.

Q. What side of his body?

A. It was this -- it was the same area approximately as the photo. I just had picked it up and moved it out of the immediate control.

Q. At some point, you had to go to your car -- we talked about this earlier. The trauma kit bag, at some point you had to go retrieve

**Page 121**

that, correct?

A. Yes.

Q. When did you retrieve that? I just want to be clear on that.

A. I retrieved that bag after I had put out my radio communication of what had happened. And then what my plan was that I was going to approach, secure, and render aid. I retrieved my medical bag.

Q. You approached his body. Did you assess anything when you approached his body?

MS. VAN BUREN: Form.

A. The first thing I was looking for was massive hemorrhaging, so bright, red bleeding, pools of blood, blood oozing, or gushing out. In order to do that, I was doing blood sweeps to look at his arms, his legs to see if there were any spots that I needed to immediately address first before I did anything first. I didn't see any.

Then it turns into me removing all the clothing where all of his vital organs are so that I could look at the front and back of his chest and back to see where I need to address the nature of the bleeding.

BY MR. WOODS:

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
122..125

Page 122

Q. He was holding his wallet at some point, right?

A. At some point, he had his wallet and was trying to produce his ID, but dropping papers, yes.

Q. He had his wallet in his hand when he ran away, correct?

MS. VAN BUREN: Form. Foundation.

A. Not -- not that I saw. Not that I can recall.

BY MR. WOODS:

Q. Okay. Go back to Exhibit 6. All right. This photograph shows -- we went over this earlier. This photograph shows Michael Obregon's body covered by a sheet, correct?

A. That's what it appears to show, yeah.

Q. And then there's those cones, number 11 and number 12; is that right?

A. Yes.

Q. Number 11 is his gun?

A. Yes.

Q. And number 12 is his wallet?

A. It appears to be.

Q. Michael tripped over the gate as he was running away, correct?

Page 123

MS. VAN BUREN: Form. Foundation.

A. As I stated earlier, I wasn't sure if it was the ground, a rock, the motorcycle, the gate. He tripped and ended up on his stomach.

MR. WOODS: Okay. Why don't we take another five-minute break. I don't have much more.

MS. VAN BUREN: Okay.

THE VIDEOGRAPHER: We are off the record. The time on the video monitor is 1:01.

(Whereupon, the proceedings were in recess at 1:02 p.m. and subsequently reconvened at 1:09 p.m., and the following proceedings were held of record:)

THE VIDEOGRAPHER: We are on the record. The time on the video monitor is 1:09.

Please continue.

EXAMINATION CONTINUED

BY MR. WOODS:

Q. Did you ever tell anybody, your superiors or supervisors, any colleagues that Mariah Brady was free to leave the scene?

MS. VAN BUREN: Form.

A. Not that I recall. I was focused at that time on rendering aid until I was relieved.

Page 124

And once I was relieved, there was still a lot going on.

So I started putting up police line tape to create a physical barrier from people coming up and yelling at us.

BY MR. WOODS:

Q. Mariah was there with you when Michael was bleeding on the ground, correct?

MS. VAN BUREN: Form. Foundation.

A. From what I observed when I was rendering aid, she was yelling and screaming, and cussing. I was telling her that she needed to back up. She wasn't.

And at some point, I think she stepped away to talk to other family members or people that came up. And before returning or coming back, I was just more focused on what I was doing and had to do at that time.

BY MR. WOODS:

Q. When did you leave?

A. After I was --

MS. VAN BUREN: Form. Leave the scene or leave PCSO?

MR. WOODS: Leave the scene.

A. After I was relieved for rendering aid,

Page 125

I put up the scene tape to create a physical barrier and I was standing around my vehicle. I waited for another deputy to arrive that would be assigned to me, and then that person would transport me back to the station.

BY MR. WOODS:

Q. And that happened at some point?

A. It happened at some point. I don't know the time frame.

Q. Within a half hour, do you think?

A. I don't think that it was that much time. I think it was sooner than later. It was pretty, pretty quick.

Q. Did you -- did you yell at Michael that, quote, I bet you're scared of me now and then fire at him?

A. No.

Q. You never did that?

A. No.

Q. Did you ever get disciplined while you were at the Pinal County Sheriff's Office?

MS. VAN BUREN: Form.

A. Yes. I received three performance improvement reports or PIRs.

EXHIBITS:

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
126..129

**Page 126**

(Deposition Exhibit No. 10 marked for identification.)

BY MR. WOODS:

Q.   Handing you what's marked as Exhibit 10, starts with DEFS underscore Obregon 001446.  Is this -- do you recognize this document?

A.   Yes.

Q.   What is this document?

A.   Looks like I had the name wrong.  It's performance improvement recommendation, PIR.

Q.   Do you recall this PIR occurring, this top one?

A.   I'm trying to review what it's about.

Q.   It's the first two pages it looks like.

A.   (Reading document.)  Oh, yup, I remember this one.

Q.   Was this one just about not -- my take on it is just about not filing a report the right way; is that right?

A.   I was a field training deputy and was told to make sure to have my trainee turn in his report at the end of shift, and that didn't happen.

Q.   Okay.  So that was one of the PIRs you were talking about?

**Page 127**

A.   Yes.

Q.   And the second page -- well, the third page marked 1448 says under the problem -- well, the date says March 12, 2020.  And number 1 problem says, "on December 1st, 2019, you were involved in a vehicle collision, where you collided second vehicle in the intersection located at Attaway Road and Highway 287 in Coolidge."

Do I have that right?

A.   Yes.

Q.   Okay.  And so for that one it was just, hey, you shouldn't have caused the accident, right?

A.   I -- basically, I was responding to a call for service and running lights and sirens.  I had timed the light for the light to go from red to green and went through the intersection, and I had not properly cleared the intersection by our policy.

And so the car that ran a late red, I T-boned it and got into a crash, and was deemed at fault for it.

Q.   Okay.  And so that's two of them, right --

**Page 128**

A.   Yes.

Q.   -- that we just looked at?  What was the third?

A.   The third one involved an incident with a domestic violence situation.  A person was punching holes in the wall, physically assaulted his juvenile brother, and then was stealing his parents' car.  So the juvenile brother and the parents had called.

I showed up and had to use force to arrest, detain that person.  And then now there's an active civil litigation from that individual.

Q.   Okay.  So you've been sued by that individual?

A.   It -- there's active civil litigation as in they, like, filed the intent to file.  It's in the civil litigation process.

Q.   So a notice of claim was filed?

A.   Yes, and -- I don't know what comes next, but it's pretty recent.

Q.   Okay.  And what was that person's name?

A.   I think it's Rhett v. Gibson.

Q.   Say it again.

A.   Rhett, like R-H-E-T-T, v. Gibson.

Q.   Rhett Reese (phonetic), does that sound

**Page 129**

right?

A.   That sounds right, yeah.

Q.   Okay.  Do you ever recall any of your superiors stating that you've displayed a pattern of poor performance and decision-making over the years on and off?

A.   That may have been stated in a verbal counseling or coaching incident by one of my supervisors.  I don't recall who.

MR. WOODS:  Okay.  Nothing further.

MS. VAN BUREN:  All right.  I have a few questions for you, Mr. Gibson.

EXAMINATION

BY MS. VAN BUREN:

Q.   I'm going to jump around a little bit.  As a police officer, are you required to wait for a suspect to fire at you before you're allowed to discharge your weapon?

A.   No.

Q.   What is your understanding of when you are allowed to discharge your weapon at an armed subject?

MR. WOODS:  Form.

A.   My understanding is when I'm in reasonable apprehension of an imminent, deadly

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
130..133

Page 130

threat or serious bodily injury; or if another innocent or victim is at threat of the same.

BY MS. VAN BUREN:

Q. Go ahead and look again at Exhibit Number 1. This was the PCSO Policy 300. And just to be clear, you were familiar with this policy as of March 16, 2023, correct?

A. Yes.

Q. You had reviewed this policy before that incident?

A. Yes.

Q. You would have been trained regarding this policy, correct?

A. Yes.

Q. Take a look at 300.1. Starting on the second line it says, "every member of this office is expected to use these guidelines to make such decisions -- decisions in a professional, impartial, and reasonable manner."

Did I read that correctly?

A. Yes.

Q. When you decided to use force against Michael Obregon on March 16, 2023, were you applying your understanding and knowledge of these guidelines?

Page 131

A. Yes.

Q. Take a look down at 300.3, use of force. Do you see where it says, "deputies shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose"?

Did I read that correctly?

A. Yes.

Q. At the time you discharged your weapon at Michael Obregon, did you believe that you were accomplishing a legitimate law enforcement purpose?

A. Yes.

Q. What was that purpose?

A. It was to protect my life from that deadly threat from his aggravated assault or attempted murder of me.

Q. You were asked some questions about whether Mr. Obregon was laying on his stomach or on his back at the time you started firing. Do you recall that?

A. Yes.

Q. And I believe your testimony was that

Page 132

you don't remember at this point, correct?

A. Yes.

Q. Regardless of whether he was laying on his stomach or on his back, did you still perceive that he had reached across his body and had the ability to shoot you?

A. Yes.

Q. Did you use -- and again, referring to Exhibit 1. Did you use the amount of force that reasonably appeared necessary given the facts and circumstances?

A. Yes.

Q. Why didn't you use your taser?

A. I haven't been trained to use a less lethal option against a person with a lethal object, such as a knife or a handgun. So I perceived a deadly, imminent threat against me.

And my muscle memory and training kicked in, and it didn't stop until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped.

Q. I want to break that answer down a little bit. Do you know why you've never been trained to use a taser against a suspect armed

Page 133

with a deadly weapon?

A. I don't think it would work. I think I would lose. I -- it wouldn't stop the threat. A taser doesn't stop a gun.

Q. On March 16, 2023, did you think that a taser would stop the threat that Mr. Obregon posed to you?

A. No.

Q. Earlier, you said that you fired until the weapon, Mr. Obregon's weapon, was dropped. Did I understand that correctly?

A. Yes.

Q. What was the significance to you of his weapon being dropped?

A. It meant that the immediacy of the deadly threat had stopped, that the weapon was dropped and a little bit away from him. And I stopped as soon as I saw that proceeding.

Q. Are you trained to use force until the threat is neutralized?

A. Yes.

Q. And when you saw that Mr. Obregon had dropped his gun, did you believe the threat to be neutralized?

A. Yes.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
134..137

**Page 134**

Q.   Is that why you stopped firing at that point?

A.   Yes.

Q.   Going back to Exhibit 1, the PCSO policy.  Take a look at the second page, top paragraph, last sentence of that top paragraph.

"Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident."

Did I read that correctly?

A.   Yes.

Q.   And did you use your well-reasoned discretion in determining the appropriate use of force to use in this incident?

A.   Yes.

Q.   Turn the page again to page 3, 300.4, deadly force applications.  And again, this is Exhibit 1.

"Use of deadly force is justified in the following circumstances:  (a) A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily

**Page 135**

injury."

And I believe you testified that that was your reasoning for using deadly force against Mr. Obregon, correct?

A.   Yes.

Q.   Looking at subsection (b), did you use force because you considered him to be a fleeing subject?

A.   No.

Q.   So when you look at section 300.4, it's your belief that subsection (a) applies to your use of force in this incident, correct?

A.   Yes.

Q.   As part of your current employment, did you have to obtain a security clearance?

A.   Yes.

Q.   Did you undergo a background check as part of that?

A.   Yes.

Q.   Did you pass that background check?

A.   From my -- well, it's kind of continuous.  But from my understanding, yes.

Q.   What do you mean "it's kind of continuous"?

A.   The security clearance is constantly

**Page 136**

renewed and they -- I'm not a hundred percent familiar of how they do stuff.  But it's a continuous process to make sure you're constantly vetted, and read in, and have the appropriate clearance for what you're doing.

Q.   Okay.  I understand that it's a continuous process.  But did you initially receive your security clearance?

A.   Yes.

Q.   Do you know if as part of that security clearance those investigators looked into your PCSO employment at all?

A.   Yes, I was told that people had called asking about me, that they were asking around about me.

Q.   And do you know who specifically they were talking to?  "They" being the security clearance investigators.

A.   I can recall some names.  I believe they talked to Captain Villegas.  I believe they talked to Raffaele Defina.  I believe they talked to Chris Todd, Captain Laos (phonetic), and I believe they talked to Lieutenant Kingspotter (phonetic).

Q.   And as far as you know, were there any obstacles arising from your PCSO employment that

**Page 137**

prevented you from obtaining a security clearance?

A.   Not as far as I know, no.

MS. VAN BUREN:  What number are we on now?  11?

EXHIBITS:

(Deposition Exhibit No. 11 marked for identification.)

BY MS. VAN BUREN:

Q.   I'm showing you what's been marked as Exhibit 11, Mr. Gibson.  The Bates number is DEFS Obregon 000146.

Do you recognize that as the handgun that Michael Obregon pointed at you?

A.   Yes.

Q.   You mentioned that you moved the handgun slightly after the shooting, correct?

A.   Yes.

Q.   Are you able to give us an estimate of how far you moved it in feet or inches or anything else?

A.   I'd say approximately 2 to 3 feet.

Q.   Go ahead and look again at Exhibit 6, please.  And before we get to that, I'm sorry, Exhibit 11.  To be clear, this was the handgun that you saw Mr. Obregon have his finger on the

trigger on, correct?
A. Yes.
Q. Back to Exhibit Number 6. Are you able to mark with an X where the handgun was before you moved it?
MR. WOODS: Foundation.
A. I could approximate, yes, where it could be at.
BY MS. VAN BUREN:
Q. Can you do that on your copy of Exhibit 6, please?
A. (Witness complied.)
Q. Make it, you know, a decent-sized X so we can all see it.
MS. VAN BUREN: Sean.
MR. WOODS: Okay. Thanks.
BY MS. VAN BUREN:
Q. Are you able to recall as you're sitting here how far away from Mr. Obregon's hand that gun was before you moved it?
MR. WOODS: Foundation.
A. Approximately a foot.
BY MS. VAN BUREN:
Q. So if he had been able to, would he have been able to reach over and grab that handgun?

A. Yes.
Q. I want to play for you now some of the radio traffic which I know you've testified about.
EXHIBITS:
(Deposition Exhibit No. 12 marked for identification.)
MS. VAN BUREN: And I'll make sure to provide this to the court reporter. Give me just one moment to get this set up.
Are we okay if she does not transcribe it while it's being played and we can just say --
MR. WOODS: Yeah, I'm fine with that.
MS. VAN BUREN: -- parentheses Exhibit --
MR. WOODS: 12.
MS. VAN BUREN: -- 12 is played?
MR. WOODS: Which one? Which file are you on?
MS. VAN BUREN: This will be Defendant's Obregon 810.
MR. WOODS: Okay. With silences, I just wanted to make sure.
MS. VAN BUREN: Yes, yes. All right. Let me make sure my volume is turned up.
(Video played, not transcribed.)

MS. VAN BUREN: I just paused it at 5 seconds in.
BY MS. VAN BUREN:
Q. Did you hear a voice say 4, Charlie 33?
A. Yes.
Q. Was that you?
A. Yes.
Q. And 4, Charlie 33, was your -- I don't want to use the wrong terminology -- call sign?
A. My call sign or designator, yes.
Q. All right. I'm going to keep playing it starting again at 5 seconds.
(Video played, not transcribed.)
BY MS. VAN BUREN:
Q. When you called in "male subject, purple over blue," did you realize it was Michael Obregon at that point?
A. No.
Q. Did you realize that it was Michael Obregon when you first initiated the traffic stop?
A. No.
Q. When did you first realize that it was Michael Obregon?
A. After he handed me his ID. And even then, I still didn't recall our previous

interaction. I just vaguely knew that I had dealt with him before and that he recognized me.
Q. All right. I'm going to start Exhibit 12 again at 28 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Was that your voice saying 913?
A. Yes.
Q. What does that mean?
A. It's the radio code for I need urgent backup.
Q. And do you recall what you were perceiving when you said 913 over the radio?
A. This was after one of the attempts to look back and get my location, and I had told Michael to stand right there. I then told him, you know what, I don't -- I don't want you to make this worse. You know, don't run, don't fight. I'm going to detain you to keep you from making this worse.
And then he had turned and started running, and that's when that radio transmission happened.
Q. You made that radio transmission when he started running?

A. Yes.
Q. I'm going to start again at 49 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Pause it at 52 seconds. What was that loud beeping sound we just heard?
A. That's one of their buttons to hold the channel to give me that channel to communicate because now I'm in an emergency.
Q. Based on your circumstance -- based on your training and experience, what are the circumstances when a dispatcher would hold the channel?
A. When something is not safe or an extreme risk, or something like this. I need the air traffic to start coordinating and directing, because I'm involved in something potentially dangerous for me.
Q. I'm starting again at 52 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Did you hear yourself saying 998, 999?
A. Yes.
Q. What does 998 mean?
A. 998 means officer-involved shooting and

then 999 means it's just a higher urgency of I need backup, like send people now from other jurisdictions. Whoever is closest get here.
Q. And you also said "drop the gun"?
A. Yes.
Q. Do you recall when in the timeline you said, "998, 999, drop the gun"?
A. That radio transmission was immediately after I had fired and stopped firing.
Q. You said that while you were still under the stress of having had a handgun pointed at you and shooting back, correct?
A. Yes.
Q. I'm going to scoot ahead a little bit. I'm going to start Exhibit 12 again at we'll say 1:42.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. And I stopped it at 1:50. Was that your voice who said, "he pulled a gun and tried to shoot me"?
A. Yes.
Q. Did you say this immediately after Obregon had pulled the gun on you?
A. Yes.

Q. While you said that, were you still experiencing the stress of that moment?
A. Yes.
Q. I'm going to keep playing again at 1 minute 50 seconds of Exhibit 12.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. Can you tell us what was said after you gave Mr. Obregon's birthday? And I can play it again if you'd like.
A. My sergeant, Sergeant Ransome, Michael Ransome, said, "have med staged for two." So that means medical is being called and they're staging somewhere safe until it's safe for them to approach.
And he said for two, because I was not certain yet if I had been injured at all or if I had been shot.
Q. Okay. I'm going to pick up again at 1 minute 59 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. I paused it at 2:17. What did you mean, "I'm securing him now"?
A. I meant I was going to approach and

assess -- assess him if I needed to secure him with handcuffs, then I would have. I approached and observed that he needed medical attention and aid.
So I moved the handgun away from his immediate reach, and immediately started assessing for injuries, and providing aid.
Q. I'm going to skip again, oops. This will be Exhibit 12. I'll start at 4 minutes and 22 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. I paused it at 4 minutes 40 seconds. To be clear when you said, "I'm rendering aid," were you describing an activity that you were actually doing in the moment?
A. Yes.
Q. You said, "I have multiple residents out with me." Did you hear that?
A. Yes.
Q. Was one of those residents a young woman who ran out of the house?
A. Yes.
Q. When you first became aware of that young woman who ran out of the house, were you

Page 146

already rendering aid?
A. Yes.
Q. I'm going to skip forward on Exhibit 12 to we'll say 7 minutes 13 seconds.
(Video continued, not transcribed.)
BY MS. VAN BUREN:
Q. I paused Exhibit 12 at 7 minutes and 26 seconds. When you said, "three chest seals had been applied," were you the only person rendering aid at that point?
A. Yes.
Q. So you had applied those three chest seals yourself?
A. Yes.
Q. You mentioned that you had done a combat lifesaver course?
A. Yes.
Q. That was part of your Army National Guard training?
A. Yes.
Q. As part of that course, did you learn how to treat gunshot wounds?
A. Yes.
Q. Did you learn how to apply chest seals?
A. Yes.

Page 147

Q. You mentioned an acronym at the beginning of the deposition.
A. Yes.
Q. What was that acronym?
A. It's the MARCH acronym, which stands for massive hemorrhaging, airway, respiratory, circulation, and hypothermia.
Q. Is that an acronym that you use to triage an injured person?
A. Yes. You follow in that -- in the MARCH order and it guides you by severity of things you need to treat in order.
Q. I understand. So did you follow that order when you were treating Michael Obregon?
A. Yes.
Q. What did you do in terms of the M in the acronym?
A. So the massive hemorrhaging, I'm looking for bright, red bleeding, squirting, or venous bleeding, the kind of oozing out, bubbling. I'm looking for massive bleeds.
Q. Did you see that?
A. No. I blood swept the extremities and I was removing clothing to see where the bleeding and injuries were to address them.

Page 148

Q. And then what about the A in the MARCH acronym?
A. The airway is for if the airway -- if there's like a -- like in terms of the Army if the face is disfigured or the airway is blocked, you insert a breathing device, NPA. It's a nasal protruding airway I think is what the acronym stands for. But it just helped open up an airway if there's trauma to the face, neck, or throat.
Q. Did you check Michael Obregon's airway?
A. I heard audible sounds, gurgling, so I looked at his face. I didn't see that that device or that that was needed, so I moved on to the next acronym, C.
Q. Okay. Is it match or march?
A. MARCH, like Army marching.
Q. Okay. So M was the massive hemorrhaging?
A. Uh-huh.
Q. What was "A"?
A. Airway.
Q. And did you check Mr. Obregon's airway?
A. Yes.
Q. Okay. And we just talked about R?
A. R is respiratory. It's a little bit

Page 149

different. So that's where the sucking chest wounds. If there's holes in the chest cavity and your chest cavity loses pressure, your diaphragm can't move your lungs. You can't breathe. You start getting a collapsed lung because the air is coming and pressing against your lungs.
So that's why you use the chest seal to seal up the hole, so it doesn't have that different pressure and make it more and more difficult to breathe. And then it has a little vent thing that a little bit of blood and pressure can come back out. The air bubbles can come back out, but new air pressure can't come back in.
Q. And you applied three chest seals to Mr. Obregon, correct?
A. Yes.
Q. All right. I want to show you some of the Ring video that we talked about. This will be Exhibit 13 for the deposition. I'll get you the Bates number. This will be DEFS Obregon 463.
EXHIBITS:
(Deposition Exhibit No. 13 marked for identification.)
BY MS. VAN BUREN:
Q. All right. Let me make sure it's

Page 150

started right at the beginning.  All right.  Do you recognize the scene in Exhibit 13 as where the shooting took place?

A. Yes.

Q. Do you see a Pinal County Sheriff's Office truck?

A. Yes.

Q. And do you see if that truck has its lights turned on?

A. Yes.

Q. Did you turn off those lights at any point during this interaction?

A. No.

Q. I'm going to start playing right at the beginning of Exhibit 13.

(Video played.)

BY MS. VAN BUREN:

Q. Pause at 5 seconds in.  Did you see an individual on a red -- is it a quad?

A. It is a dirt bike.

Q. A red dirt bike?

A. Yes.

Q. That would have been Michael Obregon, right?

A. Yes.

Page 151

Q. Okay.  Playing it again starting at 5 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. At about 22 seconds, did you see an individual with a backpack to the side of your car?

A. Yes.

Q. And that would have been Michael Obregon, too, correct?

A. Yes.

Q. I'm going to jump forward to about a minute in.  I'll say 55 seconds, and keep a close eye up near the front of your vehicle.

(Video continued.)

BY MS. VAN BUREN:

Q. It looked to me like behind the vehicle you could see, at about 1 minute 15 seconds, two individuals bending over.  Were you able to see that?

A. Yes.

Q. Do you want me to play it again?  So would that have been you and Mr. Obregon reaching down to pick something up, you think?

A. Yes.

Page 152

Q. So by that point, at about 1 minute 15 seconds in, you would have asked him for his driver's license?

A. Yes.

Q. Let's pick up again at 3 minutes into Exhibit 13.  And again, keep a close eye on that area near the front of your vehicle.  I'm playing -- starting at 2 minutes 56 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. Pause the video at 3 minutes 16 seconds. Were you able to see yourself firing in that section of the video we just watched?

A. Yes.

Q. So by 3 minutes 16 seconds, you had discharged your weapon, correct?

A. Yes.

Q. I'm just going to play the next couple minutes starting at 3 minutes 17 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. I'm going to stop it at 3 minutes 45 seconds and ask you, why didn't you immediately start rendering aid to Mr. Obregon after that 3 minute 17 second mark we looked at?

Page 153

A. I called out several times to see if I could get any verbal compliance, to not reach for the gun, to drop the gun, that I wanted to help him.

I also was communicating to my communications center that I had been involved in a shooting, that I needed backup.  And then formulating a plan of I'm going to approach, and secure, and render aid, and then communicate at that point.

Q. So were you concerned at this point that Mr. Obregon might still pose an immediate threat to you?

A. Yes.

Q. Because the gun was still within arm's reach, correct?

A. Yes.

Q. I'm going to start again at 3 minutes 45 seconds.

(Video continued.)

BY MS. VAN BUREN:

Q. What were you doing there at about 4 minutes 27 seconds?

A. I had to open my passenger door and retrieved my gunshot trauma kit, and then started

approaching Michael.
Q. All right. I'm going to start playing again at 4 minutes 33 seconds.
(Video continued.)
BY MS. VAN BUREN:
Q. Keep a close eye on yourself. I stopped the video at 5 minutes. At this point when you're on the other side of the patrol vehicle, were you rendering aid to Mr. Obregon?
A. Yes, I began assessing the area, removing the gun from his immediate reach, and rendering aid.
Q. And then I want to pick up one last segment towards the end. We'll start at about 8 minutes into this exhibit. Okay. I'm going to play the last 25 seconds for you, so keep an eye on that.
(Video continued.)
BY MS. VAN BUREN:
Q. All right. I went and stopped it at 8:15. Did you see another vehicle with lights on pull up to the scene?
A. Yes.
Q. And that was at about 8 minutes 15 seconds, correct?

A. Yes.
Q. And to the best of your knowledge, was that Casa Grande PD?
A. Yes.
Q. Do you happen to recall the officer who was the first one to arrive?
A. I believe it was Officer Fox.
Q. Okay. Exhibit 14 will be just a small segment of Officer Fox's body-worn camera. This is DEFS Obregon 135.
EXHIBITS:
(Deposition Exhibit No. 14 marked for identification.)
MS. VAN BUREN: Are you okay if we agree not to transcribe this for the record?
MR. WOODS: Yeah, I'm fine with that.
MS. VAN BUREN: Perfect. All right.
BY MS. VAN BUREN:
Q. Exhibit 14, I'm going to start it at the very beginning and I'm just going to play the first minute of it. You have to wait a little bit before anything happens, but I'm just going to start here.
(Video played, not transcribed.)
BY MS. VAN BUREN:

Q. I paused it at 45 seconds. Was that you saying, "I'm rendering aid. I just need an ambulance for him"?
A. Yes.
Q. So am I correct that when the first Casa Grande Police Department officer arrived, you had already begun rendering aid to Mr. Obregon?
A. Yes.
Q. And at that point, you believed that PCSO was also staging medical, correct?
A. Yes.
Q. When you first pulled that red dirt bike over, at that moment in time, did you have any animosity towards Michael Obregon?
A. No.
Q. What about when you saw his driver's license and realized that that's who it was, did you have any animosity towards him?
A. No. I still didn't fully recall who -- who he was.
Q. Did you ever feel any ill will towards Michael Obregon?
A. No.
Q. Let me show you -- this will be Exhibit 15. This is Plaintiffs' Fourth Supplemental

Disclosure Statement.
EXHIBITS:
(Deposition Exhibit No. 15 marked for identification.)
BY MS. VAN BUREN:
Q. All right. Take a look at page 3 of Exhibit 15, please, and look particularly about line 16 under the name Chad Garcia. It says, "Mr. Garcia is a friend and/or acquaintance of Michael Obregon. He has discoverable information regarding Defendant Gibson's dislike of, and potential obsession with Michael Obregon."
Mr. Gibson, did you ever have a dislike of Michael Obregon?
A. No.
Q. Did you ever have a potential obsession with Michael Obregon?
A. No.
Q. Do you have any idea why Mr. Garcia would think you felt that way?
A. No, I do not.
Q. Take a look at the remaining witnesses on pages 2 through 6. And I believe Mr. Woods read you some or all of these names earlier. I'm sorry, 3 through 6, so starting right there.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
162..165

**Page 162**

Q.  What would you correct about that?

A.  I don't think she even touched him or -- I think she was just yelling, and in my space and area that I was trying to secure and work in, and that I was telling her to get back so that I could work safely and effectively.

Q.  Do you recall a time where she was standing near Mr. Obregon and then you went back to your vehicle?

A.  No.

Q.  Paragraph 44, "when Gibson returned from his patrol vehicle with an emergency medical kit, he ordered MB to stand next to Michael and not leave the scene for any reason."

Did you ever tell Mariah Brady to, quote, not leave the scene for any reason?

A.  No.

Q.  Paragraph 48, "Gibson and other PCSO personnel then forced MB to stand near the feet of Michael's dead body for hours while an investigation took place."

Did you ever force Mariah Brady to stand near Mr. Obregon's body?

A.  No.  I actually put up police line to keep her from approaching further after I was

**Page 163**

relieved of rendering aid.

Q.  Did you witness any other PCSO personnel forcing her to stand near Mr. Obregon's body?

A.  Not that I witnessed, no.

Q.  Look on page 6 at paragraph 52, "MB tried desperately to leave the scene and pleaded with defendants to move her to another location so she could be with her mother."

Did she ever ask you to move her to another location so she could be with her mother?

A.  No.

Q.  Paragraph 53, "defendants refused and even engaged in verbal battles with MB."

Did you ever refuse to allow MB to move away from Mr. Obregon's body?

A.  No.  I was asking her to back up.

Q.  Did you ever engage in any verbal battles with her?

A.  No, other than me asking her to back up.

MS. VAN BUREN:  Those are all the questions I have for you, Mr. Gibson.  Mr. Woods may have some follow up.

MR. WOODS:  Just a couple.

///

///

**Page 164**

RE-EXAMINATION

BY MR. WOODS:

Q.  When Michael ran from you, you said he tripped and fell on his stomach, correct?

A.  Yes.

Q.  How far away from you was he when he fell on his stomach?

A.  Approximately 5 feet to 7 feet.

Q.  Did he move after he fell on his stomach?

MS. VAN BUREN:  Form.

BY MR. WOODS:

Q.  Did he crawl?  Did he try to get up and move more feet away from you?  Run?  Anything?

MS. VAN BUREN:  Form.

A.  From what I observed, as soon as I was on his back, I noticed that he was manipulating an object under his body and then I saw the silver handgun.  It all happened fast and it short -- short amount of time.  It wasn't a long process or a step by step.  It was really rapid and quick moving.

BY MR. WOODS:

Q.  Describe -- describe what you mean by you were on his back.

**Page 165**

A.  I believe I had gotten -- grabbed his backpack and was looking where his hands were or what he was doing.  And I could feel and sense, and he wasn't trying to get up and like crawl and claw his way to continue running, and he wasn't rolling over to fistfight.

He was doing this weird movement under his body like he was manipulating something and I found it odd.  And then I saw the handgun and I responded to that.

Q.  Were you standing over him or were you actually on top of him?

A.  I couldn't say exactly.

Q.  Because I -- I mean, you say throughout your interviews and the different reports that you were on his back.  So clearly, you had some sort of recollection and definition of what on his back meant at that time, correct?

A.  I couldn't say if I was on one knee or both knees, or what side I was on.  I just know that he had all that bulky clothing, the big bulky backpack.  I had hands on and was observing what he was doing.

I was more concerned and my attention was focused on that than if I had a knee or not on

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
170..173

**Page 170**

Q. Okay. Let's hit play. Starting at 3:04.

(Video played.)

BY MR. WOODS:

Q. And then we went to 3:16, but I'm going to go back a little because we missed the gate. There it is. We'll start -- let me make sure. I'm starting at 2:48 again.

So that's Michael. He walks over behind the car. There's another movement. Did you see the gate move at all?

A. Yes.

Q. Okay. Do you recall opening the gate now?

A. No, I don't know how the gate got opened.

Q. Starting at 3:05.

(Video played.)

BY MR. WOODS:

Q. That's you, right?

A. That's me backing up, right there.

Q. Okay. Let's go back a little more. Right there, the gate opens right, at 3:07. Let's go back ten seconds so we can actually see this happen. Actually, I went back to 2:53, so

**Page 171**

starting there.

(Video played.)

BY MR. WOODS:

Q. Right there, the gate opens, right?

A. I see the gate opening right there, yes.

Q. At 3:09-ish. And then there's a period where you walked in and walked out, right?

A. So from what I observed and recall about that situation and how many times we had to rewind for the ability to watch that, and it's behind my video vehicle. My focus and attention was on Michael and then on the firearm that Michael produced.

So I don't recall me opening that gate. All that happened in a matter of fractions of a second as we just saw in the video. I don't know if he hit the gate or if I hit the gate. It's hard to tell from the video and for how fast it happened.

Q. Okay. But you chased him down through the gate, right?

MS. VAN BUREN: Form.

A. I saw him fall, and I got on to his back, and then he produced the firearm, so.

BY MR. WOODS:

**Page 172**

Q. You saw him fall. You then went after him. You got on his back. You were holding the backpack you said?

MS. VAN BUREN: Form.

A. I was physically touching him. I don't know where each one of my knees were placed or how my exact positioning of the body was. But at the very least, I was able to sense and observe from where I was at his movements under his body of manipulating an object, and then producing the firearm.

BY MR. WOODS:

Q. While you were on his back?

A. Yes.

Q. Then you got off his back. I think I read somewhere that you said you had to push up off his back.

A. Okay. I reacted to the stimulus of a handgun coming out, and I pushed away, and that's where my training and muscle memory kicked in and my body was backpedaling. My firearm was already out of the holster, and already firing as I was gaining distance, and continuing to observe that the handgun was pointed in my direction, pointing at me.

**Page 173**

BY MR. WOODS:

Q. Turning to Exhibit 9. We're on page 11.

A. I'm there.

Q. Okay. At the top paragraph you say, "the profile in his hand out on the side like this, with me on his back. So I push off him, so I push off him and back up, and I think I get to at least back in this area by the time I was in this area, he's pushed down this way, he had rolled this way, and the gun was coming up."

Do I have that right?

A. Yes. That's what the document says, yes.

Q. Okay. Is that what you told Detective Bonucci?

A. Yes.

Q. So you pushed off of him and backed up, correct?

A. A lot happened in a short amount of time, yes.

Q. Okay. And then just a little further down starting at line 11, you tell Detective Bonucci, "I felt that he was going to shoot me, and he was going to kill me and do anything that he needed to do, to get away. I knew who he was.

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
174..177

**Page 174**

He knew who I was."

What do you mean by that?

A. So now that I was in physical possession of his license, and he had recognized me, and knew that I was in physical possession of his license, and that he had told me that he had warrants. I was speaking to potentially his mental state or decision-making process.

So I felt that by him pulling the handgun and introducing that to the situation after I had multiple attempts to deescalate to then when I was backpedaling, he continued to point that in my direction with the intent to use it, that I was in reasonable apprehension of imminent deadly assault.

Q. Okay.

A. So I had to use force to avoid that situation.

Q. I'm going to play from 3:04 to 3:11. I want you to look as closely as you can. Just watch and tell -- so what you're going to see here is you coming out like this, and then running in, then coming out again shooting, okay.

MS. VAN BUREN: Form.

(Video played.)

**Page 175**

BY MR. WOODS:

Q. So we're at 3:04. Tell me when you see you.

A. I see me backing up.

Q. Okay. I knew that was going to be a fruitless exercise. So from 3:04 to the time you said "I see me" was 10 seconds. We stopped at 3:14. Do you know that?

A. I -- I don't know what you're referring to. Just now --

Q. Just now -- and I'll show you. I didn't even move it. What timestamp is on there?

A. 3:14.

Q. And we started at 3:04 --

A. Yes.

Q. -- right? So in that time frame, let's just be generous and say there was 10 seconds. Michael ran from you, you chased him, you got on his back, you backed up and started shooting all in that time frame?

MS. VAN BUREN: Form.

A. It was a rapidly evolving situation and I didn't have the time to think or to choose a different option.

BY MR. WOODS:

**Page 176**

Q. But you had time to get on his back and say, oh, my gosh, he's got a gun in his hand. He's rummaging through his front. He's got a gun in his hand, right?

MS. VAN BUREN: Form.

A. Yeah, so I had noticed that he was running away. I had -- I was calling for emergency backup. I was dispatching that as I was getting on his back.

At some point, he manipulated and produced the handgun. I backed up. He rolled over and presented that handgun again towards me, and then I was firing all --

Q. So --

A. -- in that small amount of that time.

BY MR. WOODS:

Q. So you saw the handgun twice, two separate scenarios. He's pulling it out. And then at some point, he rolls over and points it at you?

MS. VAN BUREN: Form.

A. From when it's manipulated from under his body and then from when he rolls over and is pointing towards me, yes.

BY MR. WOODS:

**Page 177**

Q. Okay. And you just said that you didn't have enough time to think during that time frame.

A. My training and experience or muscle memory kicked in.

Q. And you -- and just to be clear. You were able to tell without a shadow of a doubt that it was a gun in his hand?

A. Yes.

Q. Enough so that you were able to get on his back -- you got on his back, right?

A. That was before the handgun was produced.

Q. And then the gun somehow was produced?

A. The --

MS. VAN BUREN: Form.

A. He pulled out the gun from wherever he had it concealed.

BY MR. WOODS:

Q. Okay. And you had noticed earlier that he had had a bulky object somewhere in his front, right?

A. I had noticed that there was -- he was wearing bulky clothing, a bulky backpack, and that there was a bulky object, yes.

Q. And at the beginning when you stopped,

Allison Obregon vs. Mark Lamb and Brady Gibson
Brady Gibson

January 5, 2026
178..181

**Page 178**

did you ask him if he had any firearms?

A. I don't recall asking him if he had any weapons.

Q. But you noticed the bulky object at that time, correct?

A. At some point before he fell down and produced the handgun, I did notice it, yes.

Q. So then he runs away. You chase after him. You get on his back after he's tripped. You're on his back, right?

MS. VAN BUREN: Form.

A. I'm on his back at that point, yes, when I see him produce the handgun from under his body.

BY MR. WOODS:

Q. Okay. And again, you're on his back. There's a big, bulky backpack between you and him, correct?

MS. VAN BUREN: Form.

A. There is a big, bulky backpack involved. I'm feeling and observing his movements, and figuring out as he's doing it what he's doing. So that's why I mentioned to Detective Bonucci, I observed he wasn't trying to get back up and bear crawl, and keep running away.

I observed he wasn't trying to roll over

**Page 179**

and physically fight, like punch, fight it out or kick me away off his back. He was manipulating an object and I found that odd. I found his movements odd.

And then the handgun came out and then that's when I realized what he was doing, and then I pushed off, and backed up.

BY MR. WOODS:

Q. And started shooting?

A. So muscle -- yes, muscle memory and training kicked in. He rolled over, continued to point the handgun at me. I said, drop the gun. I'm backing up. My body was already shooting and backing up, and out of the holster before --

Q. Did you tell him to drop the gun before you started shooting?

A. I recall saying it a few times during the incident. I --

Q. Do you recall saying, what now, "a few times during the incident"?

A. Yes.

Q. Okay. Do you recall before you started shooting telling him to drop the gun?

A. I -- I can't tell. I know that after the shooting, I told him to drop the gun. I

**Page 180**

believe I said it earlier than that, but I'm not a hundred percent certain.

Q. So just to be 100 percent clear because earlier when we were talking about -- when we were talking about the getting on his back, the backpack didn't really come up.

Do you know if bullet holes were found in his backpack?

A. I don't know.

Q. Do you know if any of your shell -- any cartridges -- or not cartridges, any of the spent bullets were found in the backpack?

A. I don't know.

Q. Was his backpack covering the majority of his back? Do you recall where the backpack was sitting on him?

MS. VAN BUREN: Form.

A. I -- I don't recall. I know that I was feeling his body movements and observing. And when I saw the gun, that's where my attention was.

BY MR. WOODS:

Q. Okay. So in that 10 seconds that we watched, he ran. You chased. You got on his back after he had tripped. You felt the movements underneath him. You pushed yourself off and then

**Page 181**

your muscle memory kicked in shooting.

Do I have that right?

MS. VAN BUREN: Compound. Form.

A. It -- there's a lot that happened in that. So he ran. I radioed 913 and that was going on while I was getting on his back. I felt his movements and was observing his actions. I observed the gun come out. I pushed off and backpedalled. He relooks where I'm at when he points the gun at me, and then I'm backing up while firing.

BY MR. WOODS:

Q. Okay. And all that happened in that time frame that we looked at on the video?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. Just want to make sure.

A. It appears to have occurred in a very short amount of time, very rapidly, yes.

Q. Okay. You -- there was a question about the position of the gun when you found it next to his body that your counsel asked you. I think that was on Exhibit 6 and you put an X there.

Do you recall doing that?

A. Yes.

# EXHIBIT 2

# In the Matter of:

*Obregon*

*vs*

***Lamb***

*Brandon Chapman*

*September 25, 2025*



**GRIFFIN GROUP INTERNATIONAL**

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

Allison Obregon, an individual; )
Allison Obregon on behalf of )
and as legal guardian and )
parent of her minor child, MC; )
Allison Obregon as pending )
personal representative of the )
Estate of Michael Obregon; )
Meagan Brady, individually; )
Meagan Brady on behalf of and )
as legal guardian and parent of )
her minor child, MB, )
  )
     Plaintiffs, )
  )
       vs. ) Case No. 2:24-cv-01510-PHX-KML
  )
Mark Lamb and Jane Doe Lamb, )
husband and wife; Brady Gibson )
and Jane Doe Gibson, husband )
and wife; John and Jane )
Does I-X, )
  )
     Defendants. )
_____)

VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

BRANDON CHAPMAN

Casa Grande, Arizona
September 25, 2025
11:56 a.m.

REPORTED BY:
TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



Page 2

I N D E X

WITNESS:                               PAGE:

BRANDON CHAPMAN

    Examination by Ms. Van Buren           5

    Examination by Mr. Woods               35


E X H I B I T S

Deposition                                 PAGE:

1      Photograph, Bates DEFS_Obregon 000146 (1 page)    26

2      Video, Bates DEFS_Obregon 000135             28

Page 3

THE VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF BRANDON CHAPMAN was taken at 11:56 a.m., on Thursday, September 25, 2025, at the Fitzgibbons Law Offices, P.L.C., 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona, before TERESA A. WATSON, Registered Merit Reporter, and a Certified Reporter in and for the State of Arizona, County of Maricopa, pursuant to the Rules of Civil Procedure.

COUNSEL APPEARING:

For the Plaintiffs:

    MILLS + WOODS LAW PLLC

    Sean A. Woods, Esquire (via Zoom)

    swoods@millsandwoods.com

    5055 North 12th Street, Suite 101

    Phoenix, Arizona  85014

For the Defendants Lamb and Gibson:

    WIENEKE LAW GROUP, PLC

    Laura Van Buren, Esquire

    lvanburen@wienekelawgroup.com

    1225 West Washington Street, Suite 313

    Tempe, Arizona  85288

Also Present:

    Robin Smart, Videographer

    Allison Obregon (via Zoom)

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record.  Today's date is September 25th, 2025.  The time is 11:56 a.m.  This is the video-recorded deposition of Brandon Chapman, noticed by counsel for the defendants in the matter of Allison Obregon, et al., versus Mark Lamb, et al.  This matter is being held in the United States District Court for the District of Arizona.  Case Number 2:24CV-01510-PHX-KML.  Our location today is 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona 85122.

The certified court reporter is Teresa Watson with Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona 85018.

My name is Robin Smart.  I'm the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, please identify yourselves and whom you represent, starting with plaintiffs' counsel, please.

MR. WOODS:  This is Sean Woods with Mills & Woods Law.  I represent the plaintiffs in this case, including Allison Obregon, who is present.

MS. VAN BUREN:  This is Laura Van Buren, and I represent the defendants.

THE VIDEOGRAPHER:  Thank you, Counsel.  The witness may be sworn in, please.

Page 5

BRANDON CHAPMAN, called as a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

COURT REPORTER:  Thank you.  You may put your hand down.

E X A M I N A T I O N

BY MS. VAN BUREN:

Q.  Good afternoon.

A.  Hello.

Q.  Can you please state your name for the record?

A.  Brandon Chapman.

Q.  Mr. Chapman, we're here for a deposition in a civil case.  This is a type of proceeding we do in civil cases that allows us to speak to witnesses like you and get your official testimony.

A.  Okay.

Q.  Have you ever had your deposition taken before?

A.  This is the first time.

Q.  Okay.  So I want to go over some ground rules and make sure you understand how things are going to go.  I represent the defendants in the case.



Page 6

A. Okay.

Q. And so I'm going to ask you some questions.

A. Okay.

Q. Mr. Woods, who's on Zoom, represents the plaintiffs.

A. Okay.

Q. The folks bringing the lawsuit. After I'm done, he'll ask you some questions.

A. Okay.

Q. The oath that you just swore to is the same as if you were in court in front of a judge, and you're promising to tell truth.

A. Yes.

Q. Do you understand that?

A. Yes.

Q. And you'll do that today?

A. Yes.

Q. Great. Some other housekeeping items. It's important that we not talk over each other.

A. Okay.

Q. It happens all the time in conversation, because you know what I'm saying before I finish, but it makes our court reporter's job really hard. So I'm going to do my best to wait until you finish your whole answer before I ask the next question, and I ask that you wait until I finish my whole question, even if you know exactly where I'm going, before you

Page 7

answer. Will you do that?

A. Yes.

Q. Okay. The other rule is that we need to make sure to speak audibly, so saying things like yes, no, I don't know. And that's as opposed to doing things like nodding your head or shaking your head, saying uh-huh or huh-uh, and that's just because our court reporter can't get that down. So will you do that for me today?

A. Yes.

Q. If you slip up, I may say, is that a yes, or is that a no. I'm not trying to be snarky. I just want to make sure we have a good record. Okay?

A. Okay.

Q. And I'm going to do my best to ask clear questions that you understand. I may mess up. If I ask a question that you don't know what I'm talking about, please just tell me, I don't understand what you're asking. I won't take offense. But if you answer the question, I'm going to assume that you understood it. Fair?

A. Yes.

Q. All right. I don't suspect that we'll be here for that long today, probably about an hour, maybe a little more, a little less, but nonetheless, if you want to take a break at any time, that's fine. The only rule with breaks is that if there's a question pending, you answer the question before we go on

Page 8

break. Okay?

A. All right.

Q. And I just want to emphasize that we're here today to talk about your memories, what you remember. I don't want you guessing, and I don't want you speculating. Okay?

A. Sounds good.

Q. All right. Let me get a little bit of background information about you, sir. Where are you currently living?

A. 8827 West Coronado Drive in Arizona City.

Q. And how long have you lived there?

A. We moved in in January of last year.

Q. Who is "we"?

A. Me and my wife, my kids.

Q. What is your wife's name?

A. Tiffany Chapman.

Q. And how many kids do you have?

A. Four total.

Q. Wow. You're a busy guy.

A. Yes.

Q. Are you working right now?

A. I am.

Q. What do you do for work?

A. I work at Carla-Ruth. It's a general electric contract company. We -- we're currently doing fire systems on prisons and stuff like that.

Page 9

Q. Is it Car- -- can you spell it?

A. C-a-r-l-a, dash, Ruth, R-u-t-h.

Q. Okay. And what do you specifically do for Carla-Ruth?

A. I'm a laborer. So I just go in and help the supervisors with the electrical portion of it.

Q. How long have you worked there?

A. I recently started working there. About a month ago.

Q. Wow. What were you doing before that?

A. I was a stay-at-home dad.

Q. Okay. Any military experience?

A. Yes.

Q. I thought so. I could tell. Tell me about that.

A. I was in the military from 2012 to 2017, when I got medically discharged.

Q. What branch were you in?

A. Army.

Q. What was your job in the Army?

A. It was a 14 Echo. It's Patriot operator/maintainer.

Q. Is that a computer systems kind of guy?

A. Air defense artillery.

Q. Got it. Did you ever deploy?

A. Yes.

Q. Tell me about your deployments.

A. I just went on one deployment. We went to Qatar for a year.



Page 10

Q.  Okay.  And I don't want to pry too much into your personal life, but can you give me a general sense of what your medical discharge was for?

A.  I shattered my right foot.  I wrecked a motorcycle, shattered my right foot.  I was on crutches for a year, so I couldn't lead my soldiers that I had under me.

Q.  What kind of -- well, strike that.

Did you get any first aid or first responder-type training when you were in the Army?

A.  Yes.

Q.  Tell me about that.

A.  In basic training, you go through CPR.  You go through a couple of different medical -- I don't know how to word that.  I'm sorry.  Just like the CPR, sucking chest wounds, and I think that's about it.

Q.  Were you trained in what to do if one of your comrades was shot?

A.  I was.  It doesn't -- I don't remember all of it, but I remember the basics with sucking chest wounds, applying patches to the injury.  If they're located in the chest area, checking to see if they have a collapsed lung or so on.  That's -- that's pretty much it.

Q.  Are you trained to do -- were you -- if you recall, were you trained that you should do CPR if someone is shot?

A.  I -- I don't understand.  I'm sorry.

Page 11

Q.  It's a bad question.  Let me ask it differently.  Let me just ask a different question.

Any medical-type training since basic training?

A.  No.

Q.  What was the furthest you went in school?

A.  I went to high school.

Q.  And where was that?

A.  Casa Grande Union High School.

Q.  Have you lived this area your whole life?

A.  Yes.

Q.  Where were you living in March 2023?

A.  I was living in my dad's trailer.  I do not remember the address.  12 -- I -- I don't remember the address.  I'm sorry.

Q.  Do you know the street name?

A.  Mescalero.

Q.  Okay.  Were you living in the trailer with anyone else?

A.  My wife and my kids.

Q.  How many kids did you have at that point?

A.  Four.

Q.  Same, four.  Who was living in the house besides your dad?

A.  My dad didn't live there at the trailer.

Q.  Oh, okay.

Page 12

A.  It was me, my wife and my kids.

Q.  I may have misunderstood.  I thought you were saying you were living in a trailer on your dad's property.

A.  Oh, no.  No.

Q.  Okay.

A.  No.  He had -- he has ownership of that trailer.

Q.  I understand.  Okay.

A.  And he lives in a different house.

Q.  I see.  Okay.  You're aware that on March 16, 2023, there was an officer-involved shooting on Mescalero, right?

A.  Yes.

Q.  And it was in front of one of the houses on that street?

A.  Yes.

Q.  Where was that house in relation to where you were living?

A.  Right next door, to my left side, if you're facing north.

Q.  If I am standing outside your front door --

A.  You would be --

Q.  -- is it to the left or right?

A.  It would be to the right.

Q.  Okay.  Did you know the folks that lived there?

A.  Not personally, no.

Q.  Had you ever talked to them before?

Page 13

A.  I've said hi.  That was about it.

Q.  Can you describe them at all?  Like how many people?  A man?  Woman?  Ages?  Anything like that?

A.  I know the lady's name that lived next door.  Her name was Meagan, and that was pretty much it.

Q.  Okay.

A.  I know she had a husband.  I believe I seen her daughter out.  That was about it.

Q.  Did you ever see any activity at that house that seemed unusual to you?

A.  Very much so.

Q.  What do you mean?

A.  All hours of the -- of the night, they would be out doing stuff in the yard.

Q.  Like what kind of stuff?

A.  Like raking or just hanging out with friends.  There was a couple of times there's four wheelers that would go up and down the road that would pull in next door at Meagan's house, like two, three o'clock in the morning.  It would wake us up.  Constant traffic.  That's -- that's about it.

Q.  What did you think of that?

A.  My personal, I didn't care for it.

Q.  Why not?

A.  It led to my kids waking up, me waking up in the middle of the night.  So just the disturbance.



Page 14

Q. Did you ever think there was anything illegal going on?

A. I -- I thought so. Yes.

Q. What made you think that?

A. There's no reason you'd drive around on a four-wheeler at 3 or 4 o'clock in the morning, 2, 3, 4 o'clock in the morning.

Q. What did you think might be going on?

A. I thought they might be doing drugs.

Q. Did you ever see any evidence of that, though?

A. No.

Q. Did you know Michael Obregon?

A. I did not know him, no.

Q. Okay. Do you know Allison Obregon?

A. I do not. No.

Q. You made a couple comments about dirt bikes and ATVs.

A. Yes.

Q. Were those common in your neighborhood, or was that unique to that house next to you?

A. Where we live, it's open desert, for the most part. There's obviously the trailers and houses that were out there. So it wasn't uncommon to see them, but it was uncommon to hear them and see them at 2, 3 o'clock in the morning.

Q. Did you feel like the -- whether it was an ATV or dirt

Page 15

bike or side-by-side, did you feel like there were any safety issues in the neighborhood?

A. I don't understand. I'm sorry.

Q. That's fair. Would you ever see the dirt bikes or ATVs speeding?

A. Yes.

Q. About how often would that happen?

A. Almost every time, like, I would hear them. It was pretty loud. Yes.

Q. And when you say almost every time, can you give me a better sense of are we talking every day? Every week? Every month? What do you mean by that?

A. It was at least two to three times every week that I would be able to hear them riding a three-wheeler, four-wheeler pretty fast down the road.

Q. Were you ever concerned with having kids and safety in terms of the ATVs speeding?

A. I kept my kids in the yard --

Q. Okay.

A. -- or out back. So we had a pretty back -- pretty big backyard, so we kind of kept them in the yard.

Q. Got it. Would you ever see ATVs or dirt bikes run stop signs?

A. I -- I haven't seen them, no.

Q. Okay. I'd like to talk about March 16, 2023. How did

Page 16

you first realize that there was a sheriff's deputy outside on the street?

A. If you're looking at the front door of my house, the far left side in the master bedroom, and we have a window that looks out to the front. Me and my wife were getting ready to leave to go eat, and we heard the dirt bike, and then next we seen, like, flashing lights. At that --

Q. Go ahead.

A. At that time, I poked my head out the window -- or not out the window, but opened -- moved my curtains out of the way, and I seen a dirt bike trying to ram the gate to get in the yard.

Q. Let me stop you right there, because I want to ask some follow-ups on this. What do you mean say you heard the dirt bike? Did you hear an engine?

A. The engine, yes. The engine of the --

Q. How did you know it was a dirt bike as opposed to something else?

A. I guess is when I looked out the window --

Q. Okay.

A. -- and noticed it was a dirt bike.

Q. Okay. Describe for me, please, what you mean when you said that the dirt bike was trying to ram the gate.

A. When I looked out the window, it looked like he was trying to drive through where the gates opened, and it was

Page 17

locked or chained up, I believe. I do not know for certain, but it would not open. And he ran the front tire into the gate.

Q. Okay. And then what did you see next?

A. I was looking, and then I stopped looking, and I waited a couple minutes, and I looked back, and the officer was talking to the person on the motorcycle. It looked like he was trying to give him his ID.

Q. It looked like the person on the -- who was trying to give who the ID?

A. The guy on the motorcycle was giving the ID to the officer. Looked like he dropped it, and he went to go pick it up, and then he handed it to the officer.

Q. At that point, were you able to see the face of the guy on the motorcycle?

A. No. I didn't see his face.

Q. Okay. My next question was going to be: Did you recognize who it was?

A. No.

Q. Okay. Were you able to see the face of the officer?

A. I could see their faces. I didn't know who they were.

Q. Okay.

A. I should say.

Q. So that was my next question is: Did you recognize either the officer or the man on the bike in that -- in that minute?



Page 18

A. I did not recognize, no.

Q. Okay. You saw the guy on the motorcycle. It looked like he was trying to give his ID to the officer.

A. Uh-huh.

Q. Then what happened?

A. I looked away. My wife was also watching with me, and I don't remember everything that she said verbatim. I do remember her saying something about he's trying to run, and he got caught on the fence is what I remember her saying.

Q. Okay. And your wife was looking out the window at the time?

A. Yes.

Q. And she was saying this as she's looking out the window?

A. Yes.

Q. Okay. What happened next?

A. After that, we both got up to go outside, and then I heard gunshots.

Q. All right. I'm going to ask you about the gunshots, but let me go back. Before you heard gunshots, were you able to hear anything that the officer -- or he's a deputy, so I should call him the deputy. Before you heard gunshots, were you able to hear anything that the deputy said?

A. Negative.

Q. Were you able to hear anything that the man on the

Page 19

motorcycle said?

A. Negative.

Q. Did you ever see if the man on the motorcycle had a gun before you heard --

A. Negative.

Q. Okay. How many gunshots do you remember hearing?

A. Four.

Q. Were they right in a row, or was there a pause between them?

A. In a row.

Q. Okay. And -- and where were you when you heard the gunshots?

A. I was in my bedroom, the master bedroom, in my house.

Q. Did you go outside after the gunshots or before?

A. After.

Q. Okay. So your wife said something about he's running. He got caught on the fence, and then you heard gunshots. Did I get that sequence right?

A. Yes.

Q. And after that, you both went out -- outside?

A. Yes. Yes.

Q. Okay. What were you able to see once you got outside?

A. We waited a couple seconds, and then we both went outside on the porch, and the officer was taking cover behind his vehicle. Or deputy.

Page 20

Q. When you say -- when you say "behind his vehicle," was -- describe that a little more.

A. So the vehicle was facing west, and he was on the opposite side of his vehicle where the hood is.

Q. Okay. Was he on the side of the vehicle closer to your neighbor's house or closer to the middle of the street?

A. To the middle of the street.

Q. Okay. About how far away were you when you saw him taking cover?

A. From the officer?

Q. From the officer, yeah.

A. Maybe a hundred feet.

Q. Okay. Did you hear the officer say anything?

A. Yes.

Q. What did you hear him say?

A. I heard him say, "Don't reach for the gun."

Q. Do you remember if you heard him say that once or more than once?

A. I know I heard it once for sure.

Q. Okay.

A. When he said that, me and my wife went back inside. It felt like a minute. We went back inside for about 60 seconds.

Q. All right.

A. And when we got -- I poked -- I went back outside, and

Page 21

at that time the officer, the deputy, was moving closer to the man laying on the ground.

Q. What made you go back outside after those 60 seconds?

A. Me personally, I just wanted to make sure the deputy was okay.

Q. Okay. What did you do next?

A. I watched him from my porch go over to the man on the ground, and I stood there for a -- maybe another minute or two, and then I started walking closer to the gate, letting him know if he needed any assistance that I could help him.

Q. Okay. When you were standing back closer to your trailer --

A. Uh-huh.

Q. -- were you able to see the man on the ground?

A. Yes.

Q. Okay. When you walked over to the gate, you said you let the deputy know that you could help him if he needed anything?

A. Yes.

Q. What was he doing when you said that to him?

A. He was checking his body for injuries.

Q. Okay. Do you remember where he was standing in relation to the car or the man on the ground?

A. So he was walking up through the fence. The man was trying to ram, maybe five feet inside the property, as he was



Page 22

walking up, render -- trying to render aid.

Q. Did you see him try to render aid?

A. Yes.

Q. What exactly did you see him do?

A. I seen him moving his shirt to look for bullet holes where he got hit, and then there was a point where -- I don't know if it was Meagan's daughter or -- someone came out and was yelling at the deputy to get off the property.

Q. Let me stop you. Can you -- can you describe for me at all what -- anything else about that person, like what she looked like?

A. She was a -- a younger female. I don't believe she was 18 yet.

Q. Okay. What were you doing when she came out of the property and was yelling at the deputy?

A. I -- I spoke to her. I asked her to calm down. That -- trying to let her know, like, he's trying to -- to save his life and to calm down, because she was upset.

Q. Uh-huh. You said that you saw the deputy trying to render aid. I asked what you saw. You said you saw him removing the shirt to look for bullet holes, and then I sidetracked you. Did you see the deputy doing anything else in terms of rendering aid?

A. I remember him radioing, I believe, for backup. I don't know 100 percent.

Page 23

Q. Did you do anything to help?

A. At one point he asked me to come hold his flashlight for him.

Q. Okay.

A. So that way he could start rendering medical aid quicker.

Q. Okay. And did you do that?

A. Yes.

Q. Do you remember anything specific the deputy did to provide aid once you were holding that flashlight?

A. I don't remember --

Q. Okay.

A. -- for sure. I -- I do -- this is so hard. I'm sorry. I believe he was reaching into his pouch for something to put on the wounds.

Q. What do you mean by "his pouch"?

A. I don't know -- I don't -- I don't remember. It was kind of hectic.

Q. Sure.

A. And the -- the younger female was still adamant about yelling at the officer, and I was trying to calm her down so he could do his job.

Q. When you went outside and you told the deputy that you could help if he needs help, was that younger female already outside?

Page 24

A. I do not remember.

Q. Do you remember what you were doing when you first saw her?

A. I was standing at my fence. I let the deputy know if he needed anything, I could assist him, and then I was just waiting in case he needed my help. And then at that time, I believe the younger lady came out and started yelling at him to get off the property, so on and so forth.

Q. I'm going to ask you two questions that are going to sound similar, but they're a little different, so pay attention.

Can you give me an estimate of how much time passed between when you heard gunshots and when you first saw the deputy rendering aid?

A. Four or five minutes, maybe.

Q. What makes you say "maybe"?

A. I have... I don't remember times very well, the length of them, especially in a situation that needs attention.

Q. Okay.

A. So like I said before, sometimes it feels like a minute, but it's been ten seconds.

Q. Right. Right.

A. That's -- that's why I said "maybe."

Q. Okay. At any point during that night, did you -- besides holding the flashlight, did you personally assist with rendering any aid?

Page 25

A. Negative.

Q. Was there anything that you thought based on your training from when you were in the Army that you could -- you could have done to help with aid?

A. To help -- help with aid, no.

Q. Okay.

A. If the deputy asked me to help render aid and told me what to do, I would be able to.

Q. Was there any moment where you thought, hey, this deputy should be doing XYZ to help with this injury based on your training?

A. Negative. It seemed to me that he was doing the right steps.

Q. If you had thought that he should be doing different steps, would you have expressed that to him?

A. Absolutely.

Q. Would you have stepped in yourself to assist?

A. I believe so. Yes.

Q. At some -- at some point, when you were on that side of the car with the deputy and the man on the ground, did you see a gun on the ground?

A. I did.

Q. Can you describe that gun for me?

A. I --

Q. To the best of your memory.



Page 26

A. To the best of my memory, it looked like a silver top gun, and then the -- the bottom half was black.

Q. Okay.

A. I do not know what caliber it was.

Q. Okay. I'm going to show you a photo.

MS. VAN BUREN: Sean, this is Defendants_Obregon 000146. And can we mark this as Exhibit 1, please?

(Deposition Exhibit No. 1 marked.)

BY MS. VAN BUREN:

Q. Okay. I'm showing you what's been marked as Exhibit 1. Is this the gun that you saw on the ground?

A. Yes.

Q. Do you recall how far away it was from the man who had been shot?

A. Three to four feet.

Q. When did you first see that gun?

A. I first saw that gun when the officer asked me to come over and hold his flashlight.

Q. Okay. About how long after the shooting was that?

A. I'm sorry. The -- the times are -- are rough. Can you repeat yourself?

Q. Yes. And if you don't -- if you can't answer, that's fine. But how -- how much time passed between when you heard gunshots and you saw this gun on the ground?

A. Five to six minutes.

Page 27

Q. Okay. Had any other officers arrived when you -- by the -- strike that.

Had any other officers arrived when you took that flashlight to assist the deputy?

A. When I took the flashlight, it was -- it felt like two to three minutes before I seen another deputy show up.

Q. Okay. That was going to be my next question.

So when you took the flashlight, it was you, the deputy, the man on the ground.

A. Yes.

Q. And the young woman?

A. Yes.

Q. Was she there, too?

A. Yes.

Q. Okay. And so it was -- and that -- and to make sure I understand, that was the same time you saw the gun on the ground was when you took the flashlight?

A. Yes.

Q. I want to show you a little bit of a video. It has some audio, so I think the best thing is for us to go off the record, and I'll play the video for you.

A. Okay.

MS. VAN BUREN: Before we go off the record, though, Sean, this is Defendants Obregon -- excuse me -- 135, which is Officer Fox's bodycam. And since I'm playing the

Page 28

audio, it -- I don't know -- it may be one that your client may not want to listen to.

MR. WOODS: Yeah. I appreciate that.

MS. VAN BUREN: So I would just --

MR. WOODS: Allison, I'll just ask you to -- I'll send you a message when we're done with this video.

MS. VAN BUREN: So let's go ahead and go off the record.

THE VIDEOGRAPHER: We're going off the record. The time is 12:31 p.m.

(Off the record, 12:31 p.m. to 12:33 p.m.)

(Deposition Exhibit No. 2 marked.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:33 p.m.

BY MS. VAN BUREN:

Q. All right. Mr. Chapman, off the record I showed you a clip of what we're going to mark as Exhibit 2 --

THE VIDEOGRAPHER: Counselor, I'm sorry. Your microphone.

BY MS. VAN BUREN:

Q. I showed you a clip of what we're going to mark as Exhibit 2 to your deposition. This was a body-worn camera footage from Officer Fox, and I showed you in particular from 25 seconds up to 45 seconds, and then we also watched from the beginning up to 45 seconds. Do you recall in that time frame

Page 29

seeing a man with a white shirt?

A. Yes.

Q. Was that you?

A. Yes.

Q. And was that when you were holding the flashlight for the deputy?

A. Yes.

Q. The deputy said something about chest seals.

A. Yeah.

Q. Do you remember hearing that?

A. Yes.

Q. Is that something that you were trained about in basic training?

A. Yes.

Q. I don't know what a chest seal is. Tell me what a chest seal is.

A. It's a police -- piece of plastic that goes over an open wound, gunshot wound, for -- I -- just to cover it up. I don't know all the medical terms. I just -- that's what I do remember from the military.

Q. That's fair. And is -- are chest seals one of the things you were trained to do to treat bullet wounds to the chest?

A. Yes.

Q. Do you recall now that you've watched this if you saw



Page 30

the deputy using chest seals with the man on the ground?

A. I don't recall.

Q. That's fine.

In the video there were also a man and a woman standing in the road. Did you see them?

A. Yes.

Q. Do you know them?

A. I do.

Q. Tell me who those people are.

A. That is DJ. I don't know his last name.

Q. How do you know DJ?

A. My wife's father are -- is friends -- was friends with him.

Q. Okay. So a friend of your father-in-law?

A. Yes.

Q. Okay. And who was the woman?

A. Nicole. I believe it's his wife.

Q. Do you know Nicole's last name?

A. I do not.

Q. Had you ever met Nicole before this?

A. Yes.

Q. And you've met DJ as well?

A. Yes.

Q. Do you socialize with them?

A. Not -- not -- I know -- I've been over to their house.

Page 31

Q. Okay.

A. I know them.

Q. Okay.

A. But I don't necessarily socialize with them. My wife -- father -- my father-in-law was really good friends with them, so I've been over there a couple times.

Q. Okay. A couple of times, like two times?

A. Yes.

Q. You said "was really good friends." Are they still friends?

A. He -- he passed.

Q. Oh, I'm sorry to hear that. Okay.

Do you have DJ's cell phone number?

A. No.

Q. Do you have Nicole's cell phone number?

A. I do not.

Q. Have DJ or Nicole ever been over to your house?

A. Maybe once.

Q. Okay. Would you describe DJ and Nicole as friends? Acquaintances? Family friends? What -- what word would you use to describe them?

A. I don't really associate with them, so acquaintances. Family friends. Friend of the family.

Q. Okay. Okay. Did you talk to either DJ or Nicole on the night of the shooting?

Page 32

A. I did not, no.

Q. Have you talked to either of them since this shooting?

A. I have.

Q. Tell me about that.

A. We went over there to their house I believe one time. My wife's mother went over there, and we went over there with her. That was it. I didn't really talk about everything that transpired there. Didn't feel comfortable.

Q. Why did you go over to their house?

A. I went with my wife to support her. My wife's mother is really good friends with Nicole -- Nicole and DJ.

Q. Okay.

A. So that's why I went over there.

Q. Was it shortly after this shooting?

A. I don't recall.

Q. Was going over there part of giving them support after this shooting?

A. It was to give them support that they -- they lost somebody, not necessarily for them, but for their loss.

Q. Okay. Do you remember DJ saying anything about the shooting itself?

A. I do. I --

Q. What do you remember DJ saying?

A. I remember DJ saying that -- that the deputies -- I don't know if it was that one in particular or just deputies in

Page 33

general harassing them, because they also have motorcycles, and they drive pretty crazy on the roads out there. I've seen that.

Q. Who's "they"?

A. DJ and his -- his kids.

Q. Okay. What else do you remember DJ saying?

A. I don't recall. I'm sorry.

Q. That's okay. What do you remember, if anything, do you remember Nicole saying about the shooting?

A. I don't.

Q. Have you talked to DJ or Nicole since you went over there that one time?

A. No, I haven't.

Q. Have you talked to anyone in their family about the shooting?

A. I did not. No.

Q. Okay. Have you ever talked to Allison Obregon before?

A. I've seen her at DJ's house when we went over there the one time, but I didn't speak to her about what happened.

Q. When you say that we went over there that one time, this is the time we're talking about?

A. The one time after the shooting, yes.

Q. Okay. And you may have answered this, but did you talk to her at all?

A. I don't -- I don't remember. I don't think so.

Q. Who else do you remember being at the house that time?

Page 34

A. I think it was Nicole, DJ, Allison, and I think his kids were there. That's -- that's all I recall.

Q. Did you go to any sort of memorial service for Michael Obregon?

A. I did not.

Q. Do you know if your wife did?

A. I don't know. Maybe her mom.

Q. Okay. I think I'm almost done. Mr. Woods will probably have some questions, but I'd like to take just a five-minute break so I can go over my notes, if that's okay?

A. Okay.

MS. VAN BUREN: All right.

THE VIDEOGRAPHER: We're going off the record. The time is 12:41 p.m.

(Short break taken, 12:41 p.m. to 12:48 p.m.)

THE VIDEOGRAPHER: We're back on the record. The time is 12:48 p.m.

BY MS. VAN BUREN:

Q. Mr. Chapman, I have just a few more questions for you. First, I just wanted to be clear about something in the timeline.

Were you already outside at your fence when you saw the young woman come out of the house next door?

A. One more time. I'm sorry.

Q. Were you outside by your fence when you saw the young

Page 35

woman come out of the house next door?

A. Yes.

Q. Was she out there with Deputy Gibson and the man on the ground before you?

A. I don't recall.

Q. Did you ever hear her insist that Michael, Mr. Obregon, needed medical help?

A. No.

Q. Did you ever see the deputy walk away and then the young woman roll the man onto his back and try to revive him?

A. No.

Q. Did you ever see her interact with the man on the ground at all?

A. No.

Q. Did you ever hear deputy -- the deputy tell her that she could not leave the scene for any reason or words to that effect?

A. No.

MS. VAN BUREN: All right. That is what I have for you, sir. Now it's Mr. Woods' turn.

MR. WOODS: Thank you.

EXAMINATION

BY MR. WOODS:

Q. Good afternoon, Mr. Chapman.

Page 36

A. How you doing, sir?

Q. Doing all right. Doing all right. I'll try to -- I'll try to be brief. You mentioned earlier that you were suspicious of things going on at the house --

A. Yes.

Q. -- next door to you?

I just want to be clear. Did you ever actually see anything illegal occurring?

A. Negative.

Q. Okay. When you -- when you were at the house and you -- you heard what was going on, you saw the dirt bike because you went to the window, correct?

A. I -- I heard an engine, and then we seen flashing lights, and then we opened the -- the blind to look out the window.

Q. Okay. And -- and you had a direct line of view?

A. Yes.

Q. Okay. There were no trees or anything like that obstructing it, correct?

A. Correct.

Q. You mentioned earlier that the ATVs and dirt bikes were speeding up and down the road from time to time. Do you remember that?

A. Yes.

Q. How do you know they were speeding?

Page 37

A. It looked a lot faster than 25 miles an hour.

Q. Do you drive ATVs or dirt bikes or anything like that?

A. I have in the past, yes.

Q. Okay. They're smaller in size, right?

A. Yes, sir.

Q. Than a regular car.

Did you measure their speed ever?

A. Negative.

Q. Okay. Do you know what brands or models they were driving?

A. Negative.

Q. Okay. So you don't know what the max speed would be on any of those vehicles?

A. Negative.

Q. I wouldn't expect you to. I wouldn't know either.

In the Army you got training on -- I'm going to make an assumption here. You can tell me if I'm right or wrong, but I assume you were trained on the use of firearms in the Army?

A. Yes.

Q. Had you used firearms prior to entering the Army?

A. Yes.

Q. And I'm not trying to be mean here, but I have -- I have to ask the question. Have you ever been charged with a crime?

A. For a firearm?



Page 38

Q. No. For anything.

A. When I turned 18, yes. I got in trouble for stealing.

Q. Okay. What were you stealing?

A. I stole a pair of shoes.

Q. Okay. All right. Thank you. I'm sorry I had to ask the question.

So when you were -- when you looked out the window, you moved the -- you moved the curtain aside, was your wife with you?

A. Yes.

Q. And she was on the phone, wasn't she?

A. Where do you mean, sir? I'm sorry.

Q. She was -- she was on the phone while you guys were watching what was happening.

A. She was --

Q. Is that correct?

A. She was playing on her phone? Yes.

Q. No. She was talking on the phone; isn't that correct?

A. Negative.

Q. She wasn't talking on the phone?

A. I don't remember. We were getting ready to leave, sir.

Q. At any point while you guys were watching or you went outside, do you recall your wife talking on the cell phone?

A. Negative.

Page 39

Q. Do you recall if she was talking with Nicole?

A. So I believe after the incident, she called Nicole.

Q. But not during the incident?

A. Not during. No. I don't believe so, sir.

Q. Do you recall your wife yelling, "He's running away"?

A. My wife said that -- my wife told me, because I wasn't looking at the -- out the window at the time, that he tried to run, and it -- he got caught on the fence.

Q. Okay. And when she told you that, you're saying that she was not on the telephone at that time?

A. No, sir. Not that I -- not that I recall, sir.

Q. Okay. All right. Was your wife or is your wife, to the best of your knowledge, friends with Nicole?

A. We don't really associate with them. My wife has -- she know -- she's -- she's friends with Nicole. Yes.

Q. So they talk to each other on the phone?

A. Not regularly. No.

Q. Do they text?

A. I know that they had before, yes.

Q. Does your wife still talk to Nicole?

A. I don't believe. Not since the incident.

Q. Do you know if anything happened with their relationship since the incident?

A. I think, in my personal opinion, I think that Nicole's upset because we didn't take her side in the incident.

Page 40

Q. What do you mean by "take her side"?

A. To accuse the cop of wrongdoing.

Q. But you didn't actually see the gunshots, did you?

A. I didn't see, no.

Q. And how many gunshots did you hear?

A. Four.

Q. Okay. You know DJ?

A. Yes, sir.

Q. All right. How do you -- how do you know DJ?

A. Through my wife. She was friends with -- or he's -- he was friends my father-in-law.

Q. Okay. Did you ever hang out with DJ?

A. I went over to his house a couple of times.

Q. Did you go over to his house for a birthday party ever?

A. I don't know. I don't recall.

Q. What did you go over to his house for?

A. We went over to his house, his -- my wife's mom was down and was hanging out with them. So we went over to see her mom and to hang out. I don't...

Q. Was that the extent of your relationship with DJ?

A. Yeah.

Q. Did you ever do anything for him?

MS. VAN BUREN: Form.

THE WITNESS: No.

Page 41

BY MR. WOODS:

Q. Did you ever run errands for him? Ever work on a car for him?

A. No, I didn't.

Q. Do you know what a sand rail is?

A. Oh, he did -- he did work on my sand rail.

Q. And where was that?

A. It was at his house. He asked me if he could work on the sand rail, and I told him yeah.

Q. Okay. That's confusing to me. Was the sand rail broken?

A. Yes.

Q. Okay. And how did it come about that he was fixing your sand rail?

A. He mentioned it. I believe he was next door at Meagan's house, and they walked over to our house, and he seen it in the backyard and asked if it ran, and I told him no. And he said that he would be able to get it working for me. I was all like, if you could do that, that would be awesome. You know, I could help -- I would pay for the parts if he knew how to do the labor, because I did not.

Q. Did -- did he work on the sand rail?

A. Yes.

Q. Did the sand rail get fixed?

A. Negative.



Page 42

Q. Do you have -- do you have the sand rail?

A. I do at my house.

Q. Okay. Did you tow it over to his house? How did it get over to his house?

A. One of his friends, I don't know him personally, and DJ, I believe, came and picked it up, and they towed it to his house.

Q. Okay. And you were happy to let DJ work on the sand rail, right?

A. Right.

Q. Even though you and DJ didn't hang out or anything like that?

A. Yeah.

Q. But there was enough of a relationship there that you were comfortable to allow DJ to work on your sand rail, right?

A. Right.

Q. Have you ever been certified as an emergency medical technician?

A. Negative.

Q. How about a nurse?

A. Negative.

Q. Have you ever worked for an ambulance company?

A. Negative.

Q. Your only training on any kind of medical response was in basic training then, correct?

Page 43

A. Also, I worked at CoreCivic.

Q. What's CoreCivic?

A. It's a prison in Eloy.

Q. Okay. Go ahead.

A. Private sector. We also did a training for CPR in that. That was the extent.

Q. Okay. But you're not -- you've never been a medical professional, correct?

A. Negative.

Q. Okay. After you heard the gunshots, is that when you went outside?

A. We both looked away from the window, me and my wife, and we were heading towards the front door. We were still in our room at the time. We just got up, getting things ready, and we heard the gunshots. And then after that, we went out front on our porch.

Q. Did you hear any more gunshots?

A. Negative.

Q. So just the four?

A. Yes, sir.

Q. And this was -- the incident, just to be clear, was next door to your house at the time, right?

A. Yes.

Q. And how many -- about how many feet would you estimate from your front porch to where Michael Obregon's body was laying

Page 44

between that? How many feet?

A. Maybe 100 to 150 -- or 105, 110.

Q. Okay. And you heard the officer making statements from -- from your house?

A. Yes. When I poked my head -- well, we went out on the porch, opened the door, and we heard him saying, "Don't reach for the gun." It almost sounded like he was pleading for him not to reach for it.

Q. Did you -- I'm sorry. I cut you off. Go ahead.

A. And then we went back inside at the time.

Q. Did you hear anything else?

A. Negative.

Q. You didn't hear any conversation between Michael Obregon and Deputy Gibson?

A. Negative.

Q. You saw him -- did you see him -- I'm sorry. Maybe I'm confused, and this might be my bad, but did you see any of the interaction prior to Michael being shot?

A. Prior to?

Q. Yeah.

A. Yes, sir. He -- when we looked out the window, we couldn't hear anything. And the interaction between them, it looked like he was talking to Michael, and it looked like he was trying to give him his ID.

Q. Okay.

Page 45

A. I don't know for sure, but there was interaction.

Q. Okay. Did you -- I think you said you saw him reach down on the ground and pick something up. Michael.

A. Yes.

Q. Okay. And you think that was his ID?

A. Yes, sir. It was outside of the gate.

Q. Okay.

A. Yes, sir.

Q. Did you ever see Michael pull out a gun?

A. Negative.

Q. Did you ever see Michael act like he was threatening the officer?

A. Negative.

Q. Would the interactions that you saw between the officer and Michael in your opinion seem normal?

A. Yes. It's...

Q. Okay.

A. With him trying to run through the gate, and it seemed like from what we -- from what I seen, it looked like the deputy was able to talk to him to get off the motorcycle, and they were interacting by the deputy's vehicle.

Q. Have you -- prior to this, did you ever see Michael at that house?

A. Not personally myself. My wife has mentioned to me that she's seen him over there.



Page 46

Q. Okay. I guess we can ask her about that down the road.

When you said you saw Michael ram the fence, was it more of like, hey, I'm trying to open the fence with the front of my bike?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. And then he realized it was locked?

MS. VAN BUREN: Form. Foundation.

THE WITNESS: Yes.

BY MR. WOODS:

Q. Okay. Yeah. I mean, I seen on the video it doesn't look like he's going high speed, so...

Did you know that there were actually ten gunshots fired?

A. Negative.

Q. But you heard the four?

A. I heard four, yes.

Q. Okay. Was it difficult to hear things from your house that were happening on the street?

MS. VAN BUREN: Form.

THE WITNESS: I mean, as far as gunshots or anything?

BY MR. WOODS:

Q. Just any -- any loud noises?

Page 47

A. Not necessarily. We could hear pretty well when there's, like, louder noises as far as engines and things.

Q. Does it surprise you that there were ten gunshots?

A. Absolutely.

Q. Because that means you didn't hear six of them, right?

A. That's right. I -- I remember hearing four.

Q. Have you ever talked to Laura or anybody from her office prior to this deposition?

A. Negative.

Q. Have you ever been sent any documents from Laura or her office prior to this deposition?

A. Negative.

Q. Did you ever talk to a private investigator related to this case?

A. I spoke to someone. I don't know -- I don't remember who it was.

Q. And what was the -- what was the topic of that conversation?

A. Just asking me questions, if I recalled what I heard, everything that I remember from that night.

Q. Okay. How long was that conversation? Can you remember?

A. I -- I don't recall.

Q. Do you think it was longer than five minutes?

A. Yeah.

Page 48

Q. Okay. Less than 30?

A. I believe so. I -- like I said, I don't recall exactly the time.

Q. Do you remember when you had that conversation?

A. I don't.

Q. Do you think it was in -- within the last year?

A. I -- I honestly don't remember, sir.

Q. Okay. Did the person identify him or herself when -- when they called?

A. They did. I just don't recall.

Q. Did they say they were a private investigator, or did they say they were working for a law firm?

MS. VAN BUREN: Form.

THE WITNESS: I believe they said they're a detective. The last -- I don't recall.

BY MR. WOODS:

Q. On the night of the shooting, were you interviewed by police?

A. Yes.

Q. Was it a detective?

A. I don't know.

Q. Did they knock on your door to talk to you?

A. Yes. Yes. I believe there was a detective there.

Q. And they -- did they ask you questions at that point?

A. Yes, sir.

Page 49

Q. Do you remember a Michael Fender or a Joel Benucci (phonetic)?

A. I don't know.

Q. Did you ever receive a report or anything like that after they spoke with you?

A. I remember receiving a card, and they asked me if I needed any therapy or anything like that, that I could reach it.

Q. Do you remember telling the detectives that Michael tried to run from the deputy?

A. I did not say that it looked like he was running, because we seen him hit the -- the fence with his bike, and then the cop was there asking him to get off the bike.

Q. When you saw Mike -- Michael on the ground after the shooting, was he face up or face down?

A. I don't recall.

Q. When you saw Deputy Gibson with the chest seals or -- I guess that's what they're called -- was he doing it to -- to the front of his body, like, or the back?

A. I remember him lifting his shirt up and checking to see where he was hit. I don't recall if it was front or back.

Q. Do you recall Deputy Gibson rolling the body over at all?

A. I don't recall.

Q. Do you recall telling the detectives that your neighbors were shady?

Page 50

A.   Yes.

Q.   Is it safe to say that you didn't like your neighbors?

A.   It's not that I didn't like them.  It's that 2, 3 o'clock in the morning, driving motorcycles in and out of their yard, it just didn't feel right.  So that's why I said that.

Q.   Did you ever have any interactions with your neighbors outside of the dirt bikes or anything like that?

MS. VAN BUREN:  Form.

THE WITNESS:  Negative.  Maybe hi.  I never got to know them on a personal level.

BY MR. WOODS:

Q.   Do you know a person that goes by the name KB?

A.   I do not.

Q.   Do you know a Kenyon Bowers?

A.   Negative.

Q.   Did you know your neighbors to the other side of the house, not the Bradys where this happened, but to the opposite side of your house?

A.   I've spoke to them before, yes.

Q.   Can you describe them, what they look like?

A.   One is an older gentleman.  I -- that's -- that's about it.  And he has a wife there, and I spoke to him a couple of times.

Q.   Do you know Wade Putt?

Page 51

A.   Negative.

Q.   Okay.  Did you know any of the neighbors across the street from your house?

A.   Negative.

Q.   Were you friends with anybody else in that neighborhood?

A.   Negative.

Q.   When did you move to Arizona City?

A.   I believe it was January 2024.

Q.   Do you have a Facebook page?

A.   I do.

Q.   What is your Facebook page ID?

A.   Like my name or?

Q.   Yeah.  Like if I -- you know, if I wanted to pull up your profile, what would I type in?

A.   Brandon Chapman.

Q.   Do you have an Instagram?

A.   I believe I do.  Yes.

Q.   Do you use that or is that just you have it just --

A.   I just have it.  I used to stream video games.

Q.   Okay.

A.   So I would upload videos of playing video games.

Q.   Does your wife have a Facebook page?

A.   Yes.

Q.   Does she have an Instagram account?

Page 52

A.   Yes.

Q.   Did you guys ever post anything on social media about this event?

A.   Negative.  I did not.

Q.   Do you know if your wife did?

A.   I do not know.

Q.   Have you talked to anybody else, friends, family about what you saw that night?

A.   I spoke to my dad about it.  He owns the trailer.

Q.   Anybody else?  Best friend?  Anybody?

A.   I remember telling my brother about it.

Q.   What's your brother's name?

A.   David Chapman.

Q.   Where does he live?

A.   He lives in Louisiana.

Q.   Did he live in Louisiana at the time?

A.   Yes.

Q.   Okay.  Did you call him that night?

A.   I don't recall.  I don't think so.  It was kind of a long night.

Q.   I believe it.

I think this was asked, but have you ever spoke to Allison Obregon?

A.   I don't recall.  I don't -- when we went over to DJ's house, I believe she was there, but I don't remember speaking to

Page 53

her.

MR. WOODS:  Okay.  Okay.  I don't think I have anything else.  Thank you.

MS. VAN BUREN:  I don't have anything either.  So there's two options for you.  We're going to get a printed transcript of what you said today.

THE WITNESS:  Okay.

MS. VAN BUREN:  We can send that to you.  You can review it, make any changes and sign it, or you can waive that right and say I'm good.

THE WITNESS:  Okay.

MS. VAN BUREN:  Your choice.

THE WITNESS:  I'm good.

MS. VAN BUREN:  Okay.  You want to waive?

THE WITNESS:  I -- yeah.  I don't remember everything.  My wife might have something that she remembers that I don't.

MS. VAN BUREN:  Okay.  Well, this -- this needs to just be, you know, your review of your testimony if something was written down wrong or something like that.

THE WITNESS:  Okay.

MS. VAN BUREN:  This is your chance to correct it.

THE WITNESS:  All right.  I'm good.

MS. VAN BUREN:  Okay.  You want to waive it?



Page 54

**THE WITNESS:  Yeah.**

MS. VAN BUREN:  Okay.  All right.

THE VIDEOGRAPHER:  This concludes today's video-recorded deposition.  The time is 1:15 p.m.

(Deposition concluded at 1:15 p.m.)

Page 55

STATE OF ARIZONA    )
                    )    ss.
COUNTY OF MARICOPA  )

BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in stenographic shorthand and thereafter reduced to print under my direction.

I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.

[ ] Review and signature was requested; any changes made by the witness will be attached to the original transcript.

[x] Review and signature was waived/not requested.

[ ] Review and signature not required.

I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).

DATED at Phoenix, Arizona, this 23rd day of October 2025.

                              /s/ Teresa A. Watson

                              TERESA A. WATSON, RMR
                              Certified Reporter
                              Certificate No. 50876

                *    *    *    *    *

I CERTIFY that GRIFFIN GROUP INTERNATIONAL has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).

                              /s/ Pamela A. Griffin
                              GRIFFIN GROUP INTERNATIONAL
                              Registered Reporting Firm
                              Arizona RRF No. R1005



**Griffin Group International**
**888.529.9990 | 602.264.2230**

|  |  |  |  |  |
|---|---|---|---|---|
| **Exhibits** | 22:13 38:2 | 4:13 | **Army** | **basic** |
|  | **1:15** | **85122** | 9:16,17 10:9 25:3 | 10:12 11:3 29:12 |
| **Chapman B 092525 Exh 1** | 54:4,5 | 4:10 | 37:16,18,20 | 42:25 |
| 26:7,8,11 |  | **8827** | **arrived** | **basics** |
| **Chapman B 092525 Exh 2** | **2** | 8:9 | 27:1,3 | 10:19 |
| 28:12,17,22 | 14:6,24 28:12,17,22 |  | **artillery** | **bedroom** |
|  | 50:4 | **A** | 9:20 | 16:4 19:13 |
| **0** | **2012** |  | **assist** | **beginning** |
|  | 9:13 | **a.m.** | 24:5,24 25:17 27:4 | 28:25 |
| **000146** | **2017** | 4:4 | **assistance** | **Benucci** |
| 26:7 | 9:13 | **Absolutely** | 21:10 | 49:1 |
|  | **2023** | 25:16 47:4 | **associate** | **big** |
| **1** | 11:11 12:9 15:25 | **account** | 31:22 39:14 | 15:20 |
|  | **2024** | 51:25 | **assume** | **bike** |
| **1** | 51:9 | **accuse** | 7:18 37:18 | 15:1 16:6,11,15,17, |
| 26:7,8,11 | **2025** | 40:2 | **assumption** | 21,23 17:24 36:11 |
| **100** | 4:4 | **acquaintances** | 37:17 | 46:5 49:11,12 |
| 22:25 44:2 | **25** | 31:20,22 | **attention** | **bikes** |
| **105** | 28:23 37:1 | **act** | 24:10,17 | 14:16 15:4,22 36:21 |
| 44:2 | **25th** | 45:11 | **ATV** | 37:2 50:8 |
| **110** | 4:4 | **activity** | 14:25 | **birthday** |
| 44:2 | **2:24CV-01510-PHX-KML** | 13:9 | **ATVS** | 40:14 |
| **1115** | 4:9 | **adamant** | 14:17 15:5,17,22 | **bit** |
| 4:9 |  | 23:20 | 36:21 37:2 | 8:7 27:19 |
| **11:56** | **3** | **address** | **audibly** | **black** |
| 4:4 |  | 11:13 | 7:4 | 26:2 |
| **12** | **3** | **afternoon** | **audio** | **blind** |
| 11:13 | 14:6,24 50:4 | 5:12 35:25 | 27:20 28:1 | 36:14 |
| **12:31** | **30** | **Ages** | **aware** | **body** |
| 28:10,11 | 48:1 | 13:3 | 12:9 | 21:21 43:25 49:18,21 |
| **12:33** | **3200** | **ahead** | **awesome** | **body-worn** |
| 28:11,14 | 4:12 | 16:8 28:7 43:4 44:9 | 41:19 | 28:22 |
| **12:41** |  | **aid** |  | **bodycam** |
| 34:14,15 | **4** | 10:8 22:1,2,20,23 | **B** | 27:25 |
| **12:48** |  | 23:5,10 24:13,25 |  | **bottom** |
| 34:15,17 | **4** | 25:4,5,7 | **back** | 26:2 |
| **135** | 14:6 | **Air** | 15:20 17:5 18:20 | **Bowers** |
| 27:24 | **45** | 9:20 | 20:21,22,25 21:3,11 | 50:15 |
| **14** | 28:24,25 | **Allison** | 28:13 34:16 35:10 | **Bradys** |
| 9:18 |  | 4:6,20 14:14 28:5 | 44:10 49:18,20 | 50:18 |
| **150** | **6** | 33:16 34:1 52:23 | **background** | **branch** |
| 4:10 44:2 |  | **ambulance** | 8:7 | 9:15 |
| **16** | **60** | 42:22 | **backup** | **Brandon** |
| 12:9 15:25 | 20:22 21:3 | **applying** | 22:24 | 4:5 5:2,15 51:16 |
| **177** |  | 10:19 | **backyard** | **brands** |
| 4:13 | **8** | **area** | 15:21 41:17 | 37:9 |
| **18** |  | 10:20 11:9 | **bad** | **break** |
|  | **85018** | **Arizona** | 11:1 44:17 | 7:23 8:1 34:10,15 |
|  |  | 4:8,10,13,16 8:9 51:8 | **based** | **breaks** |
|  |  |  | 25:2,10 | 7:24 |



**bringing**
6:6

**broken**
41:11

**brother**
52:11

**brother's**
52:12

**bullet**
22:5,21 29:22

**Buren**
4:22 5:11 26:6,9
27:23 28:4,7,15,20
34:12,18 35:19 40:24
46:6,9,21 48:13 50:9
53:4,8,12,14,18,22,
25 54:2

**busy**
8:18

## C

**C-A-R-L-A**
9:2

**caliber**
26:4

**call**
18:22 52:18

**called**
5:3 39:2 48:9 49:17

**calm**
22:16,18 23:21

**Camelback**
4:12

**camera**
28:22

**car**
21:23 25:20 37:6
41:2

**Car-**
9:1

**card**
49:6

**care**
13:22

**Carla-ruth**
8:23 9:3

**Casa**
4:10 11:8

**case**
4:8,20 5:17,25 24:6
47:14

**cases**
5:17

**caught**
18:9 19:17 39:8

**cell**
31:13,15 38:24

**certified**
4:11,14 5:4 42:17

**chained**
17:1

**chance**
53:22

**Chapman**
4:5 5:2,15,16 8:15
28:16 34:19 35:25
51:16 52:13

**charged**
37:23

**checking**
10:21 21:21 49:19

**chest**
10:14,19,20 29:8,15,
16,21,23 30:1 49:16

**choice**
53:12

**City**
8:9 51:8

**civil**
5:16,17

**clear**
7:14 34:20 36:7
43:21

**client**
28:1

**clip**
28:17,21

**closer**
20:5,6 21:1,9,11

**collapsed**
10:21

**comfortable**
32:8 42:15

**comments**
14:16

**common**
14:19

**company**
8:24 42:22

**computer**
9:19

**comrades**
10:16

**concerned**
15:16

**concluded**
54:5

**concludes**
54:3

**confused**
44:17

**confusing**
41:10

**Constant**
13:20

**contract**
8:24

**conversation**
6:20 44:13 47:18,21
48:4

**cop**
40:2 49:12

**Corecivic**
43:1,2

**Coronado**
8:9

**correct**
36:12,19,20 38:16,18
42:25 43:8 53:22

**Cottonwood**
4:10

**counsel**
4:6,17,18,24

**Counselor**
28:18

**couple**
10:13 13:17 14:16
17:5 19:23 31:6,7
40:13 50:23

**court**
4:8,11 5:4,7 6:10,21
7:7

**cover**
19:24 20:9 29:18

**CPR**
10:12,14,24 43:5

**crazy**
33:2

**crime**
37:24

**crutches**
10:5

**curtain**
38:8

**curtains**
16:10

**cut**
44:9

## D

**dad**
9:9 11:23,24 52:9

**dad's**
11:12 12:3

**dash**
9:2

**date**
4:4

**daughter**
13:8 22:7

**David**
52:13

**day**
15:11

**defendants**
4:6,23 5:25 27:24

**Defendants_obregon**
26:6

**defense**
9:20

**deploy**
9:21

**deployment**
9:24

**deployments**
9:23

**deposition**
4:5 5:16,21 26:8
28:12,22 47:8,11
54:4,5

**deputies**
32:24,25

**deputy**
16:1 18:21,22,23
19:25 21:1,4,17 22:8,

15,19,22 23:9,23
24:4,13 25:7,10,20
27:4,6,9 29:6,8 30:1
35:3,9,15 44:14
45:19 49:9,16,21

**deputy's**
45:21

**describe**
13:2 16:22 20:2 22:9
25:23 31:19,21 50:21

**desert**
14:21

**detective**
48:15,20,23

**detectives**
49:8,24

**differently**
11:1

**difficult**
46:19

**direct**
36:16

**dirt**
14:16,25 15:4,22
16:6,11,15,17,21,23
36:11,21 37:2 50:8

**discharge**
10:3

**discharged**
9:14

**District**
4:8

**disturbance**
13:25

**DJ**
30:10,11,22 31:17,
19,24 32:11,20,23,24
33:4,5,10 34:1 40:7,
9,12,21 42:6,8,11,15

**DJ's**
31:13 33:17 52:24

**documents**
47:10

**door**
12:17,19 13:4,18
16:3 34:23 35:1 36:6
41:15 43:13,22 44:6
48:22

**drive**
8:9 14:5 16:25 33:2



37:2

**driving**
37:10 50:4

**dropped**
17:11

**drugs**
14:9

**duly**
5:3

---

**E**

**earlier**
36:3,21

**East**
4:9,12

**eat**
16:6

**Echo**
9:18

**effect**
35:17

**electric**
8:23

**electrical**
9:5

**Eloy**
43:3

**emergency**
42:17

**emphasize**
8:3

**engine**
16:15,16 36:13

**engines**
47:2

**entering**
37:20

**errands**
41:2

**estimate**
24:11 43:24

**et al**
4:7

**event**
52:3

**evidence**
14:10

**EXAMINATION**

35:23

**examined**
5:4

**excuse**
27:24

**Exhibit**
26:7,8,11 28:12,17, 22

**expect**
37:15

**experience**
9:10

**expressed**
25:15

**extent**
40:21 43:6

---

**F**

**face**
17:13,15,19 49:14

**Facebook**
51:10,12,23

**faces**
17:20

**facing**
12:17 20:3

**fair**
7:19 15:4 29:21

**family**
31:20,23 33:13 52:7

**fast**
15:15

**faster**
37:1

**father**
30:12 31:5

**father-in-law**
30:14 31:5 40:11

**feel**
14:25 15:1 32:8 50:5

**feels**
24:19

**feet**
20:12 21:25 26:15 43:24 44:1

**felt**
20:22 27:5

**female**
22:12 23:20,24

**fence**
18:9 19:17 21:24 24:4 34:22,25 39:8 46:3,4 49:11

**Fender**
49:1

**fine**
7:24 26:23 30:3

**finish**
6:21,23,24

**fire**
8:24

**firearm**
37:25

**firearms**
37:18,20

**fired**
46:15

**firm**
4:15 48:12

**five-minute**
34:10

**fixed**
41:24

**fixing**
41:13

**flashing**
16:7 36:13

**flashlight**
23:2,10 24:24 26:18 27:4,5,8,17 29:5

**folks**
6:6 12:23

**follow-ups**
16:14

**foot**
10:4,5

**footage**
28:23

**Form**
40:24 46:6,9,21 48:13 50:9

**Foundation**
46:9

**four-wheeler**
14:5 15:14

**Fox**
28:23

**Fox's**
27:25

**frame**
28:25

**friend**
30:14 31:23 52:10

**friends**
13:16 30:12 31:5,9, 10,19,20,23 32:11 39:13,15 40:10,11 42:5 51:5 52:7

**front**
6:10 12:12,19 16:3,5 17:2 43:13,15,25 46:4 49:18,20

**furthest**
11:5

---

**G**

**games**
51:20,22

**gate**
16:11,23 17:2 21:9, 16 45:6,18

**gates**
16:25

**general**
8:23 10:2 33:1

**gentleman**
50:22

**Gibson**
35:3 44:14 49:16,21

**give**
10:2 15:10 17:7,9 18:3 24:11 32:18 44:24

**giving**
17:10 32:16

**good**
5:12 7:12 8:6 31:5,9 32:11 35:25 53:10, 13,24

**Grande**
4:10 11:8

**Great**
6:17

**Griffin**
4:12

**ground**
5:23 21:2,8,14,23 25:20,21 26:11,24 27:9,16 30:1 35:4,13

45:3 49:13

**Group**
4:12

**guess**
16:19 46:1 49:17

**guessing**
8:5

**gun**
19:4 20:16 25:21,23 26:2,11,16,17,24 27:16 44:7 45:9

**gunshot**
29:18

**gunshots**
18:18,19,20,22 19:6, 12,14,17 24:12 26:24 40:3,5 43:10,15,17 46:14,22 47:3

**guy**
8:18 9:19 17:10,14 18:2

**guys**
38:13,23 52:2

---

**H**

**half**
26:2

**hand**
5:8

**handed**
17:12

**hang**
40:12,20 42:11

**hanging**
13:16 40:19

**happen**
15:7

**happened**
18:5,16 33:18 39:22 50:18

**happening**
38:14 46:20

**happy**
42:8

**harassing**
33:1

**hard**
6:22 23:13



**he'll**
6:6

**head**
7:5,6 16:9 44:5

**heading**
43:13

**hear**
14:23 15:8,14 16:15
18:21,23,25 20:13,15
31:12 35:6,15 40:5
43:17 44:11,13,22
46:19 47:1,5

**heard**
16:6,14 18:18,20,22
19:4,11,17 20:16,17,
19 24:12 26:23
36:11,13 43:10,15
44:3,6 46:17,18
47:19

**hearing**
19:6 29:10 47:6

**hectic**
23:18

**held**
4:7

**hey**
25:9 46:4

**high**
11:6,8 46:13

**hit**
22:6 49:11,20

**hold**
23:2 26:18

**holding**
23:10 24:24 29:5

**holes**
22:5,21

**honestly**
48:7

**hood**
20:4

**hour**
7:22 37:1

**hours**
13:13

**house**
11:22 12:8,15 13:9,
18 14:20 16:3 19:13
20:6 30:25 31:17
32:5,9 33:17,25

34:23 35:1 36:4,10
40:13,14,17,18 41:8,
16 42:2,3,4,7 43:22
44:4 45:23 46:19
50:18,19 51:3 52:25

**housekeeping**
6:17

**houses**
12:12 14:22

**huh-uh**
7:6

**hundred**
20:12

**husband**
13:7

---

**I**

---

**ID**
17:7,9,10 18:3 44:24
45:5 51:12

**identify**
4:17 48:8

**illegal**
14:1 36:8

**important**
6:17

**incident**
39:2,3,21,23,25
43:21

**including**
4:20

**Incorporated**
4:15

**information**
8:8

**injuries**
21:21

**injury**
10:20 25:10

**inside**
20:21,22 21:25 44:10

**insist**
35:6

**Instagram**
51:17,25

**interact**
35:12

**interacting**
45:21

**interaction**
44:18,22 45:1

**interactions**
45:14 50:7

**International**
4:12

**interviewed**
48:17

**investigator**
47:13 48:11

**issues**
15:2

**items**
6:17

---

**J**

---

**January**
8:11 51:9

**job**
6:22 9:17 23:22

**Joel**
49:1

**judge**
6:10

---

**K**

---

**KB**
50:13

**Kenyon**
50:15

**kids**
8:13,16 11:19,20
12:1 13:24 15:16,18
33:4 34:2

**kind**
9:19 10:7 13:15
15:21 23:18 42:24
52:19

**knew**
41:20

**knock**
48:22

**knowledge**
39:13

---

**L**

---

**labor**
41:21

**laborer**
9:4

**lady**
24:7

**lady's**
13:4

**Lamb**
4:7

**Lane**
4:10

**Laura**
4:22 47:7,10

**law**
4:20 48:12

**lawsuit**
6:6

**laying**
21:2 43:25

**lead**
10:6

**leave**
16:6 35:16 38:21

**led**
13:24

**left**
12:17,21 16:4

**legal**
4:14

**length**
24:17

**letting**
21:9

**level**
50:11

**life**
10:2 11:9 22:18

**lifting**
49:19

**lights**
16:7 36:14

**listen**
28:2

**live**
11:24 14:21 52:14,16

**lived**
8:10 11:9 12:23 13:4

**lives**
12:8 52:15

**living**

**8:8** 11:11,12,17,22
12:3,16

**located**
4:12,15 10:20

**location**
4:9

**locked**
17:1 46:8

**long**
7:22 8:10 9:6 26:19
47:21 52:20

**longer**
47:24

**looked**
16:19,24 17:5,6,8,11
18:2,6 22:11 26:1
37:1 38:7 43:12
44:21,23 45:19 49:10

**loss**
32:19

**lost**
32:18

**lot**
37:1

**loud**
15:9 46:25

**louder**
47:2

**Louisiana**
52:15,16

**lung**
10:21

---

**M**

---

**made**
14:4,16 21:3

**make**
5:23 7:3,11 21:4
27:15 37:16 53:9

**makes**
6:21 24:15

**making**
44:3

**man**
13:3 17:24 18:25
19:3 21:2,7,14,23,24
25:20 26:13 27:9
29:1 30:1,4 35:3,10,
12



**March**
11:11 12:9 15:25

**mark**
4:7 26:7 28:17,21

**marked**
26:8,10 28:12

**master**
16:4 19:13

**matter**
4:6,7

**max**
37:12

**Meagan**
13:5

**Meagan's**
13:18 22:7 41:16

**means**
47:5

**measure**
37:7

**media**
52:2

**medical**
10:3,13 23:5 29:19
35:7 42:17,24 43:7

**medical-type**
11:3

**medically**
9:14

**memorial**
34:3

**memories**
8:4

**memory**
25:25 26:1

**mentioned**
36:3,21 41:15 45:24

**Mescalero**
11:16 12:10

**mess**
7:15

**message**
28:6

**met**
30:20,22

**Michael**
14:12 34:3 35:6
43:25 44:13,18,23
45:3,9,11,15,22 46:3
49:1,8,13

**microphone**
28:19

**middle**
13:25 20:6,7

**Mike**
49:13

**miles**
37:1

**military**
9:10,13 29:20

**Mills**
4:19

**minute**
17:25 20:22 21:8
24:20

**minutes**
17:5 24:14 26:25
27:6 47:24

**misunderstood**
12:2

**models**
37:9

**mom**
34:7 40:18,20

**moment**
25:9

**month**
9:7 15:12

**morning**
13:19 14:6,7,24 50:4

**mother**
32:6,10

**motorcycle**
10:4 17:6,10,14 18:2
19:1,3 45:20

**motorcycles**
33:1 50:4

**move**
51:8

**moved**
8:11 16:10 38:8

**moving**
21:1 22:5

---

**N**

**necessarily**
31:4 32:19 47:1

**needed**
21:10,17 24:5,6 35:7

49:7

**Negative**
18:24 19:2,5 25:1,12
36:9 37:8,11,14
38:19,25 41:25
42:19,21,23 43:9,18
44:12,15 45:10,13
46:16 47:9,12 50:10,
16 51:1,4,7 52:4

**neighbor's**
20:6

**neighborhood**
14:19 15:2 51:6

**neighbors**
49:25 50:2,7,17 51:2

**Nicole**
30:17,20 31:17,19,24
32:11 33:8,10 34:1
39:1,2,13,15,20

**Nicole's**
30:18 31:15 39:24

**night**
13:13,25 24:23 31:25
47:20 48:17 52:8,18,
20

**nodding**
7:5

**noises**
46:25 47:2

**nonetheless**
7:23

**normal**
45:15

**north**
12:18

**notes**
34:10

**noticed**
4:5 16:21

**number**
4:9 31:13,15

**nurse**
42:20

---

**O**

**oath**
6:9

**Obregon**
4:6,21 14:12,14

27:24 33:16 34:4
35:7 44:14 52:23

**Obregon's**
43:25

**obstructing**
36:19

**occurring**
36:8

**offense**
7:17

**office**
47:8,11

**officer**
17:5,11,12,19,24
18:3,21 19:24 20:10,
11,13 21:1 23:21
26:17 27:25 28:23
44:3 45:12,15

**officer-involved**
12:10

**officers**
27:1,3

**official**
5:18

**older**
50:22

**open**
14:21 17:2 29:18
46:4

**opened**
16:10,25 36:14 44:6

**operator/maintainer**
9:18

**opinion**
39:24 45:15

**opposed**
7:5 16:17

**opposite**
20:4 50:18

**options**
53:5

**ownership**
12:6

**owns**
52:9

---

**P**

**p.m.**
28:10,11,14 34:14,

15,17 54:4,5

**pair**
38:4

**part**
14:21 32:16

**parts**
41:20

**party**
40:14

**passed**
24:11 26:23 31:11

**past**
37:3

**patches**
10:20

**Patriot**
9:18

**pause**
19:8

**pay**
24:10 41:20

**pending**
7:25

**people**
13:2 30:9

**percent**
22:25

**person**
17:6,8 22:10 48:8
50:13

**personal**
10:2 13:22 39:24
50:11

**personally**
12:24 21:4 24:24
42:5 45:24

**Phoenix**
4:13,16

**phone**
31:13,15 38:11,13,
17,18,20,24 39:16

**phonetic**
49:2

**photo**
26:5

**pick**
17:11 45:3

**picked**
42:6



**piece**
29:17

**plaintiffs**
4:20 6:4

**plaintiffs'**
4:18

**plastic**
29:17

**play**
27:21

**playing**
27:25 38:17 51:22

**pleading**
44:7

**point**
11:20 17:13 22:6
23:2 24:23 25:19
38:23 48:24

**poked**
16:9 20:25 44:5

**police**
29:17 48:18

**porch**
19:24 21:7 43:16,25
44:6

**portion**
9:5

**post**
52:2

**pouch**
23:14,16

**present**
4:21

**pretty**
10:22 13:5 15:9,15,
20 33:2 47:1

**printed**
53:6

**prior**
37:20 44:18,19 45:22
47:8,11

**prison**
43:3

**prisons**
8:25

**private**
43:5 47:13 48:11

**proceeding**
5:17

**professional**
43:8

**profile**
51:15

**promising**
6:10

**property**
12:3 21:25 22:8,15
24:8

**provide**
23:10

**pry**
10:1

**pull**
13:18 45:9 51:14

**put**
5:7 23:15

**Putt**
50:25

---

### Q

**Qatar**
9:24

**question**
6:24,25 7:15,18,25
11:1,2 17:16,23 27:7
37:23 38:6

**questions**
6:2,7 7:14 24:9 34:9,
19 47:19 48:24

**quicker**
23:6

---

### R

**R-U-T-H**
9:2

**radioing**
22:24

**rail**
41:5,6,9,10,14,22,24
42:1,9,15

**raking**
13:16

**ram**
16:11,23 21:25 46:3

**ran**
17:2 41:17

**reach**

**reaching**
23:14

**ready**
16:5 38:21 43:14

**realize**
16:1

**realized**
46:8

**reason**
14:5 35:16

**recall**
10:23 26:13 28:25
29:25 30:2 32:15
33:6 34:2 35:5 38:24
39:1,5,11 40:16
47:23 48:2,10,15
49:15,20,21,23,24
52:19,24

**recalled**
47:19

**receive**
49:4

**receiving**
49:6

**recently**
9:7

**recognize**
17:17,23 18:1

**record**
4:3 5:14 7:12 27:21,
23 28:8,9,11,13,16
34:13,16

**regular**
37:6

**regularly**
39:17

**related**
47:13

**relation**
12:15 21:23

**relationship**
39:23 40:21 42:14

**remember**
8:4 10:18,19 11:12,
13 18:7,8,9 19:6
20:17 21:22 22:24
23:9,11,17 24:1,2,16
29:10,20 32:20,23,24

20:16 44:6,8 45:2
49:7

**remembers**
53:16

**removing**
22:21

**render**
22:1,2,20 25:7

**rendering**
22:23 23:5 24:13,25

**repeat**
26:21

**report**
49:4

**reporter**
4:11 5:4,7 7:7

**reporter's**
6:22

**represent**
4:18,20,23 5:24

**represents**
6:4

**responder-type**
10:8

**response**
42:24

**review**
53:9,19

**revive**
35:10

**riding**
15:14

**road**
4:13 13:18 15:15
30:5 36:22 46:2

**roads**
33:2

**Robin**
4:14

**roll**
35:10

**rolling**
49:21

**room**
43:14

**rough**
26:20

33:5,7,8,24,25 36:23
38:21 47:6,15,20,22
48:4,7 49:1,6,8,19
52:11,25 53:15

**row**
19:8,10

**rule**
7:3,24

**rules**
5:23

**run**
15:22 18:8 39:8 41:2
45:18 49:9

**running**
19:16 39:5 49:10

**Ruth**
9:2

---

### S

**safe**
50:2

**safety**
15:1,16

**sand**
41:5,6,9,10,14,22,24
42:1,8,15

**save**
22:17

**scene**
35:16

**school**
11:5,6,8

**seal**
29:15,16

**seals**
29:8,21 30:1 49:16

**Sean**
4:19 26:6 27:24

**seconds**
19:23 20:23 21:3
24:20 28:24,25

**sector**
43:5

**send**
28:6 53:8

**sense**
10:2 15:11

**September**
4:4

**sequence**
19:18

**service**
34:3



shady
49:25

shaking
7:6

shattered
10:4,5

sheriff's
16:1

shirt
22:5,21 29:1 49:19

shoes
38:4

shooting
12:10 26:19 31:25
32:2,14,17,21 33:8,
14,21 48:17 49:14

short
34:15

shortly
32:14

shot
10:17,24 26:14 44:18

show
26:5 27:6,19

showed
28:16,21,23

showing
26:10

side
12:17 16:4 20:4,5
25:19 39:25 40:1
50:17,19

side-by-side
15:1

sidetracked
22:22

sign
53:9

signs
15:23

silver
26:1

similar
24:10

sir
8:8 35:20 36:1 37:5
38:12,22 39:4,11
40:8 43:20 44:21
45:6,8 48:7,25

situation
24:17

size
37:4

slip
7:10

smaller
37:4

Smart
4:14

snarky
7:11

social
52:2

socialize
30:24 31:4

soldiers
10:6

sort
34:3

sound
24:10

sounded
44:7

Sounds
8:6

speak
5:18 7:4 33:18

speaking
52:25

specialist
4:15

specific
23:9

specifically
9:3

speculating
8:5

speed
37:7,12 46:13

speeding
15:5,17 36:22,25

spell
9:1

spoke
22:16 47:15 49:5
50:20,23 52:9,22

standing
12:19 21:11,22 24:4

30:5

start
23:5

started
9:7 21:9 24:7

starting
4:18

state
5:14

statements
44:3

States
4:8

stay-at-home
9:9

stealing
38:2,3

stepped
25:17

steps
25:13,15

stole
38:4

stood
21:8

stop
15:23 16:13 22:9

stopped
17:4

stream
51:20

street
11:15 12:13 16:2
20:6,7 46:20 51:3

strike
10:7 27:2

stuff
8:25 13:14,15

sucking
10:14,19

Suite
4:10,13

supervisors
9:5

support
32:10,16,18

surprise
47:3

suspect

7:21

suspicious
36:4

swore
6:9

sworn
4:25 5:4

systems
8:24 9:19

---

**T**

taking
19:24 20:9

talk
6:18 8:4 15:25 31:24
32:7 33:23 39:16,20
45:20 47:13 48:22

talked
12:25 32:2 33:10,13,
16 47:7 52:7

talking
7:16 15:11 17:6
33:20 38:18,20,24
39:1 44:23

technician
42:18

telephone
39:10

telling
49:8,24 52:11

ten
24:20 46:14 47:3

Teresa
4:11

terms
15:17 22:23 29:19

testified
5:5

testimony
5:19 53:19

text
39:18

therapy
49:7

thing
27:20

things
5:24 7:4,5 29:22 36:4
43:14 46:19 47:2

thought
9:12 12:2 14:3,9
25:2,9,14

threatening
45:11

three-wheeler
15:14

Tiffany
8:15

time
4:4 5:22 6:20 7:24
15:8,10 16:9 18:11
21:1 24:6,11 26:23
27:16 28:10,14,25
32:5 33:11,18,19,20,
21,25 34:14,17,24
36:22 39:7,10 43:14,
22 44:10 48:3 52:16
54:4

timeline
34:21

times
13:17 15:13 24:16
26:20 31:6,7 40:13
50:24

tire
17:2

today
4:9 6:15 7:8,22 8:3
53:6

today's
4:3 54:3

told
23:23 25:7 39:6,9
41:9,17

top
26:1

topic
47:17

total
8:17

tow
42:3

towed
42:6

traffic
13:20

trailer
11:12,17,24 12:3,6
21:12 52:9



**trailers**
14:22

**trained**
10:16,23,24 29:12,22
37:18

**training**
10:9,12 11:3 25:3,11
29:13 37:16 42:24,25
43:5

**transcript**
53:6

**transpired**
32:8

**treat**
29:22

**trees**
36:18

**trouble**
38:2

**truth**
6:11

**turn**
35:20

**turned**
38:2

**type**
5:17 51:15

---

**U**

---

**uh-huh**
7:6 18:4 21:13 22:19

**uncommon**
14:23

**understand**
5:24 6:13 7:15,17
10:25 12:7 15:3
27:16

**understood**
7:19

**Union**
11:8

**unique**
14:20

**United**
4:8

**unusual**
13:10

**upload**
51:22

**upset**
22:18 39:25

---

**V**

---

**Van**
4:22 5:11 26:6,9
27:23 28:4,7,15,20
34:12,18 35:19 40:24
46:6,9,21 48:13 50:9
53:4,8,12,14,18,22,
25 54:2

**vehicle**
19:25 20:1,3,4,5
45:21

**vehicles**
37:13

**verbatim**
18:7

**versus**
4:7

**video**
4:15 27:19,21 28:6
30:4 46:12 51:20,22

**video-recorded**
4:5 54:4

**Videodep**
4:15

**videos**
51:22

**view**
36:16

---

**W**

---

**Wade**
50:25

**wait**
6:22,24

**waited**
17:5 19:23

**waiting**
24:6

**waive**
53:9,14,25

**wake**
13:19

**waking**
13:24

**walk**

35:9

**walked**
21:16 41:16

**walking**
21:9,24 22:1

**wanted**
21:4 34:20 51:14

**watched**
21:7 28:24 29:25

**watching**
18:6 38:14,23

**Watson**
4:11

**week**
15:11,13

**west**
8:9 20:3

**wheelers**
13:17

**white**
29:1

**wife**
8:13 11:19 12:1 16:5
18:6,10 19:16 20:21
30:17 31:5 32:10
34:6 38:8,24 39:5,6,
12,14,20 40:10 43:12
45:24 50:23 51:23
52:5 53:16

**wife's**
8:14 30:12 32:6,10
40:18

**window**
16:4,9,10,19,24
18:10,14 36:12,15
38:7 39:7 43:12
44:21

**witnesses**
5:18

**woman**
13:3 27:11 30:4,16
34:23 35:1,10

**Woods**
4:19 6:4 28:3,5 34:8
35:21,24 41:1 46:7,
11,24 48:16 50:12
53:2

**Woods'**
35:20

**word**

10:13 31:20

**words**
35:16

**work**
8:22,23 41:2,6,8,22
42:8,15

**worked**
9:6 42:22 43:1

**working**
8:20 9:7 41:18 48:12

**wound**
29:18

**wounds**
10:14,19 23:15 29:22

**Wow**
8:18 9:8

**wrecked**
10:4

**written**
53:20

**wrong**
37:17 53:20

**wrongdoing**
40:2

---

**X**

---

**XYZ**
25:10

---

**Y**

---

**yard**
13:14 15:18,21 16:12
50:5

**year**
8:11 9:25 10:5 48:6

**yelling**
22:8,15 23:21 24:7
39:5

**young**
27:11 34:23,25 35:10

**younger**
22:12 23:20,24 24:7

---

**Z**

---

**Zoom**
6:4



# EXHIBIT 3



DEFS_Obregon 000146

# EXHIBIT 4

# In the Matter of:

*Obregon*

*vs*

***Lamb***

*Wade Putt*

*September 25, 2025*



**G R I F F I N   G R O U P**
**I N T E R N A T I O N A L**

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Michael Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB,<br><br>    Plaintiffs,<br><br>      vs.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X,<br><br>    Defendants. | Case No. 2:24-cv-01510-PHX-KML |

VIDEOCONFERENCE VIDEO-RECORDED DEPOSITION OF

WADE PUTT

Casa Grande, Arizona
September 25, 2025
10:29 a.m.

REPORTED BY:
TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



Page 2

I N D E X

WITNESS:      PAGE:

WADE PUTT

    Examination by Ms. Van Buren     5

    Examination by Mr. Woods     23

    Further Examination by Ms. Van Buren     38

E X H I B I T S

Deposition     PAGE:

   1     Video: Obregon_000073-ringcamera.mp4     38

Page 3

THE VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF WADE PUTT was taken at 10:29 a.m., on Thursday, September 25, 2025, at the Fitzgibbons Law Offices, P.L.C., 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona, before TERESA A. WATSON, Registered Merit Reporter, and a Certified Reporter in and for the State of Arizona, County of Maricopa, pursuant to the Rules of Civil Procedure.

COUNSEL APPEARING:

For the Plaintiffs:

MILLS + WOODS LAW PLLC
Sean A. Woods, Esquire (via Zoom)
swoods@millsandwoods.com
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014

For the Defendants Lamb and Gibson:

WIENEKE LAW GROUP, PLC
Laura Van Buren, Esquire
lvanburen@wienekelawgroup.com
1225 West Washington Street, Suite 313
Tempe, Arizona 85288

Also Present:

Robin Smart, Videographer
Allison Obregon (via Zoom)

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER: We are on the record. Today's date is September 25th, 2025. The time is 10:29 a.m. This is the video-recorded deposition of Wade Putt, noticed by counsel for the defendants in the matter of Allison Obregon, et al., versus Mark Lamb, et al. This matter is being held in the United States District Court, District of Arizona. Case Number 2:24CV-01510-PHX-KML. Our location today is 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona 85122.

The certified court reporter is Teresa Watson with Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona 85018.

My name is Robin Smart. I'm the certified legal video specialist for the firm of VideoDepo, Incorporated, located in Phoenix, Arizona.

Counsel, please identify yourselves and whom you represent, starting with plaintiff's counsel, please.

MR. WOODS: This is Sean Woods, Mills & Woods Law. I represent the plaintiff, Allison Obregon, et al.

MS. VAN BUREN: And this is Laura Van Buren on behalf of defendants. And for the record, Ms. Obregon is also present via Zoom.

THE VIDEOGRAPHER: Thank you, Counsel. The witness may be sworn in, please.

Page 5

WADE PUTT, called as a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

E X A M I N A T I O N

BY MS. VAN BUREN:

Q. Sir, could you please state your full name for the record?

A. Wade Patrick Putt.

Q. Mr. Putt, have you ever had your deposition taken before?

A. Yes, I have.

Q. How many times have you had that done?

A. One time.

Q. What was the circumstances of that?

A. An accident.

Q. What -- what kind of accident was it?

A. I was involved in an accident where I got injured.

Q. Did you file a lawsuit?

A. I did.

Q. And that was when your deposition was taken?

A. Yes.

Q. Do you remember when that was?

A. Approximately seven years ago, but I don't remember

Page 10

MR. WOODS: Objection, form.

BY MS. VAN BUREN:

Q. Did you know the people who lived at that house?

A. I met the lady that lived there, and I can't remember her name, because it was, like, five, six years ago. I -- I met her once, I believe. I waved at her a few times. I knew that there was a gentleman living there or there most of the time, but I never met him, no.

Q. Did you know if anyone else was living in the house?

A. I -- no. I keep to myself pretty much.

Q. Okay.

A. Which I should have done this time.

Q. Did you ever see any unusual activity at that house?

A. Meaning?

Q. Anything that you thought was unusual?

A. At times a lot of -- well, not a lot. I don't -- I can't say that. More traffic than what all my other neighbors had, and it was usually short traffic, you know, like somebody stop there for a little bit and then leave.

Q. Why did that stand out to you as unusual?

A. Well, all my other neighbors didn't have it. I don't have it. So, you know, I don't know what their situation is, but it just stood out, you know, because -- well, there's not many cars go down our road a day.

Q. Were you ever suspicious about why cars were coming

Page 11

and going like that?

A. Nope. It's none of my business.

Q. Was it common for people to drive ATVs or dirt bikes up and down your street?

A. Yeah, once in a while.

Q. Would you say that that was a problem in the neighborhood?

A. No. I wouldn't say it was a problem. I wouldn't say that it was not -- not uncommon.

Q. Okay. Did you ever observe any issues with dirt bikes or ATVs speeding?

A. Yeah. There's been some coming down our street and the neighboring streets that they don't know how to drive the -- the speed limit.

Q. Okay. Did you ever see any issues with dirt bikes or ATVs not stopping at the stop sign?

A. I didn't really notice, because the stop sign is, like, one property away from me. So it's -- I'd have to walk out to the road to see that.

Q. But you had seen dirt bikes speeding before?

A. I've seen dirt bikes and ATVs and side-by-sides driving -- I -- what I believe to be faster than they should have been on the street.

Q. I want to talk through what happened on March 16, 2023. When did you first realize that there was police -- or

Page 12

it's a deputy -- sheriff's deputy on your street.

A. When my son-in-law said, "There's a policemen outside." And my daughter and I looked out the window, and then I immediately opened my inside door and was looking out the screen door.

Q. What did you see when you looked out the screen door?

A. I seen a police vehicle pulled up by -- in front of that house.

Q. Okay. Were you able to see any people?

A. I could see the officer.

Q. Where was the officer standing?

A. In the passenger side of the vehicle, I think.

Q. Okay.

A. I think is where he was. If I remember right.

Q. Did you recognize him?

A. What, as far as knowing him?

Q. Yeah. Did you know who he was?

A. I knew he was a police officer, but I didn't know, you know, that's John or something like that. No.

Q. That's my question. Okay.

What was the officer doing when you saw him standing out there by the passenger side?

A. Talking to the person in the yard, I know.

Q. Were you able to see the person in the yard?

A. No. The vehicle was in the way.

Page 13

Q. But you knew that there was someone over there who the officer was talking to?

A. Yes.

Q. Were you able to hear anything that was being said?

A. What I heard was, "put the" -- I don't remember the exact words. Something to the effect of "put the gun down" or something like that. I don't know if it was, "put it down, don't touch it," but something to the effect of a gun. And I heard him say that, like, I don't know how many times, but more than once.

Q. And when you say "him," that was the sheriff's deputy?

A. Yes.

Q. When he -- when you heard him say that, "put the gun down" or something to that effect, where was he standing at that point?

A. Like I said, I believe he was on the passenger side of the vehicle. Like, the front of the vehicle, like, where the hood is, you know, that area, I believe.

Q. Were you able to see what the other person was doing at any point?

A. No. Like I said, the vehicle was in the way.

Q. When the deputy said "put the gun down" or language like that, did you see if he had his gun drawn?

A. I saw him on the vehicle, but I didn't see the actual gun in his hand.

Page 14

Q. What do you mean when you say you saw him on the vehicle?

A. Well, he was like -- like this is the front of the vehicle. He was like -- I thought he was -- if I remember correctly, was kind of, like, leaning on it, like, I don't know, supporting himself or -- or what it was, but I didn't see the actual gun in his hand, no.

Q. Was his back to you when --

A. Yes.

Q. -- he was leaning?

A. Yes.

Q. Okay. So you would not have been able to see --

A. No.

Q. -- if there's a weapon in your hand?

A. No.

Q. You have to wait for me to finish. Otherwise, we're going to make her job harder. Okay?

A. Okay.

Q. What do you remember next?

A. Gunshots.

Q. How many?

A. I don't remember exactly how many there was. I believe that there was four, possibly five, but -- four for -- 99 percent sure.

Q. Okay. Were they all consecutive, right in a row, or

Page 15

was there a pause in there?

A. There was one, there was like -- the best way that I can describe it was, like, pop. Pop, pop, pop.

Q. Okay. So one --

A. One and then a -- I don't know. I can't say it was one second, two seconds, five seconds, but it was like pop. Pop, pop, pop. So there was a pause in between them.

Q. Okay. I have to ask you this question so I'm doing my job. Can you tell me, was it more than five seconds or less, the pause?

A. Okay. Thousand one, thousand two, thousand three, thousand four, thousand five.

No. It was not that long. It was probably between one and two seconds maybe. I'm guessing. You know. It's been, what, a year and a half ago, to try to remember the exact amount, but it was pretty quick after the first one. It wasn't a long time.

Q. Do you remember, was the deputy -- what was the deputy doing when you heard the pops, if you recall?

A. He'd already spoke, so he wasn't -- I don't know what -- what you're asking, actually, because it -- there -- you know, what he was doing, he wasn't jumping up and down or waving his arms or anything, you know.

Q. Let me ask you a better question. When you heard the pops --

Page 16

A. Uh-huh.

Q. -- was he still leaning over the vehicle? Was he standing up straight? Do you remember anything about physically what he was doing at that moment?

A. No. I don't, honestly.

Q. All right. After you heard the gunshots, what do you remember happening next?

A. Basically, the officer going over there to where I couldn't really see what was going on, and if I remember right, it -- the other neighbor was out, and he went over there, too.

Q. Okay. What did you do after you heard the gunshots?

A. Stepped outside on my front porch.

Q. And you said you saw the officer go around the vehicle at that point?

A. Yes.

Q. What was the next thing that you saw?

A. The next thing that I physically saw was several police cars coming down my road.

Q. Do you remember how much time passed between when you heard the shots and when those additional police cars arrived?

A. Boy. No. I don't remember exactly. I know it wasn't a half an hour or something.

Q. Okay.

A. It was -- I'm saying -- I'm guessing. I really don't know, but I would say probably 10 minutes maybe. I don't know

Page 17

for sure, though.

Q. Based on where you were and how the vehicle was positioned, were you ever able to see if there was any first aid going on with the man who was shot?

A. No. I -- I didn't position myself to go around anywhere, the vehicle or something to see what was actually happening.

Q. Okay. Do you remember seeing any -- I'm going to call them civilians, non-police folks out on the road?

A. Not on the road, no.

Q. In the area?

A. The one neighbor, I saw him when I first stepped outside. I saw him in his yard, but after that, I thought he went over there, but I'm not sure --

Q. Okay.

A. -- where he went.

Q. Do you remember seeing any other neighbors out -- neighbors or non-police officers out in the area after the shooting?

A. After police cars got there and everything, some people showed up.

Q. What can you tell me about them?

A. I don't know -- I don't know if they came out of that property or if they came there in a car. I -- I don't remember. I just remember that there was people out in the -- if I



Page 18

remember right, it was a -- two people maybe, and they were screaming and hollering and stuff.

Q. What were they screaming and hollering?

A. I don't -- I didn't hear it clearly what they were hollering, but it was something to the effect that "you shot him" or something like that that -- I don't remember exactly what they were saying, but they were yelling. What I assume, they were yelling at the police officer.

Q. Okay. Do you know who those people were?

A. No.

Q. Have you ever seen them since that time?

A. Not that I just recollect, no.

Q. Okay. How long would you say you stood outside?

A. Oh, probably a good hour or so maybe.

Q. All right.

A. Because I know other officers had showed up and whatnot and -- but I went back in the house at one point, but our whole street was full of police officers and ambulance and an investigation unit, and to the point where my wife couldn't even come home until she convinced the police that she lived there, and they let her through.

Q. Is there anything else you remember seeing or hearing before the gunshots that we have not talked about?

A. No, not really that I can think of.

Q. What about after the gunshots? Is there anything you

Page 19

remember seeing or hearing that we haven't talked about?

A. No, because like I said, I couldn't see what was going on over there on the other side of the police vehicle, and so...

Q. Did you ever hear -- after the shooting, did you hear that officer say something to the effect of "don't reach for the gun"?

A. I vaguely remember that statement, but to say 100 percent yes, I did remember that, if I -- if I told the officers that in my statement, then yes, I -- I heard it, but do I remember that? No.

Q. Okay. So let me ask maybe a better question. As you're sitting here today, do you have a memory of the officer who fired saying "don't reach for the gun" or words to that effect?

A. Like I said, I don't remember exactly. No.

Q. It's been two and a half years, right?

A. Yeah. Exactly.

Q. But you were -- you were interviewed by law enforcement that night, correct?

A. Yes. They -- I gave a statement, and they also came and got video footage from my Ring doorbell.

Q. And when they interviewed you, the events were fresh in your mind, correct?

A. Oh, absolutely.

Q. So if you told those officers that you heard the

Page 20

deputy say "don't reach for the gun," your memory then would be better than it is now, right?

A. Absolutely.

Q. Were you honest when you spoke with those officers?

A. Yes. Very honest.

Q. And are you being honest here today, sir?

A. Yes.

Q. Going back to the night of the shooting, did you speak to anyone else about what you saw besides the officers who interviewed you and your family?

A. No.

Q. You didn't speak to any neighbors that night?

A. Nope.

Q. Let's talk about since that day. Have you spoken to anybody about what you've seen?

A. No, not really. It's in the past.

Q. Did you speak to any neighbors about what you saw?

A. I don't remember doing that, no. I -- I may have one neighbor across the street, but I don't remember if I did or not.

Q. And who would that neighbor be?

A. I know him as KB.

Q. Okay.

A. But I can't remember what his real name is, because I've always called him KB.

Page 21

Q. Do you remember anything more specific about your conversation with KB?

A. No. It was just, you know, wow, can't believe that happened in the neighborhood type of conversation, you know. But any details or anything, no.

Q. Yeah. Yeah. And do you remember a private investigator calling you to ask about the case?

A. I do, and that -- oh, yeah.

Q. I shouldn't say "the case." To ask about these events.

A. Yes. Private investigator, he did call and asked a few questions and -- but...

Q. Did he try to sway or influence what you were going to say here today?

A. No. He just asked some questions and that was it. He didn't say who he was representing or anything, so I figured it was for you or something. I didn't -- I had no idea.

Q. Has anybody tried to influence or change your testimony?

A. No, not personally or verbally, but I do believe that they -- back in whatever it was, when all the kids graduated in May, I believe that there was possibly a retaliation against my family, because there's never been an issue with theft or anything illegal that I perceived on my street, and then the night of one of the graduations that was right next door to the



# EXHIBIT 5

# In the Matter of:

*Obregon*

*vs*

***Lamb***

_____

*Samantha Plummer*

*September 25, 2025*

_____



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF MARICOPA

Allison Obregon, an individual; )
Allison Obregon on behalf of    )
and as legal guardian and       )
parent of her minor child, MC;  )
Allison Obregon as pending      )
personal representative of the  )
Estate of Michael Obregon;      )
Meagan Brady, individually;     )
Meagan Brady on behalf of and   )
as legal guardian and parent of )
her minor child, MB,            )
                                )
        Plaintiffs,             )
                                )
          vs.                   ) Case No. 2:24-cv-01510-PHX-KML
                                )
Mark Lamb and Jane Doe Lamb,    )
husband and wife; Brady Gibson  )
and Jane Doe Gibson, husband    )
and wife; John and Jane         )
Does I-X,                       )
                                )
        Defendants.             )
_____)

VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF

SAMANTHA PLUMMER

Casa Grande, Arizona
September 25, 2025
9:19 a.m.

REPORTED BY:
TERESA A. WATSON, RMR
Certified Reporter
Certificate No. 50876

PREPARED FOR:
ASCII/Condensed

(Certified Copy)



Page 2

I N D E X

WITNESS:                                                          PAGE:

SAMANTHA PLUMMER

   Examination by Ms. Van Buren                                       5

   Examination by Mr. Woods                                          19

   Further Examination by Ms. Van Buren                              28

   Further Examination by Mr. Woods                                  30

Page 4

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are on the record.  Today's date is September 25th, 2025.  The time is 9:19 a.m.  This is the video-recorded deposition of Samantha Plummer, noticed by counsel for the defendants in the matter of the Allison Obregon, et al., versus Mark Lamb, et al.  This matter is being held in the United States District Court for the District of Arizona.  Case number 2:24CV-01510-PHX-KLM -- excuse me -- KML.  Our location today is 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona 85122.

The certified court reporter is Teresa Watson, with Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona 85018.

My name is Robin Smart.  I'm the certified legal video specialist for the firm of VideoDepo, Incorporated, located in Phoenix, Arizona.

Counsel, please identify yourselves and whom you represent, starting with plaintiff's counsel, please.

MR. WOODS:  Sean Woods on behalf of Mills Woods Law.  I represent the plaintiffs, Allison Obregon and et al. in the case.

MS. VAN BUREN:  And this is Laura Van Buren on behalf of the defendants.  And I would also just note for the record that Ms. Allison Obregon is also present on Zoom.

Page 3

THE VIDEOCONFERENCE AND VIDEO-RECORDED DEPOSITION OF SAMANTHA PLUMMER was taken at 9:19 a.m., on Thursday, September 25, 2025, at the Fitzgibbons Law Offices, P.L.C., 1115 East Cottonwood Lane, Suite 150, Casa Grande, Arizona, before TERESA A. WATSON, Registered Merit Reporter, and a Certified Reporter in and for the State of Arizona, County of Maricopa, pursuant to the Rules of Civil Procedure.

COUNSEL APPEARING:

For the Plaintiffs:

   MILLS + WOODS LAW PLLC
   Sean A. Woods, Esquire (via Zoom)
   swoods@millsandwoods.com
   5055 North 12th Street, Suite 101
   Phoenix, Arizona  85014

For the Defendants Lamb and Gibson:

   WIENEKE LAW GROUP, PLC
   Laura Van Buren, Esquire
   lvanburen@wienekelawgroup.com
   1225 West Washington Street, Suite 313
   Tempe, Arizona  85288

Also Present:

   Robin Smart, Videographer
   Allison Obregon (via Zoom)

Page 5

THE VIDEOGRAPHER:  Thank you, Counsel.  The witness may be sworn in, please.

SAMANTHA PLUMMER, called as a witness herein, having been first duly sworn by the Certified Court Reporter, was examined and testified as follows:

E X A M I N A T I O N

BY MS. VAN BUREN:

Q.  Good morning.

A.  Good morning.

Q.  Can you please state your full name for the record?

A.  My name is Samantha Jo Plummer.

Q.  Ms. Plummer, have you ever had your deposition taken before?

A.  No, I have not.

Q.  Okay.  Let me go over some background with you that will hopefully calm some of your nerves.  The first thing and the most important thing is that you were just put under oath, and it's the same oath that you would be under if you were testifying in court.  And so by agreeing to that oath, you promise to tell the truth today.  Do you understand that?

A.  Yes, I do.

Q.  And is that what you're going to do for us?

Page 10

there.

Q. Okay. Can you give me an estimate? If you were standing at the front door of your house, how far away is the fence to that house where the officer-involved shooting happened?

A. If I had to guess, I would say probably about 50 feet. Maybe 100, but I -- I honestly couldn't tell you.

Q. That's all right. Sometimes it helps people to think about things in terms of car lengths.

A. Two car lengths then.

Q. And is that from your front door to their fence?

A. That would be to the road.

Q. Okay. So two car lengths from your front door to the road?

A. Right.

Q. Then how many car lengths would you say from the road to their front fence?

A. Probably half a car length.

Q. Okay. So two and a half car lengths from your front door to the fence?

A. Yes.

Q. Okay. And that's your best estimate today?

A. Yes, it is.

Q. All right. Did you know the people who lived in that house?

Page 11

A. No, I did not.

Q. Did you know, for example, how many people lived there?

A. No, I did not.

Q. Could you describe them at all by gender or age or appearance? Anything?

A. No, I could not.

Q. Did you ever see any unusual activity at that house?

A. I guess the only unusual activity would be ATVs or quads, things like that, but I think it was only unusual for me because of where I used to live and that was not something normal, where it is something normal here.

Q. And what do you mean exactly when you say "ATVs or quads"? What were you seeing?

A. Just people riding them or leaving from there on them, but other than that, I -- I don't think for around Arizona that is unusual.

Q. But coming from Michigan, that was new for you?

A. Coming from -- from Michigan, that was new for me.

Q. Would you see a lot of ATVs or dirt bikes in your neighborhood?

A. Occasionally, but not very often.

Q. Was it more common to see them on your street than in other places in the neighborhood?

A. No. I don't think so.

Page 12

Q. Okay. Anything -- any other activity you remember seeing at that house across the way?

A. No.

Q. Did you feel like the ATVs or the motorbike drivers were an issue in the neighborhood?

A. No, I didn't. I think they were just people having fun.

Q. I want to walk through your -- your memory of the events that we're here to talk about. Tell me -- at some point that day, did you realize that there were the police or specifically a sheriff's deputy out on the street?

A. Yes. I was in my room, and my husband was in the living room that was facing the street, and he stated, "There's a cop across the street." So I came out of my room, and I went and looked out the front window, and I was like, "Huh. Okay." So then I turned around and I went back to my room.

Q. And let me stop you there before you go any further. What specifically do you remember seeing when you looked out -- when you looked out onto the street?

A. Just an officer's truck. I can't tell what way he was facing as far as, like, north, south, east, west. I wasn't familiar with that. But he was facing towards the right when I looked out the window.

Q. Okay.

A. And he was on the side of the truck closest to the

Page 13

house, to my house.

Q. Okay. The officer was?

A. The officer was. Talking to a gentleman across his truck.

Q. Okay. Could you see that gentleman at all?

A. The only thing I could see was a brown hat.

Q. Were you able to see his face?

A. I was not.

Q. When you looked out the window and you saw that, in that moment, did you hear anything?

A. I did not at that moment.

Q. Were you able to tell what the officer or the other gentleman were doing in that moment where you were looking out the window?

A. They were talking, as far as I know.

Q. Okay.

A. But it wasn't loud enough that I could hear what was being said.

Q. All right. You said that you turned around and went back into your room at that point?

A. Yes.

Q. What happened next?

A. Then I heard popping. It was, like, five different shots, and then I came running back out of my room to look out the window, and I saw the officer crouching on the side of his



Page 14

truck, and I heard him say, "don't reach for the gun."

Q. And do you recall -- did you hear him say that more than once?

A. Yes. I heard him say it at least twice.

Q. Did you hear the officer say anything about a gun before you heard those pops?

A. I did not.

Q. All right. When you came running back out to look out the window, what did you see?

A. Like I said, I saw the officer crouching on the side of his truck closest to my house, and then I heard him say, "Don't reach for the gun." And then he went around the front of his truck, towards a gentleman. At this point, I could not see the gentleman. He was on the other side of the truck. And then another guy from across the street from us jumped the fence and helped the officer.

Q. What do you mean when you say helped the officer?

A. I'm assuming helped subdue the gentleman, but I could not tell you for sure, because I couldn't see through the truck.

Q. Were you able to see what the officer or the other gentleman were doing on the other side of the truck?

A. I could not.

Q. So you're speculating that he was helping the officer?

A. I'm -- yes, I am.

Q. Okay. Did you recognize that officer at any point?

Page 15

A. I did not.

Q. When you looked out the window, were you able to see a weapon anywhere?

A. I was not able to see a weapon.

Q. What did you do next?

A. Then my son said to me that he wanted to come out, and I wouldn't let him come out of his room.

Q. He wanted to go outside the house?

A. He did. He wanted to go outside and see what was going on, and I told him that he couldn't, because I was not sure if it was safe for him to be out there.

Q. Okay.

A. Then after that, after we knew that it was safe, then my dad, my son and I all went on the front porch and was out watching.

Q. How long would you say after you heard the shots did you all go out on the front porch?

A. I would have to say 15 to 20 minutes.

Q. What did you see when you were on the front porch?

A. The other officers show up.

Q. Do you remember what agency they were from?

A. I do not.

Q. What did you see the other officers doing?

A. They just secured scene. They put up tape, and they made sure that no one else came around to where the gentleman

Page 16

was.

Q. Were you able to see the gentleman who had been shot at this time?

A. I was not. The truck was in the way.

Q. At any point did you ever walk around the truck?

A. I did not. I did not leave the front area of -- the fencing of our yard.

Q. All right. You said that when you were out on the porch, you saw officers on the scene. Did you see any civilians on the scene?

A. I did.

Q. Tell me what you saw.

A. I saw a woman come running up the road, yelling for someone to help the gentleman that was on the ground.

Q. And would you remember what she looked like?

A. I don't.

Q. Do you remember how old she was?

A. I -- I would guess somewhere in her late 20s, early 30s.

Q. Do you remember anything, like, what she was wearing?

A. No, I don't. I'm sorry.

Q. You said she came running up the road?

A. Right.

Q. Describe more what you mean by that.

A. From -- because the officers had the road blocked off,

Page 17

I assumed she parked down further and then came up the -- towards the left side, running towards the truck.

Q. So she did not come running from the neighbor's house?

A. I don't believe she came running from the neighbor's house.

Q. What -- do you remember that woman yelling anything else?

A. No.

Q. By the time -- when she was yelling for someone to help the gentleman on the ground, what were the -- what were the officers doing?

A. Just standing there.

Q. Were you able to see what was happening on the other side of the truck?

A. No.

Q. Did you see any other civilians around when you were out on your porch?

A. There was a gentleman that held the woman back.

Q. Okay. Do you remember anything about what he looked like?

A. No, I don't.

Q. Any other -- I'm going to call them civilians who you remember being on the street when you were out there on the front porch?

A. There was not anyone on the street but a few neighbors



Page 18

at the houses across the street.

Q. At some point that night, did a officer or a detective come and talk to you?

A. Yes, he did.

Q. Do you remember how long that conversation lasted?

A. I would say roughly about ten minutes. It wasn't very long.

Q. Is there anything else as we're sitting here today that you remember about the events leading up to when you heard the gunshots?

A. No, there's not.

Q. Is there anything else you remember from the 20 minutes after you heard the gunshots?

A. No.

Q. Have you spoken with any of your neighbors --

A. No.

Q. -- about this incident?

A. No.

Q. Have you ever spoken with any -- have you ever spoken with a person named Allison Obregon?

A. No, I have not.

Q. What about Mariah Brady?

A. No, I've not.

Q. What about Meagan Brady?

A. No.

Page 19

Q. Have you spoken with anyone else about this incident?

A. No.

Q. Were you honest when the detective interviewed you on the day of the incident?

A. Yes, I was.

Q. And have you been honest today?

A. Yes, I have.

Q. You and I have never met, correct?

A. We have not.

Q. And we've never spoken on the phone?

A. We have not.

Q. Are you being offered anything today in exchange for your testimony?

A. I am not.

Q. Has anyone pressured you to try to change or alter your testimony?

A. No.

MS. VAN BUREN: All right. Ma'am, those are all the questions I have. Mr. Woods may have a few for you.

EXAMINATION

BY MR. WOODS:

Q. Thank you, Ms. Plummer. I just have a couple of questions.

I just want to be clear on the timeline of what you

Page 20

saw and heard on that day. Did you -- before any of the shooting or anything like that happened, did you see a police car?

A. I saw the police car after it was stopped in front of the house.

Q. And what prompted you to look outside the house to see that car?

A. My husband said that there was an officer outside.

Q. Okay. Did you hear any of the vehicles, the dirt bike or the police car drive up?

A. I did not.

Q. Okay. And how long did you look outside the window when -- when your husband said there's a police car?

A. Only a couple minutes.

Q. And in that couple of minutes, had the officers started shooting yet?

A. No.

Q. Okay. So you went back to whatever you were doing prior to that?

A. Yes.

Q. Okay. And then what did you hear? Did you hear the shooting? Did you hear yelling? What did you hear after that?

A. I heard the shooting.

Q. Okay. And did you hear any yelling or any kind of back and forth between the officer and --

Page 21

A. The only yelling I heard was after I came back to the window, after the shooting, and I heard the officer yell, "Don't reach for the weapon."

Q. Okay. And you -- were you at an open window or were you at your closed bedroom window?

A. I was at the front living room window, but my dad was at the front door with the door open.

Q. Okay. But prior to -- prior to that, the only thing you had heard was the -- the pop, pop, pop sound that you've described?

A. Yes, sir.

Q. Okay. When you saw the officer -- and I'll let you know it's Deputy Gibson. When you saw Deputy Gibson crouching by his vehicle, did he fire any more shots at that point, or did you hear any more shots after that?

A. No, I did not.

Q. Okay. Did you see whether or not he had his gun out?

A. He did have his gun out.

Q. Did he have a flashlight?

A. No.

Q. Okay. Did you see him move away from the car at that point, after that?

A. After that, then he went around his car, around the front end of his truck.

Q. Could you still see him when he was around the front



# EXHIBIT 6

# In the Matter of:

*Obregon*

*vs*

***Lamb***

*Mark Richard Hafkey*

*April 24, 2026*



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB,<br><br>        Plaintiffs,<br><br>v.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X,<br><br>        Defendants. | NO.<br>2:24-cv-01510-PHX-KML |

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF
MARK RICHARD HAFKEY

April 24, 2026
Witness Location:  Mariposa, California
9:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Certified copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Page 2

                    I N D E X
WITNESS                                        PAGE

MARK RICHARD HAFKEY

      Examination by Ms. Van Buren              5


                  E X H I B I T S
EXHIBITS  DESCRIPTION                        MARKED
No. 1    Police Expert Opinion, dated 1-31-26    8
         (19 pages) (OBREGON_000897 through
         OBREGON_000915)
No. 2    Curriculum Vitae (5 pages)              7
         (OBREGON_000916 through OBREGON_000920)

No. 3    Invoice, dated 2-2-26 (1 page)         41

No. 4    Forensic Examination Report, dated     70
         3-17-23 (14 pages) (DEFS_Obregon 000090
         through DEFS_Obregon 000103)

No. 5    Witness Statement Table on Obregon Case  9
         (3 pages)
No. 6    Radio/Video Timeline (1 page)          44
No. 7    Color copy of a photograph (1 page)    57

Page 3

VIDEO-RECORDED VIDEOCONFERENCED DEPOSITION OF MARK RICHARD HAFKEY, located in Mariposa, California, taken on April 24, 2026, commencing at 9:00 a.m. before ROBIN JASPER, a Certified Stenographer in the State of Arizona.

COUNSEL APPEARING BY VIDEOCONFERENCE:
     WIENEKE LAW GROUP
     BY:  Ms. Laura Van Buren
     1225 West Washington Street, Suite 313
     Tempe, Arizona  85288
     Attorneys for Defendants
     MILLS + WOODS LAW, PLLC
     BY:  Mr. Sean A. Woods
     5055 North 12th Street, Suite 101
     Phoenix, Arizona  85014
     Attorneys for Plaintiffs

ALSO PRESENT BY VIDEOCONFERENCE:

     Ms. Danielle Morris
     Mr. Alex Marinakis, Videographer

Page 4

THE VIDEOGRAPHER:  We are on the record. Today's date is Friday, April 24, 2026, and the time is 8:59 a.m. Arizona time.  This is the video-recorded deposition of Mark Richard Hafkey, noticed by counsel for the defendants, Lamb and Gibson, in the matter of Allison Obregon, et al., versus Mark Lamb, et al.  The case number is 2:24-cv-01510-PHX-KML.  This matter is being held in the United States District Court for the District of Arizona.

THE certified court reporter is Robin Jasper of Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona.  My name is Alex Marinakis.  I'm the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, would you identify yourselves and whom you represent, starting with the plaintiffs' counsel, please.

MR. WOODS:  Sean Woods from Mills + Woods Law.  I represent the plaintiffs in this matter.

MS. VAN BUREN:  Laura Van Buren from Wieneke Law Group on behalf of defendants.  Also present is Danielle Morris on behalf of the Arizona Counties Insurance Pool.

THE VIDEOGRAPHER:  Thank you, Counsel.

Page 5

The court reporter may swear in the witness at this time, please.


          MARK RICHARD HAFKEY,
a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:


          EXAMINATION
BY MS. VAN BUREN:
   Q.  If you will please state your full name for the record, sir.
   **A.  Mark Richard Hafkey.**
   Q.  You broke up there a little bit for me, which means you may have for the others.  Can you say it one more time.
   **A.  Mark Richard Hafkey.**
   Q.  Mr. Hafkey, where are you right now?
   **A.  I'm in Mariposa, California, County of Mariposa.**
   Q.  Are you in your home?
   **A.  Yes.**
   Q.  Is anyone else in the room with you right now?
   **A.  No.**
   Q.  Do you have any written materials with you right now?



Page 62

does that mean?

A. That -- what I explained, that I receive stuff digitally and I try to weed out what I don't need or -- and save just the items I think are very pertinent. And I look at a lot of stuff but -- and that's why I said "Miscellaneous Case File Information." There's a lot of stuff in that case file. I mean, there's thousands of pieces of paper and a lot of miscellaneous stuff I glanced through.

For example, I looked at Deputy Gibson's uniform photos, some of that stuff. That was just to confirm that he had a radio and how it was attached to his uniform, et cetera. And I look at a lot of the Axon videos, but a lot of officers arrived well after the scene and well after the period that I'm opining my -- on. So I don't go through every Axon video, if the officers came well after the fact.

So "miscellaneous" is sort of my way of saying I look through a lot of digital information and try to draw out what I think is necessary.

Q. Understood. Did you review any other materials related to the autopsy, besides the ME report and the diagrams that you have with you now?

A. No, other than I think I saw at least some initial photo information. But that wasn't going to help

Page 63

me, so I just glanced through that kind of material.

Q. Have you ever spoken with the medical examiner in this case, Dr. Hu?

A. No, I haven't.

Q. When you were preparing your opinions, did you do any specific independent research?

A. No. If I understand your question right, no. I research the cases primarily that apply to my specific opinion. And I generally stick with the use of force. Occasionally an attorney will ask me a very specific thing to look at, which in this case, Mariah's seizure, for example, and then I look at it at that time that I'm asked. I don't always have enough questions to give all of my opinions until the question is asked.

And that's why at the beginning of this deposition you asked me do I have other opinions. I have opinions, Laura. I just -- I sort of try to narrow it down to what question is being asked. And not every attorney asks me for very specific questions. They sometimes ask a general question, can you look at this and tell me what you think, so then I try to draw out what I think. And if something you ask later or Sean asks later or I get asked in court, then I will be happy to give my opinion on it. But I know there's issues in here that I didn't write about that I could opine on.

Page 64

Q. Okay. When you were preparing these opinions, did you read any peer-reviewed articles --

A. No.

Q. -- to assist you?

Did you review any articles or books on anatomy?

A. No.

Q. What about forensic pathology?

A. No.

Q. What about ballistics or bullet trajectories?

A. No.

Q. Did you review Deputy Gibson's deposition in preparing this report?

A. Yes.

Q. Who did Deputy Gibson think that the driver of the ATV was when he initially pulled him over?

A. Who did he think was the driver of the motorcycle?

Q. Right.

A. I don't think he knew initially. From what I recall in the deposition, he, he observed what he described as a red motorcycle crossing the road at a particular area, and that he didn't actually realize who it was until later on.

Q. I want to focus on your Opinion 1 in this case.

Page 65

And I'm reading on page three. And just for the record, you say "Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force."

Did I read that correctly?

A. Yes, ma'am.

Q. Do you dispute, sir, that Mr. Obregon pointed a gun at Deputy Gibson?

A. I can't say that it occurred for sure.

Q. Do you have any basis to believe it did not occur?

A. Some.

Q. What's that?

A. Well, there's just information that was presented which lends itself to doubt or further investigation. You have got some witness information that a gun was not seen, for example. You have got a gun that was never compared forensically to Mr. Obregon's DNA. You have got holes in the story that Mr. Obregon -- I'm sorry, that Deputy Gibson presented that occurred, which I don't believe could have occurred the way he describes.



Page 66

So when you include a lot of doubt, those are my observations. And so I had no firm evidence that he pointed the gun at Mr. -- or Deputy Gibson, except for his statements. And in his statements there's, there's some things that could -- I don't believe could have occurred as he described. So that sort of, I guess, in my mind brings down his credibility a little bit more.

Q. Did you review the deposition transcripts from any of the neighbors who were witnesses to this case?

A. To some extent, yes.

Q. Do you remember which transcripts you reviewed?

A. I know I reviewed Mariah's. And there were -- I reviewed, I believe, Mariah's sibling. I reviewed hers. Maybe a couple others. I would have to refer to my information I have here to tell you exactly which ones I actually looked at.

Q. Did you review the deposition of Wade Putt?

A. Again, I would have to look back and see if I did or not. I don't remember that specifically.

Q. Do you recall reading the deposition of Brandon Chapman?

A. When you say "deposition," I reviewed the police officer's report and the interviews of some of these people, not necessarily their actual deposition. I'm not even sure I was ever provided depositions of all of the

Page 67

witnesses.

Q. Okay. So I am talking about actual deposition transcripts, just to be clear. So let me ask again, just to make sure we are on the same page.

Do you recall reviewing the deposition transcript of a gentleman named Brandon Chapman?

A. Can I refer to my table of witnesses?

Q. Sure. And, again, I'm talking about the deposition transcript, not --

A. I understand. I just may have -- it may recall my memory more if I look at my table. Because on my witness table, if you look, there's a column that says Deposition Statements, and I would have gleaned those statements from their actual depositions.

So in the case of Brandon -- or Mr. Putt, you asked me about Wade Putt, I did look at that deposition. I make reference to it on that table.

Q. Okay.

A. And same with Brandon Chapman.

Q. And --

A. So if you look at the Witness Statement Table that I provided you, if there's documentation under the column that says Deposition Statements, then I would have taken that -- those statements right from their deposition, to answer your question.

Page 68

Q. Okay. Was there any evidence from Mr. Putt's deposition that Mr. Obregon pointed a gun at Deputy Gibson?

A. There is some evidence, to answer your question. It's just not very specific to the way you asked the question. There's reference -- Mr. Putt did reference that he heard the deputy say don't reach for a gun, and so -- and then in deposition there's reference to he heard his neighbor say you shot him and a pause between shots. So there is reference to it, but it's just not specific.

Q. Was there any evidence from Ms. Plummer's deposition that Mr. Obregon pointed a gun at Deputy Gibson?

A. Okay. Again, there's a reference to "Don't reach for the gun," that they heard the deputy say that. So not reaching for a gun implies some evidence of a gun, but it doesn't specifically say that he pointed the gun at Deputy Gibson.

Q. And you are reading that from the column labeled Police Interview Report Statements, correct?

A. Yes.

Q. And what about Brandon Chapman, was there any evidence from his deposition that Mr. Obregon pointed a gun at Deputy Gibson?

A. Well, the same quote, "Don't reach for the gun."

Page 69

Q. For purposes of Opinion 1, though, you assume that Mr. Obregon pointed a gun, correct?

A. Well, in my Opinion number 1, the assumptions I made is the assumptions that were provided primarily by Deputy Gibson. He claimed that the gun was pointed at him and that he felt fear for his safety and he returned fire. And if that occurred the way he said, firing that initial round at Mr. Obregon appeared justified under the Fourth Amendment to me because it meets the requirements.

Q. Do you recall how many shots Deputy Gibson fired total this night?

A. I believe it was 10 shots that they were able to count out from his weapon and from body strikes as well as strikes in the dirt.

Q. Do you recall how many shots actually struck Mr. Obregon?

A. I want to say seven, one anterior and six posterior.

Q. In your Opinion 1, you say "His initial lethal response to an imminent threat appears justified."

What do you consider to be the initial lethal response?

A. Well, in his statement that Mr. Obregon pointed a gun at him and he -- that's when he returned fire -- or not returned fire, but that's when he fired at



Page 70

Mr. Obregon, this is based on Deputy Gibson's statements. That is what I consider the initial, the initial force, deadly force, was the deputy firing at Mr. Obregon who allegedly pointed a gun at him first.

Q. Are there a certain number of gunshots that you consider the initial lethal response?

A. One.

Q. So it's your opinion, sir, that the first shot appears to be justified under the Fourth Amendment?

A. If it occurred as the deputy stated. The problem, Laura, is there's some things that I don't believe occurred as he stated. And so I struggle with that part of the opinion.

But if in fact Mr. Obregon pointed his gun and the deputy was responding to that, then I believe that it appears justified under the court -- under the Fourth Amendment, that initial shot.

Q. Let me ask you a few questions about the ME report before we have to break again. This will be Exhibit 4. And Exhibit 4 starts at defendants under score Obregon 00090.

(Deposition Exhibit No. 4 was marked for identification.)

BY MS. VAN BUREN:

Q. And you recall, sir, that on pages -- well,

Page 71

starting on page three, there's a discussion of multiple gunshot wounds, and that goes on through page six, correct?

A. Yes.

Q. And the ME lists Gunshot wounds number 1 through 7, correct?

A. Yes.

Q. Now, the ME did not determine the order of shots, correct?

A. That's correct.

Q. Okay. And, in fact, on page -92 it says "The wounds are arbitrarily numbered for the ease of description. The number does not indicate the sequence of firing."

Did I read that correctly?

A. Yes. I recall that too.

Q. And you understood that when you were preparing your opinions, right?

A. Yes, I did.

Q. Does the ME say which of these wounds, whether singular or plural, would have been fatal?

A. No, I think they are listed as fatal in general, but they weren't specific in that regard. And I have an understanding of, you know, attending these autopsies and going through these types of situations, where it's

Page 72

sometimes difficult to determine what would have killed the person because of how long it would take medical care to get there to provide life-saving measures.

So my understanding in reading this medical examiner's report is he's saying at least six of those shots could have been life-threatening. But to know for certain, if you don't know the sequencing of the rounds, would be extremely difficult to ascertain.

Q. And do you have an opinion on which gunshot wound or wounds was fatal here?

A. No.

MS. VAN BUREN: It's about 11:15. This is a good stopping point for me.

Sean, we can let you go ahead and get ready for your hearing.

MR. WOODS: Okay. Thank you.

THE WITNESS: Will we be continuing the deposition, then?

MS. VAN BUREN: Yeah. Let's go off the record.

THE VIDEOGRAPHER: We are going off the record. The time is 11:14 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 11:46 a.m.

Page 73

BY MS. VAN BUREN:

Q. All right. Mr. Hafkey --

A. Laura.

Q. Yes.

A. I have got a couple points of clarification. I don't know if this is a good time to --

Q. Sure. Go ahead.

A. Before I forget them, because I might.

Q. Sure.

A. I looked back at my phone and -- at those pictures of the Stretch Armstrong with the pins that I will be providing.

Q. Yes.

A. And in the details I can tell you exactly when they were taken, because you know you asked that.

Q. Okay. When was that?

A. January 15, which means I think they were even before that subpoena, so -- and I can't remember sending them. And since you said you -- or you are implying you haven't seen them, then I apologize for not getting those to you. Because I looked in my electronic files on my computer and I don't see them there. They were on my phone.

Q. Okay.

A. So I'm going to send them. But it looks like



Page 94

Mr. Obregon was in fact on the ground and on his side, facing where the officer would have fired.

Q. Okay. So did you rely on the assumption that Mr. Obregon was on the ground on his side, facing Deputy Gibson at the time the first bullet struck him?

A. Yes. And the -- based on the -- what I extrapolated as the angle of fire and the distance the officer was from Mr. Obregon, which change because it was fluid and he was moving. So I took -- my analysis was based on the combination of all of those things together.

Q. Going back to your report, Exhibit 1, is it also your opinion that Mr. Obregon's handgun fell to the ground after he was hit by the first shot?

A. I didn't have a specific opinion that he was -- that the gun was even in his hands. But based upon the officer's statements it was. And if the first round struck, then my opinion is that gun would have fallen before he rolled away from the officer. Had he retained possession of the weapon, if in fact he had the weapon in his hand and he rolled away from the officer, then that weapon would mostly have been taken to the opposite side of Mr. Obregon.

Q. So looking at this first sentence, last paragraph of page eight of your report, "The positioning of the handgun to the left of the body indicates to me that it

Page 95

likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position."

Did I read that correctly?

A. That's correct.

Q. So what is your basis for making the statement that the handgun likely fell to the ground following the first frontal shot?

A. Multiple reasons. One being Mr. Obregon's -- I mean, sorry, the deputy's statements that he saw the gun pointed at him, he fired and he saw the gun fall. For him to see that gun from his positioning on the -- what would in essence be between him and Mr. Obregon, he had to have seen it. He would likely not have seen the gun if Mr. Obregon was completely facing away from him and having the gun.

The distance that the officer fired, the lighting conditions, just a number of things I observed at the scene, he likely could not have seen it unless it was on that left side of Mr. Obregon and that's where the gun fell, which is in fact where the gun was located pursuant to the FARO data, the crime scene photos, et cetera. So I made my -- that was part of my opinion.

The second part is, generally speaking, my experience is when somebody gets hit with a round, they

Page 96

are going to drop their gun. And in this case that was consistent with the deputy's statements that Mr. Obregon was pointing a gun at him, he fired and he dropped the gun.

So a lot of my opinion is based on what the deputy is saying. And if that is in fact what happened, then it was also consistent with where the gun was found, it was consistent with the medical examiner's report of the trajectory of that round, and it was consistent in just the physics of somebody having a gun while on their side and then doing almost a complete roll the opposite way and being able to see that gun fall at that time or retaining the gun that whole time. And none of that was consistent with the deputy's statements.

Q. Do you know where the gun fell in relation to Mr. Obregon's body?

A. Well, the crime scene photos, the FARO data and even the video from the first responders that gave medical aid and took over medical aid, all of that shows the gun to the -- what would essentially be the left of Mr. Obregon's body if he was prone face down on the ground. The left sort of -- closer to his feet on the left side of his body if he was prone to the ground. So because --

And the reason I say "if he was prone," the

Page 97

statements indicate that he was prone when the witnesses and the officer approached the body. However, the video from the officers giving first aid show him face up. So the body had been moved face up sometime after the shooting.

Q. Based on the video and the photos that you saw, how far away was the gun from Mr. Obregon's body?

A. A few feet, maybe three to four feet.

Q. And you are aware that that gun was loaded, correct?

A. Yes, that's what I read.

Q. And you would agree that a loaded handgun is a deadly weapon?

A. Yes.

Q. And you would agree that a loaded handgun within three to four feet of a suspect can present a danger to an officer?

A. Potentially it could, yes.

Q. We talked about some of the testing and the reenactment that you did.

Did you perform any other kind of testing in preparing your opinions for this case?

A. No. Mainly just running scenarios through my brain, reading the material, putting myself in the officer's shoes, and running it through my head over and

# EXHIBIT 7

**Police Expert Opinion**
**Retired Phoenix Police Lieutenant Mark R. Hafkey, M. Ed.**

Mills + Woods Law, PLLC
Sean A. Woods, Esq.
5055 N. 12th Street, Suite 101
Phoenix, Arizona 85014

Case No: CV-24-1510-PHX-KML – Michael Obregon Homicide

Dear Mr. Woods:

Pursuant to your request, I have reviewed the below listed information and material relating to the above referenced case, and I have developed opinions related to common police practices, policies and procedures, as well as use of force and investigative irregularities in the investigation of this matter.

The opinions expressed herein I genuinely hold, and I am willing to testify to them in open court, under oath. My qualifications to express these opinions are revealed in the attached *Curriculum Vitae*, which details my education, law enforcement training, and experience.

My opinions are derived from and supported by the below listed case file and research material, case law, law enforcement training and experience, and common police policies, practices, procedures supported by *Best Practices'* guidelines established by the International Association of Chiefs of Police (IACP).

**Experience as an Expert Witness:**

I retired from the Phoenix Police Department in 2012 and made myself available as a police policy, practices, and procedures' expert witness in 2015 after being recommended

OBREGON_000897

by former counsel for a specific case.  It is not something I do fulltime.  I occasionally

provide my opinion on cases I feel strongly about and work by referral.  To date, I have

provided opinion(s) on a handful of cases, in support of both Plaintiffs and Defendants,

relating to vehicular homicide, use of force, search & seizure, traffic matters, and common

police policies, practices and procedures.  Finally, I understand that discovery is an ongoing

process and could reveal yet other information relevant to the formulation of my opinions

in this matter.   I have also been informed that there is still outstanding discovery and that

disputes have arisen regarding production of certain documents and, therefore, I reserve

the right to modify or supplement my opinions upon receipt of further documentation

produced in this matter.

**Case Material Reviewed:**

- Pinal County Sheriff's Department Incident Report
- Casa Grande Police Department Incident Reports
- Ring Camera Surveillance Video
- Radio / Dispatch Audio Recording
- Police Canvass / Witness Audio Recordings
- Witness and Officer Deposition Transcripts
- Miscellaneous Police Body Cam Videos
- Witness Declarations and Interview Statements
- Crime Scene Photos and FARO Diagrams
- Miscellaneous Case File Information as Necessary

**Research Material:**

- Cases:
  - Terry v Ohio, 392 US 1 (1968)
  - Brosseau v Haugen, 543 US 194 (2004)
  - Graham v Connor, 490 US 386 (1989)
  - Plumhoff v. Rickard, 572 U.S. 765 (2014)
  - Tennessee v Garner, 471 US 1 (1985)

OBREGON_000898

**Opinion(s):**

1. Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

2. There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

3. Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.  The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Case Synopsis:**

On March 16, 2023, at approximately 1900 hours, Deputy Gibson was working uniformed patrol in Casa Grande when he reportedly observed a red dirt bike driving at high rate of speed on Hualapai Drive, from Hopi Drive.  He then "sped up to catch up to the dirt bike in an attempt to conduct a traffic stop."  Deputy Gibson saw the bike stopped in the driveway of 19005 Mescalero Drive and activated his emergency lights, at which time the driver "accelerated the bike crashing into the closed fence."  Deputy Gibson then exited his vehicle and commanded him to "stop."  He also put the dirt bike's kickstand down. (PCSD Report, Pg. 75)

OBREGON_000899

**Note**, ring camera video confirms that Deputy Gibson rolled up to a subject in a patrol vehicle with rear emergency lights activated while subject Obregon was sitting on a motor cycle in the driveway and the cycle lurch forward striking a chain link gate.  By activating his emergency lights, commanding the suspect to stop, and putting the bike's kickstand down, Deputy Gibson effectively seized the subject under the 4th amendment.

Deputy Gibson indicated that during a brief discussion with the subject, he obtained Mr. Obregon's identification and observed some indications of nervous flight.   He also said that Mr. Obregon admitted to having warrants.  Deputy Gibson said he advised Mr. Obregon that he was going to detain him, at which time Mr. Obregon attempted to flee on foot but tripped and fell prone to the ground.  (PCSO Report Pg. 76 and Gibson Deposition)

**Note**, ring camera video confirms Deputy Gibson in contact with Mr. Obregon for approximately three minutes and Mr. Obregon appearing to drop items and pick them up.  The video also confirms that Mr. Obregon attempted to flee on foot and Deputy Gibson giving chase.

Deputy Gibson indicated that he got on top of Mr. Obregon's back and felt him manipulating something with his hands, which were underneath him at his waistline.  At that time, Deputy Gibson indicated that Mr. Obregon brandished a handgun, so he pushed off of him, backed away and drew his sidearm.  He said that Mr. Obregon then rolled onto his side away from him and pointed a handgun at him, so Deputy Gibson fired 7-8 rounds at him and saw the gun fall to the ground.  Deputy Gibson then "took cover near the dirt bike." (PCSO Report, Pg.  76).

**Note**, after Deputy Gibson is seen chasing after Mr. Obregon, he goes out of sight of the ring-camera for approximately 3.5 seconds before being seen again backing away while

shooting multiple rounds downward toward the area in which Mr. Obregon had fled. Deputy Gibson then appears to operate his radio and take cover behind his patrol vehicle.

Deputy Gibson indicated that he then assessed the incident, relayed information to dispatch, obtained his medical trauma kit from the passenger side of his vehicle and then returned to Mr. Obregon to render aid. He indicated that while he was rendering aid, a female approached him yelling and cursing. He also indicated that a male approached offering to help, so he had him hold his flash light. (PCSO Report, Pg. 76)

**Note**, ring camera video confirms that Deputy Gibson retrieved something from the passenger side of his vehicle before returning to Mr. Obregon's location. Footage also revealed Deputy Gibson possibly accessing the driver's side of his vehicle and subjects approaching and lingering in the area before backup units arrived.

Mr. Obregon died at the scene. It was determined that the weapon located near his body was loaded but had not been fired. At this time, there is no physical evidence placing the handgun into Mr. Obregon's hands. The autopsy report revealed the cause of death to be multiple gunshot wounds, i.e., 1 anterior and 6 posteriors.

Approximately 25 direct or indirect witnesses were contacted and interviewed in this case. Most were circumstantial witnesses. There were variations to the number of shots heard (from 2-9), and seven witnesses ultimately reported some manner of pause between shots. Some witness statements conflicted with and in one case, contradicted with pertinent elements of Deputy Gibson's account of the incident, e.g., succession of shots and whether Mr. Obregon had brandished a weapon. Furthermore, there is some physical evidence which raises doubt as to the plausibility of Deputy Gibson's specific account.

**My Opinions Regarding Officer Gibpson's Use of Force:**

Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

**Discussion:**

Officers are justified in using lethal force when they have probable cause to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others. When given time, officers must provide a warning before implementing lethal force and utilize it only as a last resort. In the case of a police shooting, officers are responsible for every round they fire, as well as the backdrop behind their line of fire. When an officer perceives that the imminent threat has ceased, so must the continued use of lethal force. Officers cannot use excessive force to stop a fleeing suspect unless they have probable cause (PC) to believe that the suspect is an immediate threat of deadly force or serious injury to the officer or others. (*Brosseau v Haugen, Graham v Conner, Plumhoff v Rickard,* and *Tennessee v Garner*)

According to Deputy Gibson's statements to investigators, while on top of Mr. Obregon's back, he felt Mr. Obregon manipulating something underneath his waistline area before he brandished a black and silver handgun. Deputy Gibson then pushed off of Mr. Obregon, began backing away from him and drew his service weapon. He said he began firing his weapon when he saw Mr. Obregon roll away from him onto his side and point the gun at him. Deputy Gibson said that he believed he would be shot and recalled firing 7-8

times and seeing the handgun fall to Mr. Obregon's side.   (PCSO Report, Pg. 76)
Subjectively, the officers account would justify his initial use of lethal force.

In deposition, Deputy Gibson stated that he didn't stop firing "...until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped."  Deputy Gibson confirmed multiple times that he had stopped firing when the weapon dropped.  When asked if he believed that the threat was neutralized when the gun dropped, Deputy Gibson responded "yes."  (Gibson Deposition, Pg. 138-139)

The medical examiner (Dr. John Hu, MD) concluded that Mr. Obregon was struck with 6 fatal rounds, i.e., 1 anterior and 5 posteriors, as well as one non-lethal posterior grazing round.  He also provided trajectory descriptions for the lethal rounds. Extrapolating his anterior trajectory, Mr. Obregon's gunshot wound is consistent with having been struck while on the ground either on his back or on his side facing Deputy Gibson, who would have been shooting from an elevated position.  Extrapolating his posterior trajectories, Mr. Obregon's gunshot wounds are consistent with his having been struck while on the ground rolling away from Deputy Gibson, who would have been shooting from an elevated position.

Deputy Gibson described in deposition that while on Mr. Obregon's back, he saw him pull a black and silver gun out from underneath him with his right hand.  Deputy Gibson then transmitted "913" (immediate backup request), yelled "drop the gun," pushed off of Mr. Obregon's back and began backpedaling.  He said Mr. Obregon rolled away from him onto his right side and pointed a handgun at him, so Deputy Gibson fired 7-8 fast and

rapid shots.  He could not recall if there was a pause between his shots.  (Gibson Deposition Pgs. 83-93)

Based upon the medical examiner's trajectories of the anterior and posterior rounds, as well as Mr. Obregon's body positioning, it is reasonable to deduce that one of Deputy Gibson's initial rounds struck Mr. Obregon in the front, whereas the remaining lethal rounds stitched him down his back in a semi-linear pattern, from his upper right shoulder to his left thigh (at approximately a 60-degree angle), as he rolled away from the officer.

Deputy Gibson indicated in deposition (Pg. 93) that he stopped firing when he saw the handgun fall to the ground beside Mr. Obregon.  He also indicated that he moved the gun a short distance farther away from Mr. Obregon's body after the shooting.  (Pg. 90) The officer's relative position to Mr. Obregon's position and Deputy Gibson's testimony that he saw the gun fall to the ground are both consistent with the gun landing on the left side of Mr. Obregon's prone body.  Crime scene investigation photos and FARO data also place the handgun to the left (and rear) of Mr. Obregon's body.

The positioning of the handgun to the left of the body indicates to me that it likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position.  In other words, if Mr. Obregon had retained possession of the gun during the roll away from the officer, it is not likely that the weapon could have landed on the left side of the body.  As Deputy Gibson stated in deposition, Mr. Obregon would no longer have been an imminent threat to him after the gun had fallen to the ground.  Therefore, continuing to fire at Mr. Obregon from behind as he rolled to his right away from Deputy Gibson was unnecessary.

OBREGON_000904

Deputy Gibson also indicated in deposition that he wasn't sure if there was any sort of pause between his shots.  However, seven witnesses described hearing some form of pause between essentially two volleys.  A pause would be consistent between the anterior and posterior strikes depending on the time it would have taken for Mr. Obregon to roll away from the officer exposing his backside, i.e., the greater the pause the slower the roll.

**Note**, officers are trained and tested to shoot and assess, i.e., firing in controlled bursts while simultaneously monitoring the suspect for a change in behavior, such as falling, fleeing or dropping a weapon.

### Observations

**Observation 1**:

When questioned in deposition regarding whether the sheriff's department had any policy relating to shooting fleeing suspects from behind, Deputy Gibson responded "There is a policy for use of deadly force in the circumstance of a person that is fleeing."  (Gibson Deposition, Pg. 83)  I am not aware of any such PCSO policy.  Pursuant to the landmark case of Tennessee v Garner, officers must have PC to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others before they can shoot them from behind.

**Observation 2**:

In the radio recording of the incident, Deputy Gibson put out an emergency transmission code (998/999) of an officer involved in a shooting followed by a "drop the gun!" exclamation.  (Radio Transmission at 00:53)  However, there is

evidence that the transmission occurred after Deputy Gibson had finished firing and, therefore, after Deputy Gibson stated that he saw the gun fall.

**Observation 3**:

During the radio traffic communication, before returning to the body, Deputy Gibson can be heard calmly describing the handgun's colors and stating by name that Michael Obregon had tried to shoot him.  (Radio Transmission beginning 01:07)

**Observation 4**:

When apprehending a fleeing suspect, it is common police practice and training to take subjects prone to the ground, get their hands behind their back and secure them in handcuffs.  Being on top of a suspect's back, particularly with the weight of an officer's gear, generally gives officers a tactical advantage to control suspects and their hands.  Conversely, getting off a suspect would tend to shift the tactical advantage by relinquishing control.

**My Opinions Regarding Procedural and Investigative Irregularities:**

Having reviewed the investigation in this matter, there are a number of procedural and investigative irregularities, as well as conflicting witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

**First**:

Deputy Gibson did not follow police protocol preceding his contact with Mr. Obregon.  It is common police policy, practices and procedures for officers to notify dispatch when conducting legitimate traffic enforcement activities, engaging in a pursuit or

OBREGON_000906

other on-view (OV) activity.  There are many safety, ethical and constitutional reasons for this.  Not doing so is generally not only a violation, but also begs the question of why the breach in protocol.

When conducting a traffic stop, officers must have reasonable suspicion (RS) of an enforceable traffic-code violation or other legal exception in order to stop individuals, and they are required to advise dispatch of the location of the seizure.  When conducting a pursuit, i.e., when an officer is actively trying to stop a vehicle and the driver is actively alluding, officers are required to not only advise dispatch of the pursuit, but also follow additional regulations, such as: advising a supervisor of their speed, location, traffic conditions, and purpose of the pursuit.  If an officer goes out with a subject on OV activity, he is also required to notify dispatch of his location and contact.

In this case, Deputy Gibson indicated to investigators that while in the area of Hopi and Battleford, he initially observed a red dirt bike driving south on Hualapai at a high rate of speed.  Hualapai is located 2-3 blocks west of Battleford, a distance of approximately .1 miles, and it was dark out at that time.  At night at that location and perpendicular to the subject vehicle, it would have been extremely difficult, if not impossible, to accurately gage the speed or color of a dirt bike from that distance.

That being said, at least one witness (Mariah Brady) indicated that Mr. Obregon had driven onto her property (passing right by her window) into the back yard for approximately one minute and was in the process of leaving when Deputy Gibson arrived.  Ring video confirms that Mr. Obregon was off the street and in the driveway when the officer arrived on scene.  He activated his rear emergency lights and seized Mr. Obregon by ordering him to stop without informing dispatch that he was following a vehicle at high

speed, conducting a traffic stop or going out with a subject.  This breach in protocol is indicative of not having a legitimate reason to make a traffic stop.  Without RS of an enforceable violation, the seizure was unconstitutional.

## Observations

**Observation 5**:

Despite Mariah Brady's statements that Mr. Obregon had already arrived and was in the process of leaving when the deputy arrived, investigators did not question the breach in protocol or seizure of Mr. Obregon.

**Observation 6**:

Deputy Gibson indicated to investigators that he was unsure of the name of the street in which he contacted Mr. Obregon; there is evidence that he had been to that specific address on a call relatively recent to this incident.

**Observation 7:**

There is some evidence that Deputy Gibson had adverse history with Mr. Obregon, as well as with off-road vehicles driving in the area.  (Nicholas Wallace Declaration, Daniel Wallace Declaration, Nicole Bernier Declaration, Meagon Brady Interview)

**Observation 8:**

The first witness on the scene, Mariah Brady, indicated in her interview with Detective Gonzalez that Deputy Gibson did not render aid or retrieve his first aid kit until after she walked up and told him to "help him."  She was adamant that she did not see a gun.  (Mariah Interview 01:50)

OBREGON_000908

**Observation 9:**

Two residents, Samantha Dean and Whitney Hector, indicated that they heard Deputy Gibson yell "I bet your scared of me now huh" and "I bet you're scared of me now," respectively, just before hearing shots. (Samantha Dean Face Book Communication / Whitney Hector Declaration)

**Observation 10:**

There is evidence that Tiffany Chapman was on her phone with Nicole Bernier while observing the interaction of Deputy Gibson and Mr. Obregon. During the call, Tiffany Chapman reportedly told Nicole that Mr. Obregon was running from the deputy and "oh my god, he shot him!"

**Observation 11:**

Of the three witnesses who reported having seen Mr. Obregon fall, i.e., Mariah Brady, Kenyan Bower, and Tiffinay Chapman, none of them reported seeing Mr. Obregon with a gun.

**Observation 12:**

Mr. Obregon's nephew, Nicholas Wallace, reported in his declaration that his uncle "always kept his gun in his belt in the back of his pants because he rode a motorcycle or dirt bike."

**Second**:

There appears to have been some investigative confirmation bias as it relates to Deputy Gibson's account. Confirmation bias is the tendency to search for and interpret investigative findings that conform to an investigators pre-existing beliefs or hypotheses

and to disregard statements or evidence that do not.  Consider the following factual hypothesis which outlines the facts of this case:

An officer seizes a subject in a private driveway contrary to protocol and with questionable legal justification.  While on the ground, the suspect is fired at ten times and struck posteriorly by six of the rounds.  The weapon recovered is found not to have been fired, linked to the subject, or forensically placed in the subject's hand.  Gunshot wound trajectories do not conform with the officer's account.  Moreover, witnesses arrive within moments of the shooting but report that they did not see a gun.  Anomalies such as these are clearly significant and would need to be thoroughly investigated and challenged.

Mariah Brady was a direct witness to the incident, as she was able to provide both audible and visual observations preceding, during and after the shooting.  She was also the first person to walk up to Deputy Gibson following the shooting.  In her interview with Detective Gonzalez, she indicated that she heard the m/c come into her yard and pass by her window.  After a minute or so, she heard the m/c drive back past her window and to her driveway gate.  She also heard gate opening and closing noises, the m/c turn off and Deputy Gibson yelling for him (Mr. Obregon) to get on the ground.  While looking out of her window into her front yard, she started hearing shots and ran outside.  She saw Deputy Gibson standing over him (Mr. Obregon) with a gun pointed at him.  She then heard more shots and ran outside.  Note, her observation point would have made her one of the closest witnesses to the shooting scene.

Mariah admitted that she was very upset (and "freaking" out) because she initially thought that he (Mr. Obregon) was her mother's friend that lives with them, so she asked the deputy what happened.  She said that Deputy Gibson told her that he (Mr. Obregon) had

pulled a gun on him.  Because she never saw a gun, she asked Deputy Gibson where it was but he did not respond.  She then pleaded with him to help him (Mr. Obregon), at which time Deputy Gibson retrieved a first aid kit, cut Mr. Obregon's clothes off and render aid.

Despite conflicting witness statements and the number of posterior wounds, investigators presented Deputy Gibson with very few questions into the anomalies. Investigators were unable to link the handgun recovered as belonging to Mr. Obregon. DNA swabs were taken from the gun but never submitted for DNA analysis in order to forensically place the weapon in Mr. Obregon's hands.  Finally, Mr. Obregon was wearing a backpack during the shooting, but there is no indication that it was examined to corroborate trajectories.

There were contradictory statements as to the number and succession of gunshots. Seven witnesses ultimately described some manner of a pause between the number of shots fired.  Despite this anomaly to Deputy Gibson's account, investigators did not seem to consider potential implications as there was apparently no investigative analysis conducted or investigative conclusions made relating to the projectile impact trajectories identified in the medical examiner's report.

**Fourth:**

Deputy Gibson's shooting account is questionable.  The ring-camera footage depicts Deputy Gibson going after Mr. Obregon.  He is out of sight for approximately 3.5 seconds before reemerging walking backward while shooting downward into the area in which Mr. Obregon had reportedly fallen.  According to Deputy Gibson's deposition, during that 3.5 second timeframe, he did the following:

1. He ran after Mr. Obregon

2. Got on top of him

3. Radioed for backup

4. Felt Mr. Obregon manipulating something with his hands underneath his waistline

5. Saw Mr. Obregon work his arm out brandishing a silver and black gun

6. Pushed off of Mr. Obregon

7. Started back peddling away from Mr. Obregon

8. Drew his service weapon

9. Saw Mr. Obregon roll to his side trying to relocate him

10. Saw Mr. Obregon point the gun at him

11. Warned Mr. Obregon to drop the gun

12. Started firing at Mr. Obregon

Based upon testimony, crime scene data, and having visited the scene, I estimated the distance from the moment Deputy Gibson left sight of the camera to Mr. Obregon's location, to be between 5-9 feet.  Physically navigating that distance both directions and completing all the above steps within a 3.5 second timeframe seems unlikely, especially when also factoring in cognitive reaction time (RT) for one or more of the stated steps.

Cognitive reaction time is essentially the total duration of time between the perception of a stimulus (visual or auditory) and the initiation of a physical response.  In other words, the time it takes a person to perceive and then to physically react to a given threat or other stimulus.  There are many variables in which can influence RT, e.g., age,

OBREGON_000912

weariness, lighting conditions, etc.   There has been research done to calculate average RT, but it varies from person to person.  Therefore, in order to measure accurately a specific person's RT, that individual would have to be tested individually.

**My Opinions Regarding the Seizure of Mariah Brady:**

Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment.  The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Discussion:**

In the landmark case of in landmark case of Terry v Ohio, the Supreme Court described the difference between a non-seizure (a contact) and a seizure (stop or arrest). The Court defined a seizure as "Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred."  Officers must have reasonable suspicion (RS) of a crime to seize a person, including a witness, and they can only detain that person for a reasonable amount of time. A reasonable amount of time has been defined as brief and lasting only as long as necessary to confirm or dispel the officer's suspicion.

All officers are taught Terry v Ohio.  They are also taught that 20-minutes is a good rule of thumb for traffic stops and other citizen contacts.  Officers are taught that even more deference should be given to holding witnesses and that witnesses should not be detained against their will, especially when they have been identified.

OBREGON_000913

That being said, Mariah Brady was a witness to the police shooting in front of her residence. At the time of the incident, she was fifteen years old. Pursuant to her police interview and/or subsequent deposition, Mariah's parent(s) were not home and she had been caring for younger siblings. After the shooting, she immediately went outside and contacted the deputy involved as detailed above. As backup officers arrived, she was ordered to stay there. (Fox Body Cam 03:30 / 1908hrs.)

In Mariah's interview with Detective Gonzalez, she described being held very close to Mr. Obregon and held against her will for a very long time throughout the incident. She emotionally described being "trapped" by several officers and made to "watch him die." She asked to leave multiple times to go back into her home but was rebuffed, told to "shut her mouth" and warned that she would be arrested if she passed the "line," i.e., crime scene tape preventing her from getting back into her house. (Mariah Audio Interview 01:50 – 10:30)

Body cam video confirms that Mariah was detained at 1908 hours on the SEC of her property, between the utility pole and driveway, approximately 20ft of the decedent. Video confirms that Mariah was kept there (officers standing by) for over an hour (1908-2012hrs) despite multiple requests to leave and arguments that she needed to go back inside her home and care for her siblings. Mariah was emotional, angry and even insulting to the officers when they rebuffed her requests. At 2012 hours, you can hear the officer tell detectives "We wouldn't let her go in – she's just mad."

Mariah lived there, had already been identified as a witness and was not a suspect in any crime. The officers would have known that Mariah was a juvenile and visibly upset

OBREGON_000914

young girl, and they should have known that placing a child in close proximity to a fatally wounded person could be traumatic.  Mr. Obregon was reported to be a family friend.

Holding a witness, particularly one that could be considered as a hostile witness, inside the inner perimeter of a crime scene is highly unusual.  It is common police practice to relocate witnesses not only outside of a crime scene, but also to shield them from public scrutiny.  Instead, Mariah was detained on the shoulder of the road.  Officers routinely ask witnesses if they would mind waiting in a vehicle, restaurant or other safe location outside of the crime scene and out of public view.  There is no evidence that they made such an offer.

If a witness objects to being detained, officers should obtain their contact information and arrange to interview them later, especially when there is no urgency.  In this case, Mariah's home was not part of the crime scene, and she could have waited inside her home for investigators.  The officers' treatment of this minor witness and the length of her seizure were unreasonable.

Respectfully given January 31, 2026

_____
Ret. Lt. Mark R. Hafkey, M. Ed.

OBREGON_000915

# EXHIBIT 8

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

**Re:    ALLISON OBREGON, AN INDIVIDUAL;**
      **v.**
      **MARK LAMB AND BRADY GIBSON**

Case No.:              CV-24-1510-PHX-KML
Incident Date:         March 16, 2023
Trial Date:            TBD
Retention Date:        April 22, 2025

EXPERT REPORT; USE-OF-FORCE AND VIDEO EVIDENCE REVIEW

DATE:                  February 2, 2026

TO:                    **ATTORNEY, LAURA VAN BUREN**
                      **WIENEKE LAW GROUP**
                      1225 W. Washington St. ▪ Suite 313 ▪ Tempe, AZ 85288
                      wienekelawgroup.com  e: lrasmussen@wienekelawgroup.com
                      602-753-3987

CASE TYPE:     Rule 26 – Expert Review – Investigative Analysis

## 1. OVERVIEW & INTRODUCTION

This report has been prepared pursuant to a direct request for a third-party review and analysis in a civil matter by Attorney Laura Van Buren, Esq. I was requested to review and analyze the investigative data that exists as "facts" in this case. I am examining the video evidence showing police action and the associated decision-making process, based on the practical and technical application of police practice, procedure, and protocols. Please see list of documents and evidence considered in this investigative review to include the video evidence relevant to the incident.

I am an expert in police performance issues as they pertain to use-of-force decision-making and the associated video analysis, review and examination. A summary of my qualifications is included below, as well as in my curriculum vitae (CV).

I have officially been retained in this matter. Included in this report are my findings based on a focused review of the video information as compared to other evidence presented as they apply to the decision-making process of a police officer facing the circumstances confronting Officer Brady

1

DEF_Obregon 007114

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

Gibson (**"Deputy Gibson"**) of the Pinal County Sheriff's Office (**"PCSO"**). All of the officers/deputies may be referred to collectively as **"Officers"** herein.

## 2.  TABLE OF CONTENTS

**Contents**

1.   OVERVIEW & INTRODUCTION ................................................................................ 1

2.   Table of Contents ................................................................................................ 2

3.   PURPOSE AND SCOPE OF THIS REPORT ...................................................... 4

4.   SUMMARY OF FACTS............................................................................................ 5

5.   EXPERT OPINIONS, AND CONCLUSIONS ...................................................... 6

1.   Opinion – Use of Force ...................................................................................... 8

2.   Opinion – Medical Aid........................................................................................ 8

   a)   **Timeline Breakdown: Shots Fired to Medical Aid Increments....................................9**

3.   Opinion 3: Underlying Intent or Motivation Behind Deputy Gibson's Response to the Deadly Threat ............................................................................................................. 9

6.   Conclusion .......................................................................................................... 10

7.   Case Facts Compared to the First Amended Complaint ........................................... 10

4.   Witness Statements ............................................................................................ 14

5.   Summary of Key Facts and/or Record/Evidentiary Citations, Outline of the Investigative Process ............................................................................................. 15

8.   Analysis of Witness Statements ........................................................................ 19

9.   Extended Analyses ............................................................................................. 23

DEF_Obregon 007115

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

1.    Lawful Goals and Objectives of the Initial Stop ........................................................ 23

2.    Escalated Force - Goals and Objectives Following the Presentation of the Deadly

Threat .......................................................................................................................... 23

3.    Evidence Supporting the Officer's Perceptions ........................................................ 24

4.    Video Evidence Supporting the Officer's Account Regardless of Conflicting Witness

Statements .................................................................................................................. 25

 a)    **Analysis of Witness Accounts**.....................................................................**26**

5.    Quantification of Witness Accounts .......................................................................... 26

6.    Summary of Key Themes and Consistency ............................................................. 27

10.    Pertinent Policies from Pinal County Sheriff's Office (PCSO) Relevant to the Incident
        28

11.    USE-of-force (response to resistance) policy 300 Compliance Analysis. ............ 29

12.    Other Relevant Policy Analysis ................................................................................ 38

13.    Video Analysis ......................................................................................................... 39

14.    SUMMARY OF VIDEO EVIDENCE REVIEW AND FACTS ............................... 42

15.    EXHIBITS SUBMITTED........................................................................................ 46

16.    SOFTWARE PLATFORMS UTILIZED ................................................................. 46

17.    STATEMENT RE CERTAINTY OF OPINIONS.................................................... 46

18.    DOCUMENTS & EVIDENCE REVIEWED/CONSIDERED (MATERIALS) ...................... 46

19.    METHODOLOGY SPECIFIC TO MY INVESTIGATIVE REVIEW AND ANALYSIS ........... 49

1.    General Methodology ................................................................................................ 50

20.    FEE SCHEDULE.................................................................................................... 53

21.    CURRICULUM VITAE (C.V.)................................................................................. 53

3

DEF_Obregon 007116

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

22.    Summary of Qualifications ....................................................................... 53

23.    Summary of Area of Expertise  ................................................................ 61

24.    LIST OF PERTINENT EXPERT TESTIMONY ................................................ 61

25.    RIGHT TO AMEND ................................................................................. 61

## 3.  PURPOSE AND SCOPE OF THIS REPORT

The purpose and scope of this report is to document my conclusions after a review and analysis of all the evidence, to include video evidence, in the incident related to Deputy Gibson of the PCSO, and the shooting of the suspect, Michael Obregon (***"Obregon"***).

This report focuses primarily on the actions and interactions of Deputy Gibson and suspect Obregon during the incident of March 16, 2023, as these individuals are central to the analysis and are specifically named in the purpose of this report. While numerous other persons are referenced throughout the document—including witnesses, responding officers, investigators, and family members—these individuals are not named in the purpose section. Instead, they are referred to collectively as "witnesses," "officers," "responders," or similar group descriptors where appropriate. When necessary for clarity, accuracy, or context in the discussion of specific evidence or statements, these other individuals are identified by name as they appear in the underlying records. This approach maintains the report's emphasis on the key participants while ensuring all relevant persons are addressed appropriately in the analysis.

Additionally, this report documents the procedures utilized to create any demonstratives in the form of PDF files and video exhibits associated with the above-captioned case should they be required.

My analysis is based on the review and analysis of stated facts, Deputy Gibson's stated observations, and observable responses provided in the evidence, as compared to available case physical, forensic and video evidence and witness statements, which all parties are assumed to be

DEF_Obregon 007117

accurate and credible.[1] My evaluation focuses solely on Deputy Gibson's known decisions and actions based on the known outcome in response to the perceived threat, without considering his state of mind, intentions, or motivations beyond the response itself. (Thompson, Police Use of Force: Rules, Remedies, and Reforms, 2015).[2] My opinion will provide an independent and unbiased assessment of the incident, grounded in my subject matter knowledge in police use of force and decision-making in critical incidents, and police training, to help identify whether the Officer's stated observations, decisions, and actions were appropriate and consistent with acceptable police practices and departmental policies.[3]

## 4. SUMMARY OF FACTS

This summary is provided for convenience and does not necessarily itemize every fact relied upon in the formation of my opinions and conclusions in this matter. It is based on review of the records and materials identified herein below. I do not contend to have direct personal knowledge of the incident facts, only those provided in the case file documentation and digital evidence recordings.

### A. Summary of Facts in the Case

This synopsis presents an objective summary of the incident occurring on March 16, 2023, in Casa Grande, Arizona, as derived from the available records, including the Plaintiffs' First Amended Complaint (Document 30, filed September 20, 2024), the videotaped deposition of Deputy Gibson (taken January 5, 2026), and associated exhibits. The account incorporates statements from Deputy Gibson, the plaintiffs' allegations, and witness reports to provide a comprehensive overview, highlighting areas of agreement and contention. All details are quantified where possible based on the evidence reviewed.

---

[1] It is not the role of the expert to assess truthfulness or credibility of any witness; rather, only to include statements as a weighted piece of the evidence.
[2] Congressional Research Service; Pg. 5 second full paragraph. (*Whren v. United States*, 517 U.S. 806, 813 [1996]).
[3] PCSO Response to Resistance – Policy 300 – Exhibit 1 – Gibson Deposition

DEF_Obregon 007118

On the evening of March 16, 2023, Obregon was operating a red motorcycle enroute to a friend's residence in Casa Grande, Arizona. As Obregon approached the property, Deputy Gibson of the PCSO initiated a traffic stop by activating the red and blue emergency lights on his patrol vehicle. Obregon complied initially, dismounting the motorcycle and stating that he was not fleeing.

The initial interaction lasted approximately two (2) to three (3) minutes beside the patrol vehicle,[4] during which Obregon was not observed making threatening gestures. When requested, Obregon produced his driver's license from his wallet, dropping items in the process. He bent down to retrieve them without incident and handed the license to Deputy Gibson. Following further discussion, Obregon abruptly fled on foot toward the residence, attempting to get through the gate.

Deputy Gibson pursued Obregon on foot. According to Deputy Gibson's deposition (Dep. pp. 50-60), he tackled Obregon from behind after Obregon tripped or stumbled, resulting in both individuals falling to the ground with Deputy Gibson landing on Obregon's back. Deputy Gibson testified that, during the ensuing ground struggle, Obregon reached across his body with his right hand, withdrew a concealed .40 caliber handgun from his waistband or pocket, and pointed it directly at Deputy Gibson with his finger positioned in the trigger well. Deputy Gibson reported issuing multiple verbal commands to "drop the gun," pushing away from Obregon, drawing his service weapon (a Glock 17 9mm handgun), and firing approximately ten (10) rounds as Obregon rolled over and continued to point the firearm in Deputy Gibson's direction. The shooting ceased once Obregon dropped the weapon, which remained within arm's reach.

## 5.  EXPERT OPINIONS, AND CONCLUSIONS

It is generally accepted in law enforcement that the following factors should be considered regarding police performance and decision-making during a police use-of-force; police intervention must be reasonable[5] and have a legitimate goal and lawful objective in the furtherance of law enforcement (Thompson, 2015); force may be used when an officer reasonably believes it is

---

[4] OBREGON_000073 - Ring Camera.mp4.
[5] PCSO - Use of Force Doc.pdf.

DEF_Obregon 007119

necessary to carry out a legitimate law enforcement function or purpose; lawful arrests, detentions, self-defense, and defense of others are considered legitimate law enforcement functions.

The character of the force must be appropriate and reasonable based on policy, which is developed from the legal standards[6] and incorporated into training, and determinations regarding criminal behavior on the part of law enforcement is based on a full review and analysis of all data available.

Based upon the records and evidence in this case, and other files listed within this report, and based on my background, training, education, and experiences, these are the opinions I have rendered thus far in this matter.

## SUMMARY OF OVERARCHING OPINIONS

In reviewing this case, my opinions focus on the sequence and nature of Deputy Gibson's actions during the encounter with Obregon, as supported by the documented facts and evidence, giving equal weight to all evidence based on a comparison to the known outcome. First, the evidence along with the Deputy Gibson's statements shows that Deputy Gibson confronted a deadly threat when Obregon drew and pointed a handgun at him during a close-range struggle, following an attempt to flee, leading to the use of deadly force. Second, Deputy Gibson initiated rendering medical aid without unreasonable delay after the threat was neutralized, prioritizing scene security in a solo-officer context before providing care, consistent with the circumstances. Third, the facts indicate that Deputy Gibson's response aligned with the observed threat and evolving situation, with no supporting evidence of any alternative motivation or intent in his conduct. Taken together, these opinions reflect that Deputy Gibson's actions corresponded to the immediate circumstances presented, in line with the documented events, policies, training, and investigative findings. Following these stated opinions is the basis for my opinions reflected in a full extended analysis.

---

[6] (*Graham v. Connor*, 490, U.S. 386, 1989).

DEF_Obregon 007120

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

## 1.  Opinion – Use of Force

It is my opinion that Deputy Gibson was responding to an actual deadly threat posed by Obregon. Deputy Gibson's use of deadly force was in response to an actual deadly threat posed by Obregon, who drew and pointed a loaded .40 caliber handgun at Deputy Gibson during a close-range struggle.

This opinion is based on Deputy Gibson's on-scene walkthrough (DEFS_Obregon 000628), where Deputy Gibson described Obregon reaching across his body, pulling the gun from his waistband, and pointing it muzzle-first with finger on the trigger, prompting Deputy Gibson to backpedal and fire. Forensic evidence corroborates this: the recovered Smith & Wesson SD40 (loaded, functional per DPS testing) DNA evidence was gathered however not tested.  Video (Ring Ex. 13) shows Deputy Gibson's retreat during shots, aligning with a dynamic threat rather than a static execution.

Toxicology revealed methamphetamine and THC in Obregon's system (PCSO Report #230316206, p. 85), potentially explaining his erratic resistance. Witness statements vary (e.g., no gun seen by Mariah Brady), but physical evidence and Deputy Gibson's consistent account (deposition, January 5, 2026) override discrepancies. My objective review of all evidence is foundational in my opinions. PCSO Executive Summary (AI2023-005) and County Attorney clearance (August 30, 2023) affirm no criminal acts, supporting the threat's reality under Policy 300.4(a).

## 2.  Opinion – Medical Aid

It is my opinion that Deputy Gibson administered medical aid to Obregon as soon as practicable given the scene's context, with no unreasonable delays. This opinion draws from Deputy Gibson's walkthrough, where he detailed radioing "shots fired" (code 998) at 19:01, securing the gun by kicking it away, assessing gurgling sounds indicating airway issues, retrieving a med kit, cutting clothes, and applying compressions until EMS arrived (DEFS_Obregon 000628). Radio traffic (Ex. 12, barcode #202440) confirms aid request at 19:03, and CGPD Report (#2023-00011039) notes Deputy Gibson performing CPR before relief. Obregon was pronounced dead at 19:30 despite efforts (PCSO Report #230316206, p. 1). Initial "freeze" (seconds-long) aligns with Force Science training on post-critical incident response (Deposition pp. 91-95). FAC claims inaction (¶¶33-37), but video and logs refute delays, showing prioritization of scene security (solo officer) before aid, compliant with Policy 304.

DEF_Obregon 007121

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

### a) Timeline Breakdown: Shots Fired to Medical Aid Increments

This breakdown analyzes the timeline from shots fired (approximately 19:01:20 hours, based on video timestamp 06:36:12 hours adjusted to real time) to key post-shooting actions, focusing on increments related to medical aid. Calculations are in minutes and seconds, derived directly from the provided logs and data – this analysis is strictly reliant on radio traffic. [7] Intervals reflect practicable response in a solo encounter, while dealing with a highly-threatening and unpredictable scene. There is an analysis of timing increments based on the video evidence[8] in the Video Analysis section of this report.

- Shots Fired to "Shots Fired" Transmission: 0 minutes, 21 seconds (19:01:41 - 19:01:20). Initial radio confirms incident, securing scene priority.
- Shots Fired to "Subject Had Firearm" Transmission: 0 minutes, 35 seconds (19:01:55 - 19:01:20). Communicates threat details, aiding response coordination.
- Shots Fired to "One Down with Multiple Gunshot Wounds" Transmission: 0 minutes, 48 seconds (19:02:08 - 19:01:20). Assesses injuries, requests EMS implicitly.
- Shots Fired to Identification and "Attempted to Shoot" Transmission: 1 minute, 14 seconds (19:02:34 - 19:01:20). Provides suspect details, supporting aid mobilization.
- Shots Fired to "Rendering Medical Care" Transmission: 1 minute, 40 seconds (19:03:00 - 19:01:20). Aid initiated post-security (e.g., gun secured), no unreasonable delay given context.

### 3. Opinion 3: Underlying Intent or Motivation Behind Deputy Gibson's Response to the Deadly Threat

It is my opinion that there is no evidence of any underlying intent, bias, or improper motivation behind Deputy Gibson's response to the deadly threat posed by Obregon. This opinion is supported by Deputy Gibson's statements denying animosity (walkthrough; Deposition pp. 25-30, 98-102), describing prior encounters as professional and non-hostile. The stop was initiated for observed violations (speeding, stop sign failure; Executive Summary p. 1), not pretext, with Obregon acknowledging Deputy Gibson by name. No taunt or unprofessional behavior, ("I'll bet you're scared now," FAC ¶63) appears in Deputy Gibson's account or video/audio evidence or in in other witness statements. Policy 319 (Conduct) review found no bias (Executive Summary p. 2). Witness claims of

---

[7] DEFS_Obregon 000001-000085 - 230316206 PCSO REPORT.pdf – Page 06-14.
[8] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.

DEF_Obregon 007122

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

dislike (FAC ¶15) lack corroboration in immediate interviews or forensics. Clearance letter and administrative inquiry affirm actions were circumstance-driven, not motivated based on the existing documentation and associated investigations. In my review of the case documents and video evidence I was unable to refute the findings  of the departmental investigation.

## 6.  CONCLUSION

The documented facts of this case demonstrate that Deputy Gibson encountered an armed threat from Obregon during a dynamic encounter that began as a traffic stop and rapidly escalated through flight, and a subsequent close-range struggle, as supported by a full investigative review of all documentation, statements and video evidence. The evidence shows that Deputy Gibson responded to Obregon drawing and pointing a handgun by using deadly force, then transitioned to securing the escalating scene and providing medical aid as a single deputy in a sensitive environment, without unreasonable delay once the immediate danger from Obregon was neutralized.

The sequence of actions—captured on video – backpedaling while firing, immediate radio communication, suspect's weapon security issues, and prompt initiation of care—corresponds to the circumstances presented, including the solo-deputy context and the need to prioritize safety before rendering assistance. No facts in the record support any alternative motivation or intent beyond responding to the threat as it unfolded in real-time. Collectively, these observations indicate that Deputy Gibson's conduct aligned with the immediate situation and the documented events, consistent with the investigative findings and applicable policies.

## 7.  CASE FACTS COMPARED TO THE FIRST AMENDED COMPLAINT

### A. Comparison of Plaintiffs' First Amended Complaint to Deputy Gibson's Account

This section compares the allegations in the First Amended Complaint (FAC, filed September 20, 2024) to Deputy Gibson's contemporaneous on-scene walkthrough statements (recorded March 16, 2023, immediately post-incident). The comparison is limited to these documents and incorporates

DEF_Obregon 007123

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

the video evidence (e.g., Ring and body-worn camera footage) showing Deputy Gibson backpedaling while firing, which refutes key FAC claims of a prone, non-threatening shooting. Disparities are outlined thematically below, highlighting inconsistencies in sequence, threat perception, and actions.

## B.  Initial Stop and Interaction

**FAC Allegations (¶¶12-20):** Obregon rode his motorcycle to a friend's home, crashed into the gate/fence and stopped when Deputy Gibson activated lights, dismounted peacefully, greeted Deputy Gibson ("hey Gibson"), conversed calmly for ~2-3 minutes, provided ID without threat or aggression.

**Deputy Gibson's Account:** Agrees on non-resistant engagement initially—Obregon stopped after striking the fence, dismounted, engaged Deputy Gibson ("hey Gibson"), conversed briefly, provided ID (dropped wallet items, bent to retrieve). Adds Deputy Gibson informed Obregon of detention due to warrants, which potentially prompted Obregon to attempt to flee from Deputy Gibson.

**Disparity:** Minor alignment on a non-resistant engagement, but FAC omits Deputy Gibson's detention statement as flight trigger. The video evidence supports Obregon's initial compliance but not FAC's implication of no justification.

## C.  Flight and Pursuit

**FAC Allegations (¶¶21-23):** Obregon ran through the gate; Deputy Gibson drew his weapon and fired at Obregon's back while fleeing.

**Deputy Gibson's Account:** Obregon fled after detention notice, tripped over bike/gate; Deputy Gibson pursued on foot, tackled from behind (landed on back), no shots were fired during the struggle.

11

DEF_Obregon 007124

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

**Disparity:** FAC claims immediate shots at Obregon in the back while he was fleeing; Deputy Gibson describes foot chase and tackle without firing. Video shows initial pursuit and then Deputy Gibson backpedaling during shots, refuting initial shots in the back-shooting during flight.[9]

## D.  Ground Struggle and Shooting

**FAC Allegations (¶¶24-28, 63-64):** Obregon fell prone with his back turned to Deputy Gibson, non-threatening; Deputy Gibson stood "atop" him, fired multiple shots (including taunt "I'll bet you're scared now"); no weapon seen or produced (witness statements and depositions).[10]

**Deputy Gibson's Account:** During tackle, Obregon reached for waistband, drew .45 handgun, pointed at Deputy Gibson (finger on trigger, muzzle first); Deputy Gibson pushed off, backpedaled, commanded "drop the gun" multiple times, fired ~10 rounds as Obregon rolled/continued pointing; no taunt mentioned.

**Disparity:** FAC portrays execution-style shooting of Obregon while he was a prone, unarmed individual; Deputy Gibson details defensive response to an armed threat during the struggle. Video evidence of backpedaling aligns with Deputy Gibson's dynamic retreat, contradicting FAC's static "atop" positioning and claim of "no-threat."

## E.  Presence of Weapon

**FAC Allegations (¶¶29-32, 64):** Witnesses (including MB) saw no gun; Implying that Obregon not threatening or armed; gun found unfired near the gate post-incident.

**Deputy Gibson's Account:** Obregon pulled gun from waistband during struggle and pointed it at Deputy Gibson; Deputy Gibson secured it post-shooting (kicked away); forensics confirmed .40 caliber firearm which tested positive for Obregon's DNA.

---

[9] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.
DEFS_Obregon 000464 - ch03-20230317-064126-064953-101000000000.mp4.
[10] See list of documents relied upon for this analysis.

DEF_Obregon 007125

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

**Disparity:** FAC denies any weapon involvement related to Obregon; Deputy Gibson centered his account on the presentation of a firearm (gun draw) as the threat trigger of an immediate and deadly threat. Video (limited by distance) supports struggle but not full details; forensics corroborate Deputy Gibson's account.

## F.  Post-Shooting Actions

**FAC Allegations (¶¶33-43):** Deputy Gibson frozen and not providing aid to Obregon; Deputy Gibson claimed Obregon pulled a firearm from his waistband (disputed by MB); abandoned MB forcing her to watch the aftermath of the incident.

**Deputy Gibson's Account:** Deputy Gibson immediately radioed for aid (code 913), secured gun, assessed gurgling sounds, retrieved med kit, began aid (cut clothes, compressions);  Deputy Gibson interacted with MB briefly during the aftermath and instructed her for her safety and scene security issues.

**Disparity:** FAC alleges the inaction and distress of Deputy Gibson as related to causation; Deputy Gibson describes prompt security/aid as supported by radio traffic and attempts to aid prior to other officers and medical personnel arriving on scene while managing an escalating and unpredictable scene with other unknown bystanders. Video (Officer Fox BWC) captures incident post-actions, supporting Deputy Gibson's response over FAC's neglect claims.

Overall, the FAC depicts an unprovoked, excessive shooting of a non-resistant individual who was not a deadly threat to Deputy Gibson, while Deputy Gibson's account describes a defensive response to violent armed resistance. Video evidence of Deputy Gibson backpedaling refutes FAC's prone/back-turned narrative, aligning with Deputy Gibson's dynamic threat description.

In contrast, the Plaintiffs' First Amended Complaint (FAC ¶¶ 21-28, 63-64) alleges that Obregon fell face-first to the ground in a prone position with his back turned, at which point Deputy Gibson stood atop him and fired multiple shots despite Obregon posing no threat and being in a position amenable to apprehension without the application of lethal force.

13

DEF_Obregon 007126

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121: 702.373.4737*
***Confidential Report***

### 4. Witness Statements

One witness reportedly heard Deputy Gibson state, "I'll bet you're scared now," prior to firing (FAC ¶ 63). Multiple witnesses, including a minor identified as MB [a resident of the property and family friend of Obregon]), stated they observed no weapon in Obregon's possession (FAC ¶¶ 30, 39, 64). MB, who heard the gunshots from inside the residence and emerged to the front yard scene, described Deputy Gibson as standing over Obregon in an apparent frozen state, not immediately rendering aid (FAC ¶¶ 31-37). She confronted Deputy Gibson about the absence of a gun after he claimed Obregon had drawn one, receiving no response (FAC ¶¶ 38-41). During this time Deputy Gibson can be seen covering Obregon with his weapon pointed at Obregon.[11]

Post-shooting, Deputy Gibson radioed for emergency assistance using PCSO code 913 (indicating an officer-involved shooting) and secured the scene by moving the handgun away (Dep. pp. 70-80; Radio Traffic Audio, Ex. 12). Deputy Gibson assessed Obregon's condition, noting gurgling sounds suggestive of airway compromise, retrieved a medical kit from his vehicle, and initiated aid, (Vehicle emergency equipment was activated from the onset of the incident, [video evidence[12]]) including checking for breathing and applying pressure to wounds (Dep. pp. 75-85). MB assisted briefly by rolling Obregon onto his back but was instructed to remain at the scene for safety and investigative purposes (FAC ¶¶ 42-45). Obregon sustained seven (7) gunshot wounds, including entries to the back consistent with a rolling motion per forensic reports (Ex. 7), and was pronounced deceased at the scene despite aid efforts.

MB reported being compelled to observe Obregon's final breaths, bleeding, and gurgling, and subsequently required to stand near the body for several hours during the investigation (FAC ¶¶ 46-50). She provided conflicting statements to investigators, attributed by the plaintiffs to fear of repercussions due to her family's relationship with Obregon and trauma from witnessing the event (FAC ¶ 51). Other PCSO personnel arrived, and MB was separated from her mother, Meagan Brady, temporarily per scene protocols (FAC ¶¶ 52-62).

---

[11] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.
[12] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.

DEF_Obregon 007127

Evidentiary materials reviewed include Ring doorbell video (Ex. 13, capturing the initial pursuit but limited by distance), Officer Fox's body-worn camera footage (Ex. 14) capturing the position of Deputy Gibson on Officer Fox's arrival (leaning over Obregon rendering medical aid), radio traffic audio (Ex. 12), forensic examination reports (Ex. 7, confirming the .40 caliber handgun with Obregon's DNA), medical examiner's chart (Ex. 8), incident photographs (Exs. 2-6, 11), and PCSO Policy 300 on Use of Force (Ex. 1). No criminal charges were filed against Deputy Gibson.

The force applied by Deputy Gibson aligns with PCSO training[13] and Policy 300, subsection 300.4(a), which authorizes deadly force in response to an imminent threat of death or serious physical injury, as described in Deputy Gibson's account of the armed confrontation during a dynamic struggle following active evasion.[14]

## 5. Summary of Key Facts and/or Record/Evidentiary Citations, Outline of the Investigative Process

The following outline summarizes the investigative process for the officer-involved shooting incident on March 16, 2023 (PCSO Incident #230316206), based on the reviewed documents, including the PCSO Deputy Report, Casa Grande Police Department ("***CGPD***") assisting reports, evidence chain of custody records, and the PCSO Executive Summary for Administrative Inquiry #AI2023-005. This outline is derived from the case facts relied upon for analysis in this expert report.[15] Officers listed in this section are not named outside of this section.

## A. Immediate Response and Scene Management (March 16, 2023)

Incident Initiation and Notification: At approximately 19:01 hours, Deputy Gibson radioed "shots fired" (code 998) and reported a subject down with multiple gunshot wounds. By 19:03 hours, Deputy Gibson transmitted that he was rendering medical aid. The incident was classified as a "Field Interview" escalating to "Assault, Police, Firearm" (offense code ASPF) with circumstances including

---

[13] OBREGON_000147-OBREGON_000185 - B Gibson Training_REDACTED.pdf.
[14] 01-05-2026 Gibson, Brady_Full_Size_ex.pdf.
[15] DEFS_Obregon 000126-000128 - PCSO Executive Summary AI2023-005.pdf, DEFS_Obregon 000111-000123 - CGPD Case Report 2023-00011039.pdf, OBREGON_000001-OBREGON_000013 - CGPD Police Reports.pdf, DEFS_Obregon 000412-000462 - PDF Evidence Report.pdf.

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121: 702.373.4737*
**Confidential Report**

homicide (1HOM), officer-involved shooting (OIS), high profile (HP), and technical involvement (1TECH K FALES).

**On-Scene Response:** Multiple PCSO units responded, including Deputies Gibson (primary), M. Bedrossian, G. Sanders, and others (totaling over forty (40) responding officers listed in the PCSO report, [not listed in this expert report]). CGPD officers (e.g., #257 Fox, #195 Reed, #319 Horst, #322 Sanchez) arrived to assist, activating emergency lights and sirens for code three response. CGPD secured the scene by blocking intersections (e.g., Hualapai Dr. and Havasupai Dr., Calgary Dr.), setting up crime scene tape, and maintaining perimeter control.

**Medical Aid and Scene Security:** Deputy Gibson retrieved a medical kit and initiated aid. CGPD Officer Reed observed casings and a gun near the subject, took over CPR from Deputy Gibson until relieved by EMS and Pinal County Regional Fire Department. The subject (Obregon) was pronounced deceased at 19:30 hours. CGPD Sergeant Rush (#S46) coordinated resources, including a light tower, and noted witness statements (e.g., a female resident heard shots and was told by Deputy Gibson that the subject "pulled a gun on him"). Body-worn cameras (BWCs) were activated by CGPD officers (e.g., Fox, Horst, Rush), capturing interactions, and footage was tagged and uploaded to evidence.com.

**Witness Management:** Approaching individuals were managed for safety; antagonistic bystanders were noted in the video evidence. CGPD provided a room at their station for interviews with three (3) female subjects, recording audio/video (saved to DVD and evidence.com). The subjects left after waiting, but their information was collected. Officer Horst captured a post-departure conversation on BWC.

## B. Criminal Investigation (March 16, 2023 – July 26, 2023)

**Assignment and Lead:** The case was assigned to PCSO Detective J. Bonucci (#877) on March 16, 2023, under the Homicide detail (HOMI). The investigation was closed on July 26, 2023, with disposition "CLO."

16

DEF_Obregon 007129

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

**Scene Processing:** The scene at W. Mescalero Dr. & N. Hualapai Dr. (Casa Grande, AZ) was secured and processed. Evidence included a handgun (Smith & Wesson SD40, loaded with one (1) round, functional per DPS testing), ten (10) 9mm cartridge casings (eight (8) Winchester range ammo, two (2) Federal Premium L/E duty ammo), and the subject's red/orange dirt bike. CGPD vehicles were part of the crime scene until cleared around 01:15 hours on March 17, 2023.

**Interviews and Statements:** Witness interviews were conducted, including at the CGPD station. Deputy Gibson provided details of the traffic stop (for high speed, stop sign violation), pursuit, tackle, and shooting after the subject pointed a handgun. Contending witness statements (e.g., no weapon observed, Deputy Gibson's alleged comment "I'll bet you're scared now") were noted in related civil filings but not detailed in initial criminal reports.

**Evidence Collection:** Items such as OIS radio traffic (CH.1) were collected by RA Gonzales (#1893) on March 17, 2023, and submitted to Florence locker. Additional evidence (e.g., DVD of interviews) was booked by CGPD.

## C. Evidence Handling and Chain of Custody (March 17, 2023 – Ongoing)

**Documentation and Tracking:** Chain of custody was maintained for key items. For example, Item #1893-1 (OIS Radio Traffic, barcode #202440) was logged by Ramon Gonzales on March 20, 2023 (10:22 AM) to INTAKE, then by Madison Vaughn on March 24, 2023 (9:32 AM) to 2692 - M VAUGHN, and finally to CASSETTE ENV2 (9:42 AM). Legacy entries included timestamps, subjects, and user logins.

**Processing:** Evidence was submitted at Florence, with offense type "Field Interview." No breaks in chain noted in reviewed records.

DEF_Obregon 007130

## D.  Medical Examination and Autopsy (Post-Incident)

**Autopsy and Toxicology:** An autopsy was conducted, listing the cause of death as "multiple gunshot trauma" (seven (7) wounds). Toxicology revealed methamphetamine, amphetamine, THC, and carboxy THC in the subject's system.[16]

**Integration into Investigation:** Results were incorporated into the criminal file reviewed by Detective Bonucci.

## E.  Legal Review and Clearance (August 30, 2023)

**County Attorney Review:** On August 30, 2023, the Pinal County Attorney's Office Critical Incident Review Board issued a clearance letter, stating that Deputy Gibson did not commit acts warranting criminal prosecution. This was based on the complete criminal investigation file provided by Detective Bonucci.

## F.  Administrative Internal Review (August 30, 2023 – October 5, 2023)

**Assignment and Scope:** PCSO Professional Standards Unit Detective C. Cetta (#2080) reviewed the criminal file for policy compliance, considering PCSO Policies 300 (Response to Resistance), 304 (Officer-Involved Shooting), 305 (Duty Firearms), 319 (Conduct), and 500 (Traffic Function).

**Findings:** No clear policy violations were identified, but areas of concern included improving officer safety during traffic stops (e.g., better location awareness and timely dispatch transmission) and ensuring proper duty ammunition (Deputy Gibson had mixed range and duty ammo). The use of force was determined to be policy appropriate based on the investigation.[17]

**Completion:** The administrative inquiry (#AI2023-005) was completed on October 5, 2023.

---

[16] DEFS_Obregon 000090-000103 - 230316206 PCME AUTOPSY Obregon, M..pdf.
[17] This is not a legal conclusion from my analysis; this is the findings noted in the investigative process.

DEF_Obregon 007131

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

## 8.  ANALYSIS OF WITNESS STATEMENTS

This analysis is based on the recordings of initial interviews conducted on March 16, 2023, by PCSO detectives (e.g., Det. Charles, Det. Gonzales, Det. McCall) with neighbors and residents at or near the scene (19005 W. Mescalero Dr., Casa Grande, AZ). The alleged disparaging remark ("I'll bet you're scared now," as stated in the Plaintiffs' First Amended Complaint, FAC ¶63) is not mentioned in any of these initial interviews. Below, I address the query's two parts: (1) references to disparaging remarks; and (2) conflicts between witness statements and Deputy Gibson's account (as detailed in his January 5, 2026 deposition and the PCSO Executive Summary AI2023-005).

### A.  Statements Regarding Alleged Disparaging Remarks

No witnesses in the initial interviews reported hearing any disparaging, taunting, or similar remarks from Deputy Gibson (e.g., "I'll bet you're scared now" or anything implying mockery or premeditation). The interviews focus primarily on auditory observations (e.g., gunshots, commands like "get down" or "don't reach for the gun") and limited visual details. Key excerpts:

Billy Leivas & Donna Pacion (DEFS_Obregon 000629): Leivas heard nothing (watching TV). Pacion heard "popping" sounds (like firecrackers) but no voices or remarks. No mention of any statements by Deputy Gibson.

Christopher Rhodes (DEFS_Obregon 000631): Heard two (2) sets of gunshots (one weak, then multiple). No voices or remarks noted; he stood up after shots and saw deputies arriving. Patricia Luna, Jesse Gutierrez Sr. & Jr. (DEFS_Obregon 000634): All heard ~5-9 shots but no voices or remarks. Jr. heard post-shooting cries and "Michael, we're trying to help you" (from aid efforts), but nothing disparaging.

Mariah G. Brady (DEFS_Obregon 000636 PT1 & 000637 PT2): Heard Deputy Gibson yell "Michael, please get on the ground" before five (5) shots. No disparaging remarks; focus on no gun seen and pleas for aid.

19

DEF_Obregon 007132

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

Arianna Brady (DEFS_Obregon 000639): Heard five (5) shots and yelling ("get down"). No disparaging remarks; mentioned hearing discussions about a gun post-shooting but no taunts.

Carolyn Buechler (DEFS_Obregon 000630): Did not hear shots; daughter Jackie (asleep, not interviewed) reportedly did, but no details on remarks.

Kenyan Bower & Kathy Bower (DEFS_Obregon 000632): Heard "don't reach for your gun" before/during four (4) shots. No disparaging remarks.

Samantha Plummer, Wade Putt, Beverly Putt (DEFS_Obregon 000635): Heard "don't reach for the gun" during/on way to door (4-5 shots). No disparaging remarks noted.

Gabriel Silva (DEFS_Obregon 000633): Not home; no observations.

The absence of such remarks in these contemporaneous statements (taken hours after the incident) contrasts with the FAC's allegation, which may stem from later recollections or other sources not captured here. No evidence in these files supports the claim during initial canvassing.

## B. Conflicts Between Witness Statements and Deputy Gibson's Account

Deputy Gibson's account (from deposition and PCSO summary) describes: A traffic stop for speeding/stop sign violation; Obregon complied initially but fled on foot after ID check; Deputy Gibson pursued, tackled Obregon; during ground struggle, Obregon drew a .40 caliber handgun and pointed it at Deputy Gibson (finger on trigger); Deputy Gibson commanded "drop the gun" multiple times, backed away, and fired ~10 rounds as Obregon rolled and continued pointing; shots ceased when gun dropped; Deputy Gibson then radioed for aid (code 913), secured the gun, and rendered aid.

Witness statements show consistencies (e.g., commands to "get down" or not reach for gun, post-shooting aid) but several conflicts, particularly on the sequence, presence of a gun, number/timing of shots, and Obregon's actions. These are quantified below in a table for clarity, grouped by theme. Conflicts are based on direct contradictions or significant variances; some

20

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

witnesses had limited views (e.g., auditory only). The following represents the comparison of witness statements considered in this analysis:

| Theme/Element | Deputy Gibson's Account | Conflicting Witness Statements | Analysis of Conflict |
|---|---|---|---|
| **Initiation and Pre-Shooting Sequence** | Traffic stop; Obregon dismounted bike, conversed peacefully ~2-3 min; fled on foot after detention announced; pursued and tackled in yard. No shots during initial flight. | - Mariah Brady (PT1/PT2): Obregon on bike at gate, turning it off/on; Deputy Gibson yelled "get on the ground" while Obregon dismounting (right leg over bike); shots fired immediately after, no flight/pursuit/tackle seen. - Arianna Brady: Heard "get down" from her room; no visual of pursuit/tackle. - Kenyan/Kathy Bower: Heard "don't reach for your gun" at door; saw Obregon fall between pole/fence (no tackle seen). - Samantha Plummer/Wade Putt: Saw Gibson talking to man in brown hat; then shots; man fell near fence (no flight/tackle). | Multiple witnesses describe shooting at/near gate while Obregon on/near bike, contradicting Deputy Gibson's foot pursuit/tackle in yard. Suggests possible discrepancy in location/timing of escalation. |
| **Presence of Gun/Threat** | Obregon drew .40 handgun during ground struggle, pointed at Deputy Gibson with finger on trigger; Deputy Gibson commanded "drop the gun." | - Mariah Brady (PT1/PT2): No gun seen (watched through window); no throw/drop; insisted "there was no gun." - Arianna Brady: No gun seen (approached ~5 ft from body); heard post-shooting talk of gun but none visible. - Patricia Luna/Jesse Gutierrez family: No visuals; Jr. heard post-aid voices but no gun mention. - Christopher Rhodes: Heard two shot sets; speculated "somebody had tried to run" but no gun seen/heard. | Direct conflict: Brady sisters (closest witnesses) deny seeing gun, contradicting Deputy Gibson's imminent threat claim. Others didn't see event closely enough to confirm/deny. |
| **Commands Issued** | Multiple "drop the gun" during struggle/shooting. | - Mariah Brady: Heard "Michael, please get on the ground" before shots; no "drop the gun." - Arianna Brady: Heard "get down." - Kenyan/Kathy Bower: Heard "don't reach for your gun" before/during shots. - Samantha Plummer/Wade Putt: Heard "don't reach for the gun." - Donna Pacion/Billy Leivas: No voices heard. - Christopher Rhodes: No voices; only shots. | Partial alignment on de-escalation commands, but variance in phrasing/timing (e.g., "get down" vs. "drop the gun" vs. "don't reach"). Some heard none, suggesting audio limitations or sequence differences. |
| **Number and Timing of Shots** | ~10 rounds fired continuously until threat neutralized (as Obregon rolled). | - Mariah/Arianna Brady: 5 shots (quick succession). - Jesse Gutierrez Jr.: 7-9 shots (bang, pause, repeated). - Christopher Rhodes: Two sets (one weak, then multiple). - Kenyan/Kathy Bower: 4 shots (after command). - Samantha Plummer/Wade Putt: 4-5 shots (during/on way to door). - Donna Pacion: | Inconsistent counts (4-10) and patterns (continuous vs. sets/pauses), potentially due to auditory distortion or partial hearing; conflicts with Deputy Gibson's single volley. |

21

DEF_Obregon 007134

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

| Theme/Element | Deputy Gibson's Account | Conflicting Witness Statements | Analysis of Conflict |
|---|---|---|---|
| | | Multiple "popping" (like firecrackers, no count). - Patricia Luna/Jesse Sr.: ~5 shots (quick). | |
| Post-Shooting Actions | Immediate radio for aid; secured gun; rendered aid (checked airway, med kit). | - Mariah Brady: Deputy Gibson "just standing there" initially (frozen); delayed aid until prompted; heard gurgling but slow response. - Arianna Brady: No immediate aid; waited for ambulance; lights off initially, turned on when she approached. - Kenyan/Kathy Bower: Saw neighbor jump fence to help; Deputy Gibson argued with girl. - Samantha Plummer/Wade Putt: Deputy Gibson crouched by car post-shots; then went to aid. | Conflicts on response speed: Witnesses describe initial inaction/delay vs. Deputy Gibson's immediate aid/radio. Aligns on eventual aid but timing disputed. |
| Overall Visibility/Position | Close-range struggle in yard. | - Many (e.g., Rhodes, Luna/Gutierrez, Pacion): Auditory only; no visuals. - Brady sisters: Partial view from windows/yard; no full struggle seen. - Bowers/Plummer/Putt: Viewed from door/window; saw fall but limited angles. | Limited witness visibility (distance, obstructions like conex boxes/fences) may explain gaps, but creates conflicts where visuals contradict (e.g., no tackle/gun). |

These conflicts are expected and consistent with witness accounts in this environment. These notes highlight potential issues with perspective, vantage points, and recall under stress. No witnesses fully corroborate Deputy Gibson's tackle/gun-draw sequence due to angle of line of sight, while several align on commands and post-aid efforts. The lack of disparaging remarks in initial statements may indicate the allegation arose later. This analysis relies solely on provided documents and statements.

## C. Section Conclusion.

There is no statement from any witness in the immediate post-incident interviews (conducted on March 16, 2023) that includes a visual or auditory account of Deputy Gibson saying, "I'll bet you're scared now." The provided interviews, (DEFS_Obregon 000629 through 000639), contain reports of commands like "get down," "don't reach for the gun," or "Michael, please get on the ground," but no disparaging or taunting remarks matching this phrase in any of the initial interviews. A review across all attached PDFs (including reports, summaries) also revealed no corroborating information related to this alleged statement. The allegation appears only in later civil

DEF_Obregon 007135

filings, such as the Plaintiffs' First Amended Complaint (¶63), which is not an immediate witness interview and is not corroborated by any existing evidence.

## 9.  EXTENDED ANALYSES

### 1.  Lawful Goals and Objectives of the Initial Stop

**Goals and Objectives:** The primary objective was to conduct a routine traffic stop for observed violations, ensure public safety, and investigate potential outstanding warrants and suspect identity. Deputy Gibson observed Obregon operating a red dirt bike motorcycle southbound on Hualapai Rd. at a high rate of speed (estimated above the residential limit) and failing to stop at a posted stop sign at the intersection with Hopi Rd. (PCSO Executive Summary, p. 1; Gibson Deposition, pp. 34-40). Deputy Gibson accelerated to catch up and initiated the stop in front of 19005 W. Mescalero Dr. The goal was to issue a citation or warning, request identification, and de-escalate if compliant.

**Lawfulness of the Stop:** The stop was lawful under the Fourth Amendment, supported by reasonable suspicion of criminal activity (traffic infractions). An officer may briefly detain an individual if there is articulable suspicion of a violation. Arizona statutes (e.g., A.R.S. §28-1595 for stop sign violations and §28-751 for speeding) provide probable cause for the stop.. The CGPD assisting report (#2023-00011039, p. 1) corroborates the traffic context, noting the dirt bike's involvement. No evidence suggests an unlawful or pretextual encounter; the stop aligned with PCSO Policy 500 (Traffic Function), which authorizes enforcement of traffic laws to promote enforcement and safety.

### 2.  Escalated Force - Goals and Objectives Following the Presentation of the Deadly Threat

**Escalated Goals and Objectives:** Upon Obregon's flight, non-compliance, and combative resistance and the presentation of a firearm, a deadly threat, the objectives shifted from enforcement to officer self-preservation and neutralization of the immediate threat, and scene

23

DEF_Obregon 007136

security. After initial compliance (dismounting bike, providing ID), Obregon fled on foot toward the residence through the gate that had been damaged, after crashing into the gate with his motorcycle (Gibson Deposition, pp. 50-60). Deputy Gibson pursued to effect an arrest for evasion (A.R.S. §13-2502, resisting arrest). During the ground struggle post-tackle, Obregon drew a concealed .40 caliber handgun and pointed it at Deputy Gibson with his finger in the trigger well, creating an imminent threat of death or serious injury (PCSO Executive Summary, p. 1; Gibson Deposition, pp. 60-70). After Obregon attempted to flee and pointed the handgun at Deputy Gibson, the objective was to stop the deadly threat posed by Obregon. Deputy Gibson then transitioned to scene security and safety, and to rendering aid (radioing code 913 for officer-involved shooting, moving the gun, assessing injuries).

**Appropriate Escalation of Force in Response to Obregon's Violent Behavior:** The escalation of force was appropriate and proportional under *Graham v. Connor's* objective reasonableness standard, reflected in the policy[18] considering the severity of the crime (escalating from traffic enforcement to aggravated assault with a firearm, A.R.S. §13-1204), the immediate threat to the officer, and active resistance/evasion. Obregon's attempt to flee constituted active resistance, and drawing/pointing the gun elevated it to a deadly assault (PCSO Policy 300.4(a), authorizing deadly force for imminent threats). Deputy Gibson did not consider non-lethal options (e.g., taser) as he deemed lower level implements would be ineffective against a firearm at close range (5-7 feet) during a dynamic struggle (Gibson Deposition, pp. 130-135). Deputy Gibson issued verbal commands ("drop the gun") multiple times before and during firing ten (10) rounds, ceasing when the threat ended (gun dropped). This aligns with training/policy on rapid threats and PCSO Policy 304 (Officer-Involved Shooting).

### 3. Evidence Supporting the Officer's Perceptions

**Physical and Forensic Evidence:** The .40 caliber Smith & Wesson SD40 handgun (loaded, and functional per DPS testing) was recovered near Obregon with his DNA (Evidence Report, Item #2329-1; Chain of Custody, barcode #202419). Ten (10) 9mm casings (mixed range/duty ammo) matched Deputy Gibson's Glock 17 service weapon (PCSO Report, p. 1). The autopsy confirmed seven (7) gunshot wounds consistent with a rolling motion during a struggle (back entries during

---

[18] Policy 300 use of Force – Exhibit no. 1.

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

turn), aligning with Deputy Gibson's perception of ongoing threat (Medical Examiner's Chart, Ex. 8). Toxicology showed methamphetamine, amphetamine, THC in Obregon's system, potentially supporting erratic/violent behavior (PCSO Executive Summary).

**Audio and Radio Evidence:** Radio traffic (CH.1, Item #1893-1, barcode #202440) captured Deputy Gibson's immediate "shots fired" (code 998) at ~19:01, aid request at ~19:03, and code 913, corroborating his perception of urgency and post-threat actions (Chain of Custody, p. 1).

Witness Corroboration (Partial): Some witnesses heard commands like "don't reach for the gun" (e.g., Kenyan Bower, Samantha Plummer), supporting Deputy Gibson's de-escalation attempts. No witnesses reported seeing the full struggle, but forensic placement of the gun and casings matches Deputy Gibson's account. The following statement from Allison Obregon during an interview with Detective Dakota McCall about the incident and Obregon trying to get through the gate which aligns with Deputy Gibson's account generally:[19]

> *"Allison stated when everything happened, her sister in law got a phone call stating ["it looks like Micky is running from someone, he is trying to get into the fence and the cops are behind him". Allison stated she was told all her sister in law heard after that was her friend's daughter screaming "they shot him, they shot him."]"*

## 4. Video Evidence Supporting the Officer's Account Regardless of Conflicting Witness Statements

Available video (Ring doorbell, Ex. 13)[20] supports Deputy Gibson's sequence despite witness conflicts (e.g., no gun seen, fewer shots heard, although considered, these are expected and common inconsistencies). The Ring video captures the initial pursuit and flight but is distant/incomplete, missing close-range details yet aligning with evasion and tackle (Deputy Gibson Deposition, pp. 115-120). The videos in evidence prioritize over conflicting statements (e.g., Mariah Brady's no-gun claim), as witnesses had limited views (obstructions like Conex boxes). My

---

[19] DEFS_Obregon 000001-000085 - 230316206 PCSO REPORT.pdf – DEFS_Obregon 000062.
[20] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.
  DEFS_Obregon 000464 - ch03-20230317-064126-064953-101000000000.mp4.

DEF_Obregon 007138

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

investigation and video review validates video alignment with Deputy Gibson's account of the incident.

## a)  Analysis of Witness Accounts

In reviewing the Pinal County Sheriff's Office (PCSO) report for Incident 230316206, dated March 16, 2023, a total of eighteen (18) civilian witnesses provided statements through recorded interviews conducted by PCSO detectives. These witnesses include neighborhood residents, family members of the decedent (Obregon), and occupants of the property where the incident occurred (19005 W. Mescalero Drive). The accounts were quantified based on key elements: what was seen (visual observations of the events, individuals, or aftermath), heard (auditory details such as gunshots, commands, or other sounds), and known (prior knowledge of the decedent, context, or related circumstances). Witnesses who were not present during the incident or reported no direct observations were noted but excluded from sensory observational quantification.

## 5.  Quantification of Witness Accounts

The following table summarizes the witness statements, categorized by sensory input and prior knowledge. Counts reflect the number of witnesses reporting each element; some witnesses reported multiple elements. These are the notes used in the analysis compared to Deputy Gibsons deposition and on-scene walk through/interview and are abbreviated:

| Category | Sub-Element | Number of Witnesses | Details/Examples |
|---|---|---|---|
| Seen | Visual observation of the decedent ( Obregon) or his actions (e.g., on motorcycle, running, falling) | 6 | - Brandon Chapman: Saw Obregon ram fence on red dirt bike, talk to deputy, then attempt to run. - Tiffany Chapman: Saw Obregon ram gate, talk to deputy, run, trip, and fall. - Samantha Plummer: Saw deputy talking to man in brown hat (inferred as Obregon). - Kenyan Bower: Saw a "guy" fall to the ground after gunshots. - Mariah Brady: Saw Obregon getting off motorcycle from window; no gun observed. - Arianna Brady: Observed scene from yard; no firearm seen near Obregon. |
|  | Visual observation of the deputy (Gibson) or his actions (e.g., rendering aid, positioning) | 7 | - Brandon Chapman: Saw deputy get first aid kit, heard commands; assisted with flashlight. - Samantha Plummer: Saw deputy crouching by vehicle after shots. - Kenyan Bower: Saw deputy after shots; neighbor jumping fence to help. - Jesse Guiterez Sr: Saw deputy telling female to get back. - Mariah Brady: Saw patrol arrive, deputy render aid after urging. - Arianna Brady: Saw lights activate, deputy |

26

DEF_Obregon 007139

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

| Category | Sub-Element | Number of Witnesses | Details/Examples |
|---|---|---|---|
| | | | radioing; CPR delayed. - Christopher Rhodes: Saw flashing lights only (view blocked). |
| | Visual observation of aftermath (e.g., Obregon down, aid being rendered, police response) | 8 | - Includes above plus: Christopher Rhodes (flashing lights); Kenyan Bower (female yelling); Mariah Brady (Obregon "gargling on blood"); Arianna Brady (resuscitation attempts). No witnesses reported seeing Obregon with a gun. |
| Heard | Gunshots (number varied: 2-9 reported) | 13 | - 2 shots: Christopher Rhodes (initial). - 4+ shots: Donna Pacion; Kenyan Bower (after command). - 5 shots: Patricia Luna; Jesse Guiterez Sr; Samantha Plummer; Wade Putt; Mariah Brady; Arianna Brady; Megan Brady (relayed). - 5-6 shots: Christopher Rhodes (additional). - 7-9 shots: Jesse Guiterez Jr. - Unspecified: Billy Leiva (none); Kathy Bower (knock-like sound). |
| | Verbal commands from deputy (e.g., "Drop the gun," "Don't reach for the gun") | 7 | - "Drop the gun": Wade Putt (3 times); Samantha Plummer; Brandon Chapman; Kenyan Bower. - "Don't reach for the gun": Christopher Rhodes ("Put down the gun"); Brandon Chapman (repeated during aid). - "Michael please get on the ground": Mariah Brady. |
| | Other sounds (e.g., motorcycle, yelling, crying) | 8 | - Motorcycle: Mariah Brady (entering/leaving property); Arianna Brady; Megan Brady (relayed). - Yelling/crying: Jesse Guiterez Jr ("Michael we're trying to help you"); Kenyan Bower (female yelling); Arianna Brady (yelling). - Gate/motorcycle brief operation: Mariah Brady. |
| Known | Prior knowledge of decedent (e.g., family friend, visitor habits) | 10 | - Family friend/relative: Brandon Chapman (DJ's cousin); Tiffany Chapman (DJ's brother); Mariah Brady (family friend, red motorcycle); Arianna Brady (frequent visitor); Megan Brady (visits for Andy/Charlie); Allison Obregon (wife; parole violation, meth use, no guns carried); Allison (prior contacts with Deputy Gibson, threats alleged). - No prior knowledge: Majority of neighbors (e.g., Patricia Luna, Christopher Rhodes). |
| Other | Surveillance availability | 3 | - Wade Putt: Provided footage (recovered). - Others: Mostly none or inoperable (e.g., Gabriel Silva, Christopher Rhodes). |
| | Not present/no observations | 5 | - Carolyn Buechler; Gabriel Silva; Billy Leiva; Kathy Bower; Allison Obregon (relayed info only). |

## 6.  Summary of Key Themes and Consistency

The witness accounts demonstrate a high degree of consistency in auditory details, with thirteen (13) out of eighteen (18) witnesses reporting hearing gunshots, typically in the range of 4-6,

27

DEF_Obregon 007140

(ten (10) actual shots fired) often described as rapid or high-powered. No witness reported hearing shots from Obregon,[21] aligning with the absence of visual confirmation of him possessing or firing a weapon. Verbal commands from Deputy Gibson were corroborated by seven (7) witnesses, predominantly "Drop the gun," or "Don't reach for the gun," suggesting a perceived threat during the encounter. Visual accounts from six (6) witnesses describe Obregon's arrival on a red dirt bike, a brief interaction, an attempt to flee, and subsequent fall, but none observed a gun in his possession.

Prior knowledge from ten (10) witnesses portrays Obregon as a frequent visitor to the area, known for motorcycle use and family ties, but also as someone with a criminal history (parole violation, methamphetamine use) per his wife. Allegations of prior threats by Deputy Gibson were raised by Allison Obregon, warranting further scrutiny in contextual analysis. Inconsistencies are minor, such as variations in gunshot counts (likely due to distance or obstructions) and timing of aid rendering (e.g., delayed per Brady family). Overall, these accounts provide a coherent narrative of a rapid escalation from a lawful traffic stop and field interview to lethal force, with emphasis on post-shooting aid and scene security. Due to distance, lighting and visual perspective, no witnesses reported seeing the initial draw of a weapon by Obregon and surveillance[22] from one source was recovered for evidentiary purposes.

## 10. PERTINENT POLICIES FROM PINAL COUNTY SHERIFF'S OFFICE (PCSO) RELEVANT TO THE INCIDENT

Based on the provided documents and related investigative records (e.g., PCSO Executive Summary for Administrative Inquiry #AI2023-005, PCSO Deputy Report #230316206, CGPD Case Report #2023-00011039, and the First Amended Complaint), the pertinent PCSO policies in effect at the time of the incident (March 16, 2023) are those reviewed during the administrative inquiry. These policies are referenced but not fully quoted in the documents, This section analyzes the policy and is compared to facts of the case as described in the case file and reflected in the video evidence. I

---

[21] It is not possible to determine from which weapon shots were being fired. This element would not have been discernable by any witness. It was determined that Obregon did not fire any shots during the incident.

[22] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.
  DEFS_Obregon 000464 - ch03-20230317-064126-064953-101000000000.mp4.

DEF_Obregon 007141

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

have summarized each policy's relevance, key described elements, and how it applied, drawing from the case file and the policies provided to me by counsel.

The policies were evaluated for compliance with the traffic stop, and the pursuit, with a focus on the use of force, officer-involved shooting (OIS), and post-incident actions.

## 11. USE-OF-FORCE (RESPONSE TO RESISTANCE) POLICY 300 COMPLIANCE ANALYSIS.

### A. 300.1 PURPOSE AND SCOPE

**Policy Section:** This policy provides guidelines on the reasonable use of force. While there is no way to specify the exact amount or type of reasonable force to be applied in any situation, every member of this office is expected to use these guidelines to make such decisions in a professional, impartial and reasonable manner.

**Facts as Described:** Deputy Gibson initiated a traffic stop on Obregon for speeding and failing to stop at a stop sign. Obregon attempted to flee, tripped, and while prone, brandished a handgun and pointed it at Deputy Gibson. Deputy Gibson backed away, drew his weapon, and fired multiple shots until the handgun dropped from Obregon's hand. Deputy Gibson then rendered medical aid to Obregon (Deposition, Page 51, Lines 1-25; Page 111, Lines 1-25; PCSO Report, Page 76).

**Analysis:** Deputy Gibson applied the guidelines by using deadly force in response to an imminent deadly threat, making a decision based on the circumstances of Obregon pointing a handgun at him. Deputy Gibson's actions were professional in quickly rendering aid post-shooting and impartial as the force was directed solely at neutralizing the threat posed by Obregon, regardless of any perceived underlying intent or motivation.[23]

---

[23] (Graham v. Connor, 490, U.S. 386, 1989)

DEF_Obregon 007142

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

## B.  300.1.1 DEFINITIONS

**Policy Section:** Definitions related to this policy include:  Deadly force - Force reasonably anticipated and intended to create a substantial likelihood of causing death or very serious injury. Force - The application of physical techniques or tactics, chemical agents or weapons to another person. It is not a use of force when a person allows him/herself to be searched, escorted, handcuffed or restrained.

**Facts as Described:** Deputy Gibson fired his handgun at Obregon, striking him multiple times, resulting in Obregon's death. No chemical agents or non-lethal weapons were used; the incident did not involve searching, escorting, handcuffing, or restraining Obregon without resistance (Deposition, Page 19, Lines 13-25; Page 133, Lines 9-25; PCSO Report, Page 76; Page 79).

**Analysis:** Deputy Gibson's use of his handgun constituted deadly force as it was intended to stop the deadly threat from Obregon's pointed handgun, creating a substantial likelihood of death or serious injury. The shooting qualifies as force under the definition, as it involved the application of a weapon to Obregon, distinct from non-force actions like searching or restraining.

The following statements are from the recorded interview between Detective Bonnuci and Deputy Gibson:

- At time marker [00:27:00]: *"And then that's when I seen the, the gun come out and he just push off and gain some distance back. And now then he rolls over and he's presenting up like this was all slow motion."*
- At time marker [00:29:00]: *"I just saw the, the gun come out. I got distance and, and drew. Down and he was already rolling over to, to find where I was standing at, to shoot."*
- At time marker [00:31:00]: *"As soon as the gun comes out and having seen all that previous behavior that he was willing to shoot and kill me to escape and get away."*
- At time marker [00:35:00]: *"And he pointed that firearm at you? Yes. Muzzle first? Yes."*

30

DEF_Obregon 007143

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

## C.  300.2 POLICY

**Policy Section:** The use of force by law enforcement personnel is a matter of critical concern, both to the public and to the law enforcement community. Deputies are involved on a daily basis in numerous and varied interactions and, when warranted, may use reasonable force in carrying out their duties. Deputies must have an understanding of, and true appreciation for, their authority and limitations. This is especially true with respect to overcoming resistance while engaged in the performance of law enforcement duties. The Office recognizes and respects the value of all human life and dignity without prejudice to anyone. Vesting deputies with the authority to use reasonable force and to protect the public welfare requires monitoring, evaluation and a careful balancing of all interests.

**Facts as Described:** Deputy Gibson conducted a traffic stop on Obregon, who fled and pointed a handgun at him. Deputy Gibson responded with deadly force to overcome the resistance and threat. After the shooting, Deputy Gibson provided medical aid and secured the scene (Deposition, Page 130, Lines 1-25; Page 149, Lines 1-25; PCSO Report, Page 76; Page 20).

**Analysis:** Deputy Gibson's use of force aligned with the policy by addressing a critical threat during a lawful traffic stop, demonstrating an understanding of his authority to protect himself without prejudice. The incident reflects a balance of interests, as Deputy Gibson respected human life by attempting verbal commands and rendering aid post-force, warranting the department's monitoring and evaluation.

## D.  300.2.1 DUTY TO INTERCEDE – Not Applicable

**Policy Section:** Any deputy present and observing another deputy using force that is clearly beyond that which is objectively reasonable under the circumstances shall, when in a position to do so, intercede to prevent the use of unreasonable force. A deputy who observes another employee use force that exceeds the degree of force permitted by law should promptly report these observations to a supervisor.

DEF_Obregon 007144

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

**Facts as Described:** Deputy Gibson was the only deputy present during the shooting. No other deputies observed the force application. Subsequent arrivals assisted in aid and scene security (PCSO Report, Page 20; Page 22; Deposition, Page 154, Lines 21-25).

**Analysis:** The duty to intercede did not apply to this incident, as Deputy Gibson acted alone during the use of force, and no other deputy was present to observe or intervene in any potentially unreasonable force. No report of excessive force by observers was necessary, as the force was in response to Obregon's immediate threat.

## E.  300.3 USE OF FORCE

**Policy Section:** Deputies shall use only that amount of force that reasonably appears necessary given the facts and circumstances perceived by the deputy at the time of the event to accomplish a legitimate law enforcement purpose. The reasonableness of force will be judged from the perspective of a reasonable deputy on the scene at the time of the incident. Any evaluation of reasonableness must allow for the fact that deputies are often forced to make split-second decisions about the amount of force that reasonably appears necessary in a particular situation, with limited information and in circumstances that are tense, uncertain and rapidly evolving. Given that no policy can realistically predict every possible situation a deputy might encounter, deputies are entrusted to use well-reasoned discretion in determining the appropriate use of force in each incident. It is also recognized that circumstances may arise in which deputies reasonably believe that it would be impractical or ineffective to use any of the tools, weapons or methods provided by the Office.

Deputies may find it more effective or reasonable to improvise their response to rapidly unfolding conditions that they are confronting. In such circumstances, the use of any improvised device or method must nonetheless be reasonable and utilized only to the degree that reasonably appears necessary to accomplish a legitimate law enforcement purpose. While the ultimate objective of every law enforcement encounter is to avoid or minimize injury, nothing in this policy requires a deputy to retreat or be exposed to possible physical injury before applying reasonable force.

32

DEF_Obregon 007145

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

**Facts as Described:** Deputy Gibson perceived Obregon pointing a handgun at him in a tense, rapidly evolving situation during a traffic stop. Deputy Gibson fired until the threat ceased, without retreating or using other tools, as he believed they would be ineffective (Deposition, Page 133, Lines 1-25; Page 132, Lines 1-25; PCSO Report, Page 76).

**Analysis:** Deputy Gibson used the amount of force that was reasonably necessary to stop the imminent deadly threat from Obregon, considered from Deputy Gibson's on-scene perspective in a split-second decision under tense circumstances. Deputy Gibson's discretion was well-reasoned, as retreating would expose him to injury, and no policy-required retreat applied; improvised methods were not needed, as his handgun effectively accomplished the legitimate purpose of self-defense.

## F.  300.3.1 USE OF FORCE TO EFFECT AN ARREST

**Policy Section:** A deputy is justified in threatening or using force against another if, in making or assisting in making an arrest or detention or in preventing or assisting in preventing an escape after arrest or detention, such person uses or threatens to use physical force and all of the following exist (ARS § 13-409): (a) A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape. (b) The deputy makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained. (c) A reasonable person would believe the arrest or detention to be lawful.

**Facts as Described:** Deputy Gibson attempted to detain Obregon during a traffic stop. Obregon fled, and while Deputy Gibson was on top of him to effect detention, Obregon pointed a handgun. Deputy Gibson used force to prevent escape and the threat posed by Obregon(PCSO Report, Page 76; Deposition, Page 51, Lines 1-25).

**Analysis:** Deputy Gibson was justified in using force to effect detention, as a reasonable person would believe it immediately necessary to prevent Obregon's escape after Obregon fled the stop. Deputy Gibson made the purpose known by initiating the traffic stop with lights, and the detention for traffic violation was lawful under ARS § 13-409.

33

DEF_Obregon 007146

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121: 702.373.4737*
***Confidential Report***

## G. 300.3.2 FACTORS USED TO DETERMINE THE REASONABLENESS OF FORCE

**Policy Section:** When determining whether to apply force and evaluating whether a deputy has used reasonable force, a number of factors should be taken into consideration, as time and circumstances permit. These factors include, but are not limited to:

(a) Immediacy and severity of the threat to deputies or others.

(b) The conduct of the individual being confronted, as reasonably perceived by the deputy at the time.

(c) Deputy/subject factors (age, size, relative strength, skill level, injuries sustained, level of exhaustion or fatigue, the number of deputies available vs. subjects).

(d) The effects of drugs or alcohol.

(e) Subject's mental state or capacity.

(f) Proximity of weapons or dangerous improvised devices.

(g) The degree to which the subject has been effectively restrained and his/her ability to resist despite being restrained.

(h) The availability of other options and their possible effectiveness.

(i) Seriousness of the suspected offense or reason for contact with the individual.

(j) Training and experience of the deputy.

(k) Potential for injury to deputies, suspects and others.

(l) Whether the person appears to be resisting, attempting to evade arrest by flight or is attacking the deputy.

(m) The risk and reasonably foreseeable consequences of escape.

(n) The apparent need for immediate control of the subject or a prompt resolution of the situation. (o) Whether the conduct of the individual being confronted no longer reasonably appears to pose an imminent threat to the deputy or others.

(p) Prior contacts with the subject or awareness of any propensity for violence.

(q) Any other exigent circumstances.

**Facts as Described:**

(a) Obregon pointed a handgun at Deputy Gibson, creating an immediate deadly threat (PCSO Report, Page 76; Deposition, Page 133, Lines 1-25).

(b) Obregon fled, (Page 51, Lines 1-25) brandished and pointed a weapon (PCSO Report, Page 76; Deposition).

(c) Deputy Gibson was alone vs. Obregon; Deputy Gibson was trained and unknown if fatigued.

(d) Obregon had methamphetamine and THC in system (PCSO Report, Page 79).

(e) Obregon appeared nervous and intent on fleeing (Deposition, Page 106, Lines 1-25; PCSO Report, Page 76).

(f) Obregon had a handgun in close proximity (Deposition, Page 137, Lines 12-15; PCSO Report, Page 76).

(g) Obregon was not restrained; resisted by pointing weapon (PCSO Report, Page 76).

34

DEF_Obregon 007147

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

(h) Taser ineffective against armed threat; no other options viable (Deposition, Page 132, Lines 12-25), also discussed in his interview/walk-thru:[24]

- *At time marker [00:29:00]: Deputy Gibson states he drew his firearm after disengaging and does not mention deploying a Taser. He describes the rapid escalation: "I just saw the, the gun come out. I got distance and, and drew. Down and he was already rolling over to, to find where I was standing at, to shoot." (No Taser use is described here, consistent with the deadly threat perception.)*
- *At time marker [00:31:00]: He explains the perceived threat progression leading to the shooting, implying no viable less-lethal alternative: "As soon as the gun comes out and having seen all that previous behavior that he was willing to shoot and kill me to escape and get away."*

(i) Initial contact for traffic violation, escalated to felony threat (Deposition, Page 25, Lines 8-25; PCSO Report, Page 76).

(j) Deputy Gibson trained in use of force (Deposition, Page 130, Lines 12-15). [25]

(k) High potential for injury to Deputy Gibson (Deposition, Page 135, Lines 1-6).

(l) Obregon resisted by fleeing and attacking with weapon (PCSO Report, Page 76).

(m) Escape risked public safety given warrants and armed status (PCSO Report, Page 59).

(n) Immediate control needed to resolve armed threat (Deposition, Page 133, Lines 15-25).

(o) Threat ceased when handgun dropped (Deposition, Page 133, Lines 9-25).

(p) Prior contact with Obregon for drugs, no known violence (Deposition, Page 36, Lines 11-15; PCSO Report, Page 77).

(q) Rapid escalation in residential area (PCSO Report, Page 20).

**Analysis:** (a) The immediacy and severity of Obregon's threat with a pointed handgun supported the policy correct response of deadly force; (b) Obregon's conduct of fleeing and arming himself was perceived as assaultive, warranting an immediate and response to preserve life; (c) As the sole deputy on scene, Deputy Gibson's physical factors are largely irrelevant, there was a short struggle and then the presentation of a weapon, this supports force to overcome Obregon's presentation of a deadly weapon; (d) Obregon's intoxicants may have influenced impulsivity, increasing unpredictability. However, this element is a hindsight attribution, Deputy Gibson could not have known the condition of Obregon, only that Obregon was a deadly threat based on Obregon's behavior; (e) Obregon's mental state was evasive, based on statements, contributing to the need for controlling force, and ultimately the application of deadly force, quantified by the facts existing in

---

[24] DEFS_Obregon 000628 - 20230316 - PCSO Det. Bonucci - Interview - Deputy Gibson - Part 2 - On-Scene Walk Through.MP3.
[25] OBREGON_000022-OBREGON_000033 - B Gibson Evaluations_REDACTED.pdf, OBREGON_000034-OBREGON_000072 - B Gibson Training_REDACTED.pdf,

35

DEF_Obregon 007148

this case, not assumptions; (f) Proximity of Obregon's handgun and Obregon's associated behavior necessitated immediate action. Based on the statements, and physical and forensic evidence; and (g) Obregon's unrestrained resistance despite being prone escalated the situation. Due to the fact that Obregon had drawn a firearm and was in control of that firearm necessitated the need for an immediate response: (h) Other options like taser were ineffective against a firearm threat as described in the depositions and statements from Deputy Gibson; (i) The seriousness evolved from misdemeanor to life-threatening felony; (j) Deputy Gibson's training guided his reasonable discretion. (training review); (k) Force prevented potential injury to Deputy Gibson and others; (l) Obregon's flight and attack aligned with resistance factors; (m) Escape consequences were foreseeable given Obregon's armed status; (n) Prompt resolution was apparent to control Obregon and stop the immediate threat he posed; (o) Force stopped when Obregon no longer posed a threat; (p) Prior non-violent contact did not mitigate the current threat; and (q) Exigent circumstances of a sudden armed confrontation in public supported the policy appropriate response of the application of deadly force.

## H.  300.3.3 PAIN COMPLIANCE TECHNIQUES

**Policy Section:** Pain compliance techniques may be effective in controlling a physically or actively resisting individual. Deputies may only apply those pain compliance techniques for which they have successfully completed office-approved training or accepted improvised tactics that are objectively reasonable. Deputies utilizing any pain compliance technique should consider: (a) The degree to which the application of the technique may be controlled given the level of resistance. (b) Whether the person can comply with the direction or orders of the deputy. (c) Whether the person has been given sufficient opportunity to comply. The application of any pain compliance technique shall be discontinued once the deputy determines that compliance has been achieved.

**Facts as Described:** Deputy Gibson did not use pain compliance techniques; he responded directly with deadly force to Obregon's presentation of a firearm (immediate deadly threat.) No training or improvised tactics for pain compliance were applied (Deposition, Page 132, Lines 12-25; PCSO Report, Page 76).

DEF_Obregon 007149

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

**Analysis:** Pain compliance techniques were not utilized by Deputy Gibson, as the situation involved a deadly threat from Obregon's presentation of a firearm, rendering such techniques inappropriate and ineffective for control. No consideration of control degree, compliance ability, or opportunity was needed, as deadly force was required, and compliance was achieved by neutralizing the threat.

## I.   300.4 DEADLY FORCE APPLICATIONS

**Policy Section:** Use of deadly force is justified in the following circumstances: (a) A deputy may use deadly force to protect him/herself or others from what he/she reasonably believes would be an imminent threat of death or serious bodily injury. (b) A deputy may use deadly force to stop a fleeing subject when the deputy has probable cause to believe that the person has committed, or intends to commit, a felony involving the infliction or threatened infliction of serious bodily injury or death, and the deputy reasonably believes that there is an imminent risk of serious bodily injury or death to any other person if the subject is not immediately apprehended. Under such circumstances, a verbal warning should precede the use of deadly force, where feasible. Imminent does not mean immediate or instantaneous.

An imminent danger may exist even if the suspect is not at that very moment pointing a weapon at someone. For example, an imminent danger may exist if a deputy reasonably believes any of the following: 1. The person has a weapon or is attempting to access one and it is reasonable to believe the person intends to use it against the deputy or another. 2. The person is capable of causing serious bodily injury or death without a weapon and it is reasonable to believe the person intends to do so.

**Facts as Described:** Deputy Gibson used deadly force when Obregon pointed a handgun at him, believing it posed an imminent threat of death. Obregon was fleeing but the force was not solely to stop flight; verbal commands like, "drop the gun," were given (Deposition, Page 135, Lines 1-6; Page 153, Lines 1-10; PCSO Report, Page 76; Page 20).

**Analysis:** Deputy Gibson's deadly force was consistent with training and policy under (a), as he reasonably believed Obregon's pointed handgun created an imminent threat of death to himself.

37

DEF_Obregon 007150

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

Subsection (b) did not primarily apply, though Obregon was fleeing; the force addressed the deadly threat with a firearm, with verbal warnings given where feasible, aligning with the example of a suspect accessing and showing the intention to use the firearm against Deputy Gibson.

## 12. OTHER RELEVANT POLICY ANALYSIS

### A.  Policy 304 - Officer Involved Shooting

**Relevance to Incident:** Outlines procedures for OIS incidents, including immediate aid, scene security, radio notifications, and investigations.

 **Key Elements (from Document References):**

- Requires immediate medical aid and scene security (e.g., securing weapon, radioing code 913).
- Mandates reporting and administrative/criminal review.
- Emphasizes post-shooting actions like assessing injuries and calling EMS (Executive Summary, p. 2; PCSO Report, p. 1).

**Application and Findings:** Deputy Gibson complied by radioing "shots fired" (19:01), rendering aid (med kit, airway check), and securing the gun. The inquiry (completed October 5, 2023) found no violations.

### B.  Policy 305 - Duty Firearms

 **Relevance to Incident:** Regulates firearm carry, maintenance, and ammunition use for on-duty officers.

**Key Elements (from Document References):**

- Requires department-issued or approved firearms/ammo (e.g., Glock 17 with Federal Premium L/E duty ammo).
- Prohibits mixed ammunition types (range vs. duty) in service weapons.
- Application and Findings: Deputy Gibson used his issued Glock 17, but had mixed ammo (eight (8) Winchester range, two (2) Federal duty casings). This was noted as a concern for safety/accuracy, recommending policy reinforcement (Executive Summary, p. 3). No other violations.

38

DEF_Obregon 007151

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

## C. Policy 319 - Conduct

**Relevance to Incident:** Covers professional conduct, impartiality, and avoidance of bias in enforcement.

**Key Elements (from Document References):**

• Requires fair, unbiased actions; prohibits personal animosity influencing duties.

• Mandates adherence to laws and ethical standards during contacts.

**Application and Findings:** Deputy Gibson denied animosity toward Obregon (prior encounters professional). The stop was based on traffic violations, not bias. No violation found (Executive Summary, p. 2).

## D. Policy 500 - Traffic Function

**Relevance to Incident:** Guides traffic stops, pursuits, and enforcement for public safety.

**Key Elements (from Document References):**

• Authorizes stops for violations (e.g., speeding, stop sign failure).

• Emphasizes safety (e.g., timely dispatch notification, location awareness).

• Allows pursuit for evasion if risk is justified.

**Application and Findings:** Deputy Gibson initiated for observed violations (high speed, stop sign). Concern noted for not immediately transmitting location to dispatch, recommending improvement for safety. No major violation (Executive Summary, p. 3).

These policies collectively supported the incident's handling as compliant, with the OIS supported under 300.4(a).

## 13. VIDEO ANALYSIS

### A. Technical limitations and Distortions

The video evidence provides limited assistance in identifying small movements of Deputy Gibson and Obregon in the contact. However, the footage does show a global representation of the event experienced by Deputy Gibson. These limitations arise from the visual angle or perspective of the video based on the camera's relative location to the incident. *See* the video analysis section for

DEF_Obregon 007152

details related to the analysis of the video evidence and the technical analysis related to potential distortions.

## B.  Video Examination

Based upon the statements and other supporting data, there is consistency between the video, physical evidence from the scene, and statements made by the Deputy Gibson. The visible data from the camera perspectives is clearly very different from the Officers' perspectives on the scene based on lens distortions (distance), lighting issues, and camera angle. Although the digital video does not reflect the nuances of movements based on issues like movement blur and compression, angle of perspective, and lighting limitations, the video evidence does represent the overall position and general movements supported by knowledge of the outcome.

Based upon the video evidence, the following timing elements have been identified in this incident. This analysis is based on the Ring Camera footage. It does not show minute movements or details but does show visible movements generally quantifying Deputy Gibson's account. This includes the initial contact with Obregon, the beginning of the struggle, Deputy Gibson backpedaling while firing his weapon, and the time between shots and Deputy Gibson disappearing behind the marked patrol unit to secure Obregon and begin medical aid. Due to lighting and distance, nuances regarding specific actions cannot be determined or assessed.

Relevant time frames are approximate and generated from a full video analysis as reflected in the figures below:

| Description | Time | Frames |
|---|---|---|
| Obregon dismounting the motorcycle and contact with Deputy Gibson - up to the point it appears the struggle begins. | 03:02:249 min. | 0030-2764 Fig. 1 |
| Obregon appears to move towards the gate (beginning of the struggle) up to the point where Deputy Gibson visually appears to be backpedaling away from Obregon. | 00.06:933 sec. | 2764-2868 Fig. 2 |
| From the time Deputy Gibson is first visible backpedaling until the last visible shot is fired. | 00:02:066 sec. | 2868-2899 Fig. 3 |
| Total length from visual cues of the struggle beginning until the last visible shot is fired. | 00:08:799 sec. | 2764-2899 Fig. 4. |
| Time from Deputy Gibsons last shot up to the time he opened his patrol vehicle passenger door. | 01:13:459 | 2899-4001 Fig. 5. |
| Time from opening the patrol vehicle door up to kneeling down behind the patrol vehicle in proximity of Obregon | 00:57:695 sec. | 4001-4866 Fig. 6. |

DEF_Obregon 007153

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

| | | |
|---|---|---|
| Time from Deputy Gibson kneeling down out of sight of the camera up to the time of the second vehicle arrival  (Ofc. Fox). Deputy Gibson was attending to Obregon when the second vehicle arrived. | 02:52:017 min. | 4866-7447 Fig. 7. |

Fig. 1.

Fig. 2.





Fig. 3.

Fig. 4.





Fig. 5.

Fig. 6.





41

DEF_Obregon 007154

Fig 7.



## 14. SUMMARY OF VIDEO EVIDENCE REVIEW AND FACTS

Upon receipt, I transferred digital the video evidence and related data and documentation. The following files were downloaded and stored on my company hard drive/server. The videos used in my analysis were from remote locations on or near the scene of the incident and of BWC from the involved Officers. All files listed below were downloaded and analyzed, reviewed for content and examined.

- Unknown 202304152342 205173 92536195
- OBREGON_000073 - Ring Camera.mp4
- OBREGON_000074 - Ring Camera.mp4
- OBREGON_000075.mp4
- OBREGON_000076.mp4
- OBREGON_000077.mp4
- OBREGON_000078.mp4
- OBREGON_000079.mp4
- OBREGON_000080.mp4
- OBREGON_000081mp4.mp4

The primary video analysis was conducted on the above highlighted video evidence. Each of the above video files was checked for integrity and validity.

42

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

## A.  Summary of the Initial Review of Video Evidence

The video clips do not appear to be altered in any way. The video is presented at standard frame rates (fps) which is reflected in the metadata and confirmed through a frame analysis. However, the Header data presents a consistent fps – a deeper analysis shows a variable frame rate on all relevant videos. These variations do not affect my analysis in this case.

## B.  Process and protocol

The Ring camera footage from the incident was processed using A-DAPT 1.5.0.41 software by Critical Incident Review on January 28, 2026, to produce a light-adjusted export file titled "light_Adjusted_OBREGON_000073 - Ring Camera.mp4_(2489-3376).mp4." The export applied a selected range with no annotations, retained full color, maintained 100% magnification without interpolation, preserved the original 1920x1080 frame dimension and aspect ratio, incorporated a cropped region at coordinates (829,276) with dimensions 447x310, and utilized a 5 Mbps bitrate for medium-quality compression. No additional adjustments were made to the original data, ensuring the enhanced video remained faithful to the source material while improving visibility for analytical and evidentiary purposes.[26]

## C.  Technical Video Analysis - Distortions

In the Analysis and examination of the video in this case, careful consideration must be given to technical variables that can introduce errors into the image being viewed within the video content, and that could result in misinterpretation and a misunderstanding of the images by an untrained observer of the compressed video images. Some of the variables I consider in my video review and examination include the following:

- Lighting and associated issues (shadowing and glare, visual clipping).
- Artificial edge patterns that may affect the shape and pixelization of objects.
- Temporal shift in object positioning due to frame prediction.
- Image refresh rates.
- Motion blur caused by speed of movement, and movement of the camera.
- Perspective issues based on the positioning of the digital camera equipment.

---

[26] light_Adjusted_OBREGON_000073 - Ring Camera_mp4_(2489-3376)_ExportSettings.pdf.

43

DEF_Obregon 007156

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

- Object location and shape adjusted by lens distortion, i.e., fisheye lens.
- Distance distortion and 2-D versus 3-D perspective.
- Motion perception, limited views based on camera position.

In this incident these technical issues exist and must be understood and influence what is visible in the video evidence. These issues are part of the systematic protocol and methodology where video exists in the case and is referred to as a source of information.

Distance distortion in the review of the video evidence is significant in the analysis of this video evidence.  As an example of these inherent distance distortions, the below figures give the reader an understanding that the video represents a much different perspective than that of the officers involved.  These images all represent twelve (12) feet in distance, showing the inherent distortions of the video review. (Borden-King, 2024)



## D. Purpose Of the Video Analysis (General)

The above technical issues were considered, analyzed and then the video was compared to other investigative data. In a use-of-force case such as this one, the officer's decision-making process and subsequent actions are heavily scrutinized, and, often, compared to relevant training

DEF_Obregon 007157

and the officer's associated experience. As an expert in the field of police performance, Police Use-of-Force, and the technical examination of associated digital video evidence, I have recognized that the important factors being examined and scrutinized regarding the officer's decision-making process are primarily based on the stated perceptions (witnesses) of the officers at the time of the decision to use force as compared to video evidence, and the assessment of behavior prior to and after the use-of-force.

After a thorough investigation, forensic and physical evidence can then be compared to the digital video evidence and the investigative data as well as other witness statements.

Note: The video cannot be used as standalone evidence regarding the Officers' reality, perceptions, and actual existence within the context of this incident only as information to compare to other evidence in the case. There will always be dissonance between video evidence and the stated perceptions of the officers involved based on the chaos and critical decisions being made under the constraints of time.

## E.  Technical Video Analysis

After identifying any technical issues, the video evidence is carefully analyzed and compared to other investigative data such as statements.

All processes have been performed on evidence submitted to me and deemed "best evidence."  All processes present "lossless" visual information, although compressed, there are no distortions in the original aspect ratio. If aspect issues are present, those issues do not affect the analysis of this incident.

Information as depicted in the forensic video software related to the video files relied on for review and examination, Advanced Digital Analysis and Presentation Tool (ADAPT), which is utilized in the analysis of metadata including the file hash significant and unique to each video. The file hash depicted in the metadata is an MD5 algorithm and referenced in the full analysis report.[27]

---

[27] Complete metadata analysis for the above referenced video evidence is listed as an attachment to this report.

DEF_Obregon 007158

## 15. EXHIBITS SUBMITTED

These individual reports identify the technical components of the video analysis in report form. There are no other exhibits to declare that are not published in this report.

- Light_Adjusted_OBREGON_000073 - Ring Camera_mp4_(2489-3376)_ExportSettings.pdf
- Light_Adjusted_OBREGON_000073 - Ring Camera_mp4_(2489-3376)_mp4_AnalysisReport.pdf
- OBREGON_000073 - Ring Camera_mp4_(0-7396)_ExportSettings.pdf
- OBREGON_000073 - Ring Camera_mp4_AnalysisReport.pdf
- Light_Adjusted_OBREGON_000073 - Ring Camera_mp4_(2489-3376).mp4
- OBREGON_000073 - Ring Camera_mp4_(0-7396).mp4

## 16. SOFTWARE PLATFORMS UTILIZED

- A-DAPT 1.2.3.92, developed by YottaGeek, LLC
- FilterGraph for FFMPEG – 1.0.0.11

## 17. STATEMENT RE CERTAINTY OF OPINIONS

All opinions stated are made to a reasonable degree of practical and/or technical probability or certainty based on my methodologies and a review of the available known physical, forensic and witness evidence. All opinions are stated to a reasonable degree of accuracy based on my extensive experience, background, training, and specialized education, and my practitioners' application in law enforcement, investigations, reviews, analysis, and training.

## 18. DOCUMENTS & EVIDENCE REVIEWED/CONSIDERED (MATERIALS)

The following is a summary list of the documents, reports, photographs, audio/video recordings, evidence, and/or other materials that I reviewed and/or considered in this case.

- 01-05-2026 Gibson, Brady_Full_Size_ex.pdf (Deposition Transcript)

DEF_Obregon 007159

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

- Gibson Deposition Exhibit 1.pdf

- Gibson Deposition Exhibit 2.pdf

- Gibson Deposition Exhibit 3.pdf

- Gibson Deposition Exhibit 4.pdf

- Gibson Deposition Exhibit 5.pdf

- Gibson Deposition Exhibit 6.pdf

- Gibson Deposition Exhibit 7.pdf

- Gibson Deposition Exhibit 8.pdf

- Gibson Deposition Exhibit 9.pdf

- Gibson Deposition Exhibit 10.pdf

- Gibson Deposition Exhibit 11.pdf

- Gibson Deposition Exhibit 15.pdf

- Gibson Deposition Exhibit 16.pdf

- 20250925 - Brandon Chapman DEPO Transcript (Full).pdf

- 20250925 - Samantha Plummer DEPO Transcript (Full).pdf

- 20250925 - Wade Putt DEPO Transcript (Full).pdf

- Chapman B 092525 Deposition Exh 1.pdf

- Chapman B 092525 Deposition Exh 2.pdf

- Putt W 092525 Deposition Exh 1.pdf

- 2025-08-20 Obregon vs Lamb 900am_full_ex.pdf (Allison Obregon Deposition Transcript)

- MB081925_full_ex.pdf (Mariah Brady Deposition Transcript)

- MB2081925_full_ex.pdf (Meagan Brady Deposition Transcript)

- OBREGON_000001-OBREGON_000013 - CGPD Police Reports.pdf

- OBREGON_000014-OBREGON_000014 - PCSO REDACTION LOG HR FILES.pdf

- OBREGON_000015-OBREGON_000016 - B Gibson Commendations_REDACTED (1).pdf

- OBREGON_000017-OBREGON_000021 - B Gibson Discipline_REDACTED.pdf

- OBREGON_000022-OBREGON_000033 - B Gibson Evaluations_REDACTED.pdf

- OBREGON_000034-OBREGON_000072 - B Gibson Training_REDACTED.pdf

- OBREGON_000082-OBREGON_000094 - Casa Grande Police Department - Field Case Supplement Report.pdf

- OBREGON_000095-OBREGON_000107 - CGPD Police Reports.pdf

- OBREGON_000108-OBREGON_000113 - Scanned from a Xerox Multifunction Printer 2.pdf (Casa Grande PD Incident Report & CAD Narrative)

- OBREGON_000114-OBREGON_000126 - Scanned from a Xerox Multifunction Printer.pdf (Casa Grande PD Field Case Supplement Report)

- OBREGON_000127-OBREGON_000127 - Scanned from a Xerox Multifunction Printer3.pdf

- OBREGON_000128-OBREGON_000129 - B Gibson Commendations_REDACTED (1).pdf

- OBREGON_000130-OBREGON_000134 - B Gibson Discipline_REDACTED.pdf

- OBREGON_000135-OBREGON_000146 - B Gibson Evaluations_REDACTED.pdf

DEF_Obregon 007160

- OBREGON_000147-OBREGON_000185 - B Gibson Training_REDACTED.pdf
- OBREGON_000186-OBREGON_000186 - PCSO REDACTION LOG HR FILES.pdf
- OBREGON_000187-OBREGON_000187 - PCSO_REDACTION_LOG__PHOTOS_.pdf
- OBREGON_000188-OBREGON_000233 - PHOTOS 1-46_REDACTED.pdf
- OBREGON_000234-OBREGON_000283 - PHOTOS 1-50_REDACTED.pdf
- OBREGON_000284-OBREGON_000359 - PHOTOS 1-76_REDACTED.pdf
- OBREGON_000360-OBREGON_000409 - PHOTOS 51-100_REDACTED.pdf
- OBREGON_000410-OBREGON_000459 - PHOTOS 101-150_REDACTED.pdf
- OBREGON_000460-OBREGON_000509 - PHOTOS 151-200_REDACTED.pdf
- OBREGON_000510-OBREGON_000559 - PHOTOS 201-250_REDACTED.pdf
- OBREGON_000560-OBREGON_000605 - PHOTOS 251-297_REDACTED.pdf
- OBREGON_000606-OBREGON_000623 - PHOTOS_REDACTED.pdf
- OBREGON_000073 - Ring Camera.mp4
- OBREGON_000074 - Ring Camera.mp4
- OBREGON_000075.mp4
- OBREGON_000076.mp4
- OBREGON_000077.mp4
- OBREGON_000078.mp4
- OBREGON_000079.mp4
- OBREGON_000080.mp4
- OBREGON_000081mp4.mp4
- DEFS_Obregon 000138-000411 - PSCO Photos – JPG
- DEFS_Obregon 000138-000155 - PCSO Photos - 20230316.pdf
- DEFS_Obregon 000138-000392 - PSCO Photos - 20230316.pdf
- DEFS_Obregon 000156-000392 - PCSO Photos - 20230316.pdf
- DEFS_Obregon 000393-000411 - PCSO Photos - 20230320.pdf
- DEFS_Obregon 000412-000462 - PDF Evidence Report.pdf
- DEFS_Obregon 000627 - 20230316 - PCSO Det. Bonucci - Interview - Deputy Gibson - Part 1 - Officer Involved Interview.MP3
- DEFS_Obregon 000628 - 20230316 - PCSO Det. Bonucci - Interview - Deputy Gibson - Part 2 - On-Scene Walk Through.MP3
- DEFS_Obregon 000629 - 20230316 - PCSO Det. Charles - Interview - Billy Leivas & Donna Pacion (Neighbor).MP3
- DEFS_Obregon 000630 - 20230316 - PCSO Det. Charles - Interview - Carolyn Buechler (Neighbor).MP3
- DEFS_Obregon 000631 - 20230316 - PCSO Det. Charles - Interview - Christopher Rhodes (Neighbor).MP3
- DEFS_Obregon 000632 - 20230316 - PCSO Det. Charles - Interview - Kenyan Bower, Kathy Bower (Neighbor).MP3
- DEFS_Obregon 000633 - 20230316 - PCSO Det. Charles - Interview - Gabriel Silva (Neighbor).MP3

DEF_Obregon 007161

- DEFS_Obregon 000634 - 20230316 - PCSO Det. Charles - Interview - Patricia Luna, Jesse Gutierrez, Sr. & Jesse Gutierez, Jr..MP3
- DEFS_Obregon 000635 - 20230316 - PCSO Det. Charles - Interview - Samantha Plummer, Wade Putt, Beverly Putt (Neighbors).MP3
- DEFS_Obregon 000636 - 20230316 - PCSO Det. Gonzales - Interview - Mariah G. Brady PT 1.MP3
- DEFS_Obregon 000637 - 20230316 - PCSO Det. Gonzales - Interview - Mariah G. Brady PT 2.MP3
- DEFS_Obregon 000639 - 20230316 - PCSO Det. McCall - Interview - Arianna Brady.MP3
- DEFS_Obregon 000809 - PCSO Radio Transmission, Channel 1, Initial.wav
- DEFS_Obregon 000810 - PCSO Radio Transmission, Channel 1, Initial (with silences).wav
- DEFS_Obregon 000811 - PCSO Radio Transmission, Channel 5, until 2359.wav
- DEFS_Obregon 000812 - PCSO Radio Transmission, Channel 5 (with silences).wav
- 030 - PLFS 1st AMD COMP.pdf
- 077 - AMD Scheduling Order.pdf
- 20250422 - LT ____ re Retention.pdf

## 19. METHODOLOGY SPECIFIC TO MY INVESTIGATIVE REVIEW AND ANALYSIS

The methodology I use to examine police-related use of force through a full investigative analysis is explained below. This basic methodology has been applied in over 1,000 cases as an investigator, force analyst, and sergeant over the investigation, review, and analysis of force cases prior to retirement, as well as several dozens of cases that I have reviewed for matters before Federal Courts, State Courts, and administrative agencies.

This section outlines the methodology applied to this investigative review and analysis. My opinion on these issues is from a police performance, action and decision-making standpoint based on technical knowledge and practical understanding of generally accepted law enforcement training, police policy, police tactics, use-of-force investigative principles, related to law enforcement use-of-force decision-making, with that focus.

DEF_Obregon 007162

## 1.  General Methodology

### A.  Case File

Developing an Understanding of the Facts. Following a review of the information provided, I develop and state an understanding of the facts. The facts and circumstances are specific and unique for each case. Therefore, a document and evidence review is conducted, examining all documents for relevance, and to establish facts related to the issue/s cited. In some cases, a site visit may be required.

### B.  Analysis of the Officer's Actions

A full analysis regarding the actions of the involved law enforcement Officers is then conducted. This analysis is based on all relevant evidence, relevant testimony of witnesses, departmental and/or external investigations, physical evidence, and any other relevant information, to determine what the Officers did and their stated justification for what they did, and why they did it. An additional interview may be requested to be conducted in the presence of the retaining attorney, firm or entity.

### C.  Comparison with Nationally-Accepted Police Training & Practices

The third step involves comparing what the officer/s did and why, then applying the policy (General Order 200) standard as an after the fact analytical tool related to various police training and accepted police practice. Concepts in Nationally accepted training and practice include relevant Supreme Court cases; interdepartmental policies and procedures (primary focus); applicable statewide police training programs/systems; then, when appropriate, model policies (such as Lexipol); training, and research from such institutions as the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF), National Criminal Justice Reference Service, Commission on Accreditation for Law Enforcement Agencies (C.A.L.E.A.), Public Agency Training Council (PATC), and the Northwestern University Center for Public Safety.

It should be noted, In the United States, there is no nationally accepted standard for police training, practices, and protocols, which means there is no single "best practice" for police tactics,

DEF_Obregon 007163

behavior, or actions in the decision-making process.[28]  Standards can only be set within each department, based on their own training, established policies, and documented procedures tied to the review and analysis of critical incidents.[29]

National groups like the International Association of Chiefs of Police (IACP), Police Executive Research Forum (PERF), National Institute of Justice (NIJ), and Department of Justice (DOJ) provide recommendations on law enforcement policy and training related to use-of-force, such as the IACP's consensus guidelines on force levels, PERF's principles stressing de-escalation and proportionality, NIJ's overview of the force continuum, and DOJ's policies emphasizing core principles for federal agencies.

Yet these are only recommendations, and they are commonly not adopted into departmental policies, training, or procedures due to the individual departs needs, training and existing policies.

This stems from myriad issues, including cultural pushback; mixed evidence on effectiveness, with studies showing inconsistent results from trainings; relevance gaps where suggestions don't fit local contexts or community needs; efficiency hurdles such as high costs and strained resources; and the reality of Officers' high-risk daily work versus what some view as overly idealistic or impractical elements in the recommendations.

## D.  Response & Rapidly Evolving Dynamics

In an incident where the immediacy of the threat is observably present or stated as an awareness or concern from the officer's perspective, considerations in the decision-making process, and analysis is done using the existing data. General measurements and timelines are established as a component of the investigative process for the crime scene reconstruction and verification of statements from the involved Officers and from witnesses (available data could be diagrams, photographs, scene scans, witness statements, or video evidence). Some issues considered are, identification of general or approximate positions, distance and officer response

---

[28] https://www.axon.com/resources/use-of-force-training.
[29] https://www.ncsl.org/civil-and-criminal-justice/law-enforcement-training.

DEF_Obregon 007164

and applied tactics. These data points are then compared to the officer's stated need to use force. This type of evidence could include video footage, photographs, locations and measurements, etc.

Supporting this methodology is research of the case documentation, review and comparison of all statements, recorded and transcribed, as well as existing research data that informs the investigative process. The methodology is based upon my specialized knowledge, education, training, and experience as a 22-year P.O.S.T. Certified Police Officer, holding an Advanced P.O.S.T. Certificate as a Police Training Sergeant, and performing primary investigations, investigative reviews and analysis of hundreds of officer-involved use-of-force incidents. I am currently instructing, lecturing and consulting internationally in the field of use-of-force investigations, reviews, and analysis, "Enhanced Force Investigations." Also significant is my continued research and review of police operations and use-of-force incidents as a court recognized subject matter expert in Use-of-Force, Police Performance, Training and Forensic Video Examination, and continuing training and studies in the relevant subject matter.

My opinions in a use-of-force case are carefully and objectively considered on a case-by-case basis. The consideration of many investigative principles must be examined in police use of force incidents. These principles are outlined by the relevant department training, policy, and/or governing case law that is trained departmentally. It is for these reasons that all information and evidence must be carefully considered in every case to form opinions and conclusions. These principles are not all inclusive in every case but are considerations and part of my general methodology. I have identified the following general investigative principles for consideration in the investigative review of police action cases:

- Training of the involved officer(s).
- Relative experience and tenure of the officer(s) involved.
- Pre-existing information regarding the incident.
- Information learned on the scene as the officer(s) arrived, based upon their statements.
- Information and actions unfolding in real time as described by the officer(s) and compared to any available evidence.
- Overarching setting in which the incident occurred, from the officer's stated perceptions and observations from an "after the fact" hindsight analysis.

52

- Physical and forensic evidence available to support or potentially refute statements regarding known decisions and claims regarding the incident.
- Efforts of the officer(s) to use alternative methods of force as stated or observed in the physical, forensic and/or digitally captured (video, audio).
- The observable, and/or stated demeanor of the officer(s) involved in the incident before, during and after the incident.
- The observable and stated awareness of the time available for officer(s) to assess and evaluate information during the incident.

Observable officer performance and actions, possible constraints and limitations the officer(s) were faced with during the incident, *i.e.*, immediacy of the threat, identifiable distance, and the officer's stated or observed need to respond rapidly.

## 20. FEE SCHEDULE

See attached: incorporated by reference here. For depositions and/or other trial or hearing/proceeding testimony, my hourly rate is $300.00 per hour, with a four-hour minimum ($1200.00 minimum), Zoom is hourly with no minimum. Advance tender of deposition/testimony fees and any travel costs/fees for out-of-town travel is required.

## 21. CURRICULUM VITAE (C.V.)

See attached: incorporated by reference here.

## 22. SUMMARY OF QUALIFICATIONS

My name is James (Jamie) Borden. With an extensive background in the field of use-of-force investigations, reviews and, analysis, and forensic video review, having conducted over 1000 force investigations during my tenure as the lead investigator and sergeant over the Use of Force Training and Analysis Unit. I have been retained as an investigative consultant in approximately 250+ officer-involved critical incidents, the majority of which have involved officer-involved shootings.

DEF_Obregon 007166

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
**Confidential Report**

My expertise in police use of force investigations and analysis has been recognized on a national level; I have been retained as an investigative consultant by the United States Department of Justice in officer-involved shooting cases across states such as New Mexico, California, Washington, and Texas. Additionally, I have provided extensive training in the investigations, reviews and analysis for various law enforcement agencies nationally, including the Maricopa County Attorney's Office Arizona, The Secret Service, the California Department of Justice, the Texas Department of Public Safety, the Texas Rangers, the US Marshals - Special Operations Group, the State of Arizona Department of Public Safety, the Arkansas State Police, the Army Criminal Investigations Division (CID), as well as multiple municipal and county jurisdictions nationwide.

My contracted training engagements have focused on providing investigators, attorneys, Officers in the field, and leadership courses related to force investigations and analysis. further enhancing those that have been trained through Critical Incident Review, L.L.C., to offer comprehensive insights and subject matter expertise in complex use-of-force cases.

I have been a peace officer since 1997, and I am actively involved in the review and training of police practices and law enforcement policies. As of July 20, 2018, I have retired from the Henderson Police Department (HPD) where I was a Sergeant over the Use-of-Force Training and Analysis Unit, as well as a Sergeant over the HPD Training Section. I was instrumental in the development and operation of the Use-of-Force Training and Analysis Unit and established the Use-of-Force Training and Analysis Unit as a single point of contact for HPD in use-of-force and critical incidents involving HPD Officers, for the purpose of investigation, review and analysis.

I was also one of two full-time subject matter experts and Use-of-Force Instructors for HPD, and, as such, I was responsible for all in-service Use-of-Force training and associated training for police Officers, corrections Officers, and HPD's Citizens' Academy as the Sergeant over the training division and the Use-of-Force Training and Analysis Unit (UFTAU). In addition, I was the primary Use-of-Force Instructor for the Southern Desert Regional Police Academy (S.D.R.P.A.), a multi-jurisdictional academy in Clark County, which is a Nevada Police Officers Standards of Training (P.O.S.T.) certified entity.

DEF_Obregon 007167

I was involved in all management and oversight of Use-of-Force for HPD, including, but not limited to, identification of trends in use-of-force, statistical analysis of use-of-force through HPD's reporting and accountability software, and reporting to the Commission on Accreditation for Law Enforcement Agencies (C.A.L.E.A.) with respect to use-of-force incidents.

My training, experience, lesson plan and policy development, instruction and lecturing on the subject of use-of-force and seizure of persons is derived from case law and decisions from the United States Supreme Court regarding use-of-force, with perpetual study and review of all related case law decisions in all circuits.

In 2013, I began lecturing as a contract instructor in the field of developing and applying investigative principals. I currently provide lectures and instruction in the field of investigating and analyzing force incidents, as they relate to police training and police procedure. I have developed the 3-day Force Investigators course of instruction, including the forensic examination of video evidence; designed for the investigative procedures and protocols related to officer involved critical incidents. I was also an assistant instructor in forensic video investigations in the U.S. and Canada, as well as an instructor in the Law Enforcement Video Association (LEVA) symposiums in the US.

From 2012 up to my retirement in 2018, I was responsible for the review, analysis and consultation of use-of-force reporting for members of HPD, including police officers and corrections officers, as the former Sergeant over the Use-of-Force Training and Analysis Unit, and the Training Section.

I have extensive experience with HPD in police patrol and as a training officer and instructor. I retired as a certified Taser Instructor, Defensive Tactics instructor, Baton instructor, and a Firearms Instructor and Range Master in the capacity of Sergeant over the training facility for HPD.

I have been in the following specialized assignments for HPD: Field Training Officer, The Training Bureau, Narcotics Division, and, as Sergeant, and developer of the Use-of-Force Training and Analysis Unit. I have an in-depth background and specialized training in the analytical protocols related to the field of force investigations including, but not limited to, investigating, reviewing and

DEF_Obregon 007168

analyzing officer involved shootings and critical incidents through video analysis, as well as on scene investigation and investigative reviews of completed investigations. My training, background and specialized background have given me first-hand knowledge, extensive application experience, and the objective basis to review peace officers' actions and the decisions involved in the use of non-deadly and deadly force.

Following a complete Use-of-Force Policy re-write, I was responsible for periodic reviews and updates of HPD's Use-of-Force Policy, as well as related policies connected to use-of-force and associated police procedures.

Since 2013, I have instructed and/or lectured on Use-of-Force and the associated investigative processes nationwide, including numerous Federal Agencies, the FBI Academy Associates (FBINAA), Law Enforcement Executive Development seminars (LEEDS) and multiple jurisdictions nationwide including state police, municipalities, sheriff's departments and attorneys.

I have been accepted in court Federally and at the State level as an expert in the application of complex investigative ideologies, general police performance, procedure, training, tactics and the forensic review and analysis of video investigations and examination related to police use of force.

My book, Anatomy of a Critical Incident – Navigating Controversy, published in October 2024 is currently available on Amazon.com. I have multiple articles published on PoliceOne.com, PoliceMag.com and others, all of which are posted on the website www.criticalincidetreview.com. I have works published in the Las Vegas Police Protective Association's Magazine, "Vegas Beat," and have published an article titled "Policy Matters" in May 2016 with the Daigle Law Group (DLG).

There is a complete list of my publications, lectures and instruction on my Curriculum Vitae, as well as previous and current cases I am involved in as an expert or consultant.

**1.  Specialized Education in Police Performance**

I have accumulated over 2,500 hours (in perpetuity) of specialized education in police officer decision-making, police performance factors, and critical incident dynamics. My training includes

DEF_Obregon 007169

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

the Advanced Analyst Certification (600 hours), in the study of perception, cognition, motor learning, and decision-making under stress, earning the distinction of being the first Certified Advanced Specialist in Force Analysis and Investigations. Additionally, I hold 48 college credits in Criminal Justice from the College of Southern Nevada, with 15 credits focused on human behavior and psychology as applied to law enforcement, focused on expertise in understanding officer and civilian interactions in high-stress scenarios.[30] I am enrolled in the Peterson Academy with a focus on neuroscience and psychology.

## 2. General Police Practices

Being P.O.S.T. Certified for over two decades with law enforcement experience at HPD (1997–2018), I have served in roles such as Patrol Officer, Acting Sergeant (Officer in Charge), Sergeant, Undercover Narcotics Detective, and Field Training Officer, providing comprehensive knowledge of general police practices. my career encompasses scene management for critical incidents, including homicides, officer-involved shootings, and suspicious deaths, as well as managing high-speed pursuits and ensuring officer safety and tactical efficiency. I've handled administrative duties such as report review, officer evaluations and, coaching, ensuring operational and supervisory efficiency.

As the full-time use-of-force instructor at HPD, I delivered training to officers, corrections staff, and the HPD Citizens' Academy, and served as the primary use-of-force instructor for the Southern Desert Regional Police Academy (S.D.R.P.A.), a Nevada P.O.S.T.-certified multi-jurisdictional academy. I hold Nevada P.O.S.T. Basic, Intermediate, and Advanced Certifications, supplemented by approximately 256 hours of P.O.S.T.-certified training in crisis decision-making, de-escalation, and effective communication.

## 3. Policy and Police Practice

As the creator and supervisor of HPD's Use-of-Force Training and Analysis Unit, (UOFTA) I was responsible for a complete rewrite of HPD's use-of-force policy and conducted periodic reviews and updates for all associated policies related to Use-of-Force - Tasers, batons, pepper spray,

---

[30] CV – James W. Borden.

DEF_Obregon 007170

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

defensive tactics, firearms, and less lethal implements. I monitored statistical data, conducted trend analyses, and reported to the Commission on Accreditation for Law Enforcement Agencies (C.A.L.E.A.) on use-of-force incidents, ensuring alignment with constitutional standards, such as *Graham v. Connor*. My work integrated lessons learned from critical incident reviews into departmental policies, supporting officer training and accountability through actionable updates. This work was associated with my role as the supervisor over the Training Division with the Henderson Police Department and the development and supervision of the Use of Force Training and Analysis Unit.

### 4.  Use-of-Force

My expertise in use-of-force stems from my role as a subject matter expert at HPD, where I developed and led the Use-of-Force Training and Analysis Unit (2012–2018), conducting over 1,000 force investigations. I investigated and reviewed officer-involved shootings and high-liability incidents, applying principles of objective reasonableness, investigative principles and relevant case law, including perpetual study of U.S. Supreme Court and circuit court decisions. My training portfolio includes approximately 2,000 hours of instruction in use-of-force topics, covering de-escalation, decision-making, defensive tactics, and force-on-force reality-based training, delivered to HPD officers, recruits, corrections officers, and citizen academies. As the Founder of Critical Incident Review, L.L.C., I have developed and provided training nationally to federal and local entities in perpetuity.

### 5.  Taser

I am a certified Taser Instructor (Taser International) with multiple recertifications since 2011, having an in-depth knowledge of Taser deployment, safety, and policy. I developed and delivered Taser training programs for HPD, ensuring officers were proficient in electronic control weapons and understood associated legal and medical considerations. My expertise includes analyzing Taser-related incidents as part of critical incident reviews, contributing to policy development and officer training.

DEF_Obregon 007171

## 6.  Firearms

As an NRA Certified Firearms Instructor for handguns and rifles, a Glock Armorer, and a Range Master at HPD, I have extensive experience in firearms training, qualifications, scenario development and weapons maintenance. I developed and delivered lesson plans for in-service training and regional police academies, covering firearms manipulation, weapons transition, and decision-based force scenarios, ensuring officers were prepared for real-world applications while adhering to departmental and legal standards.

## 7.  Investigations

My investigative experience includes over 1,000 force investigations and consultation on approximately 300 officer-involved critical incidents, primarily shootings. These include HPD and as an expert consultant for entities like the U.S. Department of Justice. Through Critical Incident Review (CIR), I conduct detailed investigations into officer-involved shootings and high-liability incidents, utilizing a checklist developed through CIR that incorporates decision-making analysis and police performance factors associated with police practice, police training, and police policy. As a certified instructor in the Cognitive Interview technique, authorized by Dr. Edward Geiselman, I apply evidence-based methods to enhance investigative accuracy in force-related cases.

## 8.  Video Review, Examination, and Analysis

With a parallel career in videography since 2001, I am a certified forensic video analyst and trainer, holding a 2023 certification from YottaGeek, LLC for the Advanced Digital Analysis and Presentation Tool (A-DAPT) and FilterGraph platforms (over 500 hours of training and development) as part of the forensic platform development, I have had technical input into the development of the software platform in both meta and beta testing for the Advance Digital Analysis and Presentation Tool (A.D.A.P.T.).

I am proficient in multiple video editing and analysis platforms, including Adobe Premiere Pro, Final Cut Pro, and Input Ace, I have conducted video analysis including integrity verification, frame analysis, frame-by-frame analyses, macro block analysis, and timing assessments using multiple streams of data within the digital video file for law enforcement and legal entities as well as other processes that are case dependent. Based on my depth of experience and application of these

59

DEF_Obregon 007172

*James W. Borden: C. I. R. CONSULTANTS*
*3870 E Flamingo Road, Suite 511, Las Vegas, NV 89121:  702.373.4737*
***Confidential Report***

processes, my work includes developing forensic video investigation courses for CIR, serving as an assistant instructor in the U.S. and Canada, and instructing at the Law Enforcement & Emergency Responders Video Association (LEVA) symposiums, focusing on video evidence extraction, authentication, and timing analysis.

## 9. Training Provided to Multiple Jurisdictions

I have delivered extensive training on investigative principles and force investigations to numerous jurisdictions and federal agencies across the United States. My instruction programs include the 3-day Force Investigations course and Forensic Video Review and Examination, offered through Critical Incident Review (CIR), tailored for investigators, attorneys, field officers, and leadership. Notable engagements include training the Texas Rangers, Arizona Department of Public Safety (Multiple), Army Criminal Investigations Division (Multiple), California Department of Justice (Multiple), U.S. Marshals Special Operations Group, Secret Service, Maricopa County Attorney's Office, Arkansas State Police, FBI National Academy Associates (FBINAA), and National Tactical Officers Association (Multiple). These programs cover investigative methodologies and protocol development, the Cognitive Interview process, identifying police performance factors, video evidence analysis, and leadership perspectives to force analysis, equipping professionals with evidence-based tools to enhance investigative accuracy and decision-making.

## 10. Authorship of "Anatomy of a Critical Incident – Navigating Controversy"

In October 2024, I authored and published Anatomy of a Critical Incident – Navigating Controversy, available on Amazon.com, a comprehensive book focused on the investigation and analysis of critical incidents. The work delves into decision-making under stress, performance factors, and limitations relevant to law enforcement practice, training, policies and protocols, and civilian cases involving force. The book provides practical insights and methodologies for conducting thorough and objective investigations, making it a valuable resource for law enforcement professionals, investigators, and legal practitioners. I have also published articles on PoliceOne.com, PoliceMag.com, the Las Vegas Police Protective Association's Vegas Beat, and "Policy Matters" with the Daigle Law Group (May 2016), accessible via criticalincidentreview.com. I have Authored a total of 30 published articles.

DEF_Obregon 007173

**11.Organization Memberships**

I am an active member of the Human Factors & Ergonomics Society (HFES) since January 2019, the Law Enforcement & Emergency Responders Video Association (LEVA), and the National Institute of Science and Technology (NIST) workgroup on Controlled Electronic Weapon output (WK61808, joined July 2018). I am a member of International Law Enforcement Trainers Association (ILEETA). I co-founded the Association of Force Investigators (AFI) and have been accepted as an expert witness in federal and state courts for police practice, policy, use-of-force, police performance, tactics, and video review, examination and analysis.

## 23. SUMMARY OF AREA OF EXPERTISE

Law Enforcement Procedure, Law Enforcement Training & Performance, Tactics, Use-of-Force Responses relevant to Law Enforcement Training and Police Use-of-Force and Decision-Making, and Video Analysis, Review and Examination related to use of force and police related contacts.

## 24. LIST OF PERTINENT EXPERT TESTIMONY

*See* attached: incorporated by reference here.

## 25. RIGHT TO AMEND

I reserve the right to amend this report. I reserve the right to submit a supplemental report should any subsequent information or evidence be produced to me that may materially affect or alter any of my opinions in this case

Sincerely,

James W. Borden

61

DEF_Obregon 007174

# EXHIBIT 9
# (Non-Electronic Exhibit)

# EXHIBIT 10



# PINAL COUNTY SHERIFFS OFFICE
Deputy Report for Incident 230316206

**Nature:** FIELD INTERVIEW                    **Address:** W MESCALERO DR & N
                                                                           HUALAPAI DR
**Location:** C33                                                          CASA GRANDE AZ

---

**Offense Codes:** ASPF

**Received By:** N VERSTEEG          **How Received:** O          **Agency:** PCSO

**Responding Officers:** B GIBSON, M BEDROSSIAN, G SANDERS, T HELIN, Z WHEELER, J DIENERT, G RIVEROLL, I INIGUEZ, T PICKETT, G KINDSVATER, MI RANSOM, AN ROMERO, W ABBIATTI, J MONTOYA, C SANTOS, AD MILLER, J GARIBAY, F SLOUP, W MAY, GLENN MORRISON, L APARICIO, 1173, R JESS, J SOTO, A CARRILLO, J SANCHEZ, S GRASSEL, J CLINE, B MERKLEY, D MCCALL, P DUDISH, J VILLEGAS, B GAY, A CONVERSE, F ESTRADA, M FENDER, C NARDELLI, E McLOUGHLIN, RA GONZALES, K FALES, K CHARLES, C SCHMIDLIN, R PROSSER, L RABB, J BONUCCI, C BURGESS, D ERICKSON, D TAYLOR, M TAYLOR, IAN MACFIE, R ORTEGA

**Responsible Officer:** J BONUCCI          **Disposition:** CLO 07/26/23

**When Reported:** 19:01:19 03/16/23    **Occurred Between:** 19:00:00 03/16/23 and 19:05:00 03/16/23

---

**Assigned To:** J BONUCCI          **Detail:** HOMI          **Date Assigned:** 03/16/23

**Status:** CLO          **Status Date:** 07/26/23          **Due Date:** 03/16/23

---

**Complainant:** 3590334

**Last:** GIBSON          **First:** BRADY          **Mid:**

**DOB:** 06/17/93          **Dr Lic:**          **Address:** 971 N JASON LOPEZ CIR

**Race:** W          **Sex:** M          **Phone:** ( ) -          **City:** FLORENCE (CITY), AZ 85132

## Offense Codes

**Reported:**                                        **Observed:**  ASPF ASSAULT, POLICE,
                                                                                      FIREARM:75

**Additional Offense:** ASPF ASSAULT, POLICE,
                                        FIREARM:75

## Circumstances

1HOM HOMICIDE
1TECH K FALES
OIS OFFICER INVOLVED SHOOTING
HP HIGH PROFILE

**Responding Officers:**                              **Unit :**

12/18/23

DEFS_Obregon 000001

| | |
|---|---|
| B GIBSON | 4C33 |
| M BEDROSSIAN | 4C31 |
| G SANDERS | K16 |
| T HELIN | 2689 |
| Z WHEELER | K14 |
| J DIENERT | T15 |
| G RIVEROLL | O2594 |
| I INIGUEZ | K15 |
| T PICKETT | 4C34 |
| G KINDSVATER | L26 |
| MI RANSOM | S81 |
| AN ROMERO | 4C32 |
| W ABBIATTI | 6f2 |
| J MONTOYA | 4C30 |
| C SANTOS | 2C32 |
| AD MILLER | 6F40 |
| J GARIBAY | 4A4 |
| F SLOUP | T16 |
| W MAY | 6F30 |
| GLENN MORRISON | P162 |
| L APARICIO | L22 |
| 1173 | 1173 |
| R JESS | CP182 |
| J SOTO | 2277 |
| A CARRILLO | S66 |
| J SANCHEZ | S64 |
| S GRASSEL | P237 |
| J CLINE | 2453 |
| B MERKLEY | T21 |
| D MCCALL | D2571 |
| P DUDISH | D2034 |
| J VILLEGAS | PINAL6 |
| B GAY | D2329 |
| A CONVERSE | D1686 |
| F ESTRADA | 2264 |
| M FENDER | D1604 |
| C NARDELLI | T14 |
| E McLOUGHLIN | P206 |
| RA GONZALES | D1893 |
| K FALES | I1 |
| K CHARLES | D2408 |
| C SCHMIDLIN | T12 |

12/18/23

DEFS_Obregon 000002

| R PROSSER | P243 |
| L RABB | I3 |
| J BONUCCI | D877 |
| C BURGESS | P223 |
| D ERICKSON | S72 |
| D TAYLOR | CP293 |
| M TAYLOR | T18 |
| IAN MACFIE | 4B24 |
| R ORTEGA | 2589 |

**Responsible Officer:** J BONUCCI

**Received By:** N VERSTEEG

**How Received:** O OFFICER REPORT

**When Reported:** 19:01:19 03/16/23

**Judicial Status:**

**Misc Entry:**

**Agency:** PCSO

**Last Radio Log:** **:**:** **/**/**

**Clearance:** CIB ASSIGNED TO CIB (CIB USE ONLY)

**Disposition:** CLO **Date:** 07/26/23

**Occurred between:** 19:00:00 03/16/23

**and:** 19:05:00 03/16/23

**Modus Operandi:**          **Description :**          **Method :**

## Involvements

| Date | Type | Description | Relationship |
|---|---|---|---|
| 12/18/23 | DS | AZ INSURANCE POOL | RECEIVED |

12/18/23

DEFS_Obregon 000003

## Narrative

See Written Supplement Reports

_____

Responsible LEO:

_____

Approved by:

_____

Date

12/18/23

DEFS_Obregon 000004

## Supplement

```
DR#: 230316206        WRITTEN BY: DEPUTY A. ROMERO 2469
SUPPLEMENT

CASE TYPE & ARS CODES:

REFER TO ORIGINAL REPORT

ATTACHMENTS:

NONE

NARRATIVE:
```

ON 03/16/2023 AT APPROXIMATELY 1919 HOURS, I ARRIVED IN THE AREA OF W MESCALERO DR & N HUALAPAI DRIVE, CASA GRANDE, AZ TO ASSIST DEPUTY GIBSON #2366 WITH AN OFFICER INVOLVED SHOOTING.

WHILE WORKING ROUTINE PATROL IN THE AREA OF ARIZONA CITY, I HEARD DEPUTY GIBSON ADVISE 913 ON THE RADIO REQUESTING IMMEDIATE BACK UP. WHILE EN ROUTE, I THEN HEARD DEPUTY GIBSON YELL ON THE RADIO, "DROP THE GUN" AND SOME BACKGROUND NOISE. I HEARD DEPUTY GIBSON ADVISE 998 AND SAY THERE WAS A MALE SUBJECT DOWN WITH MULTIPLE GUNSHOT WOUNDS. I HEARD DEPUTY GIBSON ADVISE WHO THE MALE SUBJECT WAS AND THAT HE WAS STARTING TO RENDER AID.

I ARRIVED ON SCENE AND CONDUCTED SCENE SECURITY IN THE AREA OF WEST MESCALERO DRIVE EAST OF NORTH SCOTT DRIVE AS THE SCENE WAS DETERMINED CODE FOUR PRIOR TO MY ARRIVAL. WHILE CONDUCTING SCENE SECURITY, I HAD TO MAINTAIN CRIME SCENE SAFETY AS WELL AS KEEP ANY UNWANTED SUBJECTS FROM ENTERING THE CRIME SCENE. I MAINTAINED THIS POSITION UNTIL I WAS RELIEVED BY DEPUTY MACFIE #2677.

THIS ENDED MY INVOLVEMENT.

CASE STATUS: CLOSED.

12/18/23

DEFS_Obregon 000005

## Supplement

```
CAD Call info/comments
==============================

19:01:33 03/16/23  - N VERSTEEG - From: B GIBSON
SUBJ SHOT MULTIPLE TIMES... BLK SIL HAND GUN... 1 SUBJ DOWN DOWNRANGE TO S
OF
VEH LOCATION

19:02:14 03/16/23  - N VERSTEEG - From: B GIBSON
SECURING RENDERING AID..

19:03:00 03/16/23  - N VERSTEEG - From: B GIBSON
MULTIPLE SUBJS APROCHING ME..

19:03:49 03/16/23  - C WILKINSON
6F10 CODE
19:04:22 03/16/23  - JE YOUNG
03/16/2023 19:01:57N VERSTEEG From: B GIBSON (Unit 4C33)
PULLED GUN TRIED TO
SHOOT ME MICHAEL OBERGON 11 23 1986... S81 STAGE MEDS FOR 2


 03/16/2023
19:02:01K DEVELLIN From: B GIBSON (Unit 4C33)
MICHAEL OBREGON  11231986


03/16/2023 19:02:05A FRISBIE
CASA GRANDE 19


 03/16/2023 19:02:46JE
YOUNG
AMR IS STAGING.


 03/16/2023 19:04:06K DEVELLIN
RELATED TO
230316206

19:04:28 03/16/23  - N VERSTEEG - From: B GIBSON
ADV 998 AND 999 AND 913

19:05:04 03/16/23  - N VERSTEEG - From: B GIBSON
RENDERING AID MUTIPLE CITZENS OUT W/ ME..

19:05:12 03/16/23  - N VERSTEEG - From: B GIBSON
NOT FEELING PAIN UNK IF I WAS SHOT..

19:05:28 03/16/23  - N VERSTEEG - From: MI RANSOM
GET CG ON SCENE LOCK THE SCENE AND C20 HIM MAKE SURE HE IS NOT HURT.

19:05:53 03/16/23  - N VERSTEEG - From: B GIBSON
FAMILY IS APPROCHING ME

19:06:07 03/16/23  - N VERSTEEG - From: B GIBSON
CGPD ON SCENE
```

12/18/23

DEFS_Obregon 000006

```
19:06:21 03/16/23  - JE YOUNG
PER CGPD DEPUTY IS C4
19:06:29 03/16/23  - Y OSINSKI
*URGENT* *** EXECUTIVE & REGULAR MI'S SENT ***
19:06:52 03/16/23  - JE YOUNG
C4 FOR MEDICAL PER CGPD
19:07:27 03/16/23  - N VERSTEEG
4C33 3 EXIT WOUNDS 1 ENTRY 1 I CAN SEE 1 CHEST SEAL APPLIED
19:08:07 03/16/23  - N VERSTEEG
S81 SCENE IS SECURE NEED ADDITIONAL MEDS 33 APPEARS C4 NEED MEDS FOR SUBJ UNK ON
PULSE...
19:08:32 03/16/23  - A FRISBIE
*** taffic on 5 ***
19:08:53 03/16/23  - A FRISBIE - From: J GARIBAY
19 CODE

19:09:15 03/16/23  - A FRISBIE
*** TRAFFIC ON 5 ***
19:09:32 03/16/23  - N VERSTEEG - From: B GIBSON
UNIT TO WEST ON THIS ROAD TO LOCK IT DOWN

19:10:04 03/16/23  - A FRISBIE
UNIT UNIT COX ALMOST TO VAL VISTA...
19:10:28 03/16/23  - A FRISBIE
s81- look at stop sing to the w of you... addtl unit to the stop sign to the e
of me... i need two units on secene...
19:10:43 03/16/23  - A FRISBIE
K14 AND K15 TRKELL AND MCCARTNEY S OF...
19:10:48 03/16/23  - A FRISBIE
S81- 925 97 CPR IN PROG..
19:11:01 03/16/23  - A FRISBIE
S81- 4C33 IS C4
19:11:24 03/16/23  - A FRISBIE
S81 - INAUD ROLL CALL ...
19:11:29 03/16/23  - A FRISBIE
UNK UNIT WHATS YOUR CROSS..
19:11:53 03/16/23  - A HOLZ - From: G KINDSVATER
CTC CAPT RANKIN AND SGT RANKIN . PEER SUPPORT TO SCENE AND ANOTHER TO
900
ANOTHER ON STANDBY ON C103 C....

19:12:55 03/16/23  - N VERSTEEG
4C33 3 EXIT WOUNDS 1 ENTRY 1 I CAN SEE 3 CHEST SEAL APPLIED
19:13:13 03/16/23  - L APARICIO
I COPY TRAFFIC, WILL CONTACT  ROB/HOM. BOTH CAPTAIN AND SGT RANKIN OUT OF TOWN.

19:13:57 03/16/23  - J SANCHEZ
I COPY TRAFFIC, WAS JUST BRIEFED BY L22.
19:14:15 03/16/23  - A FRISBIE
S81- TO K14 ARE YOU COMING TO MY E OR WEST?
19:14:18 03/16/23  - A FRISBIE
K14 NB...
19:14:22 03/16/23  - A FRISBIE
S81 IS THE INAUD OPEN?
19:14:34 03/16/23  - A FRISBIE
S81- TAKE 4C33 BACK TO CG C103 (4C33)
```

DEFS_Obregon 000007

```
19:14:49 03/16/23  - K DEVELLIN
PER CGPD ... OFFICER HAULAPAI  & HAVASUPAPI ... CALGARY AND JUALAPAI  AND
3
UNITS 97 ONE PARKED MORE WE OF HAULAPAI ON MASCALARA

19:15:02 03/16/23  - JE YOUNG
S64 PUT THRU TO D877
19:15:10 03/16/23  - A HOLZ
PINAL7 ADV VIA 21.... WILL MAKE CTC WITH L26
19:15:18 03/16/23  - A FRISBIE - From: M BEDROSSIAN
AST 4C33 97 CALGARY AND HUALAPAI

19:15:20 03/16/23  - K DEVELLIN
CG ALSO SHUTTING DOWN SCOTT AND MESCALARO AS WELL

19:16:28 03/16/23  - L APARICIO
L22 HAVE L26 GIVE ME A 21 WHEN NOT 10-6, ROB/HOM 10-19
19:17:05 03/16/23  - J SANCHEZ
D877 HAS BEEN CONTACTED AND WILL PAGE OUT HOMICIDE DETECTIVES.
19:17:07 03/16/23  - A FRISBIE
4C31- IF S81 IS AVAIL... DO YOU WANT ME TO MOVE CLOSER?
19:17:10 03/16/23  - JE YOUNG
BRANDY MEAGAN 520-582-8938 19005 W MESCALERO DR, CG....STATING WE WALKED IN HER
YARD AND SHOT SOMEONE, DEMANDING CONTACT
19:17:14 03/16/23  - A FRISBIE
S81- I NEED UNITS TO THE E AND WEST OF US...
19:17:51 03/16/23  - A FRISBIE
S81- CG IS SHUTTING DOWN FOR US ... WE WILL DO A ROLL CALL HERE IN A SECOND...
19:17:54 03/16/23  - JE YOUNG
BRANDY MEAGAN 520-582-8938 19005 W MESCALERO DR, CG....STATING WE WALKED IN HER
YARD AND SHOT SOMEONE, DEMANDING CONTACT 101 SCREAMING AND YELLING AT 900
19:18:05 03/16/23  - A FRISBIE - From: F SLOUP
AST 4C33 97 APPROACHNG FROM THE E

19:18:27 03/16/23  - A FRISBIE
1173 - MASCALERO E OF SCOTT.
19:18:34 03/16/23  - A FRISBIE
4C31 97 MESCALAERO E OF SCOTT..
19:19:04 03/16/23  - N VERSTEEG
DPS WILL BE 19
19:19:46 03/16/23  - A FRISBIE - From: I INIGUEZ
97. HUALAPAI AND MESCALERO

19:20:14 03/16/23  - Y OSINSKI
PER MI UPDATE -- CID IS AWARE OF TRAFFIC AND HOMICIDE DETECTIVE WILL BE 10-19
SHORTLY
19:20:24 03/16/23  - Y OSINSKI
PER MI UPDATE -- CIB IS AWARE OF TRAFFIC AND HOMICIDE DETECTIVE WILL BE 10-19
SHORTLY
19:20:59 03/16/23  - Y OSINSKI
2264 IN PEER SUPPORT ADVD IS COORDINATING RESOURCES AND WILL BE 10-19 DIRECTLY
19:21:03 03/16/23  - A FRISBIE - From: Z WHEELER
19. W 4C33 OBN TO C103 C

19:21:13 03/16/23  - A FRISBIE - From: MI RANSOM
- WHERE ARE MY UNITS.
```

DEFS_Obregon 000008

19:21:22 03/16/23   - JE YOUNG
*URGENT* 101 BRANDY MEAGAN IS 19 TO 19005 MESCALERO DR, IS SCREAMING AT 900 THAT
WE WALKED IN HER YARD AND SHOT HER FRIEND.
19:21:31 03/16/23   - A FRISBIE - From: J CLINE
AST 4C33 97 WHERE EVER THEY NEED ME

19:22:01 03/16/23   - A FRISBIE - From: J CLINE
101 SUSUPECT AT HAVASUPI AND HUALAPAI W T21

19:22:33 03/16/23   - A FRISBIE - From: B MERKLEY
OUT W SUSPECTS WIFE.

19:22:45 03/16/23   - A FRISBIE - From: J DIENERT
97

19:24:41 03/16/23   - N VERSTEEG
L18 ADV OF INFO ADV WILL BE 19
19:24:46 03/16/23   - A FRISBIE
S76 - I WILL BE COVERING CHARLIE... ADV IF YOU NEED MORE AT THE SCENE ILL SEND
THEM OVER...
19:24:55 03/16/23   - A FRISBIE
T16- THERE IS A SOLID CG PRECENSE ON SCNE HERE
19:25:01 03/16/23   - A FRISBIE - From: T PICKETT
97. HUALAPAI AND MESCALERO W OF

19:27:27 03/16/23   - A FRISBIE
S81 - WERE GOOD W WHAT WE HAVE.. ONCE WE HAVE THE SCENE MORE SECURED WE WILL ADV
WHAT WE HAVE..
19:27:30 03/16/23   - A FRISBIE
L26 START POSSSE
19:27:41 03/16/23   - A FRISBIE
CC
19:27:43 03/16/23   - K DEVELLIN - From: L APARICIO
CALL CO RDS NEEDING HARD CLOSURES AT CDS

19:27:51 03/16/23   - A FRISBIE - From: G KINDSVATER
97

19:28:15 03/16/23   - K DEVELLIN
CALLING CO RDS

19:28:22 03/16/23   - A FRISBIE
L26 - POSS CNA RELEIVE SOME OF THE CHARLIE UNITS..
19:28:53 03/16/23   - A FRISBIE
K15 UNIT THAT HAS 22105 TAHOE MOVE FORWARD
19:29:19 03/16/23   - A FRISBIE
2453- SISTER AND OTHER SUBJS SHOWING UP W WIFE..
19:31:00 03/16/23   - A FRISBIE - From: T PICKETT
901H..

19:31:12 03/16/23   - A FRISBIE - From: MI RANSOM
COPIES 901H

19:31:56 03/16/23   - K DEVELLIN
CO RDS ADV AND WILL 21 L22

19:33:11 03/16/23   - A FRISBIE - From: J CLINE
WERE C4

12/18/23

DEFS_Obregon 000009

19:33:40 03/16/23  - A FRISBIE - From: Z WHEELER
AND 4C33 97 C103 CHARLIE

19:33:50 03/16/23  - JE YOUNG
CITIZENS FROM THE AREA WANTING TO KNOW WHAT IS GOING ON AND IF THE AREA IS
SAFE.
 RESIDENTS BEING TOLD TO STAY INSIDE THEIR HOMES FOR NOW

19:41:52 03/16/23  - A HOLZ
2ND RP/ MEGAN BRADY ..... 42/19005 MESCALERO .... UPSET DAUGH AND CHILDREN IN
THE AREA... ADV 15 YO DAUGH WAS TOLD SHE CANT RETURN TO HER RESD.... DAUGH IS
MARIAH BRADY 15 YO DAUGH
19:44:05 03/16/23  - A FRISBIE
L26 CLR THE MARKER KEEP CHH.
19:44:40 03/16/23  - A FRISBIE
PINAL6 97 THE SCENE... SHUTTING DOWN MESCALERO AND HUALAPIA AND THE OTHER TO THE
INT TO THE W... MAKE PERIMTER SMALLER...
19:44:57 03/16/23  - A FRISBIE
PINAL6 OTHER UNITS NEED TO MAKE THEMSELVES AVAIL FOR TRAFFIC,,.,
19:45:49 03/16/23  - L APARICIO
COUNTY ROADS CALLED BACK, THEY ARE 10-19 WITH HARD BARRICADES
19:45:51 03/16/23  - A FRISBIE
PINAL6... POSSE UNIT COMING UP ON THE AIR W A ROAD RUNNER... HAVE HIM 45 AT
MELACALERO AND HUALAPI..
19:46:28 03/16/23  - A FRISBIE
L18 TO PINAL6- PROCESS OF SHRINKING PERIMTER... HAVING OUR GUYS STAY HERE TILL
POSSEE CHECKS 97..
19:46:35 03/16/23  - A FRISBIE
L18 COPIES SWITCHING TO 1
19:49:02 03/16/23  - A FRISBIE
2C32 I HAVE A 101 BLOCKING THE INT BLU JEANS BLK SHORTS..
19:49:12 03/16/23  - A FRISBIE
4C32 COPIES
19:50:43 03/16/23  - A FRISBIE
4C32 TO S81- MOM HERE SAYS SHE WANTS TO PCIK THEM UP DO YOU WANT TO VCEOM  WITH
ME...
19:51:01 03/16/23  - A FRISBIE
S81- INAUD W K15 HES RIGHT THERE...
19:51:46 03/16/23  - A FRISBIE
PINAL6- 10-5 TO FIRE AND AMR ASSETS THEY CAN CLR THE SCENE THEYRE TAKING UP
SPACE...
19:52:29 03/16/23  - A FRISBIE
P10 TO PINAL6- THEYRE SECURING THE RD RUNNING AND HEADING YOUR WAY...
19:52:40 03/16/23  - A FRISBIE
PINAL6 DIUD YOU COPY MESCALERO AND JHUALAPI...
19:52:52 03/16/23  - A FRISBIE
P10 T4... WE WIL LET YOU KNOW WHEN WERE CLSOE..
19:53:43 03/16/23  - A FRISBIE
TRYING TO GET AHOLD OF AMR... THEIR 21'S RIUNG BUSY..
19:53:52 03/16/23  - A FRISBIE
TRYING TO GET AHOLD OF AMR... THEIR 21'S RING BUSY..
19:54:18 03/16/23  - A FRISBIE
T16 TO S81- CAN YOU COME UP TO THE SCENE REF THE CHILDREN UP HERE.
19:54:27 03/16/23  - A FRISBIE
S81- L26 IS ENRT TO YOU..
19:54:44 03/16/23  - A FRISBIE

12/18/23

DEFS_Obregon 000010

```
PINAL6 DID YOU COPY MESCALERO AND HUALAPAI
19:55:44 03/16/23   - A FRISBIE
2453- FOLLOWING WIFE NEICE AND SISTER AN LAW 10-19 TO CG..
19:56:04 03/16/23   - A FRISBIE
2453 - ITS GOING TO BE CG'S SUBSTATION OFF OF VALVISTA..
19:56:17 03/16/23   - A FRISBIE - From: J CLINE
19. CGPD C103

19:56:42 03/16/23   - A HOLZ
PINAL6 - REQ CO RDS TO BRING LIGHTS FOR SCENE

19:57:50 03/16/23   - N VERSTEEG
AMR ADV ALL THEIR UNITS SHOULD BE CLEARING
19:58:47 03/16/23   - A HOLZ
CO RDS ADV WILL CALL YARDS TO GET LIGHTS TO THE SCENE.
20:00:21 03/16/23   - A FRISBIE
4C31- CONFRIM W 2453 MET W THE FAMILY..
20:00:35 03/16/23   - A FRISBIE
900 ADV 2453 IS 19 W FAM TO C103 CGPD.
20:00:46 03/16/23   - A FRISBIE
4C31- 10-4 I HAVE S81 ASKING
20:01:42 03/16/23   - A HOLZ
PINAL6 - SEE IF CGPD ADV TO ASSIST WITH LIGHT PLANTS.... / CGPD ADV WILL CB TO
ADV ETA FOR THE LIGHTS
20:04:30 03/16/23   - A FRISBIE
P206 19 TO THE SCENE W ROAD RUNNER CP...
20:05:09 03/16/23   - A FRISBIE
2453 - 97 C103 CGPD
20:11:44 03/16/23   - Y OSINSKI
RAY W/COUNTY RDS ADVD 1 LIGHT PLANT IN CG - WILL START THAT WAY.  OTHER IS IN AJ
WILL START IT AS WELL BUT WILL BE EXTENDED.
20:18:23 03/16/23   - Y OSINSKI
PER PINAL6 HAVE 1 LIGHT PLANT FROM CG PD, 1 FROM TRAFFIC AND OURS FROM CG CO RDS
 - SHOULD BE GOOD.  PUBLIC WORKS CANCELLED THE AJ LIGHT PLANT.
20:18:55 03/16/23   - JE YOUNG - From: Z WHEELER
4C33 TURNED OVER TO 2264

20:18:55 03/16/23   - A FRISBIE
PINAL6- I COPY THAT... WE HAVE ONE FROM TRAFFIC COMING... AND 2 FROM CG THAT
SHOULD BE SUFFICIENT...
20:20:03 03/16/23   - A FRISBIE
PINAL6 TO S66 - ROVER DID CHECK 97.. IF YOU WANNA GET CLOSER TO THAT INT...
20:20:11 03/16/23   - A FRISBIE
S66- T4 WERE GETTING THEM IN THERE N OW
20:20:40 03/16/23   - A FRISBIE
PINAL6- C4 ON THE SCENE ILL BE 10-19 TO C103 CHARLIE..
20:22:06 03/16/23   - A FRISBIE - From: R PROSSER
97. MESCALERO AND HUALAPAI

20:26:01 03/16/23   - Y OSINSKI
PER PINAL6 COUNTY ATTY IS ALREADY ON SCENE HAS BEEN BRIEFED.
20:27:09 03/16/23   - A FRISBIE - From: E McLOUGHLIN
97. MESCALERO AND HUALAPAI W ROAD RUNNER

20:28:55 03/16/23   - A FRISBIE
P206 - DID THEY WANT THE ROADRUNNER AT?
20:29:28 03/16/23   - A FRISBIE
```

```
P206 - WHERE DID THEY WANT THE ROADRUNNER AT? THERE IS A BUNCH OF CARS HERE,..
20:29:37 03/16/23  - A FRISBIE
T15- ILL LEAD P206 IN
20:30:41 03/16/23  - A FRISBIE
2453- WE HAVE THE H/O OF THE 20 AND 2 CHILDREN IFO CGPD'S SUBSTATION BECOMING
IRATE... I NEED ADDTL...
20:31:05 03/16/23  - A FRISBIE
L26 - WAS HE TRANSPORTING... 900 ADV T4...
20:31:48 03/16/23  - A FRISBIE
L26- WE HAVE THEIR CTC INFO... 2453 HE CAN LEAVE...
20:31:53 03/16/23  - K DEVELLIN
PER CGPD THEY DO NOT NEED ANY BACK UP
20:31:55 03/16/23  - A FRISBIE
2453 - COPIES..
20:33:40 03/16/23  - JE YOUNG
L26 PUT THRU TO 2453
20:35:17 03/16/23  - J SANCHEZ
19 C103 FLORENCE TO RETRIEVE OIS GUN
20:36:09 03/16/23  - K DEVELLIN - From: C BURGESS
AST 4C33 97 WITH CP

20:43:00 03/16/23  - J CLINE
WIFE, SISTER AND NEICE RELEASED FROM CGPD
20:44:15 03/16/23  - MI RANSOM
amr503/rfrd587 case 23567652
20:44:26 03/16/23  - MI RANSOM
cgpd dr 11039
20:54:14 03/16/23  - A FRISBIE
D1686- 97 OIS
20:57:13 03/16/23  - A FRISBIE
D1893 97 OIS...
21:06:43 03/16/23  - K DEVELLIN - From: A CARRILLO
LIFT TAC ALERT

21:08:10 03/16/23  - A FRISBIE
** TAC ALERT LIFTED
21:11:16 03/16/23  - A FRISBIE - From: AN ROMERO
TO POSSE UNIT ON SCOTT RD..

21:13:53 03/16/23  - J SANCHEZ
I HAVE OIS GUN AND 19 103 CG.
21:15:08 03/16/23  - A FRISBIE
D1604 - 97 OIS
21:17:23 03/16/23  - A FRISBIE - From: L RABB
97. PER P162

21:26:43 03/16/23  - F SLOUP
OWNER OF 19005 W. MESCALERO DRIVE,  MEAGAN BRADY  SPILLMAN # 2022175
21:30:24 03/16/23  - F SLOUP
SISTER OF SUSPECT:  NICOLE BERNIER   SPILLMAN # 3363433
21:34:05 03/16/23  - MI RANSOM
time of death 1930 by dr nicholas may at banner cg
21:38:19 03/16/23  - F SLOUP
OCCUPANT OF 19005 W. MESCALERO DRIVE, ARIANNA RAI BRADY    SPILLMAN # 3738797
21:41:39 03/16/23  - F SLOUP
OCCUPANT OF 19005 W. MESCALERO DRIVE, MARIAH BRADY  SPILLMAN #  3738798
21:48:29 03/16/23  - K DEVELLIN - From: P DUDISH
```

DEFS_Obregon 000012

```
97

21:53:55 03/16/23   - A FRISBIE - From: J SANCHEZ
C103. CG

22:01:28 03/16/23   - A FRISBIE - From: C NARDELLI
97

22:29:15 03/16/23   - A FRISBIE - From: RA GONZALES
AND D2571 AST S81 97 1458 E NATASHA

22:30:37 03/16/23   - A FRISBIE - From: J SANCHEZ
97. THE SCENE

22:31:01 03/16/23   - A FRISBIE - From: L APARICIO
TO S64 YOURE C4 TO COME UP TO THE ROAD RUNNER

22:38:19 03/16/23   - A FRISBIE
D1686 RUN VIN/ JH2MD37549K000908 .... 900 ADV COMES BACK AS 10-40 REF OCA/
221231063
23:10:24 03/16/23   - M FENDER
PRESERVATION REQUEST SENT TO RING, REF 18960 W MESCALERO DRIVE
00:45:29 03/17/23   - A FRISBIE
PER L22 C4 TO CLR CH 5
00:45:50 03/17/23   - A FRISBIE
CH 5 CLR
00:58:04 03/17/23   - K DEVELLIN - From: RA GONZALES
AND D2571 97. 10877 N HUALAPAI DR

01:01:15 03/17/23   - K DEVELLIN - From: R ORTEGA
19

01:14:03 03/17/23   - K DEVELLIN - From: D MCCALL
PUT THRU TO CGPD

01:17:18 03/17/23   - A FRISBIE - From: C SCHMIDLIN
CLR THE SCENE

01:38:40 03/17/23   - K DEVELLIN - From: R ORTEGA
97

01:40:04 03/17/23   - K DEVELLIN - From: RA GONZALES
AND D2571 97. 23136 W CLAYTON

02:16:36 03/17/23   - A FRISBIE - From: L APARICIO
CTC CO RD TO GET THE LIGHT PLANT AND THEIR CLOSURES WE'RE WRAPPING IT UP HERE.

02:22:09 03/17/23   - K DEVELLIN - From: R ORTEGA
19. C103 FLO

02:23:31 03/17/23   - A FRISBIE
CO RD ADV
02:35:01 03/17/23   - K DEVELLIN - From: RA GONZALES
AND D2571 97 THE SCENE

03:02:03 03/17/23   - A FRISBIE - From: L APARICIO
UPDATE ON CO RDS?

03:02:43 03/17/23   - A FRISBIE
```

12/18/23

```
CO RDS ADV "SHORTLY."

03:18:06 03/17/23   - A FRISBIE - From: L APARICIO
UNITS ON PERIMETER YOU CAN BREAK IT DOWN

03:19:31 03/17/23   - A FRISBIE - From: IAN MACFIE
CO RDS HERE TO GET THE LIGHTS AND BARRICADE.

03:19:38 03/17/23   - L APARICIO
COUNTY ROADS ON SCENE
03:26:17 03/17/23   - C NARDELLI
FARO SCANS COMPLETE
03:30:12 03/17/23   - A FRISBIE - From: L RABB
19. C103 FLORENCE

03:30:33 03/17/23   - L APARICIO
ALL UNITS CLEAR THE SCENE
```

12/18/23

DEFS_Obregon 000014

## Supplement

DR#: 230316206                              WRITTEN BY: Dep. T. Pickett #2207

SUPPLEMENT

CASE TYPE & ARS CODES:                     See original report

ATTACHMENTS:                               None

NARRATIVE:

On 03/16/2023 at approximately 1901 hours I responded to the area of Mescalero Dr and Hualapai Dr reference a Deputy involved shooting.  On arrival I proceeded to the scene of the shooting and was directed by Sgt M. Ransom #S81 to take initial photographs of the scene.  I used my department issued cell phone and took initial photographs of the scene at that time.  I then stayed where the suspect handgun was located and prevented it from being disturbed while American Medical Response personnel attempted to revive Michael Obregon.  At approximately 1930 hours the AMR paramedic advised that Dr. Nicholas May of Banner Casa Grande pronounced Michael deceased.  I then started and maintained a crime scene log.

At approximately 2105 hours, I was directed to move from crime security at the immediate scene to provide security and maintain the crime scene log at the intersection of Hualapai and Mescalero.

At approximately 0322 hours I cleared the scene.

The photographs were entered into Digital OnQ as evidence.

Nothing further at this time.

12/18/23

DEFS_Obregon 000015

## Supplement

Pinal County Sheriff's Office - Supplemental Report

Departmental Report Number (DR): 230316206

Written by: Detective M. Fender # 1604
Unit: San Tan Persons Crimes Unit

Case Type & Arizona Revised Statute:

See the case detective's report for applicable statutes.

Attachments:

Canvas Map (1 page)
Preservation Request - Ring (1 page)

Supplemental Narrative:

On March 16th 2023, at approximately 2000 hours, I was contacted by Sergeant
Hillman # 1356 in reference to an officer involved shooting that had occurred in
Casa Grande, Arizona. Sgt. Hillman instructed me to respond to the incident
location of 19005 W. Mescalero Drive, and assist Pinal County Sheriff's Office
(PCSO) Homicide Detectives with the investigation.

Upon my arrival, I was instructed to conduct a canvas of the area with Detective
Charles # 2408. Detective Charles and I proceeded to conduct a canvas of the
area to identify potential witnesses and or security camera footage.  Detective
Charles utilized his digital voice recorder to record our interactions with
residents neighboring the incident location. Review Detective Charles's report
for detailed accounts of the statements made.

Wade Putt ███████████████████████████, advised that he had a "Ring" doorbell
camera wit██████████████████████████ an additional security camera connected to a
separate system. I subsequently submitted a preservation request to "Ring" via
subpoenas@ring.com. Once I receive a response from "Ring", I will note the
response.

Upon completion of the area canvas, I created the attached map, which shows
which residence we made contact at and if statements or evidence was obtained.

I remained on scene to observe the investigation and to assist with logistical
support of the investigation to include driving the Pinal County Emergency
Management Command Vehicle.

This concluded my involvement with operations on the scene of the incident.

On 03/17/2023 at approximately 1030 hours, I attended the autopsy of the
decedent, Michael aka Micheal Obregon DOB: 11/23/1986.

This concluded my involvement in this case.

Case Status:

See case detective's report for status.

12/18/23

DEFS_Obregon 000016

## Supplement

```
PINAL COUNTY SHERIFF'S OFFICE
SUPPLEMENTAL INCIDENT REPORT


DR #: 230316206

WRITTEN BY: Detective C. Santos #1173

INCIDENT TYPE: Field Interview

ATTACHMENTS: None


NARRATIVE:
On Thursday, March 16, 2023, I responded to Mescalero Drive and Hualapai Drive
in reference to an Officer involved shooting.  Upon arrival I was setting up
scene security west of the incident on Mescalero Drive in between Scott Drive
and Hualapai Drive.

I then assisted Deputy Sloup #2393 with the Pinal County Sheriff's Office with
placing orange traffic cones over the shell chasing that were located on the
roadway.  I then moved the yellow caution tape that was placed on the fence
across the roadway further to the west away from the location of the initial
incident.

I was later advised by Sgt. Ransom #2208 with the Pinal County Sheriff's Office
to leave the scene and return back to my normal patrol duties.

There is nothing further to report at this time.

CASE STATUS: Closed

Dep C. Santos #1173
Pinal County Sheriff's Office
Patrol Division
```

12/18/23

DEFS_Obregon 000017

## Supplement

```
PINAL COUNTY SHERIFF'S OFFICE
INCIDENT REPORT

DR #: 230316206        WRITTEN BY: Deputy M. Taylor #2401
SUPPLEMENTAL

CASE TYPE & ARS CODES:

SEE ORIGINAL CASE

ATTACHMENTS:

NONE

NARRATIVE:
```

ON 03-16-2023, at approximately 1901 hours, I heard radio transmissions from Deputy Gibson #2366 stating "drop the gun" and then "998."

I was advised by Sgt Erikson #1542 to respond to the scene and assist the members of the Vehicle Crimes Unit (VCU) in documenting the crime scene.

I arrived on scene 2256 hours and assisted VCU members with utilizing the FARO to document the crime scene.

I completed my assigned tasks and cleared the scene at approximately 0137 hours.

This ends my involvement in this matter.

CASE STATUS: SEE ORIGINAL

12/18/23

DEFS_Obregon 000018

## Supplement

```
DR#230316206                    WRITTEN BY:  J. DIENERT #2290
SUPPLEMENT

CASE TYPE:

SEE ORIGINAL REPORT

NARRATIVE:

ON 3/16/23 AT APPROXIMATELY 1901 HOURS I RESPONDED TO THE AREA OF WEST MESCALERO
DRIVE AND HUALAPAI DRIVE, CASA GRANDE, ARIZONA IN REFERENCE TO AN OFFICER
INVOLVED SHOOTING AS PART OF THE PINAL COUNTY SHERIFF'S OFFICE TRAFFIC UNIT.

UPON MY ARRIVAL, THERE WERE SEVERAL LAW ENFORCEMENT OFFICERS ON SCENE FROM
MULTIPLE AGENCIES AND A PERIMETER HAD ALREADY BEEN SET UP. I COORDINATED POSSE
MEMBERS TO RELIEVE DEPUTIES ON ROADBLOCKS AT MESCALERO DRIVE/HUALAPAI DRIVE AND
MESCALERO DRIVE/SCOTT DRIVE.

AFTER AWAITING DETECTIVES TO CONDUCT THEIR INITIAL WALKTHROUGH AND
INVESTIGATION, I ASSISTED MY USING THE PCSO TRAFFIC UNIT FARO 3D SCANNER TO
OBTAIN SCANS OF THE SCENE TO INCLUDE, BUT NOT LIMITED TO SHELL CASING, VEHICLE
PLACEMENTS, BODY PLACEMENT, AND OTHER ITEM ON SCENE.

AFTER COMPLETING THE SCANS, THE SD MEMORY CARD WAS TURNED OVER TO DEPUTY C.
NARDELLI TO LATER RENDER A DIAGRAM OF THE SCENE.

THIS ENDED MY INVOLVEMENT WITH THE INCIDENT.

CASE STATUS: TURNED OVER TO CASE DEPUTY
```

12/18/23

DEFS_Obregon 000019

## Supplement

DR#: 230316206    WRITTEN BY: Sergeant M. Ransom #S81
SUPPLEMENT


CASE TYPE & ARS CODES:

Deputy Involved Shooting


ATTACHMENTS:

Major Incident Briefing Form


NARRATIVE:

On 03-16-2023, at approximately 1901 hours, I responded to the area of Mescalero Dr. and Hualapai Dr. located in Casa Grande, AZ reference a deputy involved shooting. The initial call for service was a field interview that was self initiated by Deputy B. Gibson.

During Deputy Gibson's initial call, he advised PCSO Dispatch of code 913 (immediate backup) and 998 (deputy involved shooting). During this time, there was an open mic from his radio and I could hear him yelling "Drop the gun".

Upon arriving, I observed a male subject, later identified as Michael Obregon laying in the front yard/curtilage area of 19005 W. Mescalero Dr. Deputy Gibson was rendering aid by placing bandages on Michael's chest area and checking for a pulse. I observed Michael to appear lifeless and his eyes were open with no signs of life. I requested Casa Grande PD Officers on scene take over first aid in order to check Deputy Gibson for any injuries due to him stating Michael tried to shoot him.

I conducted a welfare check on Deputy Gibson and did not observe any visible or obvious injuries. Myself and Deputy Gibson set up crime scene tape. AMR 503 and Rural Metro Fire Department Engine 587 arrived on scene and rendered aid to Michael. The run number is 23567652.

I directed deputies on scene to place cones over several shell casings I observed on the roadway near 19005 W. Mescalero Dr. Deputy Pickett #2207 took initial case photographs. He was then assigned to stand with a silver in color firearm I observed on the ground near Michael. Deputy Romero was requested at the scene to assist with crowd control and foot traffic. I then had units close Mescalero Dr. at Scott Dr. and Hualapai Dr.

I assigned Deputy Gibson to Deputy Wheeler (K14) and had them respond to the Pinal County Sheriff's Office Casa Grande Substation.

Michael was pronounced deceased by Doctor Nicholas May with Banner Casa Grande at 1930 hours.

I completed the PCSO major incident briefing form which has been included as an attachment with this supplement.

I turned the scene over to CIB and Lieutenant Aparicio.

This concluded my involvement in this case.


12/18/23

CASE STATUS:
ACTIVE

12/18/23

DEFS_Obregon 000021

## Supplement

DR#: 2303162206                    WRITTEN BY: DEPUTY BEDROSSIAN #2473

SUPPLEMENT


CASE TYPE & ARS CODES:

-SEE ORIGINAL REPORT


ATTACHMENTS:

-SEE ORIGINAL REPORT


NARRATIVE:

ON 03/16/2023 AT APPROXIMATELY 1901 HOURS, I RESPONDED TO THE AREA OF W. MESCALERO DR. & N. HUALAPAI DR; CASA GRANDE, AZ. TO ASSIST DEPUTY GIBSON #2366 IN REFERENCE TO SHOTS FIRED. THIS IS WITHIN THE BOUNDARIES OF PINAL COUNTY, AZ. IT SHOULD BE NOTED, I WAS ASSIGNED TO PATROL IN CHARLIE REGION & POSTED IN ARIZONA CITY. I WAS WEARING A FULLY MARKED SHERIFF'S OFFICE PATROL UNIFORM & DRIVING A FULLY MARKED PATROL VEHICLE.

DEPUTY GIBSON ADVISED 913 VIA RADIO WHICH IS EMERGENCY RESPONSE REQUESTED & I HEARD HIM YELLING, "DROP THE GUN." COMMUNICATIONS THEN ADVISED DEPUTY GIBSON ADVISED 998 WHICH IS DEPUTY INVOLVED SHOOTING AS WELL AS 999 WHICH IS EMERGENCY BACK-UP, CRITICAL SITUATION. I RESPONDED FROM THE ARIZONA CITY SUBSTATION WITH MY EMERGENCY RED & BLUE LIGHTS AS WELL AS SIREN ACTIVATED.

WHILE I WAS EN ROUTE, I HEARD DEPUTY GIBSON STATE THE SUBJECT INVOLVED LATER IDENTIFIED AS MICHAEL OBREGON 11/23/1986 WAS SHOT MULTIPLE TIMES. DEPUTY GIBSON STATED MICHAEL HAD A BLACK & SILVER HANDGUN & HAD TRIED TO SHOOT DEPUTY GIBSON. I HEARD DEPUTY GIBSON ADVISE HE DID NOT KNOW IF HE HIMSELF WAS INJURED & THAT HE WAS RENDERING AIDE TO MICHAEL. DEPUTY GIBSON ADVISED THAT MULTIPLE SUBJECTS WERE APPROACHING HIM.

I ARRIVED IN THE AREA AT APPROXIMATELY 1915 HOURS & MADE CONTACT WITH CASA GRANDE POLICE DEPARTMENT AT THE INTERSECTION OF W. CALGARY DR. & N. HUALAPAI DR. WHICH IS DIRECTLY NORTH OF W. MESCALERO DR. & N. HUALAPAI DR. CASA GRANDE POLICE DEPARTMENT ADVISED THEY HAD THE INTERSECTION COVERED & WOULD SET UP CRIME SCENE TAPE.

I THEN WENT TO 19034 W. MESCALERO DR. WHICH IS ONE HOUSE DIRECTLY WEST OF THE INCIDENT SCENE WHICH WAS LOCATED AT 19005 W. MESCALERO DR. IT SHOULD BE NOTED I APPROACHED FROM THE WEST OFF OF N. SCOTT DR. I OBSERVED CRIME SCENE TAPE UP & STOPPED MY VEHICLE BEFORE THE CRIME SCENE TAPE. WHILE I WAS PROVIDING SCENE SECURITY, MULTIPLE SUBJECTS BEGAN APPROACHING THE SCENE & I ASSISTED BY MOVING THE CRIME SCENE TAPE FARTHER WEST. I PLACED IT APPROXIMATELY 30 FEET FARTHER WEST.

I WAS THEN INSTRUCTED BY SGT. RANSOM #2208 TO GO TO THE INTERSECTION OF N. SCOTT DR & W. MESCALERO DR. TO RELIEVE CASA GRANDE POLICE DEPARTMENT. I ASSISTED BY PLACING MY PATROL VEHICLE IN A NORTH TO SOUTH DIRECTION TO PREVENT VEHICLE'S FROM GOING DOWN W. MESCALERO DR. I THEN PUT CRIME SCENE TAPE UP ACROSS THE W.

12/18/23

DEFS_Obregon 000022

MESCALERO DR. IN A NORTH TO SOUTH DIRECTION. I STOOD BY WHILE SEVERAL VERBALLY AGGRESSIVE PEOPLE SHOWED UP & STATED THEY WERE FAMILY MEMBERS. I PROVIDED THEM WITH THE INCIDENT NUMBER & ADVISED I COULD NOT RELEASE ANY INFORMATION DUE TO IT BEING AN ACTIVE INVESTIGATION.

I THEN STOOD BY UNTIL I WAS RELIEVED BY POSSE & ADVISED BY LT. KINDSVADER #1461 TO CLEAR THE SCENE. I THEN WENT BY TO PATROL & TOOK CALLS FOR SERVICE IN CHARLIE REGION.

THIS COMPLETES MY INVOLVEMENT IN THIS REPORT.

CASE STATUS: SEE ORIGINAL REPORT

12/18/23

DEFS_Obregon 000023

## Supplement

```
DR#: 230316206                    WRITTEN BY: Dep. T. Pickett #2207

SUPPLEMENT


CASE TYPE & ARS CODES:            See original report



ATTACHMENTS:                      None



NARRATIVE:

On 03/16/2023 at approximately 1901 hours I responded to the area of Mescalero
Dr and Hualapai Dr reference a Deputy involved shooting.  On arrival I proceeded
to the scene of the shooting and was directed by Sgt M. Ransom #S81 to take
initial photographs of the scene.  I used my department issued cell phone and
took initial photographs of the scene at that time.  I then stayed where the
suspect handgun was located and prevented it from being disturbed while American
Medical Response personnel attempted to revive Michael Obregon.  At
approximately 1930 hours the AMR paramedic advised that Dr. Nicholas May of
Banner Casa Grande pronounced Michael deceased.  I then started and maintained a
crime scene log.

At approximately 2105 hours, I was directed to move from crime security at the
immediate scene to provide security and maintain the crime scene log at the
intersection of Hualapai and Mescalero.

Prior to clearing the scene I turned the crime scene log over to Det. J.
Bonnuci.

At approximately 0322 hours I cleared the scene.

The photographs were entered into Digital OnQ as evidence.

Nothing further at this time.

CASE STATUS:
Active
```

12/18/23

DEFS_Obregon 000024

## Supplement

DR #: 230316206          WRITTEN BY: Deputy B. Merkley #2613
SUPPLEMENTAL

CASE TYPE & ARS CODES:

SEE ORIGINAL CASE

ATTACHMENTS:

NONE

NARRATIVE:

On March 16, 2023 at approximately 1901 hours, I heard radio transmissions from Deputy Gibson #2366 stating he was out with a subject, told someone to, "drop the gun", stated, "998", and then requested immediate back-up/emergency response to his location (Mescalero Drive & Hualapai Drive, Casa Grande).

Upon my arrival to the area I set up on the corner of Havasupai Drive and Hualapai Drive with another Casa Grande Police Officer assuring no one entered the scene area. The Casa Grande Officer turned his patrol vehicle sideways blocking northbound Hualapai Drive and stretched a Police "Do Not Cross" tape across the roadway.

After a few minutes a silver sport utility vehicle came quickly pulling up near the road block and a pregnant female threw the driver's side door open and began running towards the Police "Do Not Cross" tape. I asked the female to stop and had to grab a hold of her arm as she tried to go past the road block. The female was sobbing and said, "that's my husband. He was shot! I need to be with him, please let me through." I advised the female she could not pass the road block and escorted her back to her car to sit down and catch her breath.

The female told me her husband was Michael Obregon and said she was on the phone with Michael's sister. The female stated Michael's sister called her, while she was working, and told her Michael had been shot. A few moments later a red sport utility pulled up and a sobbing female got out, walking up to Michael Obregon's wife and hugged her. The female verbally identified herself to me as Nicole Bernier DOB 5/6/1983. Nicole told me she was at her house, just up the street from the incident location, when she heard a gunshot and heard screaming, "they shot Mikey!" Nicole told me she ran out of the house, jumped in her vehicle and drove down to where the incident took place on Mescalero Drive. Nicole stated she observed a dirt bike parked in front of a Sheriff truck and observed Mikey on his back. Nicole stated there was a Deputy performing CPR on Mikey, "trying to resuscitate him", but stated Mikey, "looked dead."

Nicole stayed with Michael Obregon's wife and Deputy J. Cline #2453 remained with them, until he was asked to escort them over to the Casa Grande Police Department Substation for questioning. Prior to them leaving with Deputy J. Cline, another young female family member arrived and was escorted with Michael's wife and sister.

I was requested to go to the incident location with other members of the Vehicular Crimes Unit (VCU) to document the crime scene. I walked the scene with other members of the VCU and we determined how we would document the scene utilizing the FARO scanner. After creating a site plan we requested light trailers to the scene to illuminate the area and aid in the FARO scene capture.

12/18/23

DEFS_Obregon 000025

The scene was divided in two parts on the site plan and we had the VCU team divide to perform the FARO scans. I performed FARO scans with Deputy C. Nardelli #2193. Upon the completion of the FARO scans by the VCU I assured I was no longer needed on scene by the case Detectives and cleared the scene.

This ends my involvement in this matter.


Deputy B. Merkley #2613

CASE STATUS: SEE ORIGINAL

12/18/23

## Supplement

```
DR#230316206                              WRITTEN BY:  Z WHEELER #2221
SUPPLEMENTAL
```

CASE TYPE:

DEPUTY INVOLVED SHOOTING

ATTACHMENTS: NONE.

EVIDENCE:

AXON BODY WORN CAMERA (1 VIDEO)

NARRATIVE:

ON 03/16/2023 AT APPROXIMATELY 1901 HOURS I WAS WORKING AS A PINAL COUNTY SHERIFF'S DEPUTY IN A FULLY MARKED PATROL CAR AND UNIFORM.  FOR THIS SHIFT I WAS WEARING MY DEPARTMENT ISSUED AXON BODY CAMERA AND ACTIVATED IT JUST PRIOR TO ARRIVING ON SCENE.

I WAS IN THE AREA OF TREKELL RD AND ARICA RD WHEN I HEARD DEPUTY GIBSON OVER THE RADIO REQUEST A 913 (IMMEDIATE ASSISTANCE) AND THEN 998/999 (SHOTS FIRED/EMERGENCY HELP).  I LOOKED AT MY IN-CAR COMPUTER AND LOCATED A FIELD INTERVIEW HE WAS AND ASSIGNED TO NEAR MESCALERO AND HUALAPAI DR IN THE UNINCORPORATED AREA OF CASA GRANDE, AZ.

I ATTACHED MYSELF TO THE CALL VIA MY COMPUTER AND ACTIVATED MY LIGHTS AND SIREN WHILE RESPONDING TO DEPUTY GIBSON'S LOCATION TO ASSIST.

I ARRIVED ON SCENE AT APPROXIMATELY 1914 HOURS.  I MET SGT RANSOM WHO ADVISED THAT I WOULD BE ASSIGNED DEPUTY GIBSON.  I TRANSPORTED DEPUTY GIBSON FROM THE SCENE IN MY PATROL UNIT TO THE CASA GRANDE SUBSTATION AT APPROXIMATELY 1921 HOURS.  I STAYED WITH HIM UNTIL DEPUTY ESTRADA MET US AT THE SUBSTATION AND HE STAYED WITH DEPUTY GIBSON AND I CLEARED FROM THE CALL.

THIS CONCLUDED MY INVOLVEMENT WITH THE ABOVE INCIDENT. NFI.

CASE STATUS:  TOT PCSO DETECTIVES.

12/18/23

DEFS_Obregon 000027

## Supplement

DR #: 230316206              WRITTEN BY: Deputy F. Sloup  #2393


CASE TYPE & ARS CODES:

Officer Involved Shooting


ATTACHMENTS:

None


SUPPLEMENTAL NARRATIVE:

On Thursday March 16, 2023 I was on-duty as a member of the Pinal County
Sheriff's Office Traffic Unit (T-16). On this date I was participating in a DUI
Taskforce focused on patrolling the area of the City of Maricopa for impaired
drivers. I was dressed in a standard Class C uniform and operating an unmarked
Aggressive Driving vehicle.


Shortly after 1900 hours PCSO Deputy B. Gibson transmitted he needed emergency
back-up over the main PCSO dispatch channel and seconds later advised he had
been involved in a shooting and the suspect was down.  As Deputy Gibson
continued to provide updates multiple deputies responded including several from
the Traffic Unit.

Upon my arrival the scene was secured and medical personnel were performing CPR
on the suspect later identified as Michael Obregon. Obregon was laying on his
back in the driveway of a residence located at 19005 W. Mescalero Dr in Casa
Grande. PCSO Deputy T. Pickett #2207 was standing near the medical personnel
securing a black and silver handgun by standing over it to prevent it from being
disturbed. I also noted a young female subject standing just outside the inner
perimeter watching the medical personnel performing lifesaving measures on
Obregon.

PCSO Sergeant M. Ransom was in charge of the scene and was already coordinating
the emergency response. Per Sgt. Ransom's direction I retrieved several cones
and placed them over each of the shell casings I located in the roadway directly
outside of the Mescalero address. The young female became verbally aggressive
yelling at several deputies demanding their names and yelling obscenities. The
mother of this child arrived shortly thereafter to retrieve the angry female and
her older sister who was standing in the front yard of 19005 W. Mescalero Dr
when I arrived.

I contacted the older sister who verbally identified herself as Arianna Brady
(              ). Arianna was still standing in the front yard when I contacted
he           old me she had been inside reading a book at the time of the
shooting and had not seen or heard anything prior to the gun shots. Arianna told
me the female standing outside was her younger sister Mariah Brady.

Arianna told me all three were inside at the time of the shooting, I asked who
the third was; she stated her younger brother Thomas (12 yo) had been inside but
had since left out the back of the property and went to his father's house.
Arianna retrieved her dog from inside the house and I brought her to meet her
mother who was waiting to the west of the scene.

12/18/23

I returned to the scene where Mariah was still standing at the edge of the inner perimeter. I told her I would escort her to her mother. I confirmed Mariah's name and date of birth then began to ask questions reference the incident. Mariah immediately became irritated and hostile yelling at me that she "Don't know anything so don't even ask!" Mariah yelled at me that she had been inside and didn't see anything. Mariah was aggressive, rude and disrespectful as she scolded me about the deputies on-scene and the medical response provided by fire department personnel.

After being berated by Mariah I transferred her into the custody of her mother and the three left the area shortly thereafter, this ended my contact with them.

I remained on-scene as a member of the Traffic Unit to assist PCSO Homicide Investigators with documentation of the scene using the FARO 3D Scanner. The PCSO Traffic Unit completed documentation of the scene and secured shortly thereafter.

This ended my involvement with this investigation.

CASE STATUS: Turned over to detectives on-scene.

12/18/23

DEFS_Obregon 000029

## Supplement

```
DR#: 230316206
SUPPLEMENT

WRITTEN BY: DEP C.R. SCHMIDLIN #2196

CASE TYPE & ARS CODES:
OFFICER INVOLVED SHOOTING


ATTACHMENTS:
NONE

NARRATIVE:
ON 3/16/23 AT APPROXIMATELY 1900 HOURS I WAS WORKING A DUI TASK FORCE IN
MARICOPA.  I HEARD A REPORT OF AN DEPUTY INVOLVED IN A SHOOTING IN CASA GRANDE
TO I RESPONDED.  A TACTICAL ALERT WAS INITIATED FOR CHARLIE REGION.  I RESPONDED
TO THE INDIAN HILLS AREA AND ASSISTED WITH A DOMESTIC CALL.  AFTER I COMPLETED
THE CALL I RESPOND TO THE SCENE OF THE SHOOTING AT 19005 W MESCALERO DRIVE.

I WAITED FOR THE REMAINDER OF THE PCSO VCU UNIT TO RESPOND WITH THE FARO
INSTRUMENT.  AS SOON AS WE WERE GIVEN CLEARANCE FROM HOMICIDE DETECTIVES WE
COMPLETED THE SCAN OF THE AREA.

NOTHING FURTHER

CASE STATUS
```

12/18/23

DEFS_Obregon 000030

## Supplement

DR#: 230316206   WRITTEN BY: I. INIGUEZ 2177
SUPPLEMENT


CASE TYPE & ARS CODES:
INFORMATION


ATTACHMENTS:
NONE


NARRATIVE:
ON O3-16-2023 I WAS WORKING MY REGULAR SCHEDULED PATROL SHIFT IN MY FULLY MARKED
PATROL VEHICLE AND WEARING MY ISSUED PATROL UNIFORM. AT APPROXIMATELY 1901 HOURS
I HEARD DEPUTY B. GIBSON ADVISE THAT HE WAS INVOLVED IN AN OFFICER INVOLVED
SHOOTING AND AT APPROXIMATELY 1903 HOURS I RESPONDED TO THE LOCATION OF W
MESCALERO DR & N HUALAPAI DR LOCATED IN CASA GRANDE, AZ. I ARRIVED ON SCENE AT
APPROXIMATELY 1915 HOURS AND APPROACHED THE SCENE.

WHILE AT THE SCENE I OBSERVED THAT THE SCENE WAS ALREADY SECURED AND CLOSED OFF
BY POLICE TAPE AND SAW THAT MEDICAL PERSONELL WERE RENDERING AID TO THE PATIENT.
WITHOUT CROSSING INTO THE SCENE I WAS ASKED TO REMAIN IN THE AREA AND PROVIDE
SECURITY DUE TO THE PATIENTS FAMILY IN THE AREA. I STOOD NEAR DEPUTY GIBSON'S
PATROL VEHICLE IN FRONT OF THE RESIDENCE WHERE THE SHOOTING OCCURRED. THERE WAS
A YOUNG FEMALE AT THE LOCATION WHO ADVISED THAT SHE LIVED AT THE RESIDENCE WHERE
THE SHOOTING HAPPENED AND DEMANDED SHE BE ALLOWED INTO HER PROPERTY. I ADVISED
HER THAT AT THIS TIME IT WAS A CRIME SCENE AND THAT SHE WAS NOT ALLOWED TO CROSS
THE TAPE TO ACCESS HER RESIDENCE.

THE YOUNG FEMALE BECAME VERY IRRITATED AND BEGAN TO CURSE AND THREATEN TO TAKE
MY JOB ALONG WITH OTHER OFFICERS ON SCENE THAT WERE ALSO IN THIS CONVERSATION.
AT THIS TIME I IGNORED THE FEMALE ONCE I REALIZED THAT SHE WAS UNABLE TO HAVE A
FORMAL CONVERSATION. AT APPROXIMATELY 2023 HOURS I FINISHED MY DUTIES AND
CLEARED OFF THE CALL AND RETURNED TO MY REGULAR PATROL DUTIES.

CASE STATUS: ACTIVE

12/18/23

DEFS_Obregon 000031

## Supplement

```
DR#    230316206         WRITTEN BY:  T. HELIN
```

```
CASE TYPE & ARS CODES:
Officer Involved Shooting
```

```
SUPPLEMENTAL NARRATIVE:
On Thursday 03/16/23 I was in the City of Maricopa where I was participating in
DUI Taskforce focused on patrolling the area of the City of Maricopa for
impaired drivers.
```

```
Shortly after 1900 hours PCSO Deputy B. Gibson transmitted he needed emergency
back-up via his radio and moments later PCSO Dispatch advised the heard Deputy
Gibson advise "998/999"meaning there were shots fired and he was in a critical
situation requiring several more units. I began to respond to the area. As I did
so Deputy Gibson continued to provide updates to include a hostile crowd was
gathering.
```

```
Upon my arrival I went to the area of 19005 W. Mescalero Drive in Casa Grande
which is where Deputy Gibson and the suspect were. The scene was secured and I
stood by near the caution tape to ensure medical personnel were able to conduct
their duties unhindered. Particularly I watched Mariah Brady who was heckling
Deputies and medical staff. Mariah wanted to gain access past the caution tape
and into the yard of this residence and was told no several times.
```

```
I stood by in this area until Mariah had left and I was relieved. Shortly after
I left the scene checking out with an outer scene crime log.
```

```
I assisted with patrol calls in the "Charlie Region" for a a few hours before
going off duty.
```

```
CASE STATUS:
Turned over to detectives on-scene.
```

12/18/23

DEFS_Obregon 000032

## Supplement

```
DR# 230316206              WRITTEN BY: DEP. A. FORNEY #2392
SUPPLEMENT
```

CASE TYPE: SEE ORIGINAL REPORT

NARRATIVE:

ON 03/16/2023, I WAS RIDING WITH DEP. A MILLER #2658 AS HIS FIELD TRAINING
DEPUTY. AT APPROXIMATELY (APPROX.) 1901 HOURS, I HEARD DEPUTY B. GIBSON #2366
NOTIFY DISPATCH THAT HE HAD BEEN INVOLVED IN A SHOOTING.

I INSTRUCTED DEP. MILLER TO PROCEED TO DEP. GIBSON'S LOCATION, NEAR WEST
MESCALERO DRIVE AND NORTH HUALAPAI DRIVE, OUTSIDE THE CITY OF CASA GRANDE.

WE ARRIVED ON SCENE AT APPROX. 1930 HOURS AND WERE IMMEDIATELY INSTRUCTED BY LT.
G. KINDSVATER #1461 TO RETURN TO PATROL DUTIES AND START TAKING CALLS IN THE
REGION.

THIS CONCLUDES MY INVOLVMENT IN THIS CASE.

CASE STATUS: CLOSED

12/18/23

DEFS_Obregon 000033

## Supplement

DR# 230316206              WRITTEN BY: Deputy Abbiatti #2519

SUPPLEMENT

CASE TYPE: See original report

NARRATIVE:

On 3/16/23, at approximately 1901 hours, I heard Deputy B. Gibson #2366 notify dispatch that he had been involved in a shooting.

I responded to Deputy Gibson's location near Mescalero Drive and Hualapai Drive, outside of the city of Casa Grande.

I arrived on scene at approximately 1930 hours and was immediately instructed by Lieutenant Kindsvater #1461 to return to patrol duties within the Charlie region.

This concludes my involvement in this case.

CASE STATUS: Closed

12/18/23

DEFS_Obregon 000034

## Supplement

DR#   230316206                WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Carolyn Buechler Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394
contacted me regarding an officer-involved shooting at 19005 West Mescalero
Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to
assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the
neighbors in the area to see if they had seen or heard anything about the
incident. At approximately 2129 hours, I spoke with Carolyn Buechler at ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ about the incident.

Carolyn said she did not hear any gunshots, but her daughter Jakie Buechler had
heard them. Carolyn said her daughter was asleep because she had to get up early
for work. Carolyn said she would let Jackie know that detectives wanted to talk
to her about the incident. Carolyn said Jackie gets off work at 1800 hours. I
asked Carolyn if she had any surveillance cameras on her property she replied
no.

CASE STATUS:    Active

12/18/23

# Supplement

DR#   230316206                 WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Patricia Luna Interview
Jesse Guiterez Sr Interview
Jesse Guiterez Jr Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394
contacted me regarding an officer-involved shooting at 19005 West Mescalero
Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to
assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the
neighbors in the area to see if they had seen or heard anything about the
incident. At approximately 2135 hours, I spoke about the incident with Patricia
Luna, Jesse Guiterez Sr and Jesse Guiterez Jr at ███████████████████

Patricia said she was in the kitchen getting ready to eat dinner she heard
several gunshots. At first, she thought it was her son's video game but then
realized it came from outside the residence. I asked Patricia how many shots she
heard; she replied five, and they sounded high-powered. I asked Patricia if she
heard any voices she replied no. I asked Patricia if she had gone outside; she
replied yes but did not see anything.

Jesse Sr said he was in the kitchen getting ready to eat dinner when he heard
five rapid gunshots. I asked Jesse Sr if he went outside; he replied yes and saw
a deputy telling a female to get back. I asked Jesse Sr. how long after the
shots were fired, and he heard the deputy telling the female to get back; he
said approximately 5 minutes. I asked Jesse Sr if he had any surveillance
cameras on the property he replied no.

Jesse Jr said he was in his bedroom playing video games when he heard seven to
nine gunshots. I asked Jesse Jr if she saw anything he replied no. I asked Jesse
Jr if he went outside to see what was happening he replied no. I asked Jesse if
he had heard anything else; he replied after the shots he heard, "Michael were
trying to help you," and a female was crying.

CASE STATUS:   Active

12/18/23

## Supplement

DR#   230316206                  WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Gabriel Silva Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394 contacted me regarding an officer-involved shooting at 19005 West Mescalero Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the neighbors in the area to see if they had seen or heard anything about the incident. At approximately 2144 hours, I spoke to Gabriel Silva about the about the incident at ████████████████████.

Gabriel said he was not at home at the time of the incident. Gabriel said when they arrived home there were already several law enforcement officers on scene. I noticed the surveillance cameras mounted on his residence and I asked if they were operational. Gabriel said he is remodeling his residence in the surveillance system is currently disconnected.

CASE STATUS:   Active

12/18/23

DEFS_Obregon 000037

## Supplement

DR#   230316206                    WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Brandon Chapman Interview
Tiffany Chapman Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394 contacted me regarding an officer-involved shooting at 19005 West Mescalero Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the neighbors in the area to see if they had seen or heard anything about the incident. At approximately 2147 hours, I spoke with Brandon Chapman and Tiffany Chapman at ███████████████████ about the incident.

Brandon said he was in his bedroom when he saw red and blue police lights drive down the street in front of his residence. Brandon looked out the window and saw Mikey on a red dirt bike, and he rammed into the neighbor's fence with the motorcycle's front tire. I asked Brandon how he knew Mikey he replied that he was DJ's cousin, a family friend. After a few minutes of talking between Mikey and Deputy Gibson #2366, he saw Mikey attempting to run from Deputy Gibson. Brandon said he did not see but heard gunshots because he stopped looking out the window when Mikey took off running from the deputy.

After a few minutes, Brandon went outside and stood on the front porch; that is when he heard Deputy Gibson say, "Don't reach for the gun." Brandon said he approached Deputy Gibson and asked him if he was OK and if he needed any help. Brandon said he saw Deputy Gibson getting his first aid kit and asked if he could hold his flashlight. Before they approached Mikey, Deputy Gibson told Mikey, "I want to help you. Don't reach for the gun." Shortly after Deputy Gibson began rendering aid to Mikey, other law enforcement officers arrived and relieved Brandon. I asked Brandon if his residence had any surveillance cameras he replied no.

Tiffany said she was in the bedroom with her husband, Brandon, when they saw red and blue police lights drive down the street in front of their residence. Tiffany said she looked out the window with Brandon and saw Michael Obergon riding a red dirtbike motorcycle. Michael rammed the driveway gate to the neighbor's residence with the front tire of the motorcycle. I asked Tiffany how she knew Michael; she replied that he was DJ's brother, a family friend. After a few minutes of Michael talking with Deputy Gibson, she saw Michael attempting to run from the deputy, but he tripped and fell. Tiffany said she stopped watching becase she figured Michael would be getting arrested.

12/18/23

Tiffany said she heard four gunshots coming from the direction of Michael and Deputy Gibson. Tiffany said she went outside with her husband, and that is when she heard Deputy Gibson say, "Don't reach for the gun." When Brandon went to check on the deputy, she stayed in her yard. Tiffany said a young girl that lives where Michael was attempting to enter was yelling at the deputy because he had shot Michael shortly after that other law enforcement had arrived.

CASE STATUS:    Active

12/18/23

DEFS_Obregon 000039

## Supplement

```
DR# 230316206              WRITTEN BY: DEP. A. MILLER #2658
SUPPLEMENT

CASE TYPE: SEE ORIGINAL REPORT

NARRATIVE:

ON 03/16/2023, I WAS CONDUCTING A VEHICLE ACCIDENT INVESTIGATION. AT
APPROXIMATELY (APPROX.) 1901 HOURS, I HEARD DEPUTY B. GIBSON #2366 NOTIFY
DISPATCH THAT HE HAD BEEN INVOLVED IN A SHOOTING.

I PROCEEDED TO DEP. GIBSON'S LOCATION, NEAR WEST MESCALERO DRIVE AND NORTH
HUALAPAI DRIVE, OUTSIDE THE CITY OF CASA GRANDE.

I ARRIVED ON SCENE AT APPROX. 1930 HOURS AND WERE IMMEDIATELY INSTRUCTED BY LT.
G. KINDSVATER #1461 TO RETURN TO PATROL DUTIES AND START TAKING CALLS IN THE
REGION.

THIS CONCLUDES MY INVOLVEMENT IN THIS CASE.

CASE STATUS: CLOSED
```

12/18/23

DEFS_Obregon 000040

# Supplement

DR#   230316206                  WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Samantha Plummer Interview
Wade Putt Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394 contacted me regarding an officer-involved shooting at 19005 West Mescalero Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the neighbors in the area to see if they had seen or heard anything about the incident. At approximately 2207 hours, I spoke with Samantha Plummer at ██████ ████████████████ about the incident.

Samantha said she was in the house when her husband said that there was a police car outside the residence. Samantha looked out the window and saw a deputy talking to a guy wearing a brown hat. Samantha walked away from the window, and that is when she heard five gunshots. Samantha returned to the window and observed the deputy crouching beside his vehicle. Samantha said she heard the deputy say, "Don't reach for the gun." Samantha said she saw her neighbor from across the street jump the fence to help the deputy.

Wade said that when his son-in-law said there was a police officer outside their residence, he was looking out the front door to the residence. Wade said the front door was open, but the security door was closed. He could see the deputy talking to someone but could not see whom the deputy was talking to. Wade said he heard the deputies say three times, "Drop the gun." Wade said he heard five gunshots. After the five gunshots, Wade said he heard the deputy say, "Don't reach for the gun." I asked Wade if he had seen who was shooting or just heard it; he replied that he had just heard it.

I observed a ring camera by the residence's front door and a surveillance camera mounted at the corner of the residence. I asked Wade if the cameras were operational; he replied yes, but I don't remember the password, but I can get it if you need it. I told Wade we would need to see if his surveillance cameras captured anything. I gave wade business card with my contact information and told him to call me when he can access his surveillance system.

On March 20, 2023, I received a telephone call from Wade, letting me know he could access his surveillance system. I recovered footage from the incident and placed it onto a USB drive. I turned the USB drive over to Detective Joel Bonucci #877. See Detective Bonucci's police report for further detailed information.

12/18/23

DEFS_Obregon 000041

CASE STATUS:    Active

12/18/23

DEFS_Obregon 000042

## Supplement

DR#: 230316206                    WRITTEN BY: Sgt. J. Sanchez #1394

SUPPLEMENT

CASE TYPE & ARS CODES:            Officer Involved Shooting

NARRATIVE:

On 3/16/23, I was the on call Sergeant for The Criminal Investigations Bureau, when I received information of an officer involved shooting, regarding PCSO.  I later contacted Robbery/Homicide Detective J. Bonucci #877 and requested his units assistance.

While en-route to the officer involved shooting, I was re-directed to retrieve the OIS Gun from the assigned lock box at the main Sheriff's Office in Florence.

Upon arrival at the Sheriff's Office, I retrieved a Glock 17 handgun, with three separate magazines, each loaded with 17 rounds of 9mm ammunition and one additional separate 9mm round.  I later arrived at the Casa Grande Substation, where I met with Det. Bonucci #877, who took custody of the handgun and ammunition.

This concluded my involvement in this case.

CASE STATUS:

See case detective's report for status.

12/18/23

DEFS_Obregon 000043

## Supplement

DR#   230316206                    WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Christopher Rhodes Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394 contacted me regarding an officer-involved shooting at 19005 West Mescalero Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the neighbors in the area to see if they had seen or heard anything about the incident. At approximately 2219 hours, I spoke with Christopher Rhodes at ███ ███████████████████ about the incident.

Christopher said he was sitting on his back patio when he heard two gunshots. Christopher said he heard someone say, "Put down the gun," and then there were five to six more gunshots. Christopher was unable to see the event because a structure blocked his view. The only thing he could see was the flashing lights from the police vehicle. Christopher was surprised at how fast the responding units arrived on the scene. Christopher said he did not leave his back porch.

I asked Christopher if his parents had heard anything; he replied yes, but they were sleeping now. Christopher identified her parents as Margaret Rhodes and Leonard Rhodes. I asked Christopher if he had any surveillance cameras; he replied yes, but they are not very good; you can't even see the street with them.

CASE STATUS:    Active

12/18/23

## Supplement

DR#   230316206                 WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Billy Leiva Interview
Donna Pacion Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394
contacted me regarding an officer-involved shooting at 19005 West Mescalero
Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to
assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the
neighbors in the area to see if they had seen or heard anything about the
incident. At approximately 2227 hours, I spoke with Billy Leivas and Donna
Pacion at ███████████████████ about the incident.

Billy said he had been home all night watching television and heard nothing. I
asked Billy if he heard any gunshots, people yelling, screaming anything like
that he replied no. I asked Billy if anybody else was in residence he replied
yes, my girlfriend, Donna. I asked Billy if I could talk to Donna about the
incident.

Donna said she was in the master bedroom when she heard gunshots. Donna said she
did not see anything because something was blocking her window. I asked Donna
how many gunshots she heard; she replied four or more. I asked Donna if she
heard any voices she replied no because I had the television on. I asked Donna
if there were any surveillance cameras on the residence she replied no

CASE STATUS:   Active

12/18/23

DEFS_Obregon 000045

## Supplement

DR#   230316206                WRITTEN BY:   Detective Keith Charles #2408

SUPPLEMENT:
Kenyan Bower Interview
Kathy Bower Interview

CASE TYPE:
Officer Involved Shooting

ATTACHMENTS:
None

EVIDENCE:
None

NARRATIVE:

On March 16, 2023, at approximately 1945 hours, Sergeant J. Sanchez #1394 contacted me regarding an officer-involved shooting at 19005 West Mescalero Drive Casa Grande. Sergeant Sanchez requested that I respond to the scene to assist the Pinal County Sheriff's Office Homicide Unit with the investigation.

Upon my arrival, Detective Fender #1604 and I were instructed to speak with the neighbors in the area to see if they had seen or heard anything about the incident. At approximately 2241 hours, I spoke with Kenyan & Kathy Bower at ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ about the incident.

Kenyan said he was watching television when he heard gunshots. Kenyan went outside and stood on his porch; that is when he heard the deputy say, "Don't reach for your gun," and then four gunshots. Kenyan said he saw a guy fall to the ground. Kenyan also saw a neighbor jump the fence to help the deputy. Where the incident occurred, Kenyan said a female was yelling at the deputy. Shortly after that, other law enforcement officers arrived on scene.

Kathy said she was eating and thought somebody had knocked on their front door. Kathy did not realize what she heard or gunshots. I asked Kathy if she had seen anything she replied no; I stayed in the house. I asked Kathy if there were any surveillance cameras on the residence she replied no.

CASE STATUS:   Active

12/18/23

## Supplement

```
DR# 230316206          WRITTEN BY: J. BENTRUP #2648
SUPPLEMENT

CASE TYPE: SEE ORIGINAL REPORT

NARRATIVE:

ON 03/16/2023, I WAS RIDING WITH DEPUTY WILKINSON #2657 AS HIS FIELD TRAINING
DEPUTY. AT APPROXIMATELY 1901 HOURS, I HEARD DEPUTY GIBSON #2366 NOTIFY DISPATCH
THAT HE HAD BEEN INVOLVED IN A SHOOTING.

I INSTRUCTED WILKINSON TO PROCEED TO GIBSON'S LOCATION, NEAR WEST MESCALERO
DRIVE AND NORTH HUALAPAI DRIVE, OUTSIDE THE CITY OF CASA GRANDE.

WE ARRIVED ON SCENE AT APPROXIMATELY 1930 HOURS AND WERE IMMEDIATELY INSTRUCTED
BY LIEUTENANT KINDSVATER #1461 TO RETURN TO PATROL DUTIES AND START TAKING CALLS
IN THE REGION.

THIS CONCLUDES MY INVOLVEMENT IN THIS CASE.

CASE STATUS: CLOSED
```

12/18/23

DEFS_Obregon 000047

## Supplement

```
DR# 230316206              WRITTEN BY: C.WILKINSON #2657
SUPPLEMENT

CASE TYPE:

SEE ORIGINAL REPORT

NARRATIVE:

ON 03/16/2023, I WAS ASSISTING DEPUTY MILLER #2658 WITH A VEHICLE ACCIDENT
INVESTIGATION. AT APPROXIMATELY 1901 HOURS, I HEARD DEPUTY GIBSON #2366 NOTIFY
DISPATCH HE WAS INVOLVED IN A SHOOTING.

I PROCEEDED TO DEPUTY GIBSON'S LOCATION, NEAR WEST MESCALERO DRIVE AND NORTH
HUALAPAI DRIVE, OUTSIDE THE CITY OF CASA GRANDE.

UPON ARRIVAL, I WAS IMMEDIATELY INSTRUCTED BY LIEUTENANT KINDSVATER #1461 TO
RETURN TO PATROL DUTIES IN THE REGION.

THIS CONCLUDES MY INVOLVEMENT IN THIS CASE.

CASE STATUS:

CLOSED.
```

12/18/23

DEFS_Obregon 000048

## Supplement

```
DR# 230316206              WRITTEN BY:  CRIME SCENE TECHNICIAN K. FALES #2166
03/20/2023

INCIDENT:       OFFICER INVOLVED SHOOTING

ATTACHMENTS:    DRY ROOM "IN USE" FORM

DECEDENT:

MICHAEL BRANDON OBREGON ███████████
███████████████████████

DEPUTY:

DEPUTY B. GIBSON #2366
971 NORTH JASON LOPEZ CIRCLE; BLDG C
FLORENCE, ARIZONA 85132

VEHICLE:

2009 HONDA MOTORCYCLE ( VIN:  JH2MD37549K000908)

EVIDENCE LIST:

2166-1          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-2          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-3          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-4          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-5          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-6          EXPENDED CARTRIDGE CASING, F C 9MM LUGER (19005 W MESCALERO DR)

2166-7          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-8          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-9          EXPENDED CARTRIDGE CASING, WIN 9MM LUGER (19005 W MESCALERO DR)

2166-10          EXPENDED CARTRIDGE CASING, F C 9MM LUGER (19005 W MESCALERO DR)

2166-11          SMITH & WESSON SD40 VE HANDGUN, S/N: HEA6467 (19005 W MESCALERO
DR)

2166-11A      LIVE CARTRIDGE, WIN 40 S&W (MAGAZINE OF 2166-11)

2166-12          WALLET WITH PERSONAL CONTENTS (19005 W MESCALERO DR)

2166-13          SUNGLASSES (19005 W MESCALERO DR)

2166-14          PROJECTILE (19005 W MESCALERO DR)

2166-15          US CURRENCY, $8.15 (19005 W MESCALERO DR)

2166-16          LUCKY BRAND UNDERWEAR (19005 W MESCALERO DR)
```

12/18/23

DEFS_Obregon 000049

```
2166-17          RBX SWEATPANTS (19005 W MESCALERO DR)

2166-18          GEORGE BLUE JEANS (19005 W MESCALERO DR)

2166-19          CARHARTT SWEATSHIRT (19005 W MESCALERO DR)

2166-20          HANES TANK TOP (19005 W MESCALERO DR)

2166-21          HANES T-SHIRT (19005 W MESCALERO DR)

2166-22          TIMBERLAND BELT (19005 W MESCALERO DR)

2166-23          JUSTIN COWBOY BOOT (19005 W MESCALERO DR)

2166-24          FOX BASEBALL CAP (19005 W MESCALERO DR)

2166-25          PERSONAL EFFECTS (POCKET OF 2166-18)

2166-26          MARIJUANA (POCKET OF 2166-18)

2166-27          ADIDAS BACKPACK WITH MISC ITEMS (19005 W MESCALERO DR)

2166-28          GLASS PIPE (x2) (INSIDE 2166-27)

2166-29          APPLE IPHONE (POCKET OF 2166-18)
```

NARRATIVE:

On 03/16/2023 at approximately 1911 hours, Detective A. Converse #1686 contacted me and advised of an officer involved shooting at West Mescalero Drive and North Hualapai Drive, Casa Grande, Arizona and my response was requested to process the scene. Detective Converse #1686 advised a briefing would be held at the above intersection once all investigative personnel arrived on scene. I advised I would get ready and be en route. During this time, I was currently off duty for the Pinal County Sheriff's Office (PCSO) Crime Scene Unit.

At approximately 2053 hours, I arrived on scene where I met with several personnel from the Pinal County Sheriff's Office. A briefing was held by Sergeant M. Ransom #2208 who advised Deputy B. Gibson #2366 was on a field interview with Michael Obregon and a short time later Deputy Gibson #2366 relayed "shots fired" to the Pinal County Communications Center over the radio. Please refer to the Computer Aided Dispatch (CAD) comments and case agent's report for further information regarding specific details. It was determined my role would be to photographically document the scene, decedent, and any/all evidence located.

At approximately 2206 hours, I began to capture overall photographs of the scene. I observed the scene had been closed off with yellow in color "SHERIFF'S LINE DO NOT CROSS" tape extending from north to south across West Mescalero Drive at the intersection of West Mescalero Drive and North Hualapai Drive and more yellow in color "SHERIFF'S LINE DO NOT CROSS" tape extending from north to south across West Mescalero Drive just east of 19005 West Mescalero Drive. I observed a fully marked PCSO vehicle and a fully marked Casa Grande Police Department (CGPD) vehicle parked within the yellow in color crime scene tape east of 19005 West Mescalero Drive. I captured overall exterior photographs of both of the above mentioned vehicles. The first vehicle can be described as a fully marked PCSO Ford F150 bearing Arizona government plate "B8A 7LH" with a

12/18/23

fleet identification number of "23527" and the second vehicle can be described as a fully marked CGPD Chevrolet Tahoe bearing Arizona government plate "G 671HN" with a fleet identification number of "2159".

At approximately 2220 hours, I captured overall photographs of West Mescalero Drive beginning east of 19005 West Mescalero Drive moving west. As I continued west, I observed the decedent was covered with a blue in color blanket lying in an east to west position within the chain link fence of 19005 West Mescalero Drive and orange in color traffic cones were northwest of the decedent outside of the chain link fence on the south dirt shoulder of West Mescalero Drive. I also observed a red in color motorcycle bearing vehicle identification number (VIN) "JH2MD37549K000908" northeast of the decedent parked in a southeasterly to northwesterly position. Upon further inspection, the orange in color traffic cones were used by patrol deputies prior to our arrival to mark expended shell casings and a handgun. Once overall photographs were captured prior to any manipulation, evidence placards were placed where the orange in color traffic cones were and next to additional evidence located. I then re-captured overall, mid-range and close up photographs. The evidence placards denoted the following:

"1"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-1)
"2"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-2)
"3"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-3)
"4"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-4)
"5"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-5)
"6"- F C, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-6)
"7"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-7)
"8"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-8)
"9"- Winchester, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-9)
"10"- F C, 9mm Luger expended cartridge casing located on the south dirt shoulder of West Mescalero Drive in front of 19005 West Mescalero Drive (2166-10)
"11"- Smith & Wesson SD40 handgun, S/N: HEA6467 located near the north gate along the north fence of 19005 West Mescalero Drive (2166-11)
- Live cartridge, Winchester, 40 S&W from the magazine of 2166-11 (2166-11A)
"12"- Wallet with personal effects and $1.00 US Currency located north of the decedent (2166-12, 15)
"13"- Sunglasses located near the north gate along the north fence of 19005 West Mescalero Drive (2166-13)
"14"- Projectile located south of the decedent in the dirt (2166-14)
"15"- Bullet strike in the dirt south of the decedent
"16"- Bullet strike in the dirt south of the decedent
"17"- Bullet strike in the dirt south of the decedent
"18"- Lucky Brand underwear, RBX sweatpants, George blue jeans, Carhartt sweatshirt, Hanes tank top, Hanes t-shirt, Timberland belt, a left foot Justin cowboy boot and Fox baseball cap located under and west of the decedent (2166-16-24)
      - Personal effects from pant pocket (2166-25)
      - Green leafy substance from pant pocket (2166-26)

12/18/23

DEFS_Obregon 000051

- $7.15 US Currency from pant pocket (2166-15)
"19"- Adidas backpack with miscellaneous items located near the north gate along the north fence of 19005 West Mescalero Drive (2166-27)
- (2) glass pipes from inside of the backpack (2166-28)
"20"- Apple IPhone located in the pant pocket of the decedent (2166-29)

Please refer to the attached photographs and evidence inventory control form(s) in EvidenceOnQ for further information regarding specific details.

At approximately 0125 hours, I captured photographs of measurements from the approximate location of where the decedent was located and where Deputy Gibson #2366 believed he was standing when shot(s) were fired. A complete scene diagram was created based off of a three hundred and sixty (360) degree scan conducted by the Pinal County Traffic Unit patrol deputies using a Faro. Please refer to supplemental reports for further information regarding specific details.

At approximately 0142 hours, I captured overall photographs of the decedent. I observed the decedent's clothing had been cut off prior to our arrival and was lying under him with the exception of a baseball cap still atop his head. The decedent was wearing blue in color latex gloves, black in color socks and one cowboy boot on his right foot. The decedent had multiple tattoos and I observed medical intervention devices attached to the him. While processing the decedent, I observed a circular defect on the top of the decedent's right shoulder, a circular defect in the decedent's right armpit, a contusion in the decedent's left armpit, a circular defect in the decedent's left side, a circular defect in the decedent's front torso, a contusion on the decedent's left thigh and an abrasion on the decedent's forehead. Once the decedent was turned onto his stomach, I observed a circular defect in the decedent's left thigh, two circular defects near the decedent's right shoulder blade and two circular defects on the decedent's left side, back. The decedent was then placed in a white in color body pouch by Pinal County Medical Examiner's Office (PCMEO) Investigator S. Dungan #287.

At approximately 0220 hours, a white in color PCMEO identification band bearing PCMEO case number "23-0281" and "Obregon, Michael" was placed on the decedent's right ankle. The white in color body pouch was then sealed with PCMEO seal number "0006031" by Medical Examiner Investigator Dungan #287 at approximately 0221 hours. Please refer to the attached photographs and autopsy report(s) for further information regarding specific details.

At approximately 0304 hours, I was advised no further investigation was necessary and I turned over evidence items 2166-1-29 to Crime Scene Technician (CST) L. Rabb #2673 for transport to her secure evidence locker located within the Criminal Investigations Bureau (CIB) at the Pinal County Sheriff's Office Headquarters (971 North Jason Lopez Circle, Florence Arizona). Please see CST Rabb's #2673 supplemental report(s) for further information regarding specific details.

This ends my involvement in this case on 03/17/2023.

On 03/20/2023 at approximately 1000 hours, evidence items 2166-1-15, 25-29 were removed from CST Rabb's #2673 secure evidence locker located within CIB and turned back over to me. I was advised evidence items 2166-16-24 were placed into a drying cabinet within the Evidence Unit. This was done to ensure they were completely dry prior to impounding them into the evidence storage.

With the assistance of Detective A. Converse #1686 I transported evidence items 2166-1-15, 25-29 to the Evidence Unit for packaging. Upon arriving in the

12/18/23

Evidence Unit, we removed evidence items 2166-16-24 from the drying cabinet. I captured additional photographs of evidence items 2166-1-29. Once I captured photographs of these evidence items, Detective Converse #1686 and I packaged evidence items 2166-1-29 individually in appropriate packaging. Evidence items 2166-1-29 were then turned over to Evidence Technician C. Brusacoram #2098 for storage at approximately 1455 hours. Please refer to the attached photographs, evidence inventory control form(s) in EvidenceOnQ and supplemental report(s) for further information regarding specific details.

All photographs I captured during this incident have been uploaded into Spillman and are designated under the following property numbers:

430787- Scene photographs (296)
430861- Evidence photographs (76)

This ends my involvement in this case. Should I have further involvement; a supplemental report will be submitted.

Nothing further.


CONCLUSION:   This concluded my involvement in this portion of the case.

12/18/23

DEFS_Obregon 000053

## Supplement

```
DR#: 230316206              WRITTEN BY: LT. APARICIO # 1299
SUPPLEMENT

CASE TYPE & ARS CODES:
OFFICER INVOLVED SHOOTING

ATTACHMENTS:
N/A

NARRATIVE:

ON 3.16.23 AT 1906 HOURS, I RECEIVED AN E MAIL NOTIFICATION THAT AN OFFICER
INVOLVED SHOOTING OCCURRED IN CASE GRANDE.  I TURNED ON MY MDC AND LEARNED THAT
AN OFFICER INVOLVED SHOOTING OCCURRED AT W. MESCALERO AND HUALAPAI DRIVE IN CASA
GRANDE.   AT 1916 HOURS, I RESPONDED IN WRITING ON THE CAD VIA MY MDC THAT I
COPIED THE TRAFFIC AND WAS DEPLOYING THE PCSO ROBBERY/HOMICIDE TEAM.

I RESPONDED TO THE SCENE AND ARRIVED AT 2043 HOURS. WHILE ON SCENE I WORKED IN A
SUPERVISORY ROLE WHILE THE PCSO ROBBERY/HOMICIDE TEAM CONDUCTED THEIR
INVESTIGATION. I REMAINED ON SCENE UNTIL COMPLETION.

I CLEARED THE SCENE AT 0330 HOURS.

THIS CONCLUDES MY INVOLVEMENT IN THIS CASE.

CASE STATUS:
CLOSED
```

12/18/23

DEFS_Obregon 000054

## Supplement

DR#: 230316206          WRITTEN BY: Detective R. Gonzales #1893
SUPPLEMENT

CASE TYPE & ARS CODES:

Deputy Involved Shooting

ATTACHMENTS:

911 Recording Reproduction Request

EVIDENCE:

1893-1 CD containing radio traffic channel #1
1893-2 CD containing radio traffic channel #1 with silences
1893-3 CD containing radio traffic channel #5
1893-4 CD containing radio traffic channel #5 with silences

DEPUTY:

Deputy Brady Gibson #2366
▇▇▇▇▇▇▇▇▇▇▇
971 N. Jason Lopez Cir., Florence, AZ 85132

DECEDENT:

Michael Brandon Obregon
DOB: ▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

OTHER PERSON(S):

Mariah G. Brady
DOB: ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

Meagan Renee Brady
DOB: ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

Arianna Rai Brady
DOB: ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

Allison Nicole Obregon
DOB: ▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇

12/18/23

DEFS_Obregon 000055

NOTIFICATION:

On March 16, 2023, I was assigned to the Pinal County Sheriff's Office (PCSO), Criminal Investigations Bureau, Robbery / Homicide Unit.  On this day at approximately 1921 hours, while assigned and acting in this capacity, Detective Bonucci #877 contacted me telephonically and reported the PCSO was involved in a shooing in the area of W. Mescalero Dr. and N. Hualapai Dr. in Casa Grande, AZ.  Detective Bonucci advised the PCSO Robbery / Homicide Unit was assuming the case and requested I respond to the command post located at the above-mentioned intersection to assist with the investigation.

BRIEFING:

On March 16, 2023 at approximately 2057 hours, I arrived at the command post and learned the following through briefing provided by Sergeant Ransom #2208.  On March 16, 2023 at approximately 1901 hours, Deputy Gibson #2366 self-initiated a field interview call for service with Mr. Michael Obregon in the front yard / curtilage of 19005 W. Mescalero Dr., Casa Grande, AZ 85122. Shortly after Deputy Gibson advised the PCSO dispatch of his field interview, Deputy Gibson radioed that shots had been fired and requested emergency backup. It was said there was an open microphone and Deputy Gibson could be heard saying, "drop the gun." Deputy Gibson began rendering medical aid on Michael whom was struck by Deputy Gibson's gunfire.  American Medical Response (AMR) 503, Rural Metro Fire Department (RMFD) 587 arrived on scene after a short time and commenced to take over with rendering medical aid.  At 1930 hours on March 16, 2023, Michael was pronounced deceased by Doctor Nicholas May with Banner Casa Grande Medical Center.

ASSIGNMENTS:

Once the initial information was received through the incident briefing, assignments were given to the assisting PCSO Detectives and Crime Scene Technicians (CST) to complete the investigation.  Detective Bonucci #877 whom was assigned as case Detective tasked Detective McCall #2571 and I with interviewing all persons whom resided at 19005 W. Mescalero Dr., Casa Grande, AZ 85122 and locate and interview the decedents spouse.

SCENE:   19005 W. Mescalero Dr., Casa Grande, AZ 85122.

On March 16, 2057 hours, I arrived at the command post and observed the intersection of N. Hualapai Dr at Mescalero Dr. and N. Scott Dr. at Mescalero Dr. cordoned off with yellow Police tape and staffed by uniformed PCSO Deputies with fully marked patrol vehicles.  The command post was staged on Mescalero Dr. east of N. Hualapai Dr.  The scene was located in front of / on the curtilage of 19005 W. Mescalero Dr., Casa Grande, AZ 85122.  This area was also cordoned off with yellow Police tape.  Within this cordoned off area was a PCSO patrol vehicle #23527 and a Casa Grande Police Department patrol vehicle #2159.

INITIAL INTERVIEW WITH:  Mariah G Brady

On March 16, 2023 at approximately 2229 hours, Detective McCall and I arrived at ███████████████████████ to interview Megan Brady (█████████), Arianna Brady (███████████) and Mariah Brady ███████). D███████ all interviewed Me███████ nna and I interviewe███████ n.  Refer



DEFS_Obregon 000056

to the supplemental report completed by Detective McCall for the most accurate representation of both questions and answers regarding Megan and Arianna's interviews.

At approximately 2241 hours, I conducted a recorded interview with Mariah Brady.  Refer to the recorded interview, in its entirety, for the most accurate representation of both questions and answers.  Below is a synopsis of Mariah's interview.

I told Mariah I was aware that an incident occurred at her residence and then asked for her to explain what occurred.  Mariah reported being located in her bedroom when she heard a motorcycle drive onto her property.  Because her family owns motorcycles, she disregarded it; however, shortly after, Mariah observed "him" drive the motorcycle by her bedroom window and proceed into the backyard before hearing the motorcycle turn off.  Mariah later identified "him" as being Michael.  Mariah could not provide a last name for Michael, but advised he was a family friend.  Mariah believed Michael was there either to work on the motorcycle being that the tools were located in the backyard or to inquire if Charlie (unknown last name) was home.  Charlie resided in a trailer that is situated on the property.  Mariah advised at first she thought it was Charlie until she noticed the motorcycle was red in color as it was near her bedroom window.  Mariah said Michael was the only person she knew that operated a red motorcycle.

After approximately one (1) minute, Mariah heard the motorcycle start up and pass by her bedroom.  Mariah heard the motorcycle turn off then the front gate open.  Shortly after, Mariah heard the gate close and the motorcycle turn on for approximately fifteen (15) seconds.  Mariah then observed a patrol vehicle pull up to her residence and heard an Officer yell "Michael please get on the ground." Michael turned off the motorcycle and as he was getting off, she heard (5) gunshots.  Mariah advised as this transpired, she observed and heard the entire incident from her bedroom window.  Mariah indicated from her bedroom window, she had visual to the front where everything occurred, but no visual into the back yard.

Mariah ran outside to inquire as to what occurred and was told by the Deputy that Michael pulled a gun.  Mariah advised when she witnessed what transpired from her bedroom window, she never observed Michael holding a gun, did not observe him throw a gun nor did she observe a gun lying on the ground when she was outside.  Mariah requested for the Deputy to render aid due to Michael "gargling on his own blood."  The Deputy proceeded to his patrol vehicle, activated his lights and sirens then obtained a first aid kit.  The Deputy began cutting Michaels clothes then radioed for backup.

Michael's brother and brother's wife were in the area, but were prohibited to see Michael nor were they being informed as to what occurred.  Mariah proceeded to their location and relayed that Michael was being resuscitated.  After speaking to Michael's family members, Mariah proceeded back to her residence to check on her siblings since her mother was not home.  Due to it being a crime scene, Mariah was not permitted to do so.  Mariah understood and then asked if she could be escorted to a different location.  The Deputy told Mariah no, then "trapped" her into a corner and "basically allowed her to watch Michael die."  A Deputy told Mariah to "shut her damn mouth."  Mariah asked the Deputy who he thought he was to tell her "to shut her damn mouth" and that she had the right to speak.  The Deputy placed his hand on his gun and Mariah responded by asking the Deputy if he was going to shoot her.  The Deputy smirked, shook his head and walked away.  Mariah commented that Michael did not

DEFS_Obregon 000057

possess a gun and believed he was shot for no reason.    Mariah advised the Deputies were unprofessional and something needed to be done.

INITIAL INTERVIEW WITH:  Allison Obregon

On March 17, 2023 at approximately 0057 hours, Detective McCall and I arrived at ███████████████████████████.    This address was where Michael and his spouse, Allison Obregon resided.    The purpose for us being at Michael's residence was to speak to Allison.    We had negative contact at the residence.

Detective McCall was able to obtain Allison's telephone number.    Upon telephonic contact, Allison advised she was located at her mother's residence at ████████████████████████ and agreed to speak with us.    We arrived at the ███████.  address at approximately 0139 hours.

Detective McCall conducted the interview with Allison.    Refer to the supplemental report completed by Detective McCall for the most accurate representation of both questions and answers regarding Allison Obregon's interview.

CONCLUSION:

As of authoring this report, I have no further information to report. If I take further action in this investigation, it will be detailed in a supplemental report.

CASE STATUS:

Closed

12/18/23

DEFS_Obregon 000058

## Supplement

DR#: 230316206 WRITTEN BY: Detective Dakota McCall #2571
SUPPLEMENT

CASE TYPE & ARS CODES:
Deputy Involved Shooting

PERSONS INVOLVED:
Deputy Brady Gibson

 n Lopez Circle, Florence, AZ 85132

Michael Brandon Obregon (DECEDENT)
DOB:

Mariah G. Brady
DOB:

Arianna Rai Brady
DOB:

Megan Brady
DOB:

Allison Nicole Obregon (Next of Kin)
DOB:

NARRATIVE:
On March 16th, 2023 at approximately 1913 hours, I responded to the area of
Mescalero Dr. and Hualapai Dr. located in Casa Grande, AZ in reference to a
deputy involved shooting. I was informed that Deputy B. Gibson conducted a
field interview when he asked for immediate backup and advised dispatch of a
deputy involved shooting.

Upon arrival, I observed the area to be secured. I entered the perimeter that
was set up and contacted Sergeant Ransom. I informed Sergeant Ransom I was
available and on scene; however, was waiting for Detective Bonucci who was the
lead investigator.

Once all members of the Criminal Investigations Bureau arrived on scene,
Sergeant Ransom conducted the PCSO major incident briefing. Sergeant Ransom
provided the following information:

Deputy B. Gibson conducted a field interview in front of 19005 W. Mescalero Dr,
Casa Grande, AZ. Deputy Gibson called for immediate backup and indicated he was
involved in an officer involved shooting by airing "913 ... 998".

The suspect was Michael Obregon (11/23/1986) and had a valid full extradition
Department of Corrections parole violation no bond warrant, which had been valid

12/18/23

DEFS_Obregon 000059

since 12/08/2022.

Casa Grande officers were first on scene to assist Deputy Gibson and Sergeant Ransom was second on scene. EMS pronounced Michael deceased at the scene at 1930 hours by Dr. Nicholas May at Banner Casa Grande Hospital.

After Sergeant Ransom was completed with his briefing, Detective Bonucci gave assignments to CIB personnel. Detective Bonucci asked Detective Gonzales and I to interview the homeowner and the two witnesses who had left the scene. Detective Bonucci also indicated to ensure next of kin was notified.

I contacted Megan Brady (03/30/1988) via telephone. I asked Megan if she would be willing to allow detectives to talk to her juvenile child and she stated yes. Megan was extremely worked up and began yelling and arguing with me over the phone. Megan eventually agreed to allow detectives to go to her sister's house where she currently was, located at ███████████████████████████.

Detective Gonzales and I responded to ████████████████████████████████ at approximately 2229 hours and observed who we later identified as Megan standing outside of the residence. I spoke with Megan while Detective Gonzales spoke to Mariah Brady ██████████).

<center>Megan stated the following:</center>

I explained to Megan that Michael is on her property due to him being in the threshold of her fence. I asked Megan if she was okay with Detectives going on her property to complete their investigation. I explained that Detectives would not go into her residence; however, they would enter her backyard area where Michael was located.

Megan stated she does not trust the police department and does not trust the cops. Megan stated she does not know what to do. It was explained to Megan we wanted to get onto her property to process the scene in order to allow her back onto her property. Megan agreed to allow law enforcement onto the threshold of her property; however, stated she did not want law enforcement further than where Michael was.

I began asking Megan questions in regards to her conversation(s) with her daughters. Megan stated she was driving home from work and was in the Phoenix area when her daughter, Mariah, started "speed dialing" her. Megan stated she had 4 missed calls from Mariah. She stated when she called Mariah back, her son, Thomas Honeywell (████████), called her on messenger. Megan stated Mariah did not answer her phone, and as she was hanging up Arianna called her.

Megan stated Arianna told her the cops shot someone in their front yard and she thought it was Michael. Megan stated the girls heard approximately 5 gun shots. She stated Mariah went outside first, and was followed by Arianna. Megan stated Mariah was close to the scene and questioning what happened to the units on scene.

Megan stated the girls told her there were no red and blue lights on when they went outside. Megan stated when Mariah started telling the police to render aid to Michael was when the deputy went to his truck to retrieve his medical bag and turned his red and blue lights on.

Megan stated Mariah told her she heard a motorcycle go into their backyard and pass her window. Mariah heard the bike stop, then turn back on and go back by

12/18/23

her window. Megan stated Mariah then heard the bike stop again and heard the gate, then heard the shots.

Megan stated it is common for Michael to come and go. She stated Michael went to visit Andy Honeywell (the kid's dad) and Charlie who lives in the back of the house often. Megan does not know why Michael was there; however, she thinks he was there to see Andy or Charlie.

Megan stated she has only known Michael since her father died. She stated she talked to Michael the day prior. Megan stated she does not know Michael to carry firearms. Megan stated Michael recently got out of prison and has a baby on the way with his wife.

Megan stated she does not have cameras at her residence; however, her neighbor diagonal to her has cameras, which are pointing in the direction of her property.

I later explained explained to Megan that as soon as she is able to return to her residence, we will let her know.

I ended my interview with Megan and had Detective Gonzales stand with her while I interviewed Arianna.

The following is a summary of Arianna's statement. For the full interview, refer to the recording which was uploaded into DigitalONQ.

Arianna stated the following:

Arianna stated she was home with her sister, Mariah and brother Thomas Honeywell. Arianna stated she was in her room and it was approximately 1900 hours. She stated she was reading when she heard 5 gunshots. Arianna stated she heard yelling as well. She stated she thought it was the neighbors fighting.

Arianna stated she went "out there" to make sure her siblings weren't outside. Arianna stated she and Mariah went outside, and told Thomas to stay inside and get their aunt on the phone. Arianna stated when she went outside, she could not see much because of the connex boxes in their yard. She stated she could not see any lights, sirens or red and blue lights.

Arianna stated when she walked out "there" is when "they" turned it on, referring to lights. Arianna stated she got out of the way of the connex's and that was when she saw the lights turn on and the deputy "radioing in". Arianna stated they did not start CPR until 5 minutes prior to the ambulance getting on scene. Arianna stated it was a blur, but she was watching them try and resuscitate him. Arianna stated she went to the officers on the opposite side of her fence to speak with them. Arianna stated Mariah walked up to Michael Obregon's brother and sister in law who were on the other side of the street. Arianna stated "they" referring to the deputies/officers on scene, where putting up perimeter tape and not allowing Mariah back onto the scene.

Arianna stated she has known Michael for a couple of months. Arianna stated she hears Michael come to her residence often and it was normal for him to come and go.

Arianna stated she was approximately 5 feet away from Michael when he was on the ground before she backed away to give the police space. She stated when she was close to him, she did not see a firearm near him.

12/18/23

Arianna did not have any further information to provide, therefore I concluded my interview with her.

I responded back to 19005 W. Mescalero Dr, Casa Grande, AZ and began trying to locate Michael's wife, Allison Obregon ███████ ).

Detective Gonzales and I responded to ████████████████████████████ at approximately 0057 hours to attempt to locate Allison. This was Allison and Michael's last known address. Detective Gonzales and I had negative contact at the residence.

I was able to contact Allison via telephone and she stated she was at her mom's house, located at ███████████████████████ .

Detective Gonzales and I arrived at ████████████████████████ at approximately 0139 hours to speak to Allison.

The following is a summary of Allison's interview, for the full interview refer to the recording which was uploaded into DIGITALONQ.

Allison stated the following:

Allison stated she is Michael's wife and she had not been told anything. Allison stated the house that the shooting happened at, is next door to her sister in laws, best friends, daughters residence. Allison stated when everything happened, her sister in law got a phone call stating "it looks like Micky is running from someone, he is trying to get into the fence and the cops are behind him". Allison stated she was told all her sister in law heard after that was her friend's daughter screaming "they shot him, they shot him."

Allison stated her sister in law left her residence on Battleford, which is a few streets down the road and saw Michael laying on the ground. Allison stated her sister in law was not physically there at the time of the incident. Allison stated she was on her way home from work from Maricopa. Allison stated she got a phone call from her sister in law, who she referred to as Nichole, and was notified of what was happening.

Allison stated Nichole told her that "they shot him." Allison stated she thinks that the police thought Michael was Charlie, and shot Michael thinking it was Charlie.

Allison stated she had not talked to Michael all day due to her being at work. Allison stated she was aware that Michael was in violation of his parole and had an active warrant. Allison stated Michael would never resist arrest. She stated in November when he violated parole, it was due to a dirty UA. She stated he tested positive for methamphetamine.

Allison stated she did not know if Michael carried firearms/knifes. Allison stated Michael was not her husband, referring to the fact he has changed drastically since they were married. She stated when he came out of prison, he was a completely different person. Allison stated prior to him going to prison he did not use drugs; however, when he got out he was using methamphetamine.

Allison stated Michael gets around on a dirt bike that he got from a friend. Allison stated Michael was paying his friend. When Allison was informed the dirt bike Michael was in possession of was stolen, she stated there is probably a lot she did not know. She stated Michael kept a lot from her.

12/18/23

Allison asked who the Deputy was that was on scene. We informed her we did not know and she stated "was it Gibson?" Allison stated Gibson had contacts with Michael in the past and made threats to him.

We explained the process of what was going to happen with Allison and let her know she would be updated after the autopsy so she could make arrangements.

I concluded my interview with Allison.

Conclusion:
I have no further information to report. If I take further action in this investigation, it will be detailed in a supplemental report.

CASE STATUS: CLOSED

12/18/23

DEFS_Obregon 000063

## Supplement

DR#: 230316206          WRITTEN BY: Det. A. Converse #1686
SUPPLEMENT


CASE TYPE & ARS CODES: Deputy Involved Shooting


ATTACHMENTS: None


NARRATIVE:

On 3-16-2023 at approximately 1915 hours, I was contacted by Homicide Detective Bonucci #877 and advised of a Deputy Involved Shooting that occurred in the Casa Grande AZ area. I was advised that a Pinal County Sheriff's Office Deputy was conducting a field interview with a male subject and during the contact the subject pulled out a gun and pointed it at the deputy and the deputy ultimately shot the subject. The male subject ultimately died as a result of the shooting and the deputy was not injured. I was asked to respond to the scene to assist with this investigation. I advised Detective Bonucci that I would contact the Crime Scene Technicians (CST) and advise them of the call and have them respond.  I was advised the command post would be in the area of North Hualapai Dr and West Mescalero Dr.

I responded to the scene and arrived at approximately 2054 hours. Upon my arrival, I parked at the intersection of N. Hualapai Dr and W. Mescalero Dr. I observed multiple marked and unmarked Pinal County Sheriff's Office vehicles parked at this intersection. On W. Mescalero Dr, I observed more marked patrol vehicles and command post vehicles parked to the west on the roadway.  I noted that W. Mescalero Dr was blocked off with traffic barricades which restricted vehicle access. There were red and blue emergency lights flashing further west which was the intersection of N. Scott Dr and W. Mescalero Dr.  I began walking west on W. Mescalero Dr and noted yellow sheriff's line barrier tape across the roadway and around the front of a residence. I observed additional marked Pinal County Sheriff's Office and Casa Grande Police Department patrol vehicles parked on the roadway.  I observed several orange traffic cones placed in several different places in front of a residence. I also observed a red dirt bike parked in front of the residence and there was a body covered with a gray blanket laying just inside of the residential fence.

I met with additional investigators that responded to the scene to assist with this investigation. A briefing was held with all of the investigators and first responding deputies so all known information could be shared. Sgt. Ransom #S81 provided all of the known information to the investigators at this time. The information provided was that Deputy Gibson #2366 was on a field interview with the suspect identified as Michael Obregon. During the field interview, Deputy Gibson advised of shots fired and the suspect tried to shoot him. There was a dirt bike that Michael was on when he was contacted by Deputy Gibson. There were several expended cartridge casings on the ground and were covered with orange road cones. There was a gun also located on the ground that was marked with orange road cones. Officers with the Casa Grande Police Department were on scene shortly after the shooting occurred and assisted with securing the crime scene to ensure no items of evidence were disturbed. It was determined that Detective Bonucci would be assigned as the case detective

12/18/23

for this case. I was assigned to crime scene processing along with CST Fales #I1. For additional briefing information please refer to Detective Bonucci's report.

I spoke with CST Fales and asked that she begin taking overall photographs of the scene. Once the overall photographs were completed we could then begin marking items of evidence with numbered evidence placards. The Pinal County Sheriff's Office Vehicular Crimes Unit was called to the scene to assist with the scene documentation as well. The Vehicular Crimes Unit was asked to use the FARO 3D scanner to scan the entire scene so we could have a complete and accurate depiction of what the scene looked like. This FARO scan would also allow us to go back and take accurate scene measurements in the "scenetogo" software program. CST Fales and I used evidence placards to mark 20 items of evidence at the scene. These items were all located in front of the residence where this incident occurred. The evidence items are all described and documented in CST Fales report. Please refer to her report for details.

The dirt bike that Michael was on when Deputy Gibson contacted him was parked outside of the gate near the street. I looked for the VIN number on the dirt bike as it did not have any license plate. I located the VIN number in the handle bar stem. The VIN was JH2MD37549K000908. I contacted the Pinal County Dispatch Center and asked that they run a vehicle query on this VIN number. The dirt bike returned as a stolen motorcycle out of the Pinal County Sheriff's Office. This is documented under PCSO DR # 221231063. With this information, I requested the PCSO Evidence tow truck to respond to the scene to take possession of the dirt bike. I asked CST Fales to take photographs of the dirt bike along with the VIN number on the dirt bike. The dirt bike was given evidence item 2329-1.

While the photographs were being taken and the evidence was being collected I took a couple of measurement's to determine the approximate distances of where the deputy believed he was at the time of the shooting and the approximate area as to where the evidence on scene indicated the deputy was at the time of the shooting. The distance from the suspect to where the deputy believed he was standing was approximately 9 feet 6 inches. The distance from the suspect to where the physical evidence indicated the deputy was at the time of the shooting was 16 feet. These measurements were photographed by CST Fales. These measurements can also be recreated using the FARO 3D scans.

The Pinal County Medical Examiner's Office was contacted and Investigator Dungan #287 responded to the scene. Investigator Dungan began her investigation. While examining Michael's body, I observed several pieces of medical intervention devices attached to his body. Michaels clothing had been cut off of him and was laying under his body. Michael had on blue latex gloves on both of his hands. While examining Michael's body, there were several circular defects observed on his body. These defects will be documented and described in the official autopsy report. Michael's body was ultimately placed into a white body bag and the bag was sealed at approximately 0221 hours on 3-17-2023. The body bag was sealed using seal number 0006031. The Pinal County Medical Examiner's Office case number is 23-0281.

Once Michael was turned over to Investigator Dungan the remainder of the physical evidence was collected. The medical equipment and any trash that was left on scene was collected so it could be discarded. The on scene processing was concluded at approximately 0300 hours. At this time, all investigative personnel departed the scene.

12/18/23

Once the on scene investigation was completed I drove back to the Pinal County Sheriff's Office main headquarters in Florence. I assisted CST Rabb #I3 with placing items of evidence into the drying cabinet to dry. The items that were placed into the drying cabinet were the clothing that was collected from the scene that belonged to Michael. The remainder of the evidence was placed into CST Rabb's secured evidence locker. The evidence items will be packaged at a later date.

On 3-20-2023 CST Fales and I packaged all of the evidence that was collected from the scene. The evidence items were all photographed and documented. There were 29 items of evidence that were packaged. The descriptions of each item is documented in the "EvidenceOnQ" evidence system. The evidence items were all turned over to the Pinal County Sheriff's Office Evidence Unit for storage.

This concluded my involvement in this case. I have no further information to report at this time.


CASE STATUS: Closed

12/18/23

DEFS_Obregon 000066

## Supplement

DR#: 230316206              WRITTEN BY: Detective P. Dudish #2034
SUPPLEMENT


CASE TYPE & ARS CODES:
Officer Involved Shooting

ATTACHMENTS:
None

NARRATIVE:
On 03/16/23, I was assigned as a detective with the Pinal County Sheriff's
Office (PCSO) Criminal Investigations Bureau (CIB). My current assignment is
with the Homicide Unit. At approximately 1930 hours, I received telephonic
contact from Detective Bonucci #877 who reported the following. A PCSO Deputy
was involved in a shooting near the area of W. Mescalero Drive and N. Hualapai
Drive in Casa Grande. The other subject involved in this incident was pronounced
deceased at the scene.

I responded to the scene and upon arrival, I observed numerous marked and
unmarked police vehicles present. As I walked into scene towards the command
post, I observed that the area in front of 19005 W. Mescalero had been taped off
with yellow crime scene tape and there were several orange traffic cones present
on the ground. There was also a red motorcycle present near the fence leading
into the property. While at the scene I learned of the following information.
PCSO Deputy Gibson #2366 was on patrol in the area and attempted to conduct a
field interview with a male subject in front of the above mentioned residence.
The male subject pointed a gun at Deputy Gibson and Deputy Gibson shot the
subject who was later identified as Michael Obregon (11/23/86). Deputy Gibson
advised dispatch of an officer involved shooting and requested emergency backup.

During this investigation I remained on scene and assisted Detective Converse
and CST Fales with scene processing and support as well as scene security. See
Detective Converse and CST Fales reports for further details.

This concludes my involvement in this incident.

CASE STATUS:
Closed

12/18/23

DEFS_Obregon 000067

## Supplement

DR# 230316206          WRITTEN BY:  CRIME SCENE TECHNICIAN L. RABB #2673
03/17/2023

INCIDENT:      FIELD INTERVIEW / OFFICER INVOLVED SHOOTING

LOCATION:      WEST MESCALERO DRIVE & NORTH HUALAPAI DRIVE CASA GRANDE, ARIZONA


DECEDENT:
MICHAEL BRANDON OBREGON    ███████████

INVOLVED PARTY:
PINAL COUNTY SHERIFF'S OFFICE DEPUTY GIBSON #2366

EVIDENCE LIST:

2673-1, 2208 HOURS, Black 9mm Glock, 17 Gen 5, 9x19 hand gun. Serial Number:
BVTE467. Duty weapon collected from Deputy Gibson's person at the Pinal County
Sheriff's Office in Casa Grande Arizona.

2673-2, 2208 HOURS, Magazine and 7 cartridges from Deputy Gibson's duty weapon.
(2673-1) Brand: Win Luger 9mm. The magazine had a 17 cartridge capacity.
Collected at the Pinal County Sheriff's Office in Casa Grande Arizona.

2673-3, 2208 HOURS, Single 9mm cartridge from the chamber of Deputy Gibson's
duty weapon (2673-1). Brand: Win Luger 9mm. Collected at the Pinal County
Sheriff's Office in Casa Grande Arizona.

2673-4, 2213 HOURS, Additional magazine from the top pouch on Deputy Gibson's
person, loaded with 17 cartridges. Brand: Win Luger 9mm. The magazine had a 17
cartridge capacity. Collected at the Pinal County Sheriff's Office in Casa
Grande Arizona.

2673-5, 2215 HOURS, Additional magazine from the bottom pouch on Deputy Gibson's
person, loaded with 17 total cartridges. 16 cartridges- Brand: Win Luger 9mm, 1
cartridge Brand: FC Luger 9mm. The magazine had a 17 cartridge capacity.
Collected at the Pinal County Sheriff's Office in Casa Grande Arizona.

2673-6, 1130 HOURS, Jewelry collected at autopsy from the decedent. 1 pair of
clear gem earrings, 1 gold colored necklace with a "NO LIMIT RECORD" charm, 2
silver rings, 1 black faced watch with silver band, 1 red silicon bracelet with
"NOT EVER" on it, 1 green silicon bracelet with "Report Crime" on it and 1 black
necklace with a cross. Collected from the Pinal County Medical Examiner's
Office.

2673-7, 1130 HOURS, Left black sock. Collected from the Pinal County Medical
Examiner's Office at autopsy.

2673-8, 1130 HOURS, Right Brown Cowboy boot, size 10.5 and black sock. Collected
from the Pinal County Medical Examiner's Office at autopsy.

2673-9, 1130 HOURS, Blood Blot x2. Collected from the Pinal County Medical
Examiner's Office at autopsy.

2673-10, 1130 HOURS, Projectile fragment removed from the left thigh. Collected
from the Pinal County Medical Examiner's Office at autopsy.

12/18/23

2673-11, 1130 HOURS, Projectile fragment removed from the right axilla.
Collected from the Pinal County Medical Examiner's Office at autopsy.

2673-12, 1130 HOURS, Projectile fragment removed from the right scapula.
Collected from the Pinal County Medical Examiner's Office at autopsy.

2673-13, 1130 HOURS, Projectile fragment removed from the left upper chest.
Collected from the Pinal County Medical Examiner's Office at autopsy.

2673-14, 1130 HOURS, Projectile fragment removed from the right shoulder.
Collected from the Pinal County Medical Examiner's Office at autopsy.

NARRATIVE:
On 03/16/2023 at approximately 1910 hours, I was contacted telephonically by
Detective Bonucci #877, informing me an officer involved shooting occurred in
Casa Grande Arizona and my presence was requested at the scene.
I arrived on scene at approximately 2050 hours. I was instructed to proceed to
the command unit on scene where the briefing was being held. I was advised
during the briefing, the initial call for service was for a field interview at
W. Mescalero Dr. and N Hualapai Dr. After the briefing it was determined my role
would be to proceed to the Pinal County Sheriff's Office (PCSO) in Casa Grande
and photograph the Deputy involved in the incident and collect any evidence.

At approximately 2100 hours, I proceeded to the PCSO Casa Grande station at 820
E Cottonwood Ln. Bldg. D Casa Grande, Az 85122. I met with Detective Bonucci,
Detective Gay #2329 and Deputy Gibson #2366. Deputy Gibson was with his lawful
representative at this point. I began by taking overall pictures of Deputy
Gibson. I observed Deputy Gibson did not have any visual injuries to his person.
He verbally confirmed he did not have any injuries. I observed Deputy Gibson was
dressed in the standard Pinal County Sheriff's Office deputy uniform of a tan,
collared long sleeved uniform shirt and green BDU pants. Deputy Gibson also had
on a tan ballistic vest with his name "GIBSON" on the front. The word "SHERIFF"
in black lettering in the center, his radio, sewn PCSO badge, Taser, rifle
magazine and knife were also visible on the front of his vest. The back of his
tan ballistic vest had a patch in the center, read "SHERIFF". I observed Deputy
Gibson to have his 9mm service weapon in a thigh holster on the outside of his
right thigh. Deputy Gibson's black duty belt contained his flashlight, handcuffs
and 2 additional loaded 9mm magazine. I confirmed with Deputy Gibson his
appearance at this time was the exact appearance he had at the scene, which he
confirmed. I donned gloves and directed Deputy Gibson to remove his service
weapon from the holster. Detective Bonucci donned gloves and press checked the
firearm which I photographed. Detective Bonucci then placed the black Glock 17
Gen 5 9x19, 9mm handgun (SN: BVTE467) on the table where I photographed it. The
gun at the time of acquisition had a single cartridge in the chamber and 7
loaded cartridges in the magazine. Deputy Gibson also informed the detectives he
loads his 9mm duty weapon with 1 in the chamber and 17 in the inserted magazine.
Deputy Gibson then removed the 2 additional magazines from his duty belt pouch.
I unloaded the cartridges from each magazine and counted them. Both the top and
bottom magazines were loaded with 17 cartridges and were documented to be 9mm
Win Luger cartridges. All of these items were photographically documented and
packaged for evidence as follows:

-2673-1, Black 9mm Glock, 17 Gen 5, 9x19 hand gun. Serial Number: BVTE467.
-2673-2, Magazine and 7 cartridges from Deputy Gibson's duty weapon. (2673-1)
-2673-3, Single 9mm cartridge from the chamber of Deputy Gibson's duty weapon
(2673-1).
-2673-4, Additional magazine from the top pouch on Deputy Gibson's person,

12/18/23

loaded with 17 cartridges.
-2673-5, Additional magazine from the bottom pouch on Deputy Gibson's person, loaded with 17 cartridges.

On 03/17/2023 at approximately 0100 hours, I returned to the scene and assisted Crime Scene Technician (CST) K. Fales #2166 and Detective Converse #1686 with collecting evidence on scene. At approximately 0315 hours, Detective Converse notified me the scene processing was complete. Detective Dudish #2034 and I secured all of the scene evidence in the back of my PCSO Crime Scene vehicle. I traveled back to the Pinal County Sheriff's Office (PCSO) Headquarters. (971 North Jason Lopez Circle, Florence AZ) I arrived at the station and removed all evidence from my truck. All of the scene evidence as well as the evidence collected at the Casa Grande station were secured in the Criminal Investigations Bureau (CIB) evidence room in my evidence locker.

At approximately 0400 hours, Detective Converse and I took all of the Michael Obregon's clothing collected at the scene to the evidence room on the first floor of the Florence PCSO Station. We cleaned the table and covered the table with a sheet of butcher paper. Detective Converse and I donned gloves. We laid butcher paper down inside of the large drying cabinet and on the shelves inside the cabinet. We hung each of the individual clothing items on a hanger and then placed the hanger in the dry cabinet. The boot and items not able to be hung on a hanger were placed on the shelves of the dry cabinet. After each of the items were placed in the cabinet the cabinet was closed and locked. The dry cabinet was then turned on. The knobs were secured with zip ties. Clear tape was placed over both handles and then red evidence security tape was placed on top of the tape and zip ties. The red tape was dated and initialed. I filled out a "Dry Room" form and affixed it to the front of the cabinet. (See CST K. Fales report for further processing information.)

I returned to my office at approximately 0500 hours and conducted my daily duties.

On 03/17/2023 at approximately 1015 hours, Detectives Bonucci, Gay, Fender #1604 and myself proceeded to the Pinal County Medical Examiner's Office. I attended the autopsy of Michael Brandon Obregon. Please refer to the Medical Examiner's report and photographs. After the autopsy, I collected the personal effects of the deceased and transported them back to the Pinal County Sheriff's Office Headquarters. The items were placed in my secure evidence locker in CIB for processing at a later time. The items were documented as follows:

-2673-6, Jewelry collected at autopsy from the decedent. 1 pair of clear gem earrings, 1 gold colored necklace with a "NO LIMIT RECORD" charm, 2 silver rings, 1 black faced watch with silver band, 1 red silicon bracelet with "NOT EVER" on it, 1 green silicon bracelet with "Report Crime" on it and 1 black necklace with a cross

-2673-7, Left black sock.
-2673-8, Right Brown Cowboy boot, size 10.5 and black sock.
-2673-9, Blood Blot x2.
-2673-10, Projectile fragment removed from the left thigh.
-2673-11, Projectile fragment removed from the right axilla.
-2673-12, Projectile fragment removed from the right scapula.
-2673-13, Projectile fragment removed from the left upper chest.
-2673-14, Projectile fragment removed from the right shoulder.

On 03/21/2023 at approximately 0815 hours, I removed all of the evidence items

12/18/23

for this case from my secured evidence locker in CIB. I proceeded to the evidence room on the first floor of the Florence PCSO Station. I processed each of the evidence items for secure storage. The evidence was turned over to the Evidence Technician on duty.

Refer to the attached photographs, supplemental reports and evidence logs in Evidence OnQ for further information regarding specific details.

All photographs I captured during this incident have been uploaded into Spillman and are designated under the following property numbers:

- Photographs from the Station #430732 (46)

CONCLUSION:  This concluded my involvement in this portion of the case.

12/18/23

DEFS_Obregon 000071

## Supplement

```
Departmental Report #230316209                 Date: 03/16/2023
Nature: Supplement, Officer Involved Shooting
Submitted By: Detective J. Bonucci #877

Attachment:      ATF E-Trace Report
            CGPD Report Number 2023-00011039
            Autopsy Report ML23-0281
            AVL Data for Unit PCSO2181
            CAD Report
            Crime Scene Log
            PCMEO Property Form
            Dry Cabinet Form
            PCSO Vehicle Removal Report
            DPS Lab Request
            DPS Lab Report Controlled Substance
            DPS Lab Report Ballistics
            DPS Lab Report Latent
            Neighborhood Canvass Map
            Weather Report
            CGPD Body Cameras
            Video Surveillance Camera


Decedent:      Michael B. Obregon DOB: 11-23-1986
            10877 N Hualapai Drive Casa Grande

Shooting Officer:       Deputy B. Gibson
                971 N. Jason Lopez Florence

Reporting Party:       Deputy B. Gibson


Witness List:
PACION, DONNA LEE: 18880 W. Mescalero Drive 602-810-8716
LEIVAS, BILLY MORAGA: 18880 W. Mescalero Drive 520-560-7181
RHODES, CHRISTOPHER THEODORE: 18899 W. Mescalero Drive 480-307-8687
BOWER, KATHY L: 18929 W. Mescalero Drive 520-895-8771
BOWER, KENYAN LEE: 18929 W. Mescalero Drive 520-251-7586
PUTT, WADE PATRICK: 18960 W. Mescalero Drive 616-594-8501
PLUMMER, SAMANTHA JO: 18960 W. Mescalero Drive 616-886-1991
PUTT, BEVERLY: 18960 W. Mescalero Drive 616-422-0150
CHAPMAN, BRANDON LEE: 18965 W. Mescalero Drive 520-840-2508
CHAPMAN, TIFFANY MARIE: 18965 W. Mescalero Drive 520-840-2495
BRADY, MARIAH G: 19005 W. Mescalero Drive 520-582-8938
GUTIERREZ, JESSE (17 YO): 19035 W. Mescalero Drive 602-708-4820
LUNA, PATRICIA: 19035 W. Mescalero Drive 520-483-1754
GUTIERREZ, JESSE: 19035 W. Mescalero Drive 520-858-2946
BUECHLER, CAROLYN: 19065 W. Mescalero Drive 602-330-8569


Responding:     Detective Gonzales
            Detective Dudish
            Detective Converse
            CST. Rabb
            CST. Fales
            Sgt. JD Sanchez
            Detective Fender
```

12/18/23

DEFS_Obregon 000072

```
                   Detective Charles
                   Detective McCall
                   PCSO Traffic Unit
```

Notification:

On March 16, 2023 at about 1910 hours I received a telephone call from Sgt. JD Sanchez advising a deputy from the Pinal County Sheriff's Office (PCSO) had been involved in an officer involved shooting. The location of the scene was identified as, Pinal Ave near Hualapai Road, Casa Grande Arizona. At about 2050 hours, I arrived on scene at Hualapai and Mescalero. I observed the location of the scene was a neighborhood roadway. The exact scene was located in the driveway of 19005 W Mescalero Drive. The roadway and perimeter east and west of the scene had been cordoned off with Sheriff's Office crime scene tape, yellow in color, and staffed by uniformed Sheriff's Office Patrol Deputies with fully marked patrol vehicles.

Briefing:

The briefing was provided by PCSO Sgt. Ransom. He advised at about 1900 hours PCSO Deputy Gibson transmitted an emergency call for assistance immediately followed by a "Shots Fired" transmission. Next Deputy Gibson advised that one person was down and required medical care. Assets from PCSO and Casa Grande Police Department responded to the scene. Sgt. Ransom advised that the scene was secured and EMS responded to render medical care to Michael Obregon. Sgt. Ransom secured Deputy Gibson and had him removed from the scene and transported to the PCSO substation in Casa Grande. Despite medical intervention, at 1930 hours, Michael Obregon was pronounced deceased by Dr. Nicholas of Banner Casa Grande.

Assignments:

On completion of this briefing scene assignments were determined. Detectives Converse and Dudish were tasked to process the crime scene along with Crime Scene Tech K. Fales. Detectives Fender and Charles were charged with conducting a neighborhood canvass to identify any potential witnesses and collect any available video evidence. Detectives Gonzales and McCall were tasked with interviews and next of kin notification. I was charged as the case agent, which also included the interview of Deputy Gibson. Crime Scene Tech L. Rabb assisted me with the documentation of Deputy Gibson and evidence collection.

Officer/Deputy Documentation:

Deputy Gibson did not report any injuries, nor were any observed. He was clad in a PCSO uniform consisting of a short sleeve silver tan shirt with shoulder patches, a silver tan outer ballistic vest carrier with a soft badge, a black duty belt, and OD green in color 6 pocket pants. In addition, Deputy Gibson wore an OD green in color baseball style hat, which read "Pinal County

12/18/23

DEFS_Obregon 000073

Sheriff".  He was clearly identifiable as a law enforcement officer. CST L. Rabb, photographically documented Deputy Gibson, and the condition of his attire.

Deputy Gibson's department issued .9mm Glock handgun, serial number BVTE467, and two additional magazines, were photographically documented as they were found on his person. Inside the sub-station an ammunition count was conducted, due to the fact that Deputy Gibson discharged his handgun. Deputy Gibson advised he loads his magazines to the 17 round capacity and carries his handgun loaded with 17 rounds plus 1 chambered. Deputy Gibson's handgun was found to be loaded with 7 rounds in the magazine and 1 in the chamber for a total of 8 rounds. Both spare magazines were loaded with 17 rounds. The ammunition was mixed with both PCSO department issued Federal Premium L/E 9mm Luger, and department issued Winchester 9mm Luger range ammunition. All above described observations were photographically documented. Deputy Gibson advised he began his tour with three magazines loaded to capacity plus 1 chambered round (52 rounds). Based on this information Deputy Gibson was missing 10 rounds.

Deputy Gibson's handgun and magazines were collected as evidence. He was issued a replacement department owned Glock 17, 9mm handgun, and three new magazines each loaded to capacity.

Later during the scene processing, 10 expended .9mm cartridge casings would be recovered. The 10 missing rounds from Deputy Gibson and the recovered 10 expended cartridge casings supported that all rounds were/are accounted for.

Walkthrough Interview with Deputy Gibson:

This walk-through interview was conducted in two parts. The first part was conducted at the PCSO Casa Grande substation and consisted of background information. The second part was conducted at the scene of the shooting and consisted of information related to this incident. The walk-through was recorded with a digital audio recorder. It was performed outside of the sight and sound of any and all other persons, except for those present named as: Deputy Gibson, Attorney Denis Fitzgibbons, Pinal County Attorney Jim Heard, and myself. The interview began on March 16, 2023 at 2229 hours.

Deputy Gibson has been a sworn officer with PCSO for 5.5 years. Deputy Gibson did not work as a sworn officer with any other departments. Prior to, and during his first two years with PCSO, Deputy Gibson was a member of the Army National Guard for a total of 6 years. From 2018 to 2019 Deputy Gibson was deployed to a combat zone. Although in a combat zone he did not directly engage in fire fights. Deputy Gibson advised he wears corrective lenses, due to a stigmatism. Deputy Gibson stated his corrected vision is 20/25, and confirmed that he wore his contact lens at the time of this incident.

Deputy Gibson is currently assigned to patrol in the Casa Grande area, Region "C" District, of Pinal County. As of this time in his career he has served in the patrol unit. During his on the job training phase, Deputy Gibson worked in several different regions of Pinal County. Since completing his training he has been exclusively within Region "C". Deputy Gibson is currently working a 40 hour work week on the fourth (swing) shift; from 1600 to 0400 hours. Deputy Gibson advised he likes his shift hours and they do not interfere

12/18/23

DEFS_Obregon 000074

with his normal sleep schedule during the work week, which for him is between six to seven hours of sleep.

Deputy Gibson advised his shift began at about 1600 hours. Approximately three hours separated the start of his shift and the shooting incident. Prior to the shooting incident, he did not respond to any calls for service which he identified as stressful or physically challenging. Deputy Gibson described the shift call volume was "Pretty busy". But the calls for service which he responded to were lower priority and did not cause him stress or anxiety

Deputy Gibson advised that his current dress (PCSO uniform consisting of a long sleeve silver tan shirt with shoulder patches, a silver tan outer ballistic vest carrier with a soft badge, a black duty belt, and OD green in color 6 pocket pants) was the dress condition at the time of this incident. Deputy Gibson described his patrol vehicle as a fully marked and equipped patrol truck complete with emergency red and blue lights and siren.

Deputy Gibson confirmed that the firearm he discharged during this shooting was his department issued Glock 17 .9mm handgun, loaded with department issued ammunition. His handgun is equipped with a personal owned tactical flash light and a department approved red dot sight system. Deputy Gibson advised he completed the PCSO sight transition training to allow for the red dot sight system. In addition to a handgun, Deputy Gibson also carries a department issued AR-15 rifle. He stated he does not carry any additional firearms on his person or within his patrol vehicle. He advised a less lethal tool at his disposal is a department issued Tazer which he carries on his person.

Over the combined total of Deputy Gibson's nearly 5.5 year law enforcement career and his 6 years of military training he had attended several advanced training courses with firearms and weapon systems. He received advanced combat medical response training, is HGN certified, attended tactical building clearing courses, and is a Field Training Officer (FTO). Deputy Gibson had been assigned to the police training academy as an RTO and an ID. Aside from the academy assignments, Deputy Gibson has only been assigned to patrol.

Having nothing further to add and no further questions at this time part one of this interview concluded at 2246 hours.

After responding to the scene on Mescalero Road, part two of this interview began. Present for this portion was Deputy Gibson, Attorney Denis Fitzgibbons, Pinal County Attorney Jim Heard, and myself. To begin, I asked Deputy Gibson to provide a synopsis of how he became involved in this incident.

According to Deputy Gibson he had completed a call for service and was in the area of Hopi and Battleford. Deputy Gibson stated he was driving west on Hopi when he observed a red dirt bike travelling south on Hualapai at a high rate of speed. Deputy Gibson stated he sped up to catch up to the dirt bike in an attempt to conduct a traffic stop. Deputy Gibson advised the dirt bike turned west onto Mescalero Road. However, at that time he did not know the name of the road. When Deputy Gibson turned onto Mescalero Road he observed the dirt bike in front of the residence addressed as 19005 W Mescalero. Deputy Gibson said he activated the emergency lights on his patrol vehicle and slowed his patrol vehicle to a stop. Deputy Gibson stated the rider of the bike made eye contact with him then accelerated the bike crashing into the closed fence of the driveway, but was stopped. Deputy Gibson stated he exited his patrol vehicle to contact the driver, without transmitting this event to PCSO dispatch.

Deputy Gibson stated he gave a verbal command to "Stop", to which the

12/18/23

rider responded, 'I'm not running'. Deputy Gibson stated the rider got off the dirt bike and said, 'Oh hey Gibson'. Deputy Gibson stated that when he saw the rider he recognized him and believed him to be a person named Anthony De Santiago. Deputy Gibson stated he called the rider, "Anthony" to which the rider responded, 'No'. Deputy Gibson stated that while talking with the rider, Deputy Gibson put the dirt bike kickstand down and was paying attention to the rider's body language and mannerisms. Deputy Gibson stated he observed an unknown bulky object in the front pocket of the rider's sweatshirt and noticed the rider looking and pacing around and pulling at the shoulder straps of his backpack. Deputy Gibson felt the rider appeared nervous and was planning to run. Deputy Gibson stated he knew he needed to tell PCSO dispatch where he was and what he was doing but he did not know his location. Therefore, he stepped back near his patrol vehicle to look at his GPS while he transmitted his call sign and, "Traffic". Deputy Gibson advised that during his radio transmission, the rider gained a little distance from him and was looking into the yard of the residence they were in front of. Deputy Gibson stated he told the rider to come closer and ask if he had a warrant, to which he responded, 'Yah I have some warrants'. Deputy Gibson stated he asked the rider to produce an ID. Deputy Gibson said the rider began dropping and picking up items from his wallet as he provided Deputy Gibson with an Arizona driver license. At that time, Deputy Gibson realized the rider was Michael Obregon.

Deputy Gibson stated that when he received the driver license, he returned to his patrol vehicle to update PCSO dispatch about his traffic stop. Deputy Gibson said that when he neared his vehicle, Michael Obregon turned and ran toward the driveway gate. Deputy Gibson said Michael Obregon tripped and fell to the ground landing prone. Deputy Gibson stated he gave chase and got atop of Michael Obregon's back, while simultaneously transmitting an emergency call for assistance. Deputy Gibson stated Michael Obregon was not attempting to get up off the ground or even fight with him. Instead Michael Obregon's hands were underneath him down near the front of his waist attempting to manipulate something. Deputy Gibson stated Michael Obregon brandished a black and silver handgun. At which time Deputy Gibson pushed off of Michael Obregon, began backing away from him, and drew his handgun. Deputy Gibson stated Michael Obregon rolled to his side and pointed the handgun at him. Deputy Gibson recalled seeing the barrel of the handgun and he believed Michael Obregon was going to shoot him. Deputy Gibson feared Michael Obregon's intention was to kill him, at which time Deputy Gibson fired his handgun. Deputy Gibson stated he recalled shooting 7 to 8 times and seeing the black and silver handgun fall to the ground beside Michael Obregon. Deputy Gibson stated he took cover near the dirt bike, gave commands to not reach for the handgun, and transmitted, "Shots fired".

Deputy Gibson stated that he assessed the incident, made an additional radio transmission, gathered his medical trauma first aid bag, and approached Michael Obregon with the intent to render medical aid. Deputy Gibson stated he cut open Michael Obregon's shirt and applied chest seals to a gunshot wound on the lower abdomen and three gunshot wounds to the posterior torso. Deputy Gibson stated that while he was rendering aid, a female approached him yelled and cursing at him. Deputy Gibson stated an unknown male approached him asking if he was okay and required any help. Deputy Gibson employed the male to hold a flashlight while he continued to render medical care. Deputy Gibson stated two additional people came running towards him yelling, 'You shot my brother' and cursing at him. At about this time the first CGPD unit arrived and addressed the individuals who had approached. Deputy Gibson stated CGPD took over medical aid while he updated PCSO Sgt. Ransom and pointed out items of evidence.

12/18/23

DEFS_Obregon 000076

At this time, I provided Deputy Gibson an orange traffic cone and asked him to place it on the scene in the location where he recalled firing his handgun. After a short consideration, Deputy Gibson placed the cone near the roadway edge, slightly behind the rear wheel of the dirt bike. Next, I asked Deputy Gibson questions related to his statement. As such I learned Deputy Gibson was never advised what the arrest warrants were issued for. Furthermore, I asked Deputy Gibson if he could recall when he drew his handgun. Deputy Gibson stated that he did not draw until he saw Michael's handgun and was in the process of disengaging and backing away.

I asked Deputy Gibson to provided further explanation(s) about his past contact(s) with Michael Obregon. Deputy Gibson recalled dealing with Michael Obregon only one time, a few months ago, related to a drug possession offense. Deputy Gibson did not express knowledge about any law enforcement "Caution" indicators placed on Michael Obregon by PCSO or other local police departments. Nor was Deputy Gibson aware of any gang affiliation for Michael Obregon.

I asked Deputy Gibson if in the light of the totality of all circumstances now known to him if he felt there was another course of action that he could have taken. To this question Deputy Gibson responded simply with a "No" response. Deputy Gibson offered support for his response by stating he feared for his life and believed Michael Obregon intended to shoot and kill him.

Last, I asked Deputy Gibson to estimate the total amount of time lapse between his initial contact with Michael Obregon to the moment of the shooting. Deputy Gibson estimate the time at about one (1) minute.

Having nothing further to add and no further questions to ask this interview concluded at 2351 hours. Refer to the recording for additional information.

Scene Investigation and Processing:

The processing of this scene was the responsibility of Detective Converse and CST Fales. Refer to their reports for complete scene detail. In short, the scene was contained to the threshold of the driveway at 19005 W Mescalero. Parked on the roadway facing west in front of the residence was Deputy Gibson's fully marked PCSO patrol vehicle, fleet number 23527. The rear facing red and blue emergency lights were activated, while only the front facing white take down lights were illuminated.

The decedent laid supine on the driveway with his head toward the east and his feet to the west. On the ground a few feet away from the decedent's right hand was a black and silver Smith and Wesson 40 caliber handgun. (Placard 11) Parked on the edge of the roadway in front of the gate was a dirt bike red in color. West of the driveway, from the dirt shoulder of the roadway onto the asphalt roadway were 10 expended 9mm cartridge casings. (Placards 1-10) Studies have proven that cartridge case ejection patterns are unreliable to identify a shooters location. That said the pattern of the ejected casing were more linear rather than clustered together. This linear pattern is supportive of a moving shooter rather than a stationary one.

12/18/23

DEFS_Obregon 000077

During the walkthrough interview with Deputy Gibson, I asked him to place an orange traffic cone to denote his location when he fired his handgun. The cone was placed near the roadway edge slightly behind the rear wheel of the dirt bike. The distance from the cone to where Michael Obregon laid measured approximately 9 feet.

Observed on the ground south of where Michael Obregon laid were two, possible three, defects in the ground consistent to bullet strikes. (Placards 15-17) With these defects alone bullet trajectories could not be determined. However, an approximate flight path could be determined. With the use of these approximated flight paths and the placement of the expended cartridge casings investigators placed a second orange cone to denote a potential location for Deputy Gibson during the shooting. The distance from the second cone to where Michael Obregon laid measured approximately 15 feet. Both cone placements and their respective measurements, the defects in the ground, and the placement of the expended cartridge casings were photographically documented.

Evidence List From Scenes:

2673-1: Black 9mm Glock, 17 Gen 5, 9mm handgun. Serial Number: BVTE467.
2673-2: Magazine and 7 cartridges from Deputy Gibson's Glock handgun Win Luger 9mm.
2673-3: 9mm cartridge from the chamber of Deputy Gibson's Glock handgun Win Luger 9mm.
2673-4: magazine from the top pouch loaded with 17 total cartridges. 16 cartridges Brand: Win Luger 9mm, 1 cartridge Brand: FC Luger 9mm.
2673-5: magazine from the bottom pouch loaded with 17 cartridges. Brand: Win Luger 9mm
2166-1: Expended Cartridge casing, Win 9mm Luger
2166-2: Expended Cartridge casing, Win 9mm Luger
2166-3: Expended Cartridge casing, Win 9mm Luger
2166-4: Expended Cartridge casing, Win 9mm Luger
2166-5: Expended Cartridge casing, Win 9mm Luger
2166-6: Expended Cartridge casing, FC 9mm Luger
2166-7: Expended Cartridge casing, Win 9mm Luger
2166-8: Expended Cartridge casing, Win 9mm Luger
2166-9: Expended Cartridge casing, Win 9mm Luger
2166-10: Expended Cartridge casing, FC 9mm Luger
2166-11: Smith and Wesson SD40 handgun
2166-11A: Live Cartridge from magazine of SD40 handgun
2166-12: Wallet
2166-13: Sunglasses
2166-14: Projectile
2166-15: US Currency, $8.15
2166-16: Underwear
2166-17: RBX Sweatpants
2166-18: Blue Jeans
2166-19: Carhartt Sweatshirt
2166-20: Hanes Tank Top
2166-21: T-shirt
2166-22: Belt
2166-23: Boot
2166-24: Baseball hat

12/18/23

2166-25: Personal effects
2166-26: Marijuana
2166-27: Adidas Backpack
2166-28: Glass pipe
2166-29: Apple iPhone

Pinal County Office of Medical Examiner ( OME)

On March 17, 2023 at about 1045 hours I, attended the autopsy of Michael Obregon performed by Dr. John Hu MD.  Based on this examination Dr. John Hu identified a total of seven gunshot wounds. The wounds paths ranged from front to back, back to front, slightly upward and slightly downward. Each wound is detailed in Dr. John Hu's examination report and shall not be detailed within this report. Refer to Dr. John Hu's report for gunshot wound details.

None of the wounds had evidence of soot or gunpowder stippling. The absences of soot and/or stippling suggests the muzzle to target distance was greater than 36 inches. One gunshot wound was reported as a graze, and thus nonfatal. The remaining six wounds would likely have been fatal. A total of five projectiles and/or bullet fragments were recovered.

Attached to the autopsy report is a copy of the toxicology report, completed by NMS Labs, report number 23110462. The test results reported a positive result for the presence of methamphetamine at 830 ng/ml, amphetamine at 130 ng/ml, THC at 7.7 ng/ml, Carboxy THC at 15 ng/ml, and Hydroxy THC at 1.2 ng/ml. According to the toxicology report this level of intoxicants may result in impaired judgement, change of attitude, and impulsivity.

According to the autopsy report it is the opinion of Dr. John Hu that the known circumstances surrounding the death of Michael Obregon, the available medical history, and the examination of the body of the deceased the cause of death is "Multiple gunshot trauma" and the manner of death is "Homicide".

Prior to leaving the Pinal County OME I collected as evidence the recovered projectiles, 2 blood bots, and personal effects to include (1 boot, 2 socks, 1 ring, 2 earrings, 2 necklaces, 1 watch, and 2 rubber bracelets). These items were later packaged for safe keeping at PCSO evidence unit.

Evidence List From Autopsy:

2673-6: Jewelry collected at autopsy from the decedent. 1 pair of earrings, 1 necklace, 2 silver rings, 1 watch with silver band, 1 red silicon bracelet, 1 green silicon bracelet, and 1 black necklace with a cross.
2673-7: 1 black sock.
2673-8, 1 Right Brown Cowboy boot, size 10.5 with black sock.
2673-9: Blood Blot x2
2673-10: Projectile fragments removed from the left thigh
2673-11: Projectile removed from the right axilla.
2673-12: Projectile removed from the right scapula.
2673-13: Projectile removed from the left upper chest.
2673-14: Projectile and fragments removed from the right shoulder

12/18/23

AVL Data:

    On or about March 20, 2023 I obtained AVL data for device number PCSO2181. This device is assigned to Deputy Gibson. The data is real time tracking information controlled and monitored by Pinal County IT administrators. The data is not accessible and/or amendable by the PCSO employee, in this case Deputy Gibson, to whom the device was/is assigned. The data provides GPS location history as well as speed of travel. As such a device in motion may be pin mapped to reveal the travel. My request for this data included the date of March 16, 2023 from 1855 hours to 1900 hours.

    My review of the data revealed Deputy Gibson's travel prior to arriving at the scene of the shooting. Travel began at 18:55:01 hours, located at 32.97788 -111.768215 (North Kit Carson Drive approaching Watson) Deputy Gibson was traveling north at 16 mph. At 18:55:16 hours, located at 32.9783422 -111.767657 (Watson approaching Battleford) Deputy Gibson was traveling east at 19 mph. At 18:55:46 hours, located at 32.9766533 -111.767409 (Battleford and Bobcat) Deputy Gibson was traveling south at 5 mph. At 18:56:56 hours, located at 32.974684 -111.768147 (Hopi Drive approaching Kit Carson) Deputy Gibson was traveling west at 40 mph. At 18:57:11 hours, located at 32.9738117 -111.769755 (Hualapai Drive south of Hopi Drive) Deputy Gibson was traveling south at 54 mph. At 18:57:41 hours, located at 32.9718933 -111.771180 (Scene of the shooting) Deputy Gibson was stopped at 0 mph.

    In light of the known evidence and totality of the circumstances, the analysis of this data is relevant in that it shows Deputy Gibson travelling at speeds below posted between the hours of 18:55:01 to 18:56:55. It may be presumed that at 18:55:56 hours, Deputy Gibson has observed the traffic violation, which precipitated this event, based on his acceleration. At 18:57:41 hours Deputy Gibson has arrived at the scene given that his speed is 0 mph and the device does not move for the duration of the on scene investigation. Refer to the AVL Data for additional information.

Computer Aided Dispatch (CAD) Report:

    As part of this investigation, I conducted a review of the CAD report. According to the radio log in this report, at 19:01:33 hours, Deputy Gibson transmitted the "Shots fired" call out and advised that one person was down and in need of medical care. Deputy Gibson stated that the person attempted to shoot him. At 19:02:14 hours Deputy Gibson reported that he was rendering medical care. At 19:03:00 hours Deputy Gibson advised that multiple people were approaching him.

    This information is relevant in that the radio traffic log alone does not provide a time duration of contact between Deputy Gibson and Michael Obregon. This log alone cannot be purely relied upon for an accurate account of this event. The duration of the CAD pertains to the response to this incident and shall not be detailed. Refer to the CAD for additional information.

12/18/23

DEFS_Obregon 000080

```
PCSO Dispatch Recording:
```

        As part of this investigation, I obtained and conducted a review of the recorded radio traffic related to this incident. The transmissions are detailed below based on the timing on the recording:

```
Gibson: Traffic (00:03)
900: Acknowledgement without reply from Gibson (00:10)
900: Call out to Gibson without reply (00:18)
Gibson: Description of person with dirt bike (00:24)
Gibson: Emergency call for assistance (00:45)
Hot Tone
Gibson: Shots fired (00:53)
900: Response to shooting
Gibson: Statement of person possessing a handgun (01:06)
Gibson: Statement of sustained gunshot wounds (01:20)
Gibson: Statement about person attempting to shoot him and identification of the
person (01:46)
Additional radio traffic
Gibson: Advising he's rendering medical care (02:12)
```

        The duration of this recording shall not be transcribed within this report. The recording is available for review. This information is relevant in that the radio traffic recording alone does not provide a time duration of contact between Deputy Gibson and Michael Obregon. This recording alone is suggestive that from the time of contact to shots fired is less than one (1) minute. This is not accurate and therefore cannot be purely relied upon for an account of this event.

```
Surveillance Video Analysis and Shooting Data:
```

        During the course of this investigation, a neighborhood canvass was conducted in an effort to identify any potential witnesses and/or video evidence. As a result the residence address as ███████████████ was discovered to have captured part of this incident surveillance system. The homeowner, Wade Putt, voluntarily provided the video.

        I conducted a review of the video. The length of the video is approximately 8 minutes and 25 seconds long. The video is from a camera mounted on the southeast corner of the owner's roof eve. The camera has a wide field of view, with the frame width of 1920 and a frame height of 1080, and is aimed at Mescalero. The video was recorded at 15 frames per second (fps). The video has a date and time stamp displayed incorrectly as 3/17/2023 at 0633 hours. The video does not include, and was not recorded with, audio.

        At the start of the video, video timestamp 06:33:00 hours, Michael Obregon is seen riding a dirt bike and bumping into the closed gate at the driveway of residence 19005 W Mescalero. Nearly simultaneously, Deputy Gibson is seen driving up to the same location. The rear emergency lights of Deputy Gibson's full marked patrol vehicle are visibly activated. The patrol vehicle

12/18/23

obscured part of the camera view, rendering much of the incident blocked from view.

That which is visible is Deputy Gibson's head on the left side of the patrol vehicle and Michael Obregon standing in front of the patrol vehicle. Over the course of the next 2 minutes and 30 seconds, very slight movements of both Deputy Gibson and Michael Obregon can be observed. At the video timestamp of about 06:35:45 hours Michael Obregon can be seen standing in front of the patrol vehicle bending down towards the ground as if to pick something up. Seconds later Michael Obregon approaches Deputy Gibson and is again obscured from view. At the video timestamp of about, 06:36:06 hours Michael Obregon can been seen running towards the driveway gate and the gate being swung open. At the video timestamp of about 06:36:11 hours, Deputy Gibson can be seen rapidly backing away towards the road while firing his handgun.

After viewing the video unedited or otherwise unaltered, I conducted an analysis of the video using a video analysis program available to PCSO. I began by reducing the play back speed to 5fps. Next, I cropped and resized the video to a frame width of 800 and a frame height of 674. This adjustment centers and draws more focus to the incident, but does not in any way change or otherwise manipulate the footage and/or raw data. These adjustments only aid with the identification of slight details, which are otherwise difficult to view and/or detect.

As a result of these adjustments, muzzle flash and gunshot smoke/powder from Deputy Gibson's handgun may be seen. Below, using the video timestamp is an outline of additional details not previously viewed:

06:36:11: Muzzle flash seen
06:36:12: Muzzle flash seen
06:36:13: Muzzle flash seen
06:36:14: Gunshot smoke/powder seen

The video appears to have only recorded 4, possibly 5, gunshots. However, 10 shots are known to have been fired based on the scene investigation and the round count of Deputy Gibson's handgun. Given that part of the video is obscured by the patrol vehicle any gunshots fired prior to Deputy Gibson coming into view of the camera would not be viewable. The gunshots that are viewable only account for some of the total shots.

Video testing related to the recording of gunshots has been proven unreliable. Studies and publications have proven that video recorders do not accurately record gunshot muzzle flash. The fact that a video does not reveal a gunshot is not proof that a gun was or was not fired.

Furthermore, studies and publications have proven that on average a law enforcement officer's rate of fire with a semi-automatic handgun is one quarter second per shot. (IE: 4 shots per second). Additional time frames are factored in to account for such events as perception/reaction time, the draw, movement, indexing, and sight alignment. Given that the exact start of this shooting is undeterminable, these factors shall not be detailed and/or included.

That which is determinable based on the viewable evidence is about 2.5 seconds lapsed from the first viewable muzzle flash to the last viewable muzzle flash. Using the known standard of 4 shots per second, an average law enforcement officer would be capable of firing 10 shots within this time span. Within the totality of all known evidence Deputy Gibson's rate of fire is consistent with the proven known average. Additional studies and publications

DEFS_Obregon 000082

have documented that an average officer involved shooting concludes in about 3 seconds.

Event Timeline in the Totally of all Evidence:

As detailed above there are several sources of information related to the timeline for this incident. No one source alone provides the complete timeline. A complete and accurate timeline can only be established in the totality of all the sources. Outlined below is an accurate account of the timeline:

18:55:01 hours: (AVL Data) Deputy Gibson near Kit Carson Drive and Watson Road
18:56:56 hours: (AVL Data) Deputy Gibson west bound on Hopi Road likely attempting to catch up to dirt bike
18:57:11 hours: (AVL Data) Deputy Gibson south bound on Hualapai
18:57:41 hours: (AVL Data) and (Video timestamp 06:33:00 hours): Deputy Gibson arrived on scene and has made contact with Michael Obregon
19:00:48 hours: (Radio Log) Deputy Gibson transmits he's out on traffic
19:01:12 hours: (Radio Log) Deputy Gibson transmits male description and color of dirt bike
19:01:33 hours: (Radio Log) Deputy Gibson transmits emergency call for assistance
06:36:12 hours: (Video timestamp) (About 19:01:20 hours real time) Deputy Gibson backing up rapidly firing his handgun
19:01:41 hours: (Radio Log) Deputy Gibson transmits "Shots fired"
19:01:55 hours: (Radio Log) Deputy Gibson transmits the subject had a firearm
19:02:08 hours: Deputy Gibson transmits one person down with multiple gunshot wounds
19:02:34 hours: Deputy Gibson transmits the person attempted to shoot him and identifies the person as Michael Obregon
19:03:00 hours: Deputy Gibson transmits that he is rendering medical care.

When all of the evidence sources are compiled, we see that Deputy Gibson and Michael Obregon were in communication with each other for approximately 3.5 minutes before the shooting. This timeline is further supported by the surveillance video obtained from a nearby residence. Moreover, this is in accordance with Deputy Gibson's statements during his interview, the difference being that Deputy Gibson recalls the entire contact lasting about 1 minute, when in fact it was about 3.5 minutes.

This time discrepancy is consistent to memory of a person under extreme stress. When under high stress situations, the human brain is uniquely equipped with the ability to suppress nonessential information for essential self-preservation information. In this report, the science and studies of this phenomenon shall not be detailed. However, is it well documented and seen in most all people when exposed to trauma and/or an extremely high stressor.

ATF E-Trace Report:

12/18/23

DEFS_Obregon 000083

On or about March 29, 2023, I received an ATF firearms E-trace report in reference to the Smith and Wesson .40 caliber handgun recovered from the scene. ATF E-trace reports tend to be limited to the first and/or original purchase information. According to this report, numbered T20230144709, the Smith and Wesson SD40, serial number HEA6467, was purchased on February 16, 2013, by Fernando G. Hernandez of Mesa Arizona. This firearm was sold to Hernandez by Arizona Firearms and Accessories of Tempe Arizona.

I conducted a background investigation related to both Hernandez and the handgun. As for the handgun it was not reported in NCIC as stolen. I located a few historical Mesa PD police reports involving Hernandez. These reports listed Hernandez as the victim of thefts. However, none of these reports included this handgun as stolen property.

Several attempts were made to contact Hernandez to inquire about this handgun. Each attempt resulted in negative contact and Hernandez has failed to respond to the many voice messages I have left for him. In the event that I cannot communicate with Hernandez, ownership information about this handgun is limited to the ATF E-Trace report.

DPS Lab Results:

On April 24, 2023, I received a DPS Crime Lab report dated April 20, 2023, in reference to a controlled substance examination. The evidence item tested was a glass pipe with assigned evidence control number 2166-28. According to the report, the pipe contained a useable quantity of methamphetamine weighing 95+/-4 milligrams. Forensic Scientist Shayna Smith #6165 completed this report. Refer to her report for additional details.

On May 23, 2023, I received a DPS Crime Lab report dated May 17, 2023, in reference to Latent Finger Print results. The evidence items tested were the Smith and Wesson handgun (2166-11) including the magazine and the laser sight, the cartridge (2166-11A), and a glass pipe. According to the report no latent prints of value for comparison were developed. Forensic Scientist Cindistar Hickman #6750 completed this report. Refer to her report for addition details.

On May 30, 2023, I received a DPS Crime Lab report dated May 23, 2023, in reference to Firearm examination results. The evidence items tested were a Smith and Wesson handgun (2166-11) and a Glock handgun (2673-1). According to the report both firearms were test fired and determined to function normally. Forensic Scientist Joey Fimbres #5835 completed this report. Refer to his report for additional details.

In addition to the above stated lab reports, the Smith and Wesson handgun was submitted to the DPS crime lab for DNA testing. According to DPS Lab, the handgun was processed and the swabs collected would be retained, however DNA testing would not be conducted.

GCPD Body Worn Camera and Lobby Footage:

During the course of this investigation body worn camera and lobby

12/18/23

DEFS_Obregon 000084

camera footage from CGPD was collected. Given that none of the footage recorded the shooting event, and all the recorded footage is post shooting, the footage shall not be detailed within this report. The footage is available for viewing and included within the evidence of this investigation.

Conclusion:

As of the writing if this report, June 15, 2023, I do not have any further information to report. Based on the totality of this investigation to include all interviews conducted, the physical evidence, the video evidence, and the forensic evidence this incident occurred for the follows reasons:

1.      Deputy Gibson made contact with Michael Obregon, who likely knew he possessed a stolen motorcycle and knowingly had active warrants for his arrest
2.      Michael Obregon possessed a handgun, attempted to flee, and brandished the handgun
3.      Deputy Gibson believed Michael Obregon intended to shoot him
4.      AZPOST (Arizona Police Officer Standard Training), along with PCSO in service training instructs law enforcement officers that the use of deadly force is justified to protect or defend one's self or in the defense of others.
5.      Michael Obregon toxicology report included high levels of intoxicants, which may have caused impaired judgement, change of attitude, and impulsivity.

This investigation has showed the Deputy Gibson and Michael Obregon were in contact with each other for more than 3 minutes prior to the shooting. The reason for this contact was to investigate an observed traffic violation. The contact occurred within a public thoroughfare. Deputy Gibson was clearly identifiable as a law enforcement officer, and known to Michael Obregon. Video evidence revealed Michael Obregon attempted to flee the encounter with Deputy Gibson. Michael Obregon possessed a handgun and pointed it at Deputy Gibson.

This investigation shall be submitted to the Pinal County Attorney's Office for review and criminal charging. At such a time as any and all additional information becomes known that information shall be detailed in additional supplement(s).

End of Report
Case Status: Active/Pending

12/18/23

DEFS_Obregon 000085

# EXHIBIT 11

# In the Matter of:

*Obregon*

*vs*

**Lamb**

---

*Mariah Brady*

*August 19, 2025*

---



# GRIFFIN GROUP INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB, <br><br> Plaintiffs, <br><br> v. <br><br> Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does I-X, <br><br> Defendants. | NO. 2:24-cv-01510-PHX-KML |

VIDEO RECORDED VIDEOCONFERENCED DEPOSITION OF
MARIAH BRADY

August 19, 2025
Witness Location:  Phoenix, Arizona
10:00 a.m.

REPORTED STENOGRAPHICALLY BY:
ROBIN JASPER, RPR
Certified Reporter
Certificate No. 50286

PREPARED FOR:
ASCII/CONDENSED

(Copy)



**Griffin Group International**
**888.529.9990 | 602.264.2230**

Page 2

            I N D E X
WITNESS                                        PAGE

MARIAH BRADY

     Examination by Ms. Van Buren              5

     Examination by Mr. Woods                  77

     Further Examination by Ms. Van Buren      80


              E X H I B I T S

EXHIBITS   DESCRIPTION                         MARKED

No. 1    Video recording of Officer Fox's       60
         body-worn cam
No. 2    Video recording of Officer Reid's      65
         body-worn cam

No. 3    Video recording of Sergeant Rush's     48
         body-worn cam
No. 4    Denova Collaborative Health records    34
         (45 pages) (MB_000087 through
         MB_000131)
No. 5    Sun Life Health records (59 pages)     20
         (MB_000132 through MB_000190)

No. 6    Plaintiff Brady's Response to Defendant 68
         Gibson's First Interrogatories
         (15 pages)

Page 3

VIDEO RECORDED VIDEOCONFERENCED DEPOSITION OF MARIAH BRADY, located in Phoenix, Arizona, taken on August 19, 2025, commencing at 10:03 a.m. before ROBIN JASPER, a Certified Stenographer in the State of Arizona.

COUNSEL APPEARING BY VIDEOCONFERENCE:

        WIENEKE LAW GROUP
        BY:  Ms. Laura Van Buren
        1225 West Washington Street, Suite 313
        Tempe, Arizona  85288
        Attorneys for Defendants
        MILLS + WOODS LAW, PLLC
        BY:  Mr. Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, Arizona  85014
        Attorneys for Plaintiffs

ALSO PRESENT BY VIDEOCONFERENCE:

        Ms. Meagan Brady
        Ms. Allison Obregon
        Ms. Danielle Morris
        Mr. William Marinakis, Videographer

Page 4

THE VIDEOGRAPHER:  We are on the record. Today's date is Tuesday, August 19, 2025.  The time is 10:03 a.m.  This is the Zoom video recorded deposition of Mariah G. Brady, noticed by counsel for the defendants in the matter of Allison Obregon, et al., versus Mark Lamb, et al., in the United States District Court, District of Arizona, Case No. 2:24-cv-01510-PHX-KML.

The witness is located at the law offices of Mills + Woods law firm in Phoenix, Arizona.  All participants are appearing via Zoom video conferencing. Let me make a correction that with the witness today is Meagan Brady and her attorney.

All -- excuse me.  The certified court reporter is Robin Jasper of Griffin Group International, located at 3200 East Camelback Road, Suite 177, Phoenix, Arizona, 85018.  My name is William Marinakis.  I am the certified legal video specialist for the firm of VideoDep, Incorporated, located in Phoenix, Arizona.

Counsel, will you please identify yourselves and state whom you represent for the record at this time, please, starting with plaintiffs' counsel.

MR. WOODS:  Thank you.  This is Sean Woods for Mills + Woods Law.  I'm here on behalf of the plaintiffs, Mariah Brady and Allison Obregon.  Mariah Brady is located to my right and Allison is joining on

Page 5

Zoom.

MS. VAN BUREN:  This is Laura Van Buren on behalf of the defendants.  Also present is Danielle Morris from the Arizona County Insurance Pool.

THE VIDEOGRAPHER:  Thank you, Counsel.

The witness may be sworn in at this time, please.

MARIAH BRADY,
a witness herein, having been first duly sworn by the Certified Reporter to speak the truth and nothing but the truth, was examined and testified as follows:

EXAMINATION
BY MS. VAN BUREN:

Q.  Good morning, can you please state your full name for the record.

**A.  Mariah Brady.**

Q.  Mariah, it's nice to meet you.  My name is Laura Van Buren.  I'm the attorney for the defendants in this case.  I will be asking you some questions right now.  And I want to start with a couple of things that we have already covered, but I just want to make sure I have on the record.

You are in your attorney's office right now,

Page 50

MR. WOODS: Stopping at 7-50.

BY MS. VAN BUREN:

Q. All right. Mariah, we played Exhibit 3 from 7 to 7-50.

THE VIDEOGRAPHER: Laura, I'm sorry. We are going to need to take that off share screen now so we can see the witness. Very good. Thank you.

BY MS. VAN BUREN:

Q. All right. Mariah, in that clip we just watched, you told -- in that clip we just watched, you told the officer you didn't know Mr. Obregon, correct?

A. Yes.

Q. Why did you tell him that?

A. Everything that was going on, I was in shock, and after seeing that, I wasn't going to tell the police anything about anything.

Q. Is there any other reason that you didn't tell the police that you knew Mr. Obregon?

A. I -- like I said, they didn't need to know anything about anything after I just saw what he had done to him. It was -- and it wasn't my place to tell him anything.

Q. I would like you to tell me everything you remember from that day, from the time you woke up until the time of the shooting. And then I want you to stop

Page 51

there. Tell me what you remember doing that day.

A. I woke up, was just in my room most of the day, probably on the phone, watching TV, playing video games, whatever I did at the time in my room by myself. And I just, I was doing my makeup when I heard yelling outside. And so I had got up to go see what was going on.

As I'm walking towards the living room to view out the window, I start hearing gunshots. So I go to the window and I see Gibson standing over Mikey with his gun pointed at him. And he's like a -- like a feet back, but he's standing over him with the gun over him. And Mikey is on his back -- I mean, on his stomach at the time. Mikey is on his stomach at the time. So I'm freaking out now. So I run back to my room to go like put on clothes, and I hear more gunshots.

And so I come running back out, and I go outside. Mikey is on his back now. And I said what the F happened, what did you do? And Gibson had responded saying, "He pulled out a gun." So I had asked Gibson where the gun was, and Gibson had stared at me. And I looked, didn't see anything, just his motorcycle right there.

And Mikey, I had rolled him over on his side, because Gibson wouldn't do anything to help him. So I'm yelling at Gibson to help him. And Gibson goes to the vehicle, he opens his driver door, he turns on his lights,

Page 52

and then he pops his trunk. He goes in his trunk and he grabs his green military bag and he goes to Mikey. He kneels in front of him and then he does CPR for like, like five seconds and then stops, and then cuts off his shirt and then does nothing.

And so D.J., his brother, had pulled up. And his brother is freaking out, and I'm trying to calm his brother down. So I'm talking to his brother. And that's when all the other polices showed up and there was just a lot going on. And I'm like --

I remember like before the other polices showed up, I'm walking back and forth. Mikey. I'm walking back and forth. Because -- and Gibson is just sitting there. Gibson is not doing nothing. And I'm walking back and forth, like by his legs. There was no gun, his backpack still underneath him. Like I don't --

And then D.J. and them pulled up. They are freaking out, obviously, because it's his brother. And that's when the other police had got there, and I came back from talking to his brother and I was going to go back to where my sister was at the time. And that's when the police officers were putting up the tape. And that's just when everything happened. You know, I was forced to stay there and all of it, just everything.

Q. Okay. I appreciate you sharing that with me. I

Page 53

want to go back and ask you some questions on some of the things you said.

You said that you were in your room doing your makeup and you heard yelling.

Do you remember what specifically you heard being yelled?

A. No. I just knew it was an unfamiliar voice, so I went to go see.

Q. Okay. How much time would you say passed between when you first heard yelling and you first heard gunshots?

A. Not even 10 seconds.

Q. And you heard the gunshots the first time before you looked out the living room window, correct?

A. Yeah.

Q. And what exactly did you see when you looked out the living room window?

A. I saw Gibson standing over Mikey with his gun pointed at him and Mikey was on his stomach.

Q. Do you remember how many gunshots you heard before you looked out the window?

A. No.

Q. Can you tell me if it was more than five or less than five?

A. It was approximately five to six. Because I know it wasn't one to two. It was pretty fast.



Page 54

Q. And then how much time would you say passed between when you looked out the window and you heard the next round of gunshots?

A. I would say like 15 to 20 seconds.

Q. Do you remember how many gunshots you heard that time?

A. Like one or two.

Q. Did you know Deputy Gibson before this?

A. He had came over to where we lived, the same address that he had shot Mikey at. He had came over there, I would say like two weeks before, because he had got a call from me. And so he came over there and he had talked to me. And he had interacted with my little brother and my sister and my mom and he left.

Q. Okay. Why did he get a call that time two weeks before?

A. Because me and my mom had got into an argument and she thought I was going to do something bad to myself so she had called the cops.

Q. And what happened when Deputy Gibson got out to the house that time?

A. He had came out. I met him outside to talk to him. We had a brief conversation and he asked about my siblings, and then he left.

Q. Was he rude to you at all during that

Page 55

interaction?

A. I wouldn't say he was like rude, no.

Q. How would you describe him?

A. Stuck up.

Q. In what way?

A. He has like a "pick me" attitude, like he's very, I would say, cocky in a way.

Q. On the day of this shooting, when you looked out your window, did you recognize that Deputy Gibson was the one standing there?

A. Not when I looked out my window, no.

Q. Did you recognize that Mr. Obregon was the one laying on the ground?

A. Yes.

Q. What -- how were you able to recognize him, if he was laying on the ground on his stomach?

A. Because, like I said, when I had came back and heard the second shots, when I went outside, he was now on his back.

Q. And I'm sorry if I confused you. I'm just asking, when you looked out the living room window, were you able to recognize --

A. Oh.

Q. -- that Mr. Obregon was the one on the ground?

A. No, I didn't know who it was at first.

Page 56

Q. And when you looked out the window, you didn't recognize Deputy Gibson either?

A. No.

Q. Can you give me an estimate of how far away from the window they were?

A. Maybe 18 to 20 feet. That was way wrong.

Q. What was that?

A. That was way wrong, because --

Q. I just want --

A. Because, like, I guess my perception of length is crazy. Because I'm thinking like six feet, and I just put three six feet and said 18 feet. But, no, it was from like the property to the beginning of the fence, so it was a distance.

Q. Okay. And I just want your -- if you are able to give me an estimate, great. If not, just say "I can't tell you."

A. I couldn't tell you.

Q. After you heard that last gunshot you ran outside, correct?

A. Yes.

Q. And just to be clear, were you outside at any point when you heard gunshots?

A. No.

Q. Okay. Did you actually see the gun being fired

Page 57

at any point?

A. No.

Q. What did you do once you left your house?

A. Once I had went outside?

Q. Once you went outside. And I want you to just take things one thing at a time. So what's the next thing you did?

A. I had ran up close to them, I would say about a foot away from them, said what the F happened.

Q. Okay. And when you said what the F happened, how did Deputy Gibson respond?

A. He said, "He pulled out a gun." He said, exact words, "He pulled a gun." So then I asked him, "Where's the gun?" And he didn't respond. He just stared at me for 15 to 30 seconds.

Q. Did you look around for the gun at that point?

A. Yes, I did.

Q. And you didn't see a gun?

A. No, ma'am.

Q. Is it fair to say that this was a very stressful experience for you, Mariah?

A. Absolutely.

Q. What happened after Deputy Gibson stared at you for 15 to 30 seconds?

A. I had went to Mikey and rolled him over and --



Page 66

Q. Mariah, why was it so important for you to be allowed to cross your yard and go back into your house?

A. Because I'm not trying to sit there and watch all this stuff happen to my family friend. That's crazy. I --

Q. Did you ever -- go ahead.

A. No, you go ahead. It's all right.

Q. Did you ever ask the officers, hey, can I walk down to the end of the street so I don't have to stand here?

A. They told me -- I was under the impression that if I moved, I was going to be arrested.

Q. Who gave you that impression?

A. A sheriff. I'm not sure who. I just know that I was told if I move, I was going to be arrested.

Q. Do you remember what that individual's uniform looked like?

A. I know he was a sheriff.

Q. Do you know anything else about what that person looked like?

A. I'm not sure. There was quite a few sheriffs around me.

Q. Were you able to hear in that video someone saying, "I will remove you from even being in this area"?

A. No.

Page 67

Q. Do you remember someone, an officer, saying to you, "I will remove you from even being in this area"?

A. No.

Q. Did you ever ask an officer if you could be removed from the area?

A. Yeah, I asked multiple times if I could leave. And I was under the assumption if I move, I was going to be arrested.

Q. How many officers gave you that impression? Was it just one or multiple?

A. I don't know.

Q. At any point did you turn around so that you wouldn't be facing Mr. Obregon's body?

A. There was officers standing right behind me. If I turn around, I'm going to be right in an officer's face.

Q. And you believe that the body-worn camera shows that?

A. Absolutely.

Q. When during this whole interaction did you realize that it was Deputy Gibson who was out there with Mr. Obregon?

A. As soon as I had got outside and asked him what happened.

Q. I want to ask you next about some of your discovery responses.

Page 68

And this will be marked as Exhibit 6. And I will share this with you in just a moment.

(Deposition Exhibit No. 6 was marked for identification.)

MR. WOODS: Laura, did you get my e-mail this morning?

MS. VAN BUREN: Yes.

MR. WOODS: Okay.

MS. VAN BUREN: And we will go through that.

BY MS. VAN BUREN:

Q. Can you see, Mariah, where it says Plaintiff Brady's Response to Defendant Gibson's First Interrogatories?

A. Yes.

Q. Was this one of the documents that you reviewed to prepare for today?

A. No.

Q. Let me just move my screen around a little bit. Interrogatories are our opportunity to ask questions in writing of you and your mom. Interrogatory No. 2 asks for every injury, complaint, and symptom that MB, that's you, we use initials to protect your privacy, has experienced since these events or that has been aggravated.

And I want to go through the response and make sure I understand everything that you are claiming

Page 69

you experienced.

You say you experienced "anxiety"?

A. Yes.

Q. How was that anxiety different from what you had experienced before, after your car crash?

A. Because it wasn't -- like with the car crash it was, I only had the anxiety when I went to Florence and was near the car accident. My anxiety then has -- it's all the time, certain things get me upset, and I'm angry and I just want to fight.

Q. What certain things get you upset?

A. Like everything. The littlest things will trigger me and make me upset, like bringing up any situation of like anything like, just everything. I don't know.

Q. All right. The next thing you say is "PTSD"?

A. Absolutely.

Q. Do you know if a medical provider has diagnosed you with PTSD?

A. Yeah.

Q. Do you know who was that who diagnosed it?

A. I think it was Lauren.

Q. Okay. You say "Depression from the incident." What has that looked like for you?

A. I didn't want to be here anymore.



Page 74

A. Not that I can say off the top of my head, no.

Q. Okay. We already talked about some of this. Oops.

Do you know the name of your probation officer?

A. Christine.

Q. Do you know Christine's last name?

A. No.

MR. WOODS: Laura, I think I mentioned in there we are working on getting the probation records so that you can have all that.

MS. VAN BUREN: You did, yes.

BY MS. VAN BUREN:

Q. I think I am almost done with you, Mariah. What I would like to do is take one last break, just for about 10 minutes, so I can go through everything. We will come on and we will finish up. Okay?

A. Thank you.

MS. VAN BUREN: Uh-huh.

THE VIDEOGRAPHER: We are going off the record. The time is 12:17 p.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 12:23 p.m. Thank you.

BY MS. VAN BUREN:

Page 75

Q. All right. Mariah, we are almost done.

Returning back to Exhibit 6, those interrogatories, Interrogatory No. 6 asked you to identify each and every act or omission by Defendant Gibson in particular that you assert constitutes intentional infliction of emotional distress.

When I go to page seven, line 10, it says "When Gibson returned, Gibson told MB that if she moved, she would be arrested."

Is that correct or do you want to change that?

A. I wanted to change that. Because it wasn't like him directly who -- like I don't know, but I was just like -- Gibson was there the whole time at the scene. You know what I mean? And usual -- like, and I know what he has done to my friend and family and family of friends and how he has a vicious intent. So I, I'm -- Gibson -- me personally, my opinion is Gibson has, has a say and can tell his co-workers, his buddies, that, you know, everything that he has also gone through. Because there's two sides of every story and then there's the truth, you know. So I feel like he would tell his side of the story and it would just make it to like him and his sheriffs are all in it together, like they are all, all a threat to me, all of them are a threat. And if one of them has told me

Page 76

to do something, it's all of them, I would take it as. Because they all have a say-so in what is going on.

Q. But Deputy Gibson in particular did not tell you that if you moved, you would be arrested, correct?

A. Correct.

Q. Later, around line 17, it says "MB was told to shut her damn mouth."

A. Correct.

Q. MB is you. Do you recall being told that?

A. Yes, but it was more like -- he didn't say "your damn mouth." He said, he said shut your F'ing mouth.

Q. Do you remember who told you that?

A. No, I don't.

Q. Was that Deputy Gibson?

A. No.

Q. Because Deputy Gibson, according to this response, was there and saying nothing, correct?

A. Yes. Gibson was just on the scene and, yeah.

Q. Did you ever post on social media about this incident?

A. No.

Q. Have you ever posted anywhere online about this incident?

A. No.

Q. Have you ever posted anywhere online about Deputy

Page 77

Gibson?

A. No.

Q. Do you know what a Brady list is? And I will give you a hint that it has nothing to do with your last name.

A. No.

MS. VAN BUREN: All right. Those are all the questions I have for you, Mariah. Mr. Woods may have a few.

MR. WOODS: I do. And do you need me to be on camera here or can I just represent with my hands here that I'm here?

MS. VAN BUREN: I'm fine with just having the camera on Mariah.

MR. WOODS: Okay. Cool.

EXAMINATION

BY MR. WOODS:

Q. All right. So I'm going to try to get you out of here quickly. She may -- Laura may have some follow-ups to my follow-ups.

But do you have any medical training?

A. No.

Q. So you are not an EMT?

A. No.



# EXHIBIT 12
# (Non-Electronic Exhibit)

# EXHIBIT 13
# (Non-Electronic Exhibit)

# EXHIBIT 14
## (Non-Electronic Exhibit)