Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as personal representative of The Estate of Micheal Obregon; Meagan Brady, on behalf of and as legal guardian and parent of her minor child, MB, <br><br> Plaintiffs, <br><br> vs. <br><br> Mark Lamb; and, Brady Gibson, <br><br> Defendants. | Case No.: CV-24-1510-PHX-KML <br><br> **PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' DAUBERT MOTION REGARDING PLAINTIFFS' POLICE PRACTICES EXPERT MARK HAFKEY** <br><br> (Assigned to the Honorable Krissa M. Lanham) |

Plaintiffs oppose Defendants' Daubert Motion (ECF No. 108). The Motion invites the Court to weigh evidence and resolve factual disputes at the gatekeeping stage, which the Ninth Circuit does not permit. Mark Hafkey is a retired Phoenix Police Department lieutenant. Over roughly 25 years he worked and supervised hundreds of shooting and homicide scenes, and his opinions in this case address police practices, training, and the handling of the investigation. Those are proper subjects for experience-based expert testimony, and Defendants can raise every criticism in their Motion on cross-examination. The Court should deny the Motion. If the Court has concerns about particular portions of the testimony, targeted limitations will address them without excluding the witness.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND

### A. The Shooting and the Surviving Claims

On March 16, 2023, Pinal County Sheriff's Deputy Brady Gibson contacted Michael Obregon in a private driveway after Obregon had been riding a dirt bike in the neighborhood. (ECF No. 108-2, Ex. 2 (Hafkey Report) at OBREGON_000899-900.) A residential Ring camera recorded portions of the encounter. After approximately three minutes of contact, Obregon fled on foot; Deputy Gibson pursued, and the two were out of the camera's view for approximately 3.5 seconds before Deputy Gibson reappeared, backing away while firing downward. (*Id.* at OBREGON_000900-901.) Deputy Gibson fired seven to eight rounds. Obregon died at the scene. The Medical Examiner, Dr. John Hu, documented seven gunshot wounds, one anterior and six posterior (five lethal and one grazing), and provided a trajectory description for each wound. (*Id.* at OBREGON_000903.) The handgun recovered near Obregon's body was loaded, had not been fired, and, per the crime-scene photographs and FARO scene-mapping data, lay to the left and rear of his prone body. (*Id.* at OBREGON_000904.) Deputy Gibson testified that he stopped firing when he perceived that Obregon "no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped," and agreed the threat was "neutralized when the gun dropped." (*Id.* at OBREGON_000903 (quoting Gibson Depo. 138-139).) He also testified that, after the shooting, he "moved the gun slightly away from his body out of reach," approximately a foot, before rendering aid. (ECF No. 108-2, Ex. 1 (Gibson Depo.) at 86:17-19, 138:18-22.)

Four claims survived dismissal: Obregon's § 1983 excessive-force claim against Deputy Gibson; her wrongful-death claim arising from the shooting; a wrongful-death/gross-negligence claim against Deputy Gibson and Sheriff Lamb arising from the failure to render medical aid; and M.B.'s intentional-infliction-of-emotional-distress claim. (ECF No. 110 at 7-8.)

**B. Hafkey's Qualifications**

Hafkey served approximately 25 years with the Phoenix Police Department, retiring as a lieutenant in 2012. (ECF No. 108-2, Ex. 8 (CV).) He worked assignments in patrol, the Traffic Bureau, and the Organized Crime Bureau, earned a detective certification, and later supervised detectives. (ECF No. 108-2, Ex. 3 (Hafkey Depo.) at 24:16-25:1.) As a firearms instructor he went "through quite a bit of ballistic-type training," including on "the types of wounds and the types of damage that particular rounds will cause on a body." (*Id.* at 29:5-15.) He responded to, worked, and managed "probably hundreds" of homicide scenes, once four in a single shift, often for hours or days before homicide detectives took over. (*Id.* at 74:22-75:16.) At those scenes, he "had to take a look at a scene and determine trajectories to try to gather evidence at the scene, determine where the shots were fired from." (*Id.* at 26:1-7.) As a supervisor and as president of the Phoenix Police Sergeants and Lieutenants Association, he responded to "virtually all homicides" involving his members and reviewed complete officer-involved-shooting investigations, including their trajectory data, "to make sure that the data collected was accurate" and to evaluate whether "the officer act[ed] correctly or incorrectly." (*Id.* at 23:9-16, 27:1-12, 77:8-14.) He candidly acknowledged the limits of scene-level trajectory work: it is "very general," and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

investigators "can't get more specific until you get the medical examiner's report." (*Id.* at 76:18-24.)

### C. What Hafkey Did in This Case

Hafkey reviewed the complete investigative record: the PCSO and Casa Grande incident reports, the Ring video, radio and dispatch audio, witness canvass recordings, deposition transcripts, body-camera videos, witness declarations, crime-scene photographs, and FARO data. (ECF No. 108-2, Ex. 2 at OBREGON_000898.) He traveled to the scene, spent hours there, and walked off the relevant distances using measurement skills developed as an accident investigator. (ECF No. 108-2, Ex. 3 at 42:1-43:17.) He prepared a Radio/Video Timeline aligning radio transmissions with the actions visible on the Ring video. (*Id.* at 44:1-11 & Depo. Ex. 6.) His "trajectory analysis" consisted of "comparing primarily the medical examiner's report of the injuries and seeing how they align to the rounds fired," meaning the rounds that struck Obregon. (*Id.* at 44:24-45:2.) He did not perform, and does not claim to have performed, independent forensic trajectory reconstruction: his understanding of the wound paths "was 100 percent based on the written opinion from the medical examiner," because he is "not trained well enough" to read autopsy photographs. (*Id.* at 60:24-61:4.)

From that record, Hafkey drew three opinions: (1) accepting Deputy Gibson's account, the initial lethal response appears justified, but the subsequent rounds fired into Obregon's back as he rolled away were contrary to police practices requiring force to cease when the perceived threat ceases; (2) there were procedural and investigative irregularities in the post-shooting investigation; and (3) the hour-long detention of the minor witness

M.B. inside the crime-scene perimeter, twenty feet from a dying family friend, departed from common police practices for the treatment of witnesses. (ECF No. 108-2, Ex. 2 at OBREGON_000899, 000902-915.)

### D. The Post-Report Confirmations Defendants Feature

Hafkey's report was complete before either "demonstration" Defendants showcase. He testified without contradiction that the timing walk-through and the figurine visualization "helped me confirm my opinion that I had already written at that point" and were "calculated more as a confirmation of my opinion." (ECF No. 108-2, Ex. 3 at 46:13-16, 48:16-20; *see id.* at 52:14-23.) Neither is mentioned in his report, because neither is a basis for it. Hafkey disclosed both openly at his deposition, identified the date of the figurine photographs (January 15, 2026), and produced them; defense counsel examined him about both at length. (*Id.* at 48:24-49:14, 73:10-74:3.)

## II. LEGAL STANDARD

Rule 702 tasks the Court with ensuring that expert testimony is relevant and reliable. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The inquiry is "a flexible one," *id.* at 594, applied consistent with the "liberal thrust" of the Federal Rules, *id.* at 588. The court is "a gatekeeper, not a fact finder," is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable," and "is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1044 (9th Cir. 2014) (first quoting *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010); and then quoting *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

738 F.3d 960, 969-70 (9th Cir. 2013)). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* (quoting *Primiano*, 598 F.3d at 564); *accord Daubert*, 509 U.S. at 596. "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge. A district court should not make credibility determinations that are reserved for the jury." *Id.*; *see Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024-25 (9th Cir. 2022) (holding it was "abuse of discretion" for "the district court [to] assume[] a factfinding role" under the guise of Rule 702).

For experience-based expertise, reliability does not turn on peer review, error rates, or testability: "[t]he Daubert factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Rule 702 "contemplates a broad conception of expert qualifications," and only "the minimal foundation of knowledge, skill, and experience" is required. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1015-16 (9th Cir. 2004). Under Rule 703, "[a]n expert may base an opinion on facts or data in the case that [he] has been made aware of," including the findings of other qualified professionals on which experts in his field reasonably rely. *See* Fed. R. Evid. 703.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### III. ARGUMENT

#### A. Hafkey is Qualified, and His First Opinion Does Not Require a Ballistics Expert, and He Adopts the Medical Examiner's Trajectory Findings.

Defendants' qualifications argument attacks an opinion Hafkey does not offer. Hafkey renders no independent ballistics or wound-path opinion. The trajectory findings in this case come from the Medical Examiner, and Hafkey took Dr. Hu's written wound-path descriptions as a given, "100 percent," as he testified. (ECF No. 108-2, Ex. 3 at 60:24-61:4.) He then did what shooting-scene supervisors and police-practices experts do: synthesized the ME's findings with the video, audio, FARO data, the gun's documented resting position, the witness accounts, and Deputy Gibson's own testimony, and evaluated the force against police training and practices. Rule 703 expressly permits an expert to rest on such record facts and professional findings.

*Krause v. County of Mohave*, 459 F. Supp. 3d 1258 (D. Ariz. 2020), on which Defendants stake their Motion, drew exactly this line, and most of it runs in Plaintiffs' favor. *Krause* excluded the police-practices expert's self-generated trajectory conclusions (that the decedent was "perpendicular" to the officer and the shotgun "probably not pointing directly at" him) because that expert purported to do the forensic work himself. *Id.* at 1265-66. But, the same court held the expert "generally qualified as a police practices and use of force expert," his experience-based opinions "allowable," and his "testimony regarding Defendants' alleged violation of MCSO policies and the appropriateness of their conduct in light of both those policies and accepted police practices [ ] *permissible*." *Id.* at 1271 (emphasis added); *id.* at 1265 n.2 (holding expert "may opine on whether Selmanson's use of force or Defendants' conduct was appropriate under the circumstances"). And, the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

same Order admitted the defense expert's shot-sequence animations, which were built from autopsy measurements and deposition testimony, because disputes about the underlying data "can be addressed through cross-examination and other expert testimony," and "[t]he firing sequence is based in admissible testimony which Plaintiff may later challenge." *Id.* at 1271-74. Defendants cannot have it both ways: if a defense expert may depict a firing sequence extrapolated from the autopsy and testimony, a plaintiff's police-practices expert may anchor his opinion in the ME's own trajectory findings, the officer's own admissions, and the mapped physical evidence.

The core of Opinion 1, moreover, is not trajectory; it is threat cessation. Deputy Gibson himself testified that the threat was over when the gun dropped and that he stopped firing at that point. (ECF No. 108-2, Ex. 2 at OBREGON_000903.) Officers are trained to fire in controlled bursts, to assess continuously ("shoot and assess"), and to stop when the perceived threat stops. (*Id.* at OBREGON_000905.) Whether the five lethal rounds that entered Obregon's back as he rolled away comported with that training is a classic police-practices question, and it maps directly onto governing law: "terminating a threat doesn't necessarily mean terminating the suspect. If the suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." *Zion v. County of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017).

Hafkey's police-practices qualifications are well established on this record. (*See* § **I.B.**, *supra*; ECF No. 108-2, Ex. 3 at 23:9-29:15, 74:22-77:14; Ex. 8.) Defendants' portrait of Hafkey as a union officer who left real police work in 2004 ignores his unrebutted

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

testimony that the union role placed him at "virtually all homicides" involving his members and required review of those complete investigations. (*Id.* at 23:9-16, 27:1-12.) In this District, a retired Phoenix Police commander with comparable experience was held "qualified . . . to testify as to whether the officers' conduct was consistent with standard police practices." *See Wheatcroft v. City of Glendale*, No. CV-18-02347-PHX-MTL (D. Ariz. Feb. 22, 2022); *Davis v. Mason County*, 927 F.2d 1473, 1484-85 (9th Cir. 1991); *Larez v. City of Los Angeles*, 946 F.2d 630, 635 (9th Cir. 1991).

If the Court nonetheless concludes that any discrete portion of Opinion 1 crosses from synthesis into forensic reconstruction, the proportionate remedy is a limitation confining Hafkey to the Medical Examiner's stated findings, the physical and video record, and police-practices analysis, not the wholesale exclusion Defendants demand. *See Krause*, 459 F. Supp. 3d at 1266-67 (limiting, not excluding).

**B. Hafkey's Actual Methodology is the Accepted Methodology of His Discipline; the Post-Report Confirmations are Not His Methodology, and in any Event go to Weight.**

Defendants' reliability argument rests on a bait-and-switch: they present the Stretch Armstrong figurine and the living-room walk-through as though those produced the opinions. The record says otherwise. The report predates the demonstrations; Hafkey testified they merely "confirm[ed] my opinion that I had already written at that point." (ECF No. 108-2, Ex. 3 at 46:13-16, 48:16-20.) The opinions rest on their stated bases: the investigative file, the site inspection, the Radio/Video Timeline, the ME's findings, and three decades of law-enforcement experience. (ECF No. 108-2, Ex. 2 at OBREGON_000897-898.) That record-synthesis methodology is the same one every

defense police-practices expert employs, and it is reliable because its "reliability depends heavily on the knowledge and experience of the expert . . . ." *Hankey*, 203 F.3d at 1169. A private double-check of an opinion already formed and disclosed is not the "principles and methods" Rule 702(c) polices; if it were, every expert who re-reads his file with a skeptical eye would fail Rule 702.

Even judged on their own terms, the demonstrations are cross-examination material, not grounds for exclusion. The walk-through was a timing check: Hafkey measured the relevant distance from the FARO data, the Ring camera's field of view, and his site visit; identified the twelve actions Deputy Gibson described; and clocked the sequence twice, obtaining times exceeding the 3.5-second window each time. (ECF No. 108-2, Ex. 3 at 46:3-48:15, 53:3-11, 56:1-21.) Defendants may attack the exercise's rigor, but "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. The same is true of the figurine: a pin-and-rod visualization of the ME's stated wound paths is the demonstrative equivalent of the "straight stick" officers use at scene briefings (ECF No. 108-2, Ex. 3 at 50:1-13), and it is considerably more modest than the computer animations *Krause* admitted over identical objections. *See* 459 F. Supp. 3d at 1271-74. Nor is there any disclosure problem: the demonstrations were disclosed at deposition, and Defendants examined Hafkey about them at length.

Defendants' remaining reliability points misread the record:

First, as to "ipse dixit" – Hafkey's inference that the frontal shot came first and the gun fell at that point is tethered, step by step, to identified record facts: Gibson's testimony

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

10

that he saw the gun pointed at him, fired, and saw the gun fall; the gun's photographed and FARO-mapped position at Obregon's left, where it could not likely have landed had Obregon retained it through a 270-degree roll; the one-anterior/six-posterior wound distribution; and seven witnesses describing a pause between volleys. (ECF No. 108-2, Ex. 2 at OBREGON_000903-905; Ex. 3 at 94:1-96:14.) One may dispute the inference; that is what juries are for. But an opinion built on enumerated record evidence is the opposite of ipse dixit. *Cf. Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Second, regarding the moved gun – Hafkey did not ignore Deputy Gibson's testimony that he moved the gun; he relied on Gibson's own description of the movement ("slightly away from his body out of reach," about a foot). (ECF No. 108-2, Ex. 1 at 86:17-19, 138:18-22.) He then relied on the scene documentation of where the gun came to rest. Whether a one-foot post-shooting adjustment defeats an inference drawn from which side of the body the gun was on is a quintessential jury question. *See Elosu*, 26 F.4th at 1024 ("[C]oncerns [that] speak to corroboration, not foundation, [ ] are properly addressed through impeachment before a jury at trial – not exclusion . . . at the admissibility stage.").

Third, as to reaction time – Hafkey's acknowledgment that measuring a specific individual's reaction time requires individual testing (ECF No. 108-2, Ex. 2 at OBREGON_000913) is candor about the limits of his opinion, not self-refutation: his point is that the twelve actions did not fit the 3.5-second window even before adding any reaction time. "Lack of certainty is not, for a qualified expert, the same thing as guesswork." *Primiano*, 598 F.3d at 565.

**C. Any Legal-Conclusion Phrasing Warrants Limitation, not Exclusion: Hafkey May Testify That the Conduct Departed From Gnerally Accepted Police Practices.**

Plaintiffs do not quarrel with the settled rule that an expert may not announce legal conclusions. But the other half of that rule is equally settled: a police-practices expert may testify that an officer's conduct violated generally accepted police practices, training, and standards, and a "rational jury could rely upon such evidence in assessing whether the officers' use of force was unreasonable." *See Smith v. City of Hemet*, 394 F.3d 689, 703 (9th Cir. 2005) (en banc); *Davis*, 927 F.2d at 1484-85; *Larez*, 946 F.2d at 635. Testimony does not become inadmissible "just because it embraces an ultimate issue," Fed. R. Evid. 704(a), or because the expert "refer[s] to the law in expressing an opinion," *Hangarter*, 373 F.3d at 1016-17. The Ninth Circuit has reversed a district court for striking a police-practices expert on precisely the rationale Defendants advance:

> [t]he district court mistakenly concluded that a police practices expert cannot assist the jury in making the legal determination about whether an officer's conduct was 'reasonable' ... The report should have been admitted to assist the trier of fact in determining whether [the officer's] conduct deviated so far from institutional norms that the jury could conclude that [he] was [liable].

*Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018).

The substance of Opinion 1 is exactly that practices opinion: officers are trained to shoot and assess; universally accepted practice requires deadly force to stop when the perceived threat stops; and on this record, including Deputy Gibson's own testimony about when the threat ceased, the continued volley into Obregon's back departed from those practices. (ECF No. 108-2, Ex. 2 at OBREGON_000902-905.) To the extent the report's phrasing ("excessive," "justified under the 4th Amendment") borrows constitutional vocabulary, the routine and proportionate remedy in this District is an order that trial

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

testimony be framed as compliance with, or departure from, generally accepted police practices. That is the very order entered in *Krause*: "while Lauck may not use the terms and adopt the conclusions identified, the Court does not bar him from expressing opinions on the issues that derive from his expertise in police practices that fall short of legal conclusions." 459 F. Supp. 3d at 1265 & n.2; *accord Wheatcroft*, *supra*. Plaintiffs affirmatively accept such a limitation.

Defendants' "20/20 hindsight" point makes too much of one deposition answer. Hafkey expressly agreed that under the law a use of force is judged on a reasonableness standard, and he correctly identified the *Graham* factors. (ECF No. 108-2, Ex. 3 at 100:15-101:13.) His remark that lawyers hire experts to review events "after the fact" describes every retained expert in every case, including Defendants'. And his actual analysis honors the on-scene perspective: he credits Gibson's account of the initial threat and opines that the first shot was consistent with training and appears justified. (ECF No. 108-2, Ex. 2 at OBREGON_000899, 000902.) A stray colloquialism is impeachment fodder, not a Rule 702 defect. *See Alaska Rent-A-Car*, 738 F.3d at 969.

### D. Hafkey Offers No Credibility Opinions; He Compares an Account to the Physical, Video, and Audio Record, and His Investigative Practices Opinions are Relevant to the Claims Being Tried.

It is the jury's exclusive province to decide credibility, and Hafkey does not invade it. He nowhere opines that Deputy Gibson is lying or that any witness should be believed. Opinion 2 identifies objective tension between Deputy Gibson's account and fixed data points (the 3.5-second window, the radio timing, the wound distribution, the gun's location) and identifies concrete investigative steps never taken: DNA swabs collected from the gun

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

but never submitted for analysis; Obregon's backpack never examined against the trajectories; the anomalies in roughly two dozen witness statements never pursued. (ECF No. 108-2, Ex. 2 at OBREGON_000905-911.) Explaining that a version of events does not align with physical evidence is standard expert assistance, not vouching; Hafkey repeatedly emphasized that his opinions assume the accuracy of Gibson's statements and that other inferences are possible if those statements are set aside. (ECF No. 108-2, Ex. 3 at 98:17-99:6.) And the law does not require anyone to take an involved officer's account at face value: courts "may not simply accept what may be a self-serving account by the police officer," particularly "where there is contrary evidence." *Zion*, 874 F.3d at 1076 (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)).

The investigative-practices testimony is also independently relevant. Defendants' summary-judgment motion relies on the products of the very investigation Hafkey critiques, and a wrongful-death/gross-negligence claim concerning the failure to render aid remains against both Deputy Gibson and Sheriff Lamb. (ECF No. 110 at 7-8.) Testimony that the investigation deviated from institutional norms helps the jury weigh that investigation's conclusions. *Cf. Mellen*, 900 F.3d at 1104; *Krause*, 459 F. Supp. 3d at 1268 (declining to exclude opinion that officers violated departmental policies, which, "though not dispositive, may inform the trier of fact's determination"). If the Court finds the phrase "confirmation bias" unhelpful, the fix is an instruction that Hafkey describe the omitted investigative steps without psychological labels. That is a limitation, not exclusion.

///

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

14

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**E. Opinion 3 is Police Practices Testimony That Goes to the Heart of M.B.'s IIED Claim.**

Defendants argue Opinion 3 analyzes "the wrong claim" because M.B.'s surviving claim is IIED rather than a Fourth Amendment violation. That argument concedes that the conduct at issue, M.B.'s hour-long detention, is at the center of the case. The first element of IIED under Arizona law is "extreme and outrageous" conduct. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). What a civilized community may tolerate from a trained officer is measured in part against what police training and practice require, and that is not lay knowledge. Hafkey supplies the professional benchmark: accepted practice is to relocate witnesses outside a crime scene and shield them from it; to honor an identified, non-suspect witness's request to leave and arrange a later interview; and never to hold a visibly distraught minor inside the inner perimeter, twenty feet from a dying family friend, for over an hour despite repeated pleas to go inside her own home. (ECF No. 108-2, Ex. 2 at OBREGON_000913-915.) A jury deciding whether that was "utterly intolerable in a civilized community," *Ford*, 734 P.2d at 585, is plainly assisted by learning just how "far from institutional norms" such conduct was. *Cf. Mellen*, 900 F.3d at 1104.

Defendants' assertion that M.B. "recanted" as to Deputy Gibson misstates her testimony and, regardless, goes to the merits, not admissibility. M.B. testified that "Gibson was there the whole time at the scene" while officers, acting collectively, refused her requests to leave and told her to shut her mouth. (ECF No. 108-2, Ex. 9 at 75:12-76:18.) Whether Gibson directed, participated in, or acquiesced in the detention is a disputed fact for summary judgment and trial, not a reason to strike expert testimony describing the professional standards that governed the officers on that scene. Finally, if the Court

15

concludes that *Terry* and its vocabulary should not come in through Opinion 3, Plaintiffs do not oppose an order that Hafkey testify to witness-handling practices and the departures from them without opining that a "seizure" violated "the Fourth Amendment."

### F. Rule 403 Provides No Basis for Exclusion.

Rule 403 is "an extraordinary remedy to be used sparingly," and requires that "the danger of prejudice must not merely outweigh the probative value of the evidence, but *substantially* outweigh it." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (emphasis added) (citation omitted). Defendants identify no unfair prejudice at all, only the ordinary sting of adverse opinion evidence, every element of which they are fully equipped to cross-examine. The Court "should not make credibility determinations that are reserved for the jury," *City of Pomona*, 750 F.3d at 1044, and it should decline Defendants' invitation to resolve the parties' competing accounts of a disputed shooting under the heading of evidence law.

## IV. CONCLUSION

The Motion should be denied. In the alternative, the Court should deny the Motion except to order that: (1) Hafkey frame his trial testimony in terms of compliance with, or departure from, generally accepted police practices, rather than constitutional or legal vocabulary; and (2) Hafkey's testimony concerning wound trajectories be confined to the Medical Examiner's stated findings, on which he is entitled to rely under Rule 703.

///

///

///

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

16

**RESPECTFULLY SUBMITTED** this 14th day of July 2026.

MILLS + WOODS LAW, PLLC


By    /s/ Sean A. Woods
        Robert T. Mills
        Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, AZ 85014
        *Attorneys for Plaintiffs*


**CERTIFICATE OF SERVICE**

I hereby certify that on July 14, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
Laura Van Buren
lvanburen@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
lrasmussen@wienekelawgroup.com
1225 W Washington St., Ste. 313
Tempe, Arizona 85288
*Attorneys for Defendants*


    /s/ Ben Dangerfield