Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

*Attorneys for Defendants Lamb and Gibson*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB;<br><br>Plaintiffs,<br><br>v.<br><br>Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does 1-X,<br><br>Defendants. | NO. 2:24-cv-01510-PHX-KML<br><br>**DEFENDANTS' REPLY IN SUPPORT OF *DAUBERT* MOTION REGARDING PLAINTIFFS' POLICE PROCEDURES EXPERT MARK HAFKEY** |

Plaintiffs' Response does not defend the opinions Mr. Hafkey actually disclosed. It rewrites them. Where his report rendered legal conclusions regarding the Fourth Amendment, the Response promises testimony about "police practices." Where his report purports to reconstruct the sequence of the shots, the roll of Mr. Obregon's body, and the moment the gun fell, the Response insists he merely adopted those findings from the Medical Examiner's report, despite the report not rendering any such conclusions. And if, as Hafkey's invoice suggests, the reenactment and figurine exercise were conducted prior to the report being completed and formed part of the basis of his opinions, then those opinions rest on an unrecorded, unscientific and ad hoc demonstration. If instead, as Plaintiffs now insist, Hafkey completed his opinions before any reenactment or

reconstruction, then his opinion lacks any reliable scientific basis, as merely reading the Medical Examiner's report cannot qualify a police-practices expert to reconstruct a shooting. *Krause v. County of Mohave*, 459 F. Supp. 3d 1258, 1266 (D. Ariz. 2020). Each revision is a concession: definitionally, an opinion that must be reworded, re-founded, or re-dated to survive Rule 702 does not meet the admissibility requirements imposed by the rule. The Court's gatekeeping obligation rests on the opinions and methodology disclosed in his mandatory report, not on the improved version Plaintiffs' brief imagines, and Plaintiffs bear the burden of establishing that expert's reliability by a preponderance of the evidence. Fed. R. Evid. 702; Fed. R. Evid. 702 advisory committee's note to 2023 amendment. They have not carried that burden. The Court should exclude Hafkey's testimony in its entirety. At a *minimum*, the Court should hold Plaintiffs to the two limitations they themselves propose: that Hafkey testify only to departures from generally accepted police practices, without constitutional or legal conclusions; and that he does not provide any testimony that goes beyond the medical examiner's stated findings, including the sequence of shots, the position of the body, and when precisely Obregon dropped his firearm.

## I.    PLAINTIFFS' SILENCE CONCEDES THE FATAL-WOUND AND MEDICAL-CAUSATION GROUNDS FOR EXCLUSION.

First, Hafkey cannot support his core theory, that the first shot was justified but the later shots were excessive, without any evidence of what order the shots were fired. He also cannot support any argument that it was the later-fired shot(s)—not the first, admittedly-justified shot—that was fatal. Hafkey admits he has no opinion on "which gunshot wound or wounds was fatal," and he conceded that "[t]o know for certain, if you don't know the sequencing of the rounds, would be extremely difficult to ascertain." (Ex. 3, Hafkey Depo. at 72:1–11.) He therefore cannot exclude the possibility that the concededly justified first shot was itself the fatal one, and he lacks the medical qualifications to try. (Mot. at 11–12 (citing Estate of *Jaquez v. Flores*, 2016 U.S. Dist. LEXIS 42579, at *9–10 (S.D.N.Y. 2016)).) The response does not address this argument.

These concessions undermine his core conclusions. Opinion 1's theory is that the rounds Deputy Gibson fired after the perceived threat ceased violated police practices, and that the first shot was justified. But without knowing the order in which Obregon's wounds were created and which were fatal, Hafkey cannot know whether Obregon was even alive after the first shot struck him, or whether the threat was still continuing after that first shot. Without expert medical testimony affirmatively identifying which shot in the sequence caused the fatal injury, Hafkey's Opinion 1 cannot tell the jury whether the concededly justified first shot or the challenged later rounds killed Obregon. *See Estate of Jaquez*, 2016 U.S. Dist. LEXIS 42579, at *9–12 (holding that, where only the final shot in a multi-shot encounter remained at issue, the jury could not "parse the effect of the final shot from that of the initial volley" without expert medical evidence, and Plaintiffs could not "seek damages that were caused by Mr. Jaquez's death"). An opinion that cannot connect the conduct it criticizes to the injury the jury must assess does not "help the trier of fact," Fed. R. Evid. 702(a), and that defect infects Opinion 1 as a whole. Second, the Motion sought exclusion of any opinion on whether or when medical aid would have affected the outcome. (Mot. at 14–15, § III.G.) The Response is silent on this argument as well. The Court may deem a party's failure to respond to an argument as consent to its disposition. See LRCiv 7.2(i). The Court should exclude any opinions from Hafkey that veer into whether or when medical aid would have affected the outcome.

## II.   HAFKEY'S OWN INVOICE AND PHOTOGRAPHS REFUTE PLAINTIFFS' CLAIM THAT HIS REPORT PRECEDED HIS "DEMONSTRATIONS."

### A.   Hafkey photographed and billed the demonstrations sixteen days before he signed his report.

Defendants' Motion recounted Hafkey's testimony that his living-room reenactment and figurine exercise "helped me confirm my opinion that I had already written at that point" to demonstrate that Hafkey did not use a scientific methodology but prejudged a conclusion and then sought evidence to justify it. (Mot. at 10 (quoting Ex. 3 at 46:13–16).) Plaintiffs have now converted Hafkey's self-serving characterization into the linchpin of their opposition, declaring that they were not mentioned in his report because "neither is a basis

3

for it," and that the record is clear that "[t]he report predates the demonstrations." (Resp. at 5, 9–10.) Hafkey himself was not so certain. Pressed on the sequence, he stated: "And that's what I'm telling you, I can't remember exactly. It would have been near the completion of my opinion, or even after I had written it, I might have gone back and just confirmed by doing that." (Ex. 3 at 52:13–19.)

Fortunately, the contemporaneous records resolve what Hafkey's memory could not. His signed report is dated January 31, 2026. (Ex. 2 at OBREGON_000915.) Hafkey took the figurine photographs sixteen days earlier, on January 15, 2026, a date he confirmed at his deposition based on the metadata from the pictures on his phone, and one Plaintiffs' own Response concedes. (Ex. 3 at 73:10–74:03; Resp. at 5.) Hafkey's invoice, moreover, bills January 15 as "**Tragectory [sic] analysis**, timing, and statement analysis." *See* Ex. 10, Hafkey invoice.[1] He testified that this work included "**reenacting what the officer said occurred** and comparing it with the timeline." (Ex. 3 at 44:20–45:18 & Depo. Ex. 3.) In other words, Hafkey billed the demonstrations to Plaintiffs as analysis,[2] performed them around the same time as his January 10 site visit (*id.* at 52:19–23) and completed them weeks before he signed his report.

Asked what the reenactment accomplished, Hafkey's answered: "[I]t helped me develop my opinion. Well, it helped me confirm my opinion that I had already written at

---

[1] Hafkey's invoice is attached as Exhibit 10. Consideration of the invoice on reply is proper because it responds directly to an assertion Plaintiffs raised for the first time in their Response: that "Hafkey's report was complete before either 'demonstration.'" (Resp. at 5.) Evidence submitted in direct rebuttal to arguments raised in an opposition is not "new" reply evidence. *TSI Inc. v. Azbil BioVigilant Inc.,* 2014 U.S. Dist. LEXIS 28938, 2014 WL 880408, 1 (D. Ariz. 2014). Nor should the invoice be a surprise: it is Hafkey's own billing record, which he produced from his file, was marked as Exhibit 3 at his April 24, 2026 deposition, and about which both parties examined him.

[2] In their response, Plaintiffs claim that "Hafkey renders no independent ballistics or wound path opinion." (Resp. at 7) They state that "His 'trajectory analysis' consisted of 'comparing primarily the medical examiner's report of the injuries and seeing how they align to the rounds fired,' meaning the rounds that struck Obregon. . . . **He did not perform, and does not claim to have performed, independent forensic trajectory reconstruction: his understanding of the wound paths 'was 100 percent based on the written opinion from the medical examiner,' because he is 'not trained well enough' to read autopsy photographs**." (Resp. at 4) (emphasis added). The Plaintiffs' statement is plainly contradicted by Hafkey's own invoice.

that point." (*Id.* at 46:13–16.) The mid-sentence correction is his own. The stickpins "helped me understand what position Mr. Obregon's body was in when the rounds were fired." (*Id.* at 50:20–23.) He "maneuver[ed] the figurine to help determine how both posterior and anterior rounds could have occurred and what the body's position must have been in." (*Id.* at 51:10–14.) And through the doll, the cue stick, and his daughter's timed walk-through, he "got a better grasp of how Mr. Obregon must have been shot." (*Id.* at 47:14–20.) Body position, roll, and shot sequence make up a significant part of the basis of Opinion 1. By claiming the demonstrations were only conducted to "confirm" his opinions after the report was written, Plaintiffs have attempted to sever Hafkey's methodology from his opinions; but in doing so they undermined the basis for those opinions and contradicted the contemporaneous written records that both parties maintained.

> **B.      If the demonstrations formed the basis of his opinion, they fail every Rule 702 reliability factor.**

If the demonstrations were part of the analysis and opinion formation, as the invoice describes and the timeline suggests, then the principles and methods that formed the basis of his opinions were: a nine-to-ten-inch toy doll that Hafkey used because it was "handy" and never confirmed was to scale (Ex. 3 at 49:13, 57:13–15); sewing pins and a pool cue; and a stopwatch exercise that his seventeen-year-old daughter performed in the family living room (*id.* at 55:10–20). No court, jury, or opposing expert can test, replicate, or review any of it. It has no error rate and no professional standard. *Daubert v. Merrell Dow Pharms*., Inc., 509 U.S. 579, 593–94 (1993).

Plaintiffs' "both ways" analogy to the animations that were admitted in *Krause* fails at every point of comparison. There, the Plaintiff "d[id] not dispute Tavernetti's qualifications" to generate the depictions; the court found that his CV and report "establish his qualifications"; and he supplied "detailed foundation for each animation by citing the record evidence relied upon," including the specific autopsy measurements he used. *Krause*, 459 F. Supp. 3d at 1271–72. Here, Hafkey's qualifications are a contested issue, and Hafkey was not nearly so rigorous in his documentation and citation. *Krause* admitted properly

5

disclosed demonstratives prepared by a qualified expert accompanied by citation and documentation. It does not purport to launder an undocumented reconstruction by an unqualified expert.

### C.    If they were mere "confirmation," Hafkey formed his opinions without any testing.

Plaintiffs cannot escape by insisting the demonstrations came after the fact, because that account concedes the Motion's other argument: Hafkey fully formed his opinions before performing any testing of any kind. Asked whether he performed "any other kind of testing," Hafkey answered: "No. Mainly just running scenarios through my brain, reading the material, putting myself in the officer's shoes, and running it through my head over and over and over." (Ex. 3 at 97:19–98:03.) He prepared no diagrams and used no software, although he acknowledged that reconstruction tools exist in the industry and that he is "not skilled" to use them. (*Id.* at 98:04–16.) In Hafkey's words, the demonstrations served "just to help me confirm what my brain said had occurred based on just reading the material." (*Id.* at 51:20–22.) Reaching a conclusion first and "confirming" it afterward is the definition of result-driven analysis the rules are intended to forbid, and Rule 702 does not permit "taking the expert's word for it." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It is also, notably, the precise "confirmation bias" methodology Hafkey condemns in others. (Ex. 2 at OBREGON_000909–910.)

*United States v. Hankey* does not paper over that crack. Experience can supply reliability for opinions that experience actually generates, such as testimony about training and accepted practices. 203 F.3d 1160, 1169 (9th Cir. 2000). It does not supply reliability for forensic reconstruction of shot sequence and body kinematics, which is precisely the reason *Krause* excluded such specialized conclusions from an otherwise "generally qualified" police-practices expert. 459 F. Supp. 3d at 1265–66, 1270–71. Plaintiffs' weight-not-admissibility refrain, meanwhile, rests entirely on authority predating the December 2023 amendment to Rule 702: *City of Pomona* (2014), *Primiano* (2010), *Alaska Rent-A-*

6

*Car* (2013), and *Elosu* (2022). The amendment rewrote Rule 702's text to state expressly that the proponent must demonstrate to the court that it is more likely than not that the testimony rests on sufficient facts and reflects a reliable application of reliable principles and methods. As explained by the committee, rulings holding that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility ... are an incorrect application of Rules 702 and 104(a)." Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

### D. Hafkey's report disclosed neither the demonstrations nor the photographs.

A written report "must contain" the facts or data considered, and any exhibits used to summarize or support the opinions. Fed. R. Civ. P. 26(a)(2)(B)(ii)–(iii). The figurine photographs existed on January 15, which he admits was before he received a subpoena for his files and two weeks before he signed his report. Yet the report neither mentions the demonstrations nor attaches the photographs, and Hafkey produced them only after his April 24, 2026, deposition while apologizing that he "can't remember sending them." (Ex. 3 at 73:10–74:03.) Disclosure by deposition surprise is not appropriate disclosure, and the inconsistency about how Hafkey came to his conclusions and what methods he used to get there demonstrates how the Defendant has been prejudiced by the late disclosure. Exclusion is the proper remedy. Fed. R. Civ. P. 37(c)(1); *Krause*, 459 F. Supp. 3d at 1270–71 (excluding untimely opinion).

### III. RULE 703 DOES NOT COVER OPINIONS THE MEDICAL EXAMINER NEVER STATED.

Plaintiffs' qualifications argument rests on a sleight of hand: because Hafkey took Dr. Hu's (the ME's) wound-path descriptions "100 percent" as given, he supposedly offers no trajectory opinion at all. (Resp. at 7.) But the opinions Defendants are contesting are not Dr. Hu's findings. The Medical Examiner documented wound locations and a per-wound trajectory description. *See* Ex. 4. He did not opine on the order of the shots, the position or rotation of Mr. Obregon's body during the volley, or when the handgun left his hand. Those

conclusions are Hafkey's alone. By his own description, that analysis rested on "**what I extrapolated** as the angle of fire and the distance the officer was from Mr. Obregon" (Ex. 3 at 94:6–8) (emphasis added) and on "the physics of somebody having a gun while on their side and then doing almost a complete roll the opposite way" (*Id.* at 96:9–14). Extrapolating body kinematics and shot sequencing from an autopsy is beyond the qualifications of a police practices expert, and Plaintiffs admit that he is "not trained well enough" to read autopsy photographs. (Resp. at 4). "Reading a coroner's report does not transform a police practices expert into an expert on bullet trajectory analysis." *Krause*, 459 F. Supp. 3d at 1266 (quoting *Dominguez v. City of Los Angeles*, 2018 WL 6164278, at *9 (C.D. Cal. Oct. 9, 2018)). Krause excluded exactly this category of testimony, the expert's "conclusions regarding the physical locations and orientations" of the participants, while preserving his general police practices opinions. *Id.* at 1270–71.

Plaintiffs' own fallback concession proves the point. They "affirmatively accept" a limiting order (Resp. at 13) under which Hafkey's trajectory testimony would be confined "to the Medical Examiner's stated findings" (Resp. at 16). Because Dr. Hu never stated a shot sequence, a 270-degree roll, a body position for each round, or the moment that Obregon dropped the gun, an order holding Hafkey to the Medical Examiner's stated findings would exclude those opinions. What Plaintiffs may not do is invoke the limitation while Hafkey continues to testify, in substance, to the conclusions he extrapolated from the medical examiners reports that he is not qualified to give.

## IV.   HAFKEY'S CONSTITUTIONAL VERDICTS AND HINDSIGHT ANALYSIS REQUIRE EXCLUSION, NOT RELABELING.

A police-practices expert may testify that conduct departed from generally accepted practices, but he may not announce legal conclusions. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 n.10 (9th Cir. 2002); *Krause*, 459 F. Supp. 3d at 1265 & n.2. Plaintiffs concede that an order limiting Hafkey to testify regarding "compliance with, or departure from, generally accepted police practices, rather than constitutional or legal vocabulary." (Resp. at 12–13, 16.) However, Hafkey's legal conclusions go deeper than a matter of vocabulary.

Hafkey's misunderstanding of the *Graham* factors and Fourth amendment analysis irreversibly colors his opinions and risks tainting the jury itself.

Plaintiffs' claim that the hindsight problem is a "stray colloquialism" and that Hafkey "expressly agreed" with the governing standard (Resp. at 13) misdescribes the transcript. Asked directly whether he agreed that force "should not be viewed with the benefit of 20/20 hindsight," Hafkey called it "a loaded question" and answered that "the courts and the juries want to have somebody come in and provide a 20/20 opinion after the fact. And that's what I was hired to do and that's what I have tried to do." (Ex. 3 at 100:22–101:04.) He agreed only to a generic "reasonableness standard" (*id.* at 101:11–13), and his recitation of the *Graham* factors named only the severity of the crime, omitting the immediacy of the threat and active resistance or flight, the factors most relevant to this case (*id.* at 100:15–21). *See Graham v. Connor*, 490 U.S. 386, 396 (1989). Hafkey clearly states that applying hindsight was his analytical framework from the beginning, and no limiting instruction can cure testimony that invites he jury to apply the wrong standard. Fed. R. Evid. 702(a).

## V. OPINION 2 ATTACKS GIBSON'S CREDIBILITY AND AN INVESTIGATION NO CLAIM PUTS AT ISSUE.

Opinion 2 states in full: "There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident." (Ex. 2 at OBREGON_000899.) Plaintiffs argue that this testimony is relevant because Defendants' summary-judgment motion relies on the investigation's products and because "[t]estimony that the investigation deviated from institutional norms helps the jury weigh that investigation's conclusions." (Resp. at 14.) The argument fails at Rule 401: no surviving claim challenges the investigation, and whether PCSO's after-the-fact investigation followed institutional norms makes no fact about the shooting, the failure to render aid, or M.B.'s detention more or less probable. Plaintiffs' own sentence identifies the testimony's true function: the jury would be "weigh[ing]" the credibility of the investigation and of Deputy Gibson's account, and credibility belongs to the jury alone. *United States v. Sanchez-Lima*, 161 F.3d 545, 548 (9th

Cir. 1998). Their claim that Hafkey offers no credibility opinions fails on their own authority. *Zion* instructs that a court does not need to simply accept what may be a self-serving account by the police officer when the record contains contrary evidence, *Zion v. County of Orange,* 874 F.3d 1072, 1076 (9th Cir. 2017) (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)), but inherently, declining to accept one account in light of contrary evidence is definitionally an assessment of its credibility[3]. The jury can make that assessment without help: it needs no expert "[e]xplaining that a version of events does not align with physical evidence." (Resp. at 14.) At minimum, Plaintiffs concede that the Court can strip the "confirmation bias" label (*id.*), and the Court should enter that concession as an order.

## VI.    OPINION 3 ANALYZES THE WRONG CLAIM AGAINST THE WRONG OFFICERS.

Plaintiffs concede that Hafkey's discussion of *Terry* stops and use of legal and constitutional language could be excluded (Resp. at 15–16.) But there is simply no way to separate Opinion 3 from Hafkey's legal conclusions. Opinion 3 states that "Mariah Brady was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment." (Ex. 2 at OBREGON_000899.) The "IIED benchmark" opinion the Response describes appears nowhere in the report, and Plaintiffs cannot introduce it by brief. Fed. R. Civ. P. 26(a)(2)(B).

Nor did the Motion "misstate" the deposition. Ms. Brady affirmatively changed her interrogatory answer at deposition, testifying that "it wasn't Gibson directly" who told her she would be arrested if she moved. She explained that she had named him only "because he was there the whole time." And whoever told her to "shut her f'ing mouth," she testified, "wasn't Dep. Gibson." (Ex. 9, M.B. Depo. at 75:2–76:15.) Deputy Gibson likewise testified that he did not tell her not to leave and did not witness any PCSO personnel forcing her to

---

[3] Credibility is "the fact that someone can be believed or trusted," *Credibility*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/credibility (last visited July 20, 2026).

remain near the body. (Ex. 1, Gibson Depo. at 162:11–163:11.) Opinion 3 attempts to impute the alleged conduct of other, unnamed officers to Deputy Gibson simply because he was present at the scene and should be excluded under Rule 403.

## VII.   CONCLUSION

The Court should exclude Mr. Hafkey's opinions and testimony in their entirety. In the alternative, the Court should enter an order: (1) excluding, as unopposed, any opinion identifying fatal wounds or addressing medical care or causation; (2) adopting Plaintiffs' proffered limitation confining Hafkey to the Medical Examiner's stated findings and, because the Medical Examiner stated no shot sequence, body position, roll, or gun-drop timing, excluding those reconstruction opinions; (3) barring constitutional and legal vocabulary and any opinion on the ultimate reasonableness of the force; (4) excluding "confirmation bias" testimony and any commentary on the credibility or accuracy of Deputy Gibson's account; and (5) excluding the entirety of Opinion 3 as irrelevant.

DATED this 21st day of July, 2026.

WIENEKE LAW GROUP, PLC

By:   */s/ Laura Van Buren*
Kathleen L. Wieneke
Laura Van Buren
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants Lamb and Gibson*

11

**CERTIFICATE OF SERVICE**

I hereby certify that on July 21, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

N/A

By:   */s/ Lauren Rasmussen*