Robert T. Mills (Arizona Bar #018853)
Sean A. Woods (Arizona Bar #028930)
**MILLS + WOODS LAW, PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com
swoods@millsandwoods.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as personal representative of The Estate of Micheal Obregon; Meagan Brady, on behalf of and as legal guardian and parent of her minor child, MB,

Plaintiffs,

vs.

Ross Teeple; and, Brady Gibson,

Defendants.

Case No.: CV-24-1510-PHX-KML

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**(ORAL ARGUMENT REQUESTED)**

(Assigned to the Honorable Krissa M. Lanham)

Plaintiffs respond in opposition to Defendants' Motion for Summary Judgment (Doc. 110). The motion rests on Deputy Brady Gibson's account that he fired all ten of his rounds in a single, continuous response to Obregon pointing a handgun at him. Plaintiffs do not dispute, for purposes of this motion, that Gibson would have been entitled to respond with deadly force if Obregon pointed a gun at him. (Ex. 6 at OBREGON_000899.) The evidence, however, creates a genuine dispute of material fact as to whether Gibson continued to fire after the gun had fallen from Obregon's hand and Obregon lay prone and wounded on the ground. Two neighbors heard an initial shot, a pause, and a second group of shots. (Ex. 2 at 14:19-15:13; Ex. 3 at 29:21-30:8.) M.B. looked out her window after the first shots and saw Gibson standing over Obregon with his gun pointed at him while

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Obregon lay on his stomach; she left the window and then heard additional shots. (Ex. 4 at 51:7-15, 53:17-54:7.) The autopsy documented one anterior entrance wound and several posterior entrance wounds. (Ex. 5 at DEFS_Obregon 000093-95.) Gibson himself testified that he continued firing until he perceived that the gun had dropped and the threat had ended. (Ex. 1 at 132:18-22, 133:9-25.)

Because a jury could find from this evidence that the later rounds were fired after Obregon no longer posed an immediate threat, summary judgment is not available on the excessive force claim, on the Arizona justification defense, or on qualified immunity, which *Zion v. County of Orange* forecloses on these facts. The remaining claims present factual disputes of the same kind.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. STATEMENT OF FACTS

### A. Gibson fired ten rounds, and testified that he stopped firing when he saw the gun fall.

For purposes of this motion, Plaintiffs do not dispute that Gibson stopped Obregon for a traffic violation, that Obregon volunteered that he had outstanding warrants, or that Obregon ran from Gibson and fell before the shooting. (Doc. 110 at 2-3.) Gibson testified that Obregon fell on his stomach while fleeing, that Gibson got on top of him, that Obregon reached across his body and pointed a handgun at Gibson, and that Gibson pushed away, drew his own weapon, and fired. (Ex. 1 at 82:4-83:23.) Gibson acknowledged firing ten rounds but did not remember whether he fired them in one continuous sequence or in separate groups. (*Id.* at 84:18-85:3.)

Gibson further testified that his training and muscle memory "didn't stop until" he perceived that Obregon no longer possessed the handgun, that the gun had dropped, and that the imminent threat had stopped, and that seeing the gun on the ground was what told him the threat had been neutralized. (*Id.* at 132:18-22, 133:9-134:3.) Under Gibson's own account, therefore, the moment the gun left Obregon's hand marked the end of both the threat and his justification for using deadly force.

**B. <u>The eyewitnesses described separate volleys and shots fired at Obregon while he lay on the ground.</u>**

Wade Putt heard one shot, a pause, and then three more shots. (Ex. 2 at 14:19-15:13.) Samantha Plummer heard one shot, a pause she estimated at 15 to 30 seconds while acknowledging she could not time it precisely, and then four more shots. (Ex. 3 at 13:23-14:2, 29:21-30:8.) Brandon Chapman heard four shots and did not hear the other six. (Ex. 13 at 19:6-10, 46:14-47:6.)

M.B. heard yelling inside her home and walked toward the living room window, hearing gunshots as she approached. When she reached the window she saw Gibson standing over Obregon with his gun pointed at him while Obregon lay on his stomach. M.B. ran back toward her room and then heard additional gunshots. (Ex. 4 at 51:7-15.) She estimated that she heard five or six shots before she reached the window, that 15 to 20 seconds passed while she was at the window, and that she then heard one or two more shots. (*Id.* at 53:19-54:7.) When she went outside she did not see a gun near Obregon. (*Id.* at 51:16-21.) A jury is entitled to credit this testimony even if it rejects other portions of M.B.'s account.

Defendants assert that three neighbors "independently corroborate that Obregon was armed" because they heard Gibson command Obregon not to reach for the gun (Doc. 110 at 4), but the deposition testimony does not support that characterization. Chapman heard nothing said by either man before the shots, and he heard "Don't reach for the gun" only after the gunshots, when he stepped onto his porch and saw Gibson taking cover behind his patrol vehicle. (Ex. 13 at 18:19-19:5, 19:22-20:19, 44:3-10.) Plummer likewise heard that command only after the shooting. (Ex. 3 at 14:1-7, 21:1-3.) Putt heard something to the effect of "put the gun down" before the shots, but the patrol vehicle blocked his view of Obregon. (Ex. 2 at 13:4-21.) Chapman, who watched the two men before the shooting from a direct line of sight, never saw Obregon pull out a gun or threaten the deputy. (Ex. 13 at 36:10-20, 45:9-13.) Commands shouted after the shooting do not establish what Obregon held when each round was fired. Defendants' own expert, Dr. James Borden, acknowledges

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

that no witness saw Obregon holding a gun and that the witnesses disagreed about the number and timing of the shots. (Ex. 7 at 20-22.)

Two neighbors also heard what Gibson said as he fired. Whitney Hector, who was outside her house, declares under penalty of perjury that she heard Gibson yell "Stop!", then heard five or six shots, then heard him yell "I bet you're scared of me now!", then heard three more shots. (Ex. 14 at OBREGON_000885.) Samantha Dean, who lives one street over, wrote to Allison Obregon the next morning that she heard the deputy say "I bet your scared of me now huh" and then heard the shots. (Ex. 15 at OBREGON_000743; see also Ex. 6 at OBREGON_000909.) Gibson denies saying it. (Ex. 1 at 125:14-19.) Plaintiffs' acoustical consultant, Anthony Sola, tested whether a shout from the shooting address could be heard and understood at Dean's address on North Battleford Drive, approximately 1,270 feet away. He measured the ambient noise there at 38 to 42 dBA, which he describes as a very quiet area, found that a shout of ordinary volume from the shooting address was clearly audible and completely intelligible at the listening location under atmospheric conditions similar to those on the night of the shooting, and concluded that "[i]t is entirely possible that the shout the night of the incident was audible and intelligible at the listener location." (Ex. 16 at OBREGON_000891-92.) Defendants' motion to exclude Sola's opinions (Doc. 102) was denied without prejudice to refiling by July 6, 2026 (Doc. 107), and Defendants did not refile it. Gibson's statement is an admission of a party opponent, Fed. R. Evid. 801(d)(2)(A), and both witnesses have been disclosed and can give the same testimony at trial. See Fed. R. Civ. P. 56(c)(2).

**C. <u>The physical evidence is consistent with the eyewitness testimony.</u>**

The medical examiner attributed Obregon's death to multiple gunshot wounds and classified the manner of death as homicide. (Ex. 5 at DEFS_Obregon 000091.) The autopsy documented an entrance wound to the front of the upper abdomen, together with entrance wounds to the posterior right shoulder, the right upper back, the left mid back, and the

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

posterior lateral left thigh, and a graze wound to the back of the neck. (*Id.* at DEFS_Obregon 000093-95.) Several of the wound trajectories ran from back to front. (*Id.*)

Plaintiffs' police practices expert, Mark Hafkey, accepts for purposes of his analysis that Gibson could lawfully respond to an initial gun threat. (Ex. 6 at OBREGON_000899.) Based on the wound locations, the position of the gun at the scene, Gibson's testimony, the Ring camera video, and the witness accounts, Hafkey concludes that the first, frontal shot caused Obregon to turn or roll, and that the later posterior shots were fired after Obregon no longer posed a threat. (*Id.* at OBREGON_000904-05.) Hafkey also explains that the gun was found to Obregon's left and rear, a location inconsistent with Obregon having retained it through the full rolling movement Gibson described. (*Id.* at OBREGON_000904; Ex. 8.) Chapman placed the gun three to four feet from Obregon's body (Ex. 13 at 26:13-15), a distance Defendants treat as proof that Obregon was armed when shot (Doc. 110 at 4), but which is equally consistent with a gun that left his hand before the later rounds.

The Ring camera video does not show either man clearly at the moment of the shooting, and both men are out of view for roughly 3.5 seconds before the shots. (Ex. 9 at 03:09-03:17; Ex. 6 at OBREGON_000911-12.) Neither the video nor the toxicology report (Doc. 110 at 5) bears on whether the gun had already fallen when Gibson fired the later rounds.

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate only when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court must view the evidence in the light most favorable to Plaintiffs and may not make credibility determinations, a principle of particular weight in a fatal police shooting, where the officer is the only surviving participant. *See Cruz ex rel. Estate of Cruz v. City of Anaheim*, 765 F.3d 1076, 1079-80 (9th Cir. 2014). In cases where the individual shot by the officer did not survive, the court must "carefully examine all the evidence in the record,"

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and may *not* "simply accept what may be a self-serving account by the police officer" when circumstantial evidence could potentially support a contrary finding. *Id.* at 1079.

Because the Case Management Order suspends LRCiv 56.1 except for subsection (d) (Doc. 19 at 6), Plaintiffs have set out the disputed facts in this response with citations to the attached exhibits.

## III. A GENUINE DISPUTE OF MATERIAL FACT EXISTS AS TO WHETHER GIBSON USED EXCESSIVE FORCE AFTER THE THREAT HAD ENDED.

Whether the force used to make a seizure was reasonable under the Fourth Amendment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Of those three factors, the immediate threat to officers or others is the most important, and the Court looks to the totality of the circumstances at the moment the officer fired. *Napouk v. Las Vegas Metropolitan Police Department*, 123 F.4th 906, 915, 917-18 (9th Cir. 2024). The mere possession of a weapon has never, by itself, justified the use of deadly force. *Id.* at 917.

The remaining *Graham* factors, the severity of the crime and Obregon's flight (Doc. 110 at 9-10), describe the beginning of the encounter; a wounded man lying face down with the gun beside him is neither fleeing nor resisting arrest. Defendants' motion treats all ten shots as a single event, but the evidence, viewed in Plaintiffs' favor, supports a different sequence: an initial shot, a pause, and a later group of shots fired while Obregon lay prone under Gibson's aim, followed by multiple posterior entrance wounds with back-to-front trajectories. (Ex. 2 at 14:19-15:13; Ex. 3 at 29:21-30:8; Ex. 4 at 51:7-15, 53:17-54:7; Ex. 5 at DEFS_Obregon 000093-95; Ex. 6 at OBREGON_000904-05.) Gibson's own testimony establishes why this sequence is material. He testified that he fired until he perceived that the gun had fallen and the threat had stopped. (Ex. 1 at 132:18-22, 133:9-25.) If the jury finds that the gun fell before the later shots were fired, then Gibson's stated justification for

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

using deadly force had ended before he fired them. Hector's account that Gibson yelled "I bet you're scared of me now!" after the first volley and before the final three shots supports the same sequence from a different direction. A jury that credits her could find that Gibson paused after Obregon went down, taunted him, and then fired again, which is not the sudden, reactive response to a pointed gun that Gibson describes. (Ex. 14 at OBREGON_000885; Ex. 15 at OBREGON_000743; Ex. 16 at OBREGON_000891-92; Ex. 1 at 125:14-19.)

*Napouk* does not require a different result. The decedent there repeatedly ignored commands and advanced on the officers with what they reasonably believed was a bladed weapon, coming within about nine feet before they fired, 123 F.4th at 912, 916, and the court expressly rejected the proposition that an armed individual may be shot in the absence of an immediate threat, *see id.* at 917-18. Nor may the Court accept Gibson's description of a rapid reaction to a perceived threat; even though multiple officers in *Cruz* testified that the decedent reached for a gun in his waistband, the Ninth Circuit nonetheless held that other circumstantial evidence, most notably that *Cruz* had no gun on him, created a jury question. *See* 765 F.3d at 1079-80.

## IV. <u>GIBSON IS NOT ENTITLED TO QUALIFIED IMMUNITY, BECAUSE *ZION* CLEARLY ESTABLISHED THAT AN OFFICER MAY NOT CONTINUE SHOOTING A WOUNDED SUSPECT WHO NO LONGER POSES A THREAT.</u>

To defeat qualified immunity, a plaintiff must identify precedent involving similar circumstances that defines the right at issue with a high degree of specificity. *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026). *Zion v. County of Orange*, 874 F.3d 1072 (9th Cir. 2017), satisfies that standard.

In *Zion*, officers shot a man nine times after he attacked an officer with a knife, and he fell to the ground; an officer then approached and fired nine more rounds while the man lay wounded. *See id.* at 1075. The Ninth Circuit held that a reasonable jury could find that the man no longer posed an immediate threat when the second volley was fired, and it

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

rejected the argument that an officer who is justified in firing may continue shooting until the suspect stops moving, explaining that terminating a threat does not necessarily mean terminating the suspect and that a reasonable officer would reassess rather than continue shooting once the suspect is on the ground and appears wounded. *See id.* at 1076. The court further held the law clearly established, because the use of deadly force against a suspect who no longer poses a threat, including continued force against a suspect who has been brought to the ground, violates long-settled Fourth Amendment law. *Id.* at 1076-77.

*Zion* involved the same circumstances presented here: an asserted initial weapon threat, multiple rounds, a suspect brought to the ground, and evidence from which a jury could find that the later rounds came after the threat had ended. On Plaintiffs' facts, *Zion* placed the unlawfulness of the later shots beyond debate.

The en banc Ninth Circuit reaffirmed *Zion* in 2025, holding that "*[i]t has been clearly established for more than a decade* that when an officer shoots and wounds a suspect, and he falls to the ground, the officer *cannot* continue to shoot him, absent some indication that he presents a continuing threat, *without first reassessing* the need for lethal force." *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 795, 802-03 (9th Cir. 2025) (en banc), cert. denied, No. 25-538 (U.S. June 22, 2026) (emphasis added) (citing *Zion*, 874 F.3d at 1076). The entire shooting in *Hernandez* lasted six seconds, and yet the court nonetheless held that a jury could find the final volley unreasonable because it was fired after the suspect had collapsed. *See id.* at 794-795.

The authorities on which Defendants rely, *Kisela*, *Sabbe*, *Strickland*, *Napouk*, and *Blanford*, each concern an officer's initial decision to fire when confronted with a person holding a weapon. (Doc. 110 at 9-11.) *Sabbe* states the rule on which Defendants rely, that "when a suspect reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." *Sabbe v. Washington County Board of Commissioners*, 84 F.4th 807, 828 (9th Cir. 2023). Plaintiffs do not dispute that rule as

applied to the first shot, but none of Defendants' authorities holds that an officer may continue firing at a wounded, prone suspect after the weapon has left his hand.

Defendants also rely on the panel opinion in *Easley v. City of Riverside*, 890 F.3d 851 (9th Cir. 2018), quoted at page 12 of their motion, but that opinion is not precedent, as the Ninth Circuit granted rehearing en banc and ordered that "[t]he three-judge panel disposition in this case shall not be cited as precedent by or to any court of the Ninth Circuit." *Easley v. City of Riverside*, 908 F.3d 1156, 1157 (9th Cir. 2018) (order). The en banc court then *reversed* the grant of summary judgment because the district court had resolved disputed facts and made credibility determinations, which are reserved for the jury. *Easley v. City of Riverside*, No. 16-55941, Mem. at 4 (9th Cir. Apr. 3, 2019) (en banc). *Easley* therefore undermines Defendants' request that the Court accept Gibson's version of events.

## V. PLAINTIFFS' STATE LAW CLAIMS SURVIVE BECAUSE A JURY COULD FIND THAT THE LATER SHOTS WERE NOT JUSTIFIED.

### A. A genuine dispute of material fact exists as to justification.

Arizona law permits a peace officer to use deadly force only when the officer reasonably believes it is necessary, including to defend against the use or imminent use of deadly force. *See* A.R.S. § 13-410(C)(1). Justification does not continue for the duration of an encounter regardless of changing circumstances. The Arizona Supreme Court has explained that “although the use of force can be justified at its commencement, it loses legal justification at the point the force becomes unnecessary.” *Ryan v. Napier*, 425 P.3d 230, 239, ¶ 34 (Ariz. 2018).

The same factual dispute that defeats summary judgment on the Fourth Amendment claim defeats Defendants' justification defense. If Obregon pointed a gun at Gibson, the first responsive shot may have been justified, but if the gun then fell and Gibson continued to fire at a prone man who no longer presented an immediate threat, the later shots were neither necessary nor justified. (See Part I, supra.) Because a jury could find that the later force was unjustified, A.R.S. § 13-413 does not entitle Defendants to judgment.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B. A.R.S. § 12-716 does not eliminate the factual dispute.**

Defendants' reliance on A.R.S. § 12-716 omits a threshold requirement that the Court first find that the plaintiff was harmed while "attempting to commit, committing or fleeing after having committed or attempted to commit a felony criminal act . . . ." *See* A.R.S. § 12-716(A). Flight from a traffic stop does not satisfy that requirement, and Defendants' felony theory depends on the disputed assertion that Obregon pointed a gun at Gibson, which cannot be resolved against Plaintiffs on summary judgment. Even where § 12-716 applies, it creates only a rebuttable presumption; the burden of persuasion for justification remains with the defendant. *Ryan*, 425 P.3d at 241, ¶ 46. The eyewitness testimony, the autopsy findings, the scene evidence, and Hafkey's opinion rebut any presumption with respect to the later shots.

**C. Plaintiffs' wrongful death claim survives.**

Arizona's wrongful death statute permits recovery when a death is caused by a wrongful act that would have entitled the decedent to maintain an action had death not ensued. A.R.S. § 12-611. The medical examiner attributed Obregon's death to the multiple gunshot wounds collectively (Ex. 5 at DEFS_Obregon 000091), and because a jury could find that one or more of the later rounds was unjustified, it could find a wrongful act that caused or contributed to Obregon's death. Defendants' argument that the state law claim fails along with the federal claim (Doc. 110 at 12) fails for the same reason the federal claim survives, and because Defendants do not dispute that Gibson acted within the course and scope of his employment, Sheriff Lamb's vicarious liability rises or falls with Gibson's.

**VI. COUNT III SURVIVES BECAUSE IT RESTS ON CONDUCT INDEPENDENT OF THE INTENTIONAL USE OF FORCE.**

*Ryan* holds that a negligence claim cannot be based solely on an officer's intentional use of force, but it expressly permits a negligence claim based on "conduct that is independent of the intentional use of force . . . .: *Ryan*, 425 P.3d at 236-38, ¶¶ 21-22, 31. Plaintiffs do not assert Count III as an alternative label for the shooting; the independent conduct at issue is Gibson's delay in rendering aid after the shooting.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Gibson identified the shooting at approximately the 3:16 mark of the Ring camera video, but he did not retrieve his trauma kit until approximately 4:27 and did not begin rendering aid until approximately 5:00. (Ex. 1 at 152:12-153:12, 153:22-154:12.) M.B. testified that Gibson stared at her for 15 to 30 seconds, did not retrieve his medical bag until she had repeatedly told him to help Obregon, and performed CPR for approximately five seconds before stopping. (Ex. 4 at 57:8-59:10.) She told investigators the same thing on the night of the shooting: that Gibson did not render aid or retrieve his first aid kit until she told him to help. (Ex. 6 at OBREGON_000908.) Chapman estimated that perhaps four or five minutes passed between the gunshots and the first aid, while acknowledging that he does not recall time well. (Ex. 13 at 24:11-22.)

Defendants respond with Borden's opinion that the delay was consistent with accepted police practice and with Chapman's testimony that Gibson was "doing the right steps." (Doc. 110 at 5, 15.) Chapman's "right steps" observation describes what he saw after he watched Gibson walk over to Obregon from his porch, waited another minute or two, and then went to his gate, where Gibson was checking Obregon for injuries; by Chapman's own estimate, four or five minutes had passed between the shots and the first aid he saw. (Ex. 13 at 21:6-22:8, 24:11-22, 25:9-13.) Whether the delay was reasonable is the disputed question, and an expert's opinion does not remove it from the jury.

Obregon was still alive during this interval. Gibson testified that when he checked Obregon's airway he heard audible gurgling (Ex. 1 at 148:10-14), and Defendants' own expert records that M.B. told investigators the night of the shooting that she heard gurgling while Gibson was slow to respond (Ex. 7 at 22). A jury could reasonably find that an officer who waited while a gunshot victim showed signs of life, and who began rendering aid only after a child repeatedly pleaded with him to help, acted with reckless indifference rather than inadvertence, which satisfies even Defendants' formulation of gross negligence as flagrant conduct evincing a lawless and destructive spirit. (Doc. 110 at 14-15.) Arizona's public entity immunity statute expressly preserves liability where a public officer rendering

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

emergency care is guilty of gross negligence, A.R.S. § 12-820.05(C), and Defendants' footnote concerning the Fourth Amendment duty to summon medical aid (Doc. 110 at 15 n.2) addresses a constitutional claim that Plaintiffs have not pleaded.

Defendants emphasize that Plaintiffs have not retained a medical expert to isolate the effect of a delay of approximately 100 seconds, but that is an issue for trial and does not eliminate the evidence of causation. The autopsy attributes Obregon's death to multiple gunshot wounds, Gibson heard gurgling when he checked the airway, M.B. reported the same sound to investigators, and Gibson thereafter treated those same wounds. (Ex. 5 at DEFS_Obregon 000091; Ex. 1 at 147:13-148:14; Ex. 7 at 22; Ex. 4 at 57:8-59:10.) A jury may reasonably infer that a gunshot victim who remains alive loses some chance of survival while an officer delays emergency care. Because Count III survives, Sheriff Lamb's derivative liability survives as well; Defendants seek judgment for Lamb only on the ground that the underlying claim fails. (Doc. 110 at 15 n.3; see also Doc. 48 at 6 n.6.)

## VII. <u>THE EVIDENCE SUPPORTS EACH ELEMENT OF M.B.'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.</u>

### A. <u>M.B. did not recant her testimony that she was detained at the scene.</u>

Defendants characterize M.B.'s deposition testimony as a recantation. In fact, M.B. corrected a single point: that Gibson was not the particular officer who told her she would be arrested if she moved. (*See* Ex. 4 at 75:12-76:5.) She did not withdraw her testimony that a sheriff's deputy gave that warning, that several deputies surrounded her, that she asked multiple times to leave, or that she believed she would be arrested if she moved, and she explained that Gibson remained at the scene and that the deputies were acting together. (*See id.* at 66:8-67:11, 75:12-76:5.) This testimony creates a question of fact for the jury to decide. Her mother's testimony confirms that PCSO was holding M.B. as a witness. Meagan Brady testified that at the crime scene tape, PCSO Deputy Frank Sloup and another officer brought her other daughter to her but said "they were going to keep" M.B. because she was a possible witness, and that Sloup released M.B. only after her mother objected that PCSO could not keep her minor child there. (Ex. 12 at 35:2-36:23.)

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Defendants' summary of the body camera footage does not eliminate this dispute. (Doc. 110 at 6-7.) The Casa Grande cameras began recording only after Officer Fox arrived. That M.B. walked a short distance down the road with Obregon's brother and his wife and then returned is consistent with her testimony that she had been told she could not go home and was being watched, and her repeated demands to be allowed into her own yard (Doc. 110 at 7) confirm that she wanted to leave and was not permitted to. (*See* Ex. 4 at 66:8-67:11.) Hafkey's review of the same footage documents M.B. being ordered to stay, held near Obregon, refused when she asked to return home, and kept under officer supervision for more than an hour. (Ex. 6 at OBREGON_000914-15.) M.B.'s statement to Sergeant Rush that she did not know the decedent bears on credibility, not on whether she was detained; she testified that Obregon was a family friend she saw almost daily and that she said otherwise because she was in shock and "wasn't going to tell the police anything about anything." (Ex. 4 at 47:1-7, 50:9-22.) Chapman's testimony that he never heard the deputy tell M.B. she could not leave (Doc. 110 at 6) carries little weight. Chapman was holding a flashlight for Gibson during the two to three minutes before the next deputy arrived, and M.B. testified that the warning came from one of the several deputies who later surrounded her, not from Gibson. (Ex. 13 at 26:16-27:14; Ex. 4 at 66:8-67:11, 75:12-76:5.)

**B. <u>A jury could find that Gibson and PCSO directed the Casa Grande officers.</u>**

Defendants treat the Casa Grande officers as independent actors whose conduct cannot be attributed to Gibson, but the officers' own reports establish otherwise. Casa Grande classified the call as an "Agency Assist" for PCSO. (Ex. 10 at DEFS_Obregon 000114.) When Officer Fox arrived and asked what was needed, Gibson instructed him to keep two individuals east of the shooting away from the scene, Fox complied, and Gibson then joined a PCSO supervisor in erecting the crime scene tape. (*Id.* at DEFS_Obregon 000114-15.) Gibson admitted that the tape was intended to keep M.B. from approaching. (Ex. 1 at 162:22-163:4.) PCSO's dispatch log records that M.B.'s mother reported her 15-year-old daughter had been told she could not return home, that "PINAL6" directed officers

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

to shrink the perimeter, and that officers sought a PCSO supervisor's direction when M.B.'s mother arrived for her children. (*See* Ex. 11 at DEFS_Obregon 000010-11.) PCSO Sergeant Ransom reported that he directed the scene, set up the tape with Gibson, assigned crowd control, and closed the roads. (*Id.* at DEFS_Obregon 000020.) A jury could reasonably infer from this evidence that the Casa Grande officers were enforcing a Pinal County perimeter that Gibson helped create.

**C. <u>A jury could find each element of intentional infliction of emotional distress.</u>**

A claim for intentional infliction of emotional distress requires extreme and outrageous conduct, an intent to cause emotional distress or reckless disregard of the near certainty that such distress will result, and severe emotional distress caused by the conduct. *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (Ariz. 1987). This Court has already held that forcing a 15-year-old girl to stand near a person who had been shot and was gurgling blood could be found atrocious and utterly intolerable (Doc. 48 at 7), and discovery has produced evidence that M.B. was held there under a perimeter controlled by PCSO. Factors Arizona courts consider in determining “outrageous conduct” and “sever emotional distress” are the position occupied by the defendant and the defendant's knowledge that the plaintiff is peculiarly susceptible to emotional distress. *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 149 Ariz. 76, 79 (Ariz. 1986). Gibson was an armed deputy who had just shot M.B.'s family friend, and M.B. was 15, visibly distraught, asking to leave, and close to the dying man. (Ex. 4 at 47:1-7, 66:1-67:11; Ex. 6 at OBREGON_000914-15.) Holding her at the scene under those circumstances supports a finding of reckless disregard even without proof that Gibson intended to injure her.

The evidence of severe distress is substantial. M.B. testified that she was diagnosed with post-traumatic stress disorder, received medication for PTSD and nightmares, became depressed, attempted suicide after the incident, and suffers daily migraines. (Ex. 4 at 33:17-34:2, 69:2-72:3.) Her prior anxiety had been limited to being near the scene of an earlier car crash; after this incident it became constant, and she had never attempted suicide before.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(*Id.* at 69:2-15, 70:2-21.) Defendants' reliance on pre-existing anxiety and later stressors (Doc. 110 at 17) raises causation arguments for cross-examination, not grounds for summary judgment.

**VIII. <u>THE PUBLIC ENTITY CONTEXT DOES NOT BAR SHERIFF LAMB'S DERIVATIVE LIABILITY ON COUNT V.</u>**

*Ryan* itself involved a claim against a county sheriff based solely on vicarious liability for a deputy's conduct, and the Arizona Supreme Court did not hold that a sheriff can never be vicariously liable for an intentional tort; it applied A.R.S. § 12-820.05(B) because the deputy's act constituted a felony. *See* 425 P.3d at 234, ¶ 7, 236-37, ¶¶ 21-24. Defendants have not invoked that statute against Count V or identified any felony on which the claim rests. In *State, Dept. of Admin v. Schallock*, 189 Ariz. 250 (Ariz. 1997), an intentional infliction case against the State, the Arizona Supreme Court rejected the categorical proposition that an intentional tort can never support vicarious liability and held that the inquiry turns on whether the service in which the tort occurred was within the ordinary course of the employer's business or within the scope of the employee's authority. *Id.* at 260.

Witness control, crime scene security, and the direction of assisting officers are official police functions, and the First Amended Complaint alleges that Gibson acted within the scope of his employment and that Lamb is vicariously liable. (Doc. 30 ¶¶ 83, 106, 122-23.) The participation of Casa Grande officers does not break the chain of responsibility where PCSO requested their assistance, Gibson directed them, PCSO controlled the tape, and a PCSO deputy decided to keep M.B. at the scene as a witness. (*See* **§ VII**, *supra*.)

**IX. <u>PUNITIVE DAMAGES REMAIN AVAILABLE.</u>**

Punitive damages are available under 42 U.S.C. § 1983 when a defendant's conduct "involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). On Plaintiffs' evidence, Gibson fired the later rounds after Obregon was prone, after the gun had fallen, and after the threat had ended, knowing that force must stop once the threat is neutralized, and he did so after pausing to yell "I bet you're

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

scared of me now!" at the man on the ground. (*See* Ex. 1 at 132:18-22, 133:19-134:3; Ex. 14 at OBREGON_000885; Ex. 15 at OBREGON_000743.) A jury that credits that evidence could find either the evil motive or the reckless indifference required for a punitive award. A.R.S. § 12-820.04 bars punitive damages against a public entity and a public employee acting within the scope of employment, and Plaintiffs preserve their Arizona punitive damages claim against Gibson only in the alternative, should the factfinder find that relevant intentional conduct fell outside that scope.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Summary Judgment. Genuine disputes of material fact preclude judgment on Counts I, II, III, and V, and Plaintiffs' claim for punitive damages under § 1983 should proceed to the jury. Any ruling under A.R.S. § 12-820.04 should be limited to Arizona punitive damages for conduct within the scope of public employment.

**RESPECTFULLY SUBMITTED this 3rd day of September 2026.**

**MILLS + WOODS LAW, PLLC**

By *\/s/ Sean A. Woods*
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## CERTIFICATE OF SERVICE

I hereby certify that on September 3, 2026, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Kathleen L. Wieneke
kwieneke@wienekelawgroup.com
Laura Van Buren
lvanburen@wienekelawgroup.com
**WIENEKE LAW GROUP, PLC**
lrasmussen@wienekelawgroup.com
1225 W Washington St., Ste. 313
Tempe, Arizona 85288
*Attorneys for Defendants*

*/s/ Ben Dangerfield*

# EXHIBIT TABLE OF CONTENTS


| | |
|---|---|
| **1** | Excerpts from Deposition of Deputy Brady Gibson |
| **2** | Excerpts from Deposition of Wade Putt |
| **3** | Excerpts from Deposition of Samantha Plummer |
| **4** | Excerpts from Deposition of M.B. |
| **5** | Excerpts from Pinal County Medical Examiner Autopsy Report |
| **6** | Excerpts from Report of Mark Hafkey |
| **7** | Excerpts from Report of Dr. James W. Borden |
| **8** | Scene Photograph |
| **9** | Ring Camera Video |
| **10** | Excerpts from Casa Grande Police Department Case Report |
| **11** | Excerpts from Pinal County Sheriff's Office Report |
| **12** | Excerpts from Deposition of Meagan Brady |
| **13** | Excerpts from Deposition of Brandon Chapman |
| **14** | Declaration of Whitney Hector |
| **15** | Facebook Message of Samantha Dean |
| **16** | Report of Anthony Sola, Acoustical Consulting Services, LLC |

# EXHIBIT 1

## Excerpts from Deposition of Deputy Brady Gibson

12:00:40 A. Michael had appeared to trip over something, either his motorcycle or an object in the road, and he landed on his stomach or on the front. I had gotten onto his back to attempt to detain him with handcuffs and get his hands behind his back.

12:01:03 And I observed that he wasn't trying to continue to crawl and claw to run away, and he wasn't trying to roll towards me to fistfight. He was focused on something else and was doing this other movement under his body. And I didn't know what that was until he produced a silver and black handgun and it came out from under his body.

12:01:34 Q. You were still on his back when that happened?

12:01:36 A. Yes.

12:01:37 Q. And his arm came out with a handgun you're saying?

12:01:42 A. Not -- not as you're showing me. His other arm came out and he produced a handgun.

12:01:54 Q. You're showing that his other arm came cross body. And by his "other arm," you're saying his right arm with your movement that you just showed me?

12:02:02 MS. VAN BUREN: Form.

A. It appeared an arm came cross body and that their finger was in the trigger well. I could see the gun come out and I said, drop the gun.

Q. Okay. And then what happened?

A. Since I was holding my radio, I had said 913, which is our emergency code for backup. The gun came out. I yelled, drop the gun. And I had responded muscle memory into my training and found myself backpedaling.

And my gun was already out of the holster and my gun was already firing. And next thing I knew, I was behind my engine block, and I was yelling for him to drop the gun, don't reach for the gun, and that I wanted to help him.

Q. When did you start shooting him?

MS. VAN BUREN: Form.

A. My muscle memory, my training kicked in. So as soon as the gun came out, my -- I pushed off him and was backpedaling. And my gun was already out of the holster, and shooting, and backing up before I could catch up and realize that that's what was happening.

BY MR. WOODS:

Q. Did you fire all your shots in the

12:03:25 same -- let me take a step back.
12:03:29 Did you pause in between any of your
12:03:31 shots?
12:03:33 MS. VAN BUREN: Form.
12:03:34 A. My muscle memory and training kicked in.
12:03:39 It felt very tense and rapidly evolving, and fast,
12:03:47 like milliseconds, just extremely fast and rapid.
12:03:51 BY MR. WOODS:
12:03:51 Q. I mentioned earlier that there were 10
12:03:58 gunshots or 10 bullet casings found from your
12:04:01 weapon. Is that -- do you recall that?
12:04:02 A. I recall --
12:04:03 MS. VAN BUREN: Form.
12:04:04 A. -- you mentioning that.
12:04:05 BY MR. WOODS:
12:04:05 Q. Do you recall there being 10?
12:04:06 MS. VAN BUREN: Form. Foundation.
12:04:08 A. I recall possibly shooting approximately
12:04:15 seven to eight shots. But later in the
12:04:17 investigation, it appears that I fired 10 shots.
12:04:23 BY MR. WOODS:
12:04:23 Q. Okay. And did you fire the 10 shots,
12:04:28 one, two, three, four, five, six, seven, eight,
12:04:32 nine, ten? Or was it some other combination,
12:04:35 pause, combination?

12:04:36 MS. VAN BUREN: Form.
12:04:36 A. I don't recall exactly, but it seemed very fast and very rapid.
12:04:42 BY MR. WOODS:
12:04:42 Q. Were you yelling anything while you were shooting?
12:04:46 A. The only thing I recall saying was drop the gun, 913, drop the gun. I was backing up, firing. And then when I realized what had happened, I again was saying, drop the gun, don't reach for the gun. I want to help you, as well as putting out radio communication of what had happened.
12:05:08 Q. After the shooting stopped, what did you do?
12:05:20 A. So after I was behind or backed up kind of near the hood of my vehicle, I had called out, don't reach for the gun, drop the gun. Michael, I want to help you.
12:05:37 And I had advised our communication center, 998, 999, which are the codes for officer-involved shooting and I need urgent help. I then stated that there was one person down that was shot multiple times, and that my down range was to the south.

01:11:58 I put up the scene tape to create a physical barrier and I was standing around my vehicle. I waited for another deputy to arrive that would be assigned to me, and then that person would transport me back to the station.
01:12:17 BY MR. WOODS:
01:12:17 Q. And that happened at some point?
01:12:18 A. It happened at some point. I don't know the time frame.
01:12:22 Q. Within a half hour, do you think?
01:12:25 A. I don't think that it was that much time. I think it was sooner than later. It was pretty, pretty quick.
01:12:35 Q. Did you -- did you yell at Michael that, quote, I bet you're scared of me now and then fire at him?
01:12:55 A. No.
01:12:56 Q. You never did that?
01:12:57 A. No.
01:12:58 Q. Did you ever get disciplined while you were at the Pinal County Sheriff's Office?
01:13:35 MS. VAN BUREN: Form.
01:13:36 A. Yes. I received three performance improvement reports or PIRs.
01:13:40 EXHIBITS:

01:22:34 you don't remember at this point, correct?
01:22:37 A. Yes.
01:22:38 Q. Regardless of whether he was laying on his stomach or on his back, did you still perceive that he had reached across his body and had the ability to shoot you?
01:22:48 A. Yes.
01:22:49 Q. Did you use -- and again, referring to Exhibit 1. Did you use the amount of force that reasonably appeared necessary given the facts and circumstances?
01:23:01 A. Yes.
01:23:02 Q. Why didn't you use your taser?
01:23:04 A. I haven't been trained to use a less lethal option against a person with a lethal object, such as a knife or a handgun. So I perceived a deadly, imminent threat against me.
01:23:22 And my muscle memory and training kicked in, and it didn't stop until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped.
01:23:36 Q. I want to break that answer down a little bit. Do you know why you've never been trained to use a taser against a suspect armed

with a deadly weapon?
A. I don't think it would work. I think I would lose. I -- it wouldn't stop the threat. A taser doesn't stop a gun.
Q. On March 16, 2023, did you think that a taser would stop the threat that Mr. Obregon posed to you?
A. No.
Q. Earlier, you said that you fired until the weapon, Mr. Obregon's weapon, was dropped. Did I understand that correctly?
A. Yes.
Q. What was the significance to you of his weapon being dropped?
A. It meant that the immediacy of the deadly threat had stopped, that the weapon was dropped and a little bit away from him. And I stopped as soon as I saw that proceeding.
Q. Are you trained to use force until the threat is neutralized?
A. Yes.
Q. And when you saw that Mr. Obregon had dropped his gun, did you believe the threat to be neutralized?
A. Yes.

01:25:07 Q. Is that why you stopped firing at that
01:25:09 point?
01:25:09 A. Yes.
01:25:11 Q. Going back to Exhibit 1, the PCSO
01:25:18 policy. Take a look at the second page, top
01:25:22 paragraph, last sentence of that top paragraph.
01:25:29 "Given that no policy can realistically
01:25:32 predict every possible situation a deputy might
01:25:35 encounter, deputies are entrusted to use
01:25:39 well-reasoned discretion in determining the
01:25:41 appropriate use of force in each incident."
01:25:43 Did I read that correctly?
01:25:44 A. Yes.
01:25:45 Q. And did you use your well-reasoned
01:25:48 discretion in determining the appropriate use of
01:25:53 force to use in this incident?
01:25:54 A. Yes.
01:25:55 Q. Turn the page again to page 3, 300.4,
01:26:02 deadly force applications. And again, this is
01:26:05 Exhibit 1.
01:26:08 "Use of deadly force is justified in the
01:26:10 following circumstances: (a) A deputy may use
01:26:14 deadly force to protect him/herself or others from
01:26:18 what he/she reasonably believes would be an
01:26:22 imminent threat of death or serious bodily

01:36:05 then 999 means it's just a higher urgency of I
01:36:10 need backup, like send people now from other
01:36:13 jurisdictions. Whoever is closest get here.
01:36:17 Q. And you also said "drop the gun"?
01:36:18 A. Yes.
01:36:19 Q. Do you recall when in the timeline you
01:36:21 said, "998, 999, drop the gun"?
01:36:24 A. That radio transmission was immediately
01:36:26 after I had fired and stopped firing.
01:36:33 Q. You said that while you were still under
01:36:35 the stress of having had a handgun pointed at you
01:36:39 and shooting back, correct?
01:36:40 A. Yes.
01:36:41 Q. I'm going to scoot ahead a little bit.
01:36:54 I'm going to start Exhibit 12 again at we'll say
01:37:00 1:42.
01:37:07 (Video continued, not transcribed.)
01:37:10 BY MS. VAN BUREN:
01:37:10 Q. And I stopped it at 1:50. Was that your
01:37:20 voice who said, "he pulled a gun and tried to
01:37:21 shoot me"?
01:37:21 A. Yes.
01:37:21 Q. Did you say this immediately after
01:37:24 Obregon had pulled the gun on you?
01:37:25 A. Yes.

01:37:25 Q. While you said that, were you still experiencing the stress of that moment?
01:37:30 A. Yes.
01:37:31 Q. I'm going to keep playing again at 1 minute 50 seconds of Exhibit 12.
01:37:38 (Video continued, not transcribed.)
01:37:43 BY MS. VAN BUREN:
01:37:43 Q. Can you tell us what was said after you gave Mr. Obregon's birthday? And I can play it again if you'd like.
01:37:55 A. My sergeant, Sergeant Ransome, Michael Ransome, said, "have med staged for two." So that means medical is being called and they're staging somewhere safe until it's safe for them to approach.
01:38:13 And he said for two, because I was not certain yet if I had been injured at all or if I had been shot.
01:38:23 Q. Okay. I'm going to pick up again at 1 minute 59 seconds.
01:38:30 (Video continued, not transcribed.)
01:38:36 BY MS. VAN BUREN:
01:38:36 Q. I paused it at 2:17. What did you mean, "I'm securing him now"?
01:38:52 A. I meant I was going to approach and

Q. You mentioned an acronym at the beginning of the deposition.
A. Yes.
Q. What was that acronym?
A. It's the MARCH acronym, which stands for massive hemorrhaging, airway, respiratory, circulation, and hypothermia.
Q. Is that an acronym that you use to triage an injured person?
A. Yes. You follow in that -- in the MARCH order and it guides you by severity of things you need to treat in order.
Q. I understand. So did you follow that order when you were treating Michael Obregon?
A. Yes.
Q. What did you do in terms of the M in the acronym?
A. So the massive hemorrhaging, I'm looking for bright, red bleeding, squirting, or venous bleeding, the kind of oozing out, bubbling. I'm looking for massive bleeds.
Q. Did you see that?
A. No. I blood swept the extremities and I was removing clothing to see where the bleeding and injuries were to address them.

Q. And then what about the A in the MARCH acronym?

A. The airway is for if the airway -- if there's like a -- like in terms of the Army if the face is disfigured or the airway is blocked, you insert a breathing device, NPA. It's a nasal protruding airway I think is what the acronym stands for. But it just helped open up an airway if there's trauma to the face, neck, or throat.

Q. Did you check Michael Obregon's airway?

A. I heard audible sounds, gurgling, so I looked at his face. I didn't see that that device or that that was needed, so I moved on to the next acronym, C.

Q. Okay. Is it match or march?

A. MARCH, like Army marching.

Q. Okay. So M was the massive hemorrhaging?

A. Uh-huh.

Q. What was "A"?

A. Airway.

Q. And did you check Mr. Obregon's airway?

A. Yes.

Q. Okay. And we just talked about R?

A. R is respiratory. It's a little bit

Q. So by that point, at about 1 minute 15 seconds in, you would have asked him for his driver's license?
A. Yes.
Q. Let's pick up again at 3 minutes into Exhibit 13. And again, keep a close eye on that area near the front of your vehicle. I'm playing -- starting at 2 minutes 56 seconds.
(Video continued.)
BY MS. VAN BUREN:
Q. Pause the video at 3 minutes 16 seconds. Were you able to see yourself firing in that section of the video we just watched?
A. Yes.
Q. So by 3 minutes 16 seconds, you had discharged your weapon, correct?
A. Yes.
Q. I'm just going to play the next couple minutes starting at 3 minutes 17 seconds.
(Video continued.)
BY MS. VAN BUREN:
Q. I'm going to stop it at 3 minutes 45 seconds and ask you, why didn't you immediately start rendering aid to Mr. Obregon after that 3 minute 17 second mark we looked at?

01:49:28 A. I called out several times to see if I could get any verbal compliance, to not reach for the gun, to drop the gun, that I wanted to help him.

01:49:38 I also was communicating to my communications center that I had been involved in a shooting, that I needed backup. And then formulating a plan of I'm going to approach, and secure, and render aid, and then communicate at that point.

01:49:56 Q. So were you concerned at this point that Mr. Obregon might still pose an immediate threat to you?

01:50:00 A. Yes.

01:50:01 Q. Because the gun was still within arm's reach, correct?

01:50:04 A. Yes.

01:50:04 Q. I'm going to start again at 3 minutes 45 seconds.

01:50:10 (Video continued.)

01:50:11 BY MS. VAN BUREN:

01:50:11 Q. What were you doing there at about 4 minutes 27 seconds?

01:51:01 A. I had to open my passenger door and retrieved my gunshot trauma kit, and then started

01:51:09 approaching Michael.
01:51:11 Q. All right. I'm going to start playing again at 4 minutes 33 seconds.
01:51:16 (Video continued.)
01:51:18 BY MS. VAN BUREN:
01:51:18 Q. Keep a close eye on yourself. I stopped the video at 5 minutes. At this point when you're on the other side of the patrol vehicle, were you rendering aid to Mr. Obregon?
01:51:54 A. Yes, I began assessing the area, removing the gun from his immediate reach, and rendering aid.
01:52:04 Q. And then I want to pick up one last segment towards the end. We'll start at about 8 minutes into this exhibit. Okay. I'm going to play the last 25 seconds for you, so keep an eye on that.
01:52:40 (Video continued.)
01:52:41 BY MS. VAN BUREN:
01:52:41 Q. All right. I went and stopped it at 8:15. Did you see another vehicle with lights on pull up to the scene?
01:53:01 A. Yes.
01:53:02 Q. And that was at about 8 minutes 15 seconds, correct?

02:05:50 (Deposition Exhibit No. 16 marked for identification.)

02:05:50 BY MS. VAN BUREN:

02:06:07 Q. Go to page 5 and take a look at
02:06:15 paragraph 42. That paragraph says, "MB" -- and
02:06:22 I'll represent to you that that's **M.B.** Brady --
02:06:25 "insisted that Michael needed medical help."
02:06:29 Do you recall her ever insisting on that
02:06:31 to you?

02:06:32 A. I don't recall her using that
02:06:38 terminology. I just know she was yelling and
02:06:40 screaming, and swearing at me.

02:06:42 Q. Do you remember anything that she said
02:06:43 in particular?

02:06:45 A. I just remember I was telling her to get
02:06:48 back and that I was trying to save him, and I
02:06:56 don't -- I don't want to repeat, but just swearing
02:07:00 at me.

02:07:01 Q. Okay. Paragraph 43, "at that point,
02:07:05 Gibson walked away to his patrol vehicle leaving
02:07:08 MB with the responsibility of rolling Michael over
02:07:11 on to his back and trying to revive him."
02:07:15 Is that what you recall from the night
02:07:18 of March 16, 2023?

02:07:20 A. No.

Q. What would you correct about that?
A. I don't think she even touched him or -- I think she was just yelling, and in my space and area that I was trying to secure and work in, and that I was telling her to get back so that I could work safely and effectively.
Q. Do you recall a time where she was standing near Mr. Obregon and then you went back to your vehicle?
A. No.
Q. Paragraph 44, "when Gibson returned from his patrol vehicle with an emergency medical kit, he ordered MB to stand next to Michael and not leave the scene for any reason."
Did you ever tell **M.B.** Brady to, quote, not leave the scene for any reason?
A. No.
Q. Paragraph 48, "Gibson and other PCSO personnel then forced MB to stand near the feet of Michael's dead body for hours while an investigation took place."
Did you ever force **M.B.** Brady to stand near Mr. Obregon's body?
A. No. I actually put up police line to keep her from approaching further after I was

relieved of rendering aid.
Q. Did you witness any other PCSO personnel forcing her to stand near Mr. Obregon's body?
A. Not that I witnessed, no.
Q. Look on page 6 at paragraph 52, "MB tried desperately to leave the scene and pleaded with defendants to move her to another location so she could be with her mother."
Did she ever ask you to move her to another location so she could be with her mother?
A. No.
Q. Paragraph 53, "defendants refused and even engaged in verbal battles with MB."
Did you ever refuse to allow MB to move away from Mr. Obregon's body?
A. No. I was asking her to back up.
Q. Did you ever engage in any verbal battles with her?
A. No, other than me asking her to back up.
MS. VAN BUREN: Those are all the questions I have for you, Mr. Gibson. Mr. Woods may have some follow up.
MR. WOODS: Just a couple.
///
///

# EXHIBIT 2

## Excerpts from Deposition of Wade Putt

Q. But you knew that there was someone over there who the officer was talking to?

**A. Yes.**

Q. Were you able to hear anything that was being said?

**A. What I heard was, "put the" -- I don't remember the exact words. Something to the effect of "put the gun down" or something like that. I don't know if it was, "put it down, don't touch it," but something to the effect of a gun. And I heard him say that, like, I don't know how many times, but more than once.**

Q. And when you say "him," that was the sheriff's deputy?

**A. Yes.**

Q. When he -- when you heard him say that, "put the gun down" or something to that effect, where was he standing at that point?

**A. Like I said, I believe he was on the passenger side of the vehicle. Like, the front of the vehicle, like, where the hood is, you know, that area, I believe.**

Q. Were you able to see what the other person was doing at any point?

**A. No. Like I said, the vehicle was in the way.**

Q. When the deputy said "put the gun down" or language like that, did you see if he had his gun drawn?

**A. I saw him on the vehicle, but I didn't see the actual gun in his hand.**

Q. What do you mean when you say you saw him on the vehicle?

**A. Well, he was like -- like this is the front of the vehicle. He was like -- I thought he was -- if I remember correctly, was kind of, like, leaning on it, like, I don't know, supporting himself or -- or what it was, but I didn't see the actual gun in his hand, no.**

Q. Was his back to you when --

**A. Yes.**

Q. -- he was leaning?

**A. Yes.**

Q. Okay. So you would not have been able to see --

**A. No.**

Q. -- if there's a weapon in your hand?

**A. No.**

Q. You have to wait for me to finish. Otherwise, we're going to make her job harder. Okay?

**A. Okay.**

Q. What do you remember next?

**A. Gunshots.**

Q. How many?

**A. I don't remember exactly how many there was. I believe that there was four, possibly five, but -- four for -- 99 percent sure.**

Q. Okay. Were they all consecutive, right in a row, or

was there a pause in there?

**A. There was one, there was like -- the best way that I can describe it was, like, pop. Pop, pop, pop.**

Q. Okay. So one --

**A. One and then a -- I don't know. I can't say it was one second, two seconds, five seconds, but it was like pop. Pop, pop, pop. So there was a pause in between them.**

Q. Okay. I have to ask you this question so I'm doing my job. Can you tell me, was it more than five seconds or less, the pause?

**A. Okay. Thousand one, thousand two, thousand three, thousand four, thousand five.**

**No. It was not that long. It was probably between one and two seconds maybe. I'm guessing. You know. It's been, what, a year and a half ago, to try to remember the exact amount, but it was pretty quick after the first one. It wasn't a long time.**

Q. Do you remember, was the deputy -- what was the deputy doing when you heard the pops, if you recall?

**A. He'd already spoke, so he wasn't -- I don't know what -- what you're asking, actually, because it -- there -- you know, what he was doing, he wasn't jumping up and down or waving his arms or anything, you know.**

Q. Let me ask you a better question. When you heard the pops --

# EXHIBIT 3

## Excerpts from Deposition of Samantha Plummer

**house, to my house.**

Q. Okay. The officer was?

**A. The officer was. Talking to a gentleman across his truck.**

Q. Okay. Could you see that gentleman at all?

**A. The only thing I could see was a brown hat.**

Q. Were you able to see his face?

**A. I was not.**

Q. When you looked out the window and you saw that, in that moment, did you hear anything?

**A. I did not at that moment.**

Q. Were you able to tell what the officer or the other gentleman were doing in that moment where you were looking out the window?

**A. They were talking, as far as I know.**

Q. Okay.

**A. But it wasn't loud enough that I could hear what was being said.**

Q. All right. You said that you turned around and went back into your room at that point?

**A. Yes.**

Q. What happened next?

**A. Then I heard popping. It was, like, five different shots, and then I came running back out of my room to look out the window, and I saw the officer crouching on the side of his**

**truck, and I heard him say, "don't reach for the gun."**

Q. And do you recall -- did you hear him say that more than once?

**A. Yes. I heard him say it at least twice.**

Q. Did you hear the officer say anything about a gun before you heard those pops?

**A. I did not.**

Q. All right. When you came running back out to look out the window, what did you see?

**A. Like I said, I saw the officer crouching on the side of his truck closest to my house, and then I heard him say, "Don't reach for the gun." And then he went around the front of his truck, towards a gentleman. At this point, I could not see the gentleman. He was on the other side of the truck. And then another guy from across the street from us jumped the fence and helped the officer.**

Q. What do you mean when you say helped the officer?

**A. I'm assuming helped subdue the gentleman, but I could not tell you for sure, because I couldn't see through the truck.**

Q. Were you able to see what the officer or the other gentleman were doing on the other side of the truck?

**A. I could not.**

Q. So you're speculating that he was helping the officer?

**A. I'm -- yes, I am.**

Q. Okay. Did you recognize that officer at any point?

A. **I did not.**

Q. When you looked out the window, were you able to see a weapon anywhere?

A. **I was not able to see a weapon.**

Q. What did you do next?

A. **Then my son said to me that he wanted to come out, and I wouldn't let him come out of his room.**

Q. He wanted to go outside the house?

A. **He did. He wanted to go outside and see what was going on, and I told him that he couldn't, because I was not sure if it was safe for him to be out there.**

Q. Okay.

A. **Then after that, after we knew that it was safe, then my dad, my son and I all went on the front porch and was out watching.**

Q. How long would you say after you heard the shots did you all go out on the front porch?

A. **I would have to say 15 to 20 minutes.**

Q. What did you see when you were on the front porch?

A. **The other officers show up.**

Q. Do you remember what agency they were from?

A. **I do not.**

Q. What did you see the other officers doing?

A. **They just secured scene. They put up tape, and they made sure that no one else came around to where the gentleman**

**A. The only yelling I heard was after I came back to the window, after the shooting, and I heard the officer yell, "Don't reach for the weapon."**

Q. Okay. And you -- were you at an open window or were you at your closed bedroom window?

**A. I was at the front living room window, but my dad was at the front door with the door open.**

Q. Okay. But prior to -- prior to that, the only thing you had heard was the -- the pop, pop, pop sound that you've described?

**A. Yes, sir.**

Q. Okay. When you saw the officer -- and I'll let you know it's Deputy Gibson. When you saw Deputy Gibson crouching by his vehicle, did he fire any more shots at that point, or did you hear any more shots after that?

**A. No, I did not.**

Q. Okay. Did you see whether or not he had his gun out?

**A. He did have his gun out.**

Q. Did he have a flashlight?

**A. No.**

Q. Okay. Did you see him move away from the car at that point, after that?

**A. After that, then he went around his car, around the front end of his truck.**

Q. Could you still see him when he was around the front

A. **I honestly forgot about it.**
Q. Okay. But now you remember?
A. **Yes.**
Q. And were you honest when you spoke with that individual?
A. **Yes.**
Q. Did that individual try to sway or change your testimony in any way?
A. **No.**
Q. Do you remember anything else about your conversation with that gentleman?
A. **No, I don't.**
Q. You mentioned -- you -- so you saw other officers arrive on the scene --
A. **Yes.**
Q. -- correct?
Can you give me an estimate of how much time passed between when you heard the gunshots and when those other officers arrived?
A. **I'd say a max of ten minutes.**
Q. Okay. And then lastly, you said you heard five popping sounds that you interpreted to be shots, right?
A. **Yes.**
Q. Were those five popping sounds all right in a row, or was there a break between some of them?

**A. There was one, and then there was a brief pause, like maybe 15 seconds, 30 seconds, and then the other four shots.**

Q. Fifteen seconds is pretty different than 30 seconds. Are you able to -- as you think about it right now, there was that first shot. Are you able to tell me how much time passed between the next ones?

**A. I would not be able to tell you exactly how much time passed.**

Q. Okay. Fifteen to 30 seconds --

**A. Yes.**

Q. -- is your estimate?

**A. Is my best estimate.**

MS. VAN BUREN: All right. Mr. Woods, did you have any follow-up on that?

FURTHER EXAMINATION

BY MR. WOODS:

Q. Yeah. I just -- I'm sorry. I thought I was done.

So we talked earlier about other people you might have talked to, and I mentioned a private investigator, and then it was elaborated on after I was done asking you questions.

Do you recall when that call was with the private investigator?

**A. I do not.**

Q. Okay. And you said you thought he was an attorney?

# EXHIBIT 4

## Excerpts from Deposition of M.B.

**A. Because, like I said, it's their protocol.**

Q. Okay. But what, what happened before that that caused you to end up in an ambulance?

**A. I was in MIND 24. They sent me to the hospital.**

Q. What kind of symptoms were you showing that caused you to be sent to Phoenix Children's Hospital?

**A. I don't know.**

Q. What other mental health treatment have you had between March of 2023 and 2025?

**A. You are going to have to ask my mother.**

Q. Do you remember anything else, as you are sitting here today?

**A. No.**

Q. Are you on any medication right now for your mental health?

**A. No.**

Q. Have you been on any medication for mental health since March of 2023?

**A. Yes. I forgot what it's called. It's hard to pronounce. But I was taking it for depression and PTSD -- well, it's mainly for my PTSD. And then, also, they had gave me some sleeping medication, so therefore I could sleep, because nightmares of the incident, basically. But I was taking -- like I said, I forgot what it's called. I took it but stopped because I'm pregnant now.**

Q. Who prescribed that medication to you?

**A. Lauren.**

MS. VAN BUREN: All right. M.B., we have been going for about 45 minutes. So I want to go ahead and take a 10-minute break and then we will come back. Okay?

**THE WITNESS: Okay. Thank you.**

THE VIDEOGRAPHER: We are going off the record. The time is -- lost my time here, sorry. The time is 10:44 a.m.

(The deposition was at recess.)

THE VIDEOGRAPHER: We are back on the record. The time is 10:57 a.m. Thank you.

BY MS. VAN BUREN:

Q. All right. M.B., I'm going to show you some records that will be marked as Exhibit 4. These are from Denova. And I'm going to ask you some questions about these.

(Deposition Exhibit No. 4 was marked for identification.)

BY MS. VAN BUREN:

Q. First, I want to point out the address up here. It's an Avondale address.

Is this where you see your therapist, Lauren?

Q. Did you know Micheal Obregon before the events of this case?

**A. Yes.**

Q. How did you know him?

**A. Mikey, he was a family friend. He is my, my friend's father figure. I would see him almost every day. And, yeah, he just, he was family, he was family.**

Q. What's your friend's name who he was a father figure towards?

**A. Sireana.**

Q. What's her last name?

**A. Rosales.**

Q. What was Mr. Obregon's relationship with Sireana?

**A. Father figure.**

Q. Okay. Was he -- if you don't know, that's fine. Was he a family friend of Sireana? Was he a stepfather? Do you know anything else about how he knew her?

**A. I just -- his -- their -- I don't know. Yeah, I don't know.**

Q. You said you would see him almost daily?

**A. Yeah.**

Q. What were the circumstances when you would see him?

**A. He would come to the house, just hang out with my dad. And my dad's friend, who also lived on the property**

MR. WOODS: Stopping at 7-50.

BY MS. VAN BUREN:

Q. All right. M.B. , we played Exhibit 3 from 7 to 7-50.

THE VIDEOGRAPHER: Laura, I'm sorry. We are going to need to take that off share screen now so we can see the witness. Very good. Thank you.

BY MS. VAN BUREN:

Q. All right. M.B. , in that clip we just watched, you told -- in that clip we just watched, you told the officer you didn't know Mr. Obregon, correct?

**A. Yes.**

Q. Why did you tell him that?

**A. Everything that was going on, I was in shock, and after seeing that, I wasn't going to tell the police anything about anything.**

Q. Is there any other reason that you didn't tell the police that you knew Mr. Obregon?

**A. I -- like I said, they didn't need to know anything about anything after I just saw what he had done to him. It was -- and it wasn't my place to tell him anything.**

Q. I would like you to tell me everything you remember from that day, from the time you woke up until the time of the shooting. And then I want you to stop

there. Tell me what you remember doing that day.

A. I woke up, was just in my room most of the day, probably on the phone, watching TV, playing video games, whatever I did at the time in my room by myself. And I just, I was doing my makeup when I heard yelling outside. And so I had got up to go see what was going on.

As I'm walking towards the living room to view out the window, I start hearing gunshots. So I go to the window and I see Gibson standing over Mikey with his gun pointed at him. And he's like a -- like a feet back, but he's standing over him with the gun over him. And Mikey is on his back -- I mean, on his stomach at the time. Mikey is on his stomach at the time. So I'm freaking out now. So I run back to my room to go like put on clothes, and I hear more gunshots.

And so I come running back out, and I go outside. Mikey is on his back now. And I said what the F happened, what did you do? And Gibson had responded saying, "He pulled out a gun." So I had asked Gibson where the gun was, and Gibson had stared at me. And I looked, didn't see anything, just his motorcycle right there.

And Mikey, I had rolled him over on his side, because Gibson wouldn't do anything to help him. So I'm yelling at Gibson to help him. And Gibson goes to the vehicle, he opens his driver door, he turns on his lights,

and then he pops his trunk. He goes in his trunk and he grabs his green military bag and he goes to Mikey. He kneels in front of him and then he does CPR for like, like five seconds and then stops, and then cuts off his shirt and then does nothing.

And so D.J., his brother, had pulled up. And his brother is freaking out, and I'm trying to calm his brother down. So I'm talking to his brother. And that's when all the other polices showed up and there was just a lot going on. And I'm like --

I remember like before the other polices showed up, I'm walking back and forth. Mikey. I'm walking back and forth. Because -- and Gibson is just sitting there. Gibson is not doing nothing. And I'm walking back and forth, like by his legs. There was no gun, his backpack still underneath him. Like I don't --

And then D.J. and them pulled up. They are freaking out, obviously, because it's his brother. And that's when the other police had got there, and I came back from talking to his brother and I was going to go back to where my sister was at the time. And that's when the police officers were putting up the tape. And that's just when everything happened. You know, I was forced to stay there and all of it, just everything.

Q. Okay. I appreciate you sharing that with me. I

want to go back and ask you some questions on some of the things you said.

You said that you were in your room doing your makeup and you heard yelling.

Do you remember what specifically you heard being yelled?

**A. No. I just knew it was an unfamiliar voice, so I went to go see.**

Q. Okay. How much time would you say passed between when you first heard yelling and you first heard gunshots?

**A. Not even 10 seconds.**

Q. And you heard the gunshots the first time before you looked out the living room window, correct?

**A. Yeah.**

Q. And what exactly did you see when you looked out the living room window?

**A. I saw Gibson standing over Mikey with his gun pointed at him and Mikey was on his stomach.**

Q. Do you remember how many gunshots you heard before you looked out the window?

**A. No.**

Q. Can you tell me if it was more than five or less than five?

**A. It was approximately five to six. Because I know it wasn't one to two. It was pretty fast.**

Q. And then how much time would you say passed between when you looked out the window and you heard the next round of gunshots?

**A. I would say like 15 to 20 seconds.**

Q. Do you remember how many gunshots you heard that time?

**A. Like one or two.**

Q. Did you know Deputy Gibson before this?

**A. He had came over to where we lived, the same address that he had shot Mikey at. He had came over there, I would say like two weeks before, because he had got a call from me. And so he came over there and he had talked to me. And he had interacted with my little brother and my sister and my mom and he left.**

Q. Okay. Why did he get a call that time two weeks before?

**A. Because me and my mom had got into an argument and she thought I was going to do something bad to myself so she had called the cops.**

Q. And what happened when Deputy Gibson got out to the house that time?

**A. He had came out. I met him outside to talk to him. We had a brief conversation and he asked about my siblings, and then he left.**

Q. Was he rude to you at all during that

at any point?

**A. No.**

Q. What did you do once you left your house?

**A. Once I had went outside?**

Q. Once you went outside. And I want you to just take things one thing at a time. So what's the next thing you did?

**A. I had ran up close to them, I would say about a foot away from them, said what the F happened.**

Q. Okay. And when you said what the F happened, how did Deputy Gibson respond?

**A. He said, "He pulled out a gun." He said, exact words, "He pulled a gun." So then I asked him, "Where's the gun?" And he didn't respond. He just stared at me for 15 to 30 seconds.**

Q. Did you look around for the gun at that point?

**A. Yes, I did.**

Q. And you didn't see a gun?

**A. No, ma'am.**

Q. Is it fair to say that this was a very stressful experience for you, M.B.?

**A. Absolutely.**

Q. What happened after Deputy Gibson stared at you for 15 to 30 seconds?

**A. I had went to Mikey and rolled him over and --**

Q. And what did you do next?

**A. I told Gibson to help him multiple times, help him. And then that's when Gibson had went to his vehicle and he turned on his lights, and then he opened up his trunk and he got his medical bag from his trunk. And then he started to do CPR on him for about five seconds, stopped, and then cut off his shirt and waited until other officers got there and EMT's got there.**

Q. Can you give me an estimate, M.B. , in seconds of how much time passed between the time you got outside and you were standing with the two of them and the time Deputy Gibson walked over for his medical bag?

**A. I honestly couldn't tell you. Everything was happening so -- like, it was just a lot.**

Q. Would you say it was more than a minute or less than a minute?

**A. Longer than a minute.**

Q. Longer than five minutes?

**A. I would say around there. Less.**

Q. Okay. Did you ever perform any CPR on Mr. Obregon?

**A. No, not myself, no.**

Q. I know you rolled him over. But did you do anything else to physically assist with first aid?

**A. No.**

Q. Did Deputy Gibson tell you why he stopped the CPR after five seconds?
**A. No.**
Q. Did he tell you why he cut off Mr. Obregon's shirt?
**A. No.**
Q. How much time passed between the time when he cut off Mr. Obregon's shirt and the time that the next officer arrived?
**A. I would say like seven to 10 minutes.**
Q. And what is that estimate based on?
**A. Just the videos and my time frame.**
Q. Do you remember what kind of vehicle the next officer who arrived was driving?
**A. I don't.**
Q. Do you remember if it was from Casa Grande Police Department or the sheriff's office or some other agency?
**A. I believe it was Casa Grande Police Department.**
Q. All right. And when that next -- that vehicle from Casa Grande Police Department arrived, do you recall if there was one officer or more than one?
**A. There was one officer in his vehicle. But after that, that's when more police officers and sheriffs had showed up on scene, like pretty quick after that.**
Q. I'm going to show you Exhibit 1, which is Officer

Q. M.B. , why was it so important for you to be allowed to cross your yard and go back into your house?

**A. Because I'm not trying to sit there and watch all this stuff happen to my family friend. That's crazy. I --**

Q. Did you ever -- go ahead.

**A. No, you go ahead. It's all right.**

Q. Did you ever ask the officers, hey, can I walk down to the end of the street so I don't have to stand here?

**A. They told me -- I was under the impression that if I moved, I was going to be arrested.**

Q. Who gave you that impression?

**A. A sheriff. I'm not sure who. I just know that I was told if I move, I was going to be arrested.**

Q. Do you remember what that individual's uniform looked like?

**A. I know he was a sheriff.**

Q. Do you know anything else about what that person looked like?

**A. I'm not sure. There was quite a few sheriffs around me.**

Q. Were you able to hear in that video someone saying, "I will remove you from even being in this area"?

**A. No.**

Q. Do you remember someone, an officer, saying to you, "I will remove you from even being in this area"?

**A. No.**

Q. Did you ever ask an officer if you could be removed from the area?

**A. Yeah, I asked multiple times if I could leave. And I was under the assumption if I move, I was going to be arrested.**

Q. How many officers gave you that impression? Was it just one or multiple?

**A. I don't know.**

Q. At any point did you turn around so that you wouldn't be facing Mr. Obregon's body?

**A. There was officers standing right behind me. If I turn around, I'm going to be right in an officer's face.**

Q. And you believe that the body-worn camera shows that?

**A. Absolutely.**

Q. When during this whole interaction did you realize that it was Deputy Gibson who was out there with Mr. Obregon?

**A. As soon as I had got outside and asked him what happened.**

Q. I want to ask you next about some of your discovery responses.

And this will be marked as Exhibit 6. And I will share this with you in just a moment.

(Deposition Exhibit No. 6 was marked for identification.)

MR. WOODS: Laura, did you get my e-mail this morning?

MS. VAN BUREN: Yes.

MR. WOODS: Okay.

MS. VAN BUREN: And we will go through that.

BY MS. VAN BUREN:

Q. Can you see, M.B., where it says Plaintiff Brady's Response to Defendant Gibson's First Interrogatories?

**A. Yes.**

Q. Was this one of the documents that you reviewed to prepare for today?

**A. No.**

Q. Let me just move my screen around a little bit. Interrogatories are our opportunity to ask questions in writing of you and your mom. Interrogatory No. 2 asks for every injury, complaint, and symptom that MB, that's you, we use initials to protect your privacy, has experienced since these events or that has been aggravated.

And I want to go through the response and make sure I understand everything that you are claiming

you experienced.

You say you experienced "anxiety"?

**A. Yes.**

Q. How was that anxiety different from what you had experienced before, after your car crash?

**A. Because it wasn't -- like with the car crash it was, I only had the anxiety when I went to Florence and was near the car accident. My anxiety then has -- it's all the time, certain things get me upset, and I'm angry and I just want to fight.**

Q. What certain things get you upset?

**A. Like everything. The littlest things will trigger me and make me upset, like bringing up any situation of like anything like, just everything. I don't know.**

Q. All right. The next thing you say is "PTSD"?

**A. Absolutely.**

Q. Do you know if a medical provider has diagnosed you with PTSD?

**A. Yeah.**

Q. Do you know who was that who diagnosed it?

**A. I think it was Lauren.**

Q. Okay. You say "Depression from the incident."

What has that looked like for you?

**A. I didn't want to be here anymore.**

Q. The next thing that I want to ask you about is "suicide attempts." Tell me about that, please.
**A. Like I said, I didn't want to be here anymore and -- yeah.**
Q. How many times have you attempted suicide since this incident?
**A. Like three or four.**
Q. How would you -- how did those -- I'm sorry.
How did you attempt suicide?
**A. I would take drugs, cut myself, anything that I could, honestly, just do it.**
Q. Were you ever hospitalized after any of those suicide attempts?
**A. Not really, no. No one knew about it.**
Q. Did anyone in your family know?
**A. My mom had found out that I had attempted. And she had called the crisis team on me and they had came out and stuff like that.**
Q. Had you ever attempted suicide before this incident?
**A. No.**
Q. Have you experienced weight fluctuations?
**A. What does that mean, like?**
Q. Your weight has gone up and down at all?
**A. Oh, yeah.**

Q. Tell me about that.

**A. Well, I just, for like -- even sometimes still now I'm just like I don't have an appetite ever. Like I know I'm hungry, but I can't -- like when I look at food or anything like that, it just makes me want to throw up.**

Q. Have you experienced migraines?

**A. Yeah, like every day.**

Q. Every day?

**A. Pretty much, yeah.**

Q. Have you gotten medical care for those migraines?

**A. Yeah. There's nothing really they do for them, except for give me medicine and send me home.**

Q. Where have you gone for migraine treatment?

**A. Hospitals, doctors' offices.**

Q. What hospitals?

**A. Banner Hospital in Casa Grande, probably a Banner out in Tempe or Mesa area. I know I went to Dobson, the hospital on Dobson once for it.**

Q. This talks about you experiencing self-destructive behaviors.

What has that looked like for you?

**A. Just like I'm angry and I ruin everything, like my relationships, even like I was just a mean person and like I would do stuff to like just sabotage myself and others just because I was angry and not okay.**

Q. Has this incident affected your family relationships?
**A. Yeah, a lot.**
Q. Tell me about that.
**A. Like I said, I was angry. I didn't want to be around nobody. It was constant arguing. Me fighting with them. And I would just be rude and angry.**
Q. This interrogatory also asked -- and that's what this discovery is called. It asked for who has treated you for these conditions since the incident. And we have Sun Life Women and Children's, Casa Grande Pediatrics, Denova, Phoenix Children's, MIND 24-7, Horizon Health and Wellness.
**A. Yeah.**
Q. Who else has treated you for the conditions we just talked about since this incident?
**A. That's it, I believe. Just -- I don't know who it was. Yeah, I was going to say I really don't know who it was who treated me in Juvie, like who diagnosed like to get the anxiety. I forgot what her name was, but -- yeah, other than that, yeah.**
Q. So someone at the Juvenile Detention Center?
**A. Yeah.**
Q. And Banner Casa Grande and Banner Dobson for migraines?

Q. All right. M.B. , we are almost done.
Returning back to Exhibit 6, those interrogatories, Interrogatory No. 6 asked you to identify each and every act or omission by Defendant Gibson in particular that you assert constitutes intentional infliction of emotional distress.
When I go to page seven, line 10, it says "When Gibson returned, Gibson told MB that if she moved, she would be arrested."
Is that correct or do you want to change that?
**A. I wanted to change that. Because it wasn't like him directly who -- like I don't know, but I was just like -- Gibson was there the whole time at the scene. You know what I mean? And usual -- like, and I know what he has done to my friend and family and family of friends and how he has a vicious intent. So I, I'm -- Gibson -- me personally, my opinion is Gibson has, has a say and can tell his co-workers, his buddies, that, you know, everything that he has also gone through. Because there's two sides of every story and then there's the truth, you know. So I feel like he would tell his side of the story and it would just make it to like him and his sheriffs are all in it together, like they are all, all a threat to me, all of them are a threat. And if one of them has told me**

**to do something, it's all of them, I would take it as. Because they all have a say-so in what is going on.**

Q. But Deputy Gibson in particular did not tell you that if you moved, you would be arrested, correct?

**A. Correct.**

Q. Later, around line 17, it says "MB was told to shut her damn mouth."

**A. Correct.**

Q. MB is you. Do you recall being told that?

**A. Yes, but it was more like -- he didn't say "your damn mouth." He said, he said shut your F'ing mouth.**

Q. Do you remember who told you that?

**A. No, I don't.**

Q. Was that Deputy Gibson?

**A. No.**

Q. Because Deputy Gibson, according to this response, was there and saying nothing, correct?

**A. Yes. Gibson was just on the scene and, yeah.**

Q. Did you ever post on social media about this incident?

**A. No.**

Q. Have you ever posted anywhere online about this incident?

**A. No.**

Q. Have you ever posted anywhere online about Deputy

# EXHIBIT 5

## Excerpts from Pinal County Medical Examiner Autopsy Report

## ***Report of Examination***

| | |
|---|---|
| Decedent: | Michael Brandon Obregon |
| Date of death: | March 16, 2023 |
| Date of examination: | March 17, 2023 |
| Time of examination: | 1045 hours |
| Investigator: | Samantha Dungan |
| Forensic Technician: | Breanna McGinnis, Samantha Kuba |
| Present at examination: | Crime Scene Technician L. Rabb #2673 PCSO<br>Detective. B. Gay #2329 PCSO<br>Detective. M. Fender #1604 PCSO<br>Detective. J. Bonucci #877 PCSO |

---

| | |
|---|---|
| Cause of Death: | Multiple gunshot wounds |
| Manner of Death: | Homicide |

April 6, 2023
Date Signed

**John Hu, MD**
**Chief Medical Examiner**

**Gunshot wound #1**

There is a gunshot wound of entrance present on the posterior aspect of the right shoulder, labeled defect #2. It is located 13 inches below the top of the head and 7 inches to the right of a posterior midline. The wound consists of a 0.9 cm circular defect with a thin regular abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the scapula and the musculatures around the scapula. The bullet is lodged in the right scapular region muscle, along with three small lead colored fragments. A medium caliber severely deformed jacketed bullet and three small metal fragments are recovered from the right scapular region. The trajectory for this gunshot wound is from back to front, right to left, and slightly downward when the body is viewed in its anatomic position.

**Gunshot wound #2**

There is a gunshot wound of entrance on the right upper back, labeled defect #3. It is located 15 ½ inches below the top of the head and 5 inches to the right of a posterior midline. The wound consists of a 0.9 cm circular defect with a regular abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the right posterior chest wall perforating right lower lobe of the lung, the descending aorta, the esophagus, left pulmonary vein, and the left upper lobe of the lung. There are bilateral hemothoraces measuring 1400 cc in the left pleural cavity and 200 cc in the right pleural cavity. There is 100 cc in the pericardial sac. The bullet is lodged in the left upper chest wall. A medium caliber severely deformed jacketed bullet is recovered from the left upper chest. The trajectory for this gunshot wound is from right to left, back to front, and slightly upward when the body is viewed in its anatomic position.

**Gunshot wound #3**

There is a gunshot wound of entrance located on the left mid back, labeled defect #4. It is located 20 inches below the top of the head and 2 inches to the left of a posterior midline. The wound consists of an irregular defect measuring 1 x 1.5 cm with an exaggerated abrasion margin on its 5 to 7 o'clock edge. The wound proceeds from this injury through the back muscles and the ribcage. The bullet is lodged in the right shoulder area. The trajectory for this gunshot wound is from back to front, left to right, and sharply upward when the body is viewed in its anatomic position. A medium caliber severely deformed jacketed bullet is recovered from the right shoulder area and packaged as evidence.

**Gunshot wound #4**

There is a gunshot wound labeled defect #5. It is located on the left mid back, 21 ½ inches below the top of the head and 4 inches to the left of a posterior midline. The wound consists of an irregular 2 x 1.2 cm irregular perforation with no obvious abrasion margins identified. This wound connects with defect #6. Defect #6 is located on the left mid back on the left posterior axillary line 21 inches below the top of the head. The wound consists of a 1 cm circular defect with a thin abrasion margin. There is a contusion around the defect at its 6 to 10 o'clock edge, measuring up to 1 cm in thickness. There is no evidence of soot deposit or gunpowder stippling noted on the skin around these two wounds. These two wounds are a pair of tangential through-and-through gunshot wound involving subcutaneous tissue and muscles only. The trajectory for this wound cannot be determined.

**Gunshot wound #5**

There is a gunshot wound of entrance on the midline upper abdomen, labeled defect #9. It is located 22 ½ inches below the top of the head. The wound consists of a 1 cm circular defect with an abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the abdominal wall, causing a large deep graze wound in the liver tissue. The bullet partially exits the right axillary wall causing a large defect labeled #8. The partial exit wound is located on the right axilla on the right mid clavicle line, 14 ½ inches below the top of the head. The wound consists of an irregular defect, measuring 2 x 1 cm with no abrasion margin. There is a small amount of blood in the abdominal cavity. There is a medium caliber severely deformed jacketed projectile lodged near the partial exit wound at the right axilla. It is recovered and packaged as evidence. The trajectory for this gunshot wound is from front to back, left to right, and moderately upward when the body is viewed in its anatomic position.

**Gunshot wound #6**

There is a gunshot wound of entrance located on the posterior lateral aspect of the left thigh, labeled defect #7. It is located 15 inches below the left anterior superior iliac spine. The wound consists of a 0.9 cm circular defect with a focal abrasion margin. There is no evidence of soot deposit or gunpowder stippling noted on the skin around the entrance wound. The wound proceeds from this injury through the thigh musculature and fractures the left femur. Multiple fragments of a medium caliber jacketed projectile are recovered from the left thigh muscle and packaged as evidence. The trajectory for this gunshot wound is from back to front.

**Gunshot wound #7**

There is a graze wound on the back of the neck, labeled defect #1. This wound consists of 1.2 x 0.2 cm superficial laceration consistent with a graze wound. It is located 10 inches below the top of the head and ½ inch to the left of the posterior midline. The directionality cannot be determined.

Both hands were previously bagged at the scene. Both hands were wearing blue latex gloves. No trauma or other significant findings are noted on the hands.

**Other trauma**

There is a small abrasion on the anterior aspect of the right shoulder. There is a small abrasion on the forehead, just on the hairline.

These injuries, having been once described, will not be repeated.

**SCARS, TATTOOS, AND OTHER IDENTIFYING BODY FEATURES**

There are numerous tattoos present on the neck, upper back, torso, and left leg. There are multiple irregular scars present on the right knee.

**GENERAL EXTERNAL EXAMINATION**

The preservation is good in the absence of embalming. The body is cold to touch, subsequent to refrigeration. Rigor mortis is full. Posterior red-purple lividity is unfixed.

The body is that of a normally developed Hispanic male measuring 68 inches in length and weighing 168 pounds. The general appearance is compatible with the reported age of 36 years. Scalp hair is black. The irises are brown, and there is no jaundice or lesions of sclerae or conjunctivae. The ears are unremarkable. There is facial hair of a mustache. The nose is unremarkable. The mouth is unremarkable. Teeth are natural. The neck is unremarkable. There are no palpable axillary, cervical, abdominal, or inguinal masses. The chest and back are symmetrical and unremarkable. Body hair is normal in amount and distribution of an average male adult. The abdomen is flat. The external genitalia, anus, and perineum are unremarkable. The extremities are symmetrical, without significant clubbing, edema, or deformity. Fingernails are intact.

**INTERNAL EXAMINATION**

The body is opened by a standard Y-shaped thoracoabdominal incision. All viscera occupy their appropriate anatomic relationships. Subcutaneous adipose tissue ranges up to 1.5 cm in thickness over the abdominal wall. Serous surfaces are smooth and glistening throughout. There are extensive right pleural

# EXHIBIT 6

## Excerpts from Report of Mark Hafkey

**Opinion(s):**

1. Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.
2. There are a number of procedural and investigative irregularities, as well as contradictory witness statements, which call into question some aspects of Deputy Gibson's account of the incident.
3. M.B. was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment. The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Case Synopsis:**

On March 16, 2023, at approximately 1900 hours, Deputy Gibson was working uniformed patrol in Casa Grande when he reportedly observed a red dirt bike driving at high rate of speed on Hualapai Drive, from Hopi Drive. He then "sped up to catch up to the dirt bike in an attempt to conduct a traffic stop." Deputy Gibson saw the bike stopped in the driveway of 19005 Mescalero Drive and activated his emergency lights, at which time the driver "accelerated the bike crashing into the closed fence." Deputy Gibson then exited his vehicle and commanded him to "stop." He also put the dirt bike's kickstand down. (PCSD Report, Pg. 75)

**My Opinions Regarding Officer Gibpson's Use of Force:**

Assuming that the circumstances leading up to the deadly force utilized by Deputy Gibson occurred as he described, and Mr. Obregon pointed a gun at him, his initial lethal response to an imminent threat appears justified under the 4th Amendment. However, subsequent lethal rounds fired into Mr. Obregon's posterior were an unnecessary and excessive use of force.

**Discussion:**

Officers are justified in using lethal force when they have probable cause to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others. When given time, officers must provide a warning before implementing lethal force and utilize it only as a last resort. In the case of a police shooting, officers are responsible for every round they fire, as well as the backdrop behind their line of fire. When an officer perceives that the imminent threat has ceased, so must the continued use of lethal force. Officers cannot use excessive force to stop a fleeing suspect unless they have probable cause (PC) to believe that the suspect is an immediate threat of deadly force or serious injury to the officer or others. (*Brosseau v Haugen, Graham v Conner, Plumhoff v Rickard,* and *Tennessee v Garner*)

According to Deputy Gibson's statements to investigators, while on top of Mr. Obregon's back, he felt Mr. Obregon manipulating something underneath his waistline area before he brandished a black and silver handgun. Deputy Gibson then pushed off of Mr. Obregon, began backing away from him and drew his service weapon. He said he began firing his weapon when he saw Mr. Obregon roll away from him onto his side and point the gun at him. Deputy Gibson said that he believed he would be shot and recalled firing 7-8

times and seeing the handgun fall to Mr. Obregon's side. (PCSO Report, Pg. 76) Subjectively, the officers account would justify his initial use of lethal force.

In deposition, Deputy Gibson stated that he didn't stop firing "...until I perceived that Michael no longer was in possession of the handgun, it dropped, and that that imminent threat had stopped." Deputy Gibson confirmed multiple times that he had stopped firing when the weapon dropped. When asked if he believed that the threat was neutralized when the gun dropped, Deputy Gibson responded "yes." (Gibson Deposition, Pg. 138-139)

The medical examiner (Dr. John Hu, MD) concluded that Mr. Obregon was struck with 6 fatal rounds, i.e., 1 anterior and 5 posteriors, as well as one non-lethal posterior grazing round. He also provided trajectory descriptions for the lethal rounds. Extrapolating his anterior trajectory, Mr. Obregon's gunshot wound is consistent with having been struck while on the ground either on his back or on his side facing Deputy Gibson, who would have been shooting from an elevated position. Extrapolating his posterior trajectories, Mr. Obregon's gunshot wounds are consistent with his having been struck while on the ground rolling away from Deputy Gibson, who would have been shooting from an elevated position.

Deputy Gibson described in deposition that while on Mr. Obregon's back, he saw him pull a black and silver gun out from underneath him with his right hand. Deputy Gibson then transmitted "913" (immediate backup request), yelled "drop the gun," pushed off of Mr. Obregon's back and began backpedaling. He said Mr. Obregon rolled away from him onto his right side and pointed a handgun at him, so Deputy Gibson fired 7-8 fast and

rapid shots. He could not recall if there was a pause between his shots. (Gibson Deposition Pgs. 83-93)

Based upon the medical examiner's trajectories of the anterior and posterior rounds, as well as Mr. Obregon's body positioning, it is reasonable to deduce that one of Deputy Gibson's initial rounds struck Mr. Obregon in the front, whereas the remaining lethal rounds stitched him down his back in a semi-linear pattern, from his upper right shoulder to his left thigh (at approximately a 60-degree angle), as he rolled away from the officer.

Deputy Gibson indicated in deposition (Pg. 93) that he stopped firing when he saw the handgun fall to the ground beside Mr. Obregon. He also indicated that he moved the gun a short distance farther away from Mr. Obregon's body after the shooting. (Pg. 90) The officer's relative position to Mr. Obregon's position and Deputy Gibson's testimony that he saw the gun fall to the ground are both consistent with the gun landing on the left side of Mr. Obregon's prone body. Crime scene investigation photos and FARO data also place the handgun to the left (and rear) of Mr. Obregon's body.

The positioning of the handgun to the left of the body indicates to me that it likely fell to the ground following the first frontal shot as opposed to after Mr. Obregon had rolled 270 degrees to his right and back into a prone position. In other words, if Mr. Obregon had retained possession of the gun during the roll away from the officer, it is not likely that the weapon could have landed on the left side of the body. As Deputy Gibson stated in deposition, Mr. Obregon would no longer have been an imminent threat to him after the gun had fallen to the ground. Therefore, continuing to fire at Mr. Obregon from behind as he rolled to his right away from Deputy Gibson was unnecessary.

Deputy Gibson also indicated in deposition that he wasn't sure if there was any sort of pause between his shots. However, seven witnesses described hearing some form of pause between essentially two volleys. A pause would be consistent between the anterior and posterior strikes depending on the time it would have taken for Mr. Obregon to roll away from the officer exposing his backside, i.e., the greater the pause the slower the roll.

**Note**, officers are trained and tested to shoot and assess, i.e., firing in controlled bursts while simultaneously monitoring the suspect for a change in behavior, such as falling, fleeing or dropping a weapon.

## Observations

**Observation 1**:

When questioned in deposition regarding whether the sheriff's department had any policy relating to shooting fleeing suspects from behind, Deputy Gibson responded "There is a policy for use of deadly force in the circumstance of a person that is fleeing." (Gibson Deposition, Pg. 83) I am not aware of any such PCSO policy. Pursuant to the landmark case of Tennessee v Garner, officers must have PC to believe a suspect poses an imminent threat of death or serious physical injury to the officer or others before they can shoot them from behind.

**Observation 2**:

In the radio recording of the incident, Deputy Gibson put out an emergency transmission code (998/999) of an officer involved in a shooting followed by a "drop the gun!" exclamation. (Radio Transmission at 00:53) However, there is

evidence that the transmission occurred after Deputy Gibson had finished firing and, therefore, after Deputy Gibson stated that he saw the gun fall.

**Observation 3**:

During the radio traffic communication, before returning to the body, Deputy Gibson can be heard calmly describing the handgun's colors and stating by name that Michael Obregon had tried to shoot him. (Radio Transmission beginning 01:07)

**Observation 4**:

When apprehending a fleeing suspect, it is common police practice and training to take subjects prone to the ground, get their hands behind their back and secure them in handcuffs. Being on top of a suspect's back, particularly with the weight of an officer's gear, generally gives officers a tactical advantage to control suspects and their hands. Conversely, getting off a suspect would tend to shift the tactical advantage by relinquishing control.

**My Opinions Regarding Procedural and Investigative Irregularities:**

Having reviewed the investigation in this matter, there are a number of procedural and investigative irregularities, as well as conflicting witness statements, which call into question some aspects of Deputy Gibson's account of the incident.

**First**:

Deputy Gibson did not follow police protocol preceding his contact with Mr. Obregon. It is common police policy, practices and procedures for officers to notify dispatch when conducting legitimate traffic enforcement activities, engaging in a pursuit or

speed, conducting a traffic stop or going out with a subject. This breach in protocol is indicative of not having a legitimate reason to make a traffic stop. Without RS of an enforceable violation, the seizure was unconstitutional.

## Observations

**Observation 5**:

Despite M.B.'s statements that Mr. Obregon had already arrived and was in the process of leaving when the deputy arrived, investigators did not question the breach in protocol or seizure of Mr. Obregon.

**Observation 6**:

Deputy Gibson indicated to investigators that he was unsure of the name of the street in which he contacted Mr. Obregon; there is evidence that he had been to that specific address on a call relatively recent to this incident.

**Observation 7:**

There is some evidence that Deputy Gibson had adverse history with Mr. Obregon, as well as with off-road vehicles driving in the area. (Nicholas Wallace Declaration, Daniel Wallace Declaration, Nicole Bernier Declaration, Meagon Brady Interview)

**Observation 8:**

The first witness on the scene, M.B. indicated in her interview with Detective Gonzalez that Deputy Gibson did not render aid or retrieve his first aid kit until after she walked up and told him to "help him." She was adamant that she did not see a gun. M.B. Interview 01:50)

**Observation 9:**

Two residents, Samantha Dean and Whitney Hector, indicated that they heard Deputy Gibson yell "I bet your scared of me now huh" and "I bet you're scared of me now," respectively, just before hearing shots. (Samantha Dean Face Book Communication / Whitney Hector Declaration)

**Observation 10:**

There is evidence that Tiffany Chapman was on her phone with Nicole Bernier while observing the interaction of Deputy Gibson and Mr. Obregon. During the call, Tiffany Chapman reportedly told Nicole that Mr. Obregon was running from the deputy and "oh my god, he shot him!"

**Observation 11:**

Of the three witnesses who reported having seen Mr. Obregon fall, i.e., M.B. Kenyan Bower, and Tiffinay Chapman, none of them reported seeing Mr. Obregon with a gun.

**Observation 12:**

Mr. Obregon's nephew, Nicholas Wallace, reported in his declaration that his uncle "always kept his gun in his belt in the back of his pants because he rode a motorcycle or dirt bike."

**Second**:

There appears to have been some investigative confirmation bias as it relates to Deputy Gibson's account. Confirmation bias is the tendency to search for and interpret investigative findings that conform to an investigators pre-existing beliefs or hypotheses

pulled a gun on him. Because she never saw a gun, she asked Deputy Gibson where it was but he did not respond. She then pleaded with him to help him (Mr. Obregon), at which time Deputy Gibson retrieved a first aid kit, cut Mr. Obregon's clothes off and render aid.

Despite conflicting witness statements and the number of posterior wounds, investigators presented Deputy Gibson with very few questions into the anomalies. Investigators were unable to link the handgun recovered as belonging to Mr. Obregon. DNA swabs were taken from the gun but never submitted for DNA analysis in order to forensically place the weapon in Mr. Obregon's hands. Finally, Mr. Obregon was wearing a backpack during the shooting, but there is no indication that it was examined to corroborate trajectories.

There were contradictory statements as to the number and succession of gunshots. Seven witnesses ultimately described some manner of a pause between the number of shots fired. Despite this anomaly to Deputy Gibson's account, investigators did not seem to consider potential implications as there was apparently no investigative analysis conducted or investigative conclusions made relating to the projectile impact trajectories identified in the medical examiner's report.

**Fourth:**

Deputy Gibson's shooting account is questionable. The ring-camera footage depicts Deputy Gibson going after Mr. Obregon. He is out of sight for approximately 3.5 seconds before reemerging walking backward while shooting downward into the area in which Mr. Obregon had reportedly fallen. According to Deputy Gibson's deposition, during that 3.5 second timeframe, he did the following:

1. He ran after Mr. Obregon
2. Got on top of him
3. Radioed for backup
4. Felt Mr. Obregon manipulating something with his hands underneath his waistline
5. Saw Mr. Obregon work his arm out brandishing a silver and black gun
6. Pushed off of Mr. Obregon
7. Started back peddling away from Mr. Obregon
8. Drew his service weapon
9. Saw Mr. Obregon roll to his side trying to relocate him
10. Saw Mr. Obregon point the gun at him
11. Warned Mr. Obregon to drop the gun
12. Started firing at Mr. Obregon

Based upon testimony, crime scene data, and having visited the scene, I estimated the distance from the moment Deputy Gibson left sight of the camera to Mr. Obregon's location, to be between 5-9 feet. Physically navigating that distance both directions and completing all the above steps within a 3.5 second timeframe seems unlikely, especially when also factoring in cognitive reaction time (RT) for one or more of the stated steps.

Cognitive reaction time is essentially the total duration of time between the perception of a stimulus (visual or auditory) and the initiation of a physical response. In other words, the time it takes a person to perceive and then to physically react to a given threat or other stimulus. There are many variables in which can influence RT, e.g., age,

weariness, lighting conditions, etc. There has been research done to calculate average RT, but it varies from person to person. Therefore, in order to measure accurately a specific person's RT, that individual would have to be tested individually.

**My Opinions Regarding the Seizure of M.B.**

M.B. was detained against her will for an unreasonable amount of time and, therefore, the seizure was beyond the scope of the 4th Amendment. The manner in which this witness was held was contrary to common police policies, practices and procedures.

**Discussion:**

In the landmark case of in landmark case of Terry v Ohio, the Supreme Court described the difference between a non-seizure (a contact) and a seizure (stop or arrest). The Court defined a seizure as "Only when the officer by means of physical force or show of authority has in some way restrained the liberty of a citizen may we conclude that a seizure has occurred." Officers must have reasonable suspicion (RS) of a crime to seize a person, including a witness, and they can only detain that person for a reasonable amount of time. A reasonable amount of time has been defined as brief and lasting only as long as necessary to confirm or dispel the officer's suspicion.

All officers are taught Terry v Ohio. They are also taught that 20-minutes is a good rule of thumb for traffic stops and other citizen contacts. Officers are taught that even more deference should be given to holding witnesses and that witnesses should not be detained against their will, especially when they have been identified.

That being said, M.B. was a witness to the police shooting in front of her residence. At the time of the incident, she was fifteen years old. Pursuant to her police interview and/or subsequent deposition, M.B.'s parent(s) were not home and she had been caring for younger siblings. After the shooting, she immediately went outside and contacted the deputy involved as detailed above. As backup officers arrived, she was ordered to stay there. (Fox Body Cam 03:30 / 1908hrs.)

In M.B.'s interview with Detective Gonzalez, she described being held very close to Mr. Obregon and held against her will for a very long time throughout the incident. She emotionally described being "trapped" by several officers and made to "watch him die." She asked to leave multiple times to go back into her home but was rebuffed, told to "shut her mouth" and warned that she would be arrested if she passed the "line," i.e., crime scene tape preventing her from getting back into her house. M.B. Audio Interview 01:50 – 10:30)

Body cam video confirms that M.B. was detained at 1908 hours on the SEC of her property, between the utility pole and driveway, approximately 20ft of the decedent. Video confirms that M.B. was kept there (officers standing by) for over an hour (1908-2012hrs) despite multiple requests to leave and arguments that she needed to go back inside her home and care for her siblings. M.B. was emotional, angry and even insulting to the officers when they rebuffed her requests. At 2012 hours, you can hear the officer tell detectives "We wouldn't let her go in – she's just mad."

M.B. lived there, had already been identified as a witness and was not a suspect in any crime. The officers would have known that M.B. was a juvenile and visibly upset

young girl, and they should have known that placing a child in close proximity to a fatally wounded person could be traumatic. Mr. Obregon was reported to be a family friend.

Holding a witness, particularly one that could be considered as a hostile witness, inside the inner perimeter of a crime scene is highly unusual. It is common police practice to relocate witnesses not only outside of a crime scene, but also to shield them from public scrutiny. Instead, M.B. was detained on the shoulder of the road. Officers routinely ask witnesses if they would mind waiting in a vehicle, restaurant or other safe location outside of the crime scene and out of public view. There is no evidence that they made such an offer.

If a witness objects to being detained, officers should obtain their contact information and arrange to interview them later, especially when there is no urgency. In this case, M.B.'s home was not part of the crime scene, and she could have waited inside her home for investigators. The officers' treatment of this minor witness and the length of her seizure were unreasonable.

Respectfully given January 31, 2026

______________________________

Ret. Lt. Mark R. Hafkey, M. Ed.

# EXHIBIT 7

## Excerpts from Report of Dr. James W. Borden

Case 2:24-cv-01510-KML Document 112-3 Filed 09/30/26 Page 25 of 133



A.B. (DEFS_Obregon 000639): Heard five (5) shots and yelling ("get down"). No disparaging remarks; mentioned hearing discussions about a gun post-shooting but no taunts.

Carolyn Buechler (DEFS_Obregon 000630): Did not hear shots; daughter Jackie (asleep, not interviewed) reportedly did, but no details on remarks.

Kenyan Bower & Kathy Bower (DEFS_Obregon 000632): Heard "don't reach for your gun" before/during four (4) shots. No disparaging remarks.

Samantha Plummer, Wade Putt, Beverly Putt (DEFS_Obregon 000635): Heard "don't reach for the gun" during/on way to door (4-5 shots). No disparaging remarks noted.
Gabriel Silva (DEFS_Obregon 000633): Not home; no observations.

The absence of such remarks in these contemporaneous statements (taken hours after the incident) contrasts with the FAC's allegation, which may stem from later recollections or other sources not captured here. No evidence in these files supports the claim during initial canvassing.

## B. Conflicts Between Witness Statements and Deputy Gibson's Account

Deputy Gibson's account (from deposition and PCSO summary) describes: A traffic stop for speeding/stop sign violation; Obregon complied initially but fled on foot after ID check; Deputy Gibson pursued, tackled Obregon; during ground struggle, Obregon drew a .40 caliber handgun and pointed it at Deputy Gibson (finger on trigger); Deputy Gibson commanded "drop the gun" multiple times, backed away, and fired ~10 rounds as Obregon rolled and continued pointing; shots ceased when gun dropped; Deputy Gibson then radioed for aid (code 913), secured the gun, and rendered aid.

Witness statements show consistencies (e.g., commands to "get down" or not reach for gun, post-shooting aid) but several conflicts, particularly on the sequence, presence of a gun, number/timing of shots, and Obregon's actions. These are quantified below in a table for clarity, grouped by theme. Conflicts are based on direct contradictions or significant variances; some

witnesses had limited views (e.g., auditory only). The following represents the comparison of witness statements considered in this analysis:

| Theme/Element | Deputy Gibson's Account | Conflicting Witness Statements | Analysis of Conflict |
|---|---|---|---|
| **Initiation and Pre-Shooting Sequence** | Traffic stop; Obregon dismounted bike, conversed peacefully ~2-3 min; fled on foot after detention announced; pursued and tackled in yard. No shots during initial flight. | **M.B.** PT1/PT2): Obregon on bike at gate, turning it off/on; Deputy Gibson yelled "get on the ground" while Obregon dismounting (right leg over bike); shots fired immediately after, no flight/pursuit/tackle seen. **A.B.** Heard "get down" from her room; no visual of pursuit/tackle. - Kenyan/Kathy Bower: Heard "don't reach for your gun" at door; saw Obregon fall between pole/fence (no tackle seen). - Samantha Plummer/Wade Putt: Saw Gibson talking to man in brown hat; then shots; man fell near fence (no flight/tackle). | Multiple witnesses describe shooting at/near gate while Obregon on/near bike, contradicting Deputy Gibson's foot pursuit/tackle in yard. Suggests possible discrepancy in location/timing of escalation. |
| **Presence of Gun/Threat** | Obregon drew .40 handgun during ground struggle, pointed at Deputy Gibson with finger on trigger; Deputy Gibson commanded "drop the gun." | **M.B.** PT1/PT2): No gun seen (watched through window); no throw/drop; insisted "there was no gun." **A.B.** No gun seen (approached ~5 ft from body); heard post-shooting talk of gun but none visible. - Patricia Luna/Jesse Gutierrez family: No visuals; Jr. heard post-aid voices but no gun mention. - Christopher Rhodes: Heard two shot sets; speculated "somebody had tried to run" but no gun seen/heard. | Direct conflict: Brady sisters (closest witnesses) deny seeing gun, contradicting Deputy Gibson's imminent threat claim. Others didn't see event closely enough to confirm/deny. |
| **Commands Issued** | Multiple "drop the gun" during struggle/shooting. | **M.B.** Heard "Michael, please get on the ground" before shots; no "drop the gun." **A.B.** **A.B.** Heard "get down." - Kenyan/Kathy Bower: Heard "don't reach for your gun" before/during shots. - Samantha Plummer/Wade Putt: Heard "don't reach for the gun." - Donna Pacion/Billy Leivas: No voices heard. - Christopher Rhodes: No voices; only shots. | Partial alignment on de-escalation commands, but variance in phrasing/timing (e.g., "get down" vs. "drop the gun" vs. "don't reach"). Some heard none, suggesting audio limitations or sequence differences. |
| **Number and Timing of Shots** | ~10 rounds fired continuously until threat neutralized (as Obregon rolled). | **M.B.** **A.B.** 5 shots (quick succession). - Jesse Gutierrez Jr.: 7-9 shots (bang, pause, repeated). - Christopher Rhodes: Two sets (one weak, then multiple). - Kenyan/Kathy Bower: 4 shots (after command). - Samantha Plummer/Wade Putt: 4-5 shots (during/on way to door). - Donna Pacion: | Inconsistent counts (4-10) and patterns (continuous vs. sets/pauses), potentially due to auditory distortion or partial hearing; conflicts with Deputy Gibson's single volley. |

| Theme/Element | Deputy Gibson's Account | Conflicting Witness Statements | Analysis of Conflict |
|---|---|---|---|
| | | Multiple "popping" (like firecrackers, no count). - Patricia Luna/Jesse Sr.: ~5 shots (quick). | |
| **Post-Shooting Actions** | Immediate radio for aid; secured gun; rendered aid (checked airway, med kit). | **M.B.** Deputy Gibson "just standing there" initially (frozen); delayed aid until prompted; heard gurgling but slow response. **A.B.** No immediate aid; waited for ambulance; lights off initially, turned on when she approached. - Kenyan/Kathy Bower: Saw neighbor jump fence to help; Deputy Gibson argued with girl. - Samantha Plummer/Wade Putt: Deputy Gibson crouched by car post-shots; then went to aid. | Conflicts on response speed: Witnesses describe initial inaction/delay vs. Deputy Gibson's immediate aid/radio. Aligns on eventual aid but timing disputed. |
| **Overall Visibility/Position** | Close-range struggle in yard. | - Many (e.g., Rhodes, Luna/Gutierrez, Pacion): Auditory only; no visuals. - Brady sisters: Partial view from windows/yard; no full struggle seen. - Bowers/Plummer/Putt: Viewed from door/window; saw fall but limited angles. | Limited witness visibility (distance, obstructions like conex boxes/fences) may explain gaps, but creates conflicts where visuals contradict (e.g., no tackle/gun). |

These conflicts are expected and consistent with witness accounts in this environment. These notes highlight potential issues with perspective, vantage points, and recall under stress. No witnesses fully corroborate Deputy Gibson's tackle/gun-draw sequence due to angle of line of sight, while several align on commands and post-aid efforts. The lack of disparaging remarks in initial statements may indicate the allegation arose later. This analysis relies solely on provided documents and statements.

## C. Section Conclusion.

There is no statement from any witness in the immediate post-incident interviews (conducted on March 16, 2023) that includes a visual or auditory account of Deputy Gibson saying, "I'll bet you're scared now." The provided interviews, (DEFS_Obregon 000629 through 000639), contain reports of commands like "get down," "don't reach for the gun," or "Michael, please get on the ground," but no disparaging or taunting remarks matching this phrase in any of the initial interviews. A review across all attached PDFs (including reports, summaries) also revealed no corroborating information related to this alleged statement. The allegation appears only in later civil

(ten (10) actual shots fired) often described as rapid or high-powered. No witness reported hearing shots from Obregon,[21] aligning with the absence of visual confirmation of him possessing or firing a weapon. Verbal commands from Deputy Gibson were corroborated by seven (7) witnesses, predominantly "Drop the gun," or "Don't reach for the gun," suggesting a perceived threat during the encounter. Visual accounts from six (6) witnesses describe Obregon's arrival on a red dirt bike, a brief interaction, an attempt to flee, and subsequent fall, but none observed a gun in his possession.

Prior knowledge from ten (10) witnesses portrays Obregon as a frequent visitor to the area, known for motorcycle use and family ties, but also as someone with a criminal history (parole violation, methamphetamine use) per his wife. Allegations of prior threats by Deputy Gibson were raised by Allison Obregon, warranting further scrutiny in contextual analysis. Inconsistencies are minor, such as variations in gunshot counts (likely due to distance or obstructions) and timing of aid rendering (e.g., delayed per Brady family). Overall, these accounts provide a coherent narrative of a rapid escalation from a lawful traffic stop and field interview to lethal force, with emphasis on post-shooting aid and scene security. Due to distance, lighting and visual perspective, no witnesses reported seeing the initial draw of a weapon by Obregon and surveillance[22] from one source was recovered for evidentiary purposes.

## 10. PERTINENT POLICIES FROM PINAL COUNTY SHERIFF'S OFFICE (PCSO) RELEVANT TO THE INCIDENT

Based on the provided documents and related investigative records (e.g., PCSO Executive Summary for Administrative Inquiry #AI2023-005, PCSO Deputy Report #230316206, CGPD Case Report #2023-00011039, and the First Amended Complaint), the pertinent PCSO policies in effect at the time of the incident (March 16, 2023) are those reviewed during the administrative inquiry. These policies are referenced but not fully quoted in the documents, This section analyzes the policy and is compared to facts of the case as described in the case file and reflected in the video evidence. I

---

[21] It is not possible to determine from which weapon shots were being fired. This element would not have been discernable by any witness. It was determined that Obregon did not fire any shots during the incident.
[22] DEFS_Obregon 000463 - ch03-20230317-063300-064126-101000000000.mp4.
DEFS_Obregon 000464 - ch03-20230317-064126-064953-101000000000.mp4.

# EXHIBIT 8

## Scene Photograph




PENGAD 800-631-6989
DEPOSITION EXHIBIT
6
B. Gibson
1-5-26

# EXHIBIT 9

**Ring Camera Video**

**FILED SEPARATELY**

# EXHIBIT 10

## Excerpts from Casa Grande Police Department Case Report

**CASA GRANDE POLICE DEPARTMENT**

**FIELD CASE REPORT** CASE# **2023-00011039**

**NARRATIVE**

SYNOPSIS

On 03/16/2023, at approximately 1901 hours, the Casa Grande Police Department was called to assist the Pinal County Sheriff's Office (PCSO) with a deputy involved shooting which occurred in front of the residence located at 19005 W. Mescalero Dr.

NARRATIVE:

On 03/16/2023, at approximately 1901 hours, dispatch sent me to an Agency Assist call to the area of N. Hualapai Dr. and W. Mescalero Dr. Call notes and information provided over the radio indicated a Pinal County Deputy was involved in a shooting and needed assistance. I responded with my emergency lights and sirens activated and arrived in front of the residence located at 19005 W. Mescalero Dr at approximately 1905 hours.

Upon my arrival I observed Deputy Gibson squatting down over a male subject, later identified as Michael Obregon. There was another unidentified male subject standing over Obregon with what appeared to be a flashlight shining down on where Deputy Gibson was Deputy Gibson appeared to be rendering aid to Obregon. At one point I heard Deputy Gibson say he had applied a chest seal.

I asked Deputy Gibson what he needed, and he asked me to keep two persons just east of us away while he rendered aid to Obregon. I contacted a male, who told me Obregon was his brother, and a female. I did not get either of their names but thought I heard the male say his name was Richard. I was able to keep them away from scene and while talking with them an unidentified female came up and escorted them east down the road.

I went back to the area where Deputy Gibson was rendering aid and Officer Reed was now on scene. Officer Reed and I began taking over providing medical aid to Obregon while Deputy Gibson began working with another PCSO Deputy (possibly a Sergeant) who had arrived on scene to assist. They began to set up crime scene tape and locate shell casings, etc. Officer Reed and I were providing aid with the initial responding Emergency Medical Staff (EMS). When more EMS staff arrived, we were relieved from rendering aid.

While on scene I also moved a chain link gate out of the way to allow for more room to treat Obregon. Near the other gate which was near Obregon's feet I observed what appeared to be a Springfield or Smith and Wesson handgun. There was also a red dirt bike style motorcycle just north of where Obregon was located. I started to move the motorcycle to provide more room however was told to leave the motorcycle alone as

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| **257 Fox** | **3/16/2023** | **Rush, Richard** | **03/17/2023** |

**CASA GRANDE POLICE DEPARTMENT**

**FIELD CASE REPORT** CASE# **2023-00011039**

**NARRATIVE (continuation)**

they had enough room.

My patrol vehicle was part of the crime scene, and I remained on scene to provide information and assistance to PCSO. When they had no further need of me or my vehicle, I was told I could clear at approximately 0115 hours (03/17/2023).

My body worn camera was activated and captured my interactions on scene. I tagged the footage under this report number and uploaded it to the evidence network at the Casa Grande Police Department.

CASE STATUS:

Closed – Case filed an Agency Assist/useful information as it pertained to an investigation into a Deputy involved shooting with the Pinal County Sheriff's Office.

| REPORTING OFFICER | DATE | REVIEWED BY | |
|---|---|---|---|
| 257 Fox | 3/16/2023 | Rush, Richard | 03/17/2023 |

# EXHIBIT 11

## Excerpts from Pinal County Sheriff's Office Report

19:33:40 03/16/23 - A FRISBIE - From: Z WHEELER
AND 4C33 97 C103 CHARLIE

19:33:50 03/16/23 - JE YOUNG
CITIZENS FROM THE AREA WANTING TO KNOW WHAT IS GOING ON AND IF THE AREA IS SAFE.
RESIDENTS BEING TOLD TO STAY INSIDE THEIR HOMES FOR NOW

19:41:52 03/16/23 - A HOLZ
2ND RP/ MEGAN BRADY ..... 42/19005 MESCALERO .... UPSET DAUGH AND CHILDREN IN THE AREA... ADV 15 YO DAUGH WAS TOLD SHE CANT RETURN TO HER RESD.... DAUGH IS **M.B.** 15 YO DAUGH
19:44:05 03/16/23 - A FRISBIE
L26 CLR THE MARKER KEEP CHH.
19:44:40 03/16/23 - A FRISBIE
PINAL6 97 THE SCENE... SHUTTING DOWN MESCALERO AND HUALAPIA AND THE OTHER TO THE INT TO THE W... MAKE PERIMTER SMALLER...
19:44:57 03/16/23 - A FRISBIE
PINAL6 OTHER UNITS NEED TO MAKE THEMSELVES AVAIL FOR TRAFFIC,,.,
19:45:49 03/16/23 - L APARICIO
COUNTY ROADS CALLED BACK, THEY ARE 10-19 WITH HARD BARRICADES
19:45:51 03/16/23 - A FRISBIE
PINAL6... POSSE UNIT COMING UP ON THE AIR W A ROAD RUNNER... HAVE HIM 45 AT MELACALERO AND HUALAPI..
19:46:28 03/16/23 - A FRISBIE
L18 TO PINAL6- PROCESS OF SHRINKING PERIMTER... HAVING OUR GUYS STAY HERE TILL POSSEE CHECKS 97..
19:46:35 03/16/23 - A FRISBIE
L18 COPIES SWITCHING TO 1
19:49:02 03/16/23 - A FRISBIE
2C32 I HAVE A 101 BLOCKING THE INT BLU JEANS BLK SHORTS..
19:49:12 03/16/23 - A FRISBIE
4C32 COPIES
19:50:43 03/16/23 - A FRISBIE
4C32 TO S81- MOM HERE SAYS SHE WANTS TO PCIK THEM UP DO YOU WANT TO VCEOM WITH ME...
19:51:01 03/16/23 - A FRISBIE
S81- INAUD W K15 HES RIGHT THERE...
19:51:46 03/16/23 - A FRISBIE
PINAL6- 10-5 TO FIRE AND AMR ASSETS THEY CAN CLR THE SCENE THEYRE TAKING UP SPACE...
19:52:29 03/16/23 - A FRISBIE
P10 TO PINAL6- THEYRE SECURING THE RD RUNNING AND HEADING YOUR WAY...
19:52:40 03/16/23 - A FRISBIE
PINAL6 DIUD YOU COPY MESCALERO AND JHUALAPI...
19:52:52 03/16/23 - A FRISBIE
P10 T4... WE WIL LET YOU KNOW WHEN WERE CLSOE..
19:53:43 03/16/23 - A FRISBIE
TRYING TO GET AHOLD OF AMR... THEIR 21'S RIUNG BUSY..
19:53:52 03/16/23 - A FRISBIE
TRYING TO GET AHOLD OF AMR... THEIR 21'S RING BUSY..
19:54:18 03/16/23 - A FRISBIE
T16 TO S81- CAN YOU COME UP TO THE SCENE REF THE CHILDREN UP HERE.
19:54:27 03/16/23 - A FRISBIE
S81- L26 IS ENRT TO YOU..
19:54:44 03/16/23 - A FRISBIE

PINAL6 DID YOU COPY MESCALERO AND HUALAPAI
19:55:44 03/16/23 - A FRISBIE
2453- FOLLOWING WIFE NEICE AND SISTER AN LAW 10-19 TO CG..
19:56:04 03/16/23 - A FRISBIE
2453 - ITS GOING TO BE CG'S SUBSTATION OFF OF VALVISTA..
19:56:17 03/16/23 - A FRISBIE - From: J CLINE
19. CGPD C103

19:56:42 03/16/23 - A HOLZ
PINAL6 - REQ CO RDS TO BRING LIGHTS FOR SCENE

19:57:50 03/16/23 - N VERSTEEG
AMR ADV ALL THEIR UNITS SHOULD BE CLEARING
19:58:47 03/16/23 - A HOLZ
CO RDS ADV WILL CALL YARDS TO GET LIGHTS TO THE SCENE.
20:00:21 03/16/23 - A FRISBIE
4C31- CONFRIM W 2453 MET W THE FAMILY..
20:00:35 03/16/23 - A FRISBIE
900 ADV 2453 IS 19 W FAM TO C103 CGPD.
20:00:46 03/16/23 - A FRISBIE
4C31- 10-4 I HAVE S81 ASKING
20:01:42 03/16/23 - A HOLZ
PINAL6 - SEE IF CGPD ADV TO ASSIST WITH LIGHT PLANTS.... / CGPD ADV WILL CB TO ADV ETA FOR THE LIGHTS
20:04:30 03/16/23 - A FRISBIE
P206 19 TO THE SCENE W ROAD RUNNER CP...
20:05:09 03/16/23 - A FRISBIE
2453 - 97 C103 CGPD
20:11:44 03/16/23 - Y OSINSKI
RAY W/COUNTY RDS ADVD 1 LIGHT PLANT IN CG - WILL START THAT WAY. OTHER IS IN AJ WILL START IT AS WELL BUT WILL BE EXTENDED.
20:18:23 03/16/23 - Y OSINSKI
PER PINAL6 HAVE 1 LIGHT PLANT FROM CG PD, 1 FROM TRAFFIC AND OURS FROM CG CO RDS - SHOULD BE GOOD. PUBLIC WORKS CANCELLED THE AJ LIGHT PLANT.
20:18:55 03/16/23 - JE YOUNG - From: Z WHEELER
4C33 TURNED OVER TO 2264

20:18:55 03/16/23 - A FRISBIE
PINAL6- I COPY THAT... WE HAVE ONE FROM TRAFFIC COMING... AND 2 FROM CG THAT SHOULD BE SUFFICIENT...
20:20:03 03/16/23 - A FRISBIE
PINAL6 TO S66 - ROVER DID CHECK 97.. IF YOU WANNA GET CLOSER TO THAT INT...
20:20:11 03/16/23 - A FRISBIE
S66- T4 WERE GETTING THEM IN THERE N OW
20:20:40 03/16/23 - A FRISBIE
PINAL6- C4 ON THE SCENE ILL BE 10-19 TO C103 CHARLIE..
20:22:06 03/16/23 - A FRISBIE - From: R PROSSER
97. MESCALERO AND HUALAPAI

20:26:01 03/16/23 - Y OSINSKI
PER PINAL6 COUNTY ATTY IS ALREADY ON SCENE HAS BEEN BRIEFED.
20:27:09 03/16/23 - A FRISBIE - From: E McLOUGHLIN
97. MESCALERO AND HUALAPAI W ROAD RUNNER

20:28:55 03/16/23 - A FRISBIE
P206 - DID THEY WANT THE ROADRUNNER AT?
20:29:28 03/16/23 - A FRISBIE

## Supplement

DR#: 230316206 WRITTEN BY: Sergeant M. Ransom #S81
SUPPLEMENT

CASE TYPE & ARS CODES:

Deputy Involved Shooting

ATTACHMENTS:

Major Incident Briefing Form

NARRATIVE:

On 03-16-2023, at approximately 1901 hours, I responded to the area of Mescalero Dr. and Hualapai Dr. located in Casa Grande, AZ reference a deputy involved shooting. The initial call for service was a field interview that was self initiated by Deputy B. Gibson.

During Deputy Gibson's initial call, he advised PCSO Dispatch of code 913 (immediate backup) and 998 (deputy involved shooting). During this time, there was an open mic from his radio and I could hear him yelling "Drop the gun".

Upon arriving, I observed a male subject, later identified as Michael Obregon laying in the front yard/curtilage area of 19005 W. Mescalero Dr. Deputy Gibson was rendering aid by placing bandages on Michael's chest area and checking for a pulse. I observed Michael to appear lifeless and his eyes were open with no signs of life. I requested Casa Grande PD Officers on scene take over first aid in order to check Deputy Gibson for any injuries due to him stating Michael tried to shoot him.

I conducted a welfare check on Deputy Gibson and did not observe any visible or obvious injuries. Myself and Deputy Gibson set up crime scene tape. AMR 503 and Rural Metro Fire Department Engine 587 arrived on scene and rendered aid to Michael. The run number is 23567652.

I directed deputies on scene to place cones over several shell casings I observed on the roadway near 19005 W. Mescalero Dr. Deputy Pickett #2207 took initial case photographs. He was then assigned to stand with a silver in color firearm I observed on the ground near Michael. Deputy Romero was requested at the scene to assist with crowd control and foot traffic. I then had units close Mescalero Dr. at Scott Dr. and Hualapai Dr.

I assigned Deputy Gibson to Deputy Wheeler (K14) and had them respond to the Pinal County Sheriff's Office Casa Grande Substation.

Michael was pronounced deceased by Doctor Nicholas May with Banner Casa Grande at 1930 hours.

I completed the PCSO major incident briefing form which has been included as an attachment with this supplement.

I turned the scene over to CIB and Lieutenant Aparicio.

This concluded my involvement in this case.

# EXHIBIT 12

## Excerpts from Deposition of Meagan Brady

police there. And I was going to get my kids from there. That was the bottom line. So I pulled up there. I spoke with the Casa Grande PD officer, told him I was the homeowner and that my children were down there and I was going down there to get them.

I walked down the street. And when I got to the police tape, basically, they had already told them I was coming down there. I spoke with Deputy Sloup and another officer. I don't know if it was -- I think it was a deputy. And I told them that I needed my kids, that I need M.B. and A.B. and I need my dog. And they went and got A.B. brought her over there to me, told me they were going to keep M.B. there because she was a possible witness. And I said, "No, you are not. You are not going to keep my minor child there. She doesn't need to be around this."

I've worked my whole life to make sure my children never saw anything like this. And for them to be subjected to it because of this situation and made to stay there and watch him die is not acceptable, in my opinion. It's not acceptable in anyone's opinion that I know of. So --

Q. What did they say --

**A. I'm sorry?**

Q. Go ahead.

**A. No, you go ahead.**

Q. You go ahead.

**A. I was just going to say so they went and got me A.B. and my dog. And I told them they needed to bring M.B. over there and -- I mean, in specific words I told them you are not keeping my minor child. And Deputy Sloup talked to me like I was a 12-year-old. And I told him that he needed to go get my daughter right now, that they weren't going to keep her there. They had questioned her. They could talk to us elsewhere. So he went and got M.B. and brought her over there, and we left and went to the police station, because my sister was there. We were actually meeting my sister there, because they told her that they took the kids down to the police station, when it was Mikey's family that they had taken to the police station when they had arrived. So that's where the, I guess, confusion was. So then that's when I --**

Q. You mentioned --

**A. My sister was there, yeah.**

Q. You mentioned Deputy Sloup. Do you know if he was a sheriff's deputy or a Casa Grande police officer, or was he with some other entity?

**A. His name is Frank Sloup and he is a sheriff's deputy.**

Q. Okay. Ms. Brady, I think that I am done with

# EXHIBIT 13

## Excerpts from Deposition of Brandon Chapman

A. **I did not recognize, no.**

Q. Okay. You saw the guy on the motorcycle. It looked like he was trying to give his ID to the officer.

A. **Uh-huh.**

Q. Then what happened?

A. **I looked away. My wife was also watching with me, and I don't remember everything that she said verbatim. I do remember her saying something about he's trying to run, and he got caught on the fence is what I remember her saying.**

Q. Okay. And your wife was looking out the window at the time?

A. **Yes.**

Q. And she was saying this as she's looking out the window?

A. **Yes.**

Q. Okay. What happened next?

A. **After that, we both got up to go outside, and then I heard gunshots.**

Q. All right. I'm going to ask you about the gunshots, but let me go back. Before you heard gunshots, were you able to hear anything that the officer -- or he's a deputy, so I should call him the deputy. Before you heard gunshots, were you able to hear anything that the deputy said?

A. **Negative.**

Q. Were you able to hear anything that the man on the

motorcycle said?
     **A. Negative.**
     Q. Did you ever see if the man on the motorcycle had a
gun before you heard --
     **A. Negative.**
     Q. Okay. How many gunshots do you remember hearing?
     **A. Four.**
     Q. Were they right in a row, or was there a pause between
them?
     **A. In a row.**
     Q. Okay. And -- and where were you when you heard the
gunshots?
     **A. I was in my bedroom, the master bedroom, in my house.**
     Q. Did you go outside after the gunshots or before?
     **A. After.**
     Q. Okay. So your wife said something about he's running.
He got caught on the fence, and then you heard gunshots. Did I
get that sequence right?
     **A. Yes.**
     Q. And after that, you both went out -- outside?
     **A. Yes. Yes.**
     Q. Okay. What were you able to see once you got outside?
     **A. We waited a couple seconds, and then we both went
outside on the porch, and the officer was taking cover behind
his vehicle. Or deputy.**

Q. When you say -- when you say "behind his vehicle," was -- describe that a little more.

**A. So the vehicle was facing west, and he was on the opposite side of his vehicle where the hood is.**

Q. Okay. Was he on the side of the vehicle closer to your neighbor's house or closer to the middle of the street?

**A. To the middle of the street.**

Q. Okay. About how far away were you when you saw him taking cover?

**A. From the officer?**

Q. From the officer, yeah.

**A. Maybe a hundred feet.**

Q. Okay. Did you hear the officer say anything?

**A. Yes.**

Q. What did you hear him say?

**A. I heard him say, "Don't reach for the gun."**

Q. Do you remember if you heard him say that once or more than once?

**A. I know I heard it once for sure.**

Q. Okay.

**A. When he said that, me and my wife went back inside. It felt like a minute. We went back inside for about 60 seconds.**

Q. All right.

**A. And when we got -- I poked -- I went back outside, and**

**at that time the officer, the deputy, was moving closer to the man laying on the ground.**

Q. What made you go back outside after those 60 seconds?

**A. Me personally, I just wanted to make sure the deputy was okay.**

Q. Okay. What did you do next?

**A. I watched him from my porch go over to the man on the ground, and I stood there for a -- maybe another minute or two, and then I started walking closer to the gate, letting him know if he needed any assistance that I could help him.**

Q. Okay. When you were standing back closer to your trailer --

**A. Uh-huh.**

Q. -- were you able to see the man on the ground?

**A. Yes.**

Q. Okay. When you walked over to the gate, you said you let the deputy know that you could help him if he needed anything?

**A. Yes.**

Q. What was he doing when you said that to him?

**A. He was checking his body for injuries.**

Q. Okay. Do you remember where he was standing in relation to the car or the man on the ground?

**A. So he was walking up through the fence. The man was trying to ram, maybe five feet inside the property, as he was**

**walking up, render -- trying to render aid.**

Q. Did you see him try to render aid?

**A. Yes.**

Q. What exactly did you see him do?

**A. I seen him moving his shirt to look for bullet holes where he got hit, and then there was a point where -- I don't know if it was Meagan's daughter or -- someone came out and was yelling at the deputy to get off the property.**

Q. Let me stop you. Can you -- can you describe for me at all what -- anything else about that person, like what she looked like?

**A. She was a -- a younger female. I don't believe she was 18 yet.**

Q. Okay. What were you doing when she came out of the property and was yelling at the deputy?

**A. I -- I spoke to her. I asked her to calm down. That -- trying to let her know, like, he's trying to -- to save his life and to calm down, because she was upset.**

Q. Uh-huh. You said that you saw the deputy trying to render aid. I asked what you saw. You said you saw him removing the shirt to look for bullet holes, and then I sidetracked you. Did you see the deputy doing anything else in terms of rendering aid?

**A. I remember him radioing, I believe, for backup. I don't know 100 percent.**

**A. I do not remember.**

Q. Do you remember what you were doing when you first saw her?

**A. I was standing at my fence. I let the deputy know if he needed anything, I could assist him, and then I was just waiting in case he needed my help. And then at that time, I believe the younger lady came out and started yelling at him to get off the property, so on and so forth.**

Q. I'm going to ask you two questions that are going to sound similar, but they're a little different, so pay attention.

Can you give me an estimate of how much time passed between when you heard gunshots and when you first saw the deputy rendering aid?

**A. Four or five minutes, maybe.**

Q. What makes you say "maybe"?

**A. I have... I don't remember times very well, the length of them, especially in a situation that needs attention.**

Q. Okay.

**A. So like I said before, sometimes it feels like a minute, but it's been ten seconds.**

Q. Right. Right.

**A. That's -- that's why I said "maybe."**

Q. Okay. At any point during that night, did you -- besides holding the flashlight, did you personally assist with rendering any aid?

A. **Negative.**

Q. Was there anything that you thought based on your training from when you were in the Army that you could -- you could have done to help with aid?

A. **To help -- help with aid, no.**

Q. Okay.

A. **If the deputy asked me to help render aid and told me what to do, I would be able to.**

Q. Was there any moment where you thought, hey, this deputy should be doing XYZ to help with this injury based on your training?

A. **Negative. It seemed to me that he was doing the right steps.**

Q. If you had thought that he should be doing different steps, would you have expressed that to him?

A. **Absolutely.**

Q. Would you have stepped in yourself to assist?

A. **I believe so. Yes.**

Q. At some -- at some point, when you were on that side of the car with the deputy and the man on the ground, did you see a gun on the ground?

A. **I did.**

Q. Can you describe that gun for me?

A. **I --**

Q. To the best of your memory.

**A. To the best of my memory, it looked like a silver top gun, and then the -- the bottom half was black.**

Q. Okay.

**A. I do not know what caliber it was.**

Q. Okay. I'm going to show you a photo.

MS. VAN BUREN: Sean, this is Defendants_Obregon 000146. And can we mark this as Exhibit 1, please?

(Deposition Exhibit No. 1 marked.)

BY MS. VAN BUREN:

Q. Okay. I'm showing you what's been marked as Exhibit 1. Is this the gun that you saw on the ground?

**A. Yes.**

Q. Do you recall how far away it was from the man who had been shot?

**A. Three to four feet.**

Q. When did you first see that gun?

**A. I first saw that gun when the officer asked me to come over and hold his flashlight.**

Q. Okay. About how long after the shooting was that?

**A. I'm sorry. The -- the times are -- are rough. Can you repeat yourself?**

Q. Yes. And if you don't -- if you can't answer, that's fine. But how -- how much time passed between when you heard gunshots and you saw this gun on the ground?

**A. Five to six minutes.**

Q. Okay. Had any other officers arrived when you -- by the -- strike that.
Had any other officers arrived when you took that flashlight to assist the deputy?
**A. When I took the flashlight, it was -- it felt like two to three minutes before I seen another deputy show up.**
Q. Okay. That was going to be my next question.
So when you took the flashlight, it was you, the deputy, the man on the ground.
**A. Yes.**
Q. And the young woman?
**A. Yes.**
Q. Was she there, too?
**A. Yes.**
Q. Okay. And so it was -- and that -- and to make sure I understand, that was the same time you saw the gun on the ground was when you took the flashlight?
**A. Yes.**
Q. I want to show you a little bit of a video. It has some audio, so I think the best thing is for us to go off the record, and I'll play the video for you.
**A. Okay.**
MS. VAN BUREN: Before we go off the record, though, Sean, this is Defendants Obregon -- excuse me -- 135, which is Officer Fox's bodycam. And since I'm playing the

woman come out of the house next door?

**A. Yes.**

Q. Was she out there with Deputy Gibson and the man on the ground before you?

**A. I don't recall.**

Q. Did you ever hear her insist that Michael, Mr. Obregon, needed medical help?

**A. No.**

Q. Did you ever see the deputy walk away and then the young woman roll the man onto his back and try to revive him?

**A. No.**

Q. Did you ever see her interact with the man on the ground at all?

**A. No.**

Q. Did you ever hear deputy -- the deputy tell her that she could not leave the scene for any reason or words to that effect?

**A. No.**

MS. VAN BUREN: All right. That is what I have for you, sir. Now it's Mr. Woods' turn.

MR. WOODS: Thank you.

EXAMINATION

BY MR. WOODS:

Q. Good afternoon, Mr. Chapman.

**A. How you doing, sir?**
Q. Doing all right. Doing all right. I'll try to -- I'll try to be brief. You mentioned earlier that you were suspicious of things going on at the house --
**A. Yes.**
Q. -- next door to you?
I just want to be clear. Did you ever actually see anything illegal occurring?
**A. Negative.**
Q. Okay. When you -- when you were at the house and you -- you heard what was going on, you saw the dirt bike because you went to the window, correct?
**A. I -- I heard an engine, and then we seen flashing lights, and then we opened the -- the blind to look out the window.**
Q. Okay. And -- and you had a direct line of view?
**A. Yes.**
Q. Okay. There were no trees or anything like that obstructing it, correct?
**A. Correct.**
Q. You mentioned earlier that the ATVs and dirt bikes were speeding up and down the road from time to time. Do you remember that?
**A. Yes.**
Q. How do you know they were speeding?

Q. What do you mean by "take her side"?

**A. To accuse the cop of wrongdoing.**

Q. But you didn't actually see the gunshots, did you?

**A. I didn't see, no.**

Q. And how many gunshots did you hear?

**A. Four.**

Q. Okay. You know DJ?

**A. Yes, sir.**

Q. All right. How do you -- how do you know DJ?

**A. Through my wife. She was friends with -- or he's -- he was friends my father-in-law.**

Q. Okay. Did you ever hang out with DJ?

**A. I went over to his house a couple of times.**

Q. Did you go over to his house for a birthday party ever?

**A. I don't know. I don't recall.**

Q. What did you go over to his house for?

**A. We went over to his house, his -- my wife's mom was down and was hanging out with them. So we went over to see her mom and to hang out. I don't...**

Q. Was that the extent of your relationship with DJ?

**A. Yeah.**

Q. Did you ever do anything for him?

MS. VAN BUREN: Form.

**THE WITNESS: No.**

A. **Also, I worked at CoreCivic.**
Q. What's CoreCivic?
A. **It's a prison in Eloy.**
Q. Okay. Go ahead.
A. **Private sector. We also did a training for CPR in that. That was the extent.**
Q. Okay. But you're not -- you've never been a medical professional, correct?
A. **Negative.**
Q. Okay. After you heard the gunshots, is that when you went outside?
A. **We both looked away from the window, me and my wife, and we were heading towards the front door. We were still in our room at the time. We just got up, getting things ready, and we heard the gunshots. And then after that, we went out front on our porch.**
Q. Did you hear any more gunshots?
A. **Negative.**
Q. So just the four?
A. **Yes, sir.**
Q. And this was -- the incident, just to be clear, was next door to your house at the time, right?
A. **Yes.**
Q. And how many -- about how many feet would you estimate from your front porch to where Michael Obregon's body was laying

between that? How many feet?

**A. Maybe 100 to 150 -- or 105, 110.**

Q. Okay. And you heard the officer making statements from -- from your house?

**A. Yes. When I poked my head -- well, we went out on the porch, opened the door, and we heard him saying, "Don't reach for the gun." It almost sounded like he was pleading for him not to reach for it.**

Q. Did you -- I'm sorry. I cut you off. Go ahead.

**A. And then we went back inside at the time.**

Q. Did you hear anything else?

**A. Negative.**

Q. You didn't hear any conversation between Michael Obregon and Deputy Gibson?

**A. Negative.**

Q. You saw him -- did you see him -- I'm sorry. Maybe I'm confused, and this might be my bad, but did you see any of the interaction prior to Michael being shot?

**A. Prior to?**

Q. Yeah.

**A. Yes, sir. He -- when we looked out the window, we couldn't hear anything. And the interaction between them, it looked like he was talking to Michael, and it looked like he was trying to give him his ID.**

Q. Okay.

A. **I don't know for sure, but there was interaction.**
Q. Okay. Did you -- I think you said you saw him reach down on the ground and pick something up. Michael.
A. **Yes.**
Q. Okay. And you think that was his ID?
A. **Yes, sir. It was outside of the gate.**
Q. Okay.
A. **Yes, sir.**
Q. Did you ever see Michael pull out a gun?
A. **Negative.**
Q. Did you ever see Michael act like he was threatening the officer?
A. **Negative.**
Q. Would the interactions that you saw between the officer and Michael in your opinion seem normal?
A. **Yes. It's...**
Q. Okay.
A. **With him trying to run through the gate, and it seemed like from what we -- from what I seen, it looked like the deputy was able to talk to him to get off the motorcycle, and they were interacting by the deputy's vehicle.**
Q. Have you -- prior to this, did you ever see Michael at that house?
A. **Not personally myself. My wife has mentioned to me that she's seen him over there.**

Q. Okay. I guess we can ask her about that down the road.

When you said you saw Michael ram the fence, was it more of like, hey, I'm trying to open the fence with the front of my bike?

MS. VAN BUREN: Form.

BY MR. WOODS:

Q. And then he realized it was locked?

MS. VAN BUREN: Form. Foundation.

**THE WITNESS: Yes.**

BY MR. WOODS:

Q. Okay. Yeah. I mean, I seen on the video it doesn't look like he's going high speed, so...

Did you know that there were actually ten gunshots fired?

**A. Negative.**

Q. But you heard the four?

**A. I heard four, yes.**

Q. Okay. Was it difficult to hear things from your house that were happening on the street?

MS. VAN BUREN: Form.

**THE WITNESS: I mean, as far as gunshots or anything?**

BY MR. WOODS:

Q. Just any -- any loud noises?

**A. Not necessarily. We could hear pretty well when there's, like, louder noises as far as engines and things.**

Q. Does it surprise you that there were ten gunshots?

**A. Absolutely.**

Q. Because that means you didn't hear six of them, right?

**A. That's right. I -- I remember hearing four.**

Q. Have you ever talked to Laura or anybody from her office prior to this deposition?

**A. Negative.**

Q. Have you ever been sent any documents from Laura or her office prior to this deposition?

**A. Negative.**

Q. Did you ever talk to a private investigator related to this case?

**A. I spoke to someone. I don't know -- I don't remember who it was.**

Q. And what was the -- what was the topic of that conversation?

**A. Just asking me questions, if I recalled what I heard, everything that I remember from that night.**

Q. Okay. How long was that conversation? Can you remember?

**A. I -- I don't recall.**

Q. Do you think it was longer than five minutes?

**A. Yeah.**

# EXHIBIT 14

## Declaration of Whitney Hector

DECLARATION OF Whitney Hector

I, Whitney Hector, pursuant to Ariz. R. Civ. P. 80(c), under penalty of perjury declare that the following is true and correct:

1. I am over the age of 18 and competent to make this declaration.

2. I was outside of my house when I heard officer Gibson yelling "Stop!"

3. This was on March 16th 2023

4. After the officer yelled "Stop!" I heard the officer yell "I Bet you're Scared of me now!"

5. In between the officer yelling "Stop" and "I bet you're Scared of me now" I heard 5 or 6 gun Shots

6. Then I heard another 3 Shots. a total of 9 shots I heard.

7. I know I heard the officer Gibson yell those things because I was responding back every time he yelled something!

8. Not knowing that, that was happening to my Friend, my boyfriend's brother Mikey. being Murderd by the Police officer!

9.

DATED THIS 7th Day of January 2026

Whitney Hector

# EXHIBIT 15

## Facebook Message of Samantha Dean

Samantha Dean
Active 29m ago

Samantha Dean

3/17/23, 11:39 AM

I heard everything that happened last night, I live one street over. I HEARD the cop say "I bet your scared of me now huh" then the shots went off. My heart goes out to you.

Please please make a statement! Thank you for reaching out. My husband was not a bad person at all.

Who do I need to talk to???

My ex used to run around w the same people. I know they aren't bad people. I'm sooo fucking sorry this is happening to you. We're you there? Was it you we heard screaming? We tried to get there but there's two fences we had to get thru and by that time it was over

I think if you call the police department. No I was on my way home from work. I had no idea anything was happening

# EXHIBIT 16

**Report of Anthony Sola, Acoustical Consulting Services, LLC**

acs

acoustical consulting services

Mills + Woods Law PLLC
5005 N 12th St #101
Phoenix, AZ 85014

February 2, 2026

Attn: Sean Woods
Re: Allison Obregon et al v. Mark Lamb et al

ACS was asked to help determine if a shout could be audible and intelligible at approximately 1270’. ACS has been informed that during an officer involved shooting, the officer shouted a sentence that a witness claims was intelligible to them approximately 1270’ from the incident.

**<u>Technical Terms</u>**
**Decibel (dB):** A unit used to measure the intensity or loudness of sound.

| Changes in Intensity Level, dBA | Changes in Apparent Loudness |
|---|---|
| 1 | Almost imperceptible |
| 3 | Barely noticeable |
| 5 | Clearly noticeable |
| 10 | Twice (or half) as loud |

**A-Weighted Decibel (dBA):** An overall frequency-weighted sound level in decibels that approximates the frequency response of the human ear. It is a unit used to measure sound levels that have been adjusted to match how the human ear actually hears.

**Equivalent Sound Level (Leq):** The equivalent steady state sound level that in a stated period of time would contain the same acoustical energy.

**Ambient:** Ambient noise is the all-encompassing noise associated with a given environment, being usually a composite of sounds from many sources, near and far.

**<u>Factors That Effect Potential Intelligibility</u>**
There are numerous factors that potentially influence speech intelligibility, including:

- Two of the primary factors that influence voice audibility and intelligibility are how loud the speaker is and the hearing health of the listener.
- Loud ambient noise conditions at the listening position can interfere with audibility and intelligibility.
- Sound propagation over a distance is primarily influenced by distance, barrier attenuation, and atmospheric conditions.

*<u>Source (Voice) Noise Level</u>*
The average A-weighted sound level of individual voices ranges from 36 dBA for whispering to 96 dBA for a short-duration maximal shout at a distance of 1 meter (3.28’).

P.O. Box 41182 Mesa, AZ 85274
Tel: [illegible] Fax: [illegible]4.0801

ACS was informed that the officer is a male. The gender of the speaker has the potential to impact the overall loudness and spectral composition of the noise. Studies found that the average voice levels are louder for males – by approximately 3 dBA for normal speaking to around 6-7 dBA for shouting.

The equivalent noise level for a shout is 84 dBA with maximums ranging from 90-96 dBA:

**Table 1**. Equivalent A-weighted sound pressure levels of speech for different vocal efforts (at 1m)

| Vocal Effort | Speech Level (dB(A)) |
|---|---|
| Whispering | 36 |
| Soft | 42 |
| Relaxed | 48 |
| Relaxed, normal | 54 |
| Normal, raised | 60 |
| Raised | 66 |
| Loud | 72 |
| Very loud | 78 |
| Shouting | 84 |
| Maximal shout | 90 |
| Maximal shout (in individual cases) | 96 |

Source: (Lazarus, 1986)

*Hearing Health*
It is my understanding that the witness is a younger female. I was the listener at the receive location in the testing described below. I am a 62 year old male that has exposed himself to loud noise as part of work and recreation. Although I don't believe I am "hard of hearing", I do have diminished hearing*. Even if I am of normal hearing* for my age, a younger female with normal hearing would likely be able to hear and understand speech better than me.

> *Note: I will have an audiologist test of my hearing and submit the findings as a supplement to this report.

*Atmospheric Conditions*
It is my understanding the incident occurred the evening of 3/16/2023 at approximately 7:00pm. The atmospheric conditions on that day were fairly similar to the conditions during the evening of the test day 1/26/2026:

3/16/2023 Temperature: 61º F; Humidity: 58%, Wind: 5mph from NW
1/26/2026 Temperature: 58º F; Humidity: 22%, Wind: 7mph from N

The higher humidity on the evening of the incident would have slightly aided in the sound propagation – making it slightly easier for the sound to carry at this distance.

*Barrier Attenuation*
Although there would be some barrier attenuation, there is almost a direct path from the shout location to the listener location. (See attached Approximate Source and Listener Locations exhibit.)

*Ambient Noise Levels*
The on-site testing was conducted between approximately 7:00pm and 7:30pm on 1/26/26. During this time period, the typical ambient noise level was approximately 38 to 42 dBA. This is a very quiet area. As a comparison, ambient noise levels in metropolitan areas typically vary from 60 to 70 dBA and can be as high as 80 dBA or louder; quiet suburban neighborhoods experience ambient noise levels of approximately 45-50 dBA.

**On-Site Subjective Testing**
On-site tests were conducted the evening of 1/26/26 to see if a shout from the source location could be audible and intelligible at the listener location.

> The address where the shouting occurred: 19005 W. Mescalero Dr., Casa Grande, 85122.
> The address where a witness heard it was: 9959 N. Battleford Dr., Casa Grande, 85122.

At approximately 7:30pm, a male shouted “Hey Tony, can you hear me?” from the source location. I did not know in advance what was going to be said. The shout was clearly audible and completely intelligible at the listening location.

The source noise level of the shout at 1 meter (3.28’) was:

> Equivalent Noise Level: 84.8 Leq dBA
> Maximum Noise Level: 91.3 dBA

These noise levels are completely in line with the referenced noise levels for a typical shout.

> Note: Noise level measurements were performed with Type I sound level meters (NTI XL2 & Larson Davis LxT). The meters were calibrated before and after the tests with a 0.0 dB deviation.

**Conclusions**
I do not know how loud the officer shouted or the hearing health of the listener. However, a shout (of typical noise levels) from the source location was clearly audible and completely intelligible to me at the listener location.

It is entirely possible that the shout the night of the incident was audible and intelligible at the listener location.

Respectfully,
Tony Sola
Tony Sola
Acoustical Consulting Services, LLC

Approximate Source and Listener Locations




P.O. Box 41182 Mesa, AZ 85274