Kathleen L. Wieneke, Bar #011139
Laura Van Buren, Bar #031669
WIENEKE LAW GROUP, PLC
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
Telephone: (602) 715-1868
Fax: (602) 455-1109
Email: kwieneke@wienekelawgroup.com
Email: lvanburen@wienekelawgroup.com

*Attorneys for Defendants Teeple and Gibson*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

Allison Obregon, an individual; Allison Obregon on behalf of and as legal guardian and parent of her minor child, MC; Allison Obregon as pending personal representative of the Estate of Micheal Obregon; Meagan Brady, individually; Meagan Brady on behalf of and as legal guardian and parent of her minor child, MB;

Plaintiffs,

v.

Mark Lamb and Jane Doe Lamb, husband and wife; Brady Gibson and Jane Doe Gibson, husband and wife; John and Jane Does 1-X,

Defendants.

NO. 2:24-cv-01510-PHX-KML

**DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Plaintiffs do not dispute that Obregon fled from a lawful detention, and they accept that if Obregon had been armed—a fact they assumed frequently in their response—Gibson would have been justified in firing his first shot. (Resp. at 1-2, 5, 8-9.) What remains is a series of assumptions on which every argument in the Response depends: that the gun left Obregon's hand after that first shot; that its presence no longer constituted a threat after that first shot; that Gibson had time to and actually did pause and perceive that the threat had passed; that he then kept shooting a disarmed man on the ground; and that the subsequent rounds—not the earlier, admittedly justified round—were fatal. Plaintiffs lack competent evidence to support these claims.

The Ring camera footage reflects a scuffle behind Gibson's vehicle, and then Gibson

quickly backpedaling away, firing multiple shots in rapid succession. (MSJ Ex. 9 at 6:36:11-13.) The only reasonable inference is that the addition prior shots occurred before this, out of view of the camera, and behind the deputy's vehicle. And at this point, Plaintiff's timeline falls apart. At 6:35:48, Obregon is visible, with his backpack on, bending to pick up his dropped ID. (MSJ Ex. Ex. 9). He is seen standing upright and talking Gibson at 6:35:55. *Id.* A scuffle is visible at 6:36:06. *Id.* The reasonable inference is that this is when Gibson got on top of Obregon after he ran. Gibson is then seen backpedaling and firing multiple shots, which are visible by the flashing lights and smoke, from 6:36:11 through 6:36:13. *Id.*

"[W]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776 (2007). The video evidence blatantly contradicts Plaintiff's assertion of a shot, a long pause coupled with an exclamation of "I bet you're scared of me now!", and then more shots. Taking all facts in favor of Plaintiff, Gibson fired ten shots between roughly 6:36:06 and 6:36:13, all while rapidly backpedaling away from a suspect who had pointed a gun at him. Given this timeframe, and given the absence of any competent evidence of when Obregon dropped the gun or what bullet(s) were fatal, Defendants are entitled to summary judgment.

## I. NO REASONABLE JURY COULD FIND THAT GIBSON CONTINUED FIRING AFTER HE PERCEIVED THAT THE THREAT HAD ENDED.

At summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott*, 550 U.S. at 380. "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

The Fourth Amendment judges force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The reasonableness inquiry is based on the totality of the circumstances with no time limit, and a court "cannot review the totality of the circumstances if it has put on chronological blinders." *Barnes v. Felix*, 605 U.S. 73, 80-81 (2025). Where deadly force is justified, "officers need not stop shooting until the threat has ended," and the analysis changes only where a second volley of shots follows after a reasonable officer would have known the suspect was incapacitated or had clearly given himself up. *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014).

In *Wilkinson v. Torres*, 610 F.3d 546, 551–53 (9th Cir. 2010), an officer fired eleven rounds into a moving minivan under nine seconds, with the volley interrupted by "a slight pause during which he assessed the situation." The court directed summary judgment for the officer, holding that "the critical inquiry is what Torres perceived," and rejecting a rule that would require an officer to “reevaluate whether a deadly threat has been eliminated after each shot." *Id.* at 551-52. The court stated that because deadly force was justified, "it makes no difference in this case whether Torres fired seven rounds or eleven.” *Id.* at 552-53. In *Barnes*, the Supreme Court rejected the Fifth Circuit’s ‘moment of threat rule’, stating: “As we have explained, a court cannot thus ‘narrow’ the totality-of-the-circumstances inquiry, to focus on only a single moment.” *Barnes*, 605 U.S. at 83. Plaintiffs ask the Court to do what *Wilkinson* and *Barnes* rejected.

Plaintiffs' only supporting argument based on physical evidence is his expert Hafkey's inference that the gun's final resting place, shows that it "likely fell to the ground following the first frontal shot." (Resp. at 5; Resp. Ex. 6 at OBREGON_000904.) While the nonmoving party is entitled to all reasonable inferences for the facts, they are not entitled to rely on mere supposition or guesswork. *See Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 680 (9th Cir. 1985) ("A party opposing summary judgment is entitled to the benefit of only

reasonable inferences that may be drawn from the evidence put forth.").

Hafkey's "inference" regarding the gun's final resting place is not reasonable and lacks foundation since there is no evidence of where the gun initially landed and the gun was not photographed where it initially fell. Gibson moved it two to three feet away from Obregon's hand to keep it out of reach before he rendered aid, and Hafkey's report acknowledges as much. (Resp. Ex. 6 at OBREGON_000904;MSJ Ex. 1 at 137:8-21, 138:17-139:1) Hafkey cannot reasonably infer when Obregon dropped the gun. That is a leap too far. An inference drawn from a fact the expert knows to be artificial does not manufacture a dispute of fact. *See Hart v. City of Redwood City*, 99 F.4th 543, 551 (9th Cir. 2024) (rejecting an inference that a suspect was falling when shot when the coroner's report did not opine on the bullet's trajectory in flight or the suspects position when struck.)

The witness testimony Plaintiffs offer to support their theory fares no better against the video. M.B. has described the shooting three times. On Sergeant Rush's body camera, minutes after the shooting, she said she was inside, "did not witness anything," and heard "five shots." (MSJ Ex. 14, Rush BWC at 3:29-4:30.) That night, she told Detective Gonzales that she "observed and heard the entire incident from her bedroom window," and that Gibson fired five shots as Obregon was getting off his motorcycle. (Reply Ex. A, PCSO Report at DEFS_Obregon 000057.)[1] She described a second volley of shots for the first time at her deposition. At that time, she testified that she heard five or six shots before she reached the window, that she then saw Gibson "standing over" Obregon with his gun pointed at him, and that after she went back to her room she heard one or two more shots fifteen to twenty seconds later. (Resp. Ex. 4 at 51:7-15, 53:9-54:7.) She did not see any shot fired. (MSJ Ex. 11, M.B. Depo. at 56:19-57:2.) Plaintiffs ask the Court to credit this third version. (Resp. at 3.)

However, M.B.'s account is irreconcilable with the video from the Ring camera that

[1] This evidence may properly be considered because it is offered to rebut Plaintiffs' claim that M.B. "heard five or six shots before she reached the window, that 15 to 20 seconds passed while she was at the window, and that she then heard one or two more shots." (Resp. at 3:12-13.)

captured the shots being fired. The entire encounter lasted less than 10 seconds from the first sign of a struggle until the last shot. While the start of the altercation is not visible, from the moment Gibson is no longer obstructed, he is moving away from Obregon while firing, without a pause in firing to provide time for assessment or to shout a taunt. When witness testimony, especially unreliable witness testimony, conflicts with video evidence, the court should credit the video evidence. *Scott*, 550 U.S. at 380–81.

The taunt alleged by witnesses Hector and Dean report is even less probative. They were about a quarter mile from the shooting by Plaintiffs' consultant's measurement (1,270 ft.), more than four football fields laid end to end. (Resp. at 4; Resp. Ex. 16 at OBREGON_000890, 000892.) Hector reports shouting back at Gibson each time he yelled something to Obregon. (Resp. Ex. 14.) However, no neighbor on Mescalero Drive reported hearing a shouted taunt or a woman shouting replies from a quarter mile away, and every neighbor who heard words at all heard variations of commands to not reach for a gun. (Resp. Ex. 7 at 20-22.) M.B., who claims to have watched the shooting from her window, reported one command, "Michael please get on the ground," and no threat or taunt. (Reply Ex. A at DEFS_Obregon 000057.) Sola's test at Dean's address, which involved him simply standing at their address and listening for someone shouting his name, shows at most that a shout there could have been audible. Sola himself concluded only that intelligibility was merely 'entirely possible.' (Resp. Ex. 16 at OBREGON_000892.) No reasonable jury could find that Gibson paused his volley and shouted a taunt before resuming fire based upon those facts and the lack of any corroboration in the video footage. As the Supreme Court held on facts like these, even at summary judgment, "Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape." *Scott*, 550 U.S. at 380–81.

## II. <u>GIBSON IS ENTITLED TO QUALIFIED IMMUNITY.</u>

Plaintiffs must come forward with prior case law that defines the right at issue with a high degree of specificity and establishes that the right was clearly established at the time

of the incident. Defendants, on the other hand, have no obligation "to find factually on-point cases clearly establishing the lawfulness of an officer's actions. Nor must § 1983 defendants come forward with precedent showing that the unlawfulness of their conduct was not clearly established." *Hopson v. Alexander*, 71 F.4th 692, 708 (9th Cir. 2023).

Plaintiffs offer two cases in arguing against qualified immunity. Both of those cases, however, involved gaps between the volleys of shots—something that the evidence does not support here.

In *Zion v. Cnty. of Orange*, 874 F.3d 1072 (9th Cir. 2017), the court held that if a suspect armed with a knife is on the ground and appears wounded, he may no longer pose a threat, so a reasonable officer would reassess the situation rather than continue shooting. But the Court qualified that by noting that "this is particularly true when the suspect wields a knife rather than a firearm." *Id.* 1075–76. The court in *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790 (9th Cir. 2025) endorsed this qualifier. The officer there fired three separate volleys of two rounds each at a man with a knife who had stopped about 36 feet away, with pauses of 2.5 and 1.4 seconds between the volleys. *Id.* at 797. The en banc court emphasized, "to the extent Zion's continued possession of the knife was relevant at all in that case, it was only because the officer was standing a mere four feet away—**within striking distance**. Here, in contrast, McBride was standing approximately 36 feet from where Hernandez had fallen, a distance at which Hernandez's possession of the knife did not present an immediate threat if he was not trying to get up." *Id*. at 804 (citation omitted) (emphasis added). *Hernandez* described its suspect as "well beyond striking distance, armed only with a melee weapon," *id.* at 801, but here, Obregon was armed with a loaded handgun, either in directly in his hand or within arm's reach. A loaded handgun presents the same threat from four feet away that it does from thirty-six, and is just as deadly fired from the ground.

No case holds that an officer who has just had a handgun pointed at him violates the Fourth Amendment by firing at the armed suspect rolling on the ground, and the cases with the closest fact patterns all granted immunity. *Wilkinson*, 610 F.3d at 553; *Blanford v.*

*Sacramento County*, 406 F.3d 1110, 1119 (9th Cir. 2005); *Estate of Strickland v. Nev. Cnty.*, 69 F.4th 614, 620 (9th Cir. 2023).[2]

## III. THE SHOOTING IS PRESUMED REASONABLE UNDER ARIZONA LAW

Plaintiffs argue that that A.R.S. § 12-716 does not create a statutory presumption of reasonableness because Obregon was not committing, and had not attempted a felony, stating, "Flight from a traffic stop does not satisfy that requirement, and Defendants' felony theory depends on the disputed assertion that Obregon pointed a gun at Gibson." (Resp. at 10.) This is not an accurate statement of Arizona law. A.R.S. § 12-716(A) requires that a court find by a preponderance of the evidence that the plaintiff was harmed during the specified felony conduct; it then supplies a presumption of reasonableness. A driver who "wilfully flees or attempts to elude a pursuing official law enforcement vehicle" displaying its emergency lights commits a class 5 felony. A.R.S. § 28-622.01. Plaintiffs concede that Obregon ran from Gibson after a stop, stating "For purposes of this motion, Plaintiffs do not dispute that Gibson stopped Obregon for a traffic violation, that Obregon volunteered that he had outstanding warrants, or that Obregon ran from Gibson and fell before the shooting." (Resp. at 2.) Obregon accelerated away from Gibson's marked patrol vehicle after Gibson activated his lights until he struck a gate, and while he did momentarily stop to converse with Gibson, Obregon attempted to resume his flight while Gibson's traffic stop was still ongoing. (MSJ Ex. 1 at 49:13-51:16; MSJ. Ex. 2 at 15:25-17:2, 46:3-10.) Because it is not disputed that Obregon fled after being stopped during a lawful traffic stop in violation of A.R.S. § 28-622.01, the presumption of reasonableness in A.R.S. § 12-716 applies.

Independently, pointing a loaded handgun at a peace officer is aggravated assault, a 2 felony. A.R.S. § 13-1204. Plaintiffs say whether Obregon was armed and pointed a

---

[2] Plaintiffs are correct that the panel opinion in *Easley v. City of Riverside*, 890 F.3d 851 (9th Cir. 2018), cannot be cited as binding precedent. Upon rehearing, the *en banc* court issued an unpublished decision on procedural grounds reversing the trial court decision and "need not, and do not, reach the merits of any other issue," including qualified immunity. 765 F. App'x 282, 284 (9th Cir. 2019).

firearm at Gibson is "disputed" (Resp. at 10), but their police practices expert assumed that he did (Resp. Ex. 6 at OBREGON_000899), and their Response itself accepts that Gibson was justified in firing his first shot because Obregon pointed a gun. (Resp. at 9-10.) M.B. claims not to have seen a firearm, but she expressed no doubt that he was armed when she, while standing within sight of the firearm, said "so of course they're gonna shoot back, they have to." (MSJ Ex. 14 at 8:51.) No reasonable jury would find that Obregon was unarmed. Because the shooting was justified, A.R.S. § 13-413 bars the wrongful-death claim.

## IV. A 104-SECOND DELAY IN MEDICAL CARE IS NOT GROSS NEGLIGENCE.

Plaintiffs accept that Gibson's first shot was justified if Obregon was armed, but they contend that the later shots became unjustified at a point they cannot identify. But Plaintiffs parse the shots individually only when it is to their benefit. Asked which shot killed Obregon to determine if the justified shots were the cause of death, they answer that “the medical examiner attributed death to the multiple gunshot wounds collectively" treating the shots as one sequence for the claims under state law while asking the Court to grade each bullet separately for the Fourth Amendment. (Resp. at 10, citing Resp. Ex. 5 at DEFS_Obregon 000091) That inconsistency undermines their medical-aid claim.

Additionally, Plaintiffs' own timeline, taken from the Ring video, runs from 3:16 to 5:00, one minute and forty-four seconds. (Resp. at 11.) In that time, Gibson can be observed on video backing away from a man lying within reach of a loaded handgun, using his radio to report the event, retrieving his trauma kit, and approaching Obregon to render aid. (MSJ Ex. 8 at 9. Gibson’s efforts to render aid were observed by neighbor Chapman, who assisted by holding a flashlight for Gibson while he assessed and treated Obregon’s wounds until additional emergency responders arrived. Plaintiffs respond by citing Chapman's estimate that four or five minutes passed between the shooting and when Gibson began rendering aid, along with his qualification that "I don't remember times very well, the length of them." (Resp. Ex. 13 at 24:11-22.) A witness's admittedly uncertain estimate cannot be credited over a time-stamped recording of the event. *Scott v. Harris*, 550 U.S. at 380. Even in the

light most favorable to the plaintiff, an officer who spent just 104 seconds ensuring his own safety and acquiring first aid equipment is not grossly negligent, especially when he spent part of that time radioing other emergency responders to come and assist him.

Causation fails independently. Plaintiffs concede they have no medical expert and call that "an issue for trial." (Resp. at 12.) Plaintiffs bear the burden on causation, and Arizona law requires expert medical testimony to establish it "[u]nless a causal relationship is readily apparent to the trier of fact." *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 224 Ariz. 414, 419 ¶ 16 (Ariz. Ct. App. 2010) (quoting *Gregg v. Nat'l Med. Health Care Servs., Inc.*, 145 Ariz. 51, 54 (Ariz. Ct. App. 1985)). It is undisputed that Gibson provided first aid, and Plaintiffs only argue that he was slow to provide it. Whether chest seals applied one minute earlier would have changed the outcome for a man whose descending aorta, esophagus, and both lungs had been perforated is not readily apparent to anyone. (Resp. Ex. 5 at DEFS_Obregon 000093.) The noises overheard by MB that Plaintiffs cite to suggest that Obregon was alive for some time does no such thing without a medical expert to opine if the sound were a sign of conscious breathing, or simply air escaping from his lungs or a function of the CPR that officers were performing. (Resp. at 12). Plaintiffs have provided no medical evidence other than conjecture indicating whether earlier aid would have changed the outcome. A lost-chance theory requires "proof of increase in the risk of harm," as a result of the inaction. *Thompson v. Sun City Cmty. Hosp., Inc.*, 141 Ariz. 597, 607–08 (1984). Instead, Plaintiffs ask the jury to simply assume that *any* delay in providing medical aid, however slight, would automatically result in a changed outcome and be grossly negligent. Evidence of gross negligence "must be more than slight and may not border on conjecture." *Walls v. Ariz. Dep't of Pub. Safety*, 170 Ariz. 591, 595 (Ariz. Ct. App. 1991).

## V. <u>GIBSON DID NOT ORDER M.B. TO STAND NEAR THE BODY</u>

Plaintiffs call M.B.'s recantation a correction of "a single point." (Resp. at 12.) The single point represents the entirety of their evidence for IIED. The IIED claim this Court allowed to proceed when ruling on the motion to dismiss was that Gibson "ordered MB to stand next to Micheal and not leave the scene for any reason" and forced her to watch him

die. (Doc. 48 at 2, 6-7 & n.7.) M.B. has now testified that Gibson never told her she could not move and that "Gibson was just on the scene." (Resp. Ex. 4 at 75:12-76:18.) Plaintiffs' substitute theory, that Gibson "helped create" a perimeter that Casa Grande officers enforced (Resp. at 13-14), fails twice over. First, is not the claim pleaded, and "summary judgment is not a procedural second chance to flesh out inadequate pleadings." *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006); *Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) (en banc).

Second, Plaintiffs' own motion asserts facts that undermine their new theory. By their account, Gibson "instructed [Officer Fox] to keep two individuals east of the shooting away from the scene," then erected the crime scene tape, which was "intended to keep M.B. from approaching," while M.B. "walked a short distance down the road with Obregon's brother and his wife **and then returned**." (Resp. at 13.) Plaintiffs describe Gibson attempting to keep people away from the body, and M.B., who had walked away with two adults who were free to leave, chose to come back instead of leaving the scene with them. Hafkey's own summary of the footage ends with an officer explaining, "We wouldn't let her **go in** – she's just mad." (Resp. Ex. 6 at OBREGON_000914.) The officer was not referring to letting her leave the scene, but specifically to **go in** her yard and her house.

On this point, the Plaintiffs' account agrees with the available footage. On Officer Fox's camera, M.B. leads Obregon's brother and his wife east down the road, and no officer follows her. Officer Fox asks if M.B. and the bystanders need to stay at the scene, and neither Gibson nor any other officer stops their first aid efforts to reply. (MSJ Ex. 12, Fox BWC at 1:49-2:27.) On Sergeant Rush's camera she returns alone and unescorted, and multiple officers hold up their hands and tell her not to come any closer to the body and the crime scene tape. She instead approaches the crime scene tape anyway, with no officer telling her to do so and the open road behind her. (MSJ Ex. 14, Rush BWC at 2:00-5:55.) Her own words explaining the situation to a family member, caught on Rush's camera, describe what she wanted: "can I go back into my yard, like I don't have to go through the gate, like I will go that way. Mind you they let me pass him four times, let me walk in this

gate four times right before. So I said can I go in my gate . . . and he's like 'absolutely not, you have to stay over here[3], this is a crime scene.' . . . So I'm like hurry up then. Make it available so I can walk through." (*Id.* at 19:16.) She wanted to walk **past the body**, through the crime scene, to her yard, something she had done four times before of her own volition before the scene tape was in place and with no coercion by law enforcement.

Plaintiffs also cite Meagan Brady's testimony that a PCSO deputy named Sloup told her at the tape that "they were going to keep" M.B. because she was a possible witness. (Resp. at 12, citing Resp. Ex. 12 at 35:2-36:23.) What Sloup said to Meagan is irrelevant to the elements of this claim. The accusation in the Complaint is that Gibson detained M.B. next to the body, not that PCSO enforced an exclusionary perimeter around the body or wanted to speak with her as a witness. Whatever Sloup said, it is undisputed that Gibson never told M.B. that she had to stand next to the body or that she could not leave, and there is no evidence that Gibson directed Sloup or anyone else to do so. (Resp. Ex. 4 at 75:12-76:5.)

Finally, IIED is an intentional tort. M.B. told Sergeant Rush that she did not know the decedent and had not witnessed the shooting, and she explained at her deposition that she "wasn't going to tell the police anything about anything." (MSJ Ex. 14, Rush BWC at 7:00-8:45; Resp. Ex. 4 at 50:9-22.) M.B. argues that she suffered emotional distress because of her association with Obregon and the trauma of witnessing the shooting, but M.B. deliberately concealed that information from law enforcement while at the scene, so Gibson had no knowledge that she was uniquely susceptible to the sight of Obregon's body and could have had no intent to expose her to it with the intent to cause harm. Keeping an agitated bystander back from a shooting scene is not conduct "beyond all possible bounds of decency," *Ford v. Revlon, Inc.*, 153 Ariz. 38, 43 (1987), and there is no light in which Plaintiffs' own admissions become favorable to them. *Scott*, 550 U.S. at 380.

---

[3] Plaintiffs may argue that she was told to "stay over here" was M.B. being forced to stand next to the body, but in context, "over here" was referring to the opposite side of the crime scene tape from where she wanted to go. No officer told her to stand as close as possible to the crime scene tape.

## VI. THE SHERIFF'S DERIVATIVE LIABILITY AND PUNITIVE DAMAGES FALL WITH THE UNDERLYING CLAIMS.

In their Response, Plaintiffs state that "Sheriff Lamb's[4] vicarious liability rises or falls with Gibson's." (Resp. at 10). Plaintiffs are right about the relationship. Because the claims against Gibson fail, the Sheriff's derivative liability fails with them. The Sheriff is entitled to judgment on Count V for the reasons stated in the motion, which is that M.B. has no claim against Gibson.

Plaintiffs' punitive damages arguments are similarly derivative. They rest on the alleged taunt and on the theory that Gibson fired at a disarmed man (Resp. at 15-16), and for the reasons stated above, no reasonable jury would credit evidence that is contradicted by scene video. They also assert state law punitive damages are available in the alternative, despite conceding that A.R.S. § 12-820.04 bars punitive damages under state law for conduct within the scope of employment- and, in their own words, "the First Amended Complaint alleges that Gibson acted within the scope of his employment" (Resp. at 15.)

## VII. CONCLUSION

No reasonable jury could believe the evidence Plaintiffs offer to create a dispute, and Defendants are entitled to summary judgment on all claims.

DATED this 2nd day of October, 2026.

WIENEKE LAW GROUP, PLC

By: */s/ Laura Van Buren*

Kathleen L. Wieneke
Laura Van Buren
1225 West Washington Street, Suite 313
Tempe, Arizona 85288
*Attorneys for Defendants Teeple and Gibson*

[4] Defendant Lamb has now been substituted for Sherriff Teeples.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 2, 2026, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
*Attorneys for Plaintiffs*

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is NOT a registered participant of the CM/ECF System:

N/A

By: */s/ Lauren Rasmussen*