**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Allison Obregon, et al.,

Plaintiffs,

v.

Brady Gibson, et al.,

Defendants.

No. CV-24-01510-PHX-KML

**ORDER**

Pinal County Deputy Sheriff Brady Gibson shot and killed Micheal Obregon during a traffic stop. Allison Obregon, Micheal's widow, asserts claims for excessive force, wrongful death, and gross negligence against Gibson and his employer, the Pinal County Sheriff. Megan Brady asserts a claim for intentional infliction of emotional distress ("IIED") on behalf of her minor child, MB, who was at the shooting scene. Defendants moved to exclude plaintiffs' expert, Mark Hafkey (Doc. 108), and for summary judgment (Doc. 110). The motion for summary judgment is granted and defendants' *Daubert* motion is denied as moot.

## I. Background

In March 2023, Gibson pulled Micheal over for a traffic violation. (Docs. 110-2 at 7–8; 123 at 76.) Gibson exited his vehicle and Micheal got off his motorcycle. (Doc. 110-2 at 8.) After speaking briefly, Micheal ran away from Gibson, but he tripped and fell. (Doc. 110-2 at 12.) Gibson tried to handcuff Micheal, who was then lying on the ground on his stomach. (Doc. 110-2 at 13–14, 17.) Gibson saw Micheal produce a gun from under

his body with his finger in the trigger well.[1] (Doc. 110-2 at 34.)

The parties dispute what happened next. Defendants allege the following: Gibson told Micheal to drop the gun, radioed for backup, and began backpedaling while firing his own gun at Micheal. (Doc. 110-2 at 27, 33.) As Gibson was backpedaling, Micheal "rolled toward [Gibson]'s new position, looked for him, and again pointed the handgun in his direction." (Doc. 110-2 at 15–16, 34.) Gibson remembers firing seven or eight shots rapidly as he backpedaled and says he stopped firing "the instant he saw [Micheal] drop the gun." (Doc. 110 at 14, 25–26.) A later report concluded that Gibson had fired ten shots total, seven of which struck Micheal. (Docs. 110-2 at 129; 123 at 72.) About a minute and 40 seconds after the last shot was fired, Gibson began rendering medical aid to Micheal. (Doc. 110-2 at 113–14.) Between the shooting and rendering aid, Gibson claims he took time to radio for help and secure Micheal's weapon and the crime scene consistent with generally-accepted practices and policy. (Doc. 110-2 at 15, 114–15.)

Defendants allege MB, who lived nearby, came onto the scene after the shooting. (Doc. 110-2 at 258–59.) She told Gibson to get off her property while he was rendering aid. (Doc. 110-2 at 44.) Body camera footage from Casa Grande Police Officers who had arrived at the scene show MB leading Micheal's family members away from Micheal while Gibson delivered aid, and no officer stopped or followed her. (Defs.' Ex. 12 at 2:13.) When she returned, she was told by another officer to "stay back" behind caution tape. (Defs.' Ex. 12 at 3:22–3:35.) MB repeatedly asked to be allowed to cross the caution tape and her yard so that she could go home, but officers refused to let her pass through the crime scene. (Defs.' Ex. 13 at 24:22–30:00.) Gibson says he never ordered her or told anyone to order her to remain at the scene or to stand by Micheal's body. (Doc. 110-2 at 23, 32.) An hour later, a deputy escorted MB to her mother. (Defs.' Ex. 12 at 1:07:30.)

Plaintiffs paint a different picture. Rewinding back to when Micheal initially pointed a gun at Gibson, plaintiffs and several witnesses claim there was a pause between

---

[1] Plaintiffs' First Amended Complaint alleged that Micheal did not trip and never pulled a gun on Gibson. (Doc. 30 at 4.) In their response to defendants' motion for summary judgment, however, plaintiffs assumed that Micheal tripped. (Doc. 123 at 1.) Their subsequent arguments also assume that he pointed a gun at Gibson. (Doc. 123 at 1–2.)

two sets of gunshots. (Doc. 123 at 40–41, 43–44, 47–48.) Plaintiffs' police practices expert, Mark Hafkey, opined that although Micheal may have presented a threat initially, Micheal may have dropped the gun during the pause after Gibson's first shot or set of shots, no longer posing a threat by the time Gibson allegedly fired a second volley.[2] (Doc. 123 at 79–80.) Witnesses also reported they heard Gibson say something to the effect of "put the gun down" either before or after they heard shots. (Doc. 123 at 39, 44, 46, 108–110, 121.) Others claimed they heard Gibson shout "I bet you're scared of me now" between the two sets of shots. (Doc. 123 at 126, 128.)

According to plaintiffs, MB emerged from her house after the shooting and Gibson stared at her for 15 to 30 seconds without moving until she repeatedly told him to help Micheal. (Doc. 123 at 58–60.) Plaintiffs otherwise agree with defendants that Gibson did not render medical aid to Micheal until a minute and 40 seconds after the shooting. (Doc. 123 at 11.)

As Gibson rendered aid, MB alleges she felt she could not leave and had to remain near Micheal's body. She testified in her deposition that an officer (not Gibson) told her she would be "arrested if she moved." (Doc. 123 at 68–69.) MB claims she was forced to watch as Micheal bled and "gurgl[ed] blood" until eventually dying, and that she had to "stare at Micheal's dead body for hours." (Doc. 30 at 5.) As a result, MB said she was diagnosed with post-traumatic stress disorder, experienced depression, nightmares, and migraines, and attempted suicide. (Doc. 123 at 14, 50–51, 64–67.)

On behalf of Micheal, Obregon brings an excessive-force claim against Gibson. (Doc. 30 at 9–10.) She also brings a wrongful-death claim based on gross negligence against Gibson and—through vicarious liability—his employer, the Pinal County Sheriff. (Doc. 30 at 8–12.) MB's mother Brady brings an IIED claim on MB's behalf against Gibson and the Sheriff, also on a theory of vicarious liability. (Doc. 30 at 13.) Mark Lamb was the Sheriff when plaintiffs filed this lawsuit, but he has since been substituted for the new Sheriff, Ross Teeple, under Fed. R. Civ. P. 25(d).

[2] The court assumes for purposes of this order that Hafkey's opinions are admissible, so the motion to exclude them is denied as moot.

## II. Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant bears the burden of presenting the basis for the motion and identifying evidence it believes demonstrates the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. A genuine dispute exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255. But a non-movant cannot rest on mere allegations or denials and must instead show there is "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## III. Analysis

### A. Excessive Force

Allison Obregon asserts a Fourth Amendment excessive-force claim against Gibson. Gibson says he is entitled to qualified immunity, so for such a claim to proceed, the allegations must show that (1) Gibson's conduct violated a constitutional right that was (2) "clearly established." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (simplified). Although Obregon has established a genuine dispute of material fact as to whether Gibson used excessive force, it was not clearly established that his conduct violated the Constitution at the time of the shooting.

#### 1. Constitutional Violation

A claim that law enforcement officers used excessive force in the course of an arrest is analyzed under the Fourth Amendment's "reasonableness" standard. *Graham v. Connor*,

490 U.S. 386, 395 (1989). This inquiry requires a "careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests." *Id.* (simplified). To determine whether a Fourth Amendment violation has occurred, the court conducts a three-step analysis evaluating (1) the nature of force inflicted; (2) the governmental interests at stake, which involves assessing factors such as the severity of the crime, the threat posed by the suspect, and whether the suspect is resisting arrest (the "*Graham* factors"); and (3) whether the force used was necessary. *Espinosa v. City & Cnty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010). "These factors, however, are not exclusive. Rather, [a court must] examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (simplified). "Other relevant factors include the availability of less intrusive force, whether proper warnings were given, and whether it should have been apparent to the officers that the subject of the force used was mentally disturbed." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1033-34 (9th Cir. 2018). "Ultimately, [a court] must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances." *Espinosa*, 598 F.3d at 537 (simplified).

"The reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This is because "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

"When an individual points his gun in the officers' direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quoting *Long v. City & Cnty. of Honolulu*, 511 F.3d 901, 906 (9th Cir. 2007) (simplified). So if Micheal did produce a gun during his arrest with his

finger in the trigger well, Gibson acted reasonably by responding with an initial volley of shots. (Doc. 110-2 at 14.) Obregon's brief does not dispute this (Doc. 123 at 1–2), nor seriously challenge Gibson's evidence that Micheal reached for or pointed a gun at him (Doc. 110 at 3–5).[3] Without evidence or argument on this point, no reasonable jury could find that Gibson violated the Constitution when he initially shot Micheal.

That does not resolve the claim, however, because the Fourth Amendment inquiry is not frozen at the first use of force. When circumstances change during the course of an arrest, officers may have to reassess whether force remains justified. *See Zion v. Cnty. of Orange*, 874 F.3d 1072, 1076 (9th Cir. 2017). One plainly salient change in circumstances is when an individual stops being a threat to the officer. "If a suspect is on the ground and appears wounded, he may no longer pose a threat; a reasonable officer would reassess the situation rather than continue shooting." *Id.* Employing deadly force after the threat has abated is generally not objectively reasonable.

Here, a jury could conclude that in between shots, Gibson should have realized Micheal no longer presented any threat. Obregon points to witnesses who said there was a "pause" between two distinct sets of shots. (Doc. 123 at 45–48, 126.) Some witnesses stated they heard Gibson say "I bet you're scared of me now" between those sets. (Doc. 123 at 126, 128.) According to Obregon, Micheal may have dropped his firearm before the second volley, giving Gibson time to conclude Micheal no longer posed a threat (Doc. 123 at 5–7). *Est. of Hernandez by and through Hernandez v. City of Los Angeles*, 139 F.4th 790, 797 (9th Cir. 2025) (en banc) (officer violated Fourth Amendment by firing unjustified gunshots 1.4 seconds after justified ones), *cert. denied*, No. 25-538 (U.S. June 22, 2026). Expert witness Hafkey explains the positioning of gun after the shooting suggests the gun "fell to the ground following the first frontal shot," meaning "[Micheal] would no longer have been an imminent threat" to Gibson after that. (Doc. 123 at 5, 79.) And although

[3] Obregon comes closest when flagging how witness Brandon Chapman "never saw Micheal pull out a gun or threaten the deputy." (Doc. 123 at 3 (citing Doc. 110-2 at 47, 49).) But Chapman also stated he was "look[ing] away" when Micheal first ran and tripped, and he did not seem to have a view of the situation again until after Gibson opened fire. (Doc. 110-2 at 43.) Chapman's testimony therefore fails to raise any genuine dispute of material fact as to whether Micheal posed a threat to Gibson with his gun.

Gibson "moved the gun a short distance farther away" after the shooting (Doc. 126 at 4 (citing Doc. 123 at 79)), Hafkey's opinion on the positioning of the gun is based not only on crime scene investigation photos, but also on Gibson's deposition and position relative to Micheal (Doc. 123 at 79).

Gibson's reply argues the Ring camera footage conclusively proves there was no pause between shots during which he could assess Micheal's threat level. (Doc. 126 at 2, 4–5.) Yet the footage is anything but clear. Using the timestamps from the footage, Gibson disappears behind his vehicle at 6:36:08. He reappears around three seconds later at about 6:36:11, quickly backpedaling while shooting. He appears to fire his last shot at around 6:36:13. It is difficult to say how many times Gibson fired during the roughly two seconds he was visible, but he does not appear to fire all ten shots in that span. A jury could reasonably infer that at least some shots were fired while obscured from view. And consistent with several witnesses' testimony, a jury could infer that there was a gap between an initial round of shots and subsequent shots. Given this dispute in material fact, Obregon has sufficiently shown that a reasonable jury could find Micheal ceased posing a threat after an initial round of shots and Gibson's use of force afterwards violated the Constitution.

**2. "Clearly Established"**

Having shown that a jury could reasonably find Gibson violated Micheal's Fourth Amendment rights, to overcome qualified immunity, Obregon must now show that those rights were clearly established. They were not.

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Kisela*, 584 U.S. at 104 (simplified omitted). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (simplified). Although there need not be a case directly on point for a right to be clearly established, "existing precedent must have placed the statutory or

constitutional question beyond debate." *Id.* (simplified). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law [and the court must not] define clearly established law at a high level of generality." *Id.* (simplified).

To show Micheal's rights were clearly established, Obregon points to *Zion v. Cnty. of Orange*, 874 F.3d 1072, arguing that case made clear that continued deadly force "against a suspect who has been brought to the ground" and "who no longer poses a threat" violates long-settled Fourth Amendment law. (Doc. 123 at 7–8.) There, a knife-wielding plaintiff was shot by an officer while fleeing. *Id.* at 1075. Plaintiff fell to the ground, and six seconds after his initial set of shots, the officer shot plaintiff again nine more times. *Id.* The court found that the officer's second volley of shots could have violated clearly-established law because plaintiff might not have posed any threat after the initial shots. *Id.* at 1076. Although the officer claimed the plaintiff was still a threat because he tried to get up, that was a disputed fact for a jury to resolve. *Id.* And even though the officer was unsure if plaintiff was bluffing or only temporarily subdued, the Fourth Amendment clearly required him to hold his fire "unless and until [plaintiff] showed signs of danger or flight." *Id.*

Although *Zion* also involved an officer shooting a suspect on the ground in two separate volleys, "clearly established law" must be "particularized to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017). Drifting from the factual context in defining what is clearly established is especially dubious in excessive-force cases where it can be difficult to determine how the doctrine "will apply to the factual situation the officer confronts." *Est. of Lopez by and through Lopez v. Gelhaus*, 871 F.3d 998, 1017 (9th Cir. 2017) (simplified).

This case is obviously different from *Zion* in at least one glaring respect: the suspect in *Zion* possessed a kitchen knife, whereas Micheal had a gun. *See Zion*, 874 F.3d at 1075. *Zion* recognized the significance of the distinction, pointing out how a reasonable officer would reassess threat levels "particularly [] when the suspect wields a knife rather than a

firearm."[4] *Id.* The type of weapon can dramatically alter the threat a suspect poses to an officer at any given moment. A formerly-knife-wielding suspect on the ground may not be an immediate threat when more than an arm's length away. To attack, the suspect would have to get up or otherwise move towards the officer first, giving the officer adequate time to reassess the need for deadly force and to react if that need arose. But suspects with firearms can point and shoot at the officer from the ground in milliseconds. Because Micheal had a gun, Gibson had significantly less time to safely reassess and respond to any potential renewed threat than if Micheal had a knife. Even assuming the truth of expert witness Hafkey's statement—that Micheal stopped posing a threat after the gun "fell to the ground following the first frontal shot" (Doc. 123 at 5, 79)—*Zion* did not clearly establish that this specific scenario imposed on Gibson an obligation to reassess. It was therefore not clearly established that Gibson acted unreasonably, even under plaintiff's version of events. *Zion* does not place the constitutional question "beyond debate" here. *Kisela*, 584 U.S. at 104.

Several years after the shooting, the Ninth Circuit decided *Estate of Hernandez by and through Hernandez v. City of Los Angeles*, 139 F.4th 790, which plaintiffs frame as "reaffirm[ing]" *Zion's* clearly-established law (Doc. 123 at 8). But plaintiffs cannot rely on post-incident cases. *Kisela*, 584 U.S. at 107; *Brosseau v. Haugen*, 543 U.S. 194, 200 n.4 (2004) (per curiam). Any law established based on the facts of *Hernandez* could not have been clear to Gibson back in 2023.[5]

---

[4] *Zion* should not be read to pertain *only* to situations involving a knife-wielding suspect. The panel's use of the word "particularly" implied there must be at least some situations involving grounded gun-wielding suspects where it is "clearly established" officers would have a duty to reassess. *Id.* at 1076.

[5] To the extent plaintiffs cite *Hernandez* for its gloss on what *Zion* had clearly established at the time of the shooting, the Supreme Court has repeatedly criticized that interpretive method. *Kisela*, 584 U.S. at 107 (criticizing lower court's citation of post-incident cases to characterize pre-incident clearly-established law); *City of Tahlequah v. Bond*, 595 U.S. 9, 13 (2021) (per curiam) (same). These rebukes make sense because officers do not have notice of new principles of law—the entire point of the "clearly-established" prong—when, for example, a new case "established" law at a higher level of generality than the "particularized" facts of the pre-incident cases. *White*, 580 U.S. at 79; *Kisela*, 584 U.S. at 104. Plaintiffs' response illustrates that danger, selectively omitting quotes from *Hernandez* mentioning *Zion's* qualifying language about knives and firearms. (*See* Doc. 123 at 8.) Gibson did not have notice of the Ninth Circuit's future interpretation of what *Zion* had clearly established.

Gibson is therefore entitled to qualified immunity, and summary judgment on Obregon's excessive-force claim is granted.

### B. Wrongful Death and Gross Negligence

To show gross negligence, Obregon must prove: (1) Gibson owed Micheal a duty to conform to a certain standard of care; (2) he breached that duty; (3) causation; (4) damages; and (5) gross, willful, or wanton conduct. *Noriega v. Town of Miami*, 407 P.3d 92, 98 (Ariz. Ct. App. 2017). That final element differentiates gross negligence from ordinary negligence. "Gross negligence requires a level of disregard beyond ordinary inattention but less than conscious indifference." *Garibay v. Johnson in and for Cnty. of Pima*, 565 P.3d 236, 246 (Ariz. 2025). Ordinarily, gross negligence is a question of fact for the jury, but the evidence must be "more than slight and may not border on conjecture." *DeElena v. S. Pacific Co.*, 592 P.2d 759, 765 (Ariz. 1979).

Obregon's wrongful-death claim alleges Gibson was grossly negligent in two ways: by (1) failing to use non-lethal force and (2) delaying medical aid to Micheal. Summary judgment is granted on both theories.

#### 1. Failure to Use Non-Lethal Force

In Arizona, the "negligent use of intentionally inflicted force" or the "negligent evaluation of whether to intentionally use force" are not cognizable claims. *Liberti v. City of Scottsdale*, 816 F. App'x. 89, 90 (9th Cir. 2020) (quoting *Ryan v. Napier*, 425 P.3d 230, 236 (Ariz. 2018)) (simplified); *Cutler v. Nanos*, 546 F. Supp. 3d 856, 882 (D. Ariz. 2021). Negligence claims "must be based on conduct independent of the intentional use of force." *Ryan*, 425 P.3d at 233. Summary judgment is therefore granted on Obregon's wrongful-death claim against Gibson insofar as it is based on the purported gross negligence of Gibson's use of, or decision to use, deadly force. Summary judgment is also granted on the same claim against Teeple. *Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 528 P.3d 139, 150 (Ariz. 2023) ("Dismissing a tort claim against an employee because the claim lacks merit requires the court to also dismiss a claim against an employer under the doctrine of respondeat superior.").

**2. Delay in Rendering Medical Aid**

Obregon's claim based on delaying medical care likewise fails because she does not raise sufficient evidence of causation. Plaintiffs "cannot leave causation to the jury's speculation." *Salica v. Tucson Heart Hosp.-Carondelet, L.L.C.*, 231 P.3d 946, 951 (Ariz. Ct. App. 2010). Obregon's only evidence that the delay in care caused Micheal's death is that Gibson and MB heard him gurgling after he was shot. (Doc. 123 at 12.) Obregon concludes a "jury may reasonably infer that a gunshot victim who remains alive loses some chance of survival while an officer delays emergency care." (Doc. 123 at 12.) But she provides no evidence of any kind that Micheal could have lived if Gibson acted quicker. Obregon's argument is mere speculation, especially given the severity of Micheal's injuries. (*See* Doc. 123 at 72 (Micheal sustained seven gunshot wounds with damage to his lung, aorta, and esophagus).) The delay in aid was, at most, only a minute and 44 seconds after the shooting occurred. (*See* Docs. 123 at 12; 126 at 8.) Absent any evidence—not conjecture—earlier aid would have made a difference, a reasonable jury could not find for Obregon on this claim. Summary judgment is therefore granted as to Obregon's wrongful-death claims against Gibson and Teeple. *See Laurence*, 528 P.3d at 150.

**C. IIED**

To succeed on her IIED claim, Brady must show (1) extreme and outrageous conduct; (2) Gibson intended to cause emotional distress or recklessly disregarded the near certainty that distress would result; and (3) the causal link between Gibson's conduct and the severe emotional distress. *McKee v. State*, 388 P.3d 14, 20 (Ariz. Ct. App. 2016) (simplified). Extreme and outrageous conduct is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Cluff v. Farmers Ins. Exch.*, 460 P.2d 666, 668 (Ariz. Ct. App. 1969) (citation omitted), *overruled on other grounds by Godbehere v. Phx. Newspapers, Inc.*, 783 P.2d 781 (Ariz. Ct. App. 1989). Such conduct "must completely violate human dignity" and "strike to the very core of one's being, threatening to shatter the frame upon which one's emotional fabric is hung." *Pankratz v.*

*Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987) (citation omitted). It does not include "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Duhammel v. Star*, 653 P.2d 15, 18 (Ariz. Ct. App. 1982) (citation omitted), *overruled on other grounds by Godbehere*, 783 P.2d 781.

No reasonable jury could find Gibson's conduct with respect to MB "extreme" and "outrageous." Although Brady claims MB was forced to stay by Micheal's body, body camera footage shows MB was *not* being held against her will and should have known she was free to leave. *See Denk v. Miller*, No. 23-2675, 2025 WL 830446, at *1 (9th Cir. Mar. 17, 2025) (crediting facts shown in video over contradictory assertions by nonmoving party at summary judgment) (citing *Scott v. Harris*, 550 U.S. 372, 380–81 (2007)). For example, MB claims in her deposition that a sheriff other than Gibson told her she would be arrested if she moved. (Doc. 123 at 61, 75.) Yet Officer Reed's body camera footage tells a slightly different story. MB repeatedly demanded to be let into her yard so she could return to her house, so an officer stated: "if you cross that line [the crime scene tape] you'll go to jail." (Defs.' Ex. 13 at 19:31:53.) When MB responded by suggesting she could hop a fence to go home (which would still cross the crime scene), the officer then said: "if you try to do anything, you're going to jail." (Defs.' Ex. 13 at 19:32:05; *see also* Defs.' Ex. 13 at 19:32:33 (officer telling MB that if she continued to argue with officers, he would "remove [her] from being in this area").)

In context, no reasonable jury would conclude from this exchange that MB believed she must stay *in that exact spot*. The officer was only preventing her from crossing the crime-scene tape or fence into the area where Micheal's body lay. There is no footage of MB being prevented from going elsewhere, and no footage of officers making it clear that she could not leave at all. (Defs.' Ex. 12–14.) To the contrary, immediately after the shooting, MB walked with Micheal's family members away from his body and down the street, and no officer stopped or appeared to follow her. (Defs.' Ex. 12 at 19:07:36; Doc. 123 at 55.)

The closest thing resembling an order not to leave was when Officer Fox told MB

to "stay back there" as she approached the crime scene. (Defs.' Ex. 12 at 19:08:53.) But again, in context, no reasonable jury could interpret that as an order to remain in that exact spot. Officer Fox was simply ensuring she did not enter the crime scene as officers were administering medical aid to Micheal.

Beyond those remarks—which Gibson did not make—Brady offers no further evidence that Gibson's behavior was "extreme" and "outrageous." A jury could not find it "atrocious and utterly intolerable in a civilized community" to prevent MB from stepping onto a crime scene, and Brady does not provide any indication the officers told MB she could not otherwise leave or move further away from Micheal's body. *Cluff*, 460 P.2d at 668 (citation omitted).

Even if the officers' actions could raise a jury question as to the atrociousness of the conduct, MB does not show that those actions were "conduct *by the defendant*," Gibson. *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). The body camera footage never shows Gibson himself ordering MB to stay put or threatening to arrest her if she moved, and MB testified that it was not "him directly" that kept her near Micheal. (Doc. 123 at 75.) Brady argues that the actions of the other Casa Grande officers at the scene are attributable to Gibson because those officers were called in as an "Agency Assist" for him. (Doc. 123 at 13–14.) But there is no evidence Gibson specifically directed officers to keep MB at the scene or near Micheal's body so as to reflect his own intent to cause severe emotional distress or reckless disregard for the near certainty that it would result. *Id.* Summary judgment is therefore granted on Brady's IIED claim against Gibson and Teeple. *See Laurence*, 528 P.3d at 150.

### D. Punitive Damages

Because summary judgment is granted against all of plaintiffs' claims, they are not entitled to punitive damages.

## IV. Conclusion

Obregon cannot overcome qualified immunity as to her excessive-force claim against Gibson, and no reasonable jury could rule in plaintiffs' favor on the wrongful death,

gross negligence, and IIED claims.

Accordingly,

**IT IS ORDERED** the Motion for Summary Judgment (Doc. 110) is **GRANTED.**

**IT IS FURTHER ORDERED** defendants' *Daubert* Motion Regarding Plaintiffs' Police Procedures Expert Mark Hafkey (Doc. 108) is **DENIED AS MOOT**. The Clerk of Court is directed to enter judgment in favor of defendants and close this case.

Dated this 17th day of November, 2026.

**Honorable Krissa M. Lanham**
**United States District Judge**